**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| THOMAS REMICK, NADIYAH WALKER, JAY DIAZ, MICHAEL ALEJANDRO, MICHAEL DANTZLER, ROBERT HINTON, JOSEPH WEISS, JOSEPH SKINNER, SADDAM ABDULLAH, and JAMES BETHEA, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs-Petitioners,<br><br>          v.<br><br>CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,<br><br>      Defendants-Respondents. | Case No.<br><br><br><br><br>ELECTRONICALLY FILED<br><br><br>IMMEDIATE RELIEF SOUGHT |

**CLASS ACTION COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF AND PETITION FOR WRITS OF HABEAS CORPUS**

**INTRODUCTION**

1.     Plaintiffs-Petitioners ("Plaintiffs") are ten individuals held at the Philadelphia Department of Prisons ("PDP") who, as a result of the policies, practices, and actions adopted and undertaken by Defendants-Respondents ("Defendants"), are at significant risk of contracting COVID-19 (also known as the Coronavirus) and suffering from severe disease and possible death. The current conditions of confinement at PDP's facilities create a heightened and unreasonable risk of COVID-19 for any confined person, and a substantial risk of severe illness or death for those who are elderly and/or medically vulnerable to COVID-19.  The named Plaintiffs, on their own behalf and on behalf of all others similarly situated, seek immediate changes in the conditions

of their confinement to protect them from this clear and present danger of disease and death, and to ensure humane living conditions, as required by the United States Constitution.  Plaintiffs seek injunctive relief that would require, among other things, Defendants to comply with recognized public health and safety measures, as adopted by the Centers for Disease Control and Prevention ("CDC"), to prevent the spread of the virus for those confined at jails and prisons.

2.      Absent the implementation of and strict adherence to emergency measures that comply with these recommended public health and safety measures, Plaintiffs seek the release of individuals 55 and older and those with medical conditions that place them at heightened risk of severe illness or death from COVID-19, as these individuals face heightened risks of life-threatening conditions, and their removal from PDP would facilitate the quarantine and social distancing measures recommended by the CDC and other public health officials.

3.      Prisons and jails have become epicenters of COVID-19 in cities throughout the country.  In the PDP, on April 16, the city reported that a cumulative total of 100 incarcerated people had tested positive for the virus.[1]  The next day, Philadelphia Commissioner of Public Health Dr. Thomas Farley reported an additional thirteen new cases within the PDP.[2]  By Sunday, April 19, the number of total reported cases rose to over 120.[3]  These numbers will continue to rise

---

[1] On Thursday, April 16, 2020, Philadelphia Managing Director Brian Abernathy provided this information during an April 16th, 2020 press conference.  *See* Philadelphia Department of Public Health, *Update on COVID-19 Coronavirus Response in Philadelphia*, Facebook (April 16, 2020), https://www.facebook.com/phillyhealth/videos/175556743555021 (Managing Director Abernathy noting that 100 incarcerated individual tested positive at approximately the 26 minute mark).

[2] *See* Philadelphia Department of Public Health, *Update on COVID-19 Coronavirus Response in Philadelphia,* Facebook (April 17, 2020), https://www.facebook.com/phillyhealth/videos/2975919772519206/ (Dr. Farley noting the increase at approximately the 12 minute mark).

[3] *See* Max Marin & Aaron Moselle, *'Scared for Their Lives': Inside the Coronavirus Outbreak in Philadelphia's Jails,* WHYY (April 19, 2020), https://whyy.org/articles/scared-for-their-lives-inside-the-coronavirus-outbreak-in-philadelphias-jails/.

exponentially.  The population within PDP is uniquely vulnerable to the spread of COVID-19 due to the congregate nature of jails, exacerbated by unnecessary crowding, inadequate sanitation, denial of hygiene products, and inadequate quarantine procedures.  The current conditions within PDP's facilities create an extreme risk for the rapid, uncontrollable spread of COVID-19 among the incarcerated population, correctional officers, health care workers, and beyond jail walls to the larger Philadelphia community.

4.     To comply with basic Constitutional guarantees against cruel and unusual punishment and due process of law, conditions must be substantially improved to adhere to CDC guidelines for social distancing and enhanced sanitation and hygiene practices.  Defendants must implement adequate quarantine and social distancing protocols; provide adequate hygiene supplies; ensure that sanitation practices conform to CDC standards; conduct recreation and meal service in a manner that allows for appropriate social distancing; and require the use of Personal Protective Equipment ("PPE") for staff and those incarcerated.

## I.        JURISDICTION AND VENUE

5.     Plaintiffs bring this putative class action pursuant to 22 U.S.C. § 2241, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), for relief from both detention and conditions of confinement that violate their Fourteenth Amendment and/or Eighth Amendment rights under the U.S. Constitution.

6.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. § 1343(a) (civil rights jurisdiction), and 28 U.S.C. § 1331 (federal question jurisdiction).

7.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Eastern District of Pennsylvania.

3

## II.     PARTIES

8.      Thomas Remick, Nadiyah Walker, Jay Diaz, Michael Alejandro, Michael Dantzler, Robert Hinton, Joseph Weiss, Joseph Skinner, Saddam Abdullah and James Bethea are all adult individuals currently incarcerated at a PDP facility and are at a heightened risk for more severe symptoms and potential death from COVID-19 due to their age and/or underlying medical conditions.  They sue for injunctive and declaratory relief on behalf of themselves and on behalf of those who currently are or will in the future be subject to these unconstitutional conditions of confinement within the PDP.

9.      Defendant City of Philadelphia is a political subdivision organized and existing under the laws of the Commonwealth of Pennsylvania.  The City of Philadelphia funds, controls, and operates the Philadelphia Department of Prisons.  The City of Philadelphia currently has immediate custody over Plaintiffs and all other putative class members.

10.     Defendant Blanche Carney is the Commissioner of PDP.  Defendant Carney currently has immediate custody over Plaintiffs and all other putative class members.  Defendant Carney is a policymaker for the City of Philadelphia, and she is sued in her official capacity.

11.     Defendant City of Philadelphia and Carney have at all relevant times acted under color of state law.

### III.        FACTUAL ALLEGATIONS

**A.     COVID-19 Poses a Significant Risk of Illness, Injury, and Death.**

12.     We are in the midst of the most significant pandemic in generations.  As of April 20, 2020, there were 32,284 confirmed cases of COVID-19 in Pennsylvania and 1,112 deaths.[4,5] In the City of Philadelphia, there have been 8,764 cases and 240 deaths as of April 20.[6]  These numbers likely underestimate the impact and spread of the virus, given the lack of testing.[7]

13.     The virus spreads from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[8]  There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection.[9]  Social distancing (deliberately keeping at least six feet of space between persons[10]) and a vigilant hygiene regimen, including washing hands frequently with soap and water, are the only known measures

---

[4] *See* Exhibit A, Expert Declaration of Dr. Joseph Amon, Ph.D. MSPH, ¶ 5 ("Amon Decl.").  Dr. Amon is an infectious disease epidemiologist, Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health with past experience as an epidemiologist in the Epidemic Intelligence Service of the U.S. Center for Disease Control and Prevention.

[5] COVID-19 Data for Pennsylvania, Philadelphia Department of Health (April 2020), https://cutt.ly/Tt1J66h.

[6] *Id.*

[7] *See* Exhibit B, Expert Declaration of Robert L. Cohen, M.D., ¶ 24(i) ("Cohen Decl.").  Dr. Cohen, an internist with more than 30 years of experience, is an expert in correctional health care and correctional health system management.  He has been appointed as a federal court monitor of healthcare delivery in jails and prisons around the country and for decades has provided expert consulting on conditions within the PDP.

[8] Amon Decl. ¶ 21; Cohen Decl. ¶ 11.

[9] Amon Decl. ¶ 6; Cohen Decl. ¶ 2.

[10] Amon Decl. ¶ 22-24; Cohen Decl. ¶ 21.

for protecting against transmission of COVID-19.[11]   Because the coronavirus spreads among people who do not show symptoms, *everyone* has to act as if *everyone* has the disease.[12]

14.   The older a person is, the greater their risk of serious illness or death from COVID-19.[13]   A February 29, 2020 preliminary report found that individuals age 50-59 had an overall mortality rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[14]

15.   People of any age are also at an elevated risk if they suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, or asthma.[15]   An early report from the World Health Organization ("WHO") estimated the mortality rate of 13.2% for COVID-19 patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[16]

---

[11] Amon Decl. ¶ 22-24; Cohen Decl. ¶ 9.

[12] Cohen Decl. ¶ 12.

[13] Amon Decl. ¶ 9 (observing that "those ≥54 years could be considered high risk for severe disease and death."); Cohen Decl. ¶ 36.

[14] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report).

[15] Amon Decl. ¶ 8; Cohen Decl. ¶ 43.

[16] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf

16.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.[17]  According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[18]  For people in the highest risk populations, the fatality rate of COVID-19 infection can be greater than 13 percent.[19]  Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurological damage, loss of digits, and loss of respiratory capacity.[20]

**B.     COVID-19 Poses an Increased Risk of Serious Harm or Death in Correctional Settings, Including the PDP.**

17.     People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of coronavirus infection and COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes.[21]  It is extremely difficult, and at times impossible, for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission of the disease.[22]

---

[17] *House Oversight and Reform Committee Hearing on Coronavirus Response, Day 1*, C-SPAN (March 11, 2020), https://www.c-span.org/video/?470224-1/dr-fauci-warns-congress-coronavirus-outbreak-worse.

[18] *How the Novel Coronavirus and the Flu are Alike...and Different*, NPR (March 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.

[19] Cohen Decl. ¶ 44.

[20] Y. Wu et al., *Nervous System Involvement After Infection with COVID-19 and Other Coronaviruses* (March 30, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7146689/.

[21] Amon Decl. ¶ 29; Cohen Decl. ¶ 5.

[22] *Id.*

18.     Correctional settings further increase the risk of contracting COVID-19 because of the concentration of people with chronic, often untreated, illnesses in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact surfaces, and no possibility of staying at a distance from others.[23]

19.     Incarcerated people are dying, including a recent death of an incarcerated person at the Riverside Correctional Facility ("RCF"), the women's prison within the PDP.[24]  At the Chicago Cook County Jail and at New York City Rikers Island, the transmission rates for COVID-19 are estimated to be the highest in the world.[25]

20.     Numerous public health experts, including Dr. Joseph Amon,[26] Dr. Robert L. Cohen,[27] Dr. Gregg Gonsalves,[28] Ross MacDonald,[29] Dr. Marc Stern,[30] Dr. Oluwadamilola T.

---

[23] Amon Decl. ¶¶ 28-29, 33-35, 38, 43, 45; Cohen Decl. ¶¶ 4-5, 36.

[24] Jeremy Roebuck, Laura McCrystal, Chris Palmer and Dylan Purcell, *Philly Reports First Inmate Death From Coronavirus In Its Jails*, Philadelphia Inquirer (April 14, 2020) https://www.inquirer.com/news/philly-jail-coronavirus-death-inmate-first-blanche-carney-20200414.html; *see also He Died In Prison From The Coronavirus — Three Days Before A Breakthrough In His 30-Year Fight To Clear His Name*, Philadelphia Inquirer (April 15, 2020), https://www.inquirer.com/news/sci-phoenix-coronavirus-death-rudolph-sutton-pennsylvania-innocence-project-20200415.html (detailing first death from COVID-19 in the Pennsylvania Department of Corrections).

[25] Amon Decl. ¶ 38; Cohen Decl. ¶ 17-18, 39.

[26] Amon Decl. ¶ 63.

[27] Cohen Decl. ¶ 4-6.

[28] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[29]Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[30] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

Oladeru and Adam Beckman,[31] Dr. Anne Spaulding,[32] Homer Venters,[33] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[34] and Josiah Rich[35] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the COVID-19 pandemic.

21.     Each day of the past week, between 1 and 13 new people have tested positive for the virus within PDP with greater than 120 cases reported within the facilities.[36]  On April 17, 2020, at the City's daily Update on COVID-19 Response in Philadelphia, Dr. Thomas Farley, Commissioner of Public Health, announced that there were 13 new cases in PDP in one day alone.[37]

22.     Two weeks ago, within PDP, the infection rate was more than double the rate of infection of the City as a whole.[38]

---

[31] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, (March 10, 2020), https://cutt.ly/QtRSYNA.

[32] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[33] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[34] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[35] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[36] *See supra* notes 1-2.

[37] *See supra* note 2.

[38] *See* The Defender Association of Philadelphia, *Covid-19 in Philly Jails*, https://www.philadefender.org/wp-content/uploads/2020/04/Jail-Infection-Jurisdictions-and-Zip_Landing-Page_4.8.20.pdf; Cohen Decl. ¶ 7.

23.     The higher rate of COVID-19 infections in the PDP exacerbates the disproportionate impact the virus has had on people of color, both nationally and in Philadelphia.[39] In Philadelphia, Black people make up 44 percent of the City's total population, yet as of February, over 69 percent of the incarcerated people in the PDP were Black, and almost 19 percent were Latinx, with racial minorities totaling over 88 percent of the incarcerated population.[40]

24.     Staff as well as incarcerated people are being infected with COVID-19.  Defendants have adopted a policy of not disclosing the number of correctional officers who have tested positive, but as of April 16, 2020, 43 officers self-reported positive tests.[41]

25.     Risk mitigation is the only viable strategy to combat the spread of COVID-19 and prevent serious harm or death to class members.[42]  This requires creating and implementing a comprehensive plan to address the spread of COVID-19 in PDP.  Given the current population numbers and the housing structures within PDP, risk mitigation also requires the release of individuals who are at high risk of severe disease if infected with COVID-19.[43]  Release of the medically vulnerable population protects them from transmission of COVID-19, limits the burden

---

[39] Ryan Briggs, Nina Feldman, *African Americans Lead Coronavirus Deaths In Philadelphia,* WHYY (April 8, 2020), https://whyy.org/articles/african-americans-lead-coronavirus-deaths-in-philadelphia/; *see also* CBS News, *Philadelphia's Black Communities Disproportionately Hit By City's Coronavirus Pandemic* (April 10, 2020), https://www.cbsnews.com/news/coronavirus-pandemic-philadelphia-black-communities-disproportionately-hit/.

[40] Philadelphia Jail Report: July 2016 – February 2020, https://www.phila.gov/media/20200320153910/Full-Public-Jail-Report-February-2020-1.pdf.

[41] Prisoners Being Released from City, State Prisons Are Not Being Tested for COVID-19, NBC Philadelphia (April 16, 2020), https://www.nbcphiladelphia.com/investigators/prisoners-being-released-from-city-state-prisons-are-not-being-tested-for-covid-19/2365885/.

[42] *See* Amon Decl. ¶ 60; Cohen Decl. ¶ 9.

[43] Amon Decl. ¶ 60; Cohen Decl. ¶ 43.

on the region's health care infrastructure by reducing the number of people who will become seriously ill from COVID-19, and facilitates other risk mitigation measures.[44]

26.      Defendants have failed to respond to and manage the continued risk of harm posed by the COVID-19 outbreak by not following public health guidance from the CDC for correctional facilities.  The guidelines require: (a) providing all incarcerated persons a six-foot radius or more of distance from any other persons, including during meals, transportation, court sessions, recreation, counts, and all other activities; (b) instituting a safety plan to prevent a COVID-19 outbreak in PDP's facilities in accordance with CDC guidelines; (c) making sanitation solutions readily and freely available for the purposes of cleaning cells, dormitories, laundry, and eating areas, including sufficient antibacterial soap, and lifting any ban on alcohol-based hygiene supplies (e.g. hand sanitizer, cleaning wipes); (d) providing adequate and appropriate COVID-19 testing for incarcerated persons, jail staff, and visitors; (e) waiving all medical co-pays for those experiencing COVID-19 like symptoms; and (f) providing sufficient personal protective equipment, particularly masks, and to all staff and incarcerated people.[45]

---

[44] Amon Decl. ¶ 51, 60; Cohen Decl. ¶ 10, 43.

[45] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,*
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

**C.** **The Current Conditions of Confinement at PDP's Facilities Fail to Comply with CDC Guidelines and Exacerbate the Extreme and Imminent Danger Faced by Class Members of Contracting and Possibly Dying from COVID-19.**

27.     Defendants have failed to implement the necessary safeguards outlined above, thus creating extreme risk to all incarcerated individuals in the PDP, and imminent danger to Plaintiffs.[46]

28.     Defendants fail to allow for adequate social distancing consistent with all public health guidelines.

a.     The Detention Center ("DC") contains both dormitory-style housing ("dorms") as well as several cellblocks.  Individuals housed in dorms sleep in bunk beds less than 6 feet apart.  The dorms, in some circumstances, house more than 30 individuals in a unit.  One block is comprised of multiple dorm units, each a cage-like structure, with only metal fencing separating each unit such that air flows between each block, allowing the transmission of COVID-19 between units.  Social distancing is not possible in this setting.

b.     Many people incarcerated in PDP are double-celled.  In Curran-Fromhold Correctional Facility ("CFCF"), up to four people may be housed in a quarantine cell.  Due to the size of the typical PDP cell, which contains bunk beds, a toilet, a sink, and sometimes a desk, it is difficult or impossible for cellmates to remain six feet apart at all times.

c.     Phone usage is vital during the pandemic for people to contact their attorneys as well as friends and family who are not permitted to visit.  Because of the way phones

---

[46] The named Plaintiffs have provided Declarations outlining their experiences in PDP's facilities.  *See* Exhibit C.  Plaintiffs' experts' Declarations review the concerning patterns and trends identified in those Declarations.  *See* Amon Decl. ¶ 33; Cohen Decl. ¶ 24.

are positioned, using phones requires standing within two feet of other people for extended periods of time.

29.     Defendants have failed to adequately and consistently provide necessary hygiene products for incarcerated people in PDP.

      a.     Soap is not available for all incarcerated people at all times, especially for those who cannot buy soap from the commissary.  Some who have requested soap from correctional officers were told that no free soap is available.

      b.     At least one named Plaintiff went without soap for four days.

      c.     Plaintiffs are unable to consistently wash their hands.

      d.     PDP does not provide any hand sanitizer to those incarcerated within their facilities.

30.     Defendants have failed to provide for adequate cleaning, sanitizing and disinfecting of all spaces.

      a.     Cleaning and disinfectant supplies are inadequate for regular and necessary cleaning of living areas, including cells.  PDP failed to provide plaintiffs with the bleach and disinfectant necessary to clean their cells on a regular basis.  Some Plaintiffs have gone for a month without being able to clean and disinfect their cells.

      b.     People at all PDP facilities must share phones that are not disinfected between uses.

      c.     People at all PDP facilities must share showers, sinks, and toilets that are not cleaned or disinfected between each use.

      d.     No toilets in PDP facilities have lids.  Many toilets fail to adequately flush, allowing waste matter to remain.

31.     Defendants have failed to provide and mandate the use of adequate personal protective equipment.

a.      Correctional officers, and even prison medical staff, inconsistently use masks and often interact with people without wearing masks.  These same correctional officers move between different areas of PDP's facilities.

b.      Although PDP has distributed cloth face masks to incarcerated people, PDP does not clean or exchange these cloth face masks on an adequate basis, and Plaintiffs have been required to wear the same mask for multiple days or weeks.  Nor does PDP instruct people how to wear the masks.

32.      Defendants have failed to provide for adequate isolation or quarantine measures.

a.      Upon entry to the PDP, incarcerated people are placed into a "quarantine" unit.  This is a standard prison practice for new admissions to jail facilities at all times.  Due to the COVID-19 pandemic, the need for a quarantine unit is enhanced—and requires placement for a minimum of 14 days.  In PDP facilities, however, people newly admitted are not always held in quarantine for a full 14 days before transfer to general population.

b.      When an incarcerated person displays symptoms of COVID-19, he or she is frequently neither isolated nor tested for COVID-19.

c.      Even if someone has tested positive for COVID-19 and is taken to another location, he or she is often returned to general population without testing to ensure that COVID-19 is no longer present or contagious.

33.     PDP relies on near 24-hour lockdowns.

a.      People are let out of their cells for a mere 15 minutes, occasionally once a day, but many PDP facilities do not let people out for days on end.

b.      In these circumstances, people are unable to bathe or shower for multiple days.

c.      For those in single or double cells, these conditions constitute solitary confinement, causing and exacerbating mental illness and mental distress.

d.      People detained in these conditions suffer serious physical harms without the ability to exercise for prolonged periods of times.

e.      With people locked in their cells for prolonged periods, access to medical care for chronic conditions and acute illnesses unrelated to COVID-19 has been severely limited.

34.     PDP's measures have improperly interfered with the right to counsel.

a.      Given the PDP's failure to take adequate risk mitigation measures, in-person legal visits pose an unreasonable medical risk to all involved.

b.      Further, PDP administrators have not undertaken efforts to arrange legal calls between counsel and incarcerated clients, and any such efforts have resulted in a laborious and time-consuming process.

**D.      The Named Plaintiffs are at Heightened Risk due to the Unsafe and Inhumane Conditions of Confinement at PDP's Facilities.**

35.     Plaintiffs are at a heightened risk for serious illness and death due to medical vulnerabilities and/or age.  These risks are exacerbated—thus further increasing the risk of serious illness or death—because Plaintiffs are incarcerated under the conditions described above.

36.     Thomas Remick is a 30-year-old individual held at DC, who was diagnosed with sarcoma and requires regular chest x-rays.  He also lives in a dorm setting.

37.     Jay Diaz is a 30-year-old individual housed at RCF who suffers from asthma.  He requires breathing treatments, which have not been provided despite his requests.  He has stage 3 cervical and ovarian cancer.

38.     Nadiyah Walker is a 43-year-old individual housed at RCF who suffers from seizure-causing epilepsy, diabetes, asthma, and anemia.

39.     Michael Alejandro is a 27-year-old individual held at DC who suffers from asthma. He lives in a dorm setting.

40.     Michael Dantzler is a 45-year-old individual incarcerated in the medical unit at DC. He has vascular disease that makes him prone to blood clots, and in February 2020, had emergency surgery to remove a pulmonary embolism.  Even in the medical unit, Mr. Dantzler has not had his cell cleaned nor has he had access to cleaning products to clean the cell himself.  A doctor comes to his cell every week, but the doctor does not always wear a mask.

41.     Robert Hinton is a 63-year-old individual held at CFCF, who has Hepatitis C that has caused damage and scarring to his liver.  He is currently experiencing pain on the side of his abdomen.

42.     Joseph Weiss is a 57-year-old Army Veteran held at CFCF.  Due to being wounded in combat, he has a metal rod and pins in his femur and walks with a cane.

43.     Joseph Skinner is a 38-year-old individual held at CFCF with severe asthma currently incarcerated at CFCF.  He must use an inhaler daily, has been hospitalized 4 or 5 times, and was previously intubated due to his asthma.

44.     James Bethea is a 53-year-old individual housed at the Philadelphia Industrial Correctional Center ("PICC"), and suffers from asthma, Hepatitis C, arthritis, and diabetes.

45.     Saddam Abdullah is a 29-year-old individual incarcerated at PICC.  He has asthma and had 4 recent acute asthma attacks.  His inhaler is not working, and after his most recent asthma attack, medical staff refused to provide a breathing treatment.  He has experienced chills, loss of

taste and smell, and difficulty breathing.  Because he did not have a fever, he was not tested for COVID-19 and was not medically isolated.

## IV.        CLASS ACTION ALLEGATIONS

46.     Plaintiffs Remick, Walker, Diaz, Alejandro, Dantzler, Hinton, Weiss, Skinner, Abdullah, and Bethea bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

47.     Plaintiffs Remick, Walker, Diaz, Alejandro, Dantzler, Hinton, Weiss, Skinner, Abdullah, and Bethea seek to represent a class of all current and future detainees held in custody at PDP's facilities ("Class"), including two subclasses: (1) persons who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Subclass"), and (2) persons who, by reason of their disability, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Disability Subclass").

48.     The "Medically Vulnerable Subclass" is defined as all current and future persons in the custody of the Philadelphia Department of Prisons who are 55 or older,[47] as well as all current and future persons held of any age who have a medical condition that places them at increased risk of COVID-19 illness, injury, or death, including but not limited to: (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.* bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt

---

[47] Amon Decl. ¶ 9; Cohen Decl. ¶ 43.

of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.  All Plaintiffs represent the Medically Vulnerable Subclass.

49.     The "Disability Subclass" is defined as all current and future persons in the custody of the Philadelphia Department of Prisons who have an impairment that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or any medical treatment necessary to treat their disability, including but not limited to those who have: (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.* bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders and/or (i) developmental disability.[48]  All Plaintiffs represent the Disability Subclass.

50.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

51.     Joinder is impracticable because (1) the class members are numerous; (2) the classes include unidentifiable future members; and (3) the class members are incarcerated,

---

[48] The disability subclass is separate and apart from the medically vulnerable class as age, and some conditions within the medically vulnerable class, such as pregnancy, are not factors that place a person under the ambit of the ADA's protections.

rendering their ability to institute individual lawsuits limited, particularly in light of the court closures in the City of Philadelphia.

52.     Common questions of law and fact exist as to all members of the proposed classes: All have the right to receive adequate COVID-19 prevention, testing, and treatment.

53.     Plaintiffs' claims are typical of the members of the class because Plaintiffs and all class members are injured by the same wrongful acts, omissions, policies, and practices of Defendants-Respondents as described in this Complaint.  Plaintiffs' claims arise from the same practices, policies, and conduct that gives rise to the claims of the class members, and are based on the same legal theories.

54.     Plaintiffs Remick, Walker, Diaz, Alejandro, Dantzler, Hinton, Weiss, Skinner, Abdullah, and Bethea have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  They have no interests adverse to the interests of the proposed class.  They retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

55.     Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek class certification under Rule 23(b)(2).

56.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the
Eighth and Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983/28 U.S.C. § 2241

*Class & Medically Vulnerable Subclass versus All Defendants*

57.    Under the Eighth and Fourteenth Amendments, corrections officials are required to provide for the reasonable health and safety of persons, whether sentenced or in pretrial detention, and they must provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982).  Correctional officials have an affirmative obligation to protect persons in their custody from infectious disease.  Correctional officials also have an obligation not to place persons in their custody in oppressive conditions involving prolonged lockdowns and solitary confinement.  Officials violate the rights of incarcerated individuals when they are either deliberately indifferent to conditions of confinement that are likely to cause them serious illness and that pose an unreasonable risk of serious damage to their future health, *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993), or if their acts are objectively unreasonable. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015).

58.    PDP's facilities, as currently operated, are unable to comply with public health guidelines to prevent an outbreak of COVID-19, and Defendants have not and cannot provide for the safety of the Class, nor have they been providing humane conditions of confinement. Defendants have not taken appropriate steps to test for, treat, or prevent COVID-19 outbreaks, and Defendants are unable to protect the Medically Vulnerable Subclass from serious harm caused by COVID-19, in violation of their constitutional obligation to provide humane conditions of confinement for the Class and Medically Vulnerable Subclass.

59.     Absent the immediate implementation of the CDC-mandated health and safety measures, further relief in the form of releases of highly vulnerable inmates will be necessary.

60.     Defendants have violated the rights of the Class under the Eighth and Fourteenth Amendments.

## SECOND CLAIM FOR RELIEF

### Violation of the Americans with Disabilities Act
42 U.S.C. §§ 12101 et seq
*Disability Subclass versus Defendant City of Philadelphia*

61.     Title II of the ADA requires public entities, such as PDP, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

62.     Plaintiffs, and other members of the Class, are qualified individuals with a disability under the meaning of the ADA.

63.     Access to medical treatment and safe conditions of confinement are programs or services that PDP's facilities must provide to incarcerated people for purposes of the ADA.

64.     Defendants intentionally discriminate against people with disabilities by intentionally denying them reasonable accommodations in accordance with CDC guidelines and necessary to protect themselves from COVID-19.

65.     If the population is reduced to allow for adequate social distancing, reasonable accommodations in accordance with CDC guidelines are necessary to protect people with disabilities including, but not limited to: single celling, provision of cleaning supplies, access to soap to facilitate handwashing, and staggered dining and recreation times in numbers that permit social distancing.

66. Failing to provide these reasonable accommodations is illegal discrimination under the ADA entitling Plaintiffs and members of the Disability Subclass to injunctive and declaratory relief.

## VI.        REQUEST FOR RELIEF

67. Plaintiffs Thomas Remick, Nadiyah Walker, Jay Diaz, Michael Alejandro, Michael Dantzler, Robert Hinton, Joseph Weiss, Joseph Skinner, Saddam Abdullah, and James Bethea and Class Members respectfully request that the Court order the following:

    a. Certification of this case as a Class Action under Fed. R. Civ. P. 23(b)(2);

    b. Injunctive relief ordering Defendants to immediately mitigate the serious risk of illness, death, and harm from COVID-19 and to provide humane conditions of confinement to those who are incarcerated or detained in the PDP;

    c. A preliminary injunction directing Defendants to submit a plan to the Court within five days, to be overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines specific mitigation efforts, in line with CDC guidelines, to significantly reduce the risk of contraction of COVID-19 by all Class Members;

    d. In the absence of immediate and effective compliance with paragraphs b and c, injunctive relief and/or writs of habeas corpus requiring Defendants to:

        (i.)     Release the Medically Vulnerable Subclass Members;

        (ii.)     Provide these individuals with educational resources on COVID-19, including instructions that they should self-isolate for the CDC-recommended period of time (currently 14 days) following release;

22

(iii.)   A housing and/or public support plan for any released Class or Subclass Members with  exposure to or infection with COVID-19 confirmed by testing, and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

e.   A declaration that Defendants' policies and practices violate the Eighth and Fourteenth Amendments and that Defendants' policies and practices violate the Americans with Disabilities Act with respect to the Disability Subclass.

f.   An award of Plaintiffs' attorneys' fees and costs; and

g.   Any further relief this Court deems just and appropriate.

Respectfully submitted,

| | |
|---|---|
| */s/ Su Ming Yeh* | */s/ David Rudovsky* |
| Su Ming Yeh (PA 95111) | David Rudovsky (PA 15168) |
| */s/ Matthew A. Feldman* | */s/ Jonathan H. Feinberg* |
| Matthew A. Feldman (PA 326273) | Jonathan H. Feinberg (PA 88227) |
| PENNSYLVANIA INSTITUTIONAL | */s/ Susan M. Lin* |
| LAW PROJECT | Susan Lin (PA 94184) |
| 718 Arch St., Suite 304S | KAIRYS, RUDOVSKY, MESSING, |
| Philadelphia, PA 19106 | FEINBERG, & LIN, LLP |
| (215)-925-2966 | 718 Arch Street, Suite 501S |
| smyeh@pailp.org | Philadelphia, PA 19106 |
| mfeldman@pailp.org | (215) 925-4400 |
| | drudovsky@krlawphila.com |
| | jfeinberg@krlawphila.com |
| | slin@krlawphila.com |
| | |
| */s/ Nyssa Taylor* | */s/ Will W. Sachse* |
| Nyssa Taylor (PA 200885)* | Will W. Sachse (PA 84097) |
| */s/ Witold J. Walczak* | */s/ Benjamin R. Barnett* |
| Witold J. Walczak (PA 62976) | Benjamin R. Barnett (PA 90752) |
| */s/ Hayden Nelson-Major* | */s/ Mary H. Kim* |
| Hayden Nelson-Major (PA 320024) | Mary H. Kim* |
| */s/ Ali Szemanski* | */s/ Nicolas A. Novy* |
| Ali Szemanski (PA 327769)* | Nicolas A. Novy (PA 319499) |
| AMERICAN CIVIL LIBERTIES UNION | */s/ Theeya Musitief* |
| OF PENNSYLVANIA | Theeya Musitief (PA 327295)* |
| P.O. Box 60173 | DECHERT LLP |
| Philadelphia, PA 19102 | Cira Centre |
| (215) 592-1513 | 2929 Arch Street |
| ntaylor@aclupa.org | Philadelphia, PA 19104-2808 |
| vwalczak@aclupa.org | (215) 994-2496 |
| HNelson-Major@aclupa.org | Will.Sachse@dechert.com |
| aszemanski@aclupa.org | Ben.Barnett@dechert.com |
| | Mary.Kim@dechert.com |
| | Nicolas.Novy@dechert.com |
| | Theeya.Musitief@dechert.com |

\* indicates counsel who will seek admission or *pro hac vice* admission

*Attorneys for Petitioners/Plaintiffs*

DATE: April 20, 2020