**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THOMAS REMICK, NADIYAH WALKER, JAY DIAZ, MICHAEL ALEJANDRO, MICHAEL DANTZLER, ROBERT HINTON, JOSEPH WEISS, JOSEPH SKINNER, SADDAM ABDULLAH, and JAMES BETHEA, on behalf of themselves and all others similarly situated,  :<br><br>Plaintiffs-Petitioners,  :<br><br>v.  :<br><br>CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,  :<br><br>Defendants-Respondents. | No. 2:20-cv-01959-BMS |

**JOINT STATUS REPORT**

The Plaintiffs and Defendants, City of Philadelphia (City) and Commissioner Blanche Carney ("the City"), submit this Status Report in advance of the telephonic court conference scheduled for April 28, 2021.

**I.   STAFFING ISSUES AND ITS IMPACT ON OUT-OF-CELL TIME AND OTHER COMPLIANCE ISSUES**

**Plaintiffs' Report**

The staffing issue at the Philadelphia Department of Prisons (PDP) has now reached a crisis point with respect to the health and safety of incarcerated persons. Since the last joint status report to the Court on April 8, 2021, conditions in PDP facilities, and particularly in PDP's largest facility, CFCF, have worsened considerably.

1

Based on reports received by Plaintiffs' counsel, including the independent reports of the Deputy Wardens, the consequences of PDP's inability to adequately staff the jails include the following:

- Lack of out-of-cell time, with systemic violations of the three-hours-per-day requirement;
- Lack of staff on units to respond to emergencies;
- An increase in incidents of violence;
- Inability to make phone calls;
- Inability to take showers;
- Inability to clean cells or unit common areas;
- Delays in getting routine and emergency medical care;
- Delays in receiving and sending mail;
- Lack of access to hygiene supplies including soap, toilet paper, cleaning supplies, masks, and laundry; and
- Lack of access to grievances and delays in grievances being reviewed.

Incarcerated people on many units are now experiencing prolonged periods of continuous confinement to their cells—often for days or weeks at a time. *See* Exhibit A; Exhibit C: Nelson Decl. ¶ 3 (describing two weeks uninterrupted confinement); Henderson Decl. ¶¶ 4-5 (describing seven days of uninterrupted confinement); Cromwell Decl. ¶ 3 (describing out-of-cell time as limited to every other day for approximately 20 minutes). Incarcerated people have reported to Plaintiffs' counsel feeling terrified, anxious, hopeless, and depressed, especially given that for many, these latest conditions are a continuation of many months of little or no out-of-cell time,

creating cumulative consequences on individuals' mental and physical health. As Mr. Nelson, who is housed at CFCF, described:

> I am being housed in a multipurpose room with three other men. There is no space for any type of social distancing. There are no windows, tables, or chairs.... We have been stuck in this one small room for two weeks. None of us have had the chance to shower or clean the cell. We have to eat sitting on our beds. We have no room for any type of exercise.

Nelson Decl. ¶ 9.

The reports from incarcerated people and certifications from PDP Deputy Wardens demonstrate that these extended periods without out-of-cell time are the result of insufficient staffing. *See* Exhibit B (Deputy Wardens identifying insufficient staffing in every facility as an explanation for failure to comply with the Court's order).

In addition to the lack of recreation time, the chronic understaffing may well have had deadly consequences. Five (5) or six (6) incarcerated people have been killed in PDP custody since August 2020.[1] In addition to these homicides, Plaintiffs' counsel have received reports, confirmed by Defendants' counsel, of three other deaths in PDP custody that occurred in the past two weeks alone, possibly due to drug overdoses or other medical emergencies.

Plaintiffs' counsel have also received reports that some units go hours at a time with no correctional officers present, which many result in the lack of timely responses to emergencies. As Mr. Cromwell, who is housed at PICC, explained:

> If someone needs medical attention, we all have to bang on the doors of our cells together to get a staff member to come onto the

---

[1] *See* Samantha Melamed, *Philly Man is on Life Support after Jail Assault, as Staff and Inmates Warn of Crisis*, PHILADELPHIA INQUIRER (April 22, 2021), available at https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html. On April 25, 2021, it was reported that Christopher Hinkle, the victim of an April 12, 2021 assault by his cellmate, died from his injuries. *See* https://twitter.com/samanthamelamed/status/1386379194125410309.

> block and check on the person who needs help. When everyone is
> locked in their cells, there are long stretches of time when there are
> no COs on the block.

Cromwell Decl. ¶¶ 7-8.

David Robinson, president of the union representing PDP COs, has corroborated reports of safety concerns and lack of staffing, stating that conditions are "not safe—not safe at all" and that "[e]very day an officer works by himself, and some days some pods are unmanned, meaning no one is on the post."[2] Mr. Robinson also confirmed that the staffing issues prevents staff from quickly responding to emergencies.[3]

In addition to concerns about staff's ability to respond to medical emergencies, even routine medical care is reportedly suffering due to the staff shortages. Incarcerated people have reported to Plaintiffs' counsel that medication distribution has slowed and that it is now very difficult to be seen by medical staff. As Mr. Henderson explained,

> Medical staff told me that they have been very backed up with
> medication distribution. For two months, I was only given one of
> the two medications that I am supposed to be taking daily. I am
> scared that the medication I need will not be available again in the
> future.

Henderson Decl. ¶ 20.

People incarcerated in PDP facilities describe a situation even more restrictive than the "shelter-in-place" response to rising rates of COVID-19 infection in December 2020 and January 2021. Incarcerated people are currently being denied showers, phone calls, and the opportunity to clean their cells for long periods of time. *See* Nelson Decl. ¶¶ 5, 9 (describing his inability to make phone calls, shower, clean, exercise, or even sit on a chair for two weeks); Cromwell Decl.

---

[2] *Id.*
[3] *Id.*

¶ 5 (describing having to choose between showers and phone calls during limited periods of out-of-cell time every other day); Henderson Decl. ¶ 8 (describing inability to shower or use the phone on a daily basis). Mr. Henderson discussed the consequences of these deprivations:

> When we are unable to use the phones to call our loved ones, it puts a strain on our relationships with our families and our ability to parent our children. It is very difficult to maintain ties to our communities under these conditions, which makes reentry even harder.

Henderson Decl. ¶ 9. Reports indicate that low staffing has also reduced the frequency of mail collection and distribution, further straining incarcerated peoples' ability to communicate with their attorneys and loved ones. *See* Cromwell Decl. ¶ 9; Nelson Decl. ¶¶ 23-24.

Distribution of necessary hygiene supplies has also been impacted by staff shortages. Plaintiffs' counsel have received reports of failures to provide weekly bars of soap, cleaning supplies, laundry services, face masks, and on some units, even toilet paper. *See* Nelson Decl. ¶¶ 14, 16, 18, 22; Henderson Decl. ¶¶ 12, 14, 15, 17, 18, 19; Cromwell Decl. ¶¶ 10, 11, 16, 21. Many incarcerated people have described to Plaintiffs' counsel increasingly filthy conditions, both in their cells and in unit common spaces. *See* Nelson Decl. ¶ 15 ("On this block, no one is let out, including block workers, so there is no one on the unit to clean"); Henderson Decl. ¶ 15 ("The CO on Unit D2P3 told me that she does not distribute cleaning supplies and I should stop asking for them"); Cromwell Decl. ¶¶ 12-20 (describing trash overflowing from cells into the common areas causing rodent infestations as well as plumbing issues causing soiled water to flow onto the unit with no disinfectant to clean it up).

The population at the PDP continues to rise, and currently is at over 4,700, yet there appears to be no relief on the horizon from the current conditions.[4] Since the June 3, 2020 Consent Order on Partial Settlement Agreement (ECF No. 35), Plaintiffs have informed the City about specific areas of noncompliance with the Court's order, through status reports and weekly phone conferences between counsel. Currently, the key area of noncompliance is the City's failure to provide out-of-cell time consistent with the Court Order of January 28, 2021 (ECF No. 63). While the City has presented a plan to the Court that aims to improve staffing, Plaintiffs have concerns about the realistic implementation of the plan, and its actual impact on staffing.[5] As stated in the Status Report of April 8, 2021 (ECF No. 68), absent clear and concrete progress, counsel for Plaintiffs anticipate filing a motion with the Court for enforcement of the Court's Orders, with measures that would include the imposition of monetary sanctions, until such time when Defendants are in compliance with the Court's Orders and all incarcerated persons are provided three hours of out-of-cell time each day.

**Defendants' Report**

Defendants focus their report on staffing and census, as those two pieces are drivers of out of cell time.  As previously, Defendants again reproduce the chart submitted by Plaintiffs with the housing units in quarantine removed from the summation, in order to present a more accurate representation of the housing units associated with at least one complaint of inadequate out of cell time.  That chart is submitted for the Court's convenience as Exhibit D.  As aptly illustrated, the number of non-quarantine housing units reporting non-compliance with the three hours out of cell is twenty, of the total.  Looking first to the contentions regarding PICC, there

---

[4] Philadelphia Department of Prisons, *Daily headcount and census*, Census for April 25, 2021 at https://www.phila.gov/departments/philadelphia-department-of-prisons/daily-headcount-and-census/.
[5] We have provided the City and the Court with a response to the City's Plan.

individuals reported on the J and K units that they were locked in either for three days straight, or for multiple days at a time. But this is incorrect. Upon review, there was only one day in the April 12-21 time period on which the mandated recreation was not provided, and that was only on the J unit. Further, where recreation was missed on other days, the officers ensured that it was balanced between the shifts, thereby seeking to minimize the effect on the incarcerated population. A summary of the out-of-cell time provided on those units follows:

    J-Unit:  4/12 – Time out of Cell ran for both shifts
                 4/13 – No recreation on the 3-11 shift only
                 4/14 – Time out of Cell ran for both shifts
                 4/15 – Time out of Cell ran for both shifts
                 4/16 – No recreation on the 7-3 shift only
                 4/17 – No recreation ran - Weekend
                 4/18 – No recreation on the 7-3 shift only – Weekend
                 4/19 – Time out of Cell ran for both shifts
                 4/20 – Time out of Cell ran for both shifts
                 4/21 – Time out of Cell ran for both shifts

    K-Unit:  4/12 - Time out of Cell ran for both shifts
                 4/13 – Time out of Cell ran for both shifts
                 4/14 – Time out of Cell ran for both shifts
                 4/15 – Time out of Cell ran for both shifts
                 4/16 – Time out of Cell ran for both shifts
                 4/17 – Time out of Cell ran for both shifts
                 4/18 – Time out of Cell ran for both shifts
                 4/19 – Time out of Cell ran for both shifts
                 4/20 – Time out of Cell ran for both shifts
                 4/21 – Time out of Cell ran for both shifts

In the Riverside Correctional Facility, housing units C and F were reported to have experienced substantial impositions on out of cell time, or multiple days on which they received no out of cell time during that same April 12-21 time period. But again, while Defendants recognize that there were days on which operational requirements resulted in less out of cell time, reports of sustained time without any appear unfounded in that facility. Notably, upon further review, the following summarizes the days on which the full amount of out of cell time was not provided:

- April 16: F Unit, each person received at least 90 minutes of recreation
- April 17: F Unit, all but those in cells 33-37 received at least 60 minutes of recreation, individuals in those cells received 20 minutes of recreation
- April 18: C Unit, no recreation on the 7-3 shift.
- April 18: F Unit, each person received at least 90 minutes of recreation
- April 19: C Unit, each person received at least 15 minutes of recreation

Defendants submit this explanation simply to illuminate that while there are days on which the three hours of recreation are not met, Defendants are consistently providing recreation and, wherever possible, ensuring that the effects of staffing shortages are minimized as much as possible. As the Court will no doubt notice, the detailed days on which more limited recreation was provided fall around the weekend.

Turning to CFCF, Defendants again recognize that staff failure to report to work has, at times, frustrated Defendants' compliance with the provision of three hours of out of cell time. However, the Plaintiffs' submission overstates the extent of the problem. Upon receiving Plaintiffs' report that people claimed they were confined to their cells for up to two weeks, Defendants reviewed the available materials regarding out of cell time on those housing units, notably B1P1, C1P4, C2P3, C2P4, D2P3, and D2P4. As illustrated in Exhibit E, none of these housing units experienced the extreme privation reported to Plaintiffs' counsel. Again, Defendants recognize that incarcerated individuals had substantially less or no out of cell time on the weekends, as illustrated in the chart, and submit this information simply to show that they continue to make every effort to ensure that individuals get time out of cell as much as security permits. As the chart also shows, one of the identified housing units, B1P4, is now an open unit because all staff and incarcerated persons assigned to that unit are vaccinated.

Defendants detailed the multifaceted approach they are taking to address staffing. Hundreds of PDP staff have manifest incredible dedication during this prolonged, difficult time, and Defendants hope that their colleagues join these committed individuals in showing up to work. Defendants hope that the measures submitted to the Court do, in fact, result in reduced absenteeism, and separately continue to train and hire new staff. And PDP management is going so far as to detail administrative staff – who have also been trained as security officers – to housing units. Just last Sunday both the Commissioner and a Deputy Commissioner ran housing units on the 3-11 shift, and Deputy Wardens have also been deployed for unit coverage. But the stopgap measure of reassigning administrative staff to assure out of cell time is not a solution, and Defendants look forward to further discussion of their measures to address staffing with the Court.

Turning to census, as Plaintiffs note the incarcerated population is now approximately 4,700. Approximately 550 individuals are being held, on Philadelphia detainers only, for more than 300 days, and it remains Defendants hope that the stakeholders in the criminal justice system work collaboratively to address these extant detainers. Defendants also hope that the stakeholders in the criminal justice system make better, more efficient use of the remote courtroom that Defendants established on the PDP campus. This courtroom is located in the Detention Center and has its own entrance. While the Court initially anticipated that 60 matters could be heard a day, the maximum expected case processing is now reduced to 30 matters. Unfortunately, it appears that no more than 16 or 17 go forward, apparently a function of sought continuances and other counsel-related scheduling issues. Defendants hope that this resource will be fully utilized, so that individuals who have been held for an unprecedented period of time can have their detainers – or preliminary hearings – addressed.

## II.   VACCINATIONS

**Plaintiffs' Report**

Plaintiffs' counsel support all efforts to increase vaccinations of prison staff and incarcerated people through education, incentives, and medical advisories. Plaintiffs had requested that the PDP consider incentives to increase the rate of vaccinations, and we are pleased to see that incentives will be offered.[6] In its Plan, the City states that the PDP will offer a collection of commissary items, valued at $20, to all incarcerated people who agree to be vaccinated. The City also stated that it had started a pilot project to classify fully vaccinated housing units to permit greater out-of-cell time.  These are steps in the right direction, but even the housing incentives depend in large part on proper staffing.

Further, Plaintiffs will soon distribute our letter (written with community groups and advocacy organizations) urging our clients to be vaccinated.  Plaintiffs have also suggested the use of trained peer educators, a step that has also been proposed in other prison systems.

**Defendants' Report**

Defendants continue their efforts to encourage vaccination through education and outreach and, as reported to the Court, intend to begin a program by which those incarcerated individuals who accept vaccination will receive a collection of commissary items valued at $20. On education and outreach, the clergy who provide religious service and guidance at the PDP

---

[6] Several jail and prison systems have implemented incentive programs to increase the rate of acceptance of the COVID-19 vaccine amongst incarcerated people. For example, the Pennsylvania Department of Corrections has offered $25 in commissary credit to incarcerated people who take the COVID vaccine and has achieved an over 70% acceptance rate in the first two prisons where the vaccine was offered. *See* Joseph Darius Jaafari, Jamie Martines, *Two Pa prisons have vaccinated more than 70% of inmates. An incentive program may be making a difference.*, SPOTLIGHT PA (Mar. 17, 2021), available at https://www.inquirer.com/health/coronavirus/spl/pa-coronavirus-covid-vaccine-prison-incentive-inmates-corrections-20210317.html (last visited Apr. 21, 2021).

facilities engage individually with members of the incarcerated population, rather than in a group setting, for obvious reason.  Seven chaplains engaged with three-hundred fifty-five incarcerated persons so far this month, and have, in addition to their religious and spiritual work, have counseled in favor of vaccine acceptance.  In addition to this work, the pastor of a prominent Philadelphia church filmed a PSA urging vaccine acceptance, which PSA is played on the housing units.

Defendants continue to work with Plaintiffs' counsel on the distribution of the correspondence to their clients, and expect to coordinate the delivery for distribution when the letter is finalized and printed.  All hope that these efforts expand the population of vaccinated individuals within the PDP system.

## III.   DATA REPORTING

For the week ending April 25, 2021, 873 incarcerated persons were tested, resulting in 35 positive tests and 838 negatives.  The cumulative numbers for testing and results are 29,329 tests administered, with 1,602 returning positive and 28,127 returning negative.  Over the past week, the following housing units were removed from quarantine:

- In CFCF: A2P4, D1P4, D2P2

The following units were placed in quarantine this week, or are currently completing a quarantine:

- In CFCF: A1P1, A1P2, A2P1, A2P3, B1P2, B1P3, B2P3, C1P1, C1P3, C2P1, C2P2, D1P1, D1P2, D1P3, D2P1
- In PICC: D, E, G
- In RCF: B, F, G

The following units are used for intake quarantine:

- Men: CFCF B1 pods 2, 3 and 4; B2 pods 1, 2, 3 and 4
- Women: ASD MOD III and D Unit; DC 207

One incarcerated person is hospitalized due to Covid-19 or is being treated for Covid-19 in the infirmary.

Respectfully submitted,

/s/ David Rudovsky
David Rudovsky (PA 15168)
/s/ Jonathan H. Feinberg
Jonathan H. Feinberg (PA 88227)
/s/ Susan M. Lin
Susan Lin (PA 94184)
KAIRYS, RUDOVSKY, MESSING, FEINBERG, & LIN, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400
drudovsky@krlawphila.com
jfeinberg@krlawphila.com
slin@krlawphila.com

/s/ Su Ming Yeh
Su Ming Yeh (PA 95111)
/s/ Matthew A. Feldman
Matthew A. Feldman (PA 326273)
PENNSYLVANIA INSTITUTIONAL LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
(215)-925-2966
smyeh@pailp.org
mfeldman@pailp.org

/s/ Nyssa Taylor
Nyssa Taylor (PA 200885)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
ntaylor@aclupa.org

*/s/ Will W. Sachse*
Will W. Sachse (PA 84097)
*/s/ Benjamin R. Barnett*
Benjamin R. Barnett (PA 90752)

*/s/ Craig M. Straw*
Craig M. Straw
First Deputy City Solicitor
City of Philadelphia Department of Law
Office: (215) 683-5442
Cell: (215) 776-4528


*/s/ Anne B. Taylor*
Anne B. Taylor, Esquire
Chief Deputy City Solicitor
Civil Rights Unit, Law Department
City of Philadelphia
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
215-683-5381 (office)
215-683-5397 (fax)
anne.taylor@phila.gov

*Attorneys for Respondents-Defendants*

12

*/s/ Mary H. Kim*
Mary H. Kim
*/s/ Nicolas A. Novy*
Nicolas A. Novy (PA 319499)
*/s/ Theeya Musitief*
Theeya Musitief (PA 327295)*
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2496
Will.Sachse@dechert.com
Ben.Barnett@dechert.com
Mary.Kim@dechert.com
Nicolas.Novy@dechert.com
Theeya.Musitief@dechert.com
*Attorneys for Petitioners/Plaintiffs*             **DATE: April 28, 2021**