IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS REMICK, et al., on behalf of themselves and all others similarly situated, | : :  No. 2:20-cv-01959-BMS |
| Plaintiffs-Petitioners, | : : : |
| v. | : |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : : : : |
| Defendants-Respondents. | : : |

**PLAINTIFFS' MOTION FOR CONTEMPT AND SANCTIONS**

Plaintiffs, by and through their undersigned counsel, hereby submit this Motion for Contempt and Sanctions, the grounds for which are set forth below.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

1. Plaintiffs filed this class action under 42 U.S.C. § 1983, 28 U.S.C. § 2241, and the Americans with Disabilities Act, on April 20, 2020, to ensure that Defendants City of Philadelphia ("City") and Commissioner Blanche Carney protect individuals incarcerated in the Philadelphia Department of Prisons ("PDP") from the risks of serious harm they face from the twin dangers of Covid-19 and prolonged isolation in their cells. (*See* Class Action Complaint for Declaratory and Injunctive Relief and Petition for Writs of Habeas Corpus, ECF No. 1).

2. On April 23, 2020, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking an order requiring Defendants to ensure that conditions of confinement in PDP facilities comply with the health and safety standards necessary to protect the Plaintiff class from the risks associated with Covid-19 and to provide humane conditions of confinement, including adequate out-of-cell time consistent with constitutional requirements. (*See* ECF No. 18).

1

3. The parties reached a partial settlement agreement, which was approved by the Court and entered as a Consent Order on Partial Settlement Agreement on June 3, 2020. (ECF No. 35).

4. Along with various measures intended to mitigate the risks of harm from Covid-19 and ensure adequate access to counsel for members of the Plaintiff class, the Consent Order required Defendants to provide a minimum of 45 minutes of daily out-of-cell time for all individuals incarcerated in PPD by June 10, 2020, and to make efforts to increase out-of-cell time thereafter, with Plaintiffs reserving the right to seek further relief from the Court regarding out-of-cell time, if necessary. (*Id.* ¶ 4(a)).

5. During the summer and fall of 2020, Plaintiffs consistently reported that Defendants were failing to comply with various terms of the Consent Order, including the requirement of 45 minutes of daily out-of-cell time. Plaintiffs expressed their concerns—supported by declarations from incarcerated individuals—that the prolonged in-cell confinement to which incarcerated people were being subjected was leading to increased tension and adverse mental health consequences. (*See* Joint Status Reports, ECF Nos. 44, 45, 46, 48, 49, 52, and accompanying exhibits).

6. During this period, Defendants acknowledged on several occasions that not all incarcerated people in PDP custody were receiving the required 45 minutes of daily out-of-cell time. (*See* Joint Status Reports, ECF Nos. 44, 45, 46, 48).

7. On or around December 5, 2020, in response to an increase in Covid-19 infections among incarcerated people, PDP instituted a "shelter-in-place" protocol for all facilities, under which incarcerated people were permitted out of their cells for at most 20 minutes a day, one cell

at a time, to shower and use the phones. (*See* Joint Status Report of December 9, 2020, ECF No. 53).

8. Plaintiffs filed multiple declarations with the Court documenting that incarcerated people in some PDP facilities were not getting out of their cells each day under shelter-in-place and explaining the harms caused by the shelter-in-place protocol. (*See* Joint Status Report of December 24, 2019: Exhibit A, ECF No. 56-1; Joint Status Report of January 12, 2021: Exhibit B, ECF No. 61-2).

9. On January 13, 2021, based on the record of this case and submissions of the parties, the Court entered an Interim Order, finding that: (a) under shelter-in-place, incarcerated individuals were not receiving the 45 minutes of daily out-of-cell time required by the Consent Order; (b) it would be "feasible to permit persons from at least three cells out at a time, in 45-minute time frames, to separately shower, use phones, and engage in limited exercise, while still maintaining social distancing"; and (c) "[t]he current shelter-in-place policy . . . keeps incarcerated people in their cells for nearly 24 hours a day, and such prolonged confinement is harmful to the mental and physical health of incarcerated individuals." (ECF No. 62). The Court again ordered Defendants to provide all individuals incarcerated in PDP facilities with a minimum of 45 minutes of daily out-of-cell time and stated that the Court would consider further orders on out-of-cell time after then-pending universal Covid-19 testing was completed. (*Id.*).

10. On January 28, 2021, after the results of the universal Covid-19 testing were submitted to the Court, the Court ordered Defendants to increase out-of-cell time and provide all individuals incarcerated in PDP with a minimum of two hours of daily out-of-cell time by February 10, 2021, and a minimum of three hours of daily out-of-cell time by February 24, 2021, with

exceptions made only for individuals on "a medically necessary quarantine" and when there exist "conditions imposed by operational emergencies." (Order of January 28, 2021, ECF No. 63).

11. Defendants have consistently failed to comply with the Court's Order of January 28, 2021. The Court found on May 4, 2021 that:

> there has been a pattern of noncompliance with the January 28, 2021 Order, particularly in the Curran-Fromhold Correctional Facility. Though concentrated at CFCF, reports from class members at each of the PDP facilities that they have regularly been denied the required amount of out-of-cell time have been filed with the Court on a regular basis…. The PDP Deputy Wardens (who have been designated as the City's monitors for compliance, as required by Order of the Court of December 18, 2020 (ECF No. 55)), and the City, have also reported that staffing shortages and other emergent events have impeded the ability of the facilities to meet or exceed the three hours of recreation time…. **[B]ased on a full review of the record, particularly the Deputy Wardens' certifications, the Court finds that Defendants have not complied with the Order of January 28, 2021.**

(Interim Order of May 4, 2021, ¶ 3, ECF No. 70) (emphasis added).

12. In addition to the declarations and Deputy Wardens' certifications that have previously been filed with the Court, recent developments provide further compelling evidence of Defendants' noncompliance with the Order of January 28, 2021:

   a. Since the three-hour daily out-of-cell requirement took effect, Defendants, through the Deputy Wardens, have consistently admitted that there are many housing units on which individuals have not received the required out-of-cell time, particularly at CFCF. The number of units and facilities listed as noncompliant has steadily increased and, in recent weeks, has included large portions of all four of the men's jails operated by PDP (which, together, house approximately 95% of individuals in PDP custody). *See* Exhibit A.

b. On the evening of May 8, 2021, Defendants informed the Court that 64% of corrections officers scheduled to work at CFCF failed to report to work, and that CFCF had been put on full lockdown.[1] Defendants subsequently informed the Court that the mass absenteeism event continued the next day and did not end until the morning of May 10, 2021, at which point the lockdown at CFCF ended.

c. Declarations submitted along with this Motion confirm that Defendants are still failing to provide the Court-ordered amount of out-of-cell time. *See* Exhibit B.

13. In its Interim Order of May 4, 2021, the Court "place[d] Defendants on notice that, absent clear and convincing evidence that Defendants are in compliance with the Court's Order, the Court will entertain a motion for civil contempt by the Plaintiffs and will strongly consider the imposition of monetary sanctions against the Defendants." (ECF No. 70, ¶ 7).

14. In its Interim Order of May 4, 2021, the Court also ordered the City to provide an update to the Court on the status of its negotiations with the Corrections Officers Union to address the ongoing absenteeism crisis. (*Id.*, ¶ 14).

15. During a telephonic status conference held on May 11, 2021, the City, through counsel, informed the Court that no significant progress had been made in its discussions with the Union. The City also informed the Court that its initial discussion with the Union occurred on May 6, 2021 and was followed two days later by the massive absenteeism event described in paragraph 12(c) above.

16. Later on May 11, 2021, counsel for the City advised the Court that, while negotiations with the Union were continuing and proposals for resolving the disputes were under

---

[1] Defense counsel have informed Plaintiffs that during a "lockdown," the only services that are provided are food and medical care and that incarcerated individuals are not permitted out of their cells for showers, recreation, or phone calls.

discussion, there was no agreement, and that the City would again report on the status of the negotiations by May 13, 2021.

## II. ARGUMENT

### A. The Court should hold the City in civil contempt.

The Court should hold the City in civil contempt for failing to comply with the requirement in the Court's Order of January 28, 2021 that all individuals incarcerated in PDP facilities be provided with a daily minimum of three hours out of their cells. "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Unlike criminal contempt, which is intended to punish the contemnor and vindicate the authority of the court, "the primary purpose of civil contempt is remedial and for the benefit of the complainant." *Roe v. Operation Rescue*, 920 F.2d 213, 216 (3d Cir. 1990).[2] "[I]f a person violates a court order requiring in specific and definite language that that person do or refrain from doing an act or series of acts," a finding of civil contempt is appropriate. *Cottman Transmissions Sys. v. Melody*, 851 F. Supp. 675, 676 (E.D. Pa. 1994). To hold a party in civil contempt, a court must find, by clear and convincing evidence, that (1) a valid court order existed, (2) the party had knowledge of the order, and (3) the party disobeyed the order. *John T. v. Del. Cty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003).

---

[2] The two forms of contempt—civil and criminal—are distinguished by "the 'character and purpose' of the sanction involved." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 827, 829 (1994) (quoting *Gompers* v. *Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911); *see also United States v. Pozsgai*, 999 F.2d 719, 735 (3d Cir. 1993) ("The purpose and nature of the sanction, rather than the label attached to it, determine whether it is civil or criminal."). Because criminal contempt "is a crime in the ordinary sense," criminal contempt sanctions can only be imposed on a party who has been afforded all the protections that the Constitution requires of criminal proceedings. *Int'l Union*, 512 U.S. at 826–27.

It is the fact of a party's failure to comply with a court order—not the party's state of mind—that makes civil contempt appropriate. *See Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) (holding that "willfulness is not a necessary element of civil contempt"). "[G]ood faith is not a defense to civil contempt." *Id.*; *see also Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148–49 (3d Cir. 1994) ("Willfulness is not a necessary element of civil contempt. . . . Accordingly, evidence . . . regarding . . . good faith does not bar the conclusion . . . that [the defendant] acted in contempt.").

Nor is impossibility a defense to civil contempt—unless the alleged contemnor demonstrates that compliance is "a physical impossibility beyond the[ir] control." *FTC v. Lane Labs-USA*, 624 F.3d 575, 590 (3d Cir. 2010). To successfully invoke an impossibility defense, the alleged contemnor must demonstrate that "compliance is . . . factually impossible." *Id*. Compliance is factually impossible where, for example, an alleged contemnor is not in possession or control of documents they have been ordered to produce, *see, e.g.*, *id.*, or demonstrates a financial inability to comply with an order to pay sanctions. *See, e.g.*, *Egnotovich v. Greenfield Twp. Sewer Auth.*, 378 F. App'x 121, 123 (3d Cir. 2010). An alleged contemnor asserting an impossibility defense must "show that it has made . . . **all** reasonable efforts to comply." *Harris v. City of Philadelphia*, 47 F.3d 1311, 1324 (3d Cir. 1995) (internal quotation marks and citations omitted; emphasis added). Neither the high cost nor impracticability of compliance qualifies as impossibility. *See id.* at 1324–25 (rejecting impossibility defense where compliance might have been costly and impractical but was still possible); *see also Inmates of Allegheny Cty. Jail v. Wecht*, 874 F.2d 147, 152 (3d Cir. 1989) (rejecting impossibility defense where the defendant county jail warden could not comply with the Court's Order because county officials "chose to take no steps to provide [him] with the wherewithal to comply").

The elements of civil contempt are easily established here, as the Order of January 28, 2021 was a valid court order that the Defendants obviously had knowledge of, and the Court has already found that Defendants are failing to comply with its out-of-cell-time requirement. *See supra* § I (citing ECF No. 70, ¶ 3). Since the Court's finding of noncompliance, Defendants' noncompliance has persisted. Further, in light of the pattern of corrections officer non-reporting that dates back to the summer of 2020, almost a full year ago, it can hardly be said that compliance is "factually impossible," *see Lane Labs-USA*, 624 F.3d at 590, or that Defendants have made "all reasonable efforts to comply." *See Harris*, 47 F.3d at 1324. Indeed, the current negotiations should have been started months ago, once the pattern of non-reporting was evident and when persistent noncompliance with this Court's Orders was fully documented.

**B. The Court should impose per diem fines until the City comes into compliance.**

To pressure the City to provide members of the Plaintiff class with a minimum of three hours of daily out-of-cell time, as ordered by the Court, and to compensate class members for the harm they have suffered as a result of the City's noncompliance, the Court should impose per diem fines on the City until the City demonstrates that it is complying with the Court's Order. Since civil contempt serves a remedial, rather than punitive, purpose, "civil contempt may be employed to coerce the defendant into compliance with the court's order and to compensate for losses sustained by the disobedience." *McDonald's Corp. v. Victory Inv.*, 727 F.2d 82, 87 (3d Cir. 1984). Upon a finding of civil contempt, "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order" is appropriate in order to "exert a constant coercive pressure" on the contemnor to comply with the court's order. *Int'l Union v. Bagwell*, 512 U.S. 821, 829 (1994). The court may also impose sanctions "to make reparation to the injured party and restore the parties to the position they would have held had the [order] been obeyed." *Robin Woods*,

28 F.3d at 400 (citation omitted). Upon a finding of civil contempt, "[d]istrict courts . . . are afforded broad discretion to fashion a sanction that will achieve full remedial relief." *John T.*, 318 F.3d at 554; *see also AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 420, 426 (1st Cir. 2015) ("[In civil contempt proceedings,] the district court enjoys wide latitude in its choice of sanctions.").

Here, the Court should impose a per diem fine of $10,000 until the City demonstrates that it is complying with the Court's Order on out-of-cell time. Should the City fail to do so after two weeks, the per diem fine should escalate to $20,000 and continue to double after each two-week period of continued noncompliance. *Cf. AngioDynamics, Inc.*, 780 F.3d at 423, 427–28 (affirming contempt fines that increased in amount each month, despite the total amount ultimately imposed far exceeding the original judgment in the case).

In light of the Court's "broad discretion to fashion a sanction that will achieve full remedial relief," *see John T.*, 318 F.3d at 554, the Court should order that any contempt fines paid by the City be directed, in equal amounts, to the Philadelphia Community Bail Fund ("PCBF")[3] and the Philadelphia Bail Fund ("PBF").[4] Both bail funds raise money from tax-deductible contributions and use the funds to post bail for people in PDP custody who cannot afford to pay bail. In general, the bail funds have slightly different focuses, with PBF focusing on posting bail "at the earliest possible moment . . . ideally before [arrestees] are transferred from their holding cell to jail,"[5] and PCBF posting bail for people who are already incarcerated in PDP jails. During the pandemic, the bail funds' work has had a substantial effect on the PDP population. From March 2020, when the Covid-19 pandemic began, through mid-December 2020, PCBF spent approximately $3 million

---

[3] *See* PHILADELPHIA COMMUNITY BAIL FUND: ABOUT US, https://www.phillybailout.org/about-us.html (last visited May 11, 2021).
[4] *See* PHILADELPHIA BAIL FUND: ABOUT THE FUND, https://www.phillybailfund.org/about-the-fund (last visited May 11, 2021).
[5] *Id.*

to bail out nearly 330 people from PDP jails.[6] From March 2020 through the present, PBF has bailed out 438 people from PDP jails.[7] Plaintiffs can provide further information regarding the work of the bail funds at the request of the City or the Court.

Directing the contempt sanctions paid by the City to the bail funds will serve two purposes. First, it may contribute to a decrease in the PDP population, which could aid the City in complying with the Court's Order and improve conditions for those who remain in jail. And, second, for those whom the bail funds are able to bail out, the sanctions will serve as a form of compensation for the harm done to them by the City's noncompliance.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs move the Court to find the City of Philadelphia in civil contempt and assess sanctions in the amount of $10,000 per day, doubling after each two-week period of continued noncompliance, until the City demonstrates that it is complying with the Court's Order of January 28, 2021.

Respectfully submitted,

/s/ David Rudovsky
David Rudovsky (PA 15168)
/s/ Jonathan H. Feinberg
Jonathan H. Feinberg (PA 88227)
/s/ Susan M. Lin
Susan Lin (PA 94184)
KAIRYS, RUDOVSKY, MESSING,
FEINBERG, & LIN, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400
drudovsky@krlawphila.com

---

[6] Joshua Vaughn, *Philadelphia Jails Have Black Mold, Rats, Poor Heating, Say Women Held There*, THE APPEAL (Dec. 16, 2020), available at https://theappeal.org/philadelphia-jails-rats-mold-cold/.

[7] This has been reported to Plaintiff's counsel by PBF leadership. Verification of this figure can be provided to the Court at the request of the Court or City.

<span>
</span>

jfeinberg@krlawphila.com
slin@krlawphila.com

/s/ Su Ming Yeh
Su Ming Yeh (PA 95111)
/s/ Matthew A. Feldman
Matthew A. Feldman (PA 326273)
PA INSTITUTIONAL LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
(215)-925-2966
smyeh@pailp.org
mfeldman@pailp.org

/s/ Nyssa Taylor
Nyssa Taylor (PA 200885)
AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
ntaylor@aclupa.org

*/s/ Will W. Sachse*
Will W. Sachse (PA 84097)
*/s/ Benjamin R. Barnett*
Benjamin R. Barnett (PA 90752)
*/s/ Mary H. Kim*
Mary H. Kim
*/s/ Nicolas A. Novy*
Nicolas A. Novy (PA 319499)
*/s/ Theeya Musitief*
Theeya Musitief (PA 327295)*
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2496
Will.Sachse@dechert.com
Ben.Barnett@dechert.com
Mary.Kim@dechert.com
Nicolas.Novy@dechert.com
Theeya.Musitief@dechert.com
*Attorneys for Petitioners/Plaintiffs*

**DATE: May 14, 2021**

## CERTIFICATE OF SERVICE

I, Matthew A. Feldman, hereby certify that on May 14, 2021, I caused to be served a true and correct copy of the foregoing Motion for Contempt and Sanctions upon all counsel of record via the Court's ECF system.

*/s/ Matthew A. Feldman*
Matthew A. Feldman
Attorney I.D. # PA 326273
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: 215-925-2966
F: 215-925-5337
mfeldman@pailp.org
