IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS REMICK, NADIYAH WALKER, JAY DIAZ, MICHAEL ALEJANDRO, MICHAEL DANTZLER, ROBERT HINTON, JOSEPH WEISS, JOSEPH SKINNER, SADDAM ABDULLAH, and JAMES BETHEA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, <br><br> Defendants. | Case No. 20-cv-1959 <br><br> ELECTRONICALLY FILED |

## FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. As a result of the policies, practices, and actions adopted and undertaken by Defendants since the start of the COVID-19 pandemic, Plaintiffs, who are incarcerated at the Philadelphia Department of Prisons ("PDP"), are being held in conditions of confinement that violate the Eighth and Fourteenth Amendments to the United States Constitution. Under current conditions, which include extended periods of total lockdown, Plaintiffs—the vast majority of whom are pretrial detainees—are denied timely and adequate medical care, protection from physical and mental harm, access to legal counsel, access to timely legal mail, and due process in

disciplinary proceedings.  These conditions have led to a high death rate and rampant assaults, and they severely threaten Plaintiffs' physical and mental health.

2. The named Plaintiffs, on their own behalf and on behalf of all others similarly situated, seek changes in the conditions of their confinement to both protect them from the clear and present danger of disease and death from COVID-19 and to ensure humane living conditions, as required by the United States Constitution.  Plaintiffs seek injunctive relief that would require Defendants to comply with recognized public health and safety measures to prevent the spread of the virus for those confined at jails and prisons, and to ensure adequate out-of-cell time; proper medical care; access to the courts; access to counsel, legal mail, and law libraries; due process in disciplinary proceedings; and protection from violence from correctional officers and other incarcerated persons.  In the alternative, and should such relief not ameliorate the ongoing constitutional violations in PDP, Plaintiffs seek an order requiring that the City reduce the population of PDP facilities to a level sufficient to allow the City to satisfy its constitutional obligations.

3. Prisons and jails have become epicenters of COVID-19 throughout the United States.  The population within PDP is vulnerable to the spread of COVID-19 due to the congregate nature of jails, exacerbated by unnecessary crowding, inadequate sanitation, denial of hygiene products, and inadequate staffing and procedures for delivery of essential services.

4. To comply with basic Constitutional guarantees and to protect against COVID-19 infections, Defendants must provide adequate sanitation and hygiene practices and proper quarantine and social distancing protocols that conform to the Centers for Disease Control and Prevention ("CDC") standards.  They have failed to do so.

5. At the same time, Defendants must provide adequate out-of-cell time to allow for essential services such as medical care, access to counsel, family visits, law libraries, showers, phone calls, and physical exercise. Defendants must also continue to ensure that there is due process for people placed in disciplinary or administrative segregation; adequate and timely provision of medications; and protection from violence by correctional officers and other incarcerated persons. The dearth of opportunity to engage in constructive activities creates oppressive conditions that foster abuse and violence without ensuring adequate protections to maintain a stable environment.

6. It is of paramount importance that Defendants ensure a sufficient staff of correctional officers, social workers, medical personnel, and other service providers proportional to the number of incarcerated persons to ensure the timely delivery of essential services and the protection of the plaintiff class ("Plaintiffs"). They have failed, and Plaintiffs continue to suffer.

## I. JURISDICTION AND VENUE

7. Plaintiffs bring this class action pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202; and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA").

8. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1343(a) (civil rights jurisdiction) and 28 U.S.C. § 1331 (federal question jurisdiction).

9. This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Eastern District of Pennsylvania.

## II. PARTIES

10. Thomas Remick, Nadiyah Walker, Jay Diaz, Michael Alejandro, Michael Dantzler, Robert Hinton, Joseph Weiss, Joseph Skinner, Saddam Abdullah and James Bethea are all adult individuals who were incarcerated at a PDP facility at the time of the filing of the original

Complaint in this case, who were at a heightened risk for more severe symptoms and potential death from COVID-19 due to their age and/or underlying medical conditions, and who are or have been denied essential constitutionally mandated services. They seek injunctive and declaratory relief on behalf of themselves and on behalf of those who currently are or will in the future be subjected to unconstitutional conditions of confinement within the PDP.

11. Defendant City of Philadelphia is a political subdivision organized and existing under the laws of the Commonwealth of Pennsylvania. The City of Philadelphia funds, controls, and operates the Philadelphia Department of Prisons. The City of Philadelphia currently has immediate custody over Plaintiffs.

12. Defendant Blanche Carney is the Commissioner of PDP. Defendant Carney currently has immediate custody over Plaintiffs. Defendant Carney is a final policymaker for the City of Philadelphia, and she is sued in her official capacity.

13. All defendants have acted under color of state law.

### III.    FACTUAL ALLEGATIONS

14. The City of Philadelphia is still plagued by the most significant pandemic in generations.

15. The older a person is, the greater their risk of serious illness or death from COVID-19.[1] People of any age are at an elevated risk if they suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems

---

[1] *See* Complaint Exhibit A, ECF No. 1-4, Amon Decl. ¶ 9 (observing that "those ≥54 years could be considered high risk for severe disease and death."); and Exhibit B, ECF No. 1-5, Cohen Decl. ¶ 36.

(such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, or asthma.[2]

16. People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of coronavirus infection and COVID-19.[3]

17. Correctional settings increase the risk of contracting COVID-19 because of the concentration of people with chronic, often untreated, illnesses in a setting with minimal levels of sanitation, limited access to personal hygiene items, and limited access to medical care.[4]

18. Numerous public health experts, including Dr. Joseph Amon,[5] Dr. Robert L. Cohen,[6] Dr. Gregg Gonsalves,[7] Ross MacDonald,[8] Dr. Marc Stern,[9] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[10] Dr. Anne Spaulding,[11] Homer Venters,[12] the faculty at Johns

---

[2] ECF No. 1-4, Amon Decl. ¶ 8; ECF No. 1-5, Cohen Decl. ¶ 43.

[3] ECF No. 1-4, Amon Decl. ¶ 29; ECF No. 1-5, Cohen Decl. ¶ 5.

[4] ECF No. 1-4, Amon Decl. ¶¶ 28-29, 33-35, 38, 43, 45; ECF No. 1-5, Cohen Decl. ¶¶ 4-5, 36.

[5] ECF No. 1-4, Amon Decl. ¶ 63.

[6] ECF No. 1-5, Cohen Decl. ¶ 4-6.

[7] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak*, Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[8] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[9] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[10] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, (March 10, 2020), https://cutt.ly/QtRSYNA.

[11] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[12] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

Hopkins schools of nursing, medicine, and public health,[13] and Josiah Rich[14] have cautioned that people booked into and held in jails are likely to face serious harm due to the COVID-19 pandemic.

19.     Correctional staff are also at risk of COVID-19 infections.  As of September 13, 2021, only slightly more than one-half of PDP correctional staff is confirmed to have received even a single dose of any of the three available COVID-19 vaccines.

20.     CDC guidelines recommend:  (a) providing all incarcerated persons a six-foot radius or more of distance from any other persons, including during meals, transportation, court sessions, recreation, counts, and all other activities; (b) instituting a safety plan to prevent a COVID-19 outbreak in PDP's facilities in accordance with CDC guidelines; (c) making sanitation solutions readily and freely available for the purposes of cleaning cells, dormitories, laundry, and eating areas, including sufficient antibacterial soap, and lifting any ban on alcohol-based hygiene supplies (e.g. hand sanitizer, cleaning wipes); (d) providing adequate and appropriate COVID-19 vaccinations and testing for incarcerated persons, jail staff, and visitors; (e) waiving all medical co-pays for those experiencing COVID-19 like symptoms; (f) providing sufficient personal protective equipment, particularly masks, and to all staff and incarcerated people; (g) coordinating with local law enforcement and court officials to identify legally acceptable alternatives to in-person court appearances and options to prevent overcrowding, including alternatives to

---

[13] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[14] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

incarceration; (h) planning for staff absences; and (i) modifying measures as appropriate for fully-vaccinated individuals.[15]

21. Defendants have failed to consistently implement the above-described recommendations for reducing the risk of COVID-19 pandemic.

22. Since the start of the COVID-19 pandemic, staffing levels at the PDP have become grossly deficient. According to City Controller Rebecca Rhynhart, the PDP was short-staffed at the start of the COVID-19 pandemic and, as of mid-September 2021, was 479 people short of the 1,884 needed to fully staff the jails.[16] Between April and August 2021, staffing levels dropped by 101.

23. Further exacerbating the staffing shortage is the high rate of absenteeism among PDP staff members. The average absentee rate among corrections officers is more than 25% per shift. On weekends, it is not uncommon for more than 40% of scheduled corrections officers to fail to report for their shifts. There is also a shortage of other prison staff, including social workers, nurses, and psychiatrists.

24. As a result of restrictions implemented in response to the COVID-19 pandemic and the chronic and critical staffing shortage, significant numbers of class member-Plaintiffs, the vast

---

[15] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Sept. 13, 2021).

[16] Samantha Melamed, *Philly prison 'crisis' now includes a grand jury investigation and more court-ordered reforms*, The Philadelphia Inquirer (Sept. 20, 2021), available at https://www.inquirer.com/news/philadelphia-prisons-grand-jury-investigation-riot-disturbance-20210920.html (last visited Sept. 22, 2021); Maggie Kent, *Philadelphia's prison guard shortages lead to dangerous conditions for inmates, staff*, 6 ABC News (Sept. 17, 2021), available at https://6abc.com/prison-guard-shortage-philadelphia-system-inmates-safety/11027878/ (last visited Sept. 19, 2021).

majority of whom are pretrial detainees, are being held in unconstitutional conditions of confinement, as described below:

      a.    Class member-Plaintiffs are denied adequate out-of-cell time (including time out of cell that Defendants had agreed to provide, and which has been ordered by the Court) to protect both their physical and mental health and to provide access to essential and constitutionally mandated services. This lack of out-of-cell time results in significant numbers of Plaintiffs being unable to access showers and, to place phone calls to family and legal counsel. These solitary confinement and extreme isolation conditions have caused and exacerbated mental illness and mental distress for class member Plaintiffs, and in particular persons with mental health disabilities. Plaintiffs detained in these conditions also suffer physical harm due to the lack of exercise for prolonged periods of times, and the harmful effects are exacerbated for those with chronic medical conditions that require exercise.

      b.    Class member-Plaintiffs have been denied timely access to necessary medical care and medications. Insufficient staffing levels result in a lack of timely responses and medical treatment for those seeking medical care by sick call requests, medications not being dispensed according to the medically prescribed schedules, and the cancellation of appointments with outside medical providers.

      c.    Class member-Plaintiffs suffering from medical emergencies in their cells are not provided necessary medical care and treatment and have been forced to wait for prolonged periods for assistance from medical staff, exacerbating their condition and putting them at risk of illness, injury and death. Emergency call buttons in the cells either do not function properly or are ignored by staff. Staffing levels are not proportional to the number of incarcerated people, leaving those suffering from medical emergencies without necessary care.

    d.  Class member-Plaintiffs have not had in-person family visits since March 2020, regardless of vaccination status. Access to families through phones or tablets has been greatly limited due to the lack of a sufficient number of working tablets and/or phones, technological difficulties within the virtual visit application, lack of staff , lack of out-of-cell time to access the phones, and the cost of virtual visits.

    e.  The delivery and the sending of legal mail has been subject to long delays. Legal mail received by the PDP is not promptly delivereds, with delays extending to more than a week.

    f.  Class member-Plaintiffs do not have regular access to the law library.

    g.  Class member-Plaintiffs housed on segregation units have not had access to commissary, which means they often have no access to paper, writing implements, or postage, items needed to write legal letters and/or filings.

    h.  Visits with attorneys, both in-person and remote, are often cancelled due to lack of staff and/or COVID-19 quarantine restrictions. Entire housing units are at times denied access to their attorneys due to lack of staffing and other PDP administrative restrictions..

    i.  On some occasions, Plaintiffs have not been transported to remote (via video) and in-person court proceedings, risking additional months of delay in their cases and prolonging their incarceration.

    j.  Plaintiffs have been subjected to discipline, including being held in punitive or administrative segregation housing, without disciplinary hearings or proceedings, sometimes for several months.

      k.      Plaintiffs have been subjected to an increased danger of violence and death. There have been at least 14 deaths in the PDP this year.[17] The Bureau of Justice Statistics reports in 2019, the most recent year for which data is available, the national mortality rate for local jails was 163.37 per 100,000.[18] The mortality rate for PDP facilities in the same period was 215.19 per 100,000.  The mortality rate for PDP facilities for 2021 is approximately 300 per 100,000, almost double the national rate for 2019.  Between August 2020 and April 2021, five or six incarcerated individuals in the PDP were killed.[19]  These numbers represent a homicide rate that is significantly higher than the national average in jails.  According to data from the Bureau of Justice Statistics, the local jail homicide mortality rate for 2018, the most recently available year, is 4 deaths per 100,000.[20]  The homicide rate at PDP facilities is approximately 114.90 or 137.89 per 100,000 for the period between August 2020 and April 2021, roughly thirty times the national average.

      l.      The risk of violence is exacerbated by the lockdown conditions, which lead to disputes and fights over phones during the limited time when people are out of their cells, and

---

[17] Samantha Melamed, *'We need help': Video, reports depict violence and 'riots' at Philadelphia jails*, The Philadelphia Inquirer (Aug. 26, 2021), *available at* https://www.inquirer.com/news/philadelphia-prison-riot-cfcf-assault-20210826.html (last visited Sept. 13, 2021).

[18] Bureau of Justice Statistics, *Suicide in Local Jails and State and Federal Prisons, 2000-2019*, Statistical Table 1, (October 2021), available at https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019st.pdf (last visited October 13, 2021); Bureau of Justice Statistics, *Correctional Populations in the United States, 2019*, (July 2021), available at https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/cpus19st.pdf (last visited October 13, 2021).

[19] Samantha Melamed, *Another assault at Philly jail leaves a man on life support and staff and prisoners warning of a crisis*, The Philadelphia Inquirer (Apr. 23, 2021), *available at* https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html (last visited Sept. 13, 2021).

[20] Bureau of Justice Statistics, *Mortality in Local Jails, 2000-2018 – Statistical Tables*, (April 2021), (last visited September 19, 2021).

by the staff shortage, which leads to housing units being left unattended by corrections officers for hours at a time.  The risk of violence and resulting serious injury or death is further exacerbated by the fact that emergency call buttons in cells either do not function properly or are ignored.

      m.      Locking mechanisms on cell doors are easily disabled, thereby allowing some incarcerated individuals to leave their cells and attack others.  Instead of repairing the locks, PDP has installed bolt locks on the cell doors on some housing units, which can only be unlocked manually, one by one, thereby exposing Plaintiffs to an unreasonable risk of serious injury or death should a fire or other emergency occur.

      n.      There has been an increase in the use of unreasonable force by corrections officers against incarcerated individuals, including but not limited to the frequent use of pepper spray to enforce PDP's lockdown practices.  PDP correctional officers routinely use pepper spray and other force in response to verbal provocations or minor rule violations, rather than to protect themselves or others from physical harm.  Individuals merely in the vicinity of conflicts with officers or other persons are subjected to pepper spray without warning.  Defendants have failed to adequately train or supervise officers in the proper use of pepper spray, causing inmates to be sprayed in sensitive areas or sprayed with prolonged sprays instead of short bursts.  When pepper spray is used, Plaintiffs have been denied needed medical care to ameliorate its effects.  Pepper spray and other force are frequently used without any regard for the victims' physical or psychiatric disabilities, which place them at greater risk of injury or death from such force. PDP staff used pepper spray on incarcerated people 554 times in 2020, a 9% increase compared to the previous

year, despite a 6% decrease in the average monthly population. In 2020, pepper spray was used more at PICC than in all but two of the county jails in Pennsylvania on a per capita basis.[21]

## IV.     CLASS ACTION ALLEGATIONS

25. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals, and they seek to represent a class of all individuals who are now or in the future will be held in custody at PDP's facilities ("Class").

24. The proposed class includes two subclasses: (1) persons who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Subclass"), and (2) persons who, by reason of their disability, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Disability Subclass").

26. The "Medically Vulnerable Subclass" is defined as all current and future persons in the custody of the Philadelphia Department of Prisons who are 55 or older, as well as all current and future persons held of any age who have a medical condition that places them at increased risk of COVID-19 illness, injury, or death, including but not limited to: (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g., bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease; (c) chronic liver or kidney disease

---

[21] Pennsylvania Department of Corrections (2020). *2020 County Prisons Extraordinary Occurrences Report (EOR) Data*, 2020, *available at* https://www.cor.pa.gov/Facilities/CountyPrisons/Pages/Inspection-Schedule,-Statistics-And-General-Info.aspx.; Pennsylvania Department of Corrections (2019). *2019 County Prisons Extraordinary Occurrences Report (EOR) Data*, 2019, *available at* https://www.cor.pa.gov/Facilities/CountyPrisons/Pages/Inspection-Schedule,-Statistics-And-General-Info.aspx.

(including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.  All named Plaintiffs represent the Medically Vulnerable Subclass.

27. The "Disability Subclass" is defined as all current and future persons in the custody of the Philadelphia Department of Prisons who have an impairment, including a mental illness, that substantially limits one or more of their major life activities and who are at increased risk of COVID-19 illness, injury, or death due to their disability or any medical treatment necessary to treat their disability, or who are at greater risk of harm from the current conditions in the PDP due to their disability.  This subclass includes but is not limited to those who have: (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g., bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders and/or (i) developmental disability.[22]  All named Plaintiffs represent the Disability Subclass.

---

[22] The disability subclass is separate and apart from the medically vulnerable class as age, and some conditions within the medically vulnerable class, such as pregnancy, are not factors that place a person under the ambit of the ADA's protections.

28. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

29. Joinder is impracticable because (1) the class members are numerous; (2) the classes include unidentifiable future members; and (3) the class members are incarcerated, reducing their ability to institute individual lawsuits.

30. Common questions of law and fact exist as to all members of the proposed classes; all have the right to receive adequate COVID-19 prevention, testing, and treatment; and all have the right to humane conditions of confinement.

31. The named Plaintiffs' claims are typical of the members of the class because the named Plaintiffs and all class members are injured by the same wrongful acts, omissions, policies, and practices of Defendantsas described in this Complaint.  The named Plaintiffs' claims arise from the same practices, policies, and conduct that gives rise to the claims of the class members, and they are based on the same legal theories.

32. The named Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  They have no interests adverse to the interests of the proposed class.  They retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

33. Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek class certification under Rule 23(b)(2).

34. In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

**FIRST CLAIM FOR RELIEF**

**Unconstitutional Conditions of Confinement in Violation of the
Eighth and Fourteenth Amendments to the U.S. Constitution**
42 U.S.C. § 1983

35. Under the Eighth and Fourteenth Amendments, corrections officials are required to provide for the reasonable health and safety of persons, whether sentenced or in pretrial detention, and they must provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982). Correctional officials have an affirmative obligation to protect persons in their custody from infectious disease. Correctional officials also have an obligation not to place persons in their custody in oppressive conditions, including prolonged lockdowns and solitary confinement. Correctional officials must provide adequate access to medical care, must protect incarcerated individuals from violence from others, and may not use unreasonable or excessive force against incarcerated individuals. Officials violate the rights of incarcerated individuals when they are either deliberately indifferent to conditions of confinement that are likely to cause them serious harm and that pose an unreasonable risk of serious damage to their future health, *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993), or if their acts are objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 397–98 (2015).

36. PDP's facilities, as currently operated, deny the Plaintiff class the protections of the Eighth and Fourteenth Amendments.

**SECOND CLAIM FOR RELIEF**

**Deprivation of Right of Access to Courts and Counsel in Violation of the
First, Sixth, and Fourteenth Amendments to the U.S. Constitution**
42 U.S.C. § 1983

37. The First, Sixth, and Fourteenth Amendments to the U.S. Constitution provide that all incarcerated individuals must be provided with access to a law library, access to the materials necessary to petition the court, and the ability to have privileged, timely communications with both criminal and civil counsel.

38. Defendants have violated Plaintiffs' rights under the First, Sixth, and Fourteenth Amendments by cancelling both remote and in-person legal visits, delaying legal mail, failing to provide access to the law library, failing to transport Plaintiffs to, or cancelling, remote and in-person court appearances, and failing to provide Plaintiffs with materials necessary to write to the courts or their lawyers.

**THIRD CLAIM FOR RELIEF**

**Deprivation of Due Process Rights in Violation of the
Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983

39. Under the Fourteenth Amendment to the United States Constitution, pretrial detainees have a liberty interest in not being detained indefinitely in more restrictive conditions than the general prison population.

40. The Due Process Clause requires that pretrial detainees placed in restrictive housing for administrative reasons be provided an explanation of the reason for their transfer and an opportunity to respond.

41. The Due Process Clause requires that pretrial detainees placed in restrictive housing as punishment for disciplinary infractions be provided written notice of the charges against them,

an opportunity to defend themselves against the charges, and a written statement of the evidence relied on and the reasons for the disciplinary action.

42. Defendants have violated Plaintiffs' due process rights by placing and keeping them in punitive or administrative segregation without due process.

## FOURTH CLAIM FOR RELIEF

**Violation of the Americans with Disabilities Act**
42 U.S.C. §§ 12101 et seq.

43. Title II of the ADA bars public entities, such as PDP, from excluding qualified individuals with disabilities from its services, programs, or activities, or otherwise subjecting them to discrimination, and requires public entities to make reasonable accommodations for individuals' disabilities.

44. Plaintiffs, and other members of the Disability Subclass, are qualified individuals with disabilities under the meaning of the ADA.

45. Access to medical treatment and safe conditions of confinement are programs or services that PDP's facilities must provide to incarcerated people for purposes of the ADA.

46. Defendants discriminate against people with disabilities by denying them reasonable accommodations in accordance with CDC guidelines and necessary to protect themselves from COVID-19.

47. Defendants also discriminate against people with psychiatric disabilities by failing to provide adequate out-of-cell time and mental health treatment.

## V.    REQUEST FOR RELIEF

48. Plaintiffs respectfully request that the Court order the following:

   a. Certification of this case as a Class Action under Fed. R. Civ. P. 23(b)(2);

b. Injunctive relief ordering Defendants to mitigate the serious risk of illness, death, and harm from COVID-19 and to provide constitutional conditions of confinement, access to counsel and courts, and due process to those in disciplinary or administrative segregation in the PDP;

c. A declaration that Defendants' policies and practices violate the First, Sixth, Eighth and Fourteenth Amendments and that Defendants' policies and practices violate the Americans with Disabilities Act with respect to the Disability Subclass.

d. An award of Plaintiffs' attorneys' fees and costs; and

e. Any further relief this Court deems just and appropriate.

Respectfully submitted,

| | |
|---|---|
| */s/ Su Ming Yeh* | */s/ David Rudovsky* |
| Su Ming Yeh (PA 95111) | David Rudovsky (PA 15168) |
| */s/ Matthew A. Feldman* | */s/ Jonathan H. Feinberg* |
| Matthew A. Feldman (PA 326273) | Jonathan H. Feinberg (PA 88227) |
| */s/ Grace Harris* | */s/ Susan M. Lin* |
| Grace Harris (PA 328968) | Susan Lin (PA 94184) |
| PENNSYLVANIA INSTITUTIONAL LAW PROJECT | KAIRYS, RUDOVSKY, MESSING, FEINBERG, & LIN, LLP |
| 718 Arch St., Suite 304S | 718 Arch Street, Suite 501S |
| Philadelphia, PA 19106 | Philadelphia, PA 19106 |
| (215) 925-2966 | (215) 925-4400 |
| smyeh@pailp.org | drudovsky@krlawphila.com |
| mfeldman@pailp.org | jfeinberg@krlawphila.com |
| gharris@pailp.org | slin@krlawphila.com |

| | |
|---|---|
| */s/ Nyssa Taylor* <br> Nyssa Taylor (PA 200885) <br> AMERICAN CIVIL LIBERTIES UNION <br> OF PENNSYLVANIA <br> P.O. Box 60173 <br> Philadelphia, PA 19102 <br> (215) 592-1513 <br> ntaylor@aclupa.org <br><br> */s/ Bret D. Grote* <br> Bret Grote (PA 317273) <br> */s/ Nia Holston* <br> Nia Holston (PA 327384)* <br> */s/ Rupalee Rashatwar* <br> Rupalee Rashatwar (FL 1011088)* <br> bretgrote@abolitionistlawcenter.org <br> nia@alcenter.org <br> rupalee@alcenter.org <br> ABOLITIONIST LAW CENTER <br> PO Box 8654 <br> Pittsburgh, PA 15221 <br> (412) 654-9070 | */s/ Will W. Sachse* <br> Will W. Sachse (PA 84097) <br> */s/ Benjamin R. Barnett* <br> Benjamin R. Barnett (PA 90752) <br> */s/ Mary H. Kim* <br> Mary H. Kim* <br> */s/ Nicolas A. Novy* <br> Nicolas A. Novy (PA 319499) <br> DECHERT LLP <br> Cira Centre <br> 2929 Arch Street <br> Philadelphia, PA 19104-2808 <br> (215) 994-2496 <br> Will.Sachse@dechert.com <br> Ben.Barnett@dechert.com <br> Mary.Kim@dechert.com <br> Nicolas.Novy@dechert.com <br><br> * *indicates counsel who will seek pro hac vice admission or whose admission to this Court is pending* |

*Attorneys for Plaintiffs*

DATE: October 14, 2021