**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS REMICK, NADIYAH WALKER, JAY DIAZ, MICHAEL ALEJANDRO, MICHAEL DANTZLER, ROBERT HINTON, JOSEPH WEISS, JOSEPH SKINNER, SADDAM ABDULLAH, and JAMES BETHEA, on behalf of themselves and all others similarly situated,** | : : : : : : : : : | **No. 2:20-cv-01959-BMS** |
| **Plaintiffs-Petitioners,** | : : | |
| **v.** | : : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,** | : : : : | |
| **Defendants-Respondents.** | : : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

The Covid-19 pandemic caused extraordinary disruption in the operation of society generally, and even more so in the operation of the criminal justice system and carceral settings. While this assertion states the obvious, any acknowledgement of the enormity of this disruption is palpably missing from Plaintiffs' application for injunctive relief.  Instead, Plaintiffs seek injunctive relief because, distilled to its particulars, the Philadelphia Department of Prisons ("PDP") is not operating in the same manner it did in 2019.  Of course it is not.  Which is not to say that PDP is not aware of, concerned about, and constantly working to mitigate the effects of the pandemic on its operations, or that PDP does not accept the important responsibilities required of it by law.  The constant, ongoing efforts by PDP to meet the challenges of the pandemic, and the extent to which PDP has mitigated many of the collateral consequences of the pandemic, cannot be overstated.

Plaintiffs' unformed application for injunctive relief fails to meet their high burden to establish entitlement to mandatory injunctive relief, and should be denied.  First, Plaintiffs contend that putative class members' constitutional rights are violated in a myriad of ways, yet instead of providing material support for these contentions they instead make sweeping allegations without citation to any record support evidencing that Defendants are engaging in pervasive, ongoing constitutional violations that might warrant imposition of legal restraints on the operation of a prison.  Framed another way, Plaintiffs do not, and cannot, establish a likelihood of success on the merits of their claims that they are subjected to ongoing, unaddressed constitutional harms.  Second, Plaintiffs fail to articulate what relief they are actually seeking, which renders meaningless the Court's responsibility to consider the balancing of equities ahead of issuing any injunctive relief.  By failing to request specific relief, Plaintiffs have made it impossible for the Court to comply with the dictates of the Prison Litigation Reform Act ("PLRA"), which mandates that injunctive relief cannot be imposed upon a carceral institution unless that relief is narrowly tailored to address the alleged constitutional harm.  Third, and also implicated by the narrow-tailoring required by the PLRA, Plaintiffs have not, and cannot, establish that the constitutional harms they allege are experienced on an ongoing, systemwide basis.

Defendants are cognizant of the challenges they face, and continue to work assiduously to address them.  As detailed further below, the Plaintiffs' inability to establish a likelihood of success on the merits of their claims; the fact that Defendants are continuously working to address the staffing levels that, according to Plaintiffs, drive the matters about which they complain; and the instruction by Congress and the Courts that the judiciary should tread lightly

in matters of prison management, all counsel against the imposition of injunctive relief. Plaintiffs' application for same should be denied.

## I.        FACTUAL BACKGROUND

Defendants incorporate by reference the historical recitation of this case submitted to the Court by way of the Response in Opposition to Plaintiffs' Motion for Contempt.  Resp. in Opp., ECF No. 119, at 1-14.  This context remains essential to the consideration of Plaintiffs' claims, particularly where Plaintiffs must establish a subjective element of indifference to the alleged constitutional harms in order to warrant relief and particularly where all Defendants' actions have been taken to mitigate the effects of both the Covid-19 virus and the extraordinary effects it has had and continues to have on the operation of the local criminal justice system.  Having incorporated the background of this case, Defendants will instead highlight relevant facts about Plaintiffs' alleged harms.

### A.  *Philadelphia Department of Prisons Staffing*

Immediately before the onset of the Covid-19 pandemic, PDP was experiencing a staffing shortage of seventeen percent (17%).  Declaration of Deputy Commissioner Xavier Beaufort, Feb. 11, 2022 ("Beaufort Decl.") ¶ 3.  Seeking to address this staffing shortage, calculated as the difference between the number of security staff identified as necessary in the officer post plan and the number of positions which were filled, PDP had initiated hiring efforts in late 2019, efforts which resulted in a class of 30 cadets being started in February 2020.  *Id.* ¶ 4.  Consistent with the unprecedented displacement caused by the pandemic, the training period for these new cadets was delayed such that they did not graduate from the training academy until July 2020. *Id.* ¶ 5.  That graduating class numbered 27 cadets.  *Id.* ¶ 6.  Due to the catastrophic effects of the

pandemic on City finances, a City-wide hiring freeze went into effect shortly after the outbreak of Covid-19, and was in place until Fall 2020.  *Id.* ¶ 7.

Upon cessation of the hiring freeze, PDP sought and received approval to begin hiring another class of correctional officers.  Beaufort Decl. ¶ 8.  That class of 23 entered into the training academy in February 2021 and graduated in May 2021.  *Id.* ¶ 9.  The process for the identification of these candidates followed applicable civil service regulations.  *Id.* ¶ 10.  Job announcements for correctional officer, as with all civil service positions, have traditionally been posted on the City's website for citywide awareness.  *Id.*  Those who respond to the announcement are then scheduled to take a test for the position, from which results an "eligible list" is created.  *Id.*  Applicants are ranked in order by test result.  *Id.*  When PDP got permission in fall 2020 to hire correctional officers, the candidate pool was controlled by the then-existing eligible list.  *Id.*

Traditionally, once the eligible list generates and permission to hire is granted, PDP schedules orientations and invites the eligible list to attend orientations.  Beaufort Decl. ¶ 11. Consistent with civil service regulations, these invitations are issued in ranked order – PDP cannot consider candidates lower down the eligibility list until those higher up have been considered or have removed themselves from consideration.  *Id.* ¶ 12.  PDP invited 100 individuals to orientation, and about 40 consistently showed up.  *Id.* ¶ 13.  Those 40 applicants were then subject to an additional screening process to determine eligibility.  *Id.*  At an initial interview, each applicant was asked to provide detailed background information regarding job history, drug usage, criminal history, and any relationships with individuals who are or have been incarcerated in PDP facilities.  *Id.*  The applicant also provides standard documentation, including birth certificate, social security card, driver's license, high school diploma, and proof

4

of citizenship. *Id.* ¶ 14. After a second interview, to confirm receipt of all necessary information, the successful candidate is then scheduled for a drug test. *Id.* ¶ 15. If that result is negative, the applicant then is medically screened for fitness for duty, after which clearance the applicant has a debt check run and a criminal history run. *Id.* If the applicant owes any debt to the City, that debt must be cleared or a payment plan entered into prior to being hired by the City. *Id.* ¶ 16. Once a sufficient number of individuals have successfully completed this background check process, a two-week notice is sent to the members of the new cadet class. *Id.* ¶ 17. This process, in pre-pandemic times, traditionally took over two months to complete. *Id.*

In spring 2021, PDP sought and received permission to expedite hiring and to expand beyond the standard process. Beaufort Decl. ¶ 18. In May 2021 PDP posted a new job announcement on the City website, and bolstered its visibility with radio advertisements on major stations. *Id.* ¶ 19. This announcement ran from May 6-17, 2021. *Id.* As a further recognition of the urgent focus on hiring new correctional officers, the City permitted PDP to waive the test requirement, and instead treat the entire applicant pool from that job announcement as a list. *Id.* ¶ 20. That eligible list numbered 400 people, who were invited, sequentially, to orientations and then, if they remained interested and successfully completed the background and health checks, offered employment.[1] *Id.*

As discussed, PDP sought and received approval to hire on a continuous basis starting in spring 2021, with the following hires occurring through 2021 and graduating in 2021 into 2022 as follows:

---

[1] In addition to these efforts to recruit and hire new employees, PDP tested an incentive pay structure to encourage attendance by its current uniform staff. Imposed by agreement with Local 159B, the bargaining unit that represents the security staff, this incentive payment was in place in June 2021.

- 15 cadets entered academy early July 2021, graduated September 2021
- 30 cadets entered academy mid-August 2021, graduated early November 2021
- 27 cadets entered academy early November 2021, graduated late January 2022
- 17 cadets entered academy mid-December 2021, will graduate early March 2022

Beaufort Decl. ¶ 21.  While PDP ran these continuous background checks and training academies, the next round of recruitment was also initiated.[2]

In July 2021, PDP hired PhilaWorks to assist in recruitment throughout the City. PhilaWorks used its locations throughout the City to help recruit and respond to interested applicants, and sponsored another round of radio advertisements for the correctional officer job. Beaufort Decl. ¶ 22.  After engaging this partner, PDP ran another job announcement from September 6 - October 15, 2021.  *Id.* ¶ 23.  That job announcement yielded over 700 applicants, and once again PDP was permitted to bypass the testing requirement.  *Id.*  Rather than running the hiring process for each group of people who attend an orientation, PDP instead scheduled successive weekend orientations for all the individuals on the list, and promptly began the background check procedures for those people who attended orientation.  *Id.* ¶ 24.  For those background processes, PDP sought to expedite the process by requesting that interested individuals arrive to orientations with the necessary questionnaires and documentation that would otherwise be requested at an initial interview.  *Id.* ¶ 25.  As a result of these ongoing, expedited efforts, PDP is preparing to start a training class in late February.  *Id.* ¶ 26.

To put these numbers in context, in February 2020 PDP's officer post plan called for 1,757 security staff, and 1,523 individuals served in that role, a vacancy rate of 17%.  Beaufort Decl. ¶ 3.  By contrast, in January 2022, the officer post plan called for 1,642 security staff (the decrease is a function of posts that were no longer required because of the impact of the

---

[2] During this period, PDP also sought and received permission to recruit categories of retired security staff.  This recruiting effort did not yield the hoped-for results.

pandemic on prison operations).  *Id.* ¶ 27.  Of those positions, 1,111 were filled, a vacancy rate

of 32%.  *Id.*  As described above, PDP is in the midst of aggressively filling those vacancies.

PDP's hiring efforts are ongoing, and another job announcement will post later this

month. PDP recognizes that attrition rates have been higher than expected during pandemic,

much as they have been at higher carceral institutions around the country.  But PDP, in

partnership with the City, has taken and continues to take substantial efforts to recruit, hire, and

onboard security staff.

### B.  Out of Cell Time

Plaintiffs state, without support, that "incarcerated people throughout PDP are denied

adequate out-of-cell time . . . [which] means that incarcerated people are frequently unable to

take showers or to place phone calls to family and legal counsel."  Pls.' Mot. at 5.  This is

patently incorrect.

The charts submitted herewith illustrate the daily out of cell time reported for both CFCF

and PICC between December 17, 2021 and February 10, 2022.  *See* CFCF Out of Cell Time,

attached as Ex. A to Beaufort Decl.; PICC Out of Cell Time, attached as Ex. B to Beaufort Decl.

As illustrated in these charts, CFCF has been largely successful at providing at least three hours,

and often much more, of time out of cell across the general population housing units.  PICC has

been less successful, though the numbers are a significant improvement over those reported for

Fall 2021 (which are reflected in the charts submitted at ECF No. 119-1).

Out of cell time efforts were, of course, impacted by the Omicron spike in January.  But

the February numbers suggest a return to a higher recreation time baseline.  Defendants' efforts

to increase recreation, particularly at CFCF, have thus resulted in a clear majority of the

incarcerated population having substantially increased time out of cell.  And Defendants will continue in these efforts, so long as infection rates permit.

   *C.  Medical Care*

   Plaintiffs sweepingly contend, without citation to evidence, that "incarcerated persons are denied timely access to necessary medical care and medications."  Pls.' Mot. at 6.  Contrary to this unsupported representation, since March 2020 the physical healthcare providers at PDP have had hundreds of thousands of patient contacts.

   Prior to the pandemic, PDP served as a model to many other jurisdictions for its provision of physical and mental healthcare.  Declaration of Chief of Medical Operations Bruce W. Herdman, Feb. 11, 2022 ("Herdman Decl.") ¶ 3.  For example, the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services ("SAMHSA") included PDP's MAT program as a best practice in its published guidelines for MAT in corrections, and the DOJ commissioned and made available nationwide a video showing PDP's intake medical evaluation process as exemplary.  *Id.* ¶ 4.  As with the rest of society, however, the pandemic disrupted the ability of PDP to meet the levels of care it had provided to the incarcerated population before the onset of the pandemic.  *See id.* ¶ 5.  In addition to experiencing Covid-driven staff turnover, PDP healthcare providers are tasked with the additional, substantial task of performing all the Covid-19 testing and immunizations in the facilities.  *Id.*  Between managing the PCR serial testing process on admission and for the units in quarantine and the rapid-testing required for the incarcerated population going to court, PDP providers have performed more than sixty-three *thousand* Covid tests.  *Id.* ¶ 7.  PDP healthcare providers are also additionally responsible for counseling, offering, and administering (when accepted) Covid-19 vaccination to the incarcerated population and the PDP staff.  *Id.* ¶ 8.  Since

vaccines were first available, PDP healthcare providers have administered over 11,956 vaccine doses.  *Id.* ¶ 9.

There have certainly been times at which quarantine status due to a Covid exposure on a housing unit or staffing shortages have affected the ability of the healthcare providers at PDP to see patients.  *See* Herdman Decl. ¶ 10.  And PDP healthcare providers have, as a result, developed a process to manage the appointment backlog for the patients in their care.  *Id.* ¶ 10. In addition to PDP management specially assigning correctional officers at CFCF to escort individuals to and from the care providers, an effort which helped to alleviate the appointment backlog, PDP has applied for and received an additional $1.5 million to hire nurses to increase available appointments, and thus reduce the backlog in the near term.  *Id.* ¶ 12.

 D.  *Inmate on Inmate Violence*

Plaintiffs allege that they "have been subjected to an increased danger of violence and death."  Pls.' Mot. at 7.  At PDP, from February 2019 through January 2020, there were 145 altercations between incarcerated persons at all the facilities.  Beaufort Decl. ¶ 30.  That number increased to 149 for the time period of January 2020 through December 2020, and again to 252 for the period of December 2020 through November 2021.  *Id.*  While these are not specifically comparable time periods, they do suggest an increase in violence between members of the incarcerated population.  During each of those years, the total admissions were 18,816 (2019), 11,685 (2020), and 11,452 (2021).  *Id.* ¶ 31.  Given that there is carryover population, admissions are lower than the total population that spent time in PDP facilities in a year.  But for the sake of showing even an inflated risk of harm from another incarcerated individual, those rates would be 145/18,816 (0.77%) for 2019, 149/11,685 (1.28%) for 2020, and 252/11,452 (2.2%) for 2021. Again, those risk calculations are inflated by virtue of having a too-small denominator.

Among the major stressors facing the population are the steady increase in length of stay and the delays in criminal case processing that resulted from the court shutdown and subsequent decisions not to accept members of the incarcerated population that were housed on units in quarantine (despite negative Covid tests).  That latter issue is addressed more below.  As to length of stay, the delays in processing are illustrated by the following chart:

PDP Average Length of Stay (ALOS) for Releases

|  | 2019 | 2020 | 2021 |
|---|---|---|---|
| Release Total | 23,775 | 13,669 | 13,495 |
| ALOS | 76 | 87 | 122 |
| ALOS if housed over 14 days | 144 | 155 | 210 |
| ALOS if housed over 30 days | 186 | 188 | 246 |

Herdman Decl. ¶ 13.  At the same time, the average daily census, as reported in the MacArthur Foundation Safety and Justice Challenge reports, did not substantially shift:

|  | Dec-19 | Dec-20 | Dec-21 |
|---|---|---|---|
| Av. Daily Census | 4,644 | 4,374 | 4,467 |

*See generally* Philadelphia Prison Population Snapshot Reports, *available at* https://www.phila.gov/documents/philadelphia-jail-population-snapshot-reports/ (last viewed Feb. 11, 2022).  As illustrated, the number of releases dropped precipitously after the start of the pandemic.  While a far smaller number of people is being taken into custody, resulting in steady census numbers, those who are incarcerated stay at the jail far longer.  PDP has no control over the stakeholders responsible for these increased time periods, and instead works to mitigate the stress and frustration that result from protracted delays.

    E.  *Correctional Staff Use of Force*

Plaintiffs allege that "there has been an increase in the use of force by correctional officers against incarcerated individuals, including the frequent use of pepper spray to enforce PDP's lockdown policies." Pls.' Mot. at 9. Defendants note that Plaintiffs, in maligning PDP's cohorting efforts as "lockdown policies," grossly mischaracterize PDP's efforts to mitigate the risk of Covid spreading through the carceral institution. Turning to the facts, from February 2019 through January 2020, pepper spray was used 347 times. For January 2020 through December 2020, pepper spray was used 428 times. Beaufort Decl. ¶ 32. And for December 2020 through November 2021, pepper spray was used 660 times. *Id.* During each of those years, the total admissions were 18,816 (2019), 11,685 (2020), and 11,452 (2021). *Id.* ¶ 31. Performing the same, flawed analysis as above, the inflated risk of exposure to pepper spray for each of those years is those rates would be 347/18,816 (1.84%) for 2019, 428/11,685 (3.66%) for 2020, and 660/11,452 (5.76%) for 2021. Again, those risk calculations are inflated by virtue of having a too-small denominator.

*F.  Access to Courts and Counsel*

Plaintiffs state, without any substantiating evidence, that "due to lack of staffing and Defendants' unnecessary and unreasonable quarantine procedures and practices, numerous individuals have not been transported to report (via video) and in-person court proceedings, causing significant and, at times, months-long delays in the resolutions of their criminal charges[.]" Pls.' Mot. at 10. Plaintiffs also state, again without evidence, that "visits with attorneys, both in-person and remote, are often cancelled or delayed due to lack of staff and/or COVID-19 quarantine restrictions." *Id.* at 11.

First, PDP has consistently looked to and applied CDC guidance on quarantine practices.[3] PDP did not institute any quarantine or isolation practice not called for by the CDC, and PDP adopted CDC mitigations promptly, e.g., moving from a 14-day to 10-day quarantine period when called for.  Included in those practices is serial testing, a process that is itself affected by the time period in which laboratories can return results for PCR tests – when community viral surge stretches lab capacity, those delays are also experienced by PDP.  As Plaintiffs are well aware, more than fifty percent of the incarcerated population refuses vaccination.  And Plaintiffs are also well aware that housing assignments must be made with reference to security classification of the incarcerated person.  Housing assignments are also affected by the nature of the PDP, which is a local jail with a transitory population (albeit one in which length of stay has

---

[3] Defendants note that application of CDC guidance, and the fact that such Guidance is updated periodically based upon development of further scientific understanding of variants, risks, etc., further counsels against entry of injunctive relief affecting prison operations during the pandemic, particularly where the application for such relief is based off broad allegations and no actual evidence.  *See, e.g.*, *Roman v. Wolf*, 977 F.3d 935, 946 (9th Cir. 2020).  In *Roman*, the Ninth Circuit Court of Appeals observed:

> Second, although our court previously stayed the district court's preliminary injunction except to the extent it required compliance with the CDC's guidelines for correctional and detention facilities, we think developments since the stay have made clear that those guidelines do not provide a workable standard for a preliminary injunction. The guidance document spans 25 pages and makes hundreds of recommendations, many of which lack specificity. More fundamentally, it contains key caveats, such as that its recommendations "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Given the vagueness of that caveat, it is no surprise that the parties strongly disagree on whether the Government was complying with the CDC guidance even before this case was filed and have continued to disagree about what the CDC guidance means. The guidance document's lack of specificity makes it a poor guidepost for mandatory injunctive relief. *See* Fed. R. Civ. P. 65(d)(1)(B), (C) (an injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required").

*Id.*

increased) rather than a prison facility with a more stable population.  PDP makes every effort to manage these multitude of variables in order to create vaccinated housing units, the quarantine rules for which are different than units housing unvaccinated persons.

The delays Plaintiffs identify are instead due to decisions by actors over which PDP has no control.  Notably, for a period of months, the local court would not allow any individual in the building who was housed on a quarantine unit, regardless of vaccination status or rapid test result.  Beaufort Decl. ¶ 33.  Just this week, however, that prohibition has been lifted.  PDP is now performing rapid tests two days in a row for quarantined individuals who are scheduled for court; if both return a negative result, the court will allow that individual to appear for the scheduled hearing.  *See* Herdman Decl. ¶ 14.  The effect of this change is immediate.  On Wednesday, February 9, 49 individuals went to Court.  On Thursday, February 10, 142 did.

Second, on communication with counsel, PDP has taken significant measures to mitigate the impact of Covid-19 on attorney-client communications.  Pre-pandemic, PDP facilitated in-person attorney visits with the incarcerated population.  Covid-19 stopped that for a period of time.  And PDP immediately set to work to increase the incarcerated populations' access to counsel.  PDP invested in cell phones, so that social work staff could schedule calls.  Beaufort Decl. ¶ 34.  PDP invested in ethernet infrastructure, so that laptops could be run to facilitate zoom meetings between attorneys and clients.  *Id.*  PDP then invested in the infrastructure needed to host GTL, a program by which the incarcerated population has video visits with both family and attorneys.  *Id.* ¶ 35.  PDP also installed various safety features in its on-campus visiting rooms, to permit attorneys in-person access to their clients.  *Id.*  Through all these measures, PDP facilitated, since the start of the pandemic:

- 156,967 cell phone calls with attorneys
- 31,094 tablet visits with attorneys

- 21,424 in-person visits with attorneys

*Id.* ¶ 36.

### G.  Disciplinary and Administrative Segregation

Defendants acknowledge that in-person disciplinary hearings were stayed during the initial viral surge.  They resumed, however, on November 15, 2021, and all persons charged with discipline are provided a hearing.

## II.   STANDARD OF REVIEW

Preliminary injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances."  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief.  *Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Health and Serv.*, 724 F.3d 377, 382 (3d Cir. 2013).  While "[a]ll four factors <u>must</u> favor preliminary relief," *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117 (3d Cir. 2013) (emphasis added), "[t]he first two factors are prerequisites for a movant to prevail." *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018).

In considering an application for a preliminary injunction, the Court considers the abbreviated set of facts placed before it by the parties.  *Frank's GMC Truck Center*, 847 F.2d at 101-02.  "[T]he burden of introducing evidence to support a preliminary injunction is on the moving party with respect to the first two issues; however, the same is not true of the second two issues." *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003). "'[A] preliminary injunction is an extraordinary and drastic remedy' that should not be granted

unless the movant makes a '*clear showing*.'" *E.O.H.C. v. Barr*, No. 5:19-cv-06144-JDW, 2020

WL 362725, at *6 (E.D. Pa. Jan. 22, 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997) (original emphasis)).  "Furthermore, when the preliminary injunction is directed not

merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden

on the moving party is particularly heavy."  *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980);

*Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (same).

This is especially true in the context of federal intervention in the operations of local

prisons.  Considerations of security and operational needs of a prison are especially within the

province of prison officials, and "in the absence of substantial evidence in the record . . . courts

should ordinarily defer to their expert judgment."  *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir.

2008) (quoting *Bell*, 441 U.S. at 540 n.23); *see also Preiser v. Rodriguez*, 411 U.S. 475, 491–92

(1973) ("It is difficult to imagine an activity in which a State has a stronger interest, or one that is

more intricately bound up with state laws, regulations, and procedures, than the administration of

its prisons.").  "Furthermore, because of the intractable problems of prison administration, a

request for injunctive relief in the prison context must be viewed with considerable caution."

*Rush v. Corr. Med. Servs., Inc.*, 287 F. App'x 142, 144 (3d Cir. 2008).

These principles are reflected in the statutory authority controlling this litigation, the

Prison Litigation Reform Act ("PLRA").  Consistent with the caselaw counseling against court

insertion into prison oversight, the PLRA establishes additional contours for injunctions entered

against carceral institutions.  That statute prohibits a court from approving or ordering any

prospective relief unless the court first finds that such relief: (1) is narrowly drawn; (2) extends

no further than necessary to correct a violation of the involved federal right; and (3) is the least

intrusive means necessary to correct the violation of that federal right.  18 U.S.C. § 3626(a)(1).

### III.    ARGUMENT

Plaintiffs cannot show that they merit the extraordinary remedy of a preliminary injunction.  Plaintiffs cannot establish a likelihood of success on the merits of their myriad of unsupported claims, and their contentions regarding the threat of imminent and irreparable harm are speculative.  Furthermore, Plaintiffs have deprived the Court of the ability to attempt a balancing of the equities – or to appropriately tailor relief, if any, in conformance with the PLRA – by virtue of their utter failure to articulate the relief they seek by way of their application to the Court.  Plaintiffs' application for injunctive relief should be denied.

### A.    Plaintiffs Have Not Shown, and Cannot Show, a Likelihood of Success on the Merits of their Claims

Plaintiffs have brought claims alleging that their conditions of confinement while incarcerated within the Philadelphia Department of Prisons violate their Eighth and/or Fourteenth Amendment rights.  The Eighth Amendment governs claims brought by convicted inmates challenging their conditions of confinement, while the Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees. *Hubbard v. Taylor* (*Hubbard I*), 399 F.3d 150, 166 (3d Cir. 2005).

Because the substantial majority of the population incarcerated at PDP await trial, Defendants only summarize here the standards applicable to a Fourteenth Amendment claim.  Defendants reserve the right to argue that Plaintiffs have failed to establish any Eighth Amendment violation for those putative class members who are serving a sentence of incarceration at PDP.

To establish a basis for a Fourteenth Amendment violation, a prisoner must show that the conditions of confinement amount to punishment.  *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).  A condition reasonably related to a legitimate governmental objective does not amount to a

constitutional violation.  *Hubbard v. Taylor* (*Hubbard II*), 538 F.3d 229, 232 (3d Cir. 2008).  The

Court must determine (1) whether a legitimate purpose is served by the conditions and (2)

whether the conditions are rationally related to that purpose.  *Id.* (holding that the practice of

triple celling to manage severe overcrowding at prison did not amount to a Fourteenth

Amendment violation).  Determining whether or not a plaintiff has been exposed to an

unreasonable risk "requires a court to assess whether society considers the risk that the prisoner

complains of to be so grave that it violates contemporary standards of decency to expose anyone

unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).

In sum, Plaintiffs "must show that the risk of which [they] complain[ ] is not one that today's

society chooses to tolerate." *Id*.  In assessing whether a prisoner's conditions of confinement

violate the Fourteenth Amendment, a court should consider the totality of the circumstances.

*See, e.g., Hubbard v. Taylor* (*Hubbard II*), 538 F.3d 229, 235 (3d Cir. 2008); *Nami v. Fauver*, 82

F.3d 63, 67 (3d Cir. 1996); *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 1000-01 (3d Cir.

1983).

  "Unconstitutional punishment typically includes both objective and subjective

components."  *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).  "[T]he objective component

requires an inquiry into whether the deprivation was sufficiently serious and the subjective

component whether the officials acted with a sufficiently culpable state of mind."  *Id.*  For the

latter, in the context of pretrial detainees, "a particular measure amounts to punishment when

there is a showing of express intent to punish on the part of detention facility officials, when the

restriction or condition is not rationally related to a legitimate non-punitive government purpose,

or when the restriction is excessive in light of that purpose."  *Id.* (quoting and adopting the

framework of *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999)).

These general principles apply to the harms articulated in Plaintiffs' application for issuance of a preliminary injunction.  Given these principles, and the specific law that further applies to each theory of constitutional violation, Plaintiffs cannot establish a likelihood of success on the merits of their claims that they are subjected to an ongoing constitutional violation, that which they must prove to warrant a mandatory injunction under the PLRA.

1. *Plaintiffs Cannot Establish a Systemwide Constitutional Deprivation of Out of Cell time*

Plaintiffs aver that "much of the PDP population is currently being deprived of adequate time out of their cells for exercise and programming and have been living under these conditions for months and, for some, upwards of two years."  Pls.' Mot. at 17.  They further contend that "people have been living in conditions equivalent to solitary confinement, regularly getting little to no time out of their cells."  *Id.*  Plaintiffs are wrong on both the facts and the law, and cannot establish a likelihood of success on the merits of their claims.

Addressing first the facts, Plaintiffs cannot factually support their contention that "much of the PDP population . . . get[s] little to no time out of their cells."  Notably, Plaintiffs present no evidence to substantiate their sweeping assertions about out of cell time across PDP facilities.  Nor could they.  As demonstrated by the housing unit logs summarized by the Deputy Wardens across the PDP facilities and presented in chart format, individuals across PDP are routinely getting several hours of time out of cell a day.  *See generally* Ex. A, CFCF Out of Cell time; Ex. B, PICC Out of Cell Time.  Consistent with this, Plaintiffs do not have the evidence to show a likelihood of success on the merits of their claim.

Plaintiffs' contentions about a systemwide failure to provide constitutionally sufficient out of cell time also fail on the law.  Plaintiffs cite to *Shorter v. Baca* in support of their contention that the incarcerated population at PDP is subjected to unconstitutional restrictions.

18

895 F.3d 1176 (9th Cir. 2018).  Reliance upon this authority is perplexing, as the plaintiff in that case received a total of two and a half hours of recreation over a *thirty-two day period*, and recreation was provided by shackling her to a table.  *Id.* at 1180.  Further, the *Shorter* panel canvassed earlier precedent defining constitutional minimums for out of cell time as follows:

> In *Pierce v. County of Orange*, for example, we concluded that inmates in administrative segregation, placed in segregation because of "violent tendencies that have been deemed a threat to the jail's staff or to other inmates," are nonetheless constitutionally entitled to at least two hours per week of exercise. 526 F.3d 1190, 1208 (9th Cir. 2008). Even earlier, in *Spain v. Procunier*, we concluded that violent inmates in administrative segregation have a "right of outdoor exercise one hour per day, five days a week unless inclement weather, unusual circumstances, or disciplinary needs made that impossible." 600 F.2d at 199.

*Id.* (emphasis added).  At risk of stating the obvious, there is no record that any incarcerated person at PDP has been subjected to the severe restriction on movement – two and a half hours out of cell over the course of a month, during which time the individual was shackled to a table – at issue in the *Shorter* case.  And to reiterate, that case suggests incarcerated people have a constitutional entitlement of two hours per week of recreation for persons in disciplinary segregation, and five hours per week of those in administrative segregation.

Plaintiffs' reliance on *Henrickson v. Nevada* fares no better.  In that case, the plaintiff alleged he had received a total of less than one hour of daily out of cell time since August 28, 2020, and there is no suggestion that the plaintiff was in a segregation unit.  *See Henrickson v. Nevada*, No. 20-1014, 2021 WL 1603965, at *2 (D. Nev. Mar. 23, 2021).  The court in *Henrickson* then ordered, after the plaintiff established he had received less than an hour of daily out of cell time for seven months, that he be provided two hours of yard time every week, and one hour of tier time per day, a total of nine hours of time out of cell per week.  *Id.*  Again, nothing in the evidence before the Court establishes that an individual not in segregation has

experienced this degree of limited out of cell time, let alone that there is a systemwide deprivation arising to the level described in *Henrickson*.

To reiterate, "courts have typically […] recognized out-of-cell time of one hour per day as setting the constitutional floor." *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1213 (9th Cir. 2008); *see also, e.g.*, *Mercado v. Dep't of Corr.*, No. 16-cv-1622, 2017 WL 1095023, at *6 (D. Conn. Mar. 23, 2017) (23-hours per day of cell confinement not unconstitutional); *Kinser v. Cnty. of San Bernardino*, No. 11-cv-0718, 2011 WL 4801899, at *4 (C.D. Cal. Aug. 25, 2011) (alleged cell confinement for "more than 22 hours a day . . . d[id] not state a conditions of confinement claim"); *McKinney v. Hemsley*, No. 14-cv-3564, 2017 WL 4316881, at *4 (D.N.J. Sept. 28, 2017) (cell confinement for 21 hours-per-day does not state a constitutional claim); *O'Mara v. Hillsborough Cnty. Dep't of Corr.*, No. 08-cv-0051, 2008 WL 5077001, at *7 (D.N.H. Nov. 24, 2008) (only 2 hours per day of out-of-cell time "does not state a claim of constitutional dimension").

The available data shows that a substantial majority of the PDP population has out of cell recreation time for several hours on a daily basis.  Neither the facts nor the law support Plaintiffs' application for relief on the issue of out of cell time, and their motion should be denied.

       2.   *Given the Extensive Mental and Physical Healthcare Provided at PDP and the Ongoing Efforts to Address Any Backlog, Plaintiffs Cannot Establish a Claim of Systemwide Constitutional Harm Arising from the Provision of Medical Care*

Plaintiffs baldly allege that "delays in the provision of medical care, including medications and trips to outside medical providers, have become routine in the PDP due in part to the severe staffing shortage, leading to deprivations of necessary care in violation of the Fourteenth Amendment."  Pls.' Mot. at 18.  After reciting the law applicable to medical care

claims under the Fourteenth Amendment, Plaintiffs then contend, again without citation to any evidence, that "systemic staffing and administrative failures on the part of the Defendants are causing systemic deprivations of necessary medical care in the form of missed medications, cancelled and missed outside medical appointments, and lapses in the treatment of chronic conditions," and that "injunctive relief is appropriate." *Id.* at 20.  Plaintiffs cite as authority for the latter proposition two opinions arising out of the nearly-decade long class action *Braggs v. Dunn*, by which a discrete class of mentally ill prisoners incarcerated in the Alabama Department of Corrections have challenged, and continue to challenge, conditions of confinement and provision of mental healthcare in that system.  *Id.*

The history, extensive record, and deep consideration manifest in the multitude of opinions generated by the *Braggs* litigation highlight the extent to which Plaintiffs have in no way developed a record that might entitle them to relief on their medical care claim.  Instead, the record demonstrates that the physical and mental healthcare providers at PDP work tirelessly to ensure reasonably timely medical care, notwithstanding the incredible disruption of Covid-19 on operations and the additional burdens monitoring, testing, and vaccination have added onto the medical staff.  Plaintiffs have not presented evidence of the type of systemic delay or lack of care that might warrant imposition of injunctive relief, and their application should be denied.

>    3.   *Plaintiffs Do Not Have a Likelihood of Success on the Merits of their Failure to Protect Claim*

Plaintiffs contend that circumstances at PDP subject them to a heightened "risk of violence and resulting serious injury or death."  Pls.' Mot. at 7-8.  They both argue that the ability of the putative class members to disable locks allows some of those putative class members to break out of their cells and fight other persons, and, in the same paragraph, claim that the temporary solution to this issue is unduly dangerous.  *Id.* at 8.  Plaintiffs point to the

unusually high number of deaths in custody during 2021 as evidence to substantiate their claim that putative class members are subjected to an increased risk of violence. *Id.* Finally, Plaintiffs compare the experience in the PDP in 2021, the second year of a global pandemic that has substantially delayed court processing times, caused extreme disruption in the operation of the prison, and manifested extraordinary increases in violent crimes in the community, to the averages generated by the Bureau of Justice Statistics in 2019. *Id.* at 8-9.

As Defendants have said in previous filings, even one death in custody is one death too many. Unfortunately, however, individuals do die every year while in the custody of PDP, some through natural causes, some as a result of drug overdose or withdrawal, and some through suicide or homicide. Plaintiffs have cited the eighteen deaths during 2021 as support of their contention that safety is compromised. But of those deaths, several of which are still under investigation, at least 4 were the result of narcotics usage, at least 2 were ailments, at least 2 were suicide, and 3 were homicides. Again, while tragic, these numbers do not suggest a substantial increase in the risk of catastrophic harm from other incarcerated persons. The statistics with regard to violence between incarcerated persons are detailed more extensively in the fact section. While they illustrate that an individual who was incarcerated in PDP has an increasing risk of being involved in an altercation, even in 2021 the data suggests that the risk of involvement in an incident with another incarcerated person remains, at most, 2.2%. In 2019 that number was 0.77%, and, in 2020, 1.28%. These numbers, while higher than the totals for the years before, do not suggest that individuals are subjected to a substantial risk of harm while incarcerated at PDP facilities.

Given that Defendants have made every effort to ensure that all posts are covered during a shift, and that Defendants are continuously working to hire more correctional officers, Plaintiffs do not have a likelihood of success on the merits of their failure to protect claim.

4. *Plaintiffs Cannot Establish a Substantial Risk of Serious Harm from Pepper Spray*

The Due Process Clause of the Fourteenth Amendment also governs Plaintiffs' excessive force claim. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."). To state such a claim, a plaintiff must plausibly allege that "that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

The *Fobbs v. Hunt* case is instructive on the state of the law with regard to the use of pepper spray in carceral settings. In that case, the district court canvassed opinions from around the country touching on the constitutional bounds upon the use of pepper spray in a carceral setting. The court noted, "in some circumstances, the use of mace or tear gas might prove a more humane and effective form of force than actual physical harm." *Fobbs v. Hunt*, 21-26, 2021 WL 1792087, at *7 (E.D. Va. May 5, 2021). "Indeed, the limited application of this substance generally constitutes a relatively mild intrusion on an individual's physical and mental

wellbeing, as compared to other forms of force that have more permanent or lasting physical impacts on an individual." *Id.* at *9.  At the same time, the court also cited to cases in which "courts have found violations of the Eighth Amendment where an officer used more than a 'reasonable' among of a chemical agent." *Id.* at *7.  The breadth of potential outcomes is a function of the fact that "it is necessary to examine the totality of the circumstances to determine the validity of the use of tear gas in the prison environment." *Id.* (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)).

The very nature of the proof required for such a claim illustrates why Plaintiffs do not have a likelihood of success on the merits of their claim for excessive force – the necessary inquiry into the individual facts and circumstances of each use of force is incompatible with the putative class structure by which Plaintiffs pursue relief.  Plaintiffs baldly allege, with nothing to substantiate their statement, that "PDP correctional officers routinely use pepper spray and other force in response to verbal provocations or minor rule violations, rather than to protect themselves or others from physical harm."  Pls.' Mot. at 9.  But there is no evidence to substantiate that this actually happened to any one individual, let alone on an institution-wide basis.  Defendants certainly acknowledge there has been an increase in the use of pepper spray in the facilities, but, consistent with caselaw, that use is not per se unlawful but instead must be examined with reference to the specific facts and circumstances giving rise to its deployment.  Where Plaintiffs themselves have acknowledged, and the cited PDP data supports, an increase in altercations between incarcerated persons, it is not surprising that pepper spray usage has also increased to rapidly diffuse such fighting.  And there is nothing in the facts or the law to suggest that Plaintiffs are subjected to an increased, substantial risk of serious harm as a result of efforts to interrupt and deescalate physical confrontations.

The facts and the applicable law both support a conclusion that Plaintiffs cannot establish a likelihood of success on the merits of a class-wide claim of unconstitutional use of force, and their application for injunctive relief on this basis should be denied.

> 5. *Plaintiffs Have No Likelihood of Success on the Merits of their Access to Courts and Counsel Claim*

At the outset, Plaintiffs' claims for lack of access to counsel, courts, and legal mail arise specifically out of their ongoing criminal prosecutions.  Given that parallel state proceeding, in which each of these identified rights can be raised, this federal court should abstain from consideration of these claims pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).  Should the Court improperly decline to abstain from considering these matters, Plaintiffs' access to courts, access to counsel, and legal mail delay claims suffer from factual and legal deficiencies, and have no likelihood of success on the merits.

The Supreme Court of the United States, through its opinion in *Younger v. Harris*, counsels that a federal court should not interfere with a pending state criminal proceeding except under extraordinary circumstances.  This rule is based upon considerations of equity, comity, and federalism.  401 U.S. at 43-45.  "Abstention under *Younger* is appropriate only if (1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate important state interests; and (3) the state proceedings afford an adequate opportunity to raise federal claims."  *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir.1989).  Here, Plaintiffs seek to pursue relief via Section 1983 for alleged First, Sixth, and Fourteenth Amendment harms allegedly sustained by the putative class members during the pendency of their criminal cases. *See* Pls.' Mot. at 24-27.  But such claims implicate (1) ongoing state proceedings; (2) implicating the state's important interest in prosecuting its criminal laws; and (3) can be raised in those same criminal proceedings.  Illustrating the clear application of *Younger* abstention in an analogous

situation, the Third Circuit Court of Appeals, in *Duran v. Weeks*, affirmed a district court's application of *Younger* abstention, where the plaintiff sought to file Section 1983 claims against the judge and prosecutor involved in his pending criminal case.  399 F. App'x 756.  That panel specifically noted that the plaintiff "is free to move in state court for dismissal of the charges against him on Sixth Amendment grounds."  *Id.* at 758.  Consistent with that court's analysis, the Court should find that *Younger* abstention applies to this claim, as a result of which Plaintiffs cannot establish a likelihood of success on the merits.

Even if the Court does not apply *Younger* abstention, Plaintiffs cannot establish a likelihood of success on the merits of this claim.  Factually, Plaintiffs present no evidence of systemwide deprivation of access to counsel.  Nor could they.  Since the onset of the Covid-19 pandemic, PDP has taken extraordinary measures to provide the incarcerated population access to their attorneys.  At the outset, PDP established a process by which attorneys could converse with clients on cell phones that were assigned to the social work staff.  PDP installed the necessary infrastructure to provide laptops with zoom access, permitting attorneys and clients to consult through those video calls.  PDP then invested in the GTL system, which permits video visits with counsel.  PDP worked to create less-risky spaces for in-person visitation between attorneys and clients.  By taking all these steps, PDP facilitated well over two hundred thousand (200,000) contacts between attorneys and clients through the course of the pandemic.

Regarding access to courts, Plaintiffs suggest that "by engaging in unreasonable quarantine and housing practices that cause people to miss their court dates, Defendants have unduly burdened Plaintiffs' Sixth and Fourteenth Amendment rights to attend their criminal court proceedings."  Pls.' Mot. at 26.  Plaintiffs have no basis to suggest that, by following applicable CDC guidance on quarantine and serial testing, PDP is engaging in "unreasonable

quarantine practices." PDP engaged in serial testing and quarantine practices consistent with CDC guidance. During community viral surges, lab testing capacity is taxed by the increased number of tests and result return times are delayed. Beyond that, it remains the case that individuals have to be housed according to the custody status appropriate for their security level. It remains the case that a majority of the incarcerated population continues to refuse vaccination. And it was the case, until this week, that the Philadelphia Court of Common Pleas (Criminal Division) would <u>not permit</u> individuals housed on a quarantine unit, regardless of testing outcome and regardless of vaccination status, to enter the First Judicial District courthouse.

Given that PDP operated its quarantine protocols consistent with CDC guidance and that the Plaintiffs' harm derived from the decision of non-party actors, Plaintiffs cannot establish a likelihood of success on the merits of this claim. Beyond the failure to establish a likelihood of success, this claim is largely rendered moot by subsequent developments. In a collaborative decision guided by the Philadelphia Department of Public Health, the criminal justice system stakeholders have entered an agreement pursuant to which individuals, regardless of housing or vaccination status, who return sequentially negative Covid tests will be permitted to attend court. The impact of this protocol change was immediately apparent. On Wednesday, February 9, 49 individuals were cleared to go to court. On Thursday, February 10, 141 individuals were cleared to go to court (one refused testing, another issue outside of PDP's control).

Touching last on Plaintiffs' legal mail claim, Plaintiffs have, as with their other claims, presented no actual evidence but instead provide only sweeping statements of wrongdoing. Such contentions, without more, do not serve as the evidence necessary for Plaintiffs to carry their heavy burden to establish an entitlement to relief.

For all these reasons, Plaintiffs cannot establish a likelihood of success on the merits of these claims.

> 6. *Plaintiffs Cannot Establish a Systemwide Due Process Violation Arising Out of Segregation Placement*

Plaintiffs contend that members of the putative class have not been afforded mandated process prior to their placement in disciplinary segregation. Pls.' Mot. at 27-29. As Plaintiffs note, the Supreme Court's decision in *Wolff v. McDonnell* controls the process due an individual who is placed in segregation. 418 U.S. 539 (1974) As explicated in *Wolff*, an individual is due written notice of the charges, the opportunity to present witnesses and documentary evidence at a hearing, and a written statement of the reasons for the decision. *See id.* Defendants acknowledge that, during the pandemic viral surge, they put hearings on hold while people could not gather in the same space. However, those in-person hearings commenced on November 15, 2021. Given that hearings have restarted, and the putative class is getting the process due, there is no support for the Court to find an ongoing constitutional harm, and there is no basis for prospective injunctive relief.

**B.      Plaintiff Cannot Establish a Threat of Immediate, Irreparable Harm from their ongoing confinement at PDP**

In order to obtain the extraordinary remedy of injunctive relief, Plaintiffs must show that they will suffer irreparable harm if the motion is denied. *Miller v. New Jersey*, No. 13-2018, 2013 U.S. Dist. LEXIS 69907, at *9-11 (D.N.J. May 16, 2013). "A party seeking injunctive relief must show not only irreparable injury, but that such harm is immediate--*i.e.* the threat must be a presently existing one and not a remote or speculative possibility." *N. Jersey Vineyard Church v. Twp. of S. Hackensack*, No. 15-8369, 2016 U.S. Dist. LEXIS 46398, at *9 (D.N.J. Apr. 6, 2016). Further, establishing irreparable harm requires a plaintiff to "demonstrate

potential harm which cannot be redressed by a legal or an equitable remedy following a trial."

*Acierno v. New Castle County*, 40 F. 3d 645, 653 (3d Cir. 1994).  Thus, for example, claims that

can be redressed via monetary damages at the conclusion of a case do not constitute irreparable

harm.  *Id.*; *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) (explaining that "[t]he key word

in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time

and energy necessarily expended in the absence of a stay, are not enough.  The possibility that

adequate compensatory or other corrective relief will be available at a later date, in the ordinary

course of litigation, weighs heavily against a claim of irreparable harm.").

Here, Plaintiffs cannot establish that they will, as a putative class, experience harm that

cannot otherwise be subject to monetary remedy if an individual actual proves up a constitutional

claim.  Because Plaintiffs cannot establish this factor for injunctive relief, their application for

same must be denied.  *See, e.g.*, *Holland*, 895 F.3d at 286.

### C.  Plaintiffs' Sought Relief, Entry of an Injunction, Is Not in the Public Interest and the Balance of Equities Favors Defendants

Because Plaintiffs are unable to establish a likelihood of success on the merits or

likelihood of irreparable harm, the Court need not go any further in its analysis.  *Greater*

*Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020)

(stating that only if movant establishes a likelihood of success on the merits and the existence of

irreparable harm should "the district court consider the remaining two factors").  Regardless, the

balance of interests weighs in favor of denying Plaintiffs' motion.

In considering the extraordinary remedy of an injunction, "courts must balance the

competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief.  In exercising their sound discretion, courts of equity should

pay particular regard for the public consequences[.]"  *Winter v. Nat'l Resources Def. Council*,

555 U.S. 7, 24 (2008) (internal quotations and citations omitted); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994). Where the defendant is the government, the Court may consider these final two factors together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Further, there is a well-established public interest in permitting the government to carry out its authorized functions where doing otherwise would needlessly upend its operations. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018).

As has already been noted, Plaintiffs have utterly failed to frame what relief they are specifically seeking, which undermines the Court's ability to, as is required by the preliminary injunction framework and the PLRA, weigh the equities of any proposed relief and narrowly tailor it to the least intrusive means necessary to address constitutional harm. In their opening remarks, Plaintiffs state their alleged harms are "[d]ue in large part to severe understaffing in the PDP and, in particular, lack of sufficient correctional officer staffing and deployment[.]" Pls.' Mot. at 1. To the extent Plaintiffs seek imposition of mandatory injunctive relief around staffing, the equities weigh heavily against entry of such relief given the work that Defendants are already doing to address staffing.

Defendants describe, in detail, the hiring process and numbers of individuals who have been hired as correctional officers during the pandemic. To highlight just a few points that bear emphasis, training at the outset of the pandemic was substantially impeded by general restrictions on movement. As soon as the hiring freeze – imposed because of the catastrophic effect of the pandemic on the City of Philadelphia finances – lifted, PDP restarted its hiring process. PDP then modified its training and onboarding practices, in order to facilitate rapid onboarding of new staff, by immediately beginning training academy with smaller classes on a rolling basis instead of waiting for a larger class to develop. At the same time, PDP tested an

incentive pay structure to encourage its current staff to report to work and, thereby, reduce absenteeism among security staff.

In the summer and fall of 2021, PDP continued to modify its hiring practices to accelerate hiring and onboarding of correctional officers.  PDP was permitted to waive the test requirement that usually applies to civil service positions, and got access to a greater number of providers to perform the pre-hire medical clearance exam.  PDP's efforts to further increase efficiency continue, in that the most recent round of applicants are being screened on a rolling basis, with greater numbers of them invited to orientation and run through background check.  This hiring blitz, which will be immediately followed by another job announcement, is expected to result in another, sizeable class of cadets beginning in the training academy by the end of February.

As the Court weighs the equities and generally considers the factors applicable to establishing an entitlement to mandatory injunctive relief, a comparison between PDP and a system that has been subject to an injunction on staffing is instructive.  The *Braggs* litigation against the Alabama Department of Corrections has already been referenced in this brief, as that nearly decade long litigation has generated substantial opinions describing the proved issues, and narrowly-tailored injunctive relief imposed by the court overseeing that litigation.  The contrast between that system and PDP is telling, particularly on the issue of staffing.  In 2021, the *Braggs* court found that the AODC operated in March 2018 with only 1,467 of 3,826 total correctional staff positions.  This represents a sixty-one percent (61%) vacancy rate.  That number, by 2021, had risen to only 1,830.5 staff positions of the 3,826 total, which represents a fifty-two percent (52%) vacancy rate.  *Braggs v. Dunn*, No. 14-601, 2021 WL 6117939, at *17 (M.D. Ala. Dec. 27, 2021).  While PDP has experienced attrition, and has had episodic experiences of substantial staff call-out, these are nothing akin to the systemic staffing deficiencies described by the *Braggs*

court.  As thoroughly detailed above, PDP has made consistent efforts to hire, and is in the midst of a hiring blitz to remediate the 32% vacancy rate of January 2022.  Likening PDP to the AODC, as is implied in Plaintiffs' briefing, is an exercise in false equivalence.  Closer examination of that case and its history further highlights the extent to which court intervention in the sustained and extraordinary efforts PDP has made, and continues to make, to remedy the profound disruption of Covid-19 on operations is unsupported by the facts or the law.

For all these reasons, the equities counsel against entry of an injunction.  Defendants are engaged in a multifaceted effort to enhance recruitment, hiring, retention, and staff deployment across PDP facilities.  Defendants have also sought and gotten commitments to invest $1.5 million to increase medical staff to work through the backlog in care.  Entry of an injunction would needlessly disrupt the operations of this government function, and derail processes that are already in place to ameliorate that which even Plaintiffs identify as the root cause of their complaints.

## IV.    CONCLUSION

Plaintiffs do not, and cannot, bear their heavy burden to establish an entitlement to entry of a mandatory injunction.  They cannot establish a likelihood of success on the merits of their sweeping claims of constitutional harm; they cannot establish that they will experience irreparable harm; and they cannot establish that the equities favor judicial intervention – already disfavored by statute and decisional law – into PDP operations and PDP's ongoing, extraordinary efforts to hire additional staff.

For these reasons, each sufficient in itself and certainly all together, the Court should deny Plaintiffs' motion for injunctive relief.  *See Baxley v. Jividen*, No. CV 3:18-1436, 2020 WL

1802935, at *8 (S.D.W. Va. Apr. 8, 2020) (noting that "[i]t would be redundant for the Court to

order relief that Defendants are in the midst of granting").


                                          Respectfully submitted,


Date:  February 11, 2022                  /s/ Craig M. Straw_____
                                          Craig M. Straw
                                          First Deputy City Solicitor
                                          City of Philadelphia Department of Law
                                          1515 Arch Street, 17th Floor
                                          Philadelphia, PA 19102-1595
                                          (215) 683-5442 (office)
                                          (215) 776-4528 (cell)
                                          craig.straw@phila.gov


                                          /s/ Anne B. Taylor_____
                                          Anne B. Taylor, Esquire
                                          Chief Deputy City Solicitor
                                          City of Philadelphia Department of Law
                                          Civil Rights Unit
                                          1515 Arch Street, 14th Floor
                                          Philadelphia, PA 19102-1595
                                          215-683-5381 (office)
                                          anne.taylor@phila.gov


                                          /s/ Danielle Rosenthal_____
                                          Danielle Rosenthal, Esq.
                                          Deputy City Solicitor
                                          Civil Rights Unit, Law Department
                                          City of Philadelphia
                                          1515 Arch Street, 14th Floor
                                          Philadelphia, PA 19102-1595
                                          215-683-5381 (office)
                                          danielle.rosenthal@phila.gov


                                          *Attorneys for Respondents-Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS REMICK, NADIYAH WALKER, | : | |
| JAY DIAZ, MICHAEL ALEJANDRO, | : | No. 2:20-cv-01959-BMS |
| MICHAEL DANTZLER, ROBERT | : | |
| HINTON, JOSEPH WEISS, JOSEPH | : | |
| SKINNER, SADDAM ABDULLAH, and | : | |
| JAMES BETHEA, on behalf of themselves | : | |
| and all others similarly situated, | : | |
| | : | |
|     Plaintiffs-Petitioners, | : | |
| | : | |
|     v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and BLANCHE | : | |
| CARNEY, in her official capacity as | : | |
| Commissioner of Prisons, | : | |
| | : | |
|     Defendants-Respondents. | | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date below Defendants' Response in Opposition to Plaintiffs'

Motion for Preliminary Injunction, Declaration of Deputy Commissioner Xavier Beaufort with

Exhibits in support thereof, and Declaration of Chief of Medical Operations Bruce W. Herdman

were filed via the Court's electronic filing system and are available for downloading.

Date: February 11, 2022                 Respectfully submitted,

                                        */s/ Craig M. Straw*
                                        Craig M. Straw
                                        First Deputy City Solicitor
                                        City of Philadelphia Department of Law
                                        1515 Arch Street, 17th Floor
                                        Philadelphia, PA 19102-1595
                                        (215) 683-5442 (office)
                                        (215) 776-4528 (cell)
                                        craig.straw@phila.gov

                                        */s/ Anne B. Taylor*
                                        Anne B. Taylor, Esquire

Chief Deputy City Solicitor
City of Philadelphia Department of Law
Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
215-683-5381 (office)
anne.taylor@phila.gov

/s/ *Danielle Rosenthal*
Danielle Rosenthal, Esq.
Deputy City Solicitor
Civil Rights Unit, Law Department
City of Philadelphia
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
215-683-5381 (office)
danielle.rosenthal@phila.gov

*Attorneys for Respondents-Defendants*