**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS REMICK, NADIYAH WALKER, JAY DIAZ, MICHAEL ALEJANDRO, MICHAEL DANTZLER, ROBERT HINTON, JOSEPH WEISS, JOSEPH SKINNER, SADDAM ABDULLAH, JAMES BETHEA, CLAY PIZARRO, MICHAEL FLYNN, NASIR LEWIS, DYQUILL PLEDGER, TROY HARLEY, and CHRISTIAN MALDONADO, on behalf of themselves and all others similarly situated,** | : : : : : : : : : : : : | **Case No. 20-cv-1959** |
| **Plaintiffs,** | : : : | |
| **v.** | : : : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,** | : : : : : | **ELECTRONICALLY FILED** |
| **Defendants.** | : : | |

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## I.     INTRODUCTION

1.     As a result of the policies, practices, and actions adopted and undertaken by Defendants since the start of the COVID-19 pandemic, members of the plaintiff class who are incarcerated at the Philadelphia Department of Prisons ("PDP") are being held in conditions of confinement that violate the Eighth and Fourteenth Amendments to the United States Constitution. Under current conditions, which include extended periods of total lockdown, class member-Plaintiffs—the vast majority of whom are pretrial detainees—are denied timely and adequate medical care, protection from physical and mental harm, access to legal counsel, access to timely legal mail, access to their court hearings, and due process in disciplinary proceedings. These

conditions have led to a high death rate and rampant assaults, and they severely threaten Plaintiffs' physical and mental health.

2.     The named Plaintiffs, on their own behalf and on behalf of all others similarly situated, seek changes in the conditions of their confinement to both protect them from the clear and present danger of disease and death from COVID-19 and to ensure humane living conditions, as required by the United States Constitution.  Plaintiffs seek injunctive relief that would require Defendants to comply with recognized public health and safety measures to prevent the spread of the virus for those confined in jails and prisons, and to ensure adequate out-of-cell time; proper medical care; access to the courts; access to counsel, legal mail, and law libraries; due process in disciplinary proceedings; and protection from violence from correctional officers and other incarcerated persons.   In the alternative, and should such relief not ameliorate the ongoing constitutional violations in PDP, Plaintiffs seek an order requiring that the City reduce the population of PDP facilities to a level sufficient to allow the City to satisfy its constitutional obligations.

3.     Prisons and jails have become epicenters of COVID-19 throughout the United States.  The population within PDP is vulnerable to the spread of COVID-19 due to the congregate nature of jails, exacerbated by unnecessary crowding, inadequate sanitation, denial of hygiene products, and inadequate staffing and procedures for delivery of essential services.

4.     To comply with basic Constitutional guarantees and to protect against COVID-19 infections, Defendants must provide adequate sanitation and hygiene practices and proper quarantine and social distancing protocols that conform to the Centers for Disease Control and Prevention ("CDC") standards.  They have failed to do so.

5.      At the same time, Defendants must provide adequate out-of-cell time to allow for essential services such as medical care, access to counsel, family visits, law libraries, showers, phone calls, and physical exercise, and they must facilitate full access to court hearings for pretrial detainees. Defendants must also ensure due process for persons placed in disciplinary or administrative segregation; adequate and timely provision of medications; and protection from violence by correctional officers and other incarcerated persons.

6.      It is of paramount importance that Defendants ensure a sufficient staff of correctional officers, social workers, medical personnel, and other service providers proportional to the number of incarcerated persons to ensure the timely delivery of essential services and the protection of the plaintiff class ("Plaintiffs"). They have failed, and Plaintiffs continue to suffer.

## II.      JURISDICTION AND VENUE

7.      Plaintiffs bring this class action pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202; and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA").

8.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1343(a) (civil rights jurisdiction) and 28 U.S.C. § 1331 (federal question jurisdiction).

9.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Eastern District of Pennsylvania.

## III.      PARTIES

10.      Thomas Remick, Nadiyah Walker, Jay Diaz, Michael Alejandro, Michael Dantzler, Robert Hinton, Joseph Weiss, Joseph Skinner, Saddam Abdullah, James Bethea, Clay Pizarro, Michael Flynn, Dyquill Pledger, Nasir Lewis, Troy Harley, and Christian Maldonado are all adult individuals who are or were incarcerated at a PDP facility, and who are being or previously were denied essential constitutionally mandated services. They seek injunctive and declaratory relief

on behalf of themselves and on behalf of those who currently are or will in the future be subjected to unconstitutional conditions of confinement within the PDP.

11.     Defendant City of Philadelphia is a political subdivision organized and existing under the laws of the Commonwealth of Pennsylvania.  The City of Philadelphia funds, controls, and operates the Philadelphia Department of Prisons.  The City of Philadelphia currently has immediate custody over Plaintiffs, and has acted under color of state law.

12.     Defendant Blanche Carney is the Commissioner of PDP.  Defendant Carney currently has immediate custody over Plaintiffs.  Defendant Carney is a final policymaker for the City of Philadelphia, and she is sued in her official capacity, and has acted under color of state law.

## IV.        FACTUAL ALLEGATIONS

13.     The City of Philadelphia is still plagued by the most significant pandemic in generations.

14.     The older a person is, the greater their risk of serious illness or death from COVID-19.[1]  People of any age are at an elevated risk if they suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, or asthma.[2]

---

[1] *See* Complaint Exhibit A, ECF No. 1-4, Amon Decl. ¶ 9 (observing that "those ≥54 years could be considered high risk for severe disease and death."); and Exhibit B, ECF No. 1-5, Cohen Decl. ¶ 36.
[2] ECF No. 1-4, Amon Decl. ¶ 8; ECF No. 1-5, Cohen Decl. ¶ 43.

15.     People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of coronavirus infection.[3]

16.     Correctional settings increase the risk of contracting COVID-19 because of the concentration of people with chronic, often untreated, illnesses in a setting with minimal levels of sanitation, limited access to personal hygiene items, and limited access to medical care.[4]

17.     Numerous public health experts, including Dr. Joseph Amon,[5] Dr. Robert L. Cohen,[6] Dr. Gregg Gonsalves,[7] Ross MacDonald,[8] Dr. Marc Stern,[9] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[10] Dr. Anne Spaulding,[11] Homer Venters,[12] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[13] and Josiah Rich[14] have cautioned that people booked into and held in jails are likely to face serious harm due to the COVID-19 pandemic.

---

[3] ECF No. 1-4, Amon Decl. ¶ 29; ECF No. 1-5, Cohen Decl. ¶ 5.

[4] ECF No. 1-4, Amon Decl. ¶¶ 28-29, 33-35, 38, 43, 45; ECF No. 1-5, Cohen Decl. ¶¶ 4-5, 36.

[5] ECF No. 1-4, Amon Decl. ¶ 63.

[6] ECF No. 1-5, Cohen Decl. ¶ 4-6.

[7] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[8] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[9] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[10] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind,* (March 10, 2020), https://cutt.ly/QtRSYNA.

[11] Anne C. Spaulding, MD, MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[12] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People,* Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[13] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[14] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons,* The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

18.     Correctional staff are also at risk of COVID-19 infection.  As of December 28, 2021, only 59% of PDP correctional staff are confirmed to have received even a single dose of any of the three available COVID-19 vaccines.

19.     CDC guidelines recommend:  (a) providing all incarcerated persons a six-foot radius or more of distance from any other persons, including during meals, transportation, court sessions, recreation, counts, and all other activities; (b) instituting a safety plan to prevent a COVID-19 outbreak in PDP's facilities in accordance with CDC guidelines; (c) making sanitation solutions readily and freely available for the purposes of cleaning cells, dormitories, laundry, and eating areas, including sufficient antibacterial soap, and lifting any ban on alcohol-based hygiene supplies (e.g. hand sanitizer, cleaning wipes); (d) providing adequate and appropriate COVID-19 vaccinations and testing for incarcerated persons, jail staff, and visitors; (e) waiving all medical co-pays for those experiencing COVID-19 like symptoms; (f) providing sufficient personal protective equipment, particularly masks, to all staff and incarcerated people; (g) coordinating with local law enforcement and court officials to identify legally acceptable alternatives to in-person court appearances and options to prevent overcrowding, including alternatives to incarceration; (h) planning for staff absences; and (i) modifying measures as appropriate for fully-vaccinated individuals.[15]

20.     Defendants have failed to consistently implement the above-described recommendations for reducing the risks of contracting COVID-19 during the pandemic.

---

[15] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Sept. 13, 2021).

21.     Since the start of the COVID-19 pandemic, staffing levels at the PDP have become grossly deficient.  According to City Controller Rebecca Rhynhart, the PDP was short-staffed at the start of the COVID-19 pandemic and, as of mid-September 2021, was 479 people short of the 1,884 needed to fully staff the jails.[16]  Between April and August 2021, staffing levels dropped by 101 people.  By early January 2022, the staffing deficiencies had increased even further, and the City now has approximately 582 fewer staff members than its own deployment plan calls for, a shortfall of 31%.[17]

22.     Further exacerbating the staffing shortage is the high rate of absenteeism among PDP staff members.  The average absentee rate among corrections officers is more than 25% per shift.  On weekends, it is not uncommon for more than 40% of scheduled corrections officers to fail to report for their shifts.  There is also a shortage of other prison staff, including social workers, nurses, and psychiatrists.

23.     As a result of restrictions implemented in response to the COVID-19 pandemic and the chronic and critical staffing shortage, significant numbers of class member-Plaintiffs, the vast majority of whom are pretrial detainees, are being held in unconstitutional conditions of confinement, as described below:

---

[16] Samantha Melamed, *Philly prison 'crisis' now includes a grand jury investigation and more court-ordered reforms*, The Philadelphia Inquirer (Sept. 20, 2021), available at https://www.inquirer.com/news/philadelphia-prisons-grand-jury-investigation-riot-disturbance-20210920.html (last visited Sept. 22, 2021); Maggie Kent, *Philadelphia's prison guard shortages lead to dangerous conditions for inmates, staff*, 6 ABC News (Sept. 17, 2021), available at https://6abc.com/prison-guard-shortage-philadelphia-system-inmates-safety/11027878/ (last visited Sept. 19, 2021).
[17] Samantha Melamed, *Panic attacks and 20-hour workdays: Why Philly correctional officers are quitting in droves*, The Philadelphia Inquirer (Jan. 4, 2022), available at https://www.inquirer.com/news/philadelphia-jail-staffing-crisis-prisons-cfcf-picc-20211230.html (last visited Jan. 4, 2022).

a.      Class member-Plaintiffs are denied adequate out-of-cell time (including time out of cell that Defendants had agreed to provide, and which has been ordered by the Court) to protect both their physical and mental health and to provide access to essential and constitutionally-mandated services.  This lack of out-of-cell time results in significant numbers of class members being unable to access showers and to place phone calls to family and legal counsel. These solitary confinement and extreme isolation conditions have caused and exacerbated mental illness and mental distress for class members, and in particular persons with mental health disabilities.  Class members detained in these conditions also suffer physical harm due to the lack of exercise for prolonged periods of time, and the harmful effects are exacerbated for those with chronic medical conditions that require exercise.

b.      Class member-Plaintiffs have been denied timely access to necessary medical care and medications.  Insufficient staffing levels result in a lack of timely responses and medical treatment for those seeking medical care by sick call requests, medications not being dispensed according to the medically prescribed schedules, and the cancellation of appointments with outside medical providers.

c.      Class member-Plaintiffs suffering from medical emergencies in their cells are not provided necessary medical care and treatment and have been forced to wait for prolonged periods for assistance from medical staff, exacerbating their condition and putting them at risk of illness, injury, and death.  Emergency call buttons in the cells either do not function properly or are ignored by staff.  Staffing levels are not proportional to the number of incarcerated people, leaving those suffering from medical emergencies without necessary care.

d.      From March 2020 to November 2021, Class member-Plaintiffs were denied in-person family visits.  Since November 2021, access to in-person family visits has been limited

due to lack of staff and technological difficulties with Defendants' on-line scheduling system. Access to families through phones or tablets has also been limited due to the lack of a sufficient number of working tablets and/or phones, technological difficulties within the virtual visit application, lack of staff, lack of out-of-cell time to access the phones, and the cost of virtual visits.

e.      The delivery and the sending of legal mail has been subject to long delays. Legal mail received by the PDP is not promptly delivered and sent, with delays extending more than a week and at times several weeks.  Legal mail in some circumstances is not delivered.

f.      Class member-Plaintiffs do not have regular access to the law library.

g.      Class member-Plaintiffs housed on segregation units have not had regular access to commissary, which means they often have no access to paper, writing implements, or postage, items needed to write legal letters and/or filings.

h.      Visits with attorneys, both in-person and remote, are often cancelled or greatly delayed due to lack of staff and/or COVID-19 quarantine restrictions.  Entire housing units are at times denied access to their attorneys due to lack of staffing and other PDP administrative restrictions.

i.      Due to lack of staffing and/or Defendants' unnecessary and unreasonable quarantine procedures and practices, numerous Class member-Plaintiffs have not been transported to remote (via video) and in-person court proceedings, risking additional months of delay in their cases and prolonging their incarceration. Defendants' actions that prevent class members from attending their court proceedings include unnecessarily keeping vaccinated individuals on quarantine units, erroneously housing people on quarantined units who have already completed a quarantine period, moving unvaccinated people onto vaccinated units, moving individuals to blocks already on quarantine status in violation of CDC guidelines, which risks restarting the

quarantine period, and failing to adhere to their own serial testing protocols for quarantine units, leading housing units to remain on quarantine longer than is necessary.

       j.     Plaintiffs have been subjected to discipline, including being held in punitive or administrative segregation housing sometimes for several months and having financial assessments placed on their inmate accounts, without disciplinary hearings or proceedings,.

       k.     Plaintiffs have been subjected to an increased danger of violence and death. There were at least 18 deaths in the PDP in 2021.[18]  The Bureau of Justice Statistics reports in 2019, the most recent year for which data is available, the national mortality rate for local jails was 167 per 100,000.[19]  The mortality rate for PDP facilities in the same period was 215.19 per 100,000. The mortality rate for PDP facilities for 2021 is nearly 400 per 100,000, more than double the national rate for 2019, and almost double the PDP mortality rate for 2019.  Between August 2020 and April 2021, five incarcerated individuals in the PDP were killed.[20]  These numbers represent a homicide rate that is significantly higher than the national average in jails.  According to data from the Bureau of Justice Statistics, the local jail homicide mortality rate for 2019, the most recently available year, is 3 deaths per 100,000.[21]  The homicide rate at PDP facilities is

---

[18] Samantha Melamed, *4 Philly prisoners died in two weeks, capping a tumultuous and deadly year*, The Philadelphia Inquirer (December 27, 2021), *available at* https://www.inquirer.com/news/philadelphia-jail-deaths-lawsuit-prison-conditions-20211227.html (last visited Jan. 3, 2021).

[19] Bureau of Justice Statistics, *Mortality in Local Jails, 2000-2019*, Statistical Tables, (December 2021), available at https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf?utm_content=juststats&utm_medium=email&utm_source=govdelivery (last visited January 3, 2022).

[20] Samantha Melamed, *Another assault at Philly jail leaves a man on life support and staff and prisoners warning of a crisis*, The Philadelphia Inquirer (Apr. 23, 2021), *available at* https://www.inquirer.com/news/philadelphia-jail-murder-christopher-hinkle-armani-faison-20210423.html (last visited Sept. 13, 2021).

[21] Bureau of Justice Statistics, *Mortality in Local Jails, 2000-2019*, Statistical Tables, (December 2021), available at

approximately 114.90 per 100,000 for the period between August 2020 and April 2021, nearly forty times the national average.

l.      The risk of violence is exacerbated by the lockdown conditions, which lead to disputes and fights over phones during the limited time when people are out of their cells, and by the staff shortage, which leads to housing units being left unattended by corrections officers for hours at a time.  The risk of violence and resulting serious injury or death is further exacerbated by the fact that emergency call buttons in cells either do not function properly or are ignored.

m.      Locking mechanisms on cell doors are easily disabled, thereby allowing some incarcerated individuals to leave their cells and attack others.  Instead of repairing the locks, PDP has installed bolt locks on the cell doors on some housing units, which can only be unlocked manually, one by one, thereby exposing Plaintiffs to an unreasonable risk of serious injury or death should a fire or other emergency occur.

n.      There has been an increase in the use of unreasonable force by corrections officers against incarcerated individuals, including but not limited to the frequent use of pepper spray to enforce PDP's lockdown practices.  PDP correctional officers routinely use pepper spray and other force in response to verbal provocations or minor rule violations, rather than to protect themselves or others from physical harm.  Individuals merely in the vicinity of conflicts with officers or other persons are subjected to pepper spray without warning.  Defendants have failed to adequately train or supervise officers in the proper use of pepper spray, causing inmates to be sprayed in sensitive areas or sprayed with prolonged sprays instead of short bursts.  When pepper spray is used, Plaintiffs have been denied needed medical care to ameliorate its effects.  Pepper

https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf?utm_content=juststats&utm_medium=email&utm_source=govdelivery (last visited January 3, 2022).

spray and other force are frequently used without any regard for the victims' physical or psychiatric disabilities, which place them at greater risk of injury or death from such force. PDP staff used pepper spray on incarcerated people 554 times in 2020, a 9% increase compared to the previous year, despite a 6% decrease in the average monthly population. In 2020, pepper spray was used more at PICC than in all but two of the county jails in Pennsylvania on a per capita basis.[22]

24.     The conditions of confinement described in the preceding paragraphs especially burden incarcerated individuals with physical or psychiatric disabilities, and PDP has failed to make necessary modifications to its practices to ameliorate the harmful impact of the current conditions in PDP on individuals with disabilities.

## V.     NAMED PLAINTIFFS' EXPERIENCES IN THE PDP

25.     Michael Alejandro is 29 years old and currently incarcerated as a pretrial detainee at the PDP jail known as Philadelphia Industrial Correctional Center ("PICC"). He is currently housed on administrative segregation where he has limited and infrequent access to showers. While in PDP custody, he was prescribed medication for anxiety and depression. These conditions substantially limit his ability to sleep, concentrate, and read. He estimates that medical staff fail to give his prescribed medication approximately three times a month.

26.     Nadiyah Walker is 45 years old and currently incarcerated as a pretrial detainee at the PDP jail known as Alternative and Special Detention Center ("ASDCU"). She has epilepsy, which causes her to have seizures; diabetes; asthma; and anemia. These conditions substantially

---

[22] Pennsylvania Department of Corrections (2020). *2020 County Prisons Extraordinary Occurrences Report (EOR) Data*, 2020, *available at* https://www.cor.pa.gov/Facilities/CountyPrisons/Pages/Inspection-Schedule,-Statistics-And-General-Info.aspx.; Pennsylvania Department of Corrections (2019). *2019 County Prisons Extraordinary Occurrences Report (EOR) Data*, 2019, *available at* https://www.cor.pa.gov/Facilities/CountyPrisons/Pages/Inspection-Schedule,-Statistics-And-General-Info.aspx.

limit Ms. Walker's major life activities. PDP staff have failed to transport Ms. Walker to some of her scheduled outside medical appointments and informed her that this was due to staffing shortages. On several occasions, she has witnessed correctional officers allow women to fight one another by not intervening. Ms. Walker receives little to no time outside in the yard and has had difficulties obtaining basic hygiene supplies including toilet paper, cleaning solution, and feminine hygiene products.

27.     Clay Pizarro is 47 years old and currently incarcerated as a pretrial detainee at PDP's largest jail, Curran-Fromhold Correctional Facility ("CFCF"). He has at times experienced periods of total lockdown in PDP and has been getting very little time out of his cell since being transferred to CFCF in January 2022. Mr. Pizzaro has a diagnosed mental illness for which he receives prescription medications. He experiences panic attacks, including one recently in his cell. Mr. Pizarro's mental illness substantially limits his major life activities, including his brain functioning and his ability to concentrate.  In November 2021, Mr. Pizarro was not transported to court due to being housed on a quarantine block despite him being vaccinated against COVID-19 and having a negative COVID-19 test result; as a result, his criminal case was continued for months. He missed another court date on January 19, 2022, because his unit at CFCF was on quarantine, even though it is supposedly a unit only for people vaccinated against COVID-19. Mr. Pizzaro's mental illness is exacerbated by the lack of out-of-cell time and his anxiety about missing court. During his incarceration, he has witnessed correctional officers assaulting incarcerated persons with pepper spray without provocation, and he has witnessed officers failing to protect incarcerated persons from assaults. He fears that he, too, will be subjected to violence.

28.     Michael Flynn is 64 years old and is currently incarcerated as a pretrial detainee at PICC. Mr. Flynn was injured in his cell at the PDP jail known as Riverside Correctional Facility

("RCF") in September 2021 and required a cast for a broken hand. Treatment for this injury was delayed and he has yet to receive all recommended follow-up care. While at RCF, he was forced to remain in a cell with sliding bolt locks, a hazard in the event of an emergency. Mr. Flynn has experienced delays in receiving legal mail, lack of adequate out-of-cell time, and exposure to violence on his block where correctional officers fail to intervene in violent incidents.

29.     Dyquill Pledger is 29 years old and currently incarcerated as a pretrial detainee at PICC. He is currently held in disciplinary segregation, where he has experienced extended periods of total lockdown, where he does not have access to phones, tablets, or showers. Mr. Pledger has a diagnosed mental illness for which he receives prescription medications. Mr. Pledger's mental illness substantially limits his major life activities, including eating, sleeping, and brain functioning. In disciplinary segregation, he is held inside his cell a minimum of twenty-three hours a day, and is denied access to commissary. Mr. Pledger's mental illness has been exacerbated by being placed in disciplinary segregation. He is extremely depressed, has trouble with memory and focus, and often feels like walls are closing in on him. Mr. Pledger did not receive an in-person hearing for his alleged disciplinary violation, nor did he receive an opportunity to contest his charges before a guilty finding and restitution order were entered against him. He is not receiving law library access and is only given out-of-cell time on average once every three to five days. In October 2021, PDP staff pepper-sprayed him and, he did not receive adequate medical attention. He has also experienced undue delays in receiving legal mail.

30.     Nasir Lewis is 24 years old and currently incarcerated at PICC as a pretrial detainee. He is housed on a segregation unit. Mr. Lewis received a disciplinary misconduct and was found guilty without an in-person hearing or any opportunity to contest his charges prior to a finding of

guilt and imposition of a sentence of 60 days in disciplinary segregation.  In segregation, he has been denied adequate access to showers and calls to his family.

31.     Troy Harley is 23 years old and currently incarcerated as a pretrial detainee at CFCF. While incarcerated, he has been threatened by guards with pepper spray without provocation. Additionally, he has attempted to call for urgent medical assistance using emergency call buttons in his cell and has experienced long delays in correctional or medical response time. Mr. Harley has experienced periods of total lockdown, where he could not shower or leave his cell.  Moreover, he has had issues gaining proper and timely access to toilet paper, and phones and tablets to talk with his family and attorneys.

32.     Christian Maldonado is 28 years old and currently incarcerated at CFCF, serving a criminal sentence. While in PDP custody, he was assaulted by his cellmate in their cell, which led to serious dental injuries. After he returned from the hospital the night of the assault, PDP staff placed Mr. Maldonado back in the same cell with the cellmate who had assaulted him. PDP failed to take Mr. Maldonado to at least one of his follow-up outside medical appointments. He still experiences ongoing pain in his mouth, which substantially limits his ability to sleep and concentrate. He has submitted multiple sick call slips, but PDP still has not taken him to his follow-up outside medical appointment, nor is he currently receiving medication for his pain. While in a segregation unit at CFCF, he was pepper-sprayed and assaulted while in his cell by correctional staff. He was not offered access to the law library from March 2020 until the fall of 2021, months after the disposition of his criminal charges.

33.     At the time the original Complaint in this action was filed, Thomas Remick was a 30-year-old individual incarcerated in a dorm at PDP jail known as the Detention Center ("DC").

He had been diagnosed with sarcoma and required regular chest x-rays. He has since been released from PDP custody.

34.     At the time the original Complaint in this action was filed, Jay Diaz was a 30-year-old individual incarcerated at the PDP jail known as Riverside Correctional Facility ("RCF"). He suffered from asthma and required breathing treatments, which were not regularly provided despite his requests. He has since been released from PDP custody.

35.     At the time the original Complaint in this action was filed, Michael Dantzler was a 45-year-old individual incarcerated in the medical unit at DC. He had vascular disease that made him prone to blood clots, and, in February 2020, he had emergency surgery to remove a pulmonary embolism. Even in the medical unit, Mr. Dantzler had not had his cell cleaned nor did he have access to cleaning products to clean the cell himself. A doctor came to his cell every week, but the doctor did not always wear a mask. He has since been released from PDP custody.

36.     At the time the original Complaint in this action was filed, Robert Hinton was a 63-year-old individual incarcerated at CFCF. He had Hepatitis C that had caused damage and scarring to his liver, and he was experiencing pain on the side of his abdomen. He has since been released from PDP custody.

37.     At the time the original Complaint in this action was filed, Joseph Weiss was a 57-year-old U.S. Army veteran incarcerated at CFCF. Due to being wounded in combat, he has a metal rod and pins in his femur and walks with a cane. He has since been released from PDP custody.

38.     At the time the original Complaint in this action was filed, Joseph Skinner was a 38-year-old individual incarcerated at CFCF. He had severe asthma, which required that he use an

inhaler daily. He had been hospitalized 4 or 5 times and was previously intubated due to his asthma. He has since been released from PDP custody.

39.     At the time the original Complaint in this action was filed, James Bethea was a 53-year-old individual incarcerated at PICC. He suffered from asthma, Hepatitis C, arthritis, and diabetes. He has since been released from PDP custody.

40.     At the time the original Complaint in this action was filed, Saddam Abdullah was a 29-year-old individual incarcerated at PICC. He had asthma and had had four (4) recent acute asthma attacks. His inhaler was not working, and, after a recent asthma attack, medical staff had refused to provide a breathing treatment. He had experienced chills, loss of taste and smell, and difficulty breathing. Because he did not have a fever, he was not tested for COVID-19 and was not medically isolated. He has since been released from PDP custody.

## VI.     CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves, a class of similarly situated individuals, and three subclasses.

42.     Plaintiffs seek to represent a class ("Class") consisting of:

> All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

43.     All Plaintiffs except for Plaintiff Maldonado seek to represent a subclass ("Pretrial Subclass") consisting of:

> All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons as pretrial detainees, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

44.     Plaintiff Maldonado seeks to represent a subclass ("Sentenced Subclass") consisting of:

> All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons as sentenced prisoners, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

45.     Plaintiffs Alejandro, Walker, Pizarro, Pledger, and Maldonado seek to represent a subclass ("Disability Subclass") consisting of:

> All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons who have physical and or psychiatric impairments that substantially limit one or more of their major life activities, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

46.     At the present time, at least 90% of individuals incarcerated in the PDP are in the proposed Pretrial Subclass; the remainder of the PDP population is in the proposed Sentenced Subclass.[23]

47.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

48.     Joinder is impracticable because (1) the class members are numerous; (2) the class includes unidentifiable future members; and (3) the class members are incarcerated, reducing their ability to institute individual lawsuits.

49.     Common questions of law and fact exist as to all members of the proposed class; all have the right to receive adequate COVID-19 prevention measures, testing, and treatment; all have the right to humane and constitutional conditions of confinement; and all have the right to access the courts and legal counsel.

50.     The named Plaintiffs' claims are typical of the members of the class because the named Plaintiffs and all class members are injured by the same wrongful acts, omissions, policies, and practices of Defendants as described here.  The named Plaintiffs' claims arise from the same practices, policies, and conduct that gives rise to the claims of the class members, and they are based on the same legal theories.

---

[23] For purposes of constitutional claims regarding conditions of confinement, incarcerated persons who have been convicted of crimes but have not yet been sentenced are classified as "pretrial detainees." *See Stevenson v. Carroll*, 495 F.3d 62, 67 (3d Cir. 2007); *Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000).

51.     The named Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  They have no interests adverse to the interests of the proposed class.  They retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

52.     Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek class certification under Rule 23(b)(2).

53.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

## FIRST CLAIM FOR RELIEF

### Unconstitutional Conditions of Confinement in Violation of the
### Eighth and Fourteenth Amendments to the U.S. Constitution
42 U.S.C. § 1983
*Class, Pretrial Subclass, and Sentenced Subclass versus All Defendants*

54.     Under the Eighth and Fourteenth Amendments, corrections officials are required to provide for the reasonable health and safety of persons, whether sentenced or in pretrial detention, and they must provide humane conditions of confinement.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982).  Correctional officials have an affirmative obligation to protect persons in their custody from infectious disease.  Correctional officials also have an obligation not to place persons in their custody in oppressive conditions, including prolonged lockdowns and solitary confinement.  Correctional officials must provide adequate access to medical care, must protect incarcerated individuals from violence from others,

20

and may not use unreasonable or excessive force against incarcerated individuals.  Officials violate the rights of incarcerated individuals when they are either deliberately indifferent to conditions of confinement that are likely to cause them serious harm and that pose an unreasonable risk of serious damage to their future health, *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993), or if their acts are objectively unreasonable.  *Kingsley v. Hendrickson*, 576 U.S. 389, 397–98 (2015).

55.    PDP's facilities, as currently operated, deny the Plaintiff class the protections of the Eighth and Fourteenth Amendments.

## SECOND CLAIM FOR RELIEF

**Deprivation of Right of Access to Courts and Counsel in Violation of the First, Sixth, and Fourteenth Amendments to the U.S. Constitution**
42 U.S.C. § 1983
*Class, Pretrial Subclass, and Sentenced Subclass versus All Defendants*

56.    The First, Sixth, and Fourteenth Amendments to the U.S. Constitution provide that all incarcerated individuals must be provided with timely access to legal mail, access to their court hearings, access to a law library, access to the materials necessary to petition the court, and the ability to have privileged, timely communications with both criminal and civil counsel.

57.    Defendants have violated Plaintiffs' rights under the First, Sixth, and Fourteenth Amendments by cancelling and/or greatly delaying both remote and in-person legal visits; delaying and/or failing to deliver legal mail; failing to provide access to the law library; failing to transport Plaintiffs to, or cancelling, remote and in-person court appearances; instituting unnecessary and unreasonable quarantine policies and/or practices which cause Plaintiffs to miss remote and in-person court hearings; and failing to provide Plaintiffs with materials necessary to write to the courts or their lawyers.

### THIRD CLAIM FOR RELIEF

**Deprivation of Due Process Rights in Violation of the
Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. § 1983
*Class, Pretrial Subclass, and Sentenced Subclass versus All Defendants*

58.     Under the Fourteenth Amendment to the United States Constitution, pretrial detainees have a protected liberty interest in not being detained in more restrictive conditions than the general prison population.

59.     The Due Process Clause requires that pretrial detainees placed in restrictive housing for administrative reasons be provided an explanation of the reason for their transfer and an opportunity to respond.

60.     The Due Process Clause requires that pretrial detainees placed in restrictive housing as punishment for disciplinary infractions be provided written notice of the charges against them; an opportunity to defend themselves against the charges at a hearing, including by presenting witnesses and documentary evidence; and a written statement of the evidence relied on and the reasons for the disciplinary action.

61.     All incarcerated persons, whether pretrial or sentenced, have a protected property interest in the funds in their inmate accounts and in avoiding assessments on their inmate accounts.

62.     The Due Process Clause requires that incarcerated persons who have financial assessments placed on their inmate accounts due to alleged disciplinary infractions be provided written notice of the charges against them and the basis for the financial assessment; an opportunity to defend themselves against the charges at a hearing, including by presenting witnesses and documentary evidence; and a written statement of the evidence relied on and the reasons for the financial assessment.

63.     Defendants have violated Plaintiffs' due process rights by placing and keeping them in punitive or administrative segregation and placing financial assessments on their inmate accounts without due process.

### FOURTH CLAIM FOR RELIEF

**Violation of the Americans with Disabilities Act**
42 U.S.C. §§ 12101 et seq.
*Disability Subclass versus Defendant City of Philadelphia*

64.     Title II of the ADA bars public entities, such as PDP, from excluding qualified individuals with disabilities from its services, programs, or activities, or otherwise subjecting them to discrimination, and requires public entities to make reasonable accommodations for individuals' disabilities.

65.     Many members of the class are qualified individuals with disabilities under the meaning of the ADA.

66.     Access to medical treatment and safe conditions of confinement are programs or services that PDP's facilities must provide to incarcerated people for purposes of the ADA.

67.     Defendants discriminate against people with disabilities by denying them reasonable accommodations in accordance with CDC guidelines and are necessary to protect themselves from COVID-19.

68.     Defendants also discriminate against individuals with disabilities by failing to provide adequate out-of-cell time and medical and mental health treatment, and by failing to make necessary modifications to PDP practices to ameliorate the effects of current conditions in PDP on individuals with disabilities.

### REQUEST FOR RELIEF

69.     Plaintiffs respectfully request that the Court order the following:

    a.   Certification of this case as a Class Action under Fed. R. Civ. P. 23(b)(2);

23

b.  Injunctive relief ordering Defendants to mitigate the serious risk of illness, death, and harm from COVID-19, and to provide constitutional conditions of confinement, access to counsel and courts, and due process to those in disciplinary or administrative segregation in the PDP;

c.  An order requiring that the City reduce the population of PDP facilities to a level sufficient to allow the City to satisfy its constitutional obligations, should other injunctive relief fail to remedy the unconstitutional and otherwise unlawful conditions in PDP;

d.  A declaration that Defendants' policies and practices violate the First, Sixth, Eighth, and Fourteenth Amendments, and that Defendants' policies and practices violate the Americans with Disabilities Act.

e.  An award of Plaintiffs' attorneys' fees and costs; and

f.  Any further relief this Court deems just and appropriate.

Respectfully submitted,

/s/ Su Ming Yeh
Su Ming Yeh (PA 95111)
/s/ Matthew A. Feldman
Matthew A. Feldman (PA 326273)
/s/ Grace Harris
Grace Harris (PA 328968)
/s/ Sarah Bleiberg
Sarah Bleiberg (PA 327951)
PENNSYLVANIA INSTITUTIONAL
LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
(215)-925-2966
smyeh@pailp.org
mfeldman@pailp.org
gharris@pailp.org
sbleiberg@pailp.org

/s Bret Grote
Bret Grote (PA 317273)
/s Nia Holston
Nia Holston (PA 327384)
/s Rupalee Rashatwar
Rupalee Rashatwar (FL 1011088)*
ABOLITIONIST LAW CENTER
PO Box 31857
Philadelphia, PA 19104
(412) 654-9070
bretgrote@abolitionistlawcenter.org
nia@alcenter.org
rupalee@alcenter.org

/s/ David Rudovsky
David Rudovsky (PA 15168)
/s/ Jonathan H. Feinberg
Jonathan H. Feinberg (PA 88227)
/s/ Susan M. Lin
Susan Lin (PA 94184)
KAIRYS, RUDOVSKY, MESSING,
FEINBERG, & LIN, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400
drudovsky@krlawphila.com
jfeinberg@krlawphila.com
slin@krlawphila.com

/s/ Will W. Sachse
Will W. Sachse (PA 84097)
/s/ Benjamin R. Barnett
Benjamin R. Barnett (PA 90752)
/s/ Mary H. Kim
Mary H. Kim*
/s/ Nicolas A. Novy
Nicolas A. Novy (PA 319499)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
(215) 994-2496
Will.Sachse@dechert.com
Ben.Barnett@dechert.com
Mary.Kim@dechert.com
Nicolas.Novy@dechert.com

* indicates counsel who will seek
admission or *pro hac vice* admission

*Attorneys for Petitioners/Plaintiffs*

DATE:  January 28, 2022