**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS REMICK, et al.,** on behalf of **themselves and all others similarly situated,** | : : : | **CIVIL ACTION** |
| **Plaintiffs-Petitioners,** | : : : | |
| **v.** | : : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY,** in her official capacity as **Commissioner of Prisons,** | : : : : | |
| **Defendants-Respondents.** | : : | **No. 20-1959** |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                                              **March 11, 2022**

Before the Court is Plaintiffs' Third Amended Motion for Class Certification. (ECF No. 132.) For the reasons that follow, the Court will grant Plaintiffs' Motion and certify a class pursuant to Fed. R. Civ. P. 23(b)(2). The Court will also deny the Motions to Intervene and Motions for Contempt filed by six individual Philadelphia Department of Prisons ("PDP") inmates.

## I.      BACKGROUND

The Court reaches the issue of class certification nearly two years after the commencement of this litigation. On April 20, 2020, Plaintiffs—a group of inmates who are or were at one point incarcerated at a PDP facility—filed suit against Defendants City of Philadelphia and PDP Commissioner Blanche Carney, seeking to compel them "to protect individuals incarcerated in the PDP from the risks of serious harm they face from the twin dangers of COVID-19 and prolonged isolation in their cells." (ECF No. 132 at 6 (citing ECF No. 1).) Plaintiffs concurrently filed their first Motion for Class Certification. (ECF No. 2.)

1

Soon after, on April 23, 2020, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking a court order requiring Defendants "to ensure that conditions of confinement at PDP comply with the health and safety standards necessary to protect the [putative] plaintiff class, and to provide humane conditions of confinement." (ECF No. 18 at 4.) The parties subsequently entered into a partial settlement agreement resolving this motion, which was approved by the Court in the form of a stipulated Consent Order on June 3, 2020. (ECF No. 35.)

The June 3, 2020 Consent Order required Defendants to take various measures both to mitigate the risks of harm from COVID-19 at PDP facilities, including by supplying hygienic products, cleaning supplies, and personal protective equipment to inmates, as well as to continue to provide care for inmates' "non-COVID-19-related medical and mental health needs." (*Id.* at 3-4.) Of particular note, pursuant to the Consent Order, the City was directed to "[w]ork[] to increase daily out-of-cell time for showering, cleaning, recreation, and phone calls, with a near-term goal of allotting 45 minutes per inmate by June 10, 2020." (*Id.* at 3.)

On January 13, 2021, the Court issued an Interim Order finding that Defendants had failed to comply with the June 3, 2020 Consent Order and were not providing inmates their required forty-five minutes of daily out-of-cell time. (ECF No. 62.) Specifically, the Court found that "[t]he current shelter-in-place policy, implemented by PDP to control the transmission of COVID-19, keeps incarcerated people in their cells for nearly 24 hours a day, and such prolonged confinement is harmful to the mental and physical health of incarcerated individuals." (*Id.* at 1.) The Interim Order again ordered Defendants to provide inmates at least forty-five minutes of daily out-of-cell time. (*Id.* at 2.)

On January 28, 2021, the Court issued an Order requiring Defendants to provide at least

two hours of daily out-of-cell time by February 10, 2021 and three hours by February 24, 2021. (ECF No. 63 at 3.) The Court-ordered increase in out-of-cell time followed the "universal testing of the incarcerated population" between December 7, 2020 and January 13, 2021, culminating in a "positivity rate of just over 5%." (*Id.* at 1-2.) This approximated "[t]he PDP-stated benchmark for iteratively increasing cohort sizes," which, at the time was "a system-wide Covid-19 positivity rate at or below 5%." (*Id.* at 2.) As stated in the January 28, 2021 Order, "the size of cohorts determines the amount of time individuals will have out of cell." (*Id.* at 1.) Further, at the time of the January 28, 2021 Order, the PDP had "started a vaccination process for COVID-19" and stated its intention "to provide vaccinations to the entire staff and incarcerated population as soon as possible." (*Id.* at 2.)

On May 4, 2021, the Court issued an Interim Order finding that "there has been a pattern of noncompliance with the January 28, 2021 Order." (ECF No. 70 at 2.) The Interim Order cited to "reports from class members at each of the PDP facilities that they have regularly been denied the required amount of out-of-cell time" that "have been filed with the Court on a regular basis." (*Id.*) Both the Deputy Wardens at each PDP facility, who had been "designated as the City's monitors for compliance," and the City of Philadelphia "reported that staffing shortages and other emergent events have impeded the ability of the facilities to meet or exceed the three hours of recreation time." (*Id.*) Specifically, "Plaintiffs' Declarations allege, and the Deputy Warden certifications show, that out-of-cell time is routinely, negatively impacted by staffing shortages. Consistent with this evidence, it appears to the Court that many of the non-reporting officers have used vacation time, sick time, and FMLA leave time, while others have simply failed to report to work without stating a reason." (*Id.* at 2-3.)

On May 14, 2021, Plaintiffs filed a Motion for Contempt and Sanctions in connection with

Defendants' failure to comply with the Court's January 28, 2021 Order. (ECF No. 71.) On June 23, 2021, the Court approved a Settlement Agreement that resolved this motion, pursuant to which Defendants paid $125,000 to two Philadelphia-based bail funds. (ECF No. 81.) The Settlement Agreement also required that "Defendants [] make all reasonable efforts to increase out-of-cell times beyond those required by current Court Orders with the ultimate goal of a new schedule that would provide out-of-cell time: (a) for all vaccinated units, in the range of 4.5-5.0 hours/day; (b) for other general housing units, 3.5 hours/day; (c) for quarantined housing units, 3 hours/day; and (d) for segregation units, 1 hour/day." (ECF No. 81-1 at 1-2.) The Settlement Agreement further required that Defendants "provide to the Court and the Plaintiffs reports on infection and vaccination rates and the reports of the Deputy Wardens on out-of-cell time required under current Court Orders." (*Id.* at 2.)

On September 14, 2021, the Court entered an Order setting January 22, 2022 as the date on which the PDP must "return to full pre-COVID-19 operations with normal out-of-cell times of approximately eight hours per day [and] full attorney, family, and friends' visitation; and full programming."[1] (ECF No. 93 at 1.) The Court ordered Defendants to take interim steps to

---

[1] The Court also notes that, despite confounding objections to the contrary from Defendants in recent months, this provision of the September 14, 2021 Order—as well as the majority of that Order—was drawn directly from a Proposed Order submitted by Defendants for the Court's consideration on August 23, 2021. Defendants' Proposed Order asked the Court to order that the PDP "shall, if staffing permits, target the date of January 15, 2022 for a return to full pre-COVID pandemic operations with normal out-of-cell times of approximately eight hours per day, full attorney and family visitation, and full programming ('normal schedule')." This text appears nearly verbatim in the September 14, 2021 Order, as noted above, and even extends further Defendants' requested deadline, giving them *more* time than they proposed to provide inmates "full pre-COVID" out-of-cell time. The September 14, 2021 Order also borrowed Defendants' Proposed Order's suggestions concerning the graduated increases in out-of-cell time leading up to January 22, 2022, as well as its provision regarding the PDP "continu[ing] to hire correctional officers (retirees and new recruits) and [continuing] its efforts to incentivize staff attendance through pay increases or overtime to secure sufficient staff to safely operate the PDP with regular programming, visits, and movement of incarcerated persons."

4

gradually increase out-of-cell time, visitation, and programming, including by providing "a minimum of 5 hours daily out-of-cell time for incarcerated persons in vaccinated housing units, 4 hours for persons in other non-quarantine housing areas, 3 hours for persons in quarantined housing areas, and 1 hour for persons housed in segregation units" by November 6, 2021, increasing to six hours, five hours, four hours, and two hours, respectively, by December 22, 2021. (*Id.* at 2.) This increase in out-of-cell time was to be facilitated by increases in correctional officer staffing. (*Id.* ("To implement this schedule, the PDP shall continue its hiring of correctional officers (retirees and new recruits) and shall implement pay increases or overtime to secure sufficient staff to safely operate the PDP with regular programming, visits, and movement of incarcerated persons. Further, the City shall increase and then maintain the correctional staff at the level set forth in the City's FY 2022 budget (180 new officers over and above the 2021 authorized numbers of correctional officers).").)

On October 14, 2021, Plaintiffs filed their First Amended Complaint. (ECF No. 100.) On December 1, 2021, Plaintiffs filed a Motion for Contempt alleging that Defendants failed to comply with the requirements of the Court's January 28, 2021 and September 14, 2021 Orders. (ECF No. 113.) Plaintiffs filed motions for leave to file their Second Amended Complaint on January 7, 2022 and their Third Amended Complaint on January 27, 2022, both of which were opposed by Defendants. (ECF Nos. 126, 133.) Pursuant to a Settlement Agreement with the Defendants, whose substantive terms were not docketed at the request of the parties but were soon after made public, *see* Chris Palmer, *Philly will pay another $125,000 to settle a claim about inhumane jail conditions. A broader lawsuit is ongoing.*, PHILA. INQUIRER, Feb. 1, 2022, Plaintiffs withdrew their Motion to Compel on January 31, 2022 and made another payment to the Philadelphia Bail Fund per the agreement of the parties. (ECF No. 136.)

Plaintiffs filed a Motion for Preliminary Injunction on January 7, 2022. (ECF No. 128.) Plaintiffs filed a Third Amended Motion for Class Certification on January 28, 2022. (ECF No. 132.) Plaintiffs' Third Amended Complaint, no longer opposed by Defendants, was ultimately docketed on February 22, 2022. (ECF No. 147.)

The Third Amended Complaint names sixteen plaintiffs (collectively, the "named Plaintiffs"). Named Plaintiffs Thomas Remick, Nadiyah Walker, Jay Diaz, Michael Alejandro, Michael Dantzler, Robert Hinton, Joseph Weiss, Joseph Skinner, Saddam Abdullah, and James Bethea were, at the time of the filing of the initial Complaint and Plaintiffs' first Motion for Class Certification, incarcerated in PDP facilities. (ECF No. 132 at 10.) The Third Amended Complaint added Clay Pizarro, Michael Flynn, Nasir Lewis, Dyquill Pledger, Troy Harley, and Christian Maldonado as named Plaintiffs. (*Id.*) These newly added named Plaintiffs, in addition to Alejandro and Walker, are, as of the time of the filing of the Third Amended Complaint and the Third Amended Motion for Class Certification, incarcerated in PDP facilities.[2] (*Id.* at 10-11.)

The Third Amended Complaint asserts four claims for relief: three pursuant to 42 U.S.C. § 1983 and one pursuant to the Americans with Disabilities Act ("ADA"). Count I asserts

---

[2] Specifically, according the Third Amended Complaint, of the eight named Plaintiffs still in PDP custody, seven are allegedly pre-trial detainees (Alejandro, Walker, Pizarro, Flynn, Pledger, Lewis, Harley), (*see* ECF No. 147 ¶¶ 25-31), and one is allegedly serving a criminal sentence (Maldonado), (*see id.* ¶ 32). The remainder of the named Plaintiffs were all allegedly pre-trial detainees prior to being released from PDP custody. (*Id.* ¶¶ 33-40.) Of the currently incarcerated pre-trial detainees, four are alleged to be housed at the Philadelphia Industrial Correctional Center ("PICC") (Flynn [after being transferred from Riverside Correctional Facility ("RCF")], Alejandro, Pledger, and Lewis), one at the Alternative and Special Detention Central Unit at RCF (Walker), and two at the Curran-Fromhold Correctional Facility ("CFCF") (Pizarro and Harley). (*Id.* ¶¶ 25-31.) Maldonado is alleged to be housed at CFCF. (*Id.* ¶ 32.) Of the formerly incarcerated individuals, one is alleged to have been housed at RCF (Diaz), two are alleged to have been housed at PICC (Bethea and Abdullah), three are alleged to have been housed at CFCF (Hinton, Weiss, Skinner), and two are alleged to have been housed at the Detention Center (Remick and Dantzler). (*Id.* ¶¶ 33-40.)

violations of Plaintiffs' Eighth and Fourteenth Amendment rights based on correctional officers failing to provide "for the[ir] reasonable health and safety" and "humane conditions of confinement." (ECF No. 147 ¶ 54.) Count II asserts violations of Plaintiffs' First, Sixth, and Fourteenth Amendment rights based on a lack of access to courts and counsel. (*Id.* ¶ 57.) Count III asserts violations of Plaintiffs' Fourteenth Amendment rights based on Defendants "placing and keeping them in punitive or administrative segregation and placing financial assessments on their inmate accounts without due process." (*Id.* ¶ 63.) Count IV asserts violations of the ADA on behalf of a proposed "Disability Subclass" based on being denied "reasonable accommodations" and "adequate out-of-cell time and medical and mental health treatment." (*Id.* ¶¶ 67-68.) Plaintiffs request that the Court correspondingly order injunctive and declaratory relief, including "[i]njunctive relief ordering Defendants to mitigate the serious risk of illness, death, and harm from COVID-19, and to provide constitutional conditions of confinement, access to counsel and courts, and due process to those in disciplinary or administrative segregation in the PDP" and "[a] declaration that Defendants' policies and practices violate the First, Sixth, Eighth, and Fourteenth Amendments, and that Defendants' policies and practices violate the Americans with Disabilities Act." (*Id.* ¶ 69.) Defendants moved to dismiss the Third Amended Complaint on February 25, 2022. (ECF No. 148.)

## II.    LEGAL STANDARD

"To obtain class action certification, plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). Fed. R. Civ. P. 23(a) allows for class certification only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the

class; and (4) the representative parties will fairly and adequately protect the interests of the class. Plaintiffs seek to certify a class pursuant to Fed. R. Civ. P. 23(b)(2), under which members of a putative class must show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." As outlined by the Third Circuit, "for certification of a 23(b)(2) class seeking only declaratory or injunctive relief, a properly defined 'class' is one that: (1) meets the requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2) and our guidance in *Barnes* []; and (3) is capable of the type of description by a 'readily discernible, clear, and precise statement of the parameters defining the class,' as required by Rule 23(c)(1)(B) and our discussion in *Wachtel* []." *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015).

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (quotation marks omitted). In conducting its inquiry, a district court must assess "the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial," which may require the district court to "delve beyond the pleadings." *Id.* at 312, 316 (citations omitted).

## III.   DISCUSSION

For the reasons that follow, the Court finds that class certification is appropriate for Plaintiffs' claims for declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

### A.   Class Definition

Plaintiffs propose certifying one class and three subclasses, defined as follows:

- <u>Class</u>: All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

- <u>Pre-Trial Subclass</u>: All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons as pretrial detainees, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

- <u>Sentenced Subclass</u>: All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons as sentenced prisoners, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

- <u>Disability Subclass</u>: All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons who have physical and or psychiatric impairments that substantially limit one or more of their major life activities, and are or will be subjected to unconstitutional and otherwise illegal conditions of confinement, including extended lockdowns; lack of out-of-cell time; denial of timely and adequate medical care; lack of protection from physical assaults; denial of access to the courts, to legal counsel, and to timely legal mail; lack of due process in disciplinary proceedings; lack of access to necessary exercise; inadequate sanitation, hygiene, quarantine, and separation practices and procedures to protect against COVID-19 infections.

(ECF No. 132 at 2-3.)

In certifying a class, Fed. R. Civ. P. 23(c)(1)(B) calls for the Court to "define the class."

This definition must comprise "a readily discernible, clear, and precise statement of the parameters

defining the class or classes to be certified." *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187 (3d Cir. 2006). As noted by the Third Circuit, however, this "precision" need not be as manifest when seeking certification under Rule 23(b)(2) as compared to certification under Rule 23(b)(3): "Because the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action." *Shelton*, 775 F.3d at 561. In other words, when notice and opt-out—characteristic of Rule 23(b)(3) classes and addressed by Rule 23(c)(2)(B), which does not apply to Rule 23(b)(2) classes—are not at issue, "a precise class definition is not as critical." *Id.* at 562 (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004)); *see also Dittimus-Bey v. Taylor*, 244 F.R.D. 284, 293 (D.N.J. 2007) ("Maintaining a class action under [Rule 23(b)(2)] permits less succinct class definitions than Rule 23(b)(3) does, especially in civil rights actions."). It also follows that the Third Circuit's ascertainability requirement for Rule 23(b)(3) classes "is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief." *Shelton*, 775 F.3d at 563.

District courts possess the authority to redefine proposed classes. *See Finberg v. Sullivan*, 634 F.2d 50, 64 n.9 (3d Cir. 1980) ("The problem identified by the district court might well be remedied by requiring a more specific or a narrower definition of classes. The district court should not deny certification on account of such problems without considering the possibility of redefining the classes."); *Jackson v. Se. Pa. Transp. Auth.*, 260 F.R.D. 168, 182-83 (E.D. Pa. 2009) ("[T]he mere existence of a problematic class definition does not automatically mandate denial of class certification. Rather, the court may, if possible, limit or alter the definition to remedy the problem."); *see also Shelton*, 775 F.3d at 562 (quoting *Battle v. Pa.*, 629 F.2d 269, 271 n.1 (3d Cir.

1980)) ("Where . . . the class action seeks only injunctive or declaratory relief, for which the notice provision of [Rule] 23(c)(2) is not mandatory, the district court has even greater freedom in both the timing and specificity of its class definition.") (quotation marks omitted).

The Court will hereby redefine Plaintiffs' class as follows:

All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons, and are or will be subjected to illegal or unconstitutional conditions of confinement as a result of policies and restrictions implemented in response to the COVID-19 pandemic, and the PDP's staffing shortage.

The Court sees no need to qualify the class definition in the manner proposed by Plaintiffs, including by fastening a non-exhaustive list of the types of conduct allegedly at issue to the definition's tail end. That is unnecessary. As discussed further below, the heart of the Third Amended Complaint comprises allegations regarding "unconstitutional conditions of confinement" as a result of policies and "restrictions implemented in response to the COVID-19 pandemic and the [PDP's] chronic and critical staffing shortage." (ECF No. 147 ¶ 23.) The class definition in turn borrows from the language Plaintiffs used in Paragraph 23 of the Third Amended Complaint, which "describe[s]" some of these conditions. But they need not be restated with such particularity in the class definition because *all* unlawful conditions that have manifested as a result of these policies and staffing deficiencies are therefore, by definition, at issue in this action. And, after nearly two years, there is plenty of evidence already before the Court supporting Plaintiffs' arguments that the entire class faces at least some of these conditions—but perhaps not all of them specifically *because* of staff shortages and the PDP's COVID-19 policies. This will be developed further over the course of this litigation.[3]

---

[3] The Court also must acknowledge that class certification is taking place during a particularly delicate time in this litigation: before the parties have fully briefed Defendants' pending Motion to Dismiss, and after the easing of COVID-19-related restrictions and guidance both in Philadelphia and nationwide due to lower transmission rates. And—although issues

Most notably, and as is the focus of both Plaintiffs' class certification briefing and the lion's share of the evidence before the Court, the entire class faces a concerning lack of out-of-cell time. Although tempted to do so given this overwhelming focus, the Court will not narrow the class definition to focus solely on out-of-cell time because it does not wish to prevent Plaintiffs from addressing other potentially unlawful practices and conditions—beyond out-of-cell time in all its forms and manifestations—occurring as a result of the "policies and restrictions implemented in response to the COVID-19 pandemic" and "the PDP's staffing shortage." The exact breadth of the

---

regarding questionable policies, dangerous conditions, and inadequate staffing have hampered the PDP long before the commencement of this action, and the Court has no illusion that lower COVID-19 transmission rates will make these issues magically disappear—it is indisputable that this case is inextricably buoyed to the COVID-19 pandemic. So too are many of the issues included in the non-exhaustive list Plaintiffs affixed to their proposed class definition.

Without opining on the merits of Plaintiffs' claims—or the appropriateness of the easing of COVID-19-related restrictions at this specific point in time—the Court feels compelled to memorialize where the ever-evolving state of play regarding COVID-19 stands today, at least in the eyes of the government: as far less a threat than it was at earlier points in this litigation, including when Plaintiffs filed for class certification. For example, earlier this month, a challenge to school districts' masking requirements was dismissed as moot by the Third Circuit based on CDC guidance categorizing the county in which the school districts are located as "low risk." *See* Order, *John Doe 1 v. Upper Saint Clair Sch. Dist.*, No. 22-1160 (3d Cir. Feb. 26, 2022), ECF No. 26 (ordering the parties to advise as to "why the pending appeals are not moot" given that CDC guidance now recommends masking "based on your personal preference, informed by your personal level of risk" for "'low' risk" areas, and the county in which Plaintiffs sought mandatory masking "is now classified in the 'low' category"); *Doe 1*, No. 22-1160 (3d. Cir. Mar. 1, 2022), ECF No. 30 (dismissing appeal and related appeals as moot and remanding to the district court to dismiss complaints without prejudice as moot). On March 2, 2022, the City of Philadelphia lifted its mask mandate. *See* Press Release, City of Philadelphia Department of Public Health, All Clear: Philadelphia drops mask mandate (Mar. 2, 2022), https://www.phila.gov/2022-03-02-all-clear-philadelphia-drops-mask-mandate/. Though delayed, PDP prison guards will soon be subjected to a vaccine mandate. And, based on the most recent data provided by Defendants, the PDP COVID-19 positivity rate has fallen considerably from highs of approximately 19% and 12% in August 2021 and early January 2022, respectively, to 0.4% by early March 2022.

The Court, then, could foresee a scenario where certain of the issues invoked by Plaintiffs may come out of focus as the COVID-19 pandemic continues to evolve and—God willing—subside. It would therefore not be prudent to accept a class definition that is at risk of continuous modification by way of the Court periodically crossing off certain issues that may or may not dissipate prior to the disposition of this action.

practices and conditions at issue need not be set forth today. However, Plaintiffs should take heed of the emphasis placed on out-of-cell time in its submissions, evidence, and, now, this Court's memorandum as it moves forward with this litigation.

Further, in modifying the class definition, the Court looked to the several examples of definitions used in inmate litigations as provided by the parties in their briefs. Many of these suits were also civil rights actions challenging systemwide issues plaguing prison facilities, seeking the same kind of broad-based relief as is sought here. And many featured classes defined in a similar manner as the Court defines Plaintiffs' class here, tethered to the policies, practices, and conditions Plaintiffs seek to remedy. *See, e.g.*, *Shelton*, 775 F.3d at 558 ("All persons who are currently or will be imprisoned in the SMU program at USP Lewisburg."); *Williams v. City of Phila.*, 270 F.R.D. 208, 213-14 (E.D. Pa. 2010) ("All persons who are or will in the future be confined in the Philadelphia Prison System, and who are or will in the future be subjected to the conditions of confinement, including triple celling, or placement in dormitories, without minimally adequate security, services or programs as set forth in plaintiffs' Complaint."); *Clarke v. Lane*, 267 F.R.D. 180, 194 (E.D. Pa. 2010) ("All current and future residents of Coleman Hall to pursue claims associated with the inadequate access to and provision of medical and mental healthcare.").

And many featured even broader definitions. *See, e.g.*, *Colon v. Passaic Cnty.*, Civ. A. No. 08-4439, 2009 WL 1560156, at *6 (D.N.J. May 27, 2009) ("All persons who are now or will become incarcerated at [Passaic County Jail] during the pendency of this lawsuit."); *Inmates of Northumberland Cnty. Prison v. Reish*, Civ. A. No. 08-345, 2009 WL 8670860, at *8 (M.D. Pa. Mar. 17, 2009) ("[A]ll current and future inmates of the [Northumberland County Prison]."); *Dittimus-Bey*, 244 F.R.D. at 293 ("All individuals incarcerated at the Camden County Correctional Facility, either as pretrial detainees or as convicted prisoners, from the inception of this lawsuit on

January 6, 2005 until its termination."); *Harris v. City of Phila.*, Civ. A. No. 82-1847, 2000 WL 1239948, at *12 (E.D. Pa. Aug. 30, 2000) ("[A]ll past, present, and future inmates of the Philadelphia Prison System."); *Hassine v. Jeffes*, Civ. A. No. 84-696, 1985 U.S. Dist. LEXIS 18592, at *1 (E.D. Pa. June 25, 1985) ("All persons who are or will be incarcerated in the State Correctional Institute at Graterford."). The Court is not convinced by Defendants' argument that these cases, which largely rely on *Baby Neal*, are inapposite in the wake of *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) and *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 482 (3d Cir. 2018), as addressed further below.

*1.      Subclasses*

Plaintiffs propose that the class be divided into three subclasses pursuant to Fed. R. Civ. P. 23(c)(5). Subclasses are appropriate "where a class is found to include subclasses divergent in interest." *In re Ins. Brokerage Litig.*, 579 F.3d 241, 271 (3d Cir. 2009). District courts have discretion to determine whether or not to create subclasses. *Id.*

The Court declines to create Plaintiffs' proposed Pre-Trial Subclass and Sentenced Subclass. Although subclasses are treated as separate classes under Rule 23 for certification purposes, the parties only address the broader class and the Disability Subclass in their submissions. It thus remains unclear to the Court how the Pre-Trial Subclass and Sentenced Subclass are "divergent in interest," since the parties make no distinction between the conditions faced by pre-trial and sentenced inmates, and the broader class and these two proposed subclasses all seek to bring the same § 1983 claims as outlined in Counts I, II, and III of the Third Amended Complaint. The creation of Pre-Trial and Sentenced Subclasses is therefore not warranted. *See Williams v. Sweet Home Healthcare, LLC*, 325 F.R.D. 113, 120 (E.D. Pa. 2018) (citing *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 474 (E.D. Pa. 2009)).

The Court will, however, create and certify the Disability Subclass to pursue Count IV's ADA claim as follows:

All persons who are currently or will be in the future confined in the Philadelphia Department of Prisons who have physical and/or psychiatric impairments that substantially limit one or more of their major life activities, and are or will be subjected to illegal or unconstitutional conditions of confinement as a result of policies and restrictions implemented in response to the COVID-19 pandemic, and the PDP's staffing shortage.

### B.    Rule 23(a)

As discussed below, the Court finds that Plaintiffs' class and subclass satisfy the criteria of Fed. R. Civ. P. 23(a).

#### 1.    Numerosity

Fed. R. Civ. P. 23(a)(1) requires that the class be so numerous that joinder of all class members would be impracticable. "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

Here, the numerosity perquisite is satisfied. The PDP's facilities continuously house more than 4,000 inmates. *See* Daily headcount and census, PDP, https://www.phila.gov/departments/philadelphia-department-of-prisons/daily-headcount-and-census/#in-facility (last visited March 10, 2022). Moreover, in conditions of confinement cases, federal courts routinely find classes of incarcerated persons to satisfy Rule 23(a)(1). *See, e.g.*, *Bowers v. City of Phila.*, Civ. A. No. 06-3229, 2006 WL 2818501, at *3 (E.D. Pa. Sept. 28, 2006) (finding a class of "over 300 people" to satisfy Rule 23(a)(1) and noting that "the class in this case may include thousands of detainees" since "the class that Plaintiffs seek to have certified includes future detainees" so "the number will undoubtedly be far larger, making joinder impractical").

Although Plaintiffs do not know the exact number of disabled individuals at the PDP, the Court is also convinced as to the Disability Subclass's numerosity. (*See* ECF No. 132 at 12 ("While the current class size of individuals with a disability is not exactly known, as of 2017, 40% of people incarcerated in PDP's jails were taking psychotropic medications and 17% had a serious mental illness such as schizophrenia, bipolar disorder, or major depression. The disability subclass would be even larger, as it includes individuals with physical disabilities as well.").) Further, numerosity is not challenged by Defendants as it pertains to either the broader class or the Disability Subclass.

Rule 23(a)(1) is therefore satisfied.

### 2.    *Commonality*

Fed. R. Civ. P. 23(a)(2) requires that there is a question of law or fact common to the class. With respect to the commonality requirement, "Rule 23 does not require that the representative plaintiff have endured precisely the same injuries that have been sustained by the class members, only that the harm complained of be *common* to the class." *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988) (emphasis in original). "[C]lass members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice." *Baby Neal*, 43 F.3d at 57 (emphasis in original). The commonality requirement is "easily met" in connection with Rule 23(b)(2) classes: "[B]ecause they do not also involve an individualized inquiry for the determination of damage awards, injunctive actions by their very nature often present common questions satisfying Rule 23(a)(2)." *Id.* at 56-57 (quotation marks omitted). "Indeed, (b)(2) classes have been certified in a legion of civil rights cases where commonality findings were based primarily on the fact that defendant's conduct is central to the claims of all class members irrespective of their individual circumstances and the disparate effects of the conduct." *Id.* at 57.

16

The Court finds that there are questions of fact common to the proposed class, including, as set forth by Plaintiffs, "[w]hether the practices and policies implemented by Defendants and Defendants' actions and inactions have caused the unconstitutional conditions of confinement described in the Third Amended Complaint," (ECF No. 132 at 14), specifically as they relate to certain policies and practices affecting inmates' out-of-cell time. *See Hassine*, 846 F.2d at 178 ("[A] complainants' assertion that these conditions existed, and that they were *subject* to them—even if they had not at the time of assertion themselves been injured by those conditions—[is] sufficient to require adjudication of the claims as to the class.") (emphasis in original); *Inmates of Northumberland Cnty. Prison*, 2009 WL 8670860, at *18 ("Plaintiffs do not challenge individual instances of unconstitutional conduct; rather, they challenge the general policies, customs, and practices employed by [the Northumberland County Prison] that are allegedly violative of the Constitution.").

And Defendants should rest assured that the less "lenient" commonality standard they propound applies given the purported "out-of-step" dispositions of *Hassine* and *Baby Neal* is also satisfied here.[4] (ECF No. 151 at 3.) Defendants urge the Court to look to the Third Circuit's *Mielo* decision in finding the commonality requirement unsatisfied. In *Mielo*, the Third Circuit overturned the district court's certification of a class of "persons with qualified mobility disabilities" who "encountered accessibility barriers" at parking facilities at certain Steak 'n Shake

---

[4] The Court notes that *Hassine* and *Baby Neal* are still routinely cited by courts in this Circuit, including as recently as earlier this month. *See, e.g.*, *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, Civ. A. No. 20-3528, 2021 WL 3612155, at *3 (3d Cir. Aug. 16, 2021) (citing *Baby Neal*); *Adam X v. New Jersey Dep't of Corr.*, Civ. A. No. 17-188, 2022 WL 621089, at *3 (D.N.J. Mar. 3, 2022) (citing *Baby Neal*); *Sourovelis v. City of Phila.*, 515 F. Supp. 3d 343, 354 (E.D. Pa. 2021) (citing *Baby Neal*); *Utesch v. Lannett Co.*, Civ. A. No. 16-5932, 2021 WL 3560949, at *3 (E.D. Pa. Aug. 12, 2021) (citing *Hassine* and *Baby Neal*); *Thakker v. Doll*, 336 F.R.D. 408, 415 (M.D. Pa. 2020) (citing *Hassine* and *Baby Neal*).

restaurants. 897 F.3d at 475. Applying *Dukes*, the Third Circuit found that the proposed class did not satisfy Rule 23(a)(2)'s commonality requirement because "the ADA can be violated in many different ways," resulting in "a potentially wide array of different claims by members of the class." *Id*. at 489-90. Class members' claims—which encompassed violations involving bathroom doors and water fountains, in addition to various parking issues—therefore did not "depend upon a common contention that is capable of classwide resolution . . . in one stroke." *Id.* at 490 (quoting *Dukes*, 564 U.S. at 350).

More recently, the Middle District of Pennsylvania applied *Mielo* in the context of inmate litigation in *Molina*, finding that a proposed class of "all inmates who have been incarcerated at SCI Huntingdon at any time since December 30, 2018" suffering from injuries "arising from unconstitutional conditions at the prison both before and after the onset of COVID-19" did not satisfy Rule 23(a)(2)'s commonality requirement. *Molina v. Pa. Dep't of Corr.*, Civ. A. No. 21-38, 2021 WL 4450016, at *1-*3 (M.D. Pa. June 8, 2021), *report and recommendation adopted sub nom.*, *Molina v. Kauffman*, Civ. A. No. 21-38, 2021 WL 4439486 (M.D. Pa. Sept. 28, 2021). The court opined that "the range of injuries" purportedly suffered by class members both before and during the COVID-19 pandemic was "too varied to satisfy Rule 23(a)(2)." *Id.* at *3 (citing *Mielo*, 897 F.3d at 490).

The putative class here, however, is distinguishable from both the *Mielo* and *Molina* classes because of the sheer volume of evidence accumulated over the last two years supporting the existence of at least one common injury: insufficient out-of-cell time. Although out-of-cell time may take different forms—for instance, lack of "access to showers, medical care and treatment, in-person disciplinary hearings, phones, visits, programs, and recreation"—it is a "pattern of noncompliance" experienced by all putative class members. (ECF No. 132 at 10; *see also* ECF

No. 124 Ex. B.)

Over the past two years, the parties have shared with the Court considerable documentation evincing the existence of both concerning practices—such as staff shortages—and policies—such as the PDP's policies governing intake, quarantine, lockdowns, shelter-in-place, access and transport to court hearings, and staffers' absences from work—effectuated by Defendants, as well as the alleged resultant violations of the law. By arguing that Plaintiffs have failed to support their class certification motion with evidence, Defendants in essence ask the Court to ignore that they have submitted court-ordered reports regarding, *inter alia*, staff absenteeism, out-of-cell time, access to court hearings, COVID-19 positivity rates, vaccination rates, and the nature of PDP's quarantine units for the better part of the past year. Those reports complement the numerous affidavits and status reports filed by both parties throughout this litigation. For example, Defendants themselves have cited to staff shortages as the root cause of the PDP's issues several times in Joint Status Reports. (*See, e.g.*, ECF No. 66 at 3-4 ("There is a minimum number of staff required to safely open a housing unit for out of cell time, and when a sufficient number of people do not report to work, PDP is left without options to safely open all the housing units for the mandated period of out of cell time."), ECF No. 68 at 4 ("Shortages of staff reporting to work is the main contributor to the insufficient out of cell time . . ."), ECF No. 69 at 6 ("[S]taffing and census [] are drivers of out of cell time."). Based on the Court's review of the parties' reports and filings, *every unit* in each of the PDP's facilities, on a consistent basis, has received a concerningly low amount of out-of-cell time based on several metrics: whether low, for example, as measured against to the amount of out-of-cell time required of the PDP as ordered by the Court several times over the course of this litigation, or as measured against pre-COVID-19 levels of out-of-cell time regularly received by inmates. Defendants can pick their poison.

It is clear, then, that there is sufficient evidence demonstrating that rampant staff shortages and the implementation of certain COVID-19-related policies arguably bled into alleged violations of the law, and the Court accordingly finds that the proposed class has issues and claims "capable of classwide resolution." *Dukes*, 564 U.S. at 350 (emphasis in original).

Rule 23(a)(2) is therefore satisfied.

### a.   Disability Subclass

The Court further determines that the commonality requirement has been fulfilled for purposes of the Disability Subclass. Defendants ask the Court to find that *Mielo* prevents the certification of the Disability Subclass because its putative members are "made up of individuals with a wide array of different types of disabilities" and "Plaintiffs predicate their claim on a variety of theories, only applicable to certain subsets of the putative subclass members." (ECF No. 139 at 15.) However, like the broader class, the Disability Subclass shares at least one "common contention" regarding out-of-cell time in claiming that "Defendants [] discriminate against individuals with disabilities by failing to provide adequate out-of-cell time and medical and mental health treatment, and by failing to make necessary modifications to PDP practices to ameliorate the effects of current conditions in PDP on individuals with disabilities." (ECF No. 147 ¶ 68.) Numerous examples as faced by the named Plaintiffs are provided in the Third Amended Complaint. (*See, e.g.*, *id.* ¶¶ 26 ("PDP staff have failed to transport Ms. Walker to some of her scheduled outside medical appointments and informed her that this was due to staffing shortages."), 27 ("Mr. Pizzaro's mental illness is exacerbated by the lack of out-of-cell time and his anxiety about missing court."), 28 ("Treatment for [Mr. Flynn's hand] injury was delayed and he has yet to receive all recommended follow-up care."), 32 ("PDP failed to take Mr. Maldonado to at least one of his follow-up outside medical appointments.").)

This is sufficient to satisfy the commonality requirement. *See Tellis v. LeBlanc*, Civ. A. No. 18-541, 2021 WL 4267513, at *10 (W.D. La. Sept. 20, 2021) (certifying subclass of disabled inmates alleging that being placed on extended lockdowns as a result of COVID-19 policies is discriminatory based on their prison's "failure to treat inmates with mental illness in a way that accommodates the mental illness" and finding that subclass satisfies the commonality requirement because "if it is shown that it is not discriminatory for [the prison] not to modify its policies to accommodate prisoners' mental illness, it will resolve all Plaintiffs' claims at once").

3. *Typicality*

Fed. R. Civ. P. 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class. As courts have often recognized, "[t]ypicality and commonality are closely related and often merge." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012) (citing *Baby Neal*, 43 F.3d at 56). However, typicality "derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Id.* "Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal*, 43 F.3d at 55. "Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Id.* at 58; *see also Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014) ("Rule 23(a)(3) requires only that [named Plaintiffs'] claims be 'typical' of the class, not that they be identically positioned to each other or to every class member.").

Here, the injuries sustained by the named Plaintiffs and class members arise from the same

practices and policies that have caused the complained-of conditions to exist and continue, as discussed above. Central to all of Plaintiffs' claims are allegations concerning insufficient staffing and restrictive policies that have led to dangerous conditions including a lack of out-of-cell time. Defendants' concern that "there is not a Plaintiff capable of representing each proposed class or subclass who has allegedly suffered violations of every one of the encompassed rights" is inapposite here. (ECF No. 139 at 21.) Typicality does not depend on identifying one universally suffering Plaintiff. It instead "focuses on whether the representatives of the class suffered a *similar* injury from the *same* course of conduct." *Dittimus-Bev*, 244 F.R.D. at 291 (emphasis added).

Indeed, every currently incarcerated named Plaintiff has alleged "a similar injury"—a lack of out-of-cell time—"from the same course of conduct"—the PDP's COVID-19 policies and staff shortages. (*See, e.g.*, ECF No. 147 ¶¶ 25 (Alejandro "has limited and infrequent access to showers"), 26 (Walker "receives little to no time outside in the yard"), 27 (Pizarro "has at times experienced periods of total lockdown in PDP and has been getting very little time out of his cell"), 28 (Flynn has experienced "lack of adequate out-of-cell time"), 29 (Pledger "has experienced extended periods of total lockdown, where he does not have access to phones, tablets, or showers"), 30 (Lewis "has been denied adequate access to showers and calls to his family"), 31 (Harley "has experienced periods of total lockdown, where he could not shower or leave his cell"), 32 (Maldonado has not attended any "follow-up outside medical appointments").) In other words, they have allegedly suffered harm because of "policies and restrictions implemented in response to the COVID-19 pandemic, and the PDP's staffing shortage," as the class definition now reads.[5]

---

[5] Although the allegations concerning the named Plaintiffs who are not presently incarcerated in a PDP facility (Remick, Diaz, Dantzler, Hinton, Weiss, Skinner, Abdullah, and Bethea) do not share the same level of detail as the allegations involving the currently incarcerated named Plaintiffs, the formerly incarcerated named Plaintiffs, at the time of the initial filing of the Complaint in April 2020, were also subjected to staffing shortages and COVID-19 policies like

The Court reiterates that this harm—including what different incarcerated persons are prevented from doing during their withheld out-of-cell time—can manifest itself in different ways. The Court also reiterates that, as previously discussed, it already has before it a voluminous record of evidence documenting the lack of out-of-cell time suffered by PDP inmates systemically, as well as Defendants' own admissions that staff shortages hamper the PDP's ability to provide this out-of-cell time. *See Hassine*, 846 F.2d at 177.

a.    <u>Disability Subclass</u>

The Disability Subclass also satisfies the typicality requirement. Alejandro, Pizarro, and Pledger have each alleged that they suffer from a diagnosed mental illness for which they have been prescribed medication. (ECF No. 147 ¶¶ 25, 27, 29.) In addition, Walker has alleged that she suffers from epilepsy, and Maldonado has alleged that he experiences ongoing physical pain because of an injury sustained while at PDP. (*Id.* ¶¶ 26, 32). All allege that they experience substantial limitations of major life activities and are particularly burdened by the current conditions in PDP as a result of their disabilities. (*Id.* ¶¶ 25-27, 29, 32.) These named Plaintiffs do not necessarily "suffer from precisely the same deficiency, but they are all alleged victims of the systemic failures," and "claims framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice." *Baby Neal*, 43 F.3d at 63; *see also Tellis*, 2021 WL 4267513, at *4.

Rule 23(a)(3) is therefore satisfied.

---

the presently incarcerated Plaintiffs. As such, these named Plaintiffs' claims are not "atypical of those they seek to represent"; finding otherwise, given the "the transitory nature of the harm involved in pre-trial detention," would make "class certification . . . impossible in any case involving pre-trial detention or harms of short duration." *Bowers*, 2006 WL 2818501, at *8.

4.     *Adequacy of Representation*

Fed. R. Civ. P. 23(a)(4) requires that the representative parties will fairly and adequately

protect the interests of the class. "Adequate representation depends on two factors: (a) [counsel for

the proposed class] must be qualified, experienced, and generally able to conduct the proposed

litigation, and (b) the [named plaintiffs] must not have interests antagonistic to those of the class."

*Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).

Here, both factors are satisfied. First, Defendants do not contest that Plaintiffs' counsel is

amply qualified, experienced, and able to conduct this litigation. As stated by Plaintiffs, "[t]he

named Plaintiffs and members of the putative class are represented by counsel with extensive

experience litigating actions on behalf of prisoners' civil rights, including a combined fifty years

of litigating class action lawsuits on behalf of people incarcerated in Philadelphia's jails. Plaintiffs'

lawyers are qualified to provide the highest level of experience, knowledge, competence, and skill

required to prosecute Plaintiffs' claims, and have demonstrated their willingness, in analogous

litigation spanning decades, to vigorously pursue the relief sought by Plaintiffs." (ECF No. 132 at

17.)

Second, the interests of the named Plaintiffs align with and are not antagonistic to those of

the class. Plaintiffs seek a declaration that certain PDP policies, practices, and conditions are

unlawful, as well as injunctive relief requiring changes to those policies, practices, and conditions.

Named Plaintiffs are directly affected by the policies, practices, and conditions they contest,

motivating them to see through that they are eradicated. The relief sought by Plaintiffs would

benefit all class members and would not impair any future class members' claims, including for

monetary damages. Further, that these challenged policies, practices, and conditions manifest

differently in connection with different class members does not mean that there are conflicts

between named Plaintiffs and absent class members. *See Colon*, 2009 WL 1560156, at *5 (citing *Baby Neal*, 43 F.3d at 58) ("While the Complaint does identify some discrepancies in the treatment and identity of inmate groups . . . such differences are relatively minor when viewed beside the breadth of troublesome conditions alleged to exist at [Passaic County Jail], and the Court finds that they are unlikely to create conflicts for the class representatives."); *Dittimus-Bey*, 244 F.R.D. at 292 (citing *Baby Neal*, 43 F.3d at 58) ("[I]t does not matter for purposes of Rule 23(a)(4) that the named plaintiffs allegedly suffered different manifestations of the prison's unconstitutional [practice].").

In a series of bullet points, Defendants argue that the adequacy of representation requirement is not satisfied because "the claims brought by named Plaintiffs are subject to unique defenses specific to those individuals." (ECF No. 139 at 21-22.) The Court declines to address these defenses *in seriatim* in light of the modified and tailored class definition, and it additionally notes that some of these issues would be more appropriately raised in connection with Defendants' Motion to Dismiss and Plaintiffs' Motion for Preliminary Injunction, which are still being briefed.

The Court will address two of Defendants' points, however. First, in response to Defendants' concerns about mootness in light of the release of several named Plaintiffs since the commencement of this suit, the Court notes that "an exception to mootness applies" in litigations like this one "because of the transitory nature of the harm involved in pre-trial detention." *Bowers*, 2006 WL 2818501, at *8. Second, in response to Defendants' concerns about Plaintiffs' failure to exhaust administrative remedies, the Court sees no reason to diverge from *Chimenti v. Wetzel*, in which Judge Padova applied vicarious exhaustion. Civ. A. No. 15-3333, 2018 WL 3388305, at *6 (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004)) (explaining that, pursuant to the doctrine of vicarious exhaustion, "a class of prisoner-plaintiffs certified under Rule 23(b)(2)

satisfies the [Prison Litigation Reform Act's] administrative exhaustion requirement . . . when one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class") (quotation marks omitted). Accordingly, neither presents a "unique defense" at this time.

Rule 23(a)(4) is therefore satisfied.

### C.      Rule 23(b)(2)

"In addition to satisfying the requirements of Rule 23(a), a putative class must also comply with one of the parts of subsection (b)." *Baby Neal*, 43 F.3d at 55-56. Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(b)(2), which, as previously stated, provides that certification is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." A Rule 23(b)(2) class must be "cohesive as to those claims tried in the class action," and, correspondingly, district courts should be hesitant in certifying a Rule 23(b)(2) class in which class members face "disparate factual circumstances." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998). "[T]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory relief warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360.

This class satisfies Rule 23(b)(2)'s requirements. As discussed extensively above, the instant case involves systemwide policies and practices that affect all class members at each of PDP's facilities. The (b)(2) class "was designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons." *Barnes*, 161 F.3d at 142; *see also Shelton*, 775 F.3d at 561 ("Indeed, an Advisory

Committee note to Rule 23 notes that 'illustrative' examples of a Rule 23(b)(2) class 'are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.'").

Defendants urge the Court to preclude class certification because Plaintiffs purportedly did not describe with sufficient detail the exact relief they seek. Defendants' reliance on *Shook v. Board of County Commissioners*, 543 F.3d 597 (10th Cir. 2008) in support of this point is misplaced, however, because, as Defendants themselves admit in their surreply, "*Shook* explained that the relief need not be described 'with exacting precision at the class certification stage.'" (ECF No. 151 at 8-9 (quoting *Shook*, 543 F.3d at 606).) Instead, "*Shook* held that the relief still must be described with sufficient specificity 'to allow the district court to see how it might satisfy Rule 65(d)'s constraints and thus conform with Rule 23(b)(2)'s requirement.'" (*Id.* at 9 (quoting *Shook*, 543 F.3d at 606).)

Here, the Court finds this standard to be met. At present, the Court has been informed about the existence of several PDP policies governing, for example, out-of-cell time, access to courts, and staff absenteeism; indeed, the Court has issued several orders regarding those very policies. Although much about the specific contours of these policies, and thus the "exacting precision" of the corresponding relief, has yet to be determined, the Court nevertheless finds that Plaintiffs' description of relief at this stage conforms with Rule 23(b)(2). *See Colon*, 2009 WL 1560156, at *5 ("In this case, Plaintiffs assert class-wide grievances against [Passaic County Jail] authorities in an effort to enjoin the policies and actions leading to these conditions. As such, this case is a prime candidate for class treatment under Rule 23(b)(2) because it seeks injunctive relief against actions, or inactions, affecting the prisoners detained at [the jail] as a whole.").[6] The Court also

---

[6] The Court is also mindful of Defendants' concern that the Court lacks jurisdiction to issue

declines to analyze the contours of Rule 65(d)—which governs the "contents and scope of every injunction and restraining order"—at this time, especially as Plaintiffs' Motion for Preliminary Injunction is still pending.

The proposed class therefore satisfies the requirements of Rule 23(b)(2). Accordingly, the Court will certify the class and subclass as defined above.

### D. Class Discovery

The Court will not further delay certification of this class because of Defendants' unfounded claim that they have been deprived of the opportunity to conduct class discovery. Defendants do not cite to any authority supporting their averred entitlement to this discovery. And there is no such entitlement; instead, what matters is the Court's satisfaction that the prerequisites of Rule 23 are fulfilled by a preponderance of the evidence after a rigorous analysis. *Dukes*, 564 U.S. at 350-51; *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 184 (3d Cir. 2019). And here, the Court made its decision to certify this class based on a rigorous analysis of the record before it, *i.e.*, the bevy of information relating to this case that has been submitted by the parties over the past two years. The Court is also particularly baffled by Defendants' protestation given that it has hosted biweekly conference calls with the parties—*including* Carney and other prison officials—regarding this case for nearly two years. In other words, the Court did not "exclusive[ly] rel[y] on the complaint's allegations in order to grant certification" whatsoever, despite Defendants' fears of the contrary. (ECF No. 139 at 28.)

---

relief in connection with Plaintiffs' second request, which asks the Court to issue "[a]n order requiring that the City reduce the population of PDP facilities to a level sufficient to allow the City to satisfy its constitutional obligations, should other injunctive relief fail to remedy the unconstitutional and otherwise unlawful conditions in PDP." (ECF No. 139 at 23-24; ECF No. 147 ¶ 69.) The Court anticipates addressing this issue more comprehensively at a later stage of the litigation.

Further, the Court is not aware of Defendants engaging in class discovery, or even requesting to do so, at previous points in this litigation despite the fact that class certification motions have been pending in this action since April 20, 2020. (*See* ECF No. 2.) Even if Defendants maintain that they now require class discovery specifically concerning Plaintiffs' Third Amended Motion for Class Certification, it is not clear to the Court why class discovery could not have been at least initiated—let alone hinted at—in the twenty-one months between April 20, 2020 and the date on which Plaintiffs' instant motion was filed. Plus, Defendants currently have access to all PDP files for named Plaintiffs, and they are the keepers of considerable information regarding the policies, restrictions, and persons at issue.

Consequently, the Court will not hold up class certification in light of its satisfaction that each of the Rule 23 requirements have been met based on the record already before it.

### E.     Motions to Intervene and for Contempt

Six PDP inmates—Dwayne Henry, Walter Dobbins IV, Jeffrey Lewis, Isaiah Hudgins, Lauren Williams, and David Edwards—have filed Motions to Intervene and Motions for Contempt pursuant to Fed. R. Civ. P. 23(d), Fed. R. Civ. P. 24, and Fed. R. Civ. P. 70(a). (*See* ECF Nos. 75, 82, 84, 86, 89, 90, 122, 123, 129, 134, 135, 137.) The Court will deny these motions.

Fed. R. Civ. P. 23(d)(1)(B)(iii) provides that "[i]n conducting an action under [Rule 23], the court may issue orders that . . . require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of . . . the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action." Traditionally, this rule has been invoked when absent class members seek to "assist the class" or "protect [their] own rights" by "tak[ing] over a case from an inadequate class representative" or generally "challenging the adequacy of

representation." 3 Newberg on Class Actions § 9:30 (5th ed. 2021); *see also Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011); *Christy v. Hammel*, 87 F.R.D. 381, 395 (M.D. Pa. 1980).

"The practice of intervention in the class context is governed by the standard intervention norms of Rule 24." Newberg, *supra* (citing *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 380 (D. Del. 1990)). Fed. R. Civ. P. 24(a) requires the intervention of right of absent class members when they can demonstrate, among other factors, "that [their] interest is not adequately represented by the existing parties." *Deutschman*, 132 F.R.D. at 380. The Court finds, however, that the existing named Plaintiffs—whose circumstances and interests are substantially identical to those faced by the potential intervenors, as the potential intervenors set forth in their respective motions—are adequate representatives of the class. No potential intervenor has shown "proof of collusion between the representative and the adverse party," that "the representative has an interest adverse to the intervenor," or a "failure of the representative to fulfill his duty." *Id.* (citing *Steinberg v. Shearson Hayden Stone, Inc.*, 598 F. Supp. 273, 281 (D. Del. 1984)).[7] Permissive intervention under Fed. R. Civ. P. 24(b)—within the broad discretion of the Court—is denied for the same reasons. *See United States v. Virgin Islands*, 748 F.3d 514, 524 (3d Cir. 2014); *Stenson v. Blum*, 476 F. Supp. 1331, 1336 (S.D.N.Y. 1979), *aff'd*, 628 F.2d 1345 (2d Cir. 1980).

Finally, some individuals move the Court for contempt pursuant to Fed. R. Civ. P. 70(a). This rule states that "[i]f a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply within the time specified, the court may order the act to be done—at the disobedient party's expense—by another

---

[7] The intervenors have also not demonstrated why replacing class counsel would be appropriate or in the best interest of the class as a whole. (*See, e.g.*, ECF Nos. 90 at 2, 122 at 1.)

person appointed by the court. When done, the act has the same effect as if done by the party." However, when cited by potential intervenors, they state Rule 70(a) as follows: "If a party fails to perform a specific act required by a judgment, the court may order the act to be done—at the disobedient party's expense. . . ." (*See, e.g.*, ECF No. 89 at 2; *see also* ECF Nos. 84 at 2, 123 at 1, 134 at 2 (phrasing Rule 70(a) similarly).) This is a misstatement of Rule 70(a), and it does not apply here.[8]

Several of these motions also request individual monetary damages. (*See, e.g.*, ECF Nos. 86 at 10 (seeking individual "compensatory damages of $600,000"), 123 at 14 (seeking $1,000,000 in compensatory damages), 134 at 4 (seeking funds so "I am compensated"), 135 at 5 (requesting "compensational damages"), 137 at 6 (requesting to be "compensated up to $1,000,000.00").) However, a Rule 23(b)(2) class is not the appropriate vehicle to pursue these damages.

These Motions to Intervene and Motions for Contempt are therefore denied.

## IV.   CONCLUSION

For the reasons discussed above, the Court finds that Plaintiffs have met the requirements for certification of a Rule 23(b)(2) class action. Accordingly, their Third Amended Motion for Class Certification is granted. In addition, the Court denies the potential intervenors' Motions to Intervene and Motions for Contempt. An Order consistent with this Memorandum will be docketed separately.

---

[8] Although not cited, Fed. R. Civ. P. 70(e) states that "[t]he court may also hold the disobedient party in contempt." The Court acknowledges the potential intervenors' concerns that Defendants have failed to comply with the Court's orders, and it understands that the initial phases of this litigation have been conducted in a somewhat nonlinear manner. However, the Court believes that the concerns of these potential intervenors—who are now class members—should be allayed as the now-certified class pursues their claims going forward. Further, the Court notes that Plaintiffs have moved for contempt on a quasi-classwide basis twice since the commencement of this litigation. This demonstrates that Plaintiffs are actively monitoring and pursuing potential contempt motions, which should also allay the potential intervenors' concerns.