# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated, | : | No.: 2:20-cv-01959-BMS |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : | |
| | : | |
| | : | |
| Defendants. | : | |

## MONITOR'S FIRST REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocol, the Monitor appointed by this Court submits the attached Monitor's First Report evaluating Defendants' compliance with the terms of the Agreement through August 31, 2022.  The Monitor prepared this report as the first of regular reports to be filed of record with this Court every four months.  Subsequent reports will be filed according to the following schedule:

| | |
|---|---|
| Monitor's Second Report | March 3, 2023 |
| Monitor's Third Report | July 7, 2023 |
| Monitor's Fourth Report | November 3, 2023 |
| Monitor's Final Report | March 29, 2024 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED:  November 4, 2022                    Respectfully submitted,


By: /s/ Cathleen Beltz____
Monitor

The Agreement between Plaintiffs Thomas Remick, et al., (Plaintiffs), on behalf of themselves and all others similarly situated, and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Defendants), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-BMS (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.

The Agreement further provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision. Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means that Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision. A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. As such, in issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 12, 2024, termination date.

The Monitor has retained subject matter experts (SME) to assist in evaluating Defendants' compliance with the Agreement and in making compliance determinations. Terri McDonald has more than 34 years of experience in complex jail and prison operations, and implementation and monitoring of conditions of confinement-related class action settlement agreements. Tim Belavich, PhD, has more than 20 of experience in correctional healthcare administration, including implementation of jail and prison healthcare related class action settlement agreements and subject matter expert and expert witness experience. This report incorporates the SMEs' analysis and opinions.

The Agreement requires the Monitor to conduct site inspections "at least once every three months," during which the Monitor has access to conduct confidential interviews with personnel and incarcerated persons. The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement. In addition to at least one quarterly site visit, the Monitor will conduct periodic site visits with little advance notice to PDP.

Since the Monitor's appointment on May 25, 2022, the Monitor has completed two site visits to PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside Correctional Facility (RCF).[1]  The SMEs accompanied the Monitor on the second site visit, during which the Monitoring Team inspected housing units in every populated PDP facility with class members in each type of housing category and at each security classification level.[2] The SMEs alone conducted a third site visit and completed subject area-focused site visits and meetings with relevant PDP personnel.  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.  The Monitoring Team also met with PDP Commissioner Blanche Carney (Commissioner) and her executive team as well as facility leadership and managers at every site.

Thus far, the Monitoring Team has been granted access to facilities, documentation, personnel, and Class Members.  The Commissioner and her staff have been generous with their time, attentive to any requests made by the Monitoring Team, and agreeable to all preliminary recommendations.  They have been transparent with the Monitoring Team regarding challenges in PDP's daily operations and anticipated barriers to compliance and have communicated an understanding of the need for broad systemic reform and a commitment to achieving it.  The Monitoring Team thanks the Commissioner and her PDP staff for their service and their collaboration in the monitoring process.

The Monitor has held regular meetings with counsel for the parties, the Commissioner, and PDP executive management.  Initial meetings have been effective in refining monitoring protocols and establishing compliance expectations.  The Monitor has also begun to meet with representatives from key stakeholder organizations including the Defender Association of Philadelphia, the Pennsylvania Prison Society, the Public Defender Association of Pennsylvania, the American Federation of State County Municipal Employees, District Council 33, Local 159 (Labor), Philadelphia Bail Fund, and Healing Communities.  Information shared by stakeholders in initial meetings provides stark illustrations of current PDP conditions experienced by PDP Class Members and invaluable context that will assist the Monitoring Team in its analysis and compliance assessment.  The Monitoring Team thanks them for their time and advocacy.

The Monitoring Team has issued initial requests for data and documentation necessary to make compliance determinations for each substantive provision.  Information provided as proof of compliance is being placed into a separate shared drive on the PDP server, which is accessible by the Monitoring Team via a virtual private network.  The Monitoring Team has met extensively

---

[1] Site visits to all populated PDP facilities were completed July 18-22, August 17-19, and October 3-6, 2022.
[2] Housing units inspected included female and male intake, general population at minimum, medium, and maximum-security classification levels, protective custody, administrative and punitive segregation, "special handle" classification, behavioral health, quarantine and isolation, and medical and behavioral health licensed bed/hospital housing.  The Monitoring Team also inspected food preparation areas, attorney and family visiting areas, intake records and holding areas, safety/crisis cells and medical waiting areas, cleaning supply storage locations and laundry facilities, facility medical offices and treatment spaces, and facility and PDP command locations and administrative offices.

with PDP executives and support personnel to ensure that the request is narrowly tailored to include only data and documentation that is necessary for thorough and accurate implementation monitoring.  The requests are voluminous and the burden on PDP personnel in generating and providing requested information is substantial.  PDP has nonetheless fulfilled a significant portion of the requests and continues to provide information as it becomes available.  Much of the information requested is already being tracked by PDP and is readily available.  Some information necessary for implementation monitoring and internal quality improvement is neither readily available nor producible with PDP's current data management systems.  PDP reports that it is in the process of reconfiguring and updating systems and protocols that will benefit PDP operations and facilitate compliance monitoring.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the agreement."  In consultation with the parties, and in the interest of sound monitoring methods and supporting PDP's commitment to transparency, the Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.  The specific terms of the process by which documentation will be shared, any limitations on documents provided, and protections against improper disclosure of documents or information are still being finalized.  Documents utilized by the Monitoring Team in issuing the below compliance determinations have therefore not yet been shared with Plaintiffs' co-counsel.

## Table of Provisions

Compliance Findings .................................................................................................................. 5

Substantive Provision 1—Staffing ............................................................................................ 6

Substantive Provision 2—Out-of-Cell Time ......................................................................... 10

Substantive Provision 3—Out-of-Cell/Segregation.............................................................. 10

Substantive Provision 4—Resume Normal Operations ......................................................... 15

Substantive Provision 5—Healthcare .................................................................................... 16

Substantive Provision 6—Behavioral Health in Segregation ............................................... 20

Substantive Provision 7—Law Library Access ..................................................................... 24

Substantive Provision 8—Discipline ..................................................................................... 24

Substantive Provision 9—Tablets ......................................................................................... 25

Substantive Provision 10—Phone Calls ................................................................................ 26

Substantive Provision 11—PICC Emergency Call Systems .................................................. 27

Substantive Provision 12—Locks.......................................................................................... 28

Substantive Provision 13—Visiting....................................................................................... 29

Substantive Provision 14—Attorney Visiting ....................................................................... 30

Substantive Provision 15—COVID-19 Testing..................................................................... 30

Substantive Provision 16—Quarantine.................................................................................. 31

Substantive Provision 17—Sanitation ................................................................................... 33

Substantive Provision 18—Use-of-Force .............................................................................. 35

**Compliance Findings**

Most substantive provisions contain deadlines or implementation benchmarks that PDP must meet to achieve substantial compliance with the Agreement.  PDP is in the process of developing an internal implementation plan that divides each substantive provision into discrete tasks with specific corresponding action items that must be completed by PDP to achieve compliance.  The Monitoring Team is continuing to review documentation provided and awaits the provision of additional documentation, some of which is necessary for the Monitoring Team to make compliance findings for some provisions.  This report includes compliance findings for substantive provisions for which the Monitoring Team has sufficient proof of implementation to measure progress and issue findings.  This report also highlights several issues that emerged during initial site visits, which the Monitoring Team believed require immediate action.

The following table depicts the Agreement's 18 substantive provisions, a short-form "Designation" for each, and compliance status where appropriate (compliance status is "Deferred" where additional information or analysis is needed for a definitive compliance determination):

| Substantive Provision | Designation | Compliance Status |
|---|---|---|
| 1 | Staffing | PC |
| 2 | Out-of-Cell Time | PC |
| 3 | Out-of-Cell/Segregation | PC |
| 4 | Resume Normal Operations | Deferred |
| 5 | Healthcare | PC |
| 6 | Behavioral Health/Segregation | PC |
| 7 | Law Library Access | PC |
| 8 | Discipline | PC |
| 9 | Tablets | PC |
| 10 | Phone Calls | PC |
| 11 | PICC Emergency Call Systems | PC |
| 12 | Locks | PC |
| 13 | Visiting | PC |
| 14 | Attorney Visiting | PC |
| 15 | COVID-19 Testing | PC |
| 16 | Quarantine | PC |
| 17 | Sanitation | Deferred |
| 18 | Use-of-Force | Deferred |

*Substantive Provision 1—Staffing*

*No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring and retention of correctional officers to ensure that there are a sufficient number of correctional officers to cover all posts, according to PDP post-plans, on each shift at each facility. These measures shall continue until this goal is achieved and thereafter to maintain the proper number of correctional officers.*

### Compliance Rating:  Partial Compliance

On August 12, 2022, an arbitration award was issued that provides for the hiring and retention bonuses discussed in this substantive provision.[3]  Though the decision was issued and measures will be implemented after the Agreement deadline of April 20, 2022, bonuses will be awarded to all eligible employees hired as of that date.  Other measures ordered include regular pay increases as well as longevity and quarterly attendance bonuses, and the implementation of a 12-hour shift program.  The decision also temporarily lifts the City's requirement that civil service employees reside within City limits for one year prior to employment.[4]  The Monitoring Team will continue to track Defendants' staffing progress pursuant to the arbitration decision, and considering factors discussed below, determine whether it meets Agreement requirements.

In assessing the adequacy of PDP's staffing, the Monitoring Team evaluates three factors:  (1) the number of required and filled positions; (2) the number of required and filled posts; and (3) hiring and retention outcomes.  Determinations about how many positions PDP is funded for, and at which specific job classifications, are made by the City via its annual budget process.  PDP then allocates budgeted positions to create posts in designated work locations and assigns personnel to fill them.  A single post may require more than one employee position to fill when accounting for vacations and employee sick leave, and if, for example, a post requires staffing seven days per week.  When regularly assigned personnel are unavailable, posts are filled by redirecting personnel from other posts, requiring staff to work overtime, or by leaving budgeted posts vacant.

---

[3] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia
[4] Bill no. 200363, Section 20-101 of The Philadelphia Code (passed June 25, 2020), available at https://phila.legistar.com/View.ashx?M=F&ID=8611128&GUID=2216D7C4-6DD5-4235-A23B-88C7F3C3A25E

PDP reports and documentation provided reflects critically low vacancies across several position classifications.  The below table reflects select vacancies as of September 18, 2022:

**Philadelphia Department of Prisons Vacancy Report**
September 18, 2022

| | Position Classification | Budgeted | Filled | Vacant | Vacancy Rate |
|---|---|---|---|---|---|
| **Sworn Staff** | Officers | 1719 | 994 | 725 | 42% |
| | Sergeants | 129 | 88 | 41 | 32% |
| | Lieutenants | 56 | 39 | 17 | 30% |
| | Captains | 31 | 24 | 7 | 23% |
| | **Custody Total** | **1935** | **1145** | **790** | **41%** |
| **Maintenance Staff** | Trades Worker I | 8 | 5 | 3 | 38% |
| | Trades Worker II | 23 | 10 | 13 | 57% |
| | HVAC Mechanic | 3 | 2 | 1 | 33% |
| | Building Engineer | 1 | 0 | 1 | 100% |
| | Maintenance Group Leader | 1 | 0 | 1 | 100% |
| | **Total Maintenance** | **36** | **17** | **19** | **53%** |
| **Human Resources (HR) Staff** | HR Professional | 2 | 0 | 2 | 100% |
| | HR Associate | 2 | 2 | 0 | 0% |
| | HR Manager 3 | 1 | 1 | 0 | 0% |
| | **HR Total** | **5** | **3** | **2** | **40%** |
| **PDP TOTAL** | **All Positions** | **2186** | **1346** | **842** | **39%** |

Current vacancy rates of 39% for all PDP positions, 41% for custody positions, and 53% and 40% for maintenance and HR positions respectively are deeply concerning.

Post vacancy information provides more detail about whether personnel report to assigned work locations throughout PDP within specific timeframes (per shift, daily, weekly, etc.).  PDP maintains three separate reports on post vacancies, each of which provides some useful information, but none of which provide synthesized daily and monthly accounts with sufficient detail for management to monitor problems, quickly reallocate limited personnel resources, and strategize integrated solutions.[5]  Current post vacancy reports do not provide the Monitoring Team with sufficient vacancy data necessary for accurate compliance determinations.  The

---

[5] The "Workforce TeleStaff Roster Report" (TeleStaff Report) includes a daily attendance roster for each post and is PDP's most effective management tool of the three systems for tracking which staff are assigned and report to each post in a 24-hour period.  The "Attendance Report" includes summaries of the reasons for employee absences (sick, vacation, etc.), and the "Deputy Warden Reports" summarize fillable posts and the number of posts left vacant in PDP facilities.

Monitoring Team has recommended updates to tracking systems that will provide for more accuracy, improve transparency in public reporting, and allow PDP to better analyze trends.[6] Though the Monitoring Team is unable to establish a precise baseline of post vacancies due to data limitations, all available information reflects critical post vacancies with up to 40% of total posts routinely remaining unfilled on daily bases.  With nearly 25% of filled posts reportedly being staffed with overtime, PDP does not likely have sufficient staff working in PDP facilities.  PDP's dependence upon overtime damages morale and renders even the most committed workforce exhausted, which exacerbates existing safety, security, and operational concerns that the Agreement was negotiated to resolve.

PDP data suggests that voluntary resignations are among the largest contributing factors to the current vacancy rate.  Retention data reflects significant increases in voluntary resignations, particularly among personnel at the ranks of correctional officer, sergeant, lieutenant, and captain.  The following table depicts voluntary resignation rates for fiscal years 2019/2020, 2020/2021, and 2021/2022:

**Voluntary Resignations by Fiscal Year**
19/20, 20/21, 21/22

| Fiscal Year (FY) | FY 19/20 | FY 20/21 | | FY 21/22 | |
|---|---|---|---|---|---|
| | Staff | Staff | FY Increase | Staff | FY Increase |
| Total Resignations | 191 | 244 | 28% | 372 | 52% |
| **Sworn Staff Resignations (Percent of Total) and Increase from Previous FY** | **56 (29%)** | **87 (36%)** | **55%** | **180 (48%)** | **107%** |

PDP's increases in sworn staff resignations from FY 19/20 and 20/21 by 55% and 107% respectively for an overall 221% increase over the two-year period reflect debilitating personnel losses.

The PDP has been hiring sworn staff and its efforts are commendable given existing recruitment barriers.  A total of 155 PDP cadets graduated from seven academies since January 2021, and an academy class of 17 more trainees commenced on August 1, 2022.  PDP also reports that it held

---

[6] Current reporting systems that measure and track post assignments are not standardized between facilities and lack clarity for external monitoring.  The Monitoring Team has recommended coding updates to the TeleStaff system, or development of a new system that generates the following information: (1) vacant posts not permitted to fill due to budget reductions; (2) vacant posts not permitted to fill pursuant to a formal institutional vacancy plan due to critical position vacancies; (3) vacant posts due to employees not reporting for work and notations indicating when posts are left unfilled due to lack of available staff; (4) vacant posts due to the redirection of staff to other critical functions (i.e., suicide watch, medical guarding/transportation) that are not backfilled; and (5) all temporary posts created during a shift to meet institutional needs.

orientations on August 27, 2022, and September 17, 2022, and that 106 of 245 invited candidates attended.  During site visits, the Monitoring Team regularly spoke with new staff whose presence is noticeable throughout PDP facilities.  However, the relatively small size and current frequency of academy classes are insufficient to compensate for PDP's extraordinarily high resignation rates.

Properly functioning systems should be able to project vacancy rates based on factors known to increase personnel retention and decrease attrition.  These projections should be used in developing strategies to meet staffing needs.  The Monitoring Team has not analyzed data prior to FY 19/20, nor has it formed an opinion on the effectiveness of PDP's vacancy projection methodology.  It is certain, however, that the COVID-19 pandemic presented or exacerbated challenges in ways that were unpredictable to Defendants and unprecedented for PDP.

The voluntary resignation and post vacancy rates that PDP is experiencing constitute a dire personnel crisis, which is increasing in magnitude and cannot be corrected by the efforts and resources at the disposal of PDP alone.  Effective remediation necessitates that Defendants engage a full-scale effort with commensurate resources, innovative strategy, and close, committed collaboration between the City, PDP, Labor, and other critical stakeholders.  Because Defendants have a duty to meet basic human needs and protect the constitutional rights of those confined in its facilities, correcting PDP's personnel crisis should be prioritized among the most critical City initiatives and over other City departments not bound by the same constitutional mandates and federal court intervention.  PDP will be unable to correct systemic deficiencies and achieve substantial compliance with the Agreement while the crisis persists.

Defendants should immediately consider the following recommendations:

1. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.[7]
2. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
3. Retain a qualified recruitment firm to assist in guiding the city's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.
4. Engage an independent staffing analysis to determine true staffing needs for each facility.  The analysis should be completed by someone with specific expertise in jail staffing studies.[8]

---

[7] CFCF and RCF are serviced by a contracted maintenance provider, while remaining facilities are maintained by the City of Philadelphia.  On each site visit, the Monitoring Team observed a stark contrast between the physical plant conditions in the facilities maintained by the contractor and those maintained by the city.  PDP confirms reports of Class Members that work orders for CFCF and RCF are typically filled the same day while other facilities can take weeks or months, even for highest priority repairs.  PDP's maintenance issues are discussed in more detail under Substantive Provision 17—Sanitation below.

[8] The August 12, 2022, arbitration award directs the convening of an internal committee to develop staffing plans for each facility (*at* p.5, 7(a)(i-vii)).  PDP reports that the staffing plans will be developed, in part, by a consultant hired by Defendants to assist with compliance.  PDP reports that the consultant will be considering, among other factors, population size and needs when analyzing total necessary budgeted positions and post plans.

5. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.[9]
6. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.
7. Establish continuous-fill civil service hiring lists during the staffing crisis.
8. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

### *Substantive Provision 2—Out-of-Cell Time*

*Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

#### Compliance Rating:  Partial Compliance

### *Substantive Provision 3—Out-of-Cell/Segregation*

*Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

#### Compliance Rating:  Partial Compliance

PDP acknowledges that the COVID-19 pandemic, combined with its staffing crisis, resulted in incarcerated persons being confined to their cells with limited opportunities to recreate, shower, make phone calls, attend family or legal visits, and other activities for extended periods of time, resulting in prolonged isolation.  PDP reports that it is making progress in complying with the terms of the Agreement regarding out-of-cell time in both general population and punitive and

---

[9] The August 12, 2022, arbitration award provides for the reallocation of some tasks currently being performed by sworn staff to civilian personnel (*at* p.8, 13).

administrative segregation (segregation) as well as in ensuring that incarcerated persons are not housed in segregation for space or staffing reasons.

Based on available documentation, the Monitor's initial site visits, and discussions with Class Members and PDP personnel, Class Members are receiving more opportunities to come out of their cells than during the height of the pandemic and subsequent spikes. Most staff and Class Members reported that Class Members on most housing units receive some out-of-cell time most weeks. However, PDP has not met the out-of-cell benchmarks by prescribed deadlines and PDP executives report that staffing shortages continue to pose significant barriers to offering Class Members additional opportunities for out-of-cell time.

In April 2020, PDP began to require incarcerated persons to acknowledge via manual signature any opportunities they receive to come out of their cells. These signatures are deemed validation of the specific timeframes each incarcerated person is reportedly offered. Validated out-of-cell timeframes are compiled by unit staff and submitted to facility leadership who reports the information in weekly "Deputy Warden Certifications" that are submitted to PDP executives.

Despite the complexity and significant burden of current out-of-cell tracking and reporting processes, the Monitoring Team is confident that they were designed and implemented with the goals of improving accuracy and accountability in measuring out-of-cell time. However, PDP's Deputy Warden Certifications and all currently available out-of-cell time information and documentation are inadequate for compliance monitoring. The Monitoring Team is therefore unable to: (1) establish an accurate baseline of current out-of-cell opportunities for Class Members; (2) determine the extent to which Agreement deadlines and benchmarks have been met; and (3) make recommendations for future out-of-cell benchmarks or deadlines. Current tracking systems pose the following methodological barriers:

- Methods for collecting Class Member signatures and documenting out-of-cell-time are not consistent across PDP facilities, units, and personnel shifts.[10]
- In some units, signatures are collected before out-of-cell start and end times are documented, so incarcerated persons are being required to attest to the accuracy of information they do not have, rendering those signatures invalid.[11]
- Most logs and Deputy Warden Certifications document out-of-cell times as starting and finishing on the hour or half-hour, which is unlikely to occur naturally with the frequency reported and raises questions about data collection methods and accuracy of out-of-cell times and durations reported.

---

[10] In one unit visited, the Monitor observed incarcerated persons (specifically, "block representatives" designated to communicate with staff on behalf of other incarcerated persons housed together in a given unit) distributing logs and collecting signatures. On another unit in the same facility, this task was observed being performed by staff. In another facility, manual signature sheets were placed on tables in the unit recreation areas and incarcerated persons were allowed to come out of their cells contingent upon their agreement to sign the sheets thereafter. There are benefits and drawbacks to each method observed, and to others that personnel and incarcerated persons reported to the Monitor, but internal inconsistencies necessarily impact the accuracy of out-of-cell times reported.

[11] The Monitor observed sheets that appeared to be filled with Class Member signatures, but which did not contain out-of-cell durations or start and end times.

- Some Deputy Warden Certifications reflect anomalies in out-of-cell time Class Members received but do not provide sufficient corresponding staffing, vacancy, and other detail to contextualize them and suggest potential reporting errors.[12]
- Some Deputy Warden Certifications provide explanations for why no out-of-cell time was offered on some units in given timeframes and others do not.
- Some information reported is neither replicable nor verifiable.  In the coming months, the Monitoring Team may attempt to validate a small sample of out-of-cell information contained in the Deputy Warden Certifications by comparing available CCTV recordings to unit logs and signature sheets, though the process would be methodologically flawed, statistically unreliable, and unsustainable long-term.
- Some Class Members have reported to PDP and the Monitoring Team that some logs are inaccurate and do not reflect actual out-of-cell time offered or received, and some have reported that they have, at times, been required to sign sheets attesting to inaccurate information or to out-of-cell time that they did not receive.  Current tracking systems prevent PDP from thoroughly investigating these allegations because much of the information is either unavailable or too labor intensive to extract given PDP's existing staffing deficits.

The process of requiring manual signatures from each Class Member is lengthy, staffing resource intensive, and shortens the duration of daily out-of-cell time.  The issues with PDP's current practice described above can also lead to confusion among Class Members and have reportedly increased tension between Class Members and personnel.  Finally, the current system does not provide for the tracking of some information, such as which Class Members routinely refuse to come out of their cells.  This information is particularly important in segregation units where isolation can spur or exacerbate behavioral health symptoms or serious mental illness.

Jails and prisons are replacing paper tracking systems that rely on manual signatures or staff logs with more technologically advanced systems, such as radio-frequency identification (RFID), that track out-of-cell and other important operations electronically.  PDP reports that in early 2022, it initiated the process of procuring an RFID or similar system that will allow it to track and report out-of-cell information more accurately and reliably.  A new system that tracks information electronically will reduce errors resulting from manual information entry, assist with investigating Class Member grievances alleging lack of access, and allow PDP managers to better monitor real-time operations.  It will also allow them to better identify which facilities, units, and personnel require additional attention.  Finally, a new system will be critical to measuring compliance with out-of-cell and other Agreement requirements such as access to the

---

[12] For example, CFCF's Deputy Warden Certification for the week of April 29 through May 5, 2022, shows that Unit A1, P4, upper tier (cells 17-32) received 12 hours out-of-cell and A1, P4 lower tier (cells 1-16) only received 2 hours.  It may be that staffing or Class Member count on that administrative segregation unit or other factors explain why the lower tier received one-fifth of the out-of-cell time as the upper tier on the same housing unit on the same day.  Without additional detail explaining the anomaly, it is more likely that the 12 hours noted in the Deputy Warden Certification is an entry error.  Errors are expected whether data is entered manually or electronically, but multiple reporting layers and points of data entry from unit logs, to staff, to supervisors, to facility leadership, to PDP executives, combined with other methodological issues discussed in this report make errors more likely and impact the accuracy of information reported.

law library and educational and therapeutic programming.  The Monitoring Team recommends that PDP continue to expedite the procurement and implementation of an electronic tracking system.

During site visits, multiple officers reported that they feel unsafe following current out-of-cell requirements, particularly when they are alone on housing units without additional staff or "rover" personnel assigned to assist with transporting Class Members or during emergencies.  As a result, some report regrettably that they leave units altogether and monitor Class Members from adjacent control booths for the duration of out-of-cell time.  Monitoring recreation from the control booth is inconsistent with PDP's direct supervision model based on physical plant design and current policy and poses significant safety risks for Class Members and staff.

The current ratios of staff to Class Members during out-of-cell time may be appropriate but determining the optimal ratios for each PDP housing unit requires the independent staffing analysis recommended under substantive Provision 1—Staffing above.  In the meantime, PDP executives astutely observe that PDP staff are attempting to follow policies that cause some to fear for their safety and that PDP executives are expected to hold staff accountable for failures to comply when existing conditions may render compliance infeasible.

Any recommendations by the Monitoring Team for incremental increases in out-of-cell time pursuant to this agreement must be safe to implement, accurately measurable, and based on sound methods that consider such factors as staffing, COVID-19 and other communicable disease mitigation, population levels and security classification, behavioral health, and other programming needs.  At a minimum, they require a firm baseline of current out-of-cell opportunities that is supported by sound tracking and data mechanisms.  For the reasons detailed above, particularly those involving compromised institutional safety, the Monitor makes no specific recommendation for the next increase in out-of-cell time in this reporting period.

In addition to requiring daily out-of-cell opportunities for Class Members in administrative segregation, Substantive Provision 3—Out-of-Cell/Segregation requires that PDP not place Class Members in segregation units due to lack of available housing or inadequate staffing in other units.  PDP prohibits placing Class Members in administrative segregation for any reason other than those necessary to maintain institutional safety, and placements must be based on documented case-by-case analyses.

Administrative segregation documentation that the Monitoring Team has reviewed does not expressly identify housing space or staffing as stated rationales for placement of individual Class Members into administrative segregation.  However, PDP reports that reevaluations for retention on administrative segregation are not occurring within required timeframes and that Class Members are serving disciplinary sentences that exceed allowable policy timeframes.  Both of these conditions are likely caused or exacerbated by housing and staffing issues.[13]  Current

---

[13] PDP's Administrative Segregation Monitoring Reports indicate that a high percentage of Class Members on administrative segregation are not being reviewed for retention in administrative segregation (and consideration for release to lower security housing) within 60 and 90-day timeframes, resulting in Class Members being exposed to extended periods of isolation.

policy and PDP documentation also suggest that the overall thresholds for both placement and retention in administrative segregation may be too low.[14]  Finally, it appears that because PDP Transition Unit housing for those on the behavioral health caseload was reduced, some class members have been placed in segregation due to lack of appropriate alternative housing for those experiencing mental illness, in violation of the Agreement.  This is discussed in more detail below under Substantive Provision 6—Behavioral Health in Segregation.

Current PDP policy generally prohibits the confinement of incarcerated persons in punitive segregation (discipline) for more than 30 days without additional documented misconduct while in discipline and approval of the facility's warden.[15]  PDP's documentation reflects that many disciplinary sentences exceed policy timeframes and some records lack appropriate documentation, including any reasons for any extensions.  Current facility management vacancies likely impact the timeliness and quality of disciplinary hearings and adjudications and result in extended use of segregation.

The table below depicts total Class Members in discipline and durations of retention on disciplinary status for three facilities as of September 11, 2022:

### Lengths of Stay in Discipline
Week of September 11, 2022

| Facility | Total in Discipline | Average Time in Discipline | Total in Discipline >30 Days | Total in Discipline >60 Days |
|---|---|---|---|---|
| CFCF | 83 | 67 | 42 (51%) | 31 (37%) |
| PICC | 50 | 81 | 48 (96%) | 20 (40%) |
| RCF | 58 | 39 | 21 (36%) | 14 (24%) |
| ASD-MOD3 | 13 | 24 | 4 (31%) | 2 (15%) |
| **Total** | **204** | **60** | **115 (56%)** | **67 (33%)** |

PDP executives are aware of the harm that extended isolation may inflict on incarcerated persons as well as the operational challenges and safety issues it raises for staff and are committed to reducing PDP's reliance on segregation.  The Monitoring Team will conduct additional analysis of PDP's segregation practices and make specific recommendations in subsequent monitoring reports to reserve PDP's use of segregation only for those whose behavior necessitates it, and to limit durations of segregation placements to the shortest possible timeframes required to maintain institutional stability.

---

[14] Placement in administrative segregation must be based on a combination of factors that should include serious institutional misconduct on the part of incarcerated persons.  PDP currently allows the administrative segregation of incarcerated persons with high security classification needs (such as "Change in Custody Level," "Escape Risk," "High Bail/No Bail," "High Profile Case," "State Sentenced," and "Life Sentence") but who may not have engaged in accompanying institutional misconduct.

[15] The Monitoring Team is reviewing all current PDP policies related to segregation and discipline and will make recommendations for improvement.

*Substantive Provision 4—Resume Normal Operations*

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

## Compliance Rating:  Deferred

PDP reports that it has established an internal committee pursuant to the August 12, 2022, arbitration award to, among other tasks, analyze staffing needs and develop a plan to return to normal operations pursuant to this Agreement.  The arbitration award requires the plan to be finalized by October 1, 2022, and any disputes to be resolved by the Arbitration Panel by October 15, 2022.[16]  PDP reports that it is not currently able to safely resume normal operations and has not yet finalized a plan to do so.  The Monitoring Team has made recommendations regarding the staffing crisis and will continue to monitor and report on steps taken and any progress made.

Though the Agreement does not specifically address population reduction, given that staffing shortages are afflicting jails and prisons nation-wide and meaningful progress in reforming PDP is likely going to continue to be delayed, Defendants should continue to engage with local justice partners to develop and improve programs aimed at reducing the number of people incarcerated in PDP.  The PDP Commissioner does not possess unilateral authority to reduce the PDP population by early parole of incarcerated persons serving PDP sentences, or by release of those awaiting trial on low-level offenses who are being held on bail they cannot pay.

PDP reports that more than 90% of its current population is pretrial and that speedier adjudication of their cases would result in lower population levels.  Delays in access to the criminal courts caused largely by COVID-19 mitigation protocols have been significantly reduced.[17]  Although PDP's COVID-19 protocols continue to delay court appearances for some incarcerated persons, any delays in preliminary hearings, bail and detainer reviews, and trials and sentencing of defendants are not within PDP's control.

---

[16] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022, *at* p.5, 7(a)(i-vii)) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia

[17] For example, PDP reports that prior to February 2022, when PDP implemented the CDC's modified testing protocols, higher numbers of Class Members each day were not being medically cleared for court.  This delayed access to, among other proceedings, preliminary hearings.  Because there are dispositions of many cases at preliminary hearings, repeated continuances likely prevented the release of some Class Members from PDP.

The Monitoring Team will continue to report on PDP's efforts to ensure timely access to courts and counsel.  It would be useful for all criminal justice stakeholders, including the Courts, Philadelphia District Attorney's Office, Defender Association of Philadelphia, and the Probation Department to discuss the possible expansion and expediting of bail reviews, detainers, and early listings for misdemeanor and non-violent felony case dispositions where possible.  Over the years, cooperation on these issues has successfully reduced PDP's population and justice partners should explore whether additional programs or modification of current practices could further reduce the population without endangering public safety.[18]

### Substantive Provision 5—Healthcare

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

#### Compliance Rating:  Partial Compliance

The COVID-19 pandemic placed extraordinary pressure and a dramatically increased workload on PDP healthcare providers.  PDP was guided to restrict population movement and shelter-in-place to limit the spread of infection among incarcerated patients while instituting aggressive testing, vaccination, and sanitation protocols.  These pressures, combined with personnel losses and ongoing testing, quarantine, and isolation contributed to significant lapses in the provision of medical and mental health care.  By March 2022, more than 900 patients at CFCF were awaiting general medical, specialty and behavioral health appointments (Herdman Dep. 65).

This substantive provision provides that, by August 1, 2022, PDP must have reduced its appointment backlog to no more than 15% of its April 2022, numbers.  The 900-appointment backlog identified in March included CFCF patients only who were waiting for general medical, behavioral health and all specialty appointments (Herdman Dep. 70).  In July 2022, PDP began tracking backlogged appointments in all facilities and made other changes to its tracking methodology to achieve greater specificity.  The July 2022 backlog data for all facilities,

---

[18] The Criminal Justice Advisory Board (CJAB) Subcommittee on Prison Population Management (Subcommittee) reportedly convenes regularly to strategize population reduction.  CJAB should consider whether a review of and potential modifications to the Subcommittee's current mandates could improve population reduction outcomes.

including all appointment types, was 1,587.[19]  Because 1,587 is the most accurate backlog count currently available, it will be used to measure compliance pursuant to this substantive provision. In order to achieve substantial compliance, PDP must: (1) reduce its backlog to no more than 238, or 15% of 1,587; (2) continue efforts to reduce any remaining backlog; and (3) ensure that any solutions are designed and implemented to continue to address the remaining backlog and to sustain any reductions achieved.

PDP's initial backlog plan was to utilize overtime staff and extra personnel from healthcare registries to offer Class Member patients additional appointment slots on nights and weekends. PDP reports that additional appointment slots pursuant to this plan were offered on four occasions between April and August 2022.  The table below compares total backlogged on-site medical appointments, by type of appointment, on July 22, 2022, and seven weeks later on September 11, 2022:

**On-Site Appointment Backlogs for General Medical and Behavioral Healthcare**
July 22, 2022 and September 9, 2022

| Backlog Report Date | 7/22/22 | Percent of Total Backlog | 9/11/22 | Percent of Total Backlog | Percent Change (+/-) |
|---|---|---|---|---|---|
| **Total Backlog** | **1242** | | **1111** | | **-12%** |
| BH Initial Psychiatric Eval. | 164 | 13% | 123 | 11% | -25% |
| BH Social Work Sick Call | 76 | 6% | 34 | 3% | -45% |
| BH SW SCTR | 1 | 0% | 9 | 0% | * |
| Chronic Care Follow-up | 200 | 16% | 180 | 16% | -10% |
| Chronic Care Initial | 190 | 15% | 126 | 11% | -33% |
| MAT | 59 | 5% | 168 | 15% | 285% |
| MAT Follow-up | 0 | 0% | 0 | 0% | * |
| Provider Sick Call | 22 | 2% | 2 | 0% | * |
| RN Sick Call | 105 | 8% | 157 | 14% | 50% |
| Re-Entry Planning | 425 | 34% | 312 | 28% | -27% |

*Percent change not calculated for categories with total backlogged appointments <50.

The data reflects a 12% reduction in the total backlog over the seven-week period, with the greatest reductions in behavioral health and chronic care appointments and the greatest increases in Medication Assisted Treatment (MAT) and Nursing Sick Call appointments.  Additional PDP documentation suggests that for some appointment types, backlogs have seen periods of significant reductions with current backlogs being newly accumulated rather than long-standing. For example, the 123 backlogged Behavioral Health Initial Psychiatric Evaluation appointments for September 11, 2022, reflect a reduction from the July 22, 2022, total, and additional PDP

---

[19] This total includes 1,242 on-site general medical and behavioral health appointments (July 22, 2022), 104 on-site specialty appointments (July 22, 2022), and 241 off-site specialty appointments (July 18, 2022).

documentation shows that 95% of the September backlog accumulated over the previous 21 days. This is also true for Behavioral Health Social Worker Sick Calls, with 100% of the September backlog accumulating within the previous two weeks, and for Nursing Sick Call, with 96% of the September backlog occurring within the preceding three weeks. Although appointment backlogs persist, that some appear to be addressed within weeks suggests that additional focus in these areas has been beneficial.

Both Chronic Care Follow-ups and Chronic Care Initial Appointment backlogs were also reduced between July and September, however, both appointment types have longer accumulating backlogs of up to seven weeks. Although MAT Follow-up appointments are not backlogged, the backlog of MAT initial appointments increased from 59 in July to 168 in September with backlogs accumulating over seven weeks.

Specialty appointment backlogs also remain an issue. Data from August 2022, indicates that PDP offered on-site specialty services in optometry, orthopedics, pap testing, podiatry, physical therapy, ultrasound, and x-ray.[20] Data shows that optometry services pose the biggest challenge, representing 76 of 121 backlogged appointments reported on August 4, 2022.

Some types of specialty appointments are only offered off site and require transportation to providers outside of PDP. PDP reports that off-site specialty appointments during the height of the COVID-19 pandemic were negatively impacted for various reasons, including: (1) off-site specialists were frequently not seeing patients in person or cancelling appointments altogether; (2) increasing security staffing deficits prevented Class Member patients from being transported off site; (3) Class Member patients were frequently quarantined or medically isolated and unable to be transported off-site; and (4) telehealth options were limited. Data shows that from March to September 2022, PDP made progress in reducing the off-site specialty appointment backlog by 33% from 276 to 187.

Although PDP is making progress in reducing off-site backlogs, it struggles to get Class Member patients to scheduled appointments, requiring rescheduling, which further impacts the off-site backlog. PDP data indicates that in July 2022, Class Member patients only made it to 56%, or 147 of 262 scheduled off-site specialty appointments. Documented reasons for the missed appointments vary with the most frequent reasons being Class Member patient refusals, security staffing shortages, quarantine, and provider cancellations. Ensuring that off-site appointments are completed requires security and medical staff coordination to ensure that appointments are scheduled and confirmed with specialty providers and that Class Member patients are notified and transported in a timely way.

PDP also reports ongoing challenges with meeting its goal of completing Class Member patient intake screenings within four hours of their arrival at PDP. PDP reports that pre-COVID-19, timely intake screenings were rarely an issue, but by March 2022, PDP was reportedly meeting its four-hour goal only 31% of the time. Data for the week ending August 6, 2022, shows that the four-hour timeframe was being met 60% of the time, reflecting an improvement.

---

[20] PDP reports that it no longer offers on-site orthopedic services.

PDP reports that its most significant barrier to reducing the backlog and providing adequate care remains security and healthcare staffing deficits.  In January 2022, medical and behavioral health care, previously managed by two different correctional healthcare service providers, were consolidated under Corizon, a single provider.  Corizon was then renamed "YesCare."  In March 2022, PDP experienced a healthcare staff vacancy rate of approximately 20%, which reflected a substantial increase from the 3% vacancy rate that PDP was reportedly accustomed to historically (Herdman Dep. 47).

Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate and a "functional vacancy" rate, which accounts for shifts filled by overtime staff or temporary agency hires.  Documentation for August 2022 indicates that PDP had a staff vacancy rate of 33%, or 109 of 328 positions, and a total functional vacancy rate of 14%.  The functional vacancy rate for Behavioral Health clinicians (psychiatrists, psychiatric nurse practitioners, and social workers) was 50% and 31% for physicians and mid-level practitioners.  PDP reports that these vacancy rates continue to prevent PDP from providing care that meets its internal quality standards, which is demoralizing for committed but exhausted providers and ultimately compounds attrition issues.

The table below reflects data on personnel hires and separations, by healthcare position classification, for the combined months of June, July, and August 2022:

**Healthcare Personnel New Hires and Separations by Job Classification**
June, July, and August 2022

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Behavioral Health Nurse Practitioner | 6 | 0 | +6 |
| Licensed Clinical Social Worker | 4 | 3 | +1 |
| Behavioral Health Registered Nurse | 2 | 2 | 0 |
| Psychiatrist | 0 | 1 | -1 |
| Behavioral Health Counselor | 2 | 0 | +2 |
| Regional Director of Behavioral Health | 1 | 0 | +1 |
| Behavioral Health Licensed Practical Nurse | 1 | 2 | -1 |
| Re-Entry Director | 1 | 0 | +1 |
| Nurse Practitioner | 2 | 0 | +2 |
| Registered Nurse | 7 | 6 | +1 |
| Licensed Practical Nurse | 3 | 6 | -3 |
| Medical Assistant | 2 | 6 | -4 |
| Director of Nursing | 0 | 1 | -1 |
| Site Medical Director II | 0 | 1 | -1 |
| Certified Nursing Assistant | 1 | 0 | +1 |
| Assistant Health Services Administrator | 1 | 0 | +1 |
| X-ray Technician | 0 | 1 | -1 |
| Quality Improvement Coordinator | 0 | 1 | -1 |
| Medical Records Clerk | 1 | 0 | +1 |
| Scheduler | 0 | 2 | -2 |
| Administrative Assistant | 1 | 1 | 0 |
| **Total** | **35** | **33** | **+2** |

PDP has successfully recruited and hired 35 additional staff in a three-month period. Unfortunately, the struggle to retain staff resulted in nearly as many separations for a net gain of two employees, reflecting minimal overall headway in increasing PDP's permanent healthcare workforce.  The hiring of six behavioral health nurse practitioners is positive and the new hires should be able to assist in decreasing the backlog and wait times for patients to be evaluated and prescribed psychiatric medications.  Overall nursing classification vacancies have increased, however, with additional departures of licensed practical nurses and medical assistants.

Dr. Belavich observes that PDP's staffing deficits and attrition challenges are also occurring in jail and prison systems nationwide, and that systems must now compete with community hospitals, private practices, and healthcare staffing agencies for the same small pool of full-time and agency candidates.  Some are offering significant pay increases, recruitment bonuses, retention bonuses, preferred schedules, and other incentives to attract candidates.  Extended reliance on temporary agency staff and overtime can be problematic when regular staff experience burnout and agency staff are difficult to obtain or lack the same degree of investment as full-time personnel.

Data shows that most of the backlogged and missed appointments, intake screening delays, and other healthcare deficiencies are largely the result of the medical and security staffing deficits described above as this is the most significant change the organization has experienced during COVID-19.  PDP executives also recognize, however, that better communication and coordination between healthcare and security personnel would reduce the effects of these deficits and contribute to long-term reductions in back-logged appointments on and off site.  As a result, PDP is convening an internal working group to identify solutions for any internal inefficiencies within PDP's control despite the current healthcare and security staffing crisis.  The Monitoring Team also makes the following recommendations for immediate action:

1) Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.
2) Continue to explore options to provide both on and off-site appointment services via telehealth.
3) Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring that scheduled appointments occur.

### Substantive Provision 6—Behavioral Health in Segregation

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating:  Partial Compliance**

In order to achieve substantial compliance with this substantive provision, PDP must, at a minimum:  (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on administrative or punitive segregation (segregation) status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.

PDP policy requires physical health clearances for all Class Members who are placed on segregation status and additional behavioral health clearances for those on the behavioral health caseload or designated as seriously mentally ill (SMI).  Class Member patients who present with SMI must receive a behavioral health clearance within four hours.  Those who are on the behavioral health caseload but not designated SMI must be cleared within 24 hours.

Behavioral health clearance data shows some fluctuations in compliance with this policy requirement.[21]  It appears that one challenge in achieving full compliance with the behavioral health clearance policy is that some Class Members are being segregated in place.  That is, they are sometimes placed on segregation status, with commensurate removal of privileges, but without being moved to a designated segregation unit or informing healthcare staff.  This is reportedly occurring due to lack of segregation housing space.  Because current practice typically limits physical and behavioral health clearances to those in segregation housing, unless behavioral health clinicians are made aware of Class Members who are segregating in place, those Class Members are unlikely to be evaluated.  As part of PDP's quality improvement protocols, healthcare completed a review of 50 Class Member patient charts and determined that 42% of Class Member patients on segregation status were not housed in a segregation unit.  PDP reports that it is currently implementing a system to ensure proper tracking of this vulnerable population and improve policy compliance.

In addition to clearance requirements, PDP policy includes extensive discussion of ensuring protections for those who are navigating SMI from the potential harms associated with segregation.  Specifically, policy prohibits the punishment of incarcerated persons for experiencing SMI symptoms and requires the suspension of disciplinary hearings for those who

---

[21] In February 2022, PICC and RCF were reported at 100% compliance and CFCF at 76% compliance.  Data from July 2022 reflects improved compliance at CFCF at 92%, however, PICC and RCF dropped to 83%.  July 2022 data for ASD reflects 100% compliance.  The Monitoring Team has not reviewed work papers or raw data utilized in these audits but notes that the sample sizes are small, so slight variations appear more significant when reported as percentages only.  The Monitoring Team will review PDP's audit and reporting methods and make any appropriate recommendations.

are unable to participate due to SMI. PDP has reported challenges in ensuring that policies are consistently followed and that Class Member patients are protected.

During initial site visits, the Monitoring Team observed Class Member patients with SMI in segregation housing who appeared to be in states of acute psychiatric distress and required higher levels of care than they were receiving. Dr. Belavich noted that some patients were simply too acute to be in segregation. At the times of the site visits, the patients visited by the Monitoring Team had reportedly been in segregation housing for various durations, from some hours to weeks or months. For those who appeared to be in psychiatric distress having only been in segregation for some hours, it raises concerns about the quality of initial behavioral health clearances. It also raises concerns about PDP's adherence to the prohibitions against holding hearings for those who are unable to participate and imposing punishment for SMI symptoms. For those who had been in segregation for longer periods when visited by the Monitoring Team and observed in acute distress, it raises concerns about the overall quality of care in PDP segregation units.

Security and clinical personnel assigned to the segregation units were knowledgeable about which patients were identified as or displaying symptoms of SMI. They indicated that patients at similar levels of acuity are regularly placed and retained on segregation status and that conditions on the segregation units during the Monitoring Team's initial site visits were typical. These and other factors discussed below suggest that segregation is being overutilized for the SMI population and that some Class Member patients are not being adequately cared for.

The provision of frequent physical and behavioral healthcare rounds for those on segregation status is also critical to adequate care, and PDP policy requires healthcare personnel to make daily physical health rounds and weekly behavioral health rounds for those on segregation status. PDP audits reflect fluctuating compliance with both physical and behavioral health rounds from one audit period to the next as well as between facilities.[22] Daily healthcare rounds are critical for Class Member patients to seek necessary services and for providers to monitor the health and behavioral health status of isolated populations on daily and weekly bases. Behavioral health providers must frequently assess patients for signs of decompensation, and they must request the removal of anyone who may be harmed as a result of placement in segregation. Vigilance in consistent healthcare rounding is the best mechanism for this to occur. PDP reports that lapses in segregation rounding are largely due to staffing shortages and the inability to track those serving

---

[22] February and July 2022 audit data for daily physical health rounds in segregation show that RCF achieved 100% compliance in February and 78% compliance in July, PICC achieved 70% compliance in February and 0% compliance in July, and CFCF achieved 13% compliance in February and 15% compliance in July. ASD was audited in July 2022 only and achieved 0% compliance with this policy requirement. Behavioral health round audit data show that CFCF achieved 13% compliance in February and 26% compliance in July. PICC and RCF had each achieved 100% compliance in February and 91% and 89% percent respectively in July. ASD's July results showed 0% compliance. Again, it appears that PDP's audit methods involve small sample sizes, which may be inadvertently misleading when reported as percentages only.

segregation time in non-segregation units, among other systemic deficiencies.  PDP reports that immediate solutions are being explored by PDP's Quality Improvement Committee.

PDP has made progress in developing Positive Change, Positive Outcomes, a new behavioral health group treatment program that will be offered to Class Member patients in segregation units.  The program includes two hours of structured group treatment five days per week for a total of 10 possible treatment hours per patient per week.  PDP reports that the program commenced in July and the behavioral health staffing matrix reflects nine dedicated full-time personnel for the provision of services.  PDP executives anticipate that the program will be fully operational and serving all Class Members on segregation status by the end of October 2022.

Dr. Belavich indicates that the placement of individuals who are navigating SMI into segregation housing, or the imposition of restrictions regardless of where an individual is housed, should only occur as a last resort when no alternatives exist.  The conditions of confinement in segregated housing can lead to exacerbation of symptoms, and services are often not delivered or are inadequate compared to those offered in non-segregated housing.  Limiting, or excluding altogether, those with behavioral health concerns and SMI from segregation and isolation is no longer merely best practice but is rapidly becoming standard practice in jail and prison systems.

PDP documentation indicates that on August 8, 2022, there were 331 Class Members on segregation status, not including those in protective custody.  Of the 331 Class Members, 47% are on the behavioral health caseload and 12% are documented SMI.  PDP executives estimate that 40% of the PDP population is on the behavioral health caseload and that 13% are designated SMI.  If the combined behavioral health and SMI populations are overrepresented in segregation when compared to the total PDP population, PDP must reexamine its use of segregation for this population.

PDP has three "Transition Units" for Class Member patients on the behavioral health caseload who do not require inpatient hospitalization but are too fragile to be in the general population.  PDP reports that due to COVID-19, the size of the Transition Units decreased.  By August 2022, Transition Unit housing had decreased by 83% for females, from 64 cells to 11 cells, and by 44% for males, from 100 cells to 56 cells.  It is likely that lack of Transition Unit housing is increasing PDP's reliance on segregation for some Class Member patients.

The Monitoring Team observed the Transition Unit at PICC during both initial site visits.  The program is well run and relationships between regularly assigned security personnel and the Class Member patients on the unit are positive.  One security officer in particular was described by Class Members as "amazing" in his attentiveness to Class Member patients' needs and well-being.  Class Member patients also described him as consistently de-escalating situations in which patients experience crises or severe symptoms.  Indeed, the unit officer described for members of the Monitoring Team each patient's behavioral patterns and how he endeavors to support clinicians in supplementing patients' mental health needs.  The officer knows every patient by name and the Monitoring Team observed the officer utilize sound technique and behavior incentives to encourage patients to clean their cells, participate in structured programming, or come out for recreation time.  While the success of PICC's Transition Unit is currently dependent upon the skill set and compassion of this officer, the unit's stability and

success should be measured for positive outcomes and replicated system-wide to accommodate everyone on the behavioral health caseload in need of this level of care. Expanding Transition Unit housing will also be necessary to comply with Substantive Provision 3—Out of Cell/Segregation above, which prohibits the use of segregation due to lack of available alternative housing.

PDP executives have committed to exploring the idea of redirecting acute patients who engage in institutional misconduct to a separate Transition Unit therapeutic housing environment in lieu of placement in segregation. The Monitoring Team is encouraged by PDP's efforts in this area and will continue to report on PDP's progress.

### Substantive Provision 7—Law Library Access

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

#### Compliance Rating:  Deferred

Personnel and Class Members report that law library access has resumed in some locations, but that access to legal research is hindered by equipment failures. Access is also only provided as out-of-cell time and staffing permit. The Monitoring Team requires sound out-of-cell data and additional information about the locations and functionality of law library computers in order to make compliance determinations and any additional recommendations.

### Substantive Provision 8—Discipline

*All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007). The PDP shall: (a) expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date; (b) release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing; (c) cancel sanctions that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating:  Partial Compliance**

During the COVID-19 pandemic, PDP began conducting disciplinary hearings without affording charged Class Members opportunities to be present at the hearings, make statements, or present evidence, among other violations of PDP policy.  In order to achieve substantial compliance with this substantive provision, PDP must prove that: (1) PDP disciplinary policies, procedures, and practices comply with established due process rights; (2) disciplinary dispositions for all Class Members who were not afforded an opportunity to be present at their disciplinary hearings between the dates of March 2020 and April 12, 2022 were expunged; (3) all Class Members who were not present at their disciplinary hearings between March 2020 and April 12, 2022 but were still serving disciplinary sentences on April 12, 2022 were released from segregation; (4) all Class Members who remained in administrative segregation on April 12, 2022, following a disciplinary sentence that was imposed without a hearing were released from segregation; and (5) sanctions that required payments for damage to property or other restitution based on hearings conducted between March 2020 and April 12, 2022, in violation of PDP policy, were canceled; and (6) payments made by Class Members who were required to pay for damage to property or other harms based on hearings conducted between March 2020 and April 12, 2022, in violation of PDP policy, were returned.

Internal audit documentation dated June 7, 2022, reflects that 100%, or 4217 of 4217 total disciplinary records, were expunged through that date.  PDP also reports that it conducted an internal audit of 250 Class Member files and confirmed that 100% of the reported expungements were documented therein.  PDP also reports that all Class Members who were eligible for release from segregation pursuant to this substantive provision were released.  The Monitoring Team is in the process of verifying this information.  PDP reports that as of October 4, 2022, 279 of 4217 total disciplinary cases were identified as requiring reimbursement of a total $27,082 pursuant to this substantive provision.  PDP provided documentation reflecting that 238 of 279 reimbursements have been made, and PDP anticipates that remaining reimbursements will be issued by the next reporting period.  The Monitoring Team will verify that the 279 reimbursements constitute a complete list of disciplinary actions that were eligible for reimbursement pursuant to this substantive provision.

This substantive provision also permitted PDP to hold hearings of some Class Members who remained in segregation on April 12, 2022, contingent on PDP first providing notice to Plaintiffs' co-counsel.  PDP reports that it did not re-adjudicate any of the cases for the small number of Class Members still in segregation on April 12, 2022.

PDP reports that it is also revising its disciplinary policy and staff training curriculum to ensure future compliance with Agreement requirements.  The Monitoring Team will conduct additional document review and complete sample replication of PDP's audit findings based on the above-referenced compliance timeframe.

***Substantive Provision 9—Tablets***

*PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational*

*capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

### Compliance Rating:  Partial Compliance

The PDP maintains documentation of its tablet expansion efforts pursuant to the Agreement. The PDP reports that CFCF has expanded from four (4) tablets to six (6) tablets on all housing units, for a total of one hundred eighty (180) tablets at CFCF.  The tablet expansion was completed in July 2022**.**  The only unit at CFCF that did not appear to have at least six tablets assigned is Unit B1, with only five tablets assigned.  Regarding RCF, PDP reports that it has ordered tablets for the larger and smaller units consistent with Agreement requirements and is awaiting additional docking stations.  PDP anticipates that all tablets will be installed by the next reporting period.

During initial site visits, some units did not have all required tablets available for use by Class Members.  Some tablets were reportedly out for repairs or charging, which is consistent with inventory reports provided.  During initial tours, Class Members were observed utilizing tablets, though the Monitoring Team received complaints from Class Members that confirmed inventory reports that some tablets were unavailable.  It was also clear during site visits that some units did not have the required numbers of tablets available for use by Class Members.  PDP has committed to evaluate current practices and make appropriate adjustments to ensure that the required numbers of tablets are maintained and consistently available for Class Members.  The Monitoring Team will also confirm the presence of tablet docking stations and commensurate numbers of available tablets on each unit during subsequent site visits.

The Monitoring Team is certain that PDP and Class Members can benefit from the installation of additional tablets and is assessing current directives and practices to ensure that they are being durably implemented and that Class members have equitable access.  This assessment will inform future recommendations pursuant to this substantive provision.

### *Substantive Provision 10—Phone Calls*

*PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

### Compliance Rating:  Partial Compliance

PDP's current policy regarding phone access has not been updated to reflect Agreement requirements.  It does, however, require unit personnel to monitor and ensure equitable phone access, and the Monitoring Team has confirmed that 15-minute free phone calls for Class Members has been implemented.  During initial site visits, Class Members reported, and personnel confirmed, that Class Members receive 15-minute free phone calls.  Like other programs and services addressed in the Agreement, access to free daily calls is contingent upon Class Members' access to unit dayrooms, which remains a challenge as reported above under Substantive Provision 2—Out-of-Cell Time and Substantive Provision 3—Out-of-Cell/Segregation.  Class Members' access to 15-minute free calls is further impacted when phones are in disrepair.  The Monitoring Team will conduct additional review to verify reports of Class Members and staff during site visits that phone repairs are not being completed efficiently.  In the interim, PDP has agreed to more vigilant internal monitoring and documentation to identify issues and ensure that timely phone repairs occur.

### *Substantive Provision 11—PICC Emergency Call Systems*

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

### Compliance Rating:  Deferred

In initial discussions with PDP about emergency call systems, PDP reports that installation of call buttons at PICC was one option considered, but that PICC's physical plant cannot accommodate the installation of call buttons.  The Monitoring Team requires additional information to verify PDP's statements but recommends against the expansion of the call button system as currently designed, irrespective of physical plant capacity.

The current call button system is largely ineffective as a mechanism for Class Members to communicate needs or to seek assistance in emergencies and is entirely ineffective as a means for managers and executives to monitor personnel responses to Class Members' requests for assistance.  The call button system is not connected to any of PDP's tracking databases, which means that there is no available information or data regarding who presses call buttons, why, how often, or whether or when anyone responds.  PDP executives note that because call button use is not tracked, there is similarly no way to generate single point-in-time snapshots to compile call button information or aggregate any data.  Any surmising about frequencies or locations of and responses to call button requests would be based solely on direct observation and anecdotal information, which is inadequate for executive management to identify and address issues.

During site visits, the Monitoring Team observed working call buttons and active call button notifications on most units.  Call buttons are not connected to intercoms, so unit personnel are expected to physically respond to each cell upon notification, which is challenging for staff who must juggle multiple required tasks at once.  Some personnel are likely responsive to call button

requests for assistance if units are sufficiently staffed, though PDP executives report significant challenges with call button responses given current staffing deficits. Manual tracking of call requests and responses is wholly infeasible.

Because call buttons are one of few means by which Class Members can communicate with personnel when locked inside their cells, the call button requirements pursuant to this provision are consistent with an underlying spirit of the Agreement to ensure that Class Members' needs are met. In theory, if even some call button requests are responded to and Class Members' needs are attended to, the system serves a purpose consistent with the Agreement. However, the stress experienced by Class Members when call button requests are left unanswered, or by staff when they believe that call buttons are pressed for non-emergent reasons, breeds tension between Class Members and staff.

In evaluating call button issues for compliance with the Agreement, the Monitoring Team will focus *only* on call button operability, repairs, and training pursuant to Substantive Provision 12-- Locks.

Regarding alternative emergency call systems at PICC as well as solutions to any current issues with access to tablets and phones, the Monitoring Team will work with PDP to identify solutions and make recommendations in subsequent reports.

### *Substantive Provision 12—Locks*

*PDP initiated the lock replacement program for PICC and RCF, which will be completed by June 30, 2022. For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

### Compliance Rating:  Partial Compliance

PDP documentation reflects that PDP initiated facility-wide lock replacements at PICC and RCF beginning in December 2021 and completed RCF in May 2022, in advance of the June 30, 2022, Agreement deadline. PDP reports that it has completed 95% of lock replacements at PICC with 27 locks remaining for a total of 957 locks replaced system-wide to date. PDP also implemented a twice daily lock inspection protocol at both facilities. Copies of those inspections at RCF for the months of April through July have been provided for review. Documentation reflects that staff were trained in lock-related expectations in September 2021, April 2022, and again in July 2022. PDP has a policy governing facility captains' responsibilities in overseeing the lock and key protocols, however, housing officer post orders reviewed do not specifically direct lock inspections with the completion of the lock inspection inventory sheet.

Documentation also reflects that staff are submitting work orders when locks break or when they suspect tampering with new locking mechanisms. Completion of repairs appears to be ranging from approximately 24 hours to as many as 20 days. Work orders do not reflect whether cells

are decommissioned for use pending repair but available information and site visit observations suggest that they are.  Unit personnel reported to the Monitoring Team that, aside from periodic tampering, new locking mechanisms largely resolved lock-related safety issues.

The Agreement also requires that a one-time test and repair of all call button devices in existing facilities occur by August 1, 2022, and that, going forward, any complaints regarding necessary repairs are handled through the work order process.  PDP was also required to provide refresher training on call button operations and responses by June 1, 2022.

PDP reports that all call buttons were tested and repaired prior to the June 2, 2022, Agreement deadline.  Documentation provided reflects that RCF conducted a review and repair of all call buttons from March 17, 2022, through April 21, 2022, and that work orders have been submitted for call button repairs at that facility consistent with Agreement requirements.  PDP provided proof that in April 2022, staff at CFCF and RCF were re-briefed on staff responsibilities regarding operability of call buttons and their responsibility to notify supervisors when call buttons are not working.

The Monitoring Team is awaiting additional documentation regarding testing and repairs of remaining call buttons, as well as policies or post orders and accompanying training that guide personnel in the proper handling of nonoperational call buttons.  If additional documentation shows that call buttons were repaired, complaints are being properly handled and addressed, and training has occurred, PDP will achieve substantial compliance with this substantive provision.

### Substantive Provision 13—Visiting

*As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated outside of PDP.*

**Compliance Rating:  Partial Compliance**

PDP reports that it initially resumed in-person visiting in November 2021, but that it was suspended due to a COVID-19 surge from January 2022 through March 2022.  PDP weekly documentation for April through July 2022 from various facilities reflects an average of 208 visits for weeks reported.  To establish an appropriate baseline of initial and additional time slots as the basis for recommendations and compliance findings, the Monitoring Team will analyze more detailed information about scheduled, cancelled, attended, and refused visits, in-person versus tablet-facilitated visits, and visitors' vaccination information.  PDP is updating its current visiting policy consistent with Agreement requirements and is in the process of providing

additional required documentation.  For documentation that is not currently available, PDP is exploring its tracking and documentation capabilities to support proof of compliance with this substantive provision.

### Substantive Provision 14—Attorney Visiting

*PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

**Compliance Rating:  Partial Compliance**

Initial conversations with Defender Association of Philadelphia attorneys and private counsel for Class Members suggest that PDP has made significant improvements in ensuring access to attorney visits.  This is reportedly true both in providing more space and opportunities for virtual and in-person visiting as well as shortened wait times for Class Member clients.  PDP weekly documentation from April through July 2022, reflects an average of 324 attorney visits per week reported and reflects the total timeframes for each visit.  Initial documentation provided does not identify the times of scheduled visits and Class Member clients' arrivals, nor does it identify visits that were delayed or cancelled, or corresponding reasons.  The existing tracking system may be able to generate this information, which will be necessary to supplement generally positive feedback from counsel and Class Members during site visits.  PDP reports that it is both developing new policy and revising existing policy and post orders regarding attorney visits consistent with Agreement requirements.

### Substantive Provision 15—COVID-19 Testing

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating:  Partial Compliance**

In a memo dated February 7, 2022, the PDP Commissioner states that PDP will continue to adhere to Centers for Disease Control guidelines for jail and prison prevention and treatment of COVID-19, including screening and testing of all incarcerated persons entering PDP, testing of unvaccinated staff, provision of masks for staff and incarcerated persons, testing in housing units where exposure to COVID-19 is suspected, and offering vaccinations and boosters at intake and ensuring their ongoing availability throughout incarceration.  The memo also outlines a tiered approach to Class Member movement and testing due to COVID-19 in consultation with the Philadelphia Department of Public Health.

Consistent with the policy described in this substantive provision, PDP housing units are classified as either, "green," "yellow," or "red," each prescribing unique protocols for testing and movement.  Green housing units have no movement constraints, are not undergoing regular COVID-19 testing, and are not subject to COVID-19-related restrictions.  PDP staff report that Class Members from green housing units are tested for COVID-19 on the day prior to any scheduled court hearings.  Yellow housing units are on COVID-19 quarantine and receive COVID-19 tests every five days.  Movement on yellow units is restricted outside the housing areas except for scheduled court hearings.  In order to receive clearance to attend court while housed on a yellow unit, Class Members must be asymptomatic and test negative both on the day prior to the scheduled hearing and again on the morning of the hearing.  Red units are reserved for COVID-19-positive Class Members who require medical isolation.  Class Members remain in isolation for 10 days and are restricted from attending in-person court hearings.

PDP has provided documentation of COVID-19 testing frequency and results for Class Members with scheduled court hearings.  From September 27, 2021, through July 29, 2022, PDP reportedly administered 21,702 COVID-19 tests for those going to court.  Of these, 21,593 were reported negative, 109 were positive, and there were 270 recorded test "refusals." Additionally, PDP provided an example of a database query with Class Members' identifying information and corresponding test results.  The Monitoring Team will attempt to validate the information reported and documented by PDP by cross-referencing available database information with housing unit documentation to determine whether the testing protocol is being followed pursuant to the Agreement.

***Substantive Provision 16—Quarantine***

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

**Compliance Rating:  Partial Compliance**

PDP reports that its quarantine protocol was developed and evolves based on guidance from the Centers for Disease Control (CDC) consistent with Agreement requirements.  As more is learned about COVID-19 prevention and treatment, CDC guidance is updated and PDP reports that it modifies its protocols accordingly, in consultation with the Philadelphia Department of Public Health (PDPH).  On the April 12, 2022, Agreement date, PDP was required to follow CDC's June 9, 2021, *Interim Guidance on Management for Correctional and Detention Centers.*[23]  The June guidance allowed for vaccinated individuals who were exposed to someone with COVID-19 to avoid quarantine as long as they tested negative following the exposure.[24]  Unvaccinated individuals who tested negative were quarantined for a period of ten days, tested every five days, and released from quarantine if the entire housing unit tested negative at the end of that period.

The most recent CDC *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* was updated on May 3, 2022.[25]  The new guidance created two sets of prevention strategies, one for everyday operations and one for enhanced prevention.  Strategies for everyday operations establish a baseline for regular disease prevention that should be consistently followed.  A variety of enhanced prevention strategies are recommended when risk increases based on several factors, including community transmission levels, jail or prison physical plant design, population turnover, and institutional vaccination rates.  CDC guidance acknowledges that every jail and prison is not likely to be able to implement every enhanced strategy and offers flexibility in choosing which to implement.  As of September 25, 2022, Philadelphia County qualifies as "medium" risk based on CDC guidelines and should follow everyday *and* enhanced prevention strategies.

CDC continues to require isolation for those infected with COVID-19 and quarantine for those exposed as part of everyday operations.  As an everyday operation in its strictest interpretation, CDC requires quarantine of *all* exposed persons, either individually or in cohorts, regardless of vaccination status.  Accordingly, PDP quarantines Class Members in cohorts for periods of 10 days with additional testing of everyone in each cohort at least every 5 days.  If new cases are discovered, the quarantine period resets, which results in extended periods of quarantine.  As of August 8, 2022, PDP reported 7 symptomatic positive cases of COVID-19 and 44 asymptomatic positive cases, with 34 units either on quarantine or in medical isolation.  The longest quarantine as of August 8, 2022, was initiated on May 25, 2022, more than 10 weeks earlier. In addition, there are 7 intake quarantine units not included in this count.  CDC's guidance acknowledges that its current baseline strategy, with accompanying restrictions in movement and access to programs and services, increases stress and potential mental health risks.  Guidance permits some variation in quarantine protocols to better balance mental health and programmatic needs,

---

[23] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (June 9, 2021)

[24] *Id.*

[25] Centers for Disease Control and Prevention, *Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (May 3, 2022), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

such as allowing for movement to court and off-site medical appointments, both of which PDP protocol provides for.  PDP also has a separate testing and quarantine protocol for all Class Members entering its facilities during intake.  This requires a COVID-19 test upon entry followed by a 10-day quarantine.  The Monitoring Team will conduct additional review to determine if PDP's current strategy is adequate given the reported low vaccination rate among the PDP population.

PDP reports that it has challenges maintaining quarantines due to limited housing space.  As a result, newly arriving Class Members are sometimes placed into housing units that are already under quarantine, which undermines the purpose of strict quarantine protocols and exposes Class Members to risk.  The Monitoring Team will continue to report on PDP's quarantine protocols and document any changes for the duration of the settlement term.

***Substantive Provision 17—Sanitation***

*Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing area, and to provide regular laundry services under current PDP policies.*

**Compliance Rating:  Deferred**

PDP has provided the Monitoring Team with extensive documentation, including 10 policies and post orders, internal audit findings, inspection logs, and Deputy Warden Certifications in support of PDP's compliance with this provision.  The Monitoring Team toured laundry facilities and sanitation and linen storage locations, confirmed the presence of ample supplies, and housing unit personnel offered consistent reports on sanitation protocols and distribution of supplies.

Officers are required to document sanitation and laundry issuance in unit logbooks, samples of which PDP has provided for review.  The PDP Audit Division conducts audits for compliance with COVID-19 mandates and documents overall sanitation on housing units.  PDP has provided the results of these audits for review.  Deputy Warden Certifications contain documentation confirming Class Members' access to cell and housing unit cleaning supplies on daily bases.  PDP executives communicate a strong desire for sanitary and well-maintained facilities and have ensured the presence of appropriate policies and documentation of adherence to them.[26]  Despite these efforts, PDP executives report ongoing challenges with ensuring that Class Members consistently receive sanitation supplies, timely linen exchanges, and scheduled laundry access.

These challenges were confirmed during site visits when the Monitoring Team received regular complaints from Class Members in most housing units about insufficient quantity, frequency and methods of distribution of cleaning and other supplies.  Concerns about insufficient sanitation-related supplies and protocols are not uncommon among incarcerated persons in jail and prison systems nationwide, even with adequate policies and procedures in place.  However, when incarcerated persons from different units and different facilities throughout a system reiterate

---

[26] Some of the distribution and documentation protocols require revisions in order to prove PDP's compliance with this substantive provision, and the Monitoring Team will work with PDP to ensure that they are effective and efficient.

identical issues, and when cleaning supplies and bed linens become high-value currency within incarcerated populations as is the case in PDP facilities, it suggests larger issues with scarcity or distribution that require additional attention.  PDP executives should take immediate steps to ensure more consistent distribution of supplies, including facility-wide spot checks and standardized unit inspections.

The purpose of this substantive provision is to ensure that PDP maintains clean, habitable conditions for Class Members confined in its facilities.  Reports of unsanitary conditions are exacerbated by insect and rodent infestations in some facilities.  The Monitoring Team observed significant evidence of infestations in PICC and DC that require immediate enhanced vector control efforts.  PDP provided documentation of recent efforts in those facilities and took additional action following the site visits.  Given infrastructure and facility maintenance issues campus wide, some insect and rodent issues will likely persist outside of PDP's immediate control.  However, PDP must remain vigilant in identifying issues and ensuring that the frequency and quality of inspections and treatments in all facilities are sufficient to maintain safe working conditions for personnel and safe and habitable conditions for Class Members.

The Monitoring Team also observed serious lapses in building maintenance in some areas of ASD-CU and MOD 3, DC, and PICC, including rust, erosion, broken toilet and sink units, no lighting in occupied cells, and inoperable drinking fountains and air conditioning units in the hottest summer months.  The Monitoring Team has recommended under Substantive Provision 1—Staffing above that Defendants address maintenance staffing deficits by expanding PDP's current maintenance contract to include all PDP facilities.  The two facilities that currently receive contracted services for work orders and preventive maintenance have adequately maintained physical plants.  However, the 50% vacancy rate in the PDP plant operations staff are resulting in delayed or unaddressed repairs in remaining facilities as described here.

PDP documentation for August 10, 2022, reflects no overdue work orders for CFCF or RCF, while PICC reported 110 unusable cells due to unresolved maintenance issues and work orders, many of which existed on or before the April 12, 2022, Agreement date.[27]  SME McDonald notes that if PDP/City maintenance is unable to maintain repairs sufficient to repopulate unusable cells, it is also likely unable to ensure routine maintenance necessary to avert debilitating and costly system breakdowns.  The living conditions for Class Members who occupy poorly maintained or rodent and insect-infested cells, units, and facilities are unacceptable, and Defendants must take additional action to improve them.

Security staffing shortages also contribute to unsanitary and unsafe conditions.  As previously reported, sergeant and lieutenant posts are routinely left vacant, which likely results in supervisors being forced to prioritize other operational needs or crises over cleanliness and maintenance inspections.  Dozens of vacant correctional officer posts limit available personnel to issue supplies and supervise work details for routine deep cleaning.

---

[27] Among reported issues at PICC that resulted in cells being unusable were 14 broken locks, 3 broken lights, 12 toilet/sink units, 4 cell door windows, and 2 with exposed wires.

In monitoring PDP's compliance with this substantive provision, the Monitoring Team will complete unannounced visual inspections of facilities to track PDP's progress in improving and maintaining sanitation.  It will continue to meet with Class Members and staff and monitor Class Member grievances regarding access to cleaning supplies, bed linens, and laundry.  It will also work with PDP in refining its policies, documentation, tracking, and auditing methods for greater efficiency, and to allow PDP executives to more closely monitor living conditions and address problems.  In the interim, PDP has committed to improving internal monitoring and auditing of all sanitation, maintenance, and vector control issues.

### Substantive Provision 18—Use-of-Force

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….  Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

#### Compliance Rating:  Deferred

Assessment of PDP's use of force practices pursuant to this substantive provision requires qualitative and data analyses of PDP's:  (1) current use of force policies and procedures; (2) use of force training curriculum and instruction on law, policy, tactics, prevention, de-escalation, reporting, investigation, use of specialized equipment, and guidelines for planned versus emergency use of force; (3) current reporting and investigation practices based on specific and aggregate use of force investigations; (4) systems for commending personnel who utilize effective use of force, prevention, and de-escalation tactics; (5) disciplinary thresholds and dispositions for inappropriate or excessive uses of force; (6) mechanisms for review of use of force incidents at supervisory, management, and executive levels; and (7) processes for identifying, implementing, and monitoring any use of force-related corrective action or other quality improvement measures.  Once an assessment is completed, the Monitoring Team will prescribe the specific requirements necessary for PDP to achieve substantial compliance with this substantive provision.

PDP was required to provide refresher training on use of force policy III.A.8 – *Use of Force and Restraints*.  PDP has provided documentation reflecting that retraining commenced in May 2022 and has been completed for 1065 of 1169 security staff.  Documentation reflects that a total of 91% of PDP staff members have been retrained pursuant to this substantive provision.  Of 104 remaining staff who have not yet received the retraining, 94 are on extended leave and 10 have

not been retrained due to other delays.  PDP anticipates that the 10 staff members whose training was delayed for various reasons and any staff members who return from extended leave will be trained by the next reporting period.

The Monitoring Team has requested completed use of force packages for 30 of 130 total reported incidents for the second quarter of 2022.  Cases were selected using a semi-random method to ensure representation of cases from each facility reported.  The initial case review will establish a baseline from which to analyze PDP's use of force practices, develop recommendations, and measure results of any changes implemented.  PDP's current policies and tracking systems, including detailed monthly trend reports and Crisis Intervention Team training provide a sound foundation for PDP to improve current use of force systems.  The Monitoring Team will provide additional analysis with compliance requirements and findings in future reports.