## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated,** | : | **No.: 2:20-cv-01959-BMS** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,** | : | |
| | : | |
| **Defendants.** | : | |

## MONITOR'S THIRD REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Third Report evaluating Defendants' compliance with the terms of the Agreement through June 30, 2023.  The Monitor prepared this report as the third of regular reports to be filed of record.  The Monitor's fourth and final report in the initial settlement term will be filed March 29, 2024.

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED:  October 12, 2023                     Respectfully submitted,


                                                                    By: /s/ Cathleen Beltz_____
                                                                           Monitor

The Agreement between Plaintiffs Thomas Remick, et al., (Plaintiffs), on behalf of themselves and all others similarly situated, and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Defendants), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-BMS (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.

The Agreement further provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement.  The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision.  Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement.  A "Substantial Compliance" finding means that Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision.  A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance.  A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete discrete tasks outlined in a substantive provision.  Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence.  Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members.  As such, in issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 12, 2024, termination date.  In this reporting period, the Monitoring Team utilized data and information tracked through June 30, 2023.

The Agreement requires the Monitor to conduct site inspections "at least once every three months," during which the Monitor has access to conduct confidential interviews with personnel and Class Members.  In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP.  The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

The Remick Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[1]  In this reporting period, Deputy Monitor Ryan Grosso has continued to conduct site visits at least once per month to speak with Class Members on PDP housing units.  Following site visits, the Deputy Monitor

---

[1] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022).

schedules weekly confidential tablet meetings with Class Members if more privacy is required. Since weekly two-hour tablet meetings commenced on December 6, 2022, the Deputy Monitor has interviewed 162 Class Members across all PDP facilities.  The Monitoring Team has also utilized information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

The Monitoring Team has periodically received memoranda from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel.  With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary.  With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews.

Conditions observed and information received via these interviews and protocols are consistent with the improvements and deficiencies detailed in *Remick* filings and in reports by PDP staff and others who work in or inspect PDP facilities.  Information that the Monitor obtains via reports by and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, and others independent of PDP provides valuable context for PDP's current conditions.  It augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms.  The Monitoring Team thanks these oversight partners for their contributions and commitment.

In this reporting period, members of the Monitoring Team completed seven site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside (RCF).[2]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.

The Monitoring Team continues to meet regularly with PDP Commissioner Blanche Carney (Commissioner) and her staff and receives full access to facilities, documentation, personnel, and Class Members.  PDP remains transparent in providing information and collaborative in identifying solutions to deficiencies that impede compliance with the Agreement.  The Monitoring Team thanks the Commissioner and PDP staff for their contribution to this report.

---

[2] Site visits were conducted January 6, 2023, February 20-23, 2023, March 24, 2023, April 25, 2023, May 8-9, 2023, May 23, 2023, and June 22, 2023.

The Monitoring Team consistently observes PDP staff and leadership exerting significant effort to implement Agreement requirements. As the Monitoring Team analyzes PDP operations and issues recommendations to correct deficiencies, PDP continues to draft corresponding policies and new personnel directives to implement them. Unfortunately, PDP's efforts to change are hampered by the same dearth of personnel resources that existed when settlement monitoring began more than a year ago. As new policies and directives increase while resources to operationalize them do not, each successive reform directive leeches staff, time, and attention from others.

PDP staff report experiencing demoralization, and the Commissioner has communicated to the Monitor her ongoing concerns that PDP's conditions remain unsafe for Class Members and staff. The Commissioner also maintains that without a large influx of new staff or a significant population reduction to no more than 3,500 Class Members, PDP will be unable to implement many Agreement requirements and will struggle to sustain changes implemented thus far.

PDP's population continues to increase, and in mid-August, exceeded 4,700. The City has implemented some but not all of the Monitoring Team's initial recommendations to manage PDP's personnel vacancies. Given the national law enforcement staffing crisis and the City's efforts to date, PDP does not stand to attract new staff sufficient to implement the Agreement in the near term. Neither is it likely that PDP's population will be reduced to manageable levels without a highly coordinated effort among local and state justice partners to curtail pre-trial detention and expedite criminal cases.

The Monitor has discussed with the Parties a third option for population management that involves suspending intake for specified groups of new arrestees until PDP's count decreases to a manageable level. Suspending intake may require police agencies in the City to modify their practices to avoid new arrestees being detained for longer periods in station lockups, community placements, and hospitals, which may be ill-equipped to meet their needs. While suspending intake would yield more expeditious results for PDP in managing its Class Member population, new arrestees would likely be exposed to other constitutional violations at earlier stages in the criminal justice process.

Unconstitutional conditions inside PDP facilities do not occur in a vacuum. Rather, they occur at the end of a long criminal justice pipeline, which suffers greater deficiencies at its various stages than can be remedied through this Action--or through changes to this jail system--alone. PDP is plagued by acute and deeply problematic operational and cultural issues, many of which must be resolved internally. This Agreement and implementation monitoring were designed to address some of these issues and change is occurring slowly, as detailed below. However, broad systemic reform will require the creative reimagination of Philadelphia's criminal justice and detention practices, including a combination of options addressed above and perhaps others not yet identified.

In the meantime, the trauma experienced by Class Members is profound and clearly observable to all who work in, enter, or reside in PDP facilities. Exposure to extended periods of isolation, institutional violence, squalor, and neglect breach all standards for humane confinement and is certain to have lifelong effects for many. For this reason, small changes that result in

incremental improvements to the daily experiences of some Class Members should not be discounted and efforts must continue.  Compliance discussions and findings below were prepared and should be reviewed within this context.

# Table of Provisions

*Compliance Findings* ............................................................................................................ 7

***Substantive Provision 1—Staffing*** ............................................................................. 12

*Sub-provision 1.1* ............................................................................................................ 12

*Sub-provision 1.2* ............................................................................................................ 15

*Sub-provision 1.3* ............................................................................................................ 16

*Sub-provision 1.4* ............................................................................................................ 17

***Substantive Provision 2—Out-of-Cell Time*** ...................................................... 18

*Sub-provision 2.1* ............................................................................................................ 18

*Sub-provision 2.2* ............................................................................................................ 20

***Substantive Provision 3—Out-of-Cell/Segregation*** ...................................... 20

*Sub-provision 3.1* ............................................................................................................ 20

*Sub-provision 3.2* ............................................................................................................ 22

***Substantive Provision 4—Resume Normal Operations*** ............................... 26

***Substantive Provision 5—Healthcare*** .................................................................. 28

***Substantive Provision 6—Behavioral Health in Segregation*** ................... 37

***Substantive Provision 7—Law Library Access*** ............................................... 42

***Substantive Provision 8—Discipline*** .................................................................... 44

*Sub-provision 8.1* ............................................................................................................ 44

*Sub-provision 8.2* ............................................................................................................ 47

*Sub-provision 8.3* ............................................................................................................ 47

*Sub-provision 8.4* ............................................................................................................ 48

***Substantive Provision 9—Tablets*** ......................................................................... 48

*Sub-provision 9.1* ............................................................................................................ 49

*Sub-provision 9.2* ............................................................................................................ 50

***Substantive Provision 10—Phone Calls*** .............................................................. 51

*Sub-provision 10.1* .......................................................................................................... 51

*Sub-provision 10.2* .......................................................................................................... 51

***Substantive Provision 11—PICC Emergency Call Systems*** ......................... 51

***Substantive Provision 12—Locks*** ........................................................................... 52

*Sub-provision 12.1* .......................................................................................................... 52

*Sub-provision 12.2* .......................................................................................................... 52

*Sub-provision 12.3* ........................................................................................................ *53*

*Sub-provision 12.4* ........................................................................................................ *53*

*Sub-provision 12.5* ........................................................................................................ *53*

***Substantive Provision 13—Visiting*** .......................................................................... **53**

*Sub-provision 13.1* ........................................................................................................ *53*

*Sub-provision 13.2* ........................................................................................................ *54*

*Sub-provision 13.3* ........................................................................................................ *55*

***Substantive Provision 14—Attorney Visiting*** ......................................................... **55**

*Sub-provision 14.1* ........................................................................................................ *55*

*Sub-provision 14.2* ........................................................................................................ *56*

*Sub-provision 14.3* ........................................................................................................ *57*

***Substantive Provision 15—COVID-19 Testing*** ....................................................... **57**

***Substantive Provision 16—Quarantine*** ................................................................... **58**

***Substantive Provision 17—Sanitation*** ..................................................................... **61**

*Sub-provision 17.1* ........................................................................................................ *61*

*Sub-provision 17.2* ........................................................................................................ *62*

***Substantive Provision 18—Use-of-Force*** ................................................................. **64**

**Compliance Findings**

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision.  The Monitoring Team created sub-provisions for some of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision.  This will provide additional clarity for Defendants as they work to implement required changes and greater specificity for the Court and Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 sub-provisions were created.  In the previous reporting period, the Monitor determined that PDP had achieved substantial compliance with 5 sub-provisions, partial compliance with 25 sub-provisions, and remained in non-compliance with 7 sub-provisions.  In this reporting period, PDP has achieved substantial compliance with 9 sub-provisions, partial compliance with 21 sub-provisions, and remained in non-compliance with 7 sub-provisions.

The table below reflects all provisions and current compliance ratings for each:

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| **1** | | **Staffing** | **PC** |
| | 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| | 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . . | PC |
| | 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| | 1.4 | These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers. | NC |
| **2** | | **Out-of-Cell Time** | **PC** |
| | 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| | 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis.  *See also* para. 4, *infra*. | NC |
| 3 | | **Out-of-Cell/Segregation** | **PC** |
| | 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | NC |
| | 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| 4 | | **Resume Normal Operations** | **NC** |
| | | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services).  During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| 5 | | **Healthcare** | **PC** |
| | | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| 6 | | **Behavioral Health in Segregation** | **PC** |
| | | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |
| 7 | | **Law Library Access** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| | PDP will continue to provide law library access for all incarcerated individuals.  The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| 8 | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | SC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation.  Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline.  Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| 9 | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs.  The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF.  This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| 10 | **Phone Calls** | **PC** |

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| | 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| | 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | | **PICC Emergency Call Systems** | **PC** |
| | | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | | **Locks** | **PC** |
| | 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | PC |
| | 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | PC |
| | 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| | 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| | 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | | **Visiting** | **PC** |
| | 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| | 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| | 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | SC |
| **14** | | **Attorney Visiting** | **PC** |
| | 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| | 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results.  Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame.  These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health.  Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19.  Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands.  The parties agree that correctional officers should follow de-escalation measures provided in PDP policies.  The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors.  In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….  Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

### Compliance Rating:  Partial Compliance

Some measures to increase recruitment, hiring, and retention have been implemented, but there has been no improvement in staffing levels for critical positions in this reporting period.  The following table reflects changes in security, maintenance, and human resources vacancies since the last reporting period:

### Philadelphia Department of Prisons Vacancy Report
December 2022 and June 2023

| | Position Classification | Budgeted | December 2022 | | June 2023 | | Change in Vacancies (+/-) | Current Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Sworn Staff | Officers | 1719 | 973 | 746 | 967 | 752 | +6 | 44% (+1%) |
| | Sergeants | 129 | 77 | 52 | 73 | 56 | +4 | 43% (+3%) |
| | Lieutenants | 56 | 46 | 10 | 52 | 4 | -6 | 7% (-11%) |
| | Captains | 31 | 24 | 7 | 20 | 11 | +4 | 35% (+12%) |
| | **Custody Total** | **1935** | **1120** | **815** | **1112** | **823** | **+8** | **43% (+1%)** |
| Maintenance Staff | Trades Worker I | 8 | 5 | 3 | 4 | 4 | +1 | 50% (+12%) |
| | Trades Worker II | 23 | 8 | 15 | 8 | 15 | 0 | 65% (0) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 2 | +1 | 67% (+34%) |
| | Building Engineer | 1 | 0 | 1 | 2 | 1 | 0 | 100% (0) |
| | Maintenance Group Leader | 1 | 0 | 1 | 1 | 1 | 0 | 100% (0) |
| | **Total Maintenance** | **36** | **15** | **21** | **17** | **23** | **+2** | **64% (+6%)** |
| Human Resources (HR) Staff | HR Professional | 2 | 0 | 2 | 2 | 0 | -2 | 0 (-100%) |
| | HR Program Admin | 2 | 2 | 0 | 2 | 0 | 0 | 0% (0) |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% (0) |
| | **HR Total** | **5** | **3** | **2** | **5** | **0** | **-2** | **0% (-40%)** |
| **PDP TOTAL** | **All Positions** | **2186** | **1321** | **865** | **1311** | **875** | **+10** | **40% (0)** |

PDP filled two human resources positions, however, sworn and maintenance personnel vacancies continued to increase in this reporting period.

PDP reports that the City's Human Resources department is increasing engagement with employees who are out on long-term sick leave and is preparing a status report of off-duty staff engagement for the Monitoring Team's review in the next reporting period.

Hiring bonuses, salary increases, and attendance incentives following the various arbitration awards were designed to attract new candidates and are now being included in recruitment advertising.[3]  Also supporting recruitment, the City has modified its practice of limiting application periods for new recruits.  The City's new process essentially provides for continuous-fill applications consistent with the Monitoring Team's recommendation.  It is premature to determine whether new application protocols and the other incentives will improve hiring yields, however, the efforts are positive steps.

PDP has successfully increased the number of academies and new hires in 2023, but the retention rate of new hires remains low.  The table below depicts academy schedules, attendance, and graduation data for 2021, 2022, and 2023, and employee retention rates for the 2022 and 2023 academies:

### Philadelphia Department of Prisons Academy Report

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed June 2023 | Retention Rate Dec 2022 | Retention Rate June 2023 |
|---|---|---|---|---|---|---|
| 21-01 | February - May, 2021 | 25 | 23 | NA | NA | NA |
| 21-02 | June - September, 2021 | 19 | 15 | NA | NA | NA |
| 21-03 | August - November, 2021 | 35 | 30 | NA | NA | NA |
| 21-04 | November, 2021 - January, 2022 | 30 | 26 | 15 | 70% | 50% |
| 21-05 | December, 2021 - March, 2022 | 20 | 16 | 8 | 55% | 40% |
| 22-01 | March - June, 2022 | 31 | 25 | 12 | 58% | 39% |
| 22-02 | May - July, 2022 | 21 | 20 | 13 | 71% | 62% |
| 22-03 | August - October, 2022 | 18 | 16 | 13 | 78% | 72% |
| 22-04 | October, 2022 - January, 2023 | 26 | 20 | 17 | NA | 65% |
| 23-01 | January - March, 2023 | 21 | 22 | 16 | NA | 76% |
| 23-02 | February - April, 2023 | 17 | 15 | 15 | NA | 88% |
| 23-03 | April - July, 2023 | 20 | In Process | NA | NA | NA |
| 23-04 | June - September, 2023 | 17 | In Process | NA | NA | NA |

---

[3] For example, the August 12, 2022, Arbitration Award authorizes a range of compensation increases.  *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, August 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, December 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, January 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, January 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; *See also* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, March 31, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

In the first half of 2021 and 2022, PDP held two academies yielding an average of 58 new cadets.  In the first six months of 2023, PDP held five academies yielding a total of 101 new cadets, marking a 40 percent increase in new hires in the first half of 2023.  Despite the increases, PDP is not retaining enough new hires to address its staffing crisis.  In the last reporting period, the average retention rate of cadets who graduated from academy classes 21-04, 21-05, and 22-01 in the first half of 2022 was 61 percent.  As of June 2023, the average retention rate for those three academy classes decreased to 43 percent.  To improve overall vacancies, new hires and employee retention must both increase.

Available data on recruitment yields is depicted in the following table:

**Philadelphia Department of Prisons Average Recruitment Yields
for New Hires after January 1, 2021**

| Certification List | Total Applicants | Total Hired | Rate (%) | List Status |
|---|---|---|---|---|
| 2020-0210 | 228 | 36 | 15.8 | Closed |
| 2021-0906 | 758 | 50 | 6.6 | Closed |
| 2022-0221 | 298 | 16 | 5.4 | Closed |
| 2022-0516 | 245 | 25 | 10.2 | Closed |
| 2022-0905 | 493 | 34 | 6.9 | Closed |
| **Total Closed** | **2022** | **161** | **9** | |
| 2022-1212 | 422 | 34 | NA | In Process |
| 2023-0306 | 563 | 11 | NA | In Process |
| **Total Open** | **985** | **45** | **NA** | |

Also positive, PDP appears on target to accept twice as many applications in 2023 as it received in the same periods in 2021 and 2022 and achieved a slight increase in new hires in this rating period.

On May 8, 2023, PDP reported the escape of two Class Members from PICC.  The investigation is pending, however, the Commissioner anticipates that staff negligence, as well as insufficient staffing were contributing factors.  Generally, PDP does not have enough personnel at the ranks of lieutenant and sergeant to maintain a consistent supervisory presence inside facilities and monitor all housing units.  PDP also identified inadequate housing unit supervision during the review of at least one Class Member death in this reporting period.  Crucial custody transport and emergency backfill positions that support housing units also remain unfilled.  PDP's internal critical incident review processes have greatly improved in the last year.  Difficult and transparent discussions among involved or witness personnel, facility leadership, and executives reveal specific areas in need of corrective action.  PDP reports that it is in the process of promoting 10 new sergeants and 10 new lieutenants, which should assist PDP in implementing Agreement requirements.  The Monitoring Team is not confident, however, that PDP can remediate all identified deficiencies, including recommendations from a forthcoming post-escape security analysis, with limited personnel.  Working conditions in PDP facilities are seeing some

improvements but remain unsafe, and the staffing crisis is an absolute barrier to compliance. The situation is dire, and PDP should expect more critical incidents as long as it persists.

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to hiring and retention bonuses, to enhance the retention of correctional officers. . .*

**Compliance Rating:  Partial Compliance**

There are preliminary signs that measures taken may be raising retention rates.

A January 27, 2023, Supplemental Arbitration Award provides for attendance incentives for employees assigned to a 12-hour shift, among other incentives.[4]  PDP has made progress in implementing its Twelve-hour Shift Initiative in all facilities.  The incentives appear to have attracted a high percentage of PDP employees to volunteer for the 12-hour shift, which now constitute the large majority of PDP's overall posts.  The other benefits pursuant to the arbitration awards may also support employee retention.[5]

In the four-month period immediately following the August 12, 2022, arbitration award (which facilitated step-based salary increases, retention bonuses, longevity pay, and other positive steps), average monthly voluntary separations reduced from 22.75 in the period January through August 2022 to 10.75, or pre-pandemic levels.  In the first six months of 2023, average monthly voluntary separations were higher than the same periods in 2019 and 2020 but remain lower than 2021.  The following table depicts the average number per month of PDP employees who voluntarily separated pre-retirement from January 2022 through June 2023:

**Average Voluntary Separations by PDP Employees**

|  | Pre-Arbitration Award | | | | Post-Arbitration Award | |
|---|---|---|---|---|---|---|
|  | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | Jan-June 2023 |
| **Monthly Average** | 10 | 11 | 24.25 | 22.75 | 10.75 | 14.8 |

Short term retention rates have risen since the August 12, 2022, arbitration award.  It will be important to track retention of those new hires to see if those increases hold.

PDP held an employee recognition week in May 2023, which some staff reported was well received.  PDP also created and, in September 2023, filled an Employee Wellness Coordinator position.  However, the City has not initiated a robust employee wellness program to support retention of PDP personnel.  PDP's work environment remains uniquely stressful for employees

---

[4] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, January 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.
[5] *See* awards cited *infra* note 3.

and is exacerbated by forced overtime shifts.  Greater staff recognition is meaningful and may give at least a short-term boost to morale, but it is insufficient to equip even the most dedicated and experienced personnel with the tools necessary to persevere in the current work environment.

*Sub-provision 1.3--Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating:  Non-compliance**

With a 44 percent vacancy rate for correctional officers as of June 30, 2023, PDP is simply unable to cover all posts in its post plans consistent with this sub-provision.

As previously reported, PDP's systems for tracking posts and the staff required to fill them were inadequate to measure compliance with this sub-provision.[6]  In the last reporting period, the Monitor retained an expert to provide technical support and training, and to update PDP's post and personnel tracking systems.  As with all carceral systems, PDP's post plans are dynamic and require regular updates based on population and operational changes.  For example, PDP's transition from an 8-hour to a 12-hour shift model required broad changes to the post plans that were referenced during settlement negotiations.

PDP's staffing rosters now reflect nearly every position identified in its current post plan, and personnel now possess the expertise to reconcile and maintain rosters as plans adjust.  If progress continues as planned, PDP should be able to generate reports in the next reporting period that measure the number of unfilled posts at each facility and the reasons for each post vacancy.  Improvements should allow the Monitoring Team to verify the accuracy of personnel information reported and optimally measure compliance with this sub-provision.

PDP's anticipated staffing analysis, now reportedly being completed by the end of 2023, will not resolve PDP's staffing crisis.  It will, however, assist PDP in gaining an up-to-date understanding of current staffing needs, developing a roadmap for a return to normal operations, and identifying areas for interim relief.  For example, the Monitoring Team recommended that PDP redirect at least 70 peace officers who are currently performing non-peace officer functions, such as maintaining records and issuing and replacing computers.  A staffing analysis will identify how to transition those functions to civilian personnel and reserve peace officers for critical peace officer roles.

There are also functions within the jails that do not require direct contact with Class Members, but which are being performed by sworn personnel, such as control booth operators.  These posts may also be converted to alternative classifications.  The Monitoring Team is hopeful that PDP's staffing analysis will support efficient reorganization of PDP's current resources, facilitate partnerships with labor, and offer some relief as PDP works to reduce vacancies.

---

[6] Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 16 (Mar. 3, 2023).

Ultimately, the staffing crisis can only be addressed through aggressive hiring, effective retention strategies, and collaboration with employees on long-term leave to return them to work in functions they are able to perform.  Defendants have made improvements but have not yet met the requirements of this provision or initiated the comprehensive return-to-work strategy recommended by the Monitoring Team.

*Sub-provision 1.4--These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating:  Non-compliance**

A partial or substantial compliance rating first requires PDP to achieve compliance with sub-provision 1.3.

Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report:

1. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.
    *PDP's maintenance contract has been expanded to allow contractors to perform all repairs and maintenance at PICC and DC when City maintenance employees are unable to meet demands.*
2. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
    *PDP reports that it is still in the process of implementing this recommendation.*
3. Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.
    *As of the filing of this report, Defendants have not implemented this recommendation.*
4. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.
    *PDP reports that a staffing analysis will be completed by the end of 2023.*
5. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.
    *PDP reports that it is attempting to implement this recommendation.  The matter will be addressed in an initial arbitration hearing scheduled for November 2023.*
6. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.
    *As of the filing of this report, Defendants have not implemented this recommendation.*
7. Establish continuous-fill civil service hiring lists during the staffing crisis.
    *The City reports that the newly structured back-to-back hiring lists function as the continuous-fill lists recommended here.  It is too soon to measure any success of the new hiring protocols, but it is positive that the City has taken steps to implement this recommendation.*

8. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

    *The City has not disclosed to the Monitoring Team whether it intends or has taken any steps to implement this recommendation.*

9. PDP should implement strategies for employee retention and a robust employee wellness program.

    *PDP is making efforts to recognize employees, however, a comprehensive employee wellness program has not been developed.*

10. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.

    *PDP reports the City has increased communication with employees on long-term leave. The City has separated 38 employees who had been on leave since April 2022 and could no longer perform necessary duties.  The Monitoring Team awaits additional details regarding the City's efforts.*

11. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations.  The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.

    *This recommendation is currently being implemented.*

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

**Compliance Rating:  Partial Compliance**

The Monitoring Team previously reported that out-of-cell data generated from Deputy Warden Reports is unreliable and the Monitoring Team was therefore unable to establish an accurate baseline of out-of-cell opportunities for Class Members.[7]  PDP reports that it is finalizing procurement of a radio frequency identification (RFID) system, which will improve accuracy in tracking Class Member movement and out-of-cell time.  PDP reports that it will finalize procurement and begin RFID implementation in the next reporting period.  In the meantime, PDP has replaced its Deputy Warden Report tracking system with a spreadsheet tracking system recommended by the Monitoring Team.[8]  The spreadsheet tracker was implemented systemwide in April 2023 and tracks individual out-of-cell time in segregation units and group out-of-cell time in non-segregation units.

---

[7] *Id.* at 18; Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 11-12 (Nov. 4, 2022).
[8] Monitor's Second Report, *supra* note 6, at 19.

Initial results of the spreadsheet tracker suggest that additional staff training is necessary to improve out-of-cell reporting accuracy.  For example, like the Deputy Warden Report tracking system, some personnel continue to document out-of-cell opportunities as being offered exactly on the hour or half hour.  Jail operational needs, such as unlocking each cell door individually, make such precise start times implausible.  The Monitoring Team has recommended that personnel receive additional training in proper out-of-cell documentation, as well as the consequences for falsification of records.  Despite persisting documentation and tracking issues, the spreadsheet system is standardized across PDP housing units, which will allow PDP and the Monitoring Team to verify accuracy via CCTV for sample dates in the next reporting period. PDP's implementation of a simplified, consistent, and verifiable tracking system reflects a commitment to increase and accurately track out-of-cell opportunities for Class Members.

Data from initial tracking reports for general population units confirms that some units in each facility are attempting to offer some out-of-cell time more than once per day.  It also confirms that not all Class Members are offered out-of-cell time every day, let alone the requisite hours. Finally, when out-of-cell time is offered, durations do not consistently meet minimum Agreement requirements.  This is, in part, because bed space and staffing limitations require most general population units to house Class Members with various security classifications together in single housing units.  Class Members with different security classifications are not permitted to recreate together and are instead divided into smaller recreation groups.  The number and size of recreation groups in each unit changes based on bed space, staffing, and population dynamics.  Generally, the more groups that reside in the same housing unit, the fewer out-of-cell opportunities each group receives.  The following table depicts out-of-cell time reported for three one-week periods in April, May, and June 2023 based on total recreation groups in each facility:

**General Population Average Out-of-Cell Time Per Day Reported for Three One-Week Periods[*]**

| | Hours | April 2023 | | May 2023 | | June 2023 | |
|---|---|---|---|---|---|---|---|
| | | Groups | % | Groups | % | Groups | % |
| **CFCF** | Zero | 34 | 27% | 58 | 47% | 4 | 3% |
| | 1 to 4.9 | 68 | 55% | 17 | 14% | 116 | 94% |
| | 5 or more | 22 | 18% | 49 | 40% | 4 | 3% |
| | **Total CFCF Groups** | **124** | **100%** | **124** | **100%** | **124** | **100%** |
| **PICC** | Zero | NA | NA | 21 | 27% | 2 | 3% |
| | 1 to 4.9 | NA | NA | 21 | 27% | 61 | 77% |
| | 5 or more | NA | NA | 37 | 47% | 16 | 20% |
| | **Total PICC Groups** | **NA**** | **NA** | **79** | **100%** | **79** | **100%** |
| **RCF** | Zero | 3 | 3% | 5 | 5% | 2 | 2% |
| | 1 to 4.9 | 29 | 29% | 34 | 34% | 45 | 45% |
| | 5 or more | 69 | 68% | 62 | 61% | 54 | 53% |
| | **Total RCF Groups** | **101** | **100%** | **101** | **100%** | **101** | **100%** |

*The weeks were: 4/3-4/9, 5/1-5/7, and 6/5-6/11.
**Tracking system not yet implemented at PICC.

Initial data suggests that RCF met the five-hour Agreement benchmark most consistently over the three weeks reviewed.  Between 53 and 68 percent of all RCF groups reportedly received five or more hours of out-of-cell time each day in the weeks reviewed.  CFCF and PICC varied from week to week, but data reflects that higher percentages of Class Member groups, up to 47 percent in one of the weeks documented, remained locked down for the week.  These lockdowns are reportedly due to inadequate security coverage and are worse on weekends and holidays.

Documentation shows that some CFCF housing units often approach five hours of out-of-cell time daily, and, at times, all three facilities provide out-of-cell time to some Class Members more than once per day.  This represents improvement and efforts should continue.

PDP has made notable progress since the Monitoring Team initiated its review in May 2022.  Class Members consistently report to the Monitoring Team that they receive more out-of-cell time today than they have received since COVID-19 lockdown protocols were instituted nationwide more than three years ago.  Improvements that PDP is making, its receptivity to the Monitoring Team's recommendations, and its acknowledgement of active failures are all commendable.  It is also true that ongoing failures to offer all Class Members time outside of their cells every day constitutes one of the most harmful conditions detailed in this Action.  The injury inflicted on Class Members as they endure hours, days, or weeks in isolation is immeasurable and is compounded each day that non-compliance persists.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating:  Non-compliance**

**Substantive Provision 3—Out-of-Cell/Segregation**

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

**Compliance Rating:  Non-compliance**

PDP's initial efforts to improve out-of-cell tracking and increase out-of-cell opportunities for Class Members on segregation units warranted a rating of Partial Compliance in previous reporting periods.[9]  Because initial out-of-cell data reflects such low compliance, PDP's compliance rating in this reporting period is reduced to Non-compliance.

---

[9] *Id.* at 19; Monitor's Frist Report, *supra* note 7, at 10.

PDP's new spreadsheet tracking system was implemented in segregation units systemwide in June 2023.  In this reporting period, the Monitoring Team reviewed tracking reports for the week of June 5, 2023, which revealed that only 38 percent of Class Members on segregation units received daily out-of-cell opportunities.  The following table reflects total Class Members on segregation units who received daily out-of-cell opportunities (of any length) for the week of June 5 through June 11, 2023, as documented in PDP's segregation unit spreadsheet tracker:

**Daily Out-of-Cell Opportunities for Class Members on Segregation Units**
June 5, 2023 – June 11, 2023

| | Facility | CFCF | | | PICC** | RCF | Total |
|---|---|---|---|---|---|---|---|
| | Unit | A1P2 | A1P3 | A1P4 | J Unit | C Unit | |
| | **Total Stable Population*** | 60 | 29 | 64 | 3 | 36 | **192** |
| June 5 | Class Members Out-of-Cell | 10 | 13 | 0 | 3 | 26 | **52** |
| | Percent | 17% | 45% | 0% | 100% | 72% | **27%** |
| June 6 | Class Members Out-of-Cell | 32 | 14 | 15 | 3 | 36 | **100** |
| | Percent | 53% | 48% | 23% | 100% | 100% | **52%** |
| June 7 | Class Members Out-of-Cell | 0 | 0 | 31 | 2 | 36 | **69** |
| | Percent | 0% | 0% | 48% | 67% | 100% | **36%** |
| June 8 | Class Members Out-of-Cell | 0 | 0 | 15 | 0 | 36 | **51** |
| | Percent | 0% | 0% | 23% | 0% | 100% | **27%** |
| June 9 | Class Members Out-of-Cell | 0 | 0 | 30 | 2 | 36 | **68** |
| | Percent | 0% | 0% | 47% | 67% | 100% | **35%** |
| June 10 | Class Members Out-of-Cell | 10 | 11 | 32 | 3 | 36 | **92** |
| | Percent | 17% | 38% | 50% | 100% | 100% | **48%** |
| June 11 | Class Members Out-of-Cell | 39 | 23 | 11 | 3 | 0 | **76** |
| | Percent | 65% | 79% | 17% | 100% | 0% | **40%** |
| **Daily Average** | **Class Members Out-of-Cell** | **13** | **9** | **19** | **2** | **29** | **73** |
| | **Percent** | **22%** | **31%** | **30%** | **67%** | **81%** | **38%** |

 *"Stable Population" refers to total Class Members who resided in segregation units for the entire week.
**Out-of-cell tracking for PICC F Unit during the sample week contains several clear inaccuracies and was therefore excluded.

RCF has been more successful than other facilities in offering out-of-cell opportunities.  This is reportedly a result of increased vigilance by managers in monitoring out-of-cell time and ensuring that sufficient personnel or supervisors are assigned or redirected to its segregation unit for this purpose.  CFCF and PICC each have unique personnel and operational issues that will require a more focused approach by PDP leadership to address.

Data reported above is consistent with feedback the Monitoring Team received from Class Members and PDP personnel and executives throughout this reporting period.  As with out-of-cell reports for general population units, out-of-cell data for segregation units requires validation via sample CCTV review.

The Monitoring Team reiterates the following recommendations from the previous reporting period:

1.  PDP leadership should reevaluate the current practice requiring the presence of three correctional officers on segregation units if a single Class Member is outside of a cell for any reason.  Generally, two officers may be necessary to escort the most behaviorally challenging Class Members.  PDP's current policy and practice that mandates the presence of three or four correctional officers during any movement on a unit is outside of standard corrections segregation protocols.  As previously reported, this requirement appears to be a primary barrier to compliance and should be reevaluated with support from PDP's consulting team as it completes PDP's forthcoming staffing analysis.[10]
2.  If a facility determines that it has insufficient personnel on post to offer a full hour out-of-cell, all Class Members should at least be provided time out-of-cell to shower, use the phone, or access the law library.  CFCF reported using this approach during two shifts in the week reviewed, and while not sufficient, it was preferable to total isolation on those days.
3.  PDP leadership should ensure that out-of-cell schedules are feasible for personnel to implement and that schedules are consistently adhered to.  Personnel and Class Members in CFCF and PICC segregation units continue to report that they do not feel confident that these units follow consistent recreation, shower, phone, and other out-of-cell protocols.

PDP leadership should continue to refine its new tracking system and utilize available information to focus on units during specific days and shifts that consistently struggle to provide out-of-cell opportunities.  The Monitoring Team is confident that PDP can significantly improve its out-of-cell compliance in segregation units in the next reporting period if it implements the Monitoring Team's recommendations.

*Sub-provision 3.2--Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

**Compliance Rating:  Partial Compliance**

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[11]  However, PDP asserts that the staffing shortage contributed to lengthy delays in reviewing cases for retention of Class Members in administrative segregation.

---

[10] *Monitor's Second Report*, *supra* note 6, at 20.
[11] *Id.* at 21.

In the first reporting period, reviews were not consistently occurring at 30-day intervals as required by PDP policy, and many were exceeding 60 and 90 days.[12]  These delays contributed to excessive lengths of stay in administrative segregation in violation of this sub-provision.[13] Punitive segregation placements were also exceeding allowable timeframes in the first reporting period.[14]

In the second reporting period, PDP made improvements in reducing the timeframes for administrative segregation reviews, as well as lengths of stay in both administrative and punitive segregation.[15]  Improvements in these areas continued in this reporting period.  Data for select dates suggests that PDP reduced its reliance on both punitive and administrative segregation, with fewer administrative and punitive segregation placements and shorter lengths of stay in segregation housing.

The following tables depict total and average Class Members in administrative segregation, retention reviews exceeding 30, 60, and 90-day timeframes, and average lengths of stay in administrative segregation for sample dates in two periods, July through December 2022, and January through June 2023:

### Reviews for Retention on Administrative Segregation
### Exceeding 60 and 90 Days and Average Lengths of Stay
July 2022 – December 2022

| | CFCF | | | | | PICC | | | | | RCF* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 60 Days | > 90 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 60 Days | > 90 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| 7-1-22 | 60 | 20 | 27 | 78% | 133 | 76 | 6 | 2 | 11% | 78 | 17 | 71 | 153 | 94 |
| 8-5-22 | 80 | 0 | 8 | 10% | 127 | 60 | 1 | 5 | 10% | 88 | 19 | 89 | 159 | 101 |
| 9-2-22 | 99 | 12 | 4 | 16% | 102 | 73 | 1 | 4 | 7% | 66 | 23 | 55 | 195 | 74 |
| 10-7-22 | 89 | 16 | 7 | 26% | 93 | 102 | 1 | 2 | 3% | 49 | 18 | 75 | 209 | 72 |
| 11-4-22 | 115 | 8 | 16 | 21% | 89 | 89 | 1 | 1 | 2% | 52 | 20 | 58 | 224 | 66 |
| 12-2-22 | 124 | 1 | 8 | 7% | 99 | 67 | 0 | 0 | 0% | 53 | 28 | 50 | 219 | 67 |
| Average | 95 | 10 | 12 | 26% | 107 | 78 | 2 | 2 | 6% | 64 | 21 | 66 | 193 | 79 |

*RCF reviews were all completed within policy according to documentation reviewed.

---

[12] Monitor's First Report, *supra* note 7, at 14.
[13] RCF has consistently demonstrated compliance with timely reviews of administrative segregation placements.
[14] Monitor's First Report, *supra* note 7, at 14.
[15] Monitor's Second Report, *supra* note 6, at 21-23.

**Reviews for Retention on Administrative Segregation**
**Exceeding 30 and 60 Days and Average Lengths of Stay**
January – June 2023

| | CFCF | | | | | PICC | | | | | RCF* | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Ad-Seg | Total Ad-Seg | Average Days in Ad-Seg | Total | Average Days in Ad-Seg |
| 1-13-23 | 109 | 32 | 11 | 10% | 115 | 69 | 7 | 0 | 0 | 45 | 22 | 53 | 200 | 71 |
| 2-3-23 | 83 | 8 | 1 | 1% | 68 | 65 | 3 | 0 | 0 | 49 | 16 | 89 | 164 | 69 |
| 3-3-23 | 60 | 14 | 0 | 0% | 74 | 49 | 0 | 0 | 0 | 28 | 15 | 92 | 124 | 65 |
| 4-14-22 | 70 | 2 | 4 | 6% | 64 | 22 | 0 | 0 | 0 | 26 | 12 | 104 | 104 | 65 |
| 5-5-23 | 33 | 0 | 0 | 0 | 61 | 25 | 0 | 0 | 0 | 29 | 14 | 105 | 72 | 65 |
| 6-3-23 | 47 | 2 | 0 | 0 | 46 | 36 | 0 | 0 | 0 | 38 | 6 | 204 | 89 | 96 |
| Average | 67 | 10 | 3 | 3% | 71 | 44 | 2 | 0 | 0% | 36 | 14 | 108 | 126 | 72 |
| Difference, Qs 3 & 4 2022 and Qs 1 & 2 2023 | -29% | N/A | -70% | -88% | -34% | -44% | NA | -100% | -100% | -44% | -33% | +64% | -35% | -9% |

*RCF reviews were all completed within policy according to documentation reviewed.

CFCF data for select dates shows that the percentage of reviews for retention on administrative segregation that exceeded 60 days reduced from an average of 10 cases in the period July through December 2022 to an average of 3 cases in the first 6 months of 2023. May and June 2023 data shows that CFCF had zero retention reviews that exceeded 60 days. The same data for PICC shows that zero administrative segregation retention reviews exceeded 60 days in the first six months of 2023. This marks notable improvement at both facilities. RCF continued to meet policy timeframes for days reviewed in this reporting period.

Data for select dates also shows that the average lengths of stay in administrative segregation decreased by 36 days on average, or 34 percent, at CFCF and by 28 days on average, or 44 percent, at PICC for select dates in 2022 and 2023. RCF data shows a large increase in average lengths of stay from 66 to 108 days on average since the previous reporting period. This increase is driven by the long-term retention of a single Class Member based on an alleged in-custody homicide. The Monitoring Team is working with PDP to identify possible alternatives to segregation for this Class Member.

Based on data reviewed, PDP is making excellent progress in reducing lengths of stay in administrative segregation, including effectively addressing long-term placements.

As recommended in previous reports, PDP discontinued the automatic placement of state sentenced Class Members into administrative segregation based solely on their state commitment status.[16] On June 3, 2022, administrative segregation reports listed 36 state sentenced Class

---

[16] *Id.* at 23.

Members in administrative segregation.  A year later, on June 2, 2023, there were zero Class Members in administrative segregation pending state placement.[17]

On July 3, 2022, there were 44 Class Members in administrative segregation longer than 90 days. Eleven months later, on June 2, 2023, five Class Members remained in administrative segregation beyond 90 days, representing an 89 percent reduction in long-term administrative segregation placements.  By the end of June 2023, three of those five Class Members remained in segregation.  Two of the five are deemed long-term segregation placements, one for the alleged in-cell homicide mentioned above and the other for an alleged in-custody sexual assault. The third was referred for placement in the new Transition Unit for SMI and was subsequently removed from administrative segregation.

Issues remain with the overrepresentation of Class Members on the Behavioral Health caseload in segregation, as discussed below under Substantive Provision 6—Behavioral Health in Segregation.  The Monitoring Team also continues to recommend further modifications to the policy for placements of Class Members in segregation based solely on high bail and other static factors.

The following tables depicts total numbers of Class Members and average lengths of stay in punitive segregation for sample dates, July through December 2022, and January through June 2023:

**Punitive Segregation: Total Placements and Average Lengths of Stay**
July – December 2022

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total in Punitive Segregation | Average Days in Punitive Segregation |
| 7-1-22 | 100 | 89 | 24 | 110 | 27 | 34 | 151 | 78 |
| 8-5-22 | 65 | 98 | 34 | 89 | 36 | 44 | 135 | 77 |
| 9-2-22 | 58 | 87 | 56 | 71 | 65 | 34 | 179 | 64 |
| 10-7-22 | 56 | 37 | 50 | 53 | 64 | 32 | 170 | 41 |
| 11-4-22 | 52 | 38 | 71 | 39 | 39 | 59 | 162 | 45 |
| 12-2-22 | 33 | 30 | 59 | 27 | 36 | 18 | 128 | 25 |
| Average | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |

---

[17] PDP continues to periodically segregate a small number of state sentenced Class Members for short periods while they await movement to their designated housing unit.

**Punitive Segregation: Total Placements and Average Lengths of Stay**
January – June 2023

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total in Punitive Segregation | Average Days in Punitive Segregation |
| 1-13-23 | 32 | 27 | 38 | 31 | 29 | 18 | 99 | 25 |
| 2-3-23 | 55 | 16 | 43 | 9 | 34 | 21 | 132 | 15 |
| 3-3-23 | 69 | 16 | 56 | 20 | 24 | 11 | 149 | 16 |
| 4-14-23 | 72 | 25 | 52 | 28 | 16 | 15 | 140 | 23 |
| 5-5-23 | 64 | 23 | 56 | 25 | 19 | 9 | 139 | 19 |
| 6-3-23 | 90 | 19 | 54 | 24 | 31 | 10 | 175 | 18 |
| Average | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |
| Difference, Qs 3 & 4 2022 and Qs 1 & 2 2023 | +5% | -67% | +2% | -65% | -42% | -62% | -10% | -65% |

Data for select dates suggests that average lengths of stay in punitive segregation in the three facilities was reduced by approximately 65 percent from the previous reporting period with each facility showing similar progress. PDP has retrained hearing officers who preside over disciplinary hearings in all three facilities, which has improved consistency. This change has increased consistency and contributed to successful reductions in this reporting period.

RCF also reduced the average number of Class Members placed in punitive segregation from 45 for select dates in the second half of 2022 to 26 in the first half of 2023. In this reporting period, PDP is segregating approximately seven percent of its population, down from 10 percent in the last reporting period.[18] With sustained efforts to reduce the punitive segregation of behavioral health patients, as well as those with non-violent institutional misconduct, PDP should be able to reduce its segregated Class Member population to at least the national average of no more than six percent of its total population.

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

---

[18] Monitor's Second Report, *supra* note 6, at 22.

**Compliance Rating:  Non-compliance**

PDP continues to report that it is not prepared to submit a plan for a return to normal operations that includes all required out-of-cell time and access to other services and programs as required by the Agreement.[19]  PDP reports that while it is able to make some operational improvements with existing staffing resources, it cannot provide a date by which it will be able to return to normal operations.  As previously reported, short staffing is the primary reason articulated by PDP for its failure to comply with several Agreement provisions, including those related to out-of-cell time.[20]

In this reporting period, the Monitor requested that the Parties begin to meet regularly to discuss areas of non-compliance with the Agreement.  Goals of the meetings include: (1) increased transparency regarding PDP's systemic deficiencies and the disclosure of specific reasons for compliance failures, and (2) identification of any available solutions, including potential intervention by the Court.  The first meeting of the Parties was held on June 23, 2023, during which the Parties discussed several pressing issues, including out-of-cell time and RFID procurement, staffing and security, use of force, administrative segregation and discipline, and facility maintenance.  The confidential discussions were transparent and collaborative, and the Parties strategized potential solutions.  The Parties have scheduled a follow-up discussion from the initial meeting that will occur in October 2023, and the second meeting of the Parties is scheduled for November 6, 2023.  Areas of specific progress related to meeting agenda items are addressed in discussions of each substantive provision throughout this report.

As part of PDP's eventual plan to return to normal operations, additional personnel vacancies in PDP's Restorative and Transitional Services (RTS) Division must also be filled.  RTS consists of clinicians and other professionals whose services are among the most important to Class Members.  Commencing within the first five days of confinement, RTS personnel initiate case management protocols, including Class Member orientation, individual assessments, and discharge planning.  Among other services, they offer new intake orientations and facilitate town hall meetings, refer for services inside PDP and in the community, provide short-term and informational counseling, and liaise with Class Members' family and friends.  The Monitoring Team has received feedback from RTS personnel and Class Members that some important services are not being offered consistent with PDP policy.  Lapses are reportedly due to insufficient RTS personnel.  RTS vacancies as of June 2023 are depicted in the table below:

---

[19] The Monitoring Team is working with PDP to ensure that "normal operations" is defined according to evidence-based best practices at the time PDP is prepared to implement them.
[20] Monitor's Second Report, *supra* note 6, at 24; Monitor's First Report, *supra* note 7, at 15-16.

**Restorative and Transitional Services Division Staffing**
June 2023

| Position Category | Allocated Positions | Filled Positions | Unfilled Positions | Vacancy Rate |
|---|---|---|---|---|
| Instructor | 5 | 4 | 1 | 20% |
| Volunteer Services Director | 1 | 1 | 0 | 0% |
| Psychologist | 4 | 2 | 2 | 50% |
| Prison Psychologist Supervisor | 0 | 1 | -1 | 0% |
| Social Work Services Manager I | 0 | 1 | -1 | 0% |
| Social Work Services Manager II | 53 | 42 | 11 | 21% |
| Social Work Supervisor | 13 | 12 | 1 | 8% |
| Human Services Program Administrator | 2 | 2 | 0 | 0% |
| Social Services/Housing Program Analyst | 0 | 1 | -1 | 0% |
| Prison Closed Circuit TV Specialist | 1 | 1 | 0 | 0% |
| Inmate Computer-Based Education Instructor | 7 | 6 | 1 | 14% |
| Inmate Computer-Based Education Supervisor | 1 | 1 | 0 | 0% |
| Correctional Industries Assistant Director | 1 | 1 | 0 | 0% |
| Correctional Industries Director | 1 | 0 | 1 | 100% |
| Industries Shop Supervisor | 14 | 16 | -2 | 0% |
| Education Director | 1 | 0 | 1 | 100% |
| **Total** | **104** | **91** | **18** | **17%** |

Seventeen percent total vacancies is problematic, and hiring and retention efforts should continue.  RTS services improve the daily lives of Class Members and support security, behavioral health, and all PDP operations.  Without them, the harm experienced by Class Members in PDP's current conditions is exacerbated.  Given the current population of more than 4,700 Class Members, RTS caseloads may be unmanageable, even with a full complement of RTS staff.  The Monitoring Team has recommended that PDP review RTS job descriptions and duties to ensure it has allocated sufficient positions to perform all tasks consistent with policy.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide*

*staff towards this end.  Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

### Compliance Rating:  Partial Compliance

The reduction of both on-site care and off-site specialty care backlogs remains a primary focus for PDP Healthcare, and security and healthcare staff shortages remain the greatest barriers to compliance.  PDP has successfully reduced its on-site care appointment backlog in the last two reporting periods.  The off-site specialty appointment backlog, however, has not significantly decreased since the previous reporting period.  PDP's overall appointment backlog remains far higher than the 238-appointment backlog required for Agreement compliance.

PDP Healthcare and security executives and staff continue to report that weekly Access to Care Committee meetings are ongoing and beneficial.[21]  They report, for example, that all operational solutions implemented in this reporting period were identified during workgroup meetings.  PDP's progress in creating and sustaining this collaborative workgroup is commendable, and improvements are certain to continue despite little relief from existing staffing and operational barriers.

The table below compares on-site appointment backlogs for two four-week periods in November/December 2022 and May/June 2023:

---

[21] Meetings were initiated in November 2022.  They are chaired by the Commissioner and include the Deputy Commissioner for Operations, Chief of Medical Operations, Wardens, Deputy Wardens, CFCF Shift Commanders, Movement Captain, and YesCare Managers.

**On-Site Appointment Backlogs for General Medical and Behavioral Healthcare Weekly Averages, Four-week Comparison**
November/December 2022 and May/June 2023

| Backlog Report Four-week Period | Weekly Average Appointments[*] | | Four-week Difference | Percent Change (+/-) |
|---|---|---|---|---|
| | Nov-Dec 2022 | May-June 2023 | | |
| BH Initial Psychiatric Eval. | 24 | 40 | +16 | ** |
| BH Medication Evaluation | 71 | 42 | -29 | -41% |
| BH Social Work Sick Call | 17 | 15 | -2 | ** |
| BH SW SCTR | 2 | 1 | -1 | ** |
| Chronic Care Follow-up | 274 | 171 | -103 | -38% |
| Chronic Care Initial | 87 | 129 | +42 | +48% |
| MAT | 136 | 181 | +45 | +33% |
| MAT Follow-up | 7 | 1 | -6 | ** |
| Provider Sick Call | 48 | 66 | +18 | +38% |
| RN Sick Call | 54 | 60 | +6 | +11% |
| Re-Entry Planning | 719 | 14 | -705 | -98% |
| **Total Backlog** | **1439** | **718** | **-721** | **-50%** |

\* Weeks were: 11/22/22 to 12/13/22 and 5/30/23 to 6/20/23.
\*\*Average percent change not calculated for average appointments <50.

PDP has reduced its average four-week backlog by 50 percent, or more than 700 appointments in this reporting period.  Combined with reductions in the previous reporting period of nearly 400 appointments, PDP's backlog has been reduced by more than 1,100 appointments.[22]  Backlogs in some areas have been eliminated.  With the addition of new personnel and focused attention, PDP's re-entry planning appointments were reduced by 98 percent, from 719 to a remaining backlog of only 14 appointments.  This marks commendable progress and efforts should continue.  It is noteworthy that the backlog for some types of services has increased and that, excluding re-entry planning successes, the overall on-site backlog is largely unchanged from the previous reporting period.  However, the improvements from the last reporting period were not driven solely by a reduction in the re-entry backlog and the data shows an overall improvement since October 2022.

On-site specialty appointments continue to represent a small percentage of the overall backlog and totals are sensitive to small staffing fluctuations such as single provider absences.[23]  For instance, in this reporting period, PDP's pap test and gynecology backlog tripled to 189 appointments with the loss of one provider.  PDP reports that it is continuing to seek additional providers for these services to maintain consistent care.  Efforts continue to address the off-site

---

[22] *See* Monitor's Second Report, *supra* note 6, at 25-26.
[23] PDP offers on-site specialty services in optometry, pap testing, podiatry, physical therapy, ultrasound, and x-ray. For on-site specialty appointments, community provider/specialists come to PDP and treat patients on-site.  PT staff and x-ray techs are YCC employees.

specialty appointments backlog, but progress is limited.  PDP's off-site specialty appointment backlog remains largely unchanged in this reporting period despite the completion of approximately 200 monthly appointments.  In December 2022, PDP's off-site backlog was 172 scheduled off-site appointments and 50 appointments awaiting scheduling.  On June 19, 2023, the backlog was 187 scheduled appointments and 43 pending scheduling.

Off-site specialty appointments require more coordination between security and healthcare personnel, and more security personnel for patient guarding and transports.  As previously reported, PDP has been seeking providers who are willing to provide specialty care on-site rather than in ideal, but less efficient, community settings.[24]  PDP found a cardiologist to treat patients on-site commencing July 2023, but has not had success securing other specialty providers.  PDP also hoped to distribute off-site appointments more evenly across weekdays to reduce transportation burdens, but limitations with off-site provider offices have prevented implementation.  Off-site providers are reportedly also unwilling to offer evening appointments, which PDP hoped would help reduce the backlog.  The following table depicts off-site specialty appointments scheduled and attended from January through June 2023:

### Off-Site Specialty Appointment Summary
### January – June 2023

| Month | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|
| # Scheduled | 426 | 334 | 404 | 341 | 420 | 390 |
| Out of Custody | 88 | 7 | 15 | 14 | 21 | 14 |
| Out of Jurisdiction/Open Ward | 11 | 5 | 8 | 5 | 5 | 9 |
| Cancel Prior to Transport | 13 | 16 | 23 | 4 | 7 | 9 |
| COVID-19 Isolation | 0 | 1 | 1 | 0 | 0 | 0 |
| # Eligible Patients to Attend | 314 | 305 | 357 | 318 | 387 | 358 |
| Refused | 42 | 44 | 48 | 54 | 52 | 46 |
| C/O Shortage | 41 | 50 | 71 | 18 | 72 | 97 |
| Cancelled at Office | 2 | 2 | 2 | 7 | 5 | 5 |
| Scheduling Error | 2 | 3 | 7 | 2 | 3 | 2 |
| Court | 5 | 4 | 10 | 4 | 0 | 5 |
| Late to Appointment | 4 | 0 | 5 | 5 | 2 | 10 |
| Other | 6 | 9 | 1 | 7 | 2 | 10 |
| Total NOT Seen | 102 | 112 | 144 | 97 | 136 | 175 |
| Total Eligible Patients Seen | 212 | 193 | 213 | 221 | 251 | 183 |
| % Eligible Patients Seen | 68% | 63% | 60% | 69% | 65% | 51% |

After initial audits revealed that only 56 percent of patients were making it to scheduled off-site appointments, PDP developed uniform categories for tracking missed appointments.  Further analysis revealed patient refusals and security staff shortages as the most frequent reasons for missed appointments.  Patients have consistently reported to the Monitoring Team that excessive wait times in holding cells for transportation to appointments is a primary reason for their

---

[24] Monitor's Second Report, *supra* note 6, at 26.

refusals.[25]  PDP reports that it has made some operational changes that have improved patient wait times, which is positive.  Even with operational changes and improved wait times, without sufficient security personnel to transport patients, there remains a high number of same-day appointment cancellations.  As a result, some providers are discontinuing relationships with PDP patients due to excessive last-minute cancellations.

PDP reports that it is renewing focus on security scheduling for medical transports in hopes of further reducing the backlog to levels that will allow healthcare to achieve and maintain compliance while managing ongoing referrals.  Despite these barriers, PDP has improved from averages of 56 percent to 65 percent of patients attending their appointments.  The average 65 percent success rate has remained consistent since the previous reporting period and may mark a new threshold for appointment attendance.[26]

PDP continues to struggle to meet policy guidelines for completing patient intake screenings within four hours of arrival at PDP.  The following table depicts PDP's reported compliance with four-hour timeframes for each month in the first half of 2023:

**Percentage of Intake Screenings
Within Four Hours**
Monthly Averages 2023

| January | 30% |
|---|---|
| February | 48% |
| March | 37% |
| April | 40% |
| May | 31% |
| June | 24% |

PDP reports that it typically has adequate healthcare staffing to meet the four-hour requirement but that security staff availability to deliver patients for screenings remains challenging.  The Monitoring Team has recommended that the Access to Care Committee retain this issue on its agenda for further consideration.

In this reporting period, PDP initiated the recommended critical incident review process following Class Member deaths.  Six Class Member patients died while in PDP custody in the first six months of 2023.  Manners of death for two patients include one suicide and one homicide.  PDP is awaiting final medical examiner reports for the four remaining patients.  The Monitoring Team has observed each review, which are consistently presided over by the Commissioner and attended by PDP's entire healthcare and security executive management teams, the security and healthcare teams, and assisting and witness personnel.  The reviews are held in the days immediately following a Class Member death, so information discussed is preliminary.  All known facts and circumstances related to each death are discussed, including movement and operational timelines leading up to, during, and after each death.  Care and access

---

[25] *Id.* at 27-28; Monitor's First Report, *supra* note 7, at 20.
[26] Monitor's Second Report, *supra* note 6, at 27.

to services, as well as healthcare and security emergency responses, are also discussed.  Reviews thus far have been transparent, and discussions have been thorough and self-critical.  Every review has yielded identification of necessary corrective action, for which the Commissioner issued corresponding directives or requested additional information and follow-up.  As with the Access to Care Committee, the death review process is among the more significant, systemically impactful changes PDP has achieved thus far.  The Monitoring Team will continue to work with PDP to refine its corrective action planning and implementation and improve its finalized death investigations.

**Behavioral Healthcare**

PDP has continued to collect data regarding the frequency and timeliness of healthcare delivery.  PDP's Performance Indicator Report reflects continued challenges in completing behavioral health referrals within required timeframes.[27]  The behavioral health appointments backlog comprises 14 percent of the entire on-site appointment backlog and has not changed significantly since the last reporting period.  However, patients are not receiving care within policy timelines.  Delays are reportedly due to healthcare and custody staffing deficiencies, and they continue despite efforts to improve service delivery in this reporting period (such as delivering services directly on housing units rather than the national best practice of delivering patients to a central clinic with space for confidential communication).  The following tables depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations for the first six months of 2023:

**Percent Compliance with Behavioral Health Referral Timeframes**
January – June 2023

| Month | Total Completed Referrals | % All Referrals Completed Within Policy Timeframes | % Emergency Referrals Completed Within 4 Hours | % Emergency Referrals Completed Within 24 Hours | % Urgent Referrals Completed Within 24 Hours | % Routine Referrals Completed Within 5 Days |
|---|---|---|---|---|---|---|
| January | 621 | 54% | 76% | Unavailable | 21% | 38% |
| February | 611 | 63% | 81% | Unavailable | 22% | 59% |
| March | 757 | 59% | 84% | 100% | 17% | 43% |
| April | 658 | 65% | 88% | 100% | 22% | 52% |
| May | 766 | 64% | 86% | 100% | 25% | 38% |
| June | 650 | 61% | 87% | 100% | 18% | 34% |

*Expectation: emergent within 4 hours, urgent within 24 hours, routine within 5 days.

---

[27] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals: emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.

**Social Worker Sick Calls 2023**
January 2023 – June 2023

| Month | Number Completed | % Completed within 14 Days |
|-------|------------------|----------------------------|
| January | 413 | 70% |
| February | 454 | 67% |
| March | 393 | 69% |
| April | 355 | 70% |
| May | 363 | 69% |
| June | 380 | 69% |

**Compliance with 14-Day Evaluations**
January 2023 – June 2023

| Month | Number Completed | % Completed within 14 Days |
|-------|------------------|----------------------------|
| January | 654 | 97% |
| February | 667 | 98% |
| March | 685 | 99% |
| April | 774 | 99% |
| May | 795 | 95% |
| June | 780 | 96% |

Behavioral health referrals were completed within required timeframes less than 70 percent of the time. PDP has made improvements in recent months but still has difficulty responding to emergency referrals within the required four-hour time frame. Behavioral Health was always able to complete emergency referrals within 24 hours. This was likely at the expense of urgent referrals, which were completed within required 24-hour timeframes less than 25 percent of the time, and routine referrals, which were completed within six-day timeframes less than 50 percent of the time.

Policy requires that social worker sick calls, or Class Member initiated requests, are responded to by a Behavioral Health clinician face-to-face within 24-hours of receipt. PDP data shows that timeframes were met between 67 to 70 percent of the time from January through June 2023. This reflects a decrease from 75 to 86 percent compliance since the previous reporting period.[28]

Finally, all Class Members entering PDP are referred for a 14-day evaluation to be completed by Behavioral Health staff. As previously reported, PDP achieved increased compliance in the last three months of 2022, meeting policy guidelines more than 90 percent of the time.[29] Progress has continued and PDP is close to 100 percent compliance in this reporting period.

---

[28] Monitor's Second Report, *supra* note 6, at 30.
[29] *Id.* at 30-31.

**Healthcare Staffing**

Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions, or a "staff vacancy" rate and a "functional vacancy" rate, which accounts for shifts filled by overtime or temporary agency staff.  In the first reporting period, PDP reported a staff vacancy rate of 33 percent and a functional vacancy rate of 14 percent.[30]  In this reporting period, PDP reports a similar staff vacancy rate but a lower functional vacancy rate of six percent.  Functional vacancy rates tend to fluctuate depending on need and availability of overtime and registry staff.  Hiring and retaining permanent staff is the best way to ensure consistently high staffing levels and control for fluctuations in functional staffing.  Behavioral health classifications continue to show a high functional vacancy rate of 40 percent for clinicians and 37 percent for prescribers.  At these rates, PDP cannot meet requirements for the provision of timely and adequate behavioral healthcare.

Despite persisting vacancies, data in this reporting period suggests improvements in hiring and retention, which saw little progress in previous reporting periods.[31]  In the first six months of 2023, PDP was able to fill 26.35 positions.  In the same period, PDP lost 14.95 full time positions/employees.  The following tables depict healthcare new hires and separations for each classification in this reporting period, January through June 2023, and total healthcare vacancies for May 2023:

**Healthcare Personnel New Hires and Separations by Job Classification**
January – June 2023

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Behavioral Health Nurse Practitioner | 1 | | +1 |
| Licensed Clinical Social Worker | 1 | 1 | 0 |
| Behavioral Health Counselor | 1 | | +1 |
| Nurse Practitioner | 1 | 1 | 0 |
| Registered Nurse | 5.35 | 3.55 | +1.8 |
| Licensed Practical Nurse | 6.2 | 3.4 | +2.8 |
| Medical Assistant | 4.8 | 3 | +1.8 |
| Medical Records Clerk | 3 | 2 | +1 |
| Administrative Assistant | | 1 | -1 |
| Scheduler | 3 | | +3 |
| **Total** | **26.35** | **14.95** | **+11.4** |

---

[30] *See* Monitor's First Report, *supra* note 7, at 19.
[31] *See Id.* at 19-20; Monitor's Second Report, *supra* note 6, at 31-33.

**Healthcare Vacancy Report**
May 2023

| Position Category | Allocated FTE December 2022 | Allocated FTE June 2023 | Unfilled FTE | FTE Vacancy Rate | Functional Vacancy Rate |
|---|---|---|---|---|---|
| Administration | 50 | 49 | 1 | 2% | -16% |
| Behavioral Health Aide | 9 | 7.8 | 1.8 | 23.1% | -31% |
| Behavioral Health Clinicians: Social Worker/Psychologist | 25.1 | 23.8 | 16.6 | 69.8% | 40% |
| Behavioral Health Prescribers: Psychiatrist, NP | 16.6 | 16 | 6.5 | 40.6% | 37% |
| Behavioral Health Professionals: BH Coun./Activity Th. | 17.2 | 15 | 0 | 0% | 44% |
| Certified Nursing Assistant | 2.8 | 2.8 | 2.4 | 85.7% | 61% |
| Dialysis RN and Dialysis Technician | 1.6 | 1.6 | 0.8 | 50% | 46% |
| Infectious Disease Physician | 2 | 2 | 0 | 0% | 35% |
| License Practical Nurse: All LPNs | 64.6 | 68.2 | 27.2 | 39.9% | -13% |
| Medical Assistant | 19 | 18 | 8.8 | 48.9% | 1% |
| Medical Records Clerk | 18.8 | 13.8 | 4.8 | 34.8% | 5% |
| OB/GYN Physician | 0.8 | 0.8 | 0 | 0% | 100% |
| Optometrist | 0.8 | 0 | 0 | 0% | 0% |
| Physical Health Clinicians: Physician, NP, PA | 17.2 | 17.2 | 1.6 | 9.3% | -5% |
| Physical Therapist and Physical Therapist Assistant | 3 | 3 | 0 | 0% | 19% |
| Telehealth Coordinators | 2 | 4 | 2 | 50% | 43% |
| Radiology Technician | 2.4 | 2.4 | 1.4 | 58.3% | 48% |
| Registered Nurse: All RNs | 72.2 | 68.8 | 28.1 | 40.8% | 10% |
| **Total** | **325.1** | **314.2** | **103** | **32.8%** | **6%** |

In efforts to improve healthcare efficiency and employee recruitment and retention, PDP and YesCare reviewed PDP's current allocated positions and compensation.  PDP made adjustments to some positions, and following negotiations with the correctional healthcare labor unions, has increased compensation for many positions up to 13 percent.  Increases were made effective July 28, 2023, with a retroactive date of April 1, 2023.  This is positive news and PDP is now better positioned to attract more candidates in the competitive market.

Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's First Report:

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.

   *In the previous reporting period, PDP reported that it was planning to offer up to eight percent salary increases for many healthcare positions.[32]  Following additional review, PDP elected to offer a more significant 13 percent increase, as described above.  PDP's implementation of this recommendation reflects significant progress.*

2. Continue to explore options to provide both on and off-site appointment services via telehealth.

   *PDP reports that YesCare has engaged a cardiology group that is willing to provide telehealth services, which began in July 2023, but has been otherwise unsuccessful in these efforts.*

3. Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring that scheduled appointments occur.

   *The Access to Care Committee was formed in November 2022 to address on-site and off-site appointment issues.  As discussed above, the workgroup has been successful in identifying and correcting deficiencies and continues to meet weekly.*

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating:  Partial Compliance**

In order to achieve substantial compliance with this substantive provision, PDP must, at a minimum:  (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on administrative or punitive segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.

*Requirements 1 and 3:  Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

---

[32] Monitor's Second Report, *supra* note 6, at 33.

As discussed in prior reports, daily physical healthcare rounds and weekly behavioral healthcare rounds are essential to patients in segregated settings.[33]  Rounds allow healthcare staff to assess patients and monitor for signs of physical or mental health distress or decline.  Rounds also offer patients opportunities to express their healthcare needs with consistency, and providers may seek the removal of at-risk patients from segregation housing.

Recent audit results reflect a significant reduction and low compliance with required physical healthcare rounding.  A previous PDP Healthcare audit from September 2022 revealed that required medical rounds were occurring 84 percent of the time.[34]  The March 2023 audit reflects that only 22 percent of required rounds were occurring, and in two of three facilities, did not occur at all on some days.  PDP Healthcare reports it is increasing training and monitoring of healthcare rounding in hopes of improving compliance.

PDP has shown improvement, however, in weekly behavioral health rounds from 75 percent compliance in September 2022 to 96 percent compliance in March 2023.  This is a notable accomplishment given the behavioral health vacancies discussed above under Substantive Provision 5—Healthcare.

PDP does not currently track when clinicians initiate the removal of patients from segregation housing due to physical or mental health deterioration while in isolation.  The Monitoring Team has received reports from individual healthcare providers that patients are periodically removed or that additional services are requested.  The Monitoring Team has recommended that PDP Healthcare track these occurrences and is working with PDP to develop a system.

*Requirement 2:  Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Members being considered for placement on segregation status.  This requires a face-to-face evaluation by a physical healthcare provider, and for those on the Behavioral Health caseload, a Behavioral Health clinician.  Patients designated SMI require behavioral health clearances within four hours of placement.  Patients who are on the Behavioral Health caseload but not designated SMI require behavioral health clearances within 24 hours of placement in segregation.

The subject matter experts reviewed a sample of physical and behavioral healthcare clearance documentation, which suggests that physical health clearances are continuing to be documented consistently prior to patients' placements in segregated housing.  Dr. Belavich has determined that physical health clearances are completed using a sound practice, which sees each patient delivered to a medical clinic for physical health evaluations prior to transport to segregation units.

As discussed in more detail under Substantive Provision 8—Discipline below, behavioral health clearances are not being documented consistently.  This is due in part to discrepancies in security and healthcare documentation.  Other issues may include failures to identify patients as SMI or

---

[33] *Id.* at 34; Monitor's First Report, *supra* note 7, at 22.
[34] Monitor's Second Report, *supra* note 6, at 34.

on the Behavioral Health caseload, or failures to notify behavioral health staff of patients pending segregation placement.  The Monitoring Team has also observed that some Behavioral Health clinicians are documenting clearances in the electronic medical record, which security personnel do not have access to, but not on PDP's required disciplinary forms.  Disciplinary forms are shared with and used by security hearing officers to make segregation determinations and must be completed for each patient.  PDP is revising its process for completing and documenting behavioral health clearances and improvements will be addressed in future reports.

*Requirement 4:  Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP reported previously that it had developed "Positive Change/Positive Outcomes" (PC/PO), a behavioral health group treatment program for patients in isolation.  The program is designed and staffed with 13 providers for robust delivery five days per week for two hours, or a total of 52 groups per day or 10 possible treatment hours for each segregated patient every week.  However, documentation in this reporting period reflects that only 19 percent of total groups are being offered, largely due to security staffing shortages.  In this reporting period, PDP developed a system to track which patients are eligible for the PC/PO program, which patients are offered participation but refuse, and how much time patients in the PC/PO program spend doing program-related treatment.  PDP began tracking the information in early 2023 and are developing a better understanding of specific program needs and patient participation.

Dr. Belavich indicates that without treatment programming, Class Member patients in segregation are more likely to psychiatrically decompensate or commit additional infractions in response to their isolated conditions.  He opines that patients with SMI or mental health diagnoses accompanied by acute symptoms should not be exposed to isolation.  If no alternatives exist and these patients require placement in segregation, then they must receive close observation, frequent clinical contacts, and increased therapeutic programming.

*Requirement 5:  Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

As previously reported, PDP's tracking of behavioral health and SMI patients on segregation status was unreliable.[35]  PDP was unable to reconcile security and healthcare documentation and prove that Class Members were not "segregating in place" or serving a segregation sentence in non-segregation housing.  Segregating in place prevents healthcare staff from completing proper rounding and providing necessary care for vulnerable behavioral health patients.  PDP reports that it has corrected tracking discrepancies and issued a directive that prohibits segregating in place.  PDP Healthcare reports that audits are now being conducted to verify reconciled documentation and ensure (1) patients on segregation status are all housed in segregation housing units; and (2) clinical personnel are able to round on all segregated patients.  Results will be discussed in the next reporting period.

---

[35] *Ibid.*

*Requirement 6:  Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

Dr. Belavich maintains that PDP should reduce its dependence on segregation for all Class Members and discontinue its use altogether for SMI patients unless no alternatives exist.  Many correctional systems are now implementing Therapeutic Housing Units as alternative settings for the mentally ill.  As previously reported, prior to the COVID-19 pandemic, PDP had three therapeutic housing or "Transition Units" (TU), which by August 2022 had reduced from 64 to 11 cells for women and from 100 to 56 cells for men.[36]  The re-establishment of TUs and the creation of a new TU for patients engaging in self-harm, or other dangerous behaviors in lieu of placement in segregation, are crucial for this population.

PDP has agreed to implement the Monitoring Team's recommendations for TU expansion.  During the Monitoring Team's October 2022 tour, one unit at PICC housed 66 male TU Class Members and some general population Class Members as well.  In February 2023, PDP expanded housing for male Class Members by transferring its TU to a unit at RCF with a 128-patient capacity.  The entire 128-bed unit is reserved for patients on the Behavioral Health caseload, which allows for more programming and recreation time for the population.  Unfortunately, in June 2023, the RCF TU housed only 49 patients.  PDP must immediately reevaluate its TU placement criteria, increase the current TU population, and dedicate some of its current bed space to behavioral health patients who should be diverted from segregation.

The female TU remains at PICC and TU patients must share the unit with Class Members of various security classifications, including general population and pregnant Class Members.  PDP has reserved 17 of 64 two-person cells for TU patients for a total occupancy of 34 Class Members.  The inability to mix Class Members of different security classifications results in TU patients receiving limited out-of-cell programming.  PDP acknowledges that current programming for women generally, and TU patients specifically, remains unacceptable.  Among other recommendations for improved conditions for women, the Monitoring Team has recommended that PDP reevaluate the structure of the female TU, reserve additional beds for TU patients, and then utilize pre-COVID-19 thresholds to identify more TU patients to fill them.

PDP Healthcare is developing a procedure to allow SMI Class Members to remain in TUs throughout their disciplinary terms and the imposition of any accompanying sanctions rather than be transferred to segregation housing.  This alternative to traditional punitive segregation would allow patients to reside in familiar settings and maintain continuity of clinical contacts and TU services and programs.  If patients' behavior becomes severely disruptive to TU programming, patients will be moved to segregation housing but will still receive at least 10 hours per week of group programming through the PC/PO program.  Patients will also receive appropriate treatment planning to address identified behaviors with the goal of reintegrating patients to either a TU or general population setting.

Once implemented, these changes should reduce the presence of SMI and Behavioral Health caseload Class Members in segregation.  For PDP to meet this requirement, it will need to

---

[36] *Id.* at 36; Monitor's First Report, *supra* note 7, at 23.

reserve sufficient bedspace to accommodate all Class Member patients who are eligible for the TU program and maintain sufficient security and healthcare personnel to operate the units.

*Requirement 7: Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

On December 30, 2022, PDP's total census was 4,401 Class Members. Thirty-five percent of Class Members were on the Behavioral Health caseload and 12 percent were designated SMI.[37] There were a total of 311 Class Members on segregation status.[38] Of the segregation population, 44 percent were part of the Behavioral Health caseload and 12 percent were SMI.[39] This reflected significant overrepresentation of behavioral health patients in segregation.[40] On June 9, 2023, PDP's census was 4,565 Class Members. Thirty-six percent of the population was on the Behavioral Health caseload and 10 percent were designated SMI. There were 268 Class Members on segregation status, reflecting an overall reduction of 43 individuals. Of the segregation population, 38 percent were part of the Behavioral Health caseload and eight percent were SMI, reflecting a 10 percent reduction in SMI and behavioral health Class Members in segregation. Overrepresentation of the mentally ill in segregation persists, but the reduction, despite PDP's census increase, is a positive development and efforts should continue. The following table depicts SMI and Behavioral Health patients in segregation housing on December 30, 2022, and June 9, 2023:

**SMI and Behavioral Health Class Members in Segregation**
December 30, 2022 and June 9, 2023

| | December 30, 2022 | | June 9, 2023 | |
|---|---|---|---|---|
| | Count | Percent of Population | Count | Percent of Population |
| **PDP Census** | 4401 | 100% | 4565 | 100% |
| **Number of SMI** | 516 | 12% | 439 | 10% |
| **Number on BH Caseload** | 1546 | 35% | 1653 | 36% |
| **Number in Segregation** | 311 | 7% | 268 | 6% |
| | | Percent of Segregation Population | | Percent of Segregation Population |
| **Number of SMI in Segregation** | 36 | 12% | 21 | 8% |
| **Number of BH in Segregation** | 138 | 44% | 102 | 38% |

---

[37] Monitor's Second Report, *supra* note 6, at 37.
[38] *Ibid.*
[39] *Ibid.*
[40] *Ibid.*

Until TU policies are in place, clinicians' only option for diversion of SMI and behavioral health patients from segregation is placement in PDP's Mental Health inpatient unit at PHSW.  Hospital placement criteria are rigid and require high acuity with severe symptoms.  The Monitoring Team has recommended that PDP Healthcare issue an interim directive authorizing diversion to the TUs, which will give clinicians another option with a lower placement threshold than the hospital.  PDP may then have to contend with insufficient TU bed space until expansion is completed, but the risk to behavioral health patients in isolation warrants interim action.

The Monitoring Team also continues to observe patients in segregation settings whom Dr. Belavich flags as inappropriate for placement or whose conditions deteriorated while in isolation.  PDP's Behavioral Health clinicians and leadership face unique challenges in managing their patient population with current staffing shortages and fewer options for increasingly ill patients.  These providers' dedication despite PDP's current conditions is rare and admirable.  However, PDP's current thresholds for isolating people with SMI or severe mental health symptoms, and retaining them on segregation status, remain outdated and must end.

PDP does not currently track when individuals are diverted from segregation and where they may be appropriately placed instead.  PDP reports it is developing a tracking system that will produce monthly reports of patient diversions from segregation to TUs or PHSW.  Tracking will also assist with identifying TU needs and trends in patient acuity.

Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.
   *In consultation with the Monitoring Team, PDP is in the process of implementing this recommendation.*
2. PDP should make additional progress in identifying personnel to staff Positive Change/Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.
   *Discussed above, the PC/PO program is staffed to deliver more than 50 groups per day, but security staff shortages reportedly prevent it.  The men's TU contains only single security classification TU patients, but the women's TU continues to house Class Members of various classifications, including general population and pregnant women.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating:  Partial Compliance**

In this reporting period, PDP created a new rotating law library schedule and standardized the Class Member sign-up process for general population housing units.  During site visits, Class Members have reported some improvements to the Monitoring Team regarding access to law libraries and properly functioning equipment.  Larger issues with out-of-cell time and staffing, which limit law library access, are ongoing.

A standardized sign-up process and formalized schedule for general population units allow PDP executives and the Monitoring Team to begin tracking law library access.  Beginning in April 2023, all PDP facilities were required to implement the new law library processes.[41]  The rotating schedule provides multiple days and time slots each week for all general population housing units.  The rotation was designed to accommodate Class Member court appearances, medical appointments, visiting, work, and program assignments.

The Monitoring Team reviewed a one-week sample of rosters in each of April, May, and June 2023.  Some of the rosters for some housing units were missing, so the Monitoring Team has recommended additional training for housing unit and law library officers to ensure all schedules are retained.  The sample comparison of sign-up rosters against the law library schedules suggests that only 32 percent of the scheduled slots were documented as filled.  It is unclear whether any of the remaining 68 percent of slots were offered but not documented or documentation was not retained.  It also appears that law libraries were not always open during scheduled times due to insufficient security personnel.  PDP's new law library documentation is not yet reliable and requires improvements, which PDP has committed to implementing in the next reporting period.  With some improvements, PDP's system for tracking access to the law library in general population housing units will be useful to PDP management and the Monitoring Team in measuring compliance.

In restricted housing environments, law library access is offered during out-of-cell time but is not tracked individually.  As reported above, out-of-cell, and therefore law library, opportunities in segregation are more limited and PDP will be unable to achieve Substantial Compliance with this provision until access improves.

PDP continues to document monthly audits of law library equipment.  The following table reflects equipment issues identified at each facility during equipment audits between January and June 2023 and dates by which repairs were completed:

---

[41] CFCF did not implement the new law library process but reportedly will in the next monitoring period.

**PDP Internal Law Library Equipment Audit**
January – June 2023

| Month | Equipment | CFCF | DC | PICC | RCF | Total Issues Documented | Housing Unit Audit Dates | Repairs Completed |
|---|---|---|---|---|---|---|---|---|
| Jan 2023 | Computers | 0 | 1 | 0 | 0 | 1 | 1/19/23-1/20-23 | 1/24/23 |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Feb 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 2/22/23-2/28/23 | NA |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| Mar 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 3/21/23-3/27/23 | 3/22/23 |
| | Printers | 0 | 0 | 1 | 0 | 1 | | |
| Apr 2023 | Computers | 0 | 0 | 0 | 1 | 1 | 4/20/23-4/27/23 | 4/28/23 |
| | Printers | 0 | 0 | 0 | 1 | 1 | | |
| May 2023 | Computers | 0 | 0 | 0 | 2[42] | 2 | 5/23/23-5/24/23 | 6/5/23 |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| June 2023 | Computers | 0 | 0 | 0 | 0 | 0 | 6/23/23-6/30/23 | N/A |
| | Printers | 0 | 0 | 0 | 0 | 0 | | |
| **Total** | | **0** | **1** | **1** | **4** | **6** | | |

## Substantive Provision 8—Discipline

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating: Partial Compliance**

The following tables depict PDP's disciplinary hearing data for the six-month period, July through December 2022, and each month, January through June 2023, including totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

---

[42] PDP reports that during the May 2023 audit, two computers were identified as compromised. Both units were removed and replaced.

**PDP Disciplinary Hearings**
July – December 2022[43]

| Six-month Total | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI[44] | | Guilty without a hearing | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| Average/Average % | 268 | 19 | 7% | 30 | 11% | 24 | 9% | 6 | 2% |

**PDP Disciplinary Hearings**
January – June 2023

| Month | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| January | 333 | 22 | 7% | 59 | 18% | 36 | 11% | 0 | 0 |
| February | 294 | 26 | 9% | 22 | 7% | 30 | 10% | 0 | 0 |
| March | 365 | 32 | 9% | 36 | 10% | 34 | 9% | 0 | 0 |
| April | 263 | 18 | 7% | 18 | 7% | 24 | 9% | 0 | 0 |
| May | 290 | 19 | 7% | 40 | 14% | 27 | 9% | 0 | 0 |
| June | 270 | 19 | 7% | 29 | 11% | 26 | 10% | 0 | 0 |
| Average/Average % | 303 | 23 | 8% | 34 | 11% | 30 | 10% | 0 | 0 |

In this reporting period, no disciplinary hearings were documented as occurring without the subject Class Member present unless attendance was waived or refused.  Of 1,815 total disciplinary hearings documented from January through June 2023, 54 Class Members reportedly refused to participate, reflecting a relatively low three percent refusal rate.  PDP policy and practice now appear to be aligned, and PDP is in compliance with this aspect of the sub-provision.

As previously reported, the Monitoring Team recommended that PDP revise its disciplinary policies and hearing documentation to comply with due process and Agreement requirements.[45]  In this reporting period, PDP initiated a review of its disciplinary policies, forms, and training materials to ensure: (1) staff assistants are assigned to support Class Members throughout the hearing process whenever necessary and assignments are documented; (2) communication is facilitated for non-English speaking Class Members, those with developmental or learning disabilities, hearing or vision impairments, or other needs; (3) consistent identification and documentation of SMI and behavioral health Class Members; and (4) input from clinical

---

[43] Monthly totals included in the Monitor's Second Report.  *See* Monitor's Second Report, *supra* note 6, at 40.
[44] SMI data was incomplete in the previous reporting period when this average was calculated, and the table was generated.  *See Id.* at 40-41.
[45] *Id.* at 39-41; Monitor's First Report, *supra* note 7, at 25.

personnel regarding behavioral health or SMI Class Members subject to discipline. New forms will provide additional guidance for hearing officers in ensuring Class Members' legal rights are protected and they are able to understand the proceedings and present a defense.

In this reporting period, the Monitoring Team expanded its review of disciplinary actions to include 25 completed disciplinary cases involving Class Members who were designated SMI. As previously reported, security and behavioral health documentation is inconsistent, so the review included cases where SMI designations are present in at least one documentation source.[46] The expanded review confirmed discrepancies in security and healthcare documentation of Class Members experiencing SMI. It also revealed: (1) failures to document if hearing officers seek or receive clinical feedback about subject SMI Class Members and whether they should be held accountable for the alleged behavior; (2) whether clinical indications should limit any sanctions imposed; (3) failures in behavioral health documentation and communication of Class Members' SMI status to hearing officers; and (4) insufficient clinical assessment or documentation regarding SMI Class Members' fitness for segregation and the presence of mitigating clinical indications.

Behavioral Health staff are required to complete an assessment form (PDP 86-733) prior to placement of each Class Member into a segregated setting. The form contains a section for treating clinicians to note any behavioral health contraindication to placement in segregation. It also contains sections to document whether a Class Member is able participate in the hearing process and present a defense, and whether a Class Member's mental illness should be considered a mitigating factor in any discipline imposed. Every time a hearing officer is aware that a Class Member may be SMI, this information must be considered before a hearing may proceed. This requirement is consistent with PDP's disciplinary philosophy, but its policies, documentation, and practices do not currently align.

Of 24 cases reviewed, only six Class Members were correctly documented as SMI for disciplinary hearings. In cases where SMI documentation was ambiguous, hearings should not have proceeded without clarification. Of six cases in which Class Members' SMIs were properly documented, only one contained completed documentation of mitigating clinical indications that the hearing officer should have considered in issuing sanctions. For some SMI Class Members subject to discipline, clinicians enter appropriate notes in the electronic medical record but fail to complete 86-733 forms. Because hearing officers do not have access to patient electronic medical records and rely largely on 86-733 forms, these Class Members' mental illnesses were not likely considered in their disciplinary hearings. If they were considered, they were not documented.

Human error and documentation omissions are expected and will likely continue even after improvements are implemented, particularly given PDP's staffing shortages. However, PDP continues to discipline a high number of patients with acute mental illness whose symptoms may be severe and contribute to or cause their institutional misconduct. Dr. Belavich opines that these patients may be unable to control their behavior or understand that it violates rules, or they may lack capacity to understand the rule they violated or be deterred from future misconduct. Placement of these individuals into segregation must be avoided whenever possible, and PDP

---

[46] Monitor's Second Report, *supra* note 6, at 40.

executives agree that policies and practices should be revised accordingly. They also correctly observe that staffing and other barriers limit current options for meeting this population's unique needs. PDP anticipates it will begin piloting new disciplinary forms in the next reporting period.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3--[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

**Compliance Rating:  Substantial Compliance**

In December 2022, 12 Class Members remained in administrative segregation since at least the April 15, 2022, Agreement compliance date despite having at least one disciplinary disposition reversed and their records expunged.[47] If these Class Members' retention in administrative segregation was related to their expunged cases, they would require removal pursuant to this sub-provision. If, however, they received new disciplinary dispositions, or posed other legitimate security risks, their retention in segregation may have been appropriate. In this reporting period, the Monitoring Team evaluated additional Jail Management System and classification committee documentation for these 12 cases.

Of the 12 cases requiring additional review, four of the Class Members had been released from segregation consistent with this provision and subsequently received additional infractions before being retained on administrative segregation. Of the remaining eight Class Members who had remained in segregation for more than eight months as of December 2022, none had received a subsequent disciplinary report, classification committee actions were overdue, and documentation failed to articulate the classification committee's decisions to retain them. Four of the eight Class Members were released from segregation in January 2023, nine months from the April 15, 2022, compliance date. Three were released in February 2023, or 10 months later, and the final Class Member was released in March 2023, after at least 11 months in segregation.

Although the classification timelines were not met and committee decisions were poorly documented throughout the Class Members' protracted periods of isolation, some of the Class Members may have required administrative segregation. For example, one Class Member was determined to have committed a serious assault on another Class Member with a weapon and continued to commit gang-related infractions while in segregation. Had this and other issues been properly documented, prolonged segregation may have been justified. Because they were not, these Class Members' retention on segregation was inappropriate.

---

[47] *Id.* at 42.

By mid-March 2023, no Class Members remained in segregation in violation of this sub-provision and PDP has now achieved substantial compliance. PDP's practices are improving, including classification committee timeliness and documentation. The Monitoring Team continues to review segregation placements, documentation, and practices pursuant to other Agreement provisions.

The Monitor has consistently reported that there are several Agreement provisions that cannot be fully implemented with PDP's existing resources. It is important to note that this sub-provision was not one of them. PDP incorrectly certified to the Monitoring Team in August 2022, and again in October 2022, that no Class Members remained in segregation in violation of this sub-provision.[48] Had PDP exercised more care in reviewing its own documentation prior to offering assurances that the deficiency was corrected, several Class Members might have been spared months of additional isolation. Instead, this easily correctible yet highly consequential systemic failure persisted nearly one year into Agreement implementation and unnecessarily exposed Class Members to harm as a result.

It does not appear that PDP failed to correct this issue for lack of will to comply with this Court's order, and its negligence in doing so is uncharacteristic of its approach to the Agreement as a whole. PDP executives were admonished to the potential consequences of the failure to correct, yet certify that a deficiency was corrected. They expressed regret for the error and have committed to greater vigilance going forward. Finally, PDP acknowledges the many harms Class Members must endure inside PDP facilities in violation of this Agreement and their constitutional rights. PDP correctly observes that without support from its Co-Defendants and Philadelphia's other criminal justice partners, it will not be able to protect Class Members from every harm they face. However, this bleak and dangerous reality in no way absolves PDP of its responsibility to protect Class Members wherever possible, and it failed to do so in this instance.

*Sub-provision 8.4--[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

---

[48] *Id.* at 42*; Monitor's First Report, *supra* note 7, at 25.

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[49]*

**Compliance Rating:  Partial Compliance**

PDP reports that it continues to maintain an inventory of tablets, consistent with this sub-provision, with no significant change since the last reporting period.  In addition to the 421 tablets maintained in housing units, PDP reports that it has reserved an additional 187 tablets for educational programming, which is consistent with previously reported availability.[50]  PDP reports that it will also be activating additional tablets in the next reporting period designated for sick call requests.  Future reports will include outcomes from that project in Substantive Provision 5–Healthcare.  The following table reflects current tablet totals at each PDP facility based on documentation provided:

**Tablet Availability at Each PDP Facility**
December 2022 and June 2023

| Facility/Housing Unit | Total Tablets December 2022 | Total Tablets June 2023 | Difference |
|---|---|---|---|
| ASD Total | 12 | 12 | 0 |
| MOD 3 Total | 12 | 12 | 0 |
| CFCF Total | 198 | 184 | -14 |
| DC Total | 60 | 63 | 3 |
| PICC Total | 60 | 66 | 6 |
| RCF Total | 85 | 84 | -1 |
| **Total** | **427** | **421** | **-6** |

---

[49] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) . . .".*   In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.
[50] Monitor's Second Report, *supra* note 6, at 44.

PDP leadership acknowledges ongoing failures to ensure that tablets are charged, operational, and available to Class Members consistent with this sub-provision.  In April 2023, PDP issued a directive reiterating expectations that housing unit personnel charge tablets overnight, reissue them each morning, and follow protocol for any broken tablets.  The written directive and expectations were reportedly discussed with staff during briefings at all three jails between April 12 and April 19, 2023.  In May 2023, despite the April directive, the Monitoring Team observed that some housing units did not have required numbers of tablets available.  Feedback from Class Members regarding tablet availability continues to vary.  Some Class Members report consistent access and others report receiving limited or inconsistent access.  The Monitoring Team continues to recommend that PDP consider utilizing PDP's internal auditing team to conduct quarterly audits of tablet availability.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating:  Partial Compliance**

PDP reports that it plans to provide tablets to all eligible Class Members as part of its next telephone contract procurement.  Procurement is anticipated to begin in the spring of 2024 when the existing telephone contract expires.  This is a positive development, though procurement will not likely be completed until late 2024.  With all required infrastructure upgrades that must be completed first, tablets may not be issued to Class Members until mid-2025.

PDP's tablet expansion to include sick call requests should be piloted by the end of 2023.  PDP has begun implementation of its plan to expand capabilities to include the submission of grievances and other requests.  The grievance pilot was initiated in May 2023.  In June 2023, 320 grievances were filed via tablets and an additional 225 requests for services were received via tablets.  As anticipated, the challenge for PDP going forward will be providing timely and meaningful responses to significant increases in requests and grievances.  PDP will need mechanisms for triaging emergent grievances and requests, as well as managing administrative issues like duplicate requests.  PDP has developed a training video for Class Members in English and Spanish, which was made available to Class Members systemwide in July 2023.

Once the tablet expansion for grievances and requests is finalized, the Monitoring Team will be able to consider them in making compliance determinations.  Previously, access to PDP's grievance system was inadequate and data was therefore unreliable.  A review of grievances in this reporting period demonstrated that no grievances were logged regarding lack of access to tablets from January through May 2023, prior to the tablet grievance pilot.  In June 2023, 14 grievances were submitted alleging limited access to tablets, eight of which were duplicate filings by the same person and six of which were new grievances.  All grievances were filed in the same housing unit, which is valuable information that should be utilized by PDP management in correcting problems.  The Monitoring Team has recommended that PDP

50

management and executives regularly review grievance information to identify and address areas of non-compliance.

The Monitoring Team has considered recommending that PDP pilot a tablet sign-up process to ensure more equitable access for Class Members.  This recommendation will be revisited in the future, but given PDP's current staffing levels, a tablet sign-up would not likely be successful. PDP should instead continue to focus on ensuring staff are following existing tablet protocols, expansion, and enhanced tablet functionality.

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

**Compliance Rating:  Partial Compliance**

PDP reports that it continues to provide 15 minutes of free phone calls on a daily basis in all but its punitive segregation units.  The greatest barrier to compliance remains critical staff vacancies, which limit out-of-cell time, and eliminate access to phones.  Other barriers that impede Class Members' access to phones may include housing unit dynamics that result in more assertive Class Members controlling phone access.

PDP is able to generate a "zero-usage report" that allows PDP to determine whether a given phone is operational and identifies any Class Member who did not utilize the phone system in a given time frame.  In the next reporting period, the Monitoring Team will use the zero-usage report to attempt to audit phone access for a sample of Class Members to determine whether they chose not to use the phone or were otherwise prevented from making a call.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating:  Non-compliance**

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not yet have a plan for the return to normal operations and, therefore, remains in non-compliance with this sub-provision.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

**Compliance Rating:  Partial Compliance**

As previously reported, the Monitoring Team has discussed cell-based emergency call systems and tablet and phone expansion at PICC with PDP executive and maintenance teams.[51]  The Monitoring Team continues to recommend against the expansion of PICC's current call button system and instead recommends consistent adherence to PDP's security check protocols.  In this reporting period, PDP attempted to implement the Monitoring Team's recommendation to audit the timeliness and quality of PDP's safety checks.  PDP reports that without an integrated system, CCTV download times were excessively burdensome and unsustainable.  PDP executives acknowledge deficiencies in safety check practices, evidenced most recently by the May 2023 escape.  PDP reports that it is awaiting recommendations from the post-escape security analysis to determine the best path forward.

The Monitoring Team will evaluate any proposed strategies in the next reporting period, which may include random audits of housing units by on-duty supervisors or the use of light duty supervisors to assist with independent reviews on-site at PICC.  The Monitoring Team has also recommended upgrades to the CCTV system that would give PDP executives direct terminal access to CCTV from their desktop computers.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022.*

**Compliance Rating:  Partial Compliance**

In the second reporting period, 16 cells at PICC required new door frames before locks could be changed.[52]  In this reporting period, 11 doors remain.  PDP reports that lock replacement will be completed by August 2023.  If so, and if PDP also updates post orders to include protocols for nonoperational locks, it will achieve substantial compliance with this sub-provision in the next reporting period.

*Sub-provision 12.2--PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

**Compliance Rating:  Partial Compliance**

As previously reported, staff training on lock inspections and lock replacement at RCF was completed in May 2022.[53]  As with sub-provision 12.1, PDP must update post orders to achieve substantial compliance with this sub-provision.

Though not subject to the Agreement, PDP reports that it is also replacing locks at CFCF, which it anticipates completing in September 2023.

---

[51] *Id.* at 48.
[52] *Ibid.*
[53] Monitor's First Report, *supra* note 7, at 28-29.

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

**Compliance Rating:  Partial Compliance**

In the previous reporting period, PDP had not provided evidence that call button repairs were occurring at CFCF.[54]  In this reporting period, CFCF submitted completed work orders for 42 call button repairs from January through June 2023.  RCF maintenance staff reported there were no work orders for call buttons during the period of January through May 2023, which seems unusual given patterns of call button damage and repairs in PDP.

The average time for call button repairs at CFCF is difficult to ascertain based on the work orders alone.  Some work orders list several cells requiring call button repairs in one, and some include single cell call button repairs but list additional repairs needed for the same cell.  Work orders with limited cells or limited repairs generally occurred within 48 hours.  More extensive repairs or repairs to multiple cells took longer, including up to several days to complete.  The Monitoring Team will review a second set of work orders from CFCF in the next reporting period to verify that work is being completed in a timely manner.

As with sub-provisions 12.1 and 12.2, updates to post orders are required to ensure staff are informed of their responsibilities when a call button is nonoperational, which may require rehousing the occupant or increasing the frequency of security checks while repairs are pending.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 13—Visiting**

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

---

[54] Monitor's Second Report, *supra* note 6, at 49-50.

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

**Compliance Rating:  Partial Compliance**

As recommended in the previous reporting period, PDP administered surveys and held focus groups to receive feedback from Class Members, visitors, and visiting personnel regarding the quality of PDP's visiting program.[55]  PDP also posted signage in the visiting processing areas encouraging visitors to reach out to the Office of Community Justice and Outreach to provide feedback.

PDP reports that it has received the following feedback thus far:
- PDP's website should include all visiting policies and procedures.
- When the visiting website is down for "scheduled maintenance," visitors are unable to schedule visits, and the durations of scheduled maintenance are not clearly communicated to users.
- Visitors report that the visiting website's technical support phone line has excessive wait times.
- Visitors report that they are not notified when scheduled visits are cancelled.  This is frequently true when a Class Member is in punitive segregation at the time of scheduling or is placed in punitive segregation after a visit is scheduled.
- Class Members and staff request that Class Members receive the ability to approve or deny visits.  Currently, Class Members are unable to manage visits and do not know who is visiting until the day of a visit.  Class Members report that they may want to refuse some visits or prioritize some visitors over others.  Staff report that it would be more efficient for them, and helpful in avoiding potential conflict in the visiting area, if Class Members were able to accept or deny scheduled visits.
- Class Members request more support from PDP in visiting with their children.  For example, they have requested that PDP personnel liaise with caregivers and facilitate visits.
- Visitors and Class Members request that PDP allow visitors to resume taking photographs during visits.
- Class Members request additional access to tablet visits generally, and specifically on weekends.  They also report that existing tablets are often unavailable and request greater consistency with current tablet visiting.
- Visitors and Class Members request expanded visiting hours to include evenings for visitors who work and children who attend school during the day.

---

[55] *Id.* at 51.

PDP has committed to research the feasibility of implementing improvements consistent with this feedback and will provide updates in the next reporting period.

The Monitoring Team made additional recommendations in previous reporting periods that PDP has agreed to include in its visiting improvement plans.[56]  These include analyzing filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above), and ensuring that family visiting spaces in all facilities are regularly sanitized and consistently stocked with age and culturally appropriate activities for youth and Class Members to have meaningful engagement.

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

### Compliance Rating:  Substantial Compliance

In the previous reporting period, PDP indicated that it utilized Philadelphia's composite record to verify Class Members' vaccination status when they self-reported being vaccinated outside of PDP.[57]  In February 2023, PDP provided documentation of this practice.  PDP has, therefore, achieved substantial compliance with this sub-provision, and the Monitoring Team will discontinue monitoring this aspect of the substantive provision.

### Substantive Provision 14—Attorney Visiting

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

### Compliance Rating:  Partial Compliance

As previously reported, the requirement that attorneys receive access to their clients within 45 minutes of scheduled visits is not possible to measure because attorney visits are not scheduled for specific times.[58]  PDP and the Monitoring Team explored different possibilities for defining "scheduled visit" and measuring compliance with the 45-minute requirement.  The Monitoring Team determined that the current official visiting protocol and PDP's tracking system are inadequate to accurately measure wait times.

The Monitor receives regular updates from counsel from the Defender Association of Philadelphia, the private bar, and *Remick* class counsel regarding delays in official visiting and other issues reported by their Class Member clients.  Visiting issues reported to the Monitoring Team continue to include lengthy delays resulting from failed population counts and other security incidents.  Attorneys at times report waiting for hours to see clients.  On two occasions, the Monitor spoke with attorneys in PDP's visitor waiting area, some of whom reported having

---

[56] *Id.* at 51-52; Monitor's First Report, *supra* note 7, at 29-30.

[57] Monitor's Second Report, *supra* note 6, at 52.

[58] When COVID-19 testing protocols were instituted, attorneys were required to give advance notice of visits but not for specific timeslots.  In this reporting period, PDP reverted to pre-COVID-19 protocols and attorneys are no longer required to provide advance notice of visits.  *See also Id.* at 52-53.

waited more than two hours with no status updates from PDP personnel and were appropriately exasperated.  Although most attorneys report that visiting wait times have generally improved since the most rigid COVID-19 pandemic restrictions were removed, the frequency of reported excess wait times remains unacceptable.  This is especially true given PDP's population reduction goals, which require timely access to counsel and the courts.

Finally, the 45-minute Agreement requirement is too long for counsel to wait for clients in any case absent institutional emergencies.  Therefore, the Monitoring Team requested that PDP revisit its official visiting policies and prioritize changes that are most likely to improve access to counsel by significantly reducing wait times.  PDP's compliance with this sub-provision will be measured against the 45-minute wait time negotiated by the Parties; however, revisions should be designed to exceed the Agreement requirement.

In this reporting period, the Monitor requested that PDP work directly with the Defender Association of Philadelphia, which represents the large majority of Class Members in their pending criminal matters, to strategize mutually agreeable solutions to official visiting delays. Tom Innes, Director, Prison Policy and Advocacy, Defender Association of Philadelphia, dedicates much time and attention to this issue and, in consultation with a representative from the private bar, agreed to work with PDP's Deputy Commissioner of Administration and facility wardens to identify solutions.  Options considered included: (1) modifying PDP count times, which reportedly cause the most frequent delays; (2) adjusting tablet visiting schedules to free up space in tablet visiting rooms for in-person visits during high-traffic hours; and (3) requiring attorneys to schedule visits in advance, giving PDP more time to prepare for visits.

As a result of this collaboration, versions of all three options were piloted in this reporting period.  With additional trial and error planned in the next reporting period, PDP anticipates a solution will be finalized before the end of 2023.  The Monitoring Team will then work with the Parties to revise this sub-provision and identify an appropriate compliance measure.  The Monitor thanks Mr. Innes for his assistance in resolving this issue and is hopeful that access to counsel will improve as a result.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

### Compliance Rating:  Partial Compliance

In the first reporting period, PDP made progress in providing additional space and opportunities for virtual attorney visits and shortened wait times for Class Member clients.[59]  As with in-person official visits, PDP's data is cumbersome and measuring compliance will require evaluating information from a combination of sources.  Although in-person official visits remain the source of the most frequent complaints, attorneys also continue to report delays with tablet visits that exceed 15 minutes.  This information is consistent with delays tracked by the Monitoring Team.

---

[59] Monitor's First Report, *supra* note 7, at 30.

From December 6, 2022, through September 1, 2023, Deputy Monitor Grosso scheduled a total of 192 remote tablet meetings.  From February 6, 2023, through September 1, 2023, 119 of 137 scheduled tablet visits were attended by Class Members, which is an encouraging attendance rate.  The remaining 18 visits were no-shows.  Some visits continue to be delayed beyond the 15-minute window provided for in this sub-provision, and, at times, have exceeded 90 minutes.  Direct contact with shift commanders when remote meetings are delayed generally improves attendance, however, shift commanders did not always answer when called.  PDP explained delays and cancellations as resulting from delayed population counts or other security incidents, which is consistent with explanations reportedly provided to attorneys.

Currently, all tablet meetings are scheduled in one-hour time slots.  The Monitoring Team has recommended that PDP increase efficiency by also offering 30-minute time slots for tablet visits.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

### Compliance Rating:  Non-compliance

As previously reported, PDP's policy does not require notification to attorneys when visits are delayed or cancelled, and no temporary directives have been issued consistent with this requirement.[60]  Since February 6, 2023, the Deputy Monitor was not notified in advance of delayed or cancelled tablet meetings, which is consistent with information the Monitoring Team received from attorneys.

PDP acknowledges on-going failures to communicate delays and cancellations and has committed to policy revisions once it finalizes solutions currently being piloted.  PDP executives report that, in the interim, personnel have been instructed to notify attorneys of delays, cancellations, and refusals, and personnel have reported to the Monitoring Team that they understand the requirement.  However, personnel may not be held accountable for failure to comply with the notification requirement until policies and post orders are revised and personnel are trained.

## Substantive Provision 15—COVID-19 Testing

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame.  These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not*

---

[60] Monitor's Second Report, *supra* note 6, at 54.

*unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating: Substantial Compliance**

In the second reporting period, PDP received guidance from the Philadelphia Department of Public Health (PDPH) to revise the COVID-19 testing and quarantine protocols, and on November 29, 2022, the Centers for Disease Control (CDC) amended its guidelines for correctional facilities.[61]  Commissioner Carney issued a memorandum on December 6, 2022, directing PDP Healthcare to administer a single COVID-19 test for all Class Member patients in advance of scheduled court hearings.  In February 2023, the Monitoring Team audited PDP's compliance with the December 2022, protocols and determined that PDP was in compliance.

In consultation with PDPH, PDP further reduced testing requirements via a memorandum issued by the Commissioner on March 9, 2023.  PDP discontinued COVID-19 testing for Class Members going to court except those housed in quarantine units, who receive tests within 24-hours of transport.  In May 2023, the Monitoring Team again audited compliance with the most recent testing protocols and determined that PDP was in compliance.

Changes to PDP's COVID-19 testing protocols were made in consultation with PDPH and pursuant to CDC guidelines.  The Agreement also requires that PDP timely notify plaintiffs' co-counsel of any changes in testing protocols.  In October 2023, Plaintiffs' co-counsel reported, and PDP confirmed, that PDP had failed to notify plaintiffs' co-counsel of changes to COVID-19 testing protocols in previous reporting periods.  PDP then established a protocol to ensure Plaintiffs' co-counsel are notified of changes consistent with Agreement requirements and initial notifications were made via email communication dated October 11, 2023.

PDP has achieved substantial compliance with this substantive provision.  The Monitoring Team will continue to monitor PDP's protocol for notifying Plaintiffs' co-counsel of any changes in COVID-19 testing requirements through the next reporting period.  Once this requirement is satisfied, monitoring of this substantive provision will be discontinued.  The Monitoring Team will, however, continue to report any changes in PDP's testing protocols.

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

---

[61] Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities (November 29, 2022) *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html

**Compliance Rating: Substantial Compliance**

As previously reported, on November 29, 2022, the CDC revised its guidance for managing COVID-19 in correctional facilities, which superseded the May 2022, guidance referenced in this substantive provision.[62]  The November 2022 guidance remains in effect and includes the following:

1. Recommends enhanced COVID-19 prevention strategies when the COVID-19 Community Levels are high or when there are facility-specific risks.
2. No longer routinely recommends quarantine after someone is exposed to a person with COVID-19 but continues to provide considerations for facilities that prefer to continue implementing quarantine protocols.
3. Includes an option to end isolation for people with COVID-19 after seven days with a negative viral test.
4. Emphasizes the importance of maximizing access to in-person visitation to promote correctional and detention facility residents' mental health and well-being.

PDP reports that it consulted with PDPH, the Court of Common Pleas, the District Attorney's Office, the Defender Association of Philadelphia, Private Counsel, and the Sheriff's Department and again revised its COVID-19 response protocols via a memorandum issued by the Commissioner on March 9, 2023.  PDP agreed to:

1. Continue requiring masking by everyone when inside PDP facilities.
2. Continue use of Personal Protective Equipment (PPE) as recommended by the CDC.
3. Not require vaccination of Class Members for in-person visits.
4. Continue testing for COVID-19 at intake.
5. Discontinue testing for court transfers for those in non-quarantine areas.  Those in quarantine housing areas will be tested once, the day before their scheduled court date.
6. Continue to send people to court in masks.
7. Discontinue testing for official visits for those in non-quarantine housing areas.  Class Members in quarantine housing will be tested once within 24-hours prior to their visit, requiring the attorney for the Class Member to provide notice of the visit 24-hours prior to the requested visit time so that testing may occur.
8. Continue the length of intake quarantine to ensure the following is completed: medical screening, a negative COVID-19 PCR test, and negative TB test are received.  This is estimated to take 3-5 days.
9. COVID-19 isolation will remain at least 10 days in length.
10. If a housing unit has been exposed to COVID-19, movement will be restricted and the housing unit's residents will be tested on day 5.  If the residents test negative, movement restrictions will be lifted after day 5.  If on day 5 one or more residents test positive, movement will remain restricted and the residents will be tested after 5 additional days.
11. Discontinue symptom screening of everyone entering PDP.

---

[62] *Ibid.*

On May 11, 2023, the federal public health emergency expired.  Again, in consultation with PDPH and based on CDC guidelines, PDP supplemented the March memorandum with the following COVID-19 protocols:

1. Masking due to COVID-19 is no longer required.
2. Masks will be used as medically necessary (e.g., infirmary, N95 required for healthcare staff when interacting with COVID-19 positive or suspected COVID-19 positive Class Members).
3. Masks may be required if infections recur within PDP or community levels rise.
4. Employees and Class Members may wear masks if they wish.
5. Healthcare staff are encouraged to wear masks at the request of Class Members during healthcare visits.
6. PDP will continue to provide COVID-19 vaccinations to Class Members.
7. The healthcare worker mandate is still in effect.
8. Frequent handwashing or the use of sanitizer along with routine cleaning of workspaces is encouraged.

On September 12, 2023, PDP again modified its COVID-19 guidelines based on CDC guidelines and PDPH recommendations for managing a spike in COVID-19 cases nationally.  Current guidelines include:

a. Testing of all Class Members at intake.
b. Rapid testing of those who report symptoms either in person or in writing.
c. After identification of a positive case, cellmates or those residing in the same dorm section will be screened after 5 days.
d. The entire unit will not be screened.
e. Masking is strongly encouraged for Class Members on units where a positive case has been identified.
f. Isolation of COVID-19 positive Class Members for 10 days.
g. No movement restriction except for those in isolation.
h. There will be no testing for the following: courts, official visits, family visits, and programs.

During site visits, the Monitoring Team noted that some staff were unaware which housing units were on quarantine and which were under isolation and observed some staff working in these units without appropriate PPE.  The Monitoring Team recommended that PDP use signage to inform staff and visitors of housing unit quarantine and isolation status.[63]  PDP has implemented this recommendation, and all staff interviewed during site visits in this reporting period were aware of COVID-19 status of all housing units.  Periodically, personnel were observed with inadequate or improperly donned PPE despite reporting awareness of a unit's COVID-19 status.  This issue must be monitored by facility supervisors and addressed individually.

---

[63] Monitor's Second Report, *supra* note 6, at 57.

PDP has achieved substantial compliance with this substantive provision and compliance monitoring is discontinued.  The Monitoring Team will continue to report any changes in COVID-19 protocols.

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:   Partial Compliance**

In this reporting period, PDP filled two additional maintenance vacancies and, on April 24, 2023, temporarily expanded its external maintenance contract.  City maintenance personnel now primarily serve DC and other smaller housing units, and contractors have expanding services to include PICC.  As discussed above under *Status of Recommendations, Substantive Provision 1*, contract expansion was limited largely to emergency repairs and does not include preventative maintenance necessary for physical plant upkeep, especially of older facilities.  However, maintenance contract expansion marks progress and improvements will be assessed in subsequent reporting periods.

PDP continues to provide documentation of regular general cleaning inspections (GI) and issuance of cleaning supplies.  All staff interviewed during site visits report awareness of GI requirements.  Many units are clean and maintained consistent with industry standards and the Monitoring Team has noted improvements in some areas, including medical housing units.  As PDP closes units for lock replacement and other maintenance issues, maintenance personnel have been updating them with fresh paint, lighting and tile replacement, deep cleaning of showers, and plumbing repairs.

Unfortunately, some units remain unacceptably dirty with unabated vector control issues and continue to require significant maintenance.  In addition to previously reported conditions, flooring in some PICC housing units is crumbling, and uncollected trash and food waste are still frequently observed during site visits and on CCTV.  During a site visit in May 2023, the Monitoring Team again observed unsanitary conditions in restricted housing units at CFCF.[64]

With population increases, DC has been repopulated with more than 500 Class Members in both renovated and unrenovated housing units.  During a site visit in August 2023, Class Members in one unrenovated dormitory reported the ongoing frequent presence of rodents and insects.  Many dormitory occupants were wearing masks, reportedly not to guard against COVID-19, but to protect them from a perceived risk of respiratory illness from mold visible throughout shower areas.  PDP has not addressed weekly deep cleaning needs in cells, showers, and common areas in most housing facilities systemwide.  This is especially true in housing units where incarcerated workers are not permitted.

The Monitoring Team was encouraged by the appointment of three new wardens, all of whom have made improvements in their respective facilities in their short tenures thus far.  Facility

---

[64] *Id.* at 57-60; Monitor's First Report, *supra* note 7, at 33-35.

leadership is responsive to Monitoring Team observations during site visits and acts quickly to resolve problems.  For example, DC's Warden took immediate action when alerted to dormitory conditions described above, and all wardens have communicated to the Monitoring Team an understanding of their leadership obligations in ensuring clean, safe, and habitable living units.  Following the February 2023 site visits, the Monitoring Team recommended increased rounds by wardens and deputy wardens to assess maintenance and sanitation and, reportedly, recommended rounds are occurring.

Some Class Members in this reporting period continued to complain of lack of access to soap and toilet paper, and staff have offered inconsistent reports about the frequency of soap and toilet paper distribution.  Leaking or non-operational toilet and sink units, showers with no hot water or water that is scalding, and personal belongings and commissary items regularly destroyed by rodents are among common complaints.

Women continue to report unnecessary staff control over and inconsistent supplies of feminine hygiene products.  Staff typically report that supplies are unlimited and unrestricted, but simultaneously note that Class Members frequently misuse feminine hygiene products.  Use of maxi pads for cleaning, as toilet seat covers or art supplies, and other purposes is common, largely unavoidable, and in no way reduces jailers' obligation to provide them for menstruation.  Class Members' efforts to make uncomfortable and unsanitary conditions more livable are never appropriate rationales for denying feminine hygiene products.  Unless misuse of pads or tampons poses a risk to safety and security, they must be provided upon request, without fail.

PDP continues to utilize pest and rodent control services for both routine treatments and emergencies.  However, deteriorating infrastructure and inadequate food and trash collection are ideal conditions for rodents to enter PDP facilities and breed at a pace that current efforts fail to correct.  Inconsistent supplies of such basic yet vital provisions as soap, toilet paper, and feminine hygiene products are due in part to inconsistent staff in PDP housing units.  In a properly functioning direct supervision model, staff are part of the housing unit community and are committed to the overall operations of their assigned units, including ensuring the population has necessary supplies to maintain cell sanitation and personal hygiene.  Inconsistent housing unit personnel is a function of the staffing crisis and is currently unavoidable in PDP.

PDP's extensive and protracted staffing shortages have resulted in collective indifference to various systemic deficiencies, including unsanitary conditions in some housing units.  Given PDP's shortage of lieutenants and sergeants, correcting the issues requires daily guidance from deputy wardens and wardens to set expectations, ensure sufficient provision of supplies, and address unresolved maintenance problems.  It also requires closer monitoring by and support of PDP executives to reinforce expectations and ensure appropriate acknowledgement and accountability as needed.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

**Compliance Rating:  Partial Compliance**

The Monitoring Team continues to receive regular complaints from Class Members about insufficient laundry services.  As previously reported, there are policies and systems in place to ensure appropriate laundry exchange.[65]  However, some Class Members in general population units are not consistently receiving two sets of outer clothing, and those in segregation are not consistently receiving a change of clothing during showers.  During site visits, Class Members routinely report to the Monitoring Team having only one set of outer clothing and nothing to wear when exchanging clothing or when clothing is taken for laundering.

At CFCF, linen exchange is supervised and documented by staff and facility leadership is able to audit linen exchange via CCTV.  CCTV does not capture quantity or quality of items issued but depicts exchanges occurring consistent with documentation.  Audits can also verify or disprove allegations that items are not received so that managers can target problem areas.  Similar audits are more challenging at other facilities where Class Member workers are responsible for laundering and exchanging linens, such as at PICC and RCF, or where camera placement is limited, such as at DC.  PDP policy and post orders have not yet been revised to reflect these operational nuances and clarify expectations, as recommended.[66]

In the previous reporting period, PDP executives reported that issues with linen exchange had been identified and corrected.[67]  However, members of the Monitoring Team personally inspected the cells of some reporting Class Members' and confirmed the presence of only one set of outer wear.  When these types of reports persist with this frequency across housing units systemwide, it is inconceivable that leadership would not take immediate steps to verify and, if necessary, address them.

Despite these issues, PDP has also made improvements in this reporting period.  Consistent with the Monitoring Team's recommendation, PDP procured and began issuing underclothing to Class Members at intake.[68]  Meeting the needs of the entire population will require additional orders of large quantities of undergarments, but PDP is making progress in this area.  PDP also implemented the Monitoring Team's recommendation to revise its policy for issuing blankets and cold weather clothing.  Rather than issuing these items on the same date each year, they are now issued based on weather forecasts and the outside temperature, which are more appropriate measures.

Defendants should immediately consider the following recommendations:

1. PDP should modify schedules to increase the frequency of deep cleaning rounds.
2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.
3. PDP should procure sufficient undergarments to meet the needs of all Class Members.
4. PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and issuance of hygiene supplies.

---

[65] Monitor's Second Report, *supra* note 6, at 59.
[66] *Ibid*.
[67] *Ibid*.
[68] *Id.* at 60.

5. PDP should revise its post orders to reflect operational nuances at each facility. Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities.

6. PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and linen exchange, and the issuance of cleaning and hygiene supplies. Plans should include effective monitoring via audits, or other modes of verification, and specific acknowledgement of personnel who meet expectations and support or discipline, as appropriate, of those who do not.

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated…. Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

### Compliance Rating: Partial Compliance

As previously reported, PDP's use of force policy is too permissive and lacks clarity.[69] It emphasizes de-escalation as quoted in this substantive provision but ultimately authorizes use of force for failure to follow verbal commands without accompanying active resistance or assaultive behavior. It is also unclear regarding: (1) when force is authorized for passive resistance; (2) protocols for pre-planned versus emergency force; (3) the role of behavioral health in de-escalation; (4) duty to intervene; and (5) duty to report excessive or unnecessary force, among other issues. A review of sample use of force incidents in the previous reporting period revealed frequent violations of PDP's existing policy, unnecessary and excessive uses of force, inadequate use of force reviews, and poor accountability.[70]

PDP's current use of force review practices includes reviews of all use of force incidents in PDP facilities by supervising lieutenants, deputy wardens, and wardens. More complex cases, or cases with serious injuries, are reviewed by deputy commissioners and, at times, the Commissioner. At the time of SME McDonald's review, all 24 incidents had completed the facility command level of review required of all use of force incidents. The majority of reviews failed to identify the need for higher levels of review or additional investigation, reporting,

---

[69] *Id.* at 61-62.
[70] *See Id.* at 61-64.

training, and/or accountability in every case.  Some of the incidents reviewed had reached PDP's executive-level review, during which some additional issues were identified and addressed.  However, serious issues were missed at every completed level of review in all 24 cases.

Based on these findings, the Commissioner prioritized improving PDP's use of force review process in this reporting period.  Larger revisions and updates to PDP's use of force and discipline policies will require many months of planning and negotiations to complete.  Implementation of any revisions made will not be successful until PDP is able to reduce security staff vacancies.  Ultimately, correcting PDP's use of force deficiencies requires dramatic cultural redirection of personnel at every rank in PDP's security chain of command.  It requires systems for intensive supervision, instruction, mentorship, support, incentives, and rigid accountability that PDP does not currently possess the capacity to execute.

Despite these barriers, PDP made progress in this reporting period consistent with the Monitoring Team's recommendations, including:

- On April 27, 2023, the Commissioner issued a memorandum to all staff reiterating her expectations for de-escalation wherever possible and personnel duties to summon a supervisor, intercede if a colleague appears to be acting outside of policy during an incident, and accurately report all uses of force.  With this memorandum, the Commissioner also established a zero-tolerance policy for abuse and failure to report abuse, which should be incorporated into policy.
- In May 2023, as a temporary measure until the recommended use of force review team could be established, PDP leadership assigned a small team to review available CCTV of all use of force incidents shortly after they occurred.  The goal of the initial reviews was to determine whether significant policy violations occurred that required immediate intervention, rather than waiting for completion of the lengthy use of force review process.  In consultation with SME McDonald, the team began reviewing cases and developed a system to capture details from incidents going back to January 1, 2023.  Information tracked from the team's initial reviews informed the creation of a formal use of force review team and associated policy.
- In June 2023, PDP executives, wardens, and deputy wardens met with SME McDonald to complete CCTV review of select use of force incidents that occurred in January and February 2023.  Discussed in more detail below, the goal of the meeting, and other similar meetings in this reporting period, was to build internal capacity for critical evaluation of use of force incidents, including identifying cases that require referrals for administrative or criminal investigation.
- On July 1, 2023, PDP began piloting new use of force review forms at RCF, with the goal of revising PDP's use of force review policy and initiating associated training in the next reporting period.
- In August 2023, the Commissioner issued Executive Order 23-03:  Use of Force Review Team (UFRT).  The UFRT assumed responsibility for CCTV review following use of force incidents and monitoring the quality of PDP's use of force review process.  The UFRT was established by redirecting one captain and two lieutenants, and creating one new analyst position.  PDP recognizes the UFRT requires additional staff to implement all recommendations for training, policy updates, and other tasks.  However, UFRT will

begin by reviewing designated incidents, managing the force review process, tracking trends, and specifying training needs, which will support change and help identify specific resources needed to implement recommendations from this and prior reports.

- PDP has committed to CCTV upgrades, including converting PDP facilities to a single centralized camera system with limited expansion to address gaps in coverage. Planned upgrades will not include audio recording, and it is unclear whether conversion to a single camera system will fully address server capacity issues that limit remote monitoring, such as those discussed above under Substantive Provision 11–PICC Emergency Call Systems.

With the goal of supporting PDP's efforts to improve its use of force review process, SME McDonald selected 46 completed use of force packages, including available CCTV footage and completed force investigations, for review and detailed discussions with PDP leadership. Cases were selected from January and February 2023. At the time of the review, all reports and chain-of-command reviews were completed. Any referrals for internal administrative or criminal investigation of formal discipline would have been issued as part of completed reviews. Specific cases from this sample were analyzed in detail with PDP's jail and executive leadership teams, and post-incident reviews at all levels were critiqued.

The quality of completed force packages reviewed by SME McDonald in this reporting period contained similar weaknesses to those reviewed in the previous reporting period.[71] Some packages were incomplete, missing investigative reports or witness statements, or lacked complete accounts or statements of Class Members, among other issues that should have been identified during the multiple layers of review.

All 46, or 100 percent, of use of force incidents warranted additional training for personnel, and several should have spurred additional investigation into personnel conduct, including potential excessive or unnecessary force. PDP's use of force review process identified issues in only 5 of 46, or 11 percent, of incidents reviewed. Sample cases contained inappropriate deployment of OC spray and failures to follow decontamination protocols that were not identified by reviewers. They contained significant deviations from standards for basic correctional controls during disturbances that were not identified in reviews despite dangers to Class Members and staff. Virtually every staff use of force report was substandard, yet none were returned for clarification as is the norm with effective force reviews.

The following examples are among those addressed with PDP use of force leadership and reviewers:

- In an intake unit, a Class Member patient experiencing a mental health crisis is seen smearing feces in a cell. There is no evidence that medical or mental health staff were requested to assess the patient or assist security in devising a plan. Instead, a cell extraction is initiated and OC spray is deployed under the cell door. Staff do not maintain a constant presence at cell front to observe, communicate with or encourage the Class Member to comply with commands. Eight minutes later, a second round of OC is

---

[71] *Ibid.*

deployed, again without communication or direction from staff.  No medical personnel are standing by and the Class Member is not removed from the cell for more than 30 minutes following the first OC deployment.  Staff neither observe nor record the Class Member's responses for the incident's duration.  Once removed from the cell, the Class Member is not decontaminated or evaluated by medical staff prior to being placed in a safety cell with no running water.  The body weight resistance and positioning of the Class Member during placement into the safety cell risked positional asphyxia, yet none of the supervisors present throughout the incident interceded with quality direction.  The poor tactics, absence of clinical care, and failure to decontaminate are not addressed in any of the reviews.

- In a housing unit, a sergeant responds with additional staff to address a Class Member who is refusing to enter a cell.  The sergeant uses a significant quantity of OC spray, fully expending his assigned OC canister and then orders another officer to deploy additional OC.  The sergeant authors a report that reflects deployment of "a short burst" of OC despite CCTV and the Class Member's clothing clearly depicting that a significant amount of OC was deployed to the Class Member's head area.  Five additional responding staff who were present throughout the incident all author identical reports containing the same language.  The review failed to address likely over-deployment of OC, discrepancies between CCTV and staff accounts, and the authoring of "canned" reports.

- In a housing unit, an officer deployed OC spray and authored a report stating force was necessary to stop the Class Member from attacking another "unknown" person.  The corresponding incident report notes the reason for OC deployment as, "IP refusing to recall to [IP's] cell."  The video file that would have depicted the event was unavailable, and the other camera angles did not depict actions that corroborated the officer's statement.  Post-force, the involved officer is observed escorting the Class Member by the collar of the Class Member's clothing, an inappropriate practice.  The review does not identify or address these concerns.

- In an intake area, a Class Member refused to undress for processing.  A sergeant responded and ordered the deployment of OC spray.  No medical or mental health professionals were requested to assist pre-force or during the OC deployment.  After the Class Member was restrained and decontaminated, staff are seen on CCTV inappropriately forcing the Class Member's head into position for a photograph and then pulling the Class Member's clothing during an unprofessional escort.  These issues were not addressed in the review.

- In a housing unit, an officer begins to recall a unit of Class Members to their cells.  When one Class Member blocks the cell door with his foot, the officer kicks the Class Member, who then exits the cell.  The officer loses control of the unit but is not carrying a radio to request assistance and does not retreat while awaiting backup, as would be tactically appropriate.  The officer is then observed shoving a second Class Member into a cell and slapping food trays out of a third Class Member's hands.  The officer deploys OC spray on a fourth Class Member who then chases the officer up the housing unit stairs, hitting the officer in the head from behind.  This assault might have been prevented by a second

officer who should have controlled the Class Member post-OC deployment.  Responding staff then took the first Class Member to the floor, but failed to regain control of the housing unit.  The facility warden appropriately requested additional information and review of this incident, yet many clear issues were missed in earlier reviews.

All use of force issues regarding tactics, safety, investigations, reporting, and reviews discussed in previous reports were present in cases reviewed in this reporting period and will not be restated here.[72]  The Monitoring Team reemphasizes two issues in this reporting period that PDP has committed to address.  First, some staff use more force than others, perhaps as a function of their post assignments.  However, PDP does not have an early warning system that flags these personnel for additional review and support if necessary.  For example, one officer from the 46 cases reviewed failed to use appropriate de-escalation tactics in every use of force incident the officer was involved in.  This officer is assigned to a high stress environment, which can easily lead to frustration, poor tactics, and decision making.  An early warning system would have flagged this officer for additional support in managing the stress of the officer's assignment and potentially prevented future uses of force.  PDP has committed to implementing the Monitoring Team's recommendation to procure an early warning system.

Second, PDP's current camera system is inadequate for use of force review.  In the best circumstances with the most advanced technology, use of force review is time consuming.  Because PDP does not have a centralized camera system, incidents from PICC and RCF must be downloaded and copied using separate software systems.  Server capacity is limited, so video storage is insufficient and frames per second are too low, which causes skipping and missed footage.  PDP facilities, especially RCF, have many areas where camera placement leaves gaps in coverage, or incidents may occur too far away from fixed cameras to properly assess them.  Finally, PDP's system does not have audio, so statements and other context for use of force incidents are missing in most cases.  Audio is particularly important when incidents involve conflicting statements or information.  SME McDonald also notes that in 40 to 50 percent of incidents reviewed, available video footage fails to capture actions of Class Members and staff to allow for proper evaluation of incidents.  In addition to upgrading PDP's CCTV system, PDP reports that it is researching the feasibility of implementing a body worn camera pilot program.

It is important to acknowledge two recently completed use of force reviews that illustrate supervisors' willingness to address policy violations and training issues directly and unapologetically.  These supervisors, and others like them, should be commended and perhaps considered for roles in use of force policy development and revisions.  Additionally, in this reporting period, PICC improved its process for ensuring that all involved and witness personnel submit reports.  PICC's force packages have improved as a result.

Incidents reviewed in this reporting period occurred prior to improvements reported above, including the Commissioner's April directive and the creation of the UFRT.  Reviews in the next reporting period should begin to reveal any progress as a result of these changes.

---

[72] *Ibid.*