**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of themselves and all others similarly situated, | : : : | No. 2:20-cv-01959-GAM |
| Plaintiffs-Petitioners, | : : | |
| v. | : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : : : : | |
| Defendants-Respondents. | : : | |

**PLAINTIFFS' MOTION FOR CIVIL CONTEMPT AND SANCTIONS**

**I.      INTRODUCTION**

Plaintiffs, by their undersigned counsel, respectfully move this Court for an Order holding Defendants in Civil Contempt of Court, and sanctioning Defendants for their failure to comply with the Settlement Agreement ("Agreement"), approved by the Court on July 12, 2022. This Motion is based on the full record in this case, and in particular the Reports of the Court Appointed Monitor, including the Fourth Report, filed March 29, 2024 (ECF No. 204). These Reports document the Defendants' non-compliance with many of the substantive provisions of the Agreement and show a pattern of systemic violations of the constitutional rights of the Plaintiff class.

**II.     FACTUAL AND PROCEDURAL BACKGROUND**

     **A.     Commencement of Suit and Initial Consent Order**

1.      Plaintiffs filed this class action under 42 U.S.C. § 1983, 28 U.S.C. § 2241, and the Americans with Disabilities Act, on April 20, 2020, to require Defendants City of Philadelphia ("City") and the Commissioner of the Philadelphia Department of Prisons ("PDP") to protect

incarcerated individuals from the risks of serious harm they faced from the twin dangers of Covid-19 and prolonged isolation in their cells. ECF No. 1.

2.　　On April 23, 2020, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking an order requiring Defendants to ensure that conditions of confinement in PDP facilities complied with the then-current health and safety standards necessary to protect the Plaintiff class from the risks associated with Covid-19 and to provide humane conditions of confinement, including adequate out-of-cell time consistent with constitutional requirements. ECF No. 18.

3.　　The parties reached a partial settlement agreement, which was approved by the Court and entered as a Consent Order on Partial Settlement Agreement on June 3, 2020. ECF No. 35.

4.　　Along with various measures intended to mitigate the risks of harm from Covid-19 and ensure adequate access to counsel for members of the Plaintiff class, the Consent Order required Defendants to provide a minimum of 45 minutes of daily out-of-cell time for all individuals incarcerated in PDP by June 10, 2020, and to make efforts to increase out-of-cell time thereafter, with Plaintiffs reserving the right to seek further relief from the Court regarding out-of-cell time, if necessary. ECF No. 35, ¶ 4(a).

**B.　　Defendants' Failure to Comply with Court Orders and Plaintiffs' First Contempt Motion**

5.　　During the summer and fall of 2020, Defendants failed to comply with various terms of the Consent Order, including the requirement of 45 minutes of daily out-of-cell time. Further, the prolonged in-cell confinement of incarcerated people, in violation of the Consent Order, led to increased tension and adverse mental health consequences. *See* Joint Status Reports, ECF Nos. 44, 45, 46, 48, 49, 52, and accompanying exhibits.

6.      Plaintiffs filed multiple declarations with the Court documenting a systemic lack of compliance with the Court's out-of-cell time Order. *See* Joint Status Report of December 21, 2020: Exhibit A, ECF No. 56-1; Joint Status Report of January 12, 2021: Exhibit B, ECF No. 61.

7.      Defendants acknowledged non-compliance with the Court Order that required incarcerated people in PDP custody to receive 45 minutes of daily out-of-cell time. *See* Joint Status Reports, ECF Nos. 44, 45, 46, 48.

8.      The parties thereafter discussed possible resolutions to non-compliance but could not reach an agreement.

9.      On January 13, 2021, the Court entered an Interim Order, finding that: (a) under the shelter-in-place protocol, incarcerated individuals were not receiving the 45 minutes of daily out-of-cell time required by the Consent Order; (b) it would be "feasible to permit persons from at least three cells out at a time, in 45-minute time frames, to separately shower, use phones, and engage in limited exercise, while still maintaining social distancing"; and (c) "[t]he current shelter in-place policy . . . keeps incarcerated people in their cells for nearly 24 hours a day, and such prolonged confinement is harmful to the mental and physical health of incarcerated individuals." ECF No. 62. The Court again ordered Defendants to provide all individuals incarcerated in PDP facilities with a minimum of 45 minutes of daily out-of-cell time and stated that the Court would consider further orders on out-of-cell time after the then-pending universal Covid-19 testing was completed. *Id.*

10.     On January 28, 2021, after the results of the universal Covid-19 testing were submitted to the Court, the Court ordered Defendants to increase out-of-cell time and provide all individuals incarcerated in PDP with a minimum of two hours of daily out-of-cell time by February 10, 2021, and a minimum of three hours of daily out-of-cell time by February 24,

2021, with exceptions made only for individuals on "a medically necessary quarantine" and "operational emergencies." Order of January 28, 2021, ECF No. 63.

11.     On May 4, 2021, the Court found that Defendants failed to comply with the Court's Order of January 28, 2021, writing:

> [T]here has been a pattern of noncompliance with the January 28, 2021 Order, particularly in the Curran-Fromhold Correctional Facility. Though concentrated at CFCF, reports from class members at each of the PDP facilities that they have regularly been denied the required amount of out-of-cell time have been filed with the Court on a regular basis…. The PDP Deputy Wardens (who have been designated as the City's monitors for compliance, as required by Order of the Court of December 18, 2020 (ECF No. 55)), and the City, have also reported that *staffing shortages* and other emergent events have impeded the ability of the facilities to meet or exceed the three hours of recreation time….

Interim Order of May 4, 2021, ¶ 3, ECF No. 70 (emphasis added).

12.     On May 4, 2021, the Court "place[d] Defendants on notice that, absent clear and convincing evidence that Defendants are in compliance with the Court's Order, the Court will entertain a motion for civil contempt by the Plaintiffs and will strongly consider the imposition of monetary sanctions against the Defendants." ECF No. 70, ¶ 7.

13.     On May 14, 2021, Plaintiffs filed a Motion for Contempt and Sanctions for the Defendants' failure to comply with the January 28, 2021 Court Order. ECF No. 71. Thereafter, the Court, having found "grounds for holding the City in civil contempt of court," issued an Order on May 20, 2021, requiring the City to show by clear and convincing evidence it was in compliance with the Order of January 28, 2021, or pay a compensatory fine of $50,000 for past violations and daily fines of $10,000 (to be doubled every two weeks). ECF No. 74.

14.     On June 23, 2021, the Court approved a Settlement Agreement that resolved the Motion for Contempt pursuant to which Defendants paid $125,000 to two Philadelphia-based bail funds. ECF No. 81.

**C.     Plaintiffs' Second Motion for Contempt and Plaintiffs' Motion for Preliminary Injunction**

15.     On September 14, 2021, the Court entered an Order setting the date of January 22, 2022, for PDP to "return to full pre-COVID-19 operations with normal out-of-cell times of approximately eight hours per day [and] full attorney, family, and friends' visitation; and full programming." ECF No. 93, ¶ 1. The Court ordered Defendants to take interim steps to increase out-of-cell time, visits, and programs, including "a minimum of 5 hours daily out-of-cell time for persons in vaccinated housing units, 4 hours for persons in other non-quarantine housing areas, 3 hours for persons in quarantined housing areas, and 1 hour for persons housed in segregation units" as of November 6, 2021, *id.* ¶ 3, and an increase in out-of-cell time in each of those types of housing units to 6 hours, 5 hours, 4 hours, and 2 hours, respectively, by December 22, 2021, *id.* ¶ 4.

16.     The increase in out-of-cell time was to be supported and facilitated by increases in correctional officer staffing. *Id.* ¶¶ 2, 5.

17.     On October 14, 2021, Plaintiffs filed a First Amended Class Action Complaint alleging that Defendants had failed to "ensure a sufficient staff of correctional officers, social workers, medical personnel, and other service providers proportional to the number of incarcerated persons to ensure the timely delivery of essential services and the protection of the plaintiff class." ECF No. 100, ¶ 6.

18.     On December 1, 2021, Plaintiffs filed a second Motion for Contempt. ECF No. 113. Plaintiffs again alleged that Defendants had failed to comply with the Court's Orders "due

in large part to the failure of the Defendants to ensure an adequate staffing of correctional officers necessary for the out-of-cell access to shower, medical care and treatment, in-person disciplinary hearings, phones, visits, programs and recreation." ECF No. 113, ¶ 17.

19.     Plaintiffs' December 2021 contempt motion included a June 2021 statement from Philadelphia City Controller Rebecca Rhynhart finding that "[i]nadequate staffing levels have led to unsafe conditions for workers and confinement of inmates, many of whom are pre-trial, to their cells – sometimes for 20 or more hours a day." ECF No. 113, Ex. C. The Controller reported that "Department of Prisons vacancies have tripled since 2019" and that "[t]he current Post Plan, the approved policy regarding staff deployment for Philadelphia Prisons to ensure the safety of both inmates and staff, calls for 1,884 officers, 382 officers more than the current staffing level." *Id.*

20.     On January 7, 2022, Plaintiffs filed a Motion for Preliminary Injunction, seeking relief from unconstitutional conditions including lack of adequate out-of-cell time and exercise, denial of timely medical and mental health care, lack of protection from physical assaults, excessive force by staff, and lack of due process in disciplinary proceedings. ECF No. 128.

21.     In late January 2022, the parties settled the Plaintiffs' Motion for Contempt and Sanctions in a confidential settlement agreement, and the Court, with the agreement of the parties, set a schedule for briefing and an evidentiary hearing on Plaintiffs' Preliminary Injunction Motion. ECF Nos. 130, 131.[1]

---

[1] Plaintiffs filed a Second and Third Amended Complaint. ECF Nos. 126, 147. The Court granted Plaintiffs' Motion for Class Certification on March 11, 2022. ECF No. 152.

**D.      Class Action Settlement Agreement and Appointment of Court Monitor**

22.      On the eve of the Preliminary Injunction hearing, the Court agreed to postpone

the hearing for a limited time with the understanding that the Parties had reached a tentative

Class Action Settlement Agreement. ECF No. 164.

23.      On April 12, 2022, the parties filed a Joint Motion for Preliminary Approval of a

Class Action Settlement Agreement. ECF No. 165.

24.      On July 12, 2022, after considering objections and holding a fairness hearing, the

Court approved the Class Action Settlement Agreement. ECF Nos. 175, 176.

25.      The Agreement established specific and detailed timetables for changes and

improvements in the conditions of confinement for the Plaintiff class, all of which were

consistent with the U.S. Constitution, and state and federal law. ECF No. 173.

26.      The substantive provisions of the Agreement required that Defendants maintain a

sufficient number of corrections officers to cover all posts; provide all Class Members, including

those in segregation status, with specified numbers of hours of daily out-of-cell time; provide the

Court with a plan to return to normal operations of the PDP (including 8-10 hours of daily out-

of-cell time, programming, visits, and other services); provide adequate and timely mental and

physical healthcare to all Class Members; ensure Class Members' due process rights during

disciplinary proceedings; reinstitute in-person visitation; provide timely access to attorney visits

and calls; provide cleaning supplies and laundry to Class Members; and train staff members on

appropriate use-of-force measures. Settlement Agreement, ECF No. 173-2.

27.      The Agreement provided for the appointment of a Court Monitor to monitor

Defendants' compliance with the Agreement and submit reports assessing Defendants'

compliance with the Agreement, including identifying steps Defendants have taken to come into

compliance and providing proposals for future compliance. Monitoring Agreement and Protocol, ECF No. 169.

28.     Upon the recommendation of the parties, the Court appointed Cathleen Beltz as Court Monitor. *Id.*

29.     The Agreement and the Monitoring Agreement and Protocol provide that Plaintiffs may file a Motion for Enforcement or Contempt of Court or may seek sanctions or other judicial enforcement of the Agreement. ECF No. 173-2, ¶ 21; ECF 169, ¶ 8. Prior to doing so, Plaintiffs must provide notice and meet and confer with the Court Monitor and Defendants on areas of alleged non-compliance. ECF No. 173-2, ¶ 21; ECF 169, ¶ 8.

**E.     The Court Monitor's Reports and Defendants' Failure to Comply**

30.     The Court Monitor's First Report, filed on November 4, 2022, documented Defendants' general failure to reach compliance,[2] highlighting several areas in which the consequences for Plaintiffs were particularly severe, including staffing and out-of-cell time for both general population and segregation units. ECF No. 181. At the time of the first report, Defendants were not in substantial compliance with any of the Agreement's provisions. *Id.* at 5. This initial report detailed numerous deficient conditions, concerns, and suggestions, including but not limited to:

        a.      A custody staff vacancy rate of 41% with a shortage of 790 officers as of September 2022. *Id.* at 7;

---

[2] For each substantive provision of the Agreement, the Court Monitor determined whether Defendants were in "Substantial Compliance," "Partial Compliance," "Non-compliance," or whether the provision's rating would need to be "Deferred" until further information became available.

b.      Inability to resume normal (pre-pandemic) operations due to this "staffing crisis." *Id.* at 15 ("PDP reports that it is not currently able to safely resume normal operations and has not yet finalized a plan to do so.");

c.      Staffing shortages resulting in limited out-of-cell time. *Id.* at 11 ("PDP has not met the out-of-cell benchmarks by prescribed deadlines and PDP executives report that staffing shortages continue to pose significant barriers to offering Class Members additional opportunities for out-of-cell time.");

d.      Lack of proper supervision due to staff shortages. *Id.* at 13 ("As a result of [correctional officers' fear due to being posted alone on housing units], some report regrettably that they leave units altogether and monitor Class Members from adjacent control booths for the duration of out-of-cell time...[which] poses significant safety risks for Class Members and staff.");

e.      Staffing shortages contributing to the provision of inadequate and/or delayed medical care. *Id.* at 19 ("PDP reports that its most significant barrier to reducing the [medical appointment] backlog and providing adequate care remains security and healthcare staffing deficits.");

f.      Class members with severe mental illness held on segregation units without appropriate mental healthcare. *Id.* at 22 ("During initial site visits, the Monitoring Team observed patients with [serious mental illness ("SMI")] in segregation status who appeared to be in states of acute distress and required higher levels of care than they were receiving. [The Monitoring Team's correctional health expert] noted that some patients were simply too acute to be in segregation."). In this First Report, the Monitoring team observed factors which "suggest

that segregation is being overutilized for the SMI population and that some Class Member patients are not being adequately cared for." *Id.*[3];

      g.     Extended placements of class members on segregation units due to staffing shortages. *Id.* at 14 ("Current facility management vacancies likely impact the timeliness and quality of disciplinary hearings and adjudications and result in extended use of segregation.");

      h.     The effect of staffing shortages on facility cleanliness and safety. *Id.* at 34 ("Security staffing shortages also contribute to unsanitary and unsafe conditions. As previously reported, sergeant and lieutenant posts are routinely left vacant, which likely results in supervisors being forced to prioritize other operational needs or crises over cleanliness and maintenance inspections.");

      i.     The need to reduce the jail population, specifically the suggestion that, because "meaningful progress in reforming PDP is likely going to continue to be delayed, Defendants should continue to engage with local justice partners to develop and improve programs aimed at reducing the number of people incarcerated in PDP." *Id.* at 15.

    31.    On March 3, 2023, the Court Monitor filed a Second Report, at which point Defendants were still not in compliance with most of the Agreement provisions, due in large part to the escalating staffing shortages. ECF No. 185. As the Court Monitor stated, "the City's actions are not responsive to the enormity of PDP's staffing crisis and fail to acknowledge the

---

[3] Plaintiffs acknowledge that since the filing of the Monitor's First Report the PDP has made significant reductions in the number of incarcerated people placed in administrative and punitive segregation and has reduced the average length of stay in segregation. ECF No. 193 at 24, 26; ECF No. 204 at 26. However, as of the time of the Monitor's most recent report, the PDP is still not in compliance with the requirements to establish a mental health program for persons who are in segregation units and to provide a minimum of one hour of daily out-of-cell time. ECF No. 204 at 24, 42-46.

duty imposed on Defendants by this Court to improve working conditions for more than 1,600 employees and reduce the suffering of more than 4,200 people confined in PDP facilities." *Id.* at 13. The Second Report further described, among others, the following examples of Defendants' failure to reach substantial compliance and concerning PDP conditions:

      a.     Hiring data showing that in 2022, out of the 120 newly hired staff members, only 79 people were still employed with PDP by the end of the year, demonstrating a 34% attrition rate; *id.*

      b.     Defendants' inadequate efforts to remedy the staffing crisis. *Id.* at 11 ("To date, the City has not engaged in the full-scale hiring effort recommended by the Monitoring Team.");

      c.     Defendants' failure to implement the Court Monitor's recommendations of methods to increase PDP staffing. *Id.* at 16-17 (noting several times in relation to specific recommendations, "As of the filing of this report, Defendants have taken no action to implement this recommendation.");

      d.     Defendants' failure to provide Class Members with the agreed-upon amount of out-of-cell time. *Id.* at 18 ("PDP continues to report deficiencies in ensuring that Class Members receive opportunities to recreate, shower, make phone calls, attend family or legal visits, and other activities outside of their cells for minimum daily timeframes required in the Agreement. . . . PDP acknowledges that . . . most PDP housing units are not consistently offering the required five hours out-of-cell time daily and none are offering 6 hours out-of-cell time daily.");

      e.     Little to no out-of-cell time for Class Members held in segregation units. *Id.* at 19-20 ("PDP reports that segregation units are not consistently offering the required one-

hour out-of-cell time each day. . . .   PDP also acknowledges that Class Members on some units receive no out-of-cell opportunities for extended periods up to 50 percent of the time.");

       f.     Significant injury resulting from deprivation of out-of-cell time on segregation units. *Id.* at 20 ("[T]he Monitoring Team and others who work in or enter PDP facilities have observed first-hand the injury inflicted on Class Members as a result of extended isolation. . . .   The Monitoring Team has observed Class Members displaying behaviors such as pacing, pleading with passers-by to open cell doors, anger, crying, lashing out, or experiencing symptoms including confusion, despondence, unwillingness or inability to engage, incessant muddled communication or talking to oneself, or psychiatric decompensation requiring hospitalization.");

       g.     Repeated inability to return to normal operations, or provide a plan to do so, due to staffing shortages. In fact, while Defendants received a "deferred" compliance status rating for the Agreement requirement to provide a plan to resume normal operations in the Monitor's first report, Defendant's compliance on this requirement was downgraded to "Noncompliance" in the Monitor's second report. *Id.* at 23-24 ("Defendants have acknowledged that they are non-compliant with the requirements of this substantive provision due to PDP's staffing crisis[.]"). Because Defendants' noncompliance with this provision was directly tied to the staffing crisis, the Monitor noted that if the City failed to implement the Monitor's recommendations regarding the staffing provision, "Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions." *Id.* at 24;

       h.     The fact that "in 2022, ten Class Member patients died in PDP facilities. These deaths included three suicides, four substance overdoses, and two deaths from natural causes, one of which was identified as COVID-19 related." *Id.* at 28;

i. Staffing shortages resulting in delayed medical care. *Id.* at 31 ("PDP continues to cite inadequate custody and healthcare staffing as the most significant factors preventing the decrease in the healthcare appointment backlog.");

j. Inadequate mental healthcare on segregation units. *Id.* at 34 ("The Monitoring Team has on-going concerns about the quality of behavioral health rounds, based on observations during site visits of Class Member patients who appeared to be in acute psychiatric distress and held in segregation for weeks or months. Some Class Member patients were too acute for isolated segregation environments and should have been flagged for removal to higher levels of care.");

k. The persistence of unhygienic and dangerous unit conditions, at least partially due to a decline in maintenance staff. *Id.* at 57 ("[S]ome PDP housing units remain in dangerous disrepair with living conditions that are unsafe, unsanitary, and fail to meet basic correctional standards."); *id.* at 58 ("Documentation provided reveals that the 50 percent vacancy rate in maintenance personnel noted in the Monitor's First Report has grown to 58 percent in this reporting period[.]");[4]

32. The Court Monitor filed a Third Report on October 12, 2023, which once again found Defendants out of compliance with a significant majority of Agreement provisions. ECF No. 193. This Report highlighted Defendants' lack of progress in abating the staffing crisis as well as grave consequences of this crisis, noting that, "there has been no improvement in staffing levels for critical positions in this reporting period," *id.* at 12, and that "the situation is dire, and

---

[4] Plaintiffs acknowledge that PDP has expanded the use of maintenance contracts, which has resulted in the completion of nearly 80 maintenance projects at PICC and a substantial improvement in PICC's extreme rodent and insect infestation. ECF No. 204 at 63. However, PDP remains out of compliance with Agreement provisions regarding sanitation. ECF No. 204 at 62-65.

PDP should expect more critical incidents as long as it persists," *id.* at 15. Additionally, the Court Monitor documented in further detail:

a.     Defendants' failure to implement "all of the Monitoring Team's initial recommendation to manage PDP's personnel vacancies." *Id.* at 3;

b.     The present and long-term damage to Class Members caused by the ongoing conditions. *Id.* at 3 ("[T]he trauma experienced by Class Members is profound and clearly observable to all who work in, enter, or reside in PDP facilities. Exposure to extended periods of isolation, institutional violence, squalor, and neglect breach all standards for humane confinement and is certain to have lifelong effects for many.");

c.     A worsening of the staffing crisis. *Id.* at 12 ("[S]worn and maintenance personnel vacancies continued to increase in this reporting period.");

d.     The dramatic effects of the staffing crisis, now documented to be a contributing factor in Class Members dying in and escaping from PDP custody. *Id.* at 14 ("[T]he Commissioner anticipates that staff negligence, as well as insufficient staffing were contributing factors [in the escape of two Class Members from PICC]. Generally, PDP does not have enough personnel at the ranks of lieutenant and sergeant to maintain a consistent supervisory presence inside facilities and monitor all housing units.  PDP also identified inadequate housing staff supervision during the review of at least one Class Member death in this reporting period.");

e.     Class Members continuing to be denied agreed-upon out-of-cell time. *Id.* at 19 ("[N]ot all Class Members are offered out-of-cell time every day, let alone the requisite hours. . . . [W]hen out-of-cell time is offered, durations do not consistently meet minimum Agreement requirements.");

f.    Some units are experiencing complete, damaging lockdowns because of

lack of staff to let Class Members out of their cells. *Id.* at 20 ("CFCF and PICC varied from

week to week, but data reflects that higher percentages of Class Member groups, up to 47 percent

in one of the weeks documented, remained locked down for the week. These lockdowns are

reportedly due to inadequate security coverage and are worse on weekends and holidays. . . .

The injury inflicted on Class Members as they endure hours, days, or weeks in isolation is

immeasurable and is compounded each day that non-compliance persists.");

g.    A downgrade from "partial compliance" to "non-compliance" as to out-of-

cell time in segregation units based on PDP's own reporting. *Id.* at 20 ("Because initial out-of-

cell data reflects such low compliance, PDP's compliance rating in this reporting period is

reduced to Non-compliance."); *id.* at 21 ("In this reporting period, the Monitoring Team

reviewing tracking reports for the week of June 5, 2023, which revealed that only 38 percent of

Class Members on segregation units received daily out-of-cell opportunities");[5]

h.    A sustained failure of Defendants to provide a plan to resume normal

operations. *Id.* at 27 ("PDP continues to report that it is not prepared to submit a plan for a return

to normal operations that includes all required out-of-cell time and access to other services and

programs as required by the Agreement. . . . [S]hort staffing is the primary reason articulated by

---

[5] Plaintiffs note that a reduction in the total number of incarcerated persons in segregation units
could lead to an increase in daily out-of-cell time for those who are in segregation. As of the
Third Monitor's Report, the Monitoring Team "maintain[ed] that PDP should reduce its
dependence on segregation for all Class Members and discontinue its use altogether for SMI
patients unless no alternatives exist." ECF No. 193 at 40. Alternatives to segregation units for
SMI patients and others on the behavioral health caseload would help reduce the total number of
individuals in segregation. PDP has initiated some diversion practices with the creation of
Transition Units. *Id.* However, as of the time of the most recent Montior's Report, the PDP
remains non-compliant by failing to provide those in segregation with daily out-of-cell time.
ECF No. 204 at 24.

PDP for its failure to comply with several Agreement provisions, including those related to out-of-cell time.");

  i. Continued healthcare backlogs for which "security and healthcare staff shortages remain the greatest barrier to compliance. . . . PDP's overall appointment backlog remains far higher than the 238-appointment backlog required for Agreement compliance." *Id.* at 29. The PDP has reduced the on-site care appointment backlog relative to prior reporting periods by the hiring of additional medical staff and providing certain services in the housing units. However, the off-site specialty appointment backlog continues to be quite high, due in large part to the lack of sufficient correctional officer staffing necessary for transportation and supervision of persons for these off-site appointments. *Id.* at 31;

  j. More Class Member deaths in custody during the reporting period. *Id.* at 32 ("Six Class Member patients died while in PDP custody in the first six months of 2023.");

  k. Mental healthcare staff vacancy rates so high that "PDP cannot meet requirements for the provision of timely and adequate behavioral healthcare." *Id.* at 35;

  l. The connection between staffing shortages and ongoing unsanitary conditions. *Id.* at 62 ("PDP's extensive and protracted staffing shortages have resulted in collective indifference to various systemic deficiencies, including unsanitary conditions in some housing units.").

  33. On January 4, 2024, by consent of the parties, the Court ordered an extension of the monitoring period by two years to April 30, 2026. ECF No. 197.

  34. The Court Monitor filed a Fourth Report on March 29, 2024, that documented continued noncompliance with the Agreement. ECF No. 204. As the Monitor stated, rather than acknowledging "the urgency and enormity of its problem and the life-threatening conditions it

breeds . . . [t]he City has instead pursued a course of half measures steeped in bureaucratic and political rigidity with devastating consequences for Class Members and PDP staff." *Id.* at 3. In support of the findings, the Monitor documented the following:

a.   A correctional officer vacancy rate *increase* of 4 percent during the reporting period, reflecting a correctional officer vacancy rate of 48%. *Id.* at 11. During the monitoring period, there has been a constant vacancy rate of over 40% for correctional officers (over 800 correctional officer positions). Moreover, the population at PDP has increased, post-pandemic, to a number that ranges from 4,600-4,800 on a daily basis;[6]

b.   The Restorative and Transitional Services Division at PDP, which includes psychologists, programming instructors, and social workers, reported increases in their total vacancy rate. *Id.* at 31;

c.   The majority of class members in general population units do not receive the five hours of daily out-of-cell time required by the Agreement, and a significant portion of class members receive, on average, less than one hour of out-of-cell time per day. *Id.* at 20-22. In examining six one-week periods in the second half of 2023, the Monitoring Team found that 17% of general population recreation groups at CFCF averaged less than one hour of out-of-cell time per day, 10% of general population recreation groups at PICC averaged less than one hour of out-of-cell time per day, and 9% of general population recreation groups at RCF averaged less than one hour of out-of-cell time per day; *id.*

d.   For Class members in segregation units, the PDP continues to be non-compliant. *Id.* at 23-24. For the time periods examined by the monitoring team, the majority of

---

[6] *See* Philadelphia prison population detailed snapshot report – February 2024 (March 7, 2024), https://www.phila.gov/media/20240307132513/February-2024-Full-Public-Report.pdf.

those in segregation units did not receive daily out-of-cell time. *Id.* at 24 ("Across the three one-week periods reviewed, the average percentage of Class Members in segregation units who received no daily out-of-cell time was 62 percent in June 2023, 62 percent in November 2023, and 72 percent in December 2023."). The non-compliance with this provision is due both to the number of individuals in segregation and the lack of staffing. *Id.* ("PDP will not show meaningful compliance with this provision until there are fewer Class members in segregated settings, sufficient staff to work in the housing units and supervisors to monitor compliance.");

      e.    An increase in the medical appointment backlog, for behavioral health appointments, on-site medical appointments, and off-sited medical appointments. *Id.* at 33-35. As of November-December 2023, for on-site appointments, there was a weekly average backlog of 944 appointments. *Id.* at 33. Off-site specialty medical appointments were subjects of long delays for patients who required routine or preventive specialty care and for those "with serious or life-threatening conditions." *Id.* at 35. In the last six months of 2023, correctional officer shortages accounted for a monthly average of 151 missed appointments, a 160 percent increase as compared to the first six months of 2023; *id.*

      f.    An increase in Class Member deaths: fourteen (14) incarcerated individuals died at PDP in 2023, four more than the ten who died in 2022. *Id.* at 37; ECF No. 185 (Second Report) at 28;

      g.    The PDP "remains unable to provide consistent law library access" and "evaluating compliance with the [equitable rotation] schedule [PDP as attempted to implement] was not possible . . . because documentation is incomplete." ECF No. 204 at 48;

      h.    Significant sanitation issues were reported. "Despite incremental systemic improvements and intermittent unit-specific improvements, nearly every sanitation issue reported

in the first three reporting periods persisted to an unacceptable degree in this reporting period."
*Id.* at 62.

35.     As of this date of the filing of this Motion, the Defendants have failed to show substantial compliance with the following provisions of Section II of the Agreement:

a.     Paragraphs 1 and 2, requiring implementation of new measures to ensure that there are "a sufficient number of correctional officers to cover all posts, according to PDP post-plans, on each shift at each facility," and mandating "no less than five hours of out-of-cell time each day" for all incarcerated persons in general population by August 1, 2022, and a presumptive six hour per day mandate by October 15, 2022. ECF No. 204 at 6-7. The lack of out-of-cell time is particularly acute on evenings, weekends, and holidays. ECF No. 193 at 20;

b.     Paragraphs 3 and 6, requiring "no less than one hour" of out-of-cell time for all persons in segregation units and that a mental health program for these persons be re-established. *Id.* at 7. The issue of lack of out-of-cell time is most acute in the segregation units with reports of no out-of-cell time for days at a time. Notwithstanding the fact that this situation has existed for years, there has been no improvement in meeting out-of-cell requirements for individuals on segregation units. *Id.* at 23-24;

c.     Paragraph 4, requiring a PDP "plan for return to normal operations of the PDP" with respect to out-of-cell time, programming, visits and other services. *Id.* at 7;

d.     Paragraph 5, requiring "adequate and timely medical and mental health treatment [for] all incarcerated persons." *Id.*;

e.     Paragraph 7, requiring access to the law library. *Id.* at 7–8;

f.     Paragraph 17, relating to weekly general inspections cleaning days for each housing area and laundry services. *Id.* at 10;

36.     In the first three months of 2024, three incarcerated persons have died at PDP facilities, including one homicide.[7] In one recent homicide, the death of Rocco Carbonara, there is a question about why he was even incarcerated.[8] And in 2023, there was a 60% increase in outside hospital trips because of institutional violence.

37.     Plaintiffs have previously refrained from filing a contempt motion to provide additional time to increase staffing and to return to normal operations. At this point, however, without Court intervention and sanctions, there will be continued violations of the Agreement and the denial of fundamental rights of the Plaintiff class.

## III.   LEGAL STANDARDS ON CONTEMPT

38.     "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Unlike criminal contempt, which is intended to punish the contemnor and vindicate the authority of the court, "the primary purpose of civil contempt is remedial and for the benefit of the complainant." *Roe v. Operation Rescue*, 920 F.2d 213, 216 (3d Cir. 1990).[9] "[I]f a person violates a court order requiring in specific and definite language that that person do or refrain

---

[7] Rodrigo Torrejón and Samantha Melamed, *Inmate killed during fight at a Philly prison*, THE PHILADELPHIA INQUIRER (March 13, 2024), available at https://www.inquirer.com/crime/incarcerated-man-curran-fromhold-dies-fight-20240313.html.

[8] Samantha Melamed and Chris Palmer, *A man who was fatally beaten at a city jail should not have been jailed in the first place, lawyer says*, THE PHILADELPHIA INQUIRER (Dec. 1, 2023), available at https://www.inquirer.com/crime/philadelphia-jail-homicide-arrest-rocco-carbonara-20231201.html.

[9] The two forms of contempt—civil and criminal—are distinguished by "the 'character and purpose' of the sanction involved." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 827, 829 (1994) (quoting *Gompers* v. *Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911); *see also United States v. Pozsgai*, 999 F.2d 719, 735 (3d Cir. 1993) ("The purpose and nature of the sanction, rather than the label attached to it, determine whether it is civil or criminal."). Because criminal contempt "is a crime in the ordinary sense," criminal contempt sanctions can only be imposed on a party who has been afforded all the protections that the Constitution requires of criminal proceedings. *Int'l Union*, 512 U.S. at 826–27.

from doing an act or series of acts," a finding of civil contempt is appropriate. *Cottman Transmissions Sys. v. Melody*, 851 F. Supp. 675, 676 (E.D. Pa. 1994).

39.     To hold a party in civil contempt, a court must find, by clear and convincing evidence, that (1) a valid court order existed, (2) the party had knowledge of the order, and (3) the party disobeyed the order. *John T. v. Del. Cty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003).

40.     It is the fact of a party's failure to comply with a court order—not the party's state of mind—that makes civil contempt appropriate. *See Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) (holding that "willfulness is not a necessary element of civil contempt"). "[G]ood faith is not a defense to civil contempt." *Id.*; *see also Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148–49 (3d Cir. 1994) ("Willfulness is not a necessary element of civil contempt. . . . Accordingly, evidence . . . regarding . . . good faith does not bar the conclusion . . . that [the defendant] acted in contempt.").

41.     Impossibility is not a defense to civil contempt unless the alleged contemnor demonstrates that compliance is "a physical impossibility beyond the[ir] control." *FTC v. Lane Labs-USA*, 624 F.3d 575, 590 (3d Cir. 2010). The party must demonstrate that "compliance is . . . factually impossible." *Id*. Compliance is factually impossible where, for example, an alleged contemnor is not in possession or control of documents they have been ordered to produce or demonstrates a financial inability to comply with an order to pay sanctions. *See, e.g.*, *Egnotovich v. Greenfield Twp. Sewer Auth.*, 378 F. App'x 121, 123 (3d Cir. 2010). An alleged contemnor asserting an impossibility defense must "show that it has made . . . ***all*** reasonable efforts to comply." *Harris v. City of Philadelphia*, 47 F.3d 1311, 1324 (3d Cir. 1995) (internal quotation marks and citations omitted; emphasis added). Neither the high cost nor impracticability of

compliance qualifies as impossibility. *See id.* at 1324–25 (rejecting impossibility defense where compliance might have been costly and impractical but was still possible); *see also Inmates of Allegheny Cty. Jail v. Wecht*, 874 F.2d 147, 152 (3d Cir. 1989) (rejecting impossibility defense where the defendant county jail warden could not comply with the Court's Order because county officials "chose to take no steps to provide [him] with the wherewithal to comply").

42.     The elements of civil contempt are clearly established here. The Settlement Agreement of 2022 was entered into by all parties, approved by the Court, and placed Defendants on specific notice of their legal obligations. As described above, the Court Monitor has determined that Defendants have failed to comply.

43.     Further, considering the patterns of correctional officer non-reporting that date to at least 2018,[10] it can hardly be said that compliance is "factually impossible," *see Lane Labs-USA*, 624 F.3d at 590, or that Defendants have made "all reasonable efforts to comply," *see Harris*, 47 F.3d at 1324.

44.     On previous motions for contempt of court, Defendants argued that they should not be held in contempt given circumstances beyond their control and pointing to high rates of absenteeism by correctional officers. That defense was rejected by the Court in 2021 and must

---

[10] PDP administration was on notice of a staffing crisis even before the COVID-19 pandemic. In 2019, a cost efficiency analysis for PDP determined that PDP's "level of overtime use, in conjunction with its high ratio of inmates to correctional officers, indicates that the PDP is likely understaffed relative to other systems under review." "Cost Efficiency Analysis: Philadelphia Department of Prisons Final Report," CGL (Feb. 28, 2019) at 14. https://phlcouncil.com/wp-content/uploads/2019/04/Philadelphia-Cost-EfficiencyAnalysis-Final.03.25.19.pdf. Commissioner Blanche Carney testified at the Philadelphia City Counsel in May 2019 that "we've been understaffed for a number of years". "FY 2020 Budget Hearing Philadelphia Prisons 5-1-2019" Philadelphia City Council, (May 1, 2019), https://www.youtube.com/watch?v=60SvdsQ923Y&ab_channel=PhiladelphiaCityCouncil

be rejected now as the Defendants have been on notice of high rates of absenteeism and insufficient staffing *since at least 2018* and have failed to hire and retain a sufficient staff of correctional officers. Further, Defendants *agreed to the terms of the Settlement in 2022 with full knowledge of the difficulties they faced in achieving compliance* and, therefore, cannot claim impossibility of performance. The Third Circuit has made it clear that a finding of contempt requires only that a court find (1) a valid court order existed, (2) the party had knowledge of the order, and (3) the party disobeyed the order. *John T.*, 318 F.3d at 552.

45.     Civil contempt serves a remedial, rather than punitive purpose, and therefore "civil contempt may be employed to coerce the defendant into compliance with the court's order and to compensate for losses sustained by the disobedience." *McDonald's Corp. v. Victory Inv.*, 727 F.2d 82, 87 (3d Cir. 1984).

46.     Upon a finding of civil contempt, "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order" is appropriate in order to "exert a constant coercive pressure" on the contemnor to comply with the court's order. *Int'l Union v. Bagwell*, 512 U.S. 821, 829 (1994). The court may also impose sanctions "to make reparation to the injured party and restore the parties to the position they would have held had the [order] been obeyed." *Robin Woods*, 28 F.3d at 400 (citation omitted). Upon a finding of civil contempt, "[d]istrict courts . . . are afforded broad discretion to fashion a sanction that will achieve full remedial relief." *John T.*, 318 F.3d at 554; *see also AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 420, 426 (1st Cir. 2015) ("[In civil contempt proceedings,] the district court enjoys wide latitude in its choice of sanctions.").

**IV.      REQUESTED SANCTIONS**

47.      To remedy ongoing violations and to secure compliance with the Agreement, the Court is requested to impose a per diem fine of $5.00 for each member of the Plaintiff Class, starting from the date of the Court's contempt finding, and until such time that (1) Defendants reduce the percentage of unfilled correctional officer positions to 30%, and (2) the Court Monitor finds that Defendants are in substantial compliance with their obligation to provide one hour of daily out of cell time to Plaintiff class members in segregation units.

48.      If Defendants meet the benchmarks set forth in paragraph 47, as determined by the Court Monitor, the daily fine should be reduced to $2.50 per day for each member of the Plaintiff class.

49.      For a full termination of fines or other sanctions, PDP should be required to reduce the percentage of unfilled correctional officer positions to 15%, implement a plan for a return to normal operations at the PDP, and show substantial compliance with the Agreement.

50.      The fines shall be placed in an escrow fund and shall be distributed to each member of the Plaintiff class on the date of their release from or transfer out of PDP in accordance with the amount of fine imposed per person for each day of confinement in PDP.

## V.     CONCLUSION

Wherefore, Plaintiffs move the Court to find Defendants City of Philadelphia and the

Commissioner of the Philadelphia Department of Prisons in civil contempt and assess sanctions

until Defendants demonstrate that they are in substantial compliance with the Agreement.

Respectfully submitted,

/s/ David Rudovsky
David Rudovsky (PA 15168)
/s/ Susan M. Lin
Susan M. Lin (PA 94184)
/s/ Grace Harris
Grace Harris (PA 328968)
KAIRYS, RUDOVSKY, MESSING,
FEINBERG, & LIN, LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
(215) 925-4400

/s/ Su Ming Yeh
Su Ming Yeh (PA 95111)
/s/ Matthew A. Feldman
Matthew A. Feldman (PA 326273)
/s/ Sarah Bellos
Sarah Bellos (PA 327951)
PA INSTITUTIONAL LAW PROJECT
718 Arch St., Suite 304S
Philadelphia, PA 19106
(215)-925-2966

/s/ *Bret Grote*
Bret Grote (PA 317273)
/s/ *Nia Holston*
Nia Holston (PA 327384)
/s/ *Rupalee Rashatwar*
Rupalee Rashatwar (FL 1011088)
ABOLITIONIST LAW CENTER
PO Box 31857
Philadelphia, PA 19104
(412) 654-9070

*Attorneys for Plaintiffs*

DATE:  April 8, 2024