IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of themselves and all others similarly situated, | : : : | No. 2:20-cv-01959-BMS |
| Plaintiffs-Petitioners, | : : | |
| v. | : : | |
| CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons, | : : : : | |
| Defendants-Respondents. | : : | |

**DEFENDANTS' RESPONSE IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CONTEMPT AND SANCTIONS**

I.   **INTRODUCTION**

Plaintiffs have filed a motion for contempt and sanctions, seeking an Order finding the City in contempt of court for its failure to substantially comply with the provisions of the settlement agreement and court order entered into in April 2022, which agreement has been the subject of monitoring by a court-appointed monitor since that time. Mot. for Contempt, ECF No. 205.[1] As a sanction, Plaintiffs seek the imposition of sanctions amounting to nearly $25,000 per day, decreasing to $12,500/day only when the City has reduced the correctional officer vacancy rate to 30% and provided every person in segregation an hour of daily out of cell time. *Id.* ¶ 47. Plaintiffs propose the $12,500/day sanction remain until the correctional officer vacancy rate reduces to 15% and a plan to return to "normal operations" be implemented. *Id.* ¶¶ 48-49. Defendants respectfully submit that given the recent change in Administration, which has been

---

[1] Plaintiffs' Motion for Contempt is made in enumerated paragraphs. Rather than respond paragraph by paragraph contesting the averments as stated or as incomplete, Defendants submit this response in opposition in memorandum form.

accompanied by a change in leadership and enhanced investment in the Philadelphia Department of Prisons, neither the contempt finding nor the requested sanctions are warranted, and the Court should decline to impose either at this juncture.

This case was originally filed as one of many around the country in April 2020, challenging the efforts of carceral institutions to reduce the risk of introduction and transmission of Covid-19 inside the facilities. And though the most effective mechanism to reduce the transmission of an airborne virus is to avoid other people, the litigation also sought to reduce the reliance upon shelter-in-place as a safety tool because of the negative mental health effects of being confined to a cell. Since inception, this case has been about profoundly difficult choices between risks – between that of infection of a vulnerable population with an airborne virus and that of mental health. Although the health risks of Covid-19, particularly in a congregate facility with a population manifesting significant resistance to vaccine uptake, remained present, the Court and Plaintiffs' counsel grew less concerned about the infection risk and more concerned about the effects of time out of cell on the incarcerated population, particularly where the pretrial length of stay has increased significantly since 2019 such that people are experiencing conditions for longer as a result of protracted prosecutions. The reduced concern about potential for Covid-19 transmission manifested in several rounds of briefing about Plaintiffs' advocacy for – and the Court's decision to impose – increased out of cell minimum times across the Philadelphia Department of Prisons regardless of the physical health risks. *See, e.g.*, ECF Nos. 51, 55, 57, 58, 59, 62, 63.

In April 2022 the parties entered into a Class Action Settlement, which was then approved by the Court in July 2022. The parties agreed upon the appointment of Cathleen Beltz as the monitor, and her work has been supported by a team of subject matter experts. In the

ensuing two years, there have been four reports filed describing the substantial, partial, and non-compliance of the City with various provisions of the settlement agreement.  Tellingly, the reports also identify the significant efforts undertaken by the Philadelphia Department of Prisons to adapt and modify its practices in response to suggestions by the monitoring team.  Given Plaintiffs' focus on the experience of the population housed in segregation, it is notable that among the significant efforts of the Department of Prisons is that it significantly reduced the population being housed in segregation and further significantly reduced the time for which people would be held there.  Monitor's Fourth Report ("Fourth Report"), ECF No. 204, at 26-28.  The temporary experience of segregation status thus affects far fewer people for less time, an impactful change for the concerns that Plaintiffs have raised over the duration of this litigation.

      Throughout the monitoring process, the Department of Prisons has worked with the monitoring team to implement measures to move toward compliance with several provisions of the agreement, and the City has worked to support the Department of Prisons.  As for the latter, the most recent monitoring report opined that while the City has not "ignored its obligations under the Agreement," its efforts were insufficient and rather than being the transformative actions required constituted "a course of half measures steeped in bureaucratic and political rigidity."  Fourth Report at 3.

      The City respectfully submits that this observation was made looking back at the measures taken at the end of the last Administration, and is inapplicable to the energy, investment, and support now being directed at the Department of Prisons.  Defendants also submit that Plaintiffs have standing to file suit against or otherwise impled the system actors that appear responsible for the substantially increased time their clients are held in local custody as a result of significantly delayed case processing, which action seems particularly pressing

given the astonishing increase in pretrial detention in PDP facilities.  The City is investing significant additional resources into addressing the staffing number, morale, and retention issues in its own facilities.  But as Plaintiffs are well aware, the City does not control the criminal justice system, and the choice remains with Plaintiffs whether and how they pursue action over those otherwise unaccountable actors.  Their sought request instead seeks to punish the City for the compounding failures of entities over which it has no control, highlighting further the extent to which the sought relief is inappropriate at this time.

For the reasons that follow, the Court should not entertain contempt or sanctions at this time.

## II.     ARGUMENT

### A.  *Defendants should not be found in Contempt of Court*

To establish contempt of Court, Plaintiffs must show that defendants are guilty by *clear and convincing evidence*.  *Fox v. Capital Co.*, 96 F.2d 684, 686 (3d Cir. 1938) ("where there is ground to doubt the wrongfulness of the conduct of the defendant, he should not be adjudged in contempt"); *see also Thompson v. Johnson*, 410 F. Supp. 633, 643 (E.D. Pa. 1976) ("The exercise of the power to find and to punish for contempt is, however, discretionary, and should be undertaken 'with the utmost sense of responsibility and circumspection.'").  Any ambiguities must be resolved in favor of the so-charged party.  *John T. ex rel. Paul T. v. Delaware Cty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003); *see also Nelson Tool & Mach. Co. v. Wonderland Originals, Ltd.*, 491 F. Supp. 268, 269 (E.D. Pa. 1980)  ("Civil contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt.").  To reiterate, "the plaintiff has a heavy burden to show a defendant guilty of civil contempt.  It must be done by

'clear and convincing evidence,' and where there is ground to doubt the wrongfulness of the conduct of the defendant, he should not be adjudged in contempt." *Fox*, 92 F.2d at 686.

Even if Plaintiffs could meet their heavy burden of proof, substantial compliance is a defense to a civil contempt action. "To successfully raise this defense, Defendants must show that they '(1) ha[ve] taken all reasonable steps to comply with the valid court order, and (2) ha[ve] violated the order in a manner that is merely 'technical' or 'inadvertent.''" *Matthews Int'l Corp. v. Lombardi*, No. 20-89, 2021 WL 1929266, at *2 (W.D. Pa. May 13, 2021) (alterations in original) (quoting *FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2020)). In *Lane Labs-USA*, the Third Circuit Court of Appeals formally adopted the defense of substantial compliance, which had not previously been the rule in this circuit. *Lane Labs-USA*, 624 F.3d at 591. The Appellate Court went on to explain that: "[w]hether the alleged contemnors took all reasonable steps to comply with the court order, and the extent to which contumacious conduct constitutes a 'technical' or 'inadvertent' violation, are factual questions subject to review for clear error. Resolution of these questions will naturally depend upon the unique facts of each case, the nature of the conduct precluded, and the capabilities of the parties subject to the order." *Id.*

The Monitor has opined, and the City does not contest, that City will not achieve substantial compliance with the out of cell times that the City committed to in the settlement agreement until staff levels increase or the volume of the incarcerated population decreases. The City does not control the operation of the local courts or the criminal justice agencies that operate therein.[2] But the City has taken the following measures that it believes will alleviate staff

---

[2] The recent and historical Jail Population Reports illustrate profoundly distressing trends in pretrial length of stay. Though the local court system ostensibly officially reopened in its entirety on July 6, 2021 (*see* Ex. A, Philadelphia Prison Population Report, March 2024, at 8),

5

pressures such that it will begin to consistently deliver on its commitments.  Indeed, the City is eager to meet these commitments and extinguish the litigation.

The City first addresses hiring.  Over the last year the City has invested significant additional money in salaries by virtue of the change to twelve-hour shifts (raising the base salary of a correctional officer from $48,335 for the eight-hour shift to $57,308 for the twelve-hour shift), implemented hiring and retention bonuses, and maintained attendance bonuses.  The City has benefitted in recruitment as a result of these changes, with fifty correctional officers hired in 2024 (as of the next graduation, on May 15, 2024), and another class of forty expected to begin training on May 13, 2024.  This combines to an anticipated ninety additional correctional officers by July 24, 2024, with the hiring ongoing even as these classes train.  As has previously been reported to the monitoring team and the parties, the City has also modified its processes such that the Department of Prisons functionally has an open list, the Civil Service mechanism by which qualified individuals are initially identified for potential employment.  In years past the

---

the average length of stay for men is now 252.3 days and for women 184.9 days, *id.* at 18.  By contrast, in September 2019 the average length of stay for men was 167.5 days and for women 126.4 days.  Ex. B, Philadelphia Prison Population Report, September 2019, at 15.

Comparing these two reports also reveals disconcerting trends in the charges of the population whose cases have not been moving: in September 2019 there were 257 people with pending murder charges and no detainers (Ex. B, Sept. 2019 Report, at 10) – in March 2024 that number has spiked to 412 (Ex. A, Mar. 2024 Report, at 12).  The population held on pretrial non-murder charges has also increased significantly, from 953 in September 2019 to 1,246 in March 2024.  *See id.*

Data maintained by the Department of Prisons presents an even more stark picture.  As of April 27, 2024, six hundred and ninety-two individuals were held pretrial on murder or criminal homicide charges.  Two hundred seventy-three were admitted in 2023, one hundred sixty-six were admitted in 2022, and one hundred twenty-seven were admitted in 2021 or earlier.  *See* Chart, Ex. C.

Simply stated, these reports and data reveal that serious cases are languishing in the courts.

Department would have to wait for new lists to post and be referred, a change in practice that has accelerated creation of recruit classes. In addition to this hiring, there is increased interest being expressed by employees who separated from the Department of Prisons in returning to employment, nascent outreach that the City hopes will continue and will serve to bolster the ranks of the correctional staff.

The City next addresses retention. The Monitor has observed consistently that the physical plant of the Department of Prisons facilities, and their state of maintenance and cleanliness, affect the morale and experience of the incarcerated population and the staff at the Department of Prisons. The City has recently committed to significantly invest in the work of the contractor U.S. Facilities to conduct a deep cleaning of the facilities, as well as to enhance the services it provides in the facilities that are not already under its purview. This represents an additional investment of $5,500,000 in the environment to the benefit of the staff of the Department of Prisons and the incarcerated population. The effect of this work at PICC has been noticeable, and commented upon by the incarcerated population to the Prison Society of Pennsylvania. The City does not identify this to suggest that its work is done, but simply to illustrate that energy, focus, and investment are present and ongoing.

One of the substantial burdens on morale and additions to fatigue among the staff of the Department of Prisons has been the mechanisms by which provision of services and out of cell time were tracked, specifically by handwritten log that required members of the incarcerated population to acknowledge receipt of services by signing tracking logs. Signing papers took away the time that the incarcerated population had out of cell, and having to monitor this process enhanced tensions between the housing unit staff and the incarcerated population. The City has taken a two-fold approach to easing these tensions and enhancing out of cell time. First, the City

7

has invested in a Radio Frequency ID system (RFID), which should create more accurate tracking of the movement of the incarcerated population through the facilities, without having to burden staff with trying to engage the incarcerated population in signing a document each time they are released from their cells.  This represents an initial investment of over $700,000 for the first year and an annual cost of just over $430,000 for years two through five.  This investment in the operation and management of the PDP facilities will alleviate staff burden and enhance facility management.  Second, the Department of Prisons has determined that in the interim time it will retire the former process of tracking out of cell time.

There are additional investments being made and work being done to support the incarcerated population and the management of the Department of Prisons.  The City is working on a contract to provide every member of the incarcerated population a tablet, at an estimated cost of over $2,500,000 for product and installation.  The City is also working to procure restraint chairs, which would allow several members of the population in segregation to be out of their cells at the same time.  While the cost is much lower, at $7,400, the impact for that population will be significant and the City hopes will alleviate the operational burdens on getting out of cell time for those in segregation status.  In further support of the work to ease the staffing pressures caused by coverage at local hospitals, the City is nearing completion of a contract with Jefferson to establish a secure hospital ward, which would allow the persons in custody who require in-patient care at a hospital to be co-located in that ward.  Each independently in-patient prisoner requires two correctional officers to be bedside at all times.  This number of offsite staff will decrease significantly with the establishment of the secure ward, allowing more correctional staff to remain on the PDP campus and support the operation of the housing units.  As a final example of the work being done to support the recovery and rebuilding of the Department, the

City has continued to invest in correctional consultants to support the strategic planning and executive support of the Department, with nearly $1,500,000 in expended and anticipated funds directed to the work of Phronema Justice Strategies, run by former Pennsylvania Department of Corrections Commissioner John Wetzel. This organization is, among other things, contributing to efforts to create a comprehensive staffing analysis of what is required to efficiently operate the facilities and to develop processes to better utilize staff assignment.

In addition to the expected salutary effects of these additional investments in the expansion of the number of correctional staff and their workplace, the City respectfully submits that retention will benefit from other changes at the Department of Prisons. As is thoroughly documented throughout the history of this litigation, significant tensions existed between Management and Labor inside the Department of Prisons. As is the case in any organization, such tensions erode staff morale and escalate issues with recruitment and retention. The Department of Prisons is now under new leadership, as is the bargaining unit representing the correctional staff in the facilities. The City respectfully submits that while there will almost always be some measure of natural tension between labor and management, the leadership change in both entities should serve as a reset to the existing relationship within the Department of Prisons, which the City anticipates should inure to the benefit of the employees of the Department of Prisons and the persons incarcerated therein. The City is also hopeful that, as a founding member of the team that accomplished so much in terms of population reduction at the genesis of the MacArthur grant project, the new Prison Commissioner will again be able to collaboratively work with the criminal justice agency stakeholders to revitalize the practices and processes that facilitate the efficient processing of cases and people through the system, thereby alleviating some of the population levels and lengths of stay exacerbating conditions on State

Road.

All in all, the change in Administration has been accompanied by a change in intensity, investment, and energy directed towards supporting the Department of Prisons as it works assiduously to build out its workforce and, as a result, meet or exceed the commitments the City entered into in April 2022. In light of all the above, the City respectfully submits that it should not be found in contempt of Court.

> B. *Even if Defendants' Non-Compliance with Certain Provisions is Adjudicated Contempt, Given the Extend of Change and Investment Sanctions are Unwarranted*

Before addressing the ways in which Plaintiffs' proposed sanction does not accomplish the goals of civil sanctions, Defendants reiterate that they have acted in good faith as they make significant efforts to meet the requirements of the parties Settlement Agreement and Court Order. Even if good faith is not a defense to contempt, it is relevant to the Court's imposition of sanctions. *Essex Cty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 445 (D.N.J. 1998). As noted by another court considering similar litigation, "we simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.'" *Swain v. Junior*, 961 F.3d 1276, 1289 (11th Cir. 2020).

Further, even were the Court to find Defendants' in contempt of the Court's Order and Settlement Agreement, which it should not, "a finding of contempt does not automatically require the imposition of sanctions." *Thompson v. Johnson*, 410 F. Supp. 633, at 643 (E.D. Pa. 1976). It has been the law of the United States since 1947 that, in determining whether and how much to fine, the Court must consider the "probable effectiveness" of the fine as well the defendants' financial resources and the seriousness of the burden to that defendant. *United*

*States v. United Mineworkers*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). "Unlike criminal contempt, which has a punitive function, civil contempt is imposed either to coerce compliance with a court order or to compensate a party harmed by non-compliance." *United States v. Puerto Rico*, 642 F.3d 103, 108 (1st Cir. 2011). Here, the requested relief would not coerce faster compliance – a myriad of efforts in support of which are urgently ongoing – and instead might be counterproductive.

The Court must consider "the probable effectiveness of any suggested sanction in bringing about the result desired." *U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). In weighing the equities of a contempt sanction, the Court should be "mindful of the deference courts have exhibited towards state corrections in prison litigation." *Essex Cty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 445, 451 (D.N.J. 1998). Given the extensively described investments in the Department of Prisons, "monetary contempt sanctions would impede progress and thwart the defendants' continuing efforts to remedy the conditions of confinement." *Carty v. Schneider*, 986 F. Supp. 933 (D.V.I. 1997); *see also Essex Cty. Jail*, 18 F. Supp. 2d at 453.

Plaintiffs' proposed sanctions contemplate that the PDP pay approximately $25,000 per day into an escrow account which would then be dispersed on a per diem rate to persons incarcerated in the Philadelphia Department of Prisons until vacancy rates decrease and the population in segregation consistent get out of cell for an hour a day. Sanctions are paid out of the operating budget of PDP. That money would be better directed to the investments in salary, retention, and facility enhancement detailed above, all of which will further compliance with the Settlement Agreement. To the extent that Plaintiffs concur that low staffing levels affect the operation of the prisons, directing money away from the operating budget used to pay for

11

additional staff time does not accomplish that shared goal of supporting ongoing efforts to invest in staffing.

The second purpose of a contempt sanction is to compensate the plaintiffs for harms they have allegedly suffered as a result of defendants' non-compliance. *United States v. Puerto Rico*, 642 F.3d at 108.  Here, the sought sanction does not accomplish this purpose and might have unintended, negative consequences for members of the class.  The proposed sanctions are tied to the experience of the significantly-reduced population that rotates through the segregation population rather than the experience of the general population.  Further, to the extent that every member of the incarcerated population is compensated for their experience in the Philadelphia Department of Prisons, the structure of that sanction raises interesting questions about whether or to what extent such compensation for alleged constitutional harms might preclude later suit by those individuals.  This litigation was certified as an injunctive class action that no members could opt out of – compensation for conditions experienced in custody might preclude later litigation for those class members who are mandatory members of the class.

Plaintiffs have proposed a sanction of up to $25,000 per day, amounting to $150,000 per week, directed out of the PDP operating budget and into escrow for class members.  Setting aside how any such fund would be managed and appropriately paid out, this redirection of funds away from the critical staffing and infrastructure investments PDP is making runs counterproductive to the purposes of civil sanctions, to coerce compliance.  The City is taking urgent, necessary steps to upstaff the prisons and to supplement its workforce with contractors where it can – this work should not be derailed by the imposition of sanctions.

## III.     CONCLUSION

For the above reasons, the City respectfully submits that Plaintiffs' Motion for Sanctions should be denied.


Date:  May 6, 2024					Respectfully submitted,

							*/s/ Anne B. Taylor*
							Anne B. Taylor, Esquire
							Litigation Chair
							City of Philadelphia Department of Law
							1515 Arch Street, 14th Floor
							Philadelphia, PA 19102-1595
							215-683-5381 (office)
							anne.taylor@phila.gov


							*Attorney for Respondents-Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THOMAS REMICK, et al.,** on behalf of themselves and all others similarly situated, : | |
| : | **No. 2:20-cv-01959-BMS** |
| **Plaintiffs-Petitioners,** : | |
| v. : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY,** in her official capacity as Commissioner of Prisons, : | |
| **Defendants-Respondents.** : | |

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions, and Exhibits in support thereof, were filed via the Court's electronic filing system and are available for downloading.

Date:  May 6, 2024              Respectfully submitted,

                    */s/ Anne B. Taylor*
                    Anne B. Taylor, Esquire
                    Litigation Chair
                    City of Philadelphia Department of Law
                    1515 Arch Street, 14th Floor
                    Philadelphia, PA 19102-1595
                    215-683-5381 (office)
                    anne.taylor@phila.gov

                    *Attorney for Respondents-Defendants*