**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated,** | : | **No.: 2:20-cv-01959-GAM** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA; and BLANCHE CARNEY, in her official capacity as Commissioner of Prisons,** | : | |
| | : | |
| **Defendants.** | : | |

**MONITOR'S FIFTH REPORT**

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Fifth Report evaluating Defendants' compliance with the terms of the Agreement through June 30, 2024.  The Monitor prepared this report as the fifth of regular reports to be filed of record through the second settlement term ending April 30, 2026. Subsequent reports will be filed according to the following schedule:

| | |
|---|---|
| Monitor's Sixth Report | March 31, 2025 |
| Monitor's Seventh Report | September 30, 2025 |
| Monitor's Final Report | March 30, 2026 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED:  September 30, 2024                      Respectfully submitted,


By: /s/ Cathleen Beltz
Monitor

The Agreement between Plaintiffs Thomas Remick, et al., on behalf of themselves and all others similarly situated (Plaintiffs), and the City of Philadelphia (City) and Blanche Carney, in her official capacity as Commissioner of Prisons (Commissioner), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-GAM (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.  The two-year Agreement was scheduled to terminate on April 12, 2024.  In the initial settlement term, Defendants met the requirements for substantial compliance with Substantive Provision 15—COVID-19 Testing and Substantive Provision 16—Quarantine.  Defendants also substantially complied with sub-provisions 12.3 and 12.5 (Substantive Provision 12—Locks) and 13.1 and 13.3 (Substantive Provision 13—Visiting).  On January 4, 2024, the parties stipulated to a two-year extension with a new Agreement termination date of April 30, 2026.[1]

The Agreement provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement.  The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision.  Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement.  A "Substantial Compliance" finding means Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision.  A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance.  A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete the discrete tasks outlined in a substantive provision.  Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence.  Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members.  In issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 30, 2026, termination date.  In this reporting period, the Monitoring Team utilized data tracked through June 30, 2024, and additional information received through September 15, 2024.

The Agreement requires the Monitor to conduct site inspections "at least once every three months."  In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP.[2]  During site visits, the Monitor has access to conduct confidential interviews with personnel and Class Members.  The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and

---

[1] On January 4, 2024, upon the agreement of the Parties, this Court issued an order extending the Agreement through April 30, 2026.  Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 197 (E.D. Pa. Jan. 4, 2024).

[2] The Monitoring Team completed an unannounced site visit on January 10-11, 2024, during this reporting period.

1

patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

The Remick Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[3]  In this reporting period, Deputy Monitor Grosso (Deputy Monitor) has continued to conduct site visits at least once per month to speak with Class Members on PDP housing units.  Following site visits, the Deputy Monitor schedules weekly confidential virtual meetings with Class Members if more privacy is required.  Since weekly two-hour tablet meetings commenced December 6, 2022, the Deputy Monitor has interviewed 308 Class Members across PDP facilities.  The Monitoring Team also utilizes information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

The Monitoring Team periodically receives complaints from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel.  With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary.  With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews.  Conditions observed and information received via these interviews and protocols are consistent with *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

The Monitoring Team also receives information via published reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, criminal defense attorneys, and others independent of PDP.  This information augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms.  The Monitoring Team thanks these oversight partners for their continued contributions and commitment.

In this reporting period, members of the Monitoring Team completed seven site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside (RCF).[4]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by

---

[3] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022).
[4] Site visits were conducted January 10-11, 2024, January 29, 2024, February 22, 2024, March 27, 2024, April 17-19, 2024, May 24, 2024, and June 25-27, 2024.

Defendants and utilized by the Monitoring Team in making compliance determinations will be shared with Plaintiffs' co-counsel.

In this reporting period, the Monitoring Team met regularly with newly appointed PDP Commissioner, Michael Resnick (Commissioner or Commissioner Resnick), and his staff and continued to receive access to facilities, personnel, and Class Members.  PDP's tradition of unfettered access and cooperation with the Monitoring Team was first established by PDP's previous Commissioner, Blanche Carney (Retired Commissioner Carney), and has been key to the Monitoring Team's effective working relationship with PDP.  Commissioner Resnick has committed to honoring this tradition, and the Monitor thanks both commissioners on behalf of the Monitoring Team.

PDP executives and staff have expressed optimism about some of Commissioner Resnick's new initiatives and efforts thus far in his tenure.  The Commissioner brings energy, expertise, and a fresh perspective to PDP operations, which the Monitoring Team is confident will serve him as he navigates the significant challenges of his new role.  The Monitoring Team thanks the Commissioner and his team for their commitment to improving PDP conditions and the daily experiences of Class Members.

Pursuant to Substantive Provision 4—Resume Normal Operations, PDP and the Monitor were required to submit a plan for PDP to return to "normal operations" once COVID-19 restrictions were lifted.  The plan was due for submission to this Court by November 1, 2022.  PDP has been unable to finalize a plan due to high vacancies among correctional officer positions.  Also pursuant to Substantive Provision 4, the Monitor convened several meetings of the parties to strategize solutions to the staffing shortage that resulted in failures to comply with this and other substantive provisions.[5]  Meetings involved transparent, good faith collaboration between Retired Commissioner Carney, her executive team, and counsel for the parties and produced solutions to some of PDP's operational issues.  Ultimately, meetings revealed that the City was unwilling to expend necessary resources to address the staffing crisis.

COVID-19 wreaked havoc in jails nationwide, and the City could not have predicted the extent of the damage in its department of prisons.  Unprecedented officer vacancies have contributed to lapses in security protocols, the introduction of contraband, injuries to Class Members and staff, escapes, and deaths.  At times, post vacancies result in unattended housing units and pose serious risk to Class Members' health and safety.  Class Members have, at times, been denied access to routine and complex healthcare services, therapeutic and educational programming, communication and visits with loved ones, timely meal delivery, the provision of clean clothing and bed linens, and showers to maintain personal hygiene.  Some Class Members have been exposed to periods of isolation that exceed legal benchmarks for humane cell confinement, which have likely caused or exacerbated mental illness and maladaptive, violent, and self-harming behaviors.

---

[5] Meetings of the parties occurred over eight months on June 23, 2023, October 16, 2023, November 6, 2023, December 15, 2023, and February 5, 2024.

In the first two years of settlement implementation, PDP staff across job classifications reported experiencing demoralization due to poor working conditions and a sense of powerlessness to improve services for Class Members.  Some housing unit personnel acknowledged reluctance to search for or retrieve contraband because they lack backup, which exacerbates safety risks.  Some personnel believed they were unable to comply with multiple PDP policies and Agreement provisions, and some believed they were unable to fulfill their law enforcement oaths of office.  PDP executives and staff have gone to great lengths in efforts to reduce risk and improve conditions despite inadequate resources and support.  Although the City did not cause PDP's COVID-19-related deficiencies, it bears responsibility for correcting them and should have done far more, much sooner.

On April 8, 2024, Plaintiffs filed a motion for civil contempt seeking the imposition of sanctions to address Defendants' persistent failure to comply with the Agreement and improve conditions of confinement for Class Members.[6]  On July 12, 2024, this Court held Defendants in civil contempt[7] and on August 16, 2024 ordered the City and PDP to take immediate action on multiple requirements designed to address the following areas of non- or partial compliance:  (1) Recruitment, Staffing, and Hiring; (2) Healthcare Access for Class Members; (3) Programming and Services for Class Members; (4) Facility Maintenance; (5) Facility Security; and (6) Population Management.[8]  Several of the remedial measures ordered require additional analysis and subsequent direction from this Court to ensure proper implementation.  Anticipated improvements based on each remedial measure ordered will be discussed in more detail below.

In implementing this Court's orders through the second settlement term, the City's new administration must ensure that it does not repeat the errors of the previous two years.  By its own inaction, the City failed to honor its dedicated workforce and prolonged the neglect of many incarcerated persons.  The City must instead allocate sufficient resources to meaningfully correct its staffing crisis while working closely with Philadelphia's justice partners to reduce PDP's population.  It must take ownership of every substantive provision in this Court's orders and resist any political inclination to shirk responsibility, blame shift, or scapegoat as occurred

---

[6] Plaintiffs' Motion for Civil Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 205 (E.D. Pa. Apr. 8, 2024).  Defendants filed their response to Plaintiffs' motion for civil contempt on May 6, 2024.  *See* Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 208 (E.D. Pa. May 6, 2024).  Plaintiffs replied to Defendants' opposition motion on May 24, 204.  *See also* Plaintiffs' Reply Memorandum on Motion for Civil Contempt of Court, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 209 (E.D. Pa. May 24, 2024).  Additional motion practice was followed by oral argument, which was heard by this Court on June 27, 2024.  During oral argument, Defendants requested an evidentiary hearing.  On July 9, 2024, Defendants submitted an affidavit to this Court documenting their compliance efforts to date which included ten exhibits.  Defendants presented their evidence to this Court during an evidentiary hearing on July 11, 2024.

[7] Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 220 (E.D. Pa. July 12, 2024).

[8] *See* Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 221 (E.D. Pa. Aug. 16, 2024).  The remedial sanctions described in the August 16, 2024 Order primarily seek to remedy non-compliance with Substantive Provision 1—Staffing, Substantive Provision 2—Out-of-Cell Time, Substantive Provision 3—Out-of-Cell/Segregation, Substantive Provision 4—Resume Normal Operations, Substantive Provision 5—Healthcare, Substantive Provision 6—Behavioral Health in Segregation, Substantive Provision 7—Law Library Access, Substantive Provision 10—Phone Calls, Substantive Provision 13—Visiting, Substantive Provision 14—Attorney Visiting, Substantive Provision 17—Sanitation, and Substantive Provision 18—Use-of-Force.

during the initial settlement term.  Finally, it must reposition PDP to a higher priority among other City departments whose failures to the population they serve do not violate the United States Constitution.

## Table of Provisions

*Compliance Findings* ........................................................................................................... **8**

***Substantive Provision 1—Staffing*** ............................................................................... **13**

*Sub-provision 1.1* .............................................................................................................. *13*

*Sub-provision 1.2* .............................................................................................................. *16*

*Sub-provision 1.3* .............................................................................................................. *17*

*Sub-provision 1.4* .............................................................................................................. *18*

***Substantive Provision 2—Out-of-Cell Time*** ........................................................... **22**

*Sub-provision 2.1* .............................................................................................................. *22*

*Sub-provision 2.2* .............................................................................................................. *28*

***Substantive Provision 3—Out-of-Cell/Segregation*** ............................................ **28**

*Sub-provision 3.1* .............................................................................................................. *28*

*Sub-provision 3.2* .............................................................................................................. *31*

***Substantive Provision 4—Resume Normal Operations*** ...................................... **37**

***Substantive Provision 5—Healthcare*** ....................................................................... **40**

***Substantive Provision 6—Behavioral Health in Segregation*** ........................... **52**

***Substantive Provision 7—Law Library Access*** ..................................................... **60**

***Substantive Provision 8—Discipline*** .......................................................................... **61**

*Sub-provision 8.1* .............................................................................................................. *61*

*Sub-provision 8.2* .............................................................................................................. *64*

*Sub-provision 8.3* .............................................................................................................. *64*

*Sub-provision 8.4* .............................................................................................................. *64*

***Substantive Provision 9—Tablets*** ............................................................................... **65**

*Sub-provision 9.1* .............................................................................................................. *65*

*Sub-provision 9.2* .............................................................................................................. *66*

***Substantive Provision 10—Phone Calls*** ................................................................... **68**

*Sub-provision 10.1* ............................................................................................................ *68*

*Sub-provision 10.2* ............................................................................................................ *68*

***Substantive Provision 11—PICC Emergency Call Systems*** .............................. **69**

***Substantive Provision 12—Locks*** ............................................................................... **70**

*Sub-provision 12.1* ............................................................................................................ *70*

*Sub-provision 12.2* ............................................................................................ *70*

*Sub-provision 12.3* ............................................................................................ *70*

*Sub-provision 12.4* ............................................................................................ *70*

*Sub-provision 12.5* ............................................................................................ *71*

**_Substantive Provision 13—Visiting_** .................................................................. **_71_**

*Sub-provision 13.1* ............................................................................................ *71*

*Sub-provision 13.2* ............................................................................................ *71*

*Sub-provision 13.3* ............................................................................................ *73*

**_Substantive Provision 14—Attorney Visiting_** ................................................. **_73_**

*Sub-provision 14.1* ............................................................................................ *73*

*Sub-provision 14.2* ............................................................................................ *74*

*Sub-provision 14.3* ............................................................................................ *75*

**_Substantive Provision 15—COVID-19 Testing_** ................................................ **_75_**

**_Substantive Provision 16—Quarantine_** ............................................................ **_75_**

**_Substantive Provision 17—Sanitation_** .............................................................. **_76_**

*Sub-provision 17.1* ............................................................................................ *76*

*Sub-provision 17.2* ............................................................................................ *78*

**_Substantive Provision 18—Use-of-Force_** ......................................................... **_81_**

**Compliance Findings**

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision. The Monitoring Team created sub-provisions for some of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision. This provides additional clarity for Defendants as they work to implement required changes and greater specificity for this Court and the Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 sub-provisions were created. In this reporting period, PDP has achieved substantial compliance with 11 sub-provisions, partial compliance with 20 sub-provisions, and remained in non-compliance with 6 sub-provisions.

The table below reflects all provisions and current compliance ratings for each:

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| **1** | | **Staffing** | **PC** |
| | 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| | 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *retention* of correctional officers. . . | PC |
| | 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| | 1.4 | These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers. | PC |
| **2** | | **Out-of-Cell Time** | **PC** |
| | 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. *See also* para. 4, *infra*. | NC |
| **3** | **Out-of-Cell/Segregation** | **PC** |
| 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | NC |
| 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| **4** | **Resume Normal Operations** | **NC** |
|  | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services).  During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. |  |
| **5** | **Healthcare** | **PC** |
|  | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. |  |
| **6** | **Behavioral Health in Segregation** | **PC** |
|  | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. |  |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 7 | **Law Library Access** | **PC** |
| | PDP will continue to provide law library access for all incarcerated individuals.  The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| 8 | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | SC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation.  Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline.  Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| 9 | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs.  The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF.  This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| 10 | **Phone Calls** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | SC |
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | SC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | SC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |

11

| Provision | Requirements | Compliance Status |
|---|---|---|
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

### Compliance Rating:  Partial Compliance

PDP's correctional officer vacancies decreased by 21 positions, or 1 percent, from December 2023 to June 2024.  PDP's total staff vacancies also decreased by 36 positions between December 2023 and June 2024.  The following table reflects changes in security, maintenance, human resources, and total staff vacancies since the previous reporting period:

### Table 1: Philadelphia Department of Prisons Vacancy Report
December 2023 and June 2024

|  | Position Classification | Budgeted* | December 2023 | | June 2024 | | Vacancies (+/- change) | Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
|  |  |  | Filled | Vacant | Filled | Vacant |  |  |
| Sworn Staff | Officers | 1712 | 888 | 827 | 906 | 806 | -21 | 47% (-1%) |
|  | Sergeants | 118 | 68 | 50 | 70 | 48 | -2 | 41% (-1%) |
|  | Lieutenants | 64 | 53 | 11 | 55 | 9 | -2 | 14% (-3%) |
|  | Captains | 29 | 24 | 5 | 26 | 3 | -2 | 10% (-7%) |
|  | **Custody Total** | **1923** | **1033** | **893** | **1057** | **866** | **-27** | **45% (-1%)** |
| Maintenance Staff | Trades Worker I | 7 | 5 | 3 | 7 | 0 | -2 | 0% (-38%) |
|  | Trades Worker II | 18 | 8 | 10 | 8 | 10 | 0 | 56% (0%) |
|  | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% (0) |
|  | Building Engineer | 1 | 1 | 0 | 0 | 1 | +1 | 100% (+100%) |
|  | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% (0) |
|  | **Total Maintenance** | **30** | **16** | **15** | **17** | **13** | **-1** | **43% (-5%)** |
| Human Resources (HR) Staff | HR Professional | 2 | 1 | 1 | 0 | 2 | +1 | 100% (+50%) |
|  | HR Professional II | 2 | 2 | 0 | 3 | 0 | 0 | 0% (0) |
|  | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% (0) |
|  | **HR Total** | **5** | **4** | **1** | **4** | **2** | **+1** | **40% (+20%)** |
| **PDP TOTAL** | **All Positions\*\*** | **2186** | **1231** | **956** | **1266** | **920** | **-36** | **42% (-2%)** |

*Changes in budgeted positions from December 2023 to June 2024: Officers -3; Trades Worker I -1.  HR Professional II operates with one additional filled position above budget authority.
**"All Positions" totals include classifications not listed in the table and, therefore, exceed the sum of budgeted, filled, and vacant positions for each of the Sworn Staff, Maintenance Staff, and HR Staff categories.

13

PDP staffing issues have been exacerbated by the rising PDP population as reflected in the following table:

**Table 2: PDP Average Daily Population***
2022 – 2024

| Date | Jan-June 2022 | July-Dec 2022 | Jan-June 2023 | July-Dec 2023 | Jan-June 2024 |
|---|---|---|---|---|---|
| Average Daily Population[9] | 4421 | 4432 | 4429 | 4732 | 4660 |

*Data reflects the average daily population total over each reporting period using statistics compiled from publicly available First Judicial District of Pennsylvania Philadelphia Prison Population Reports via the MacArthur Safety and Justice Challenge.

PDP's average daily population (ADP) slightly decreased in this reporting period from 4,732, to 4,660. However, by July 31, 2024, PDP's population exceeded 4,800 Class Members.

Available data on recruitment yields is depicted in the following table:

**Table 3: Philadelphia Department of Prisons Recruitment Yields
for New Hires after January 1, 2021**

| Certification List | Total Applicants | Total Hired | Rate (%) | List Status |
|---|---|---|---|---|
| 2020-0210 | 228 | 36 | 15.8 | Closed |
| 2021-0906 | 758 | 50 | 6.6 | Closed |
| 2022-0221 | 298 | 16 | 5.4 | Closed |
| 2022-0516 | 245 | 25 | 10.2 | Closed |
| 2022-0905 | 493 | 34 | 6.9 | Closed |
| 2022-1212 | 422 | 34 | 8.1 | Closed |
| 2023-0306 | 563 | 32 | 5.7 | Closed |
| 2023-0501 | 436 | 24 | 5.5 | Closed |
| 2023-0626 | 626 | 34 | 5.4 | Closed |
| 2023-0724 | 492 | 28 | 5.7 | Closed |
| **Total Closed** | **4561** | **313** | **6.9** | |
| 2023-0821 | 464 | 16 | N/A | In Process |
| 2023-0918 | 402 | 16 | N/A | In Process |
| 2023-1023 | 869 | 1 | N/A | In Process |
| 2024-0205 | 981 | 1 | N/A | In Process |
| **Total Open** | **2716** | **34** | **N/A** | |

[9] Average Daily Population is the industry standard for tracking prison populations, which is calculated and used by PDP. These numbers are included within the publicly available Philadelphia Prison Population Reports. *See* Philadelphia Prison Population Report | July 2015 – June 2024, MacArthur Safety and Justice Challenge (July 16, 2024), https://www.phila.gov/media/20240716150642/June-2024-Full-Public-Report.pdf.

PDP's hiring yield continues to hover below 7 percent, which Subject Matter Expert, Terri McDonald (SME McDonald), notes is low but not unusual for correctional systems.  PDP has significantly increased the number of applications it has received each year since 2020, as reflected in the table below:

**Table 4: Philadelphia Department of Prisons Employment Applications By Year**
2020 – 2023

| Year | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Applicants | 228 | 758 | 1455 | 3852 |
| Applicants Hired[10] | 36 | 50 | 109 | 151 |

Despite hiring efforts and increases in applicants, PDP continues to struggle with low employee retention rates.  The table below depicts academy schedules, attendance, and graduation data for 2022, 2023, and 2024, and employee retention rates for the 2022, 2023, and 2024 academies:

**Table 5: Philadelphia Department of Prisons Academy Report and Retention Rates**
2022 – 2024

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed June 2024 | Retention Rate Dec 2023 | Retention Rate June 2024 |
|---|---|---|---|---|---|---|
| 21-04 | November, 2021 - January, 2022 | 30 | 26 | 8 | 27% | 27% |
| 21-05 | December, 2021 - March, 2022 | 20 | 16 | 6 | 30% | 30% |
| 22-01 | March - June, 2022 | 31 | 25 | 10 | 36% | 32% |
| 22-02 | May - July, 2022[11] | 21 | 20 | 9 | 43% | 43% |
| 22-03 | August - October, 2022 | 18 | 16 | 9 | 44% | 50% |
| 22-04 | October, 2022 - January, 2023 | 26 | 20 | 11 | 65% | 42% |
| 23-01 | January - March, 2023 | 21 | 22 | 10 | 59% | 48% |
| 23-02 | February - April, 2023 | 17 | 15 | 13 | 76% | 76% |
| 23-03 | April - July, 2023 | 20 | 15 | 10 | 50% | 50% |
| 23-04 | June - September, 2023 | 17 | 16 | 12 | 88% | 71% |
| 23-05 | August - October, 2023 | 32 | 30 | 19 | 87% | 59% |
| 23-06 | October - December, 2023 | 28 | 25 | 22 | 79% | 79% |
| 24-01 | January - March, 2024 | 34 | 30 | 28 | N/A | 82% |
| 24-02 | March - May, 2024 | 20 | 20 | 19 | N/A | 95% |
| 24-03 | May - July, 2024 | 38 | N/A | N/A | N/A | N/A |

For classes graduating in the first half of 2022, the two-year retention rate is currently 30 percent and the retention rate for classes graduating in the second half of 2022 and first half of 2023 is 51

---

[10] Hires from the list may have started employment in subsequent year.
[11] In the Monitor's Fourth Report, PDP's data erroneously indicated that eight correctional officers were still employed by PDP in June 2024.  This has been changed to reflect that nine correctional officers were still employed by PDP in June 2024.

percent.  As with previous reporting periods, any progress PDP has achieved remains largely negated by high attrition rates, and trends reported here emphasize the need for more thoughtful recruitment and retention strategies.[12]

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . .*

### Compliance Rating:  Partial Compliance

As previously reported, the City has instituted various pay raises, signing and retention bonuses, alternative work schedules, and other strategies designed to enhance retention of correctional peace officers.[13]  The following table depicts monthly averages of PDP employees who voluntarily separated pre-retirement from January 2019 through June 2024:

**Table 6: Average Voluntary Separations by PDP Employees**
2019 – 2024

| | Pre-Arbitration Award | | | | Post-Arbitration Award | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | 2023 | Jan-June 2024 |
| **Monthly Average** | 10 | 11 | 24 | 23 | 11 | 13 | 12 |

Voluntary separations of PDP employees appear to have stabilized over much of the previous two years, averaging 12 voluntary separations per month from September 2022 through June

---

[12] Monitor's Fourth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 204 at 3 (Mar. 29, 2024); Monitor's Third Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 193 at 15-16 (Oct. 12, 2023); Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 14 (Mar. 3, 2023); Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 9 (Nov. 4, 2022).

[13] For example, the August 12, 2022, Arbitration Award authorizes a range of compensation increases.  *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, Aug. 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, Dec. 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, Jan. 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Jan. 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, March 31, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, June 12, 2024), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

2024.  Average separations remain slightly higher than pre-COVID pandemic average separations of 10 per month.  They are, however, reduced by half since 2021 and the first eight months of 2022, likely attributable to changes ordered by the arbitration panel.  Correcting PDP's staffing crisis will require far greater efforts than have been made thus far to increase applications, hiring yields, and new employee retention, and to dramatically reduce employee separations.[14]

*Sub-provision 1.3--Ensure that there are sufficient numbers of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating:  Non-compliance**

The following tables depict monthly average percentages of vacant posts at each facility and posts filled with overtime staff for two-periods, September through December 2023, and January through June 2024:[15]

**Table 7: Percentage of Posts Left Vacant Due to Staffing Shortage**
September – December 2023

| Date | September | October | November | December | Average |
|---|---|---|---|---|---|
| Average | 43% | 43% | 33% | 40% | 40% |

**Table 8: Percentage of Posts Filled with Overtime Staff**
September – December 2023

| Date | September | October | November | December | Average |
|---|---|---|---|---|---|
| Average | 26% | 24% | 24% | 26% | 25% |

**Table 9: Percentage of Posts Left Vacant Due to Staffing Shortage**
January – June 2024

| Date | January | February | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| RCF | 40 | 38 | 40 | 40 | 37 | 36 | 39 |
| PICC | 37 | 37 | 38 | 42 | 36 | 30 | 37 |
| CFCF | 42 | 45 | 43 | 43 | 38 | 42 | 42 |
| **Average** | **40%** | **40%** | **40%** | **42%** | **37%** | **36%** | **39%** |

---

[14] Monitor's Fourth Report, *supra* note 12, at 16-18.
[15] Some posts may have been filled for a portion of some shifts.

**Table 10: Percentage of Posts Filled with Overtime Staff**
January – June 2024

| Date | January | February | March | April | May | June | Average |
|------|---------|----------|-------|-------|-----|------|---------|
| RCF | 23 | 23 | 24 | 25 | 25 | 28 | 25 |
| PICC | 29 | 28 | 28 | 30 | 26 | 26 | 28 |
| CFCF | 22 | 24 | 24 | 25 | 24 | 26 | 24 |
| **Average** | **25%** | **25%** | **26%** | **27%** | **25%** | **27%** | **26%** |

Average percentages of post vacancies and the use of mandatory or voluntary overtime to fill posts remain largely unchanged in this reporting period.  Average post vacancies reduced from 40 percent in the previous reporting period to 39 percent in this reporting period, and the average percentage of posts filled with overtime staff increased slightly from 25 percent in the previous reporting period to 26 percent in this reporting period.

*Sub-provision 1.4--These measures will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating:  Partial Compliance**

A substantial compliance rating with sub-provision 1.4 first requires PDP to achieve compliance with sub-provisions 1.1, 1.2, and 1.3.

**Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report (November 2022):[16]**

1. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
   *As previously reported, the City partially addressed this recommendation by comparing PDP correctional peace officer salaries to those in systems in the surrounding area.[17] The City did not compare non-wage benefits with other jurisdictions and it did not compare PDP salaries with Philadelphia's other sworn law enforcement agencies.*

   *On August 16, 2024, this Court ordered the City to compare salaries and other benefits offered to PDP correctional officers with those offered to uniformed employees from other City law enforcement agencies.[18]  The comparison across City departments must*

---

[16] Original Recommendations 1, 12, and 13 as discussed in the Monitor's First, Second, Third, and Fourth Reports, address facility sanitation and maintenance.  These recommendations were initially addressed under Substantive Provision 1—Staffing because PDP's staffing crisis extends to maintenance personnel, as displayed above in Table 1, page 13.  These recommendations have been moved and are now discussed *infra* under Substantive Provision 17—Sanitation, Additional Recommendations 7, 8, 9, and 10.

[17] Affidavit, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 216-7, Ex. G (E.D. Pa. July 9, 2024).

[18] Order, *supra* note 8, at 3.

*also include all other PDP job classifications with vacancy rates exceeding 10 percent.[19] The comparison is due for submission by October 15, 2024 and should allow the City to identify potential changes it must make to PDP's current compensation package to attract qualified candidates.*

2. Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.

   *The City's recruitment efforts thus far have been inadequate. The City reports that it contracts with a recruitment firm that supports recruitment for all City departments.[20] However, it does not appear that a comprehensive recruitment strategy designed specifically to attract correctional officers to reduce PDP's staffing vacancies has been developed.[21]*

   *On August 16, 2024, this Court ordered the City to generate a list of outside recruitment firms with a proven track record of hiring for law enforcement agencies.[22] The list was submitted on September 16, 2024 for the Courts consideration as required. Within 90 days of the date of the Court's approval, the City must retain the approved firm to manage the hiring and recruitment of PDP personnel.*

3. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.

   *The Monitoring Team reviewed the final staffing analysis in this reporting period and made recommendations for further analysis to address gaps in the report. Some areas requiring additional analysis include timeframes and other details regarding civilianization of posts, resources to reduce the impact of the staffing crisis and to assist with Class Members' access to healthcare, the span of employee supervision, and the creation of a compliance unit to manage the reform effort. The Commissioner reports he is in the process of considering recommendations from the staffing analysis.*

4. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

   *The City's efforts to implement this recommendation through the first settlement term were inadequate. The civilianization of some work currently performed by sworn personnel may offer relief for more than 50 correctional officer positions. It would likely increase the provision of out-of-cell time and required services in PDP facilities and reduce PDP's reliance on excessive overtime. The City has acknowledged that civilianization would offer relief in critical staffing areas and PDP has reported since September 2023 that arbitration is pending.*

   *On August 16, 2024 this Court ordered the City to evaluate which departments within PDP may be served in full or in part by civilian employees.[23] The evaluation was*

---

[19] *Ibid.*
[20] Affidavit, *supra* note 17, Ex. I.
[21] Monitor's Fourth Report, *supra* note 12, at 16-17, 19; Monitor's Third Report, *supra* note 12, at 17; Monitor's First Report, *supra* note 12, at 9.
[22] Order, *supra* note 8, at 2.
[23] *Ibid.*

*submitted on September 16, 2024 and included potential barriers to the reclassification of any positions as required.[24]*

*This Court further ordered that the City identify companies that are capable of providing medical guarding of open ward Class Member patients after the first 24 hours following admission, and to transport PDP patients to and from off-site medical appointments. These functions are currently performed by PDP correctional officers who must often be redirected from housing unit posts. On September 16, 2024, PDP submitted a proposal from a vendor to provide some of the required medical guarding and transportation services. As of this filing, the proposal is reportedly being revised to include all required services.*

*PDP must initiate contract negotiations within 90 days following the Court's approval of a vendor. The City has also been ordered to initiate engagement with PDP's correctional officer labor union on these requirements by September 30, 2024.[25]*

5. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.

   *As previously reported, the City indicated that it streamlined its hiring process in 2021 and that it is processing the current volume of applications within a reasonable timeframe.[26] It is unlikely, however, that the City's current resources dedicated to processes such as background checks, medical clearances, and academy instruction could accommodate a large influx of applicants, which PDP's targeted recruitment strategy should yield. The City should plan ahead as it implements this Court's August 16, 2024 Order, to ensure that it avoids any potential bottlenecks that might delay start dates of new personnel.*

6. Establish continuous-fill civil service hiring lists during the staffing crisis.

   *The City reported that it implemented back-to-back civil service hiring lists in response to this recommendation. Despite the back-to-back lists, the City's application portal was not configured to receive applications continuously and some applicants were instead directed to reapply at later dates.*

   *On August 16, 2024, this Court ordered the City to maintain an internal portal, which must remain open and continuously available at all times, to accept applications for employment with PDP.[27]*

7. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

   *The June 12, 2024, Arbitration Award ordered that the City residency requirement for PDP employees be eliminated until PDP reaches 80 percent of its staffing complement.[28] However, the temporary residency requirement waiver only applies to applicants who*

---

[24] Order, *supra* note 8, at 2.

[25] *Id.* at 1.

[26] Monitor's Fourth Report, *supra* note 12, at 17.

[27] Order, *supra* note 8, at 1.

[28] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4 (decision date, June 12, 2024), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

*reside within the Commonwealth of Pennsylvania. The residency requirement waiver does not apply to applicants in neighboring states.*

*On August 16, 2024, this Court ordered the City to expand the category of eligible applicants receiving the residency requirement waiver to all qualified individuals who reside outside the Commonwealth of Pennsylvania.[29]*

8. PDP should implement strategies for employee retention and a robust employee wellness program.

*The Commissioner reports that he conducts regular facility tours to maintain visibility and consistently meets with facility staff, among other initiatives, to attend to employee wellness and morale. During site visits in April and June 2024, facility staff appeared more optimistic and those interviewed reported fewer complaints than previous site visits. Most cited pay increases, the 12-hour work shift, and less mandatory overtime as improving morale. All staff interviewed continue to report needing additional staff to feel safe.*

*PDP reports that it hired an employee wellness manager who did not remain in the position through this reporting period. PDP also reports it hired an Employee Assistance Program (EAP) coordinator to facilitate access to mental health and other support services offered through the City's EAP program. Finally, PDP reports it anticipates reopening a dedicated space for employee wellness programs, which will host a gym and other wellness activities, in the next reporting period.*

*On August 16, 2024, this Court ordered PDP to appoint a new employee wellness coordinator by November 14, 2024.[30] By January 13, 2025, the City must fund an adequate Employee Wellness Program. These requirements are designed and anticipated to offer PDP staff much needed, long-awaited support and improve employee retention.*

9. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.

*The City has implemented this recommendation. In November 2023, PDP reported that there were 40 employees on long-term leave and that the City's Department of Risk Management and Human Services was working with them on a return-to-work process. As of June 30, 2024, PDP reports that only 12 employees remained on long-term leave. The City is currently employing meaningful return-to-work strategies, and is encouraged to sustain progress in this area.*

10. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations. The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.

*As previously reported, this recommendation has been implemented.[31]*

---

[29] Order, *supra* note 8, at 3.
[30] *Id.* at 2.
[31] Monitor's Fourth Report, *supra* note 12, at 18.

**Additional recommendations for immediate action:[32]**

11. Immediately authorize additional double-time pay each day of the week as necessary to staff all vacant shifts.
    *The City did not accept this recommendation.*

    *The Act 195 Interest Arbitration Supplemental Award issued January 27, 2023, requires the City to offer double-time pay to staff who work on certain regularly scheduled days off.[33] Consistent with the arbitration order and the twelve-hour shift schedule, double-time pay is routinely being offered on Thursdays and Sundays, but not on Fridays and Saturdays. An unintended consequence of this otherwise effective initiative is higher post vacancy rates on Fridays and Saturdays, which has resulted in unattended or locked-down housing units.*

    *As the double-time pay initiative demonstrates, it is impossible to predict with certainty which initiatives will be most effective in maximizing staff attendance. Increasing overtime opportunities also poses risks associated with exhaustion and staff burnout. However, given PDP's unprecedented personnel vacancies, the City and PDP must remain flexible, pilot various options, and use all available management tools until the staffing crisis is resolved. Having successfully implemented Recommendation 11 above, the Commissioner reports that he intends to use available data to make informed executive decisions about how best to allocate resources, incentivize attendance, and offer Class Members a more reliable out-of-cell schedule.*

    *On August 16, 2024, this Court ordered the City to authorize PDP to offer double-time pay on any day of the week as necessary to staff all vacant shifts.[34]*

12. The City should establish a well-resourced team to assist with recruitment, application processing, onboarding, and supporting new staff. The team should conduct meaningful exit interviews of staff leaving PDP to determine what is needed to improve retention.
    *The City has partially implemented this recommendation. PDP hired a Recruitment Coordinator who started on July 1, 2024. PDP has been encouraged to track and report on outcomes of this new position.*

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than*

---

[32] Original Additional Recommendations 12 and 13, as discussed in the Monitor's Fourth Report, regarding facility sanitation and maintenance have been moved and are now discussed *infra* under Substantive Provision 17—Sanitation, Additional Recommendations 7, 8, 9, and 10.

[33] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Jan. 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

[34] Order, *supra* note 8, at 2.

*May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than*
*August 1, 2022, no less than five hours of out-of-cell time each day.*

### Compliance Rating:  Partial Compliance

Insufficient staffing remains the primary reason for PDP's failure to comply with this substantive provision.  Most PDP housing units are staffed by only one officer.  This requires Class Members to recreate in smaller groups thereby limiting each group's out-of-cell opportunities.  For various operational and safety reasons, some housing units are able to offer more out-of-cell time than others.  Multiple units are offering more than five hours of-of-cell time daily, and some are offering eight or more.  Systemwide, PDP facilities are not consistently offering five hours daily as required.

Out-of-cell tables for 2024 depicted below reflect additional timeframes for tracking out-of-cell compliance and now include ranges for 0 to .9 hours, 1 to 2.9 hours, 3 to 5.9 hours, 6 to 7.9 hours, and 8 or more hours out of cell.  Previously reported issues with tracking and data accuracy persist and reported times can only be verified via CCTV review.[35]  Currently, the Monitoring Team is aggregating and documenting PDP's reported out-of-cell data for the Monitor's reports.  The Monitoring Team is hopeful that PDP's new data analysis team will assume responsibility for this task in the future.

---

[35] Monitor's Fourth Report, *supra* note 12, at 19.

The following tables depict average out-of-cell time that select CFCF general population recreation groups received daily for one week of each month, July through December 2023 and January through June 2024:

**Table 11: General Population Average Out-of-Cell Time Per Day Reported for CFCF, Six One-Week Periods\***

July – December 2023

| Hours** | Monthly Average | |
|---|---|---|
| | Groups | Percent (%) |
| 0 to .9 | 13 | 17% |
| 1 to 4.9 | 58 | 74% |
| ≥ 5, < 6 | 7 | 9% |
| Total CFCF Groups | 78 | 100% |

*Weeks reviewed include: July 10-16, 2023, August 7-13, 2023, September 4-10, 2023, October 9-15, 2023, November 13-19, 2023, and December 18-24, 2023. From July through December 2023, not all CFCF housing units completed out-of-cell trackers, so sampled housing units include A1, A2, B1, B2, C1, C2, D1, and D2 – Pod 1 only.

**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

**Table 12: General Population Average Out-of-Cell Time Per Day Reported for CFCF, Six One-Week Periods\***

January – June 2024

| Hours*** | Jan-March 2024 | | April-June 2024 | | Monthly Average | |
|---|---|---|---|---|---|---|
| | Groups | % | Groups | % | Groups | % |
| 0 to .9** | 201 | 30% | 183 | 27% | 64 | 29% |
| 1 to 2.9 | 53 | 8% | 80 | 12% | 22 | 10% |
| 3 to 5.9 | 408 | 62% | 413 | 61% | 137 | 61% |
| 6 to 7.9 | 0 | 0% | 0 | 0% | 0 | 0% |
| ≥ 8 | 0 | 0% | 0 | 0% | 0 | 0% |
| Total CFCF Groups | 662 | 100% | 676 | 100% | 223 | 100% |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024. Sampled housing units include: A1P1 (January 2024 only), A1P1-4; B1P1-4; C1P1-4; D1P1-4.

**For Q1 2024, only 1 of the 201 groups for the range of 0 to .9 was more than 0.

***When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

None of CFCF's housing units reviewed reported offering an average of six or more hours out-of-cell daily.  PDP reports due to staffing shortages, most CFCF general population housing units must follow a schedule that offers each tier either three or four hours out of cell per day on a regular rotation.  In this reporting period, a higher average percentage of CFCF recreation groups received less than one hour out-of-cell time daily than in the previous reporting period. Trackers reviewed reflect that from June through December 2023, an average of 17 percent of recreation groups received less than an average of one hour out-of-cell daily.  That average percentage increased to 29 percent in this reporting period.  Of groups receiving between 0 to .9

hours out of cell in this reporting period, trackers reviewed most frequently suggest that zero out-of-cell time was offered to those groups in weeks reviewed.[36]

The following tables depict average out-of-cell time that select PICC general population recreation groups received daily for one week of each month, July through December 2023 and January through June 2024:

**Table 13: General Population Average Out-of-Cell Time Per Day Reported for PICC, Six One-Week Periods***
July – December 2023

| Hours** | Monthly Average | | |
| --- | --- | --- | --- |
| | Groups | Percent (%) | |
| 0 to .9 | 13 | 10% | |
| 1 to 4.9 | 66 | 51% | |
| ≥ 5, < 6 | 50 | 39% | |
| Total PICC Groups | 129 | 100% | |

*Weeks reviewed include: July 10-16, 2023, August 7-13, 2023, September 4-10, 2023, October 9-15, 2023, November 13-19, 2023, and December 18-24, 2023. Lockdown days were not included for the following: week of 10/9 unit G2 (2 days); week of 11/13, unit F2 (2 days); week of 12/18, for K (3 days) and H2 (2 days).
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

**Table 14: General Population Average Out-of-Cell Time Per Day Reported for PICC, Six One-Week Periods***
January – June 2024

| Hours** | Jan-March 2024 | | April-June 2024 | | Monthly Average | |
| --- | --- | --- | --- | --- | --- | --- |
| | Groups | % | Groups | % | Groups | % |
| 0 to .9 | 29 | 9% | 26 | 6% | 9 | 8% |
| 1 to 2.9 | 70 | 23% | 88 | 21% | 26 | 22% |
| 3 to 5.9 | 167 | 55% | 213 | 51% | 63 | 52% |
| 6 to 7.9 | 18 | 6% | 51 | 12% | 12 | 10% |
| ≥ 8 | 22 | 7% | 40 | 10% | 10 | 9% |
| Total PICC Groups | 306 | 100% | 418 | 100% | 120 | 100% |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

PICC demonstrated progress in this reporting period, increasing average monthly out-of-cell time for weeks reviewed and reducing slightly the average percentage of groups that received less than one hour out-of-cell time. Trackers reviewed in the previous reporting period showed that PICC was unable to provide any of the recreation groups with more than six hours out-of-cell time on any day for weeks reviewed. In this reporting period, however, PICC documented providing an average of 10 percent of the general population groups an average of six to eight hours out-of-cell time daily and an additional nine percent of groups more than eight hours out-

---

[36] This will be discussed further in Substantive Provision 3—Out-of-Cell/Segregation.

of-cell time each day, on average, for weeks reviewed.  The percentage of groups receiving less than one-hour out-of-cell time daily also reduced slightly from an average of 10 percent to an average of 8 percent for weeks reviewed.  PDP reports that these improvements are largely attributable to slight staffing increases at PICC, which is permitting upper and lower tiers to recreate together in some housing units.  These improvements further demonstrate PDP leadership's ability to make the most of small decreases in daily post vacancies and emphasize the need for similar improvements in all PDP facilities.

As previously reported, housing units that combine Class Members who require varying security classifications offer less out-of-cell time to Class Members than units with fewer security classification groupings.[37]  Combining security classifications is common with women who represent smaller populations in mixed-gender jail and prison facilities and is the case for those living in PICC's E and C Units.  E Unit houses general and restricted populations together, including administratively and punitively segregated Class Members, as well as pregnant Class Members.  C Unit houses the women's Transition Unit (TU) and general population Class Members.

Officers in both units provide out-of-cell time in compatible groups or individually if a Class Member is unable to safely recreate with others.  PDP's current out-of-cell time trackers do not distinguish between various security classifications or housing statuses (such as PDP "orientation" or "Transition Unit") that might reduce out-of-cell time allowances.  For this reason, the Monitoring Team is unable to calculate average out-of-cell percentages for this and other mixed-classification units with any confidence.  Interviews of staff and Class Members on both units during site visits suggest that Class Members in restricted housing may generally be offered daily out of cell time, but often less than one hour.  Staff and Class Members have reported that those in E Unit whose security classifications fall within the general population category may receive an average of three to six hours out-of-cell time daily, but that cannot be verified with available data.

PDP reports that its data team is beginning to monitor and refine PDP's out-of-cell tracking system.  The Monitoring Team has recommended that refinements ultimately include documentation of security classification and housing status, among other details.[38]  Additional detail will be critical for the data team's tracking of out-of-cell time and will inform any analysis or recommendations it makes.

---

[37] Monitor's Third Report, *supra* note 12, at 19.
[38] Monitor's Fourth Report, *supra* note 12, at 24.

The following tables depict average out-of-cell time that RCF general population recreation groups received daily for one week of each month, July through December 2023 and January through June 2024:

**Table 15: General Population Average Out-of-Cell Time Per Day Reported for RCF, Six One-Week Periods***

July – December 2023

| Hours** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%) |
| 0 to .9 | 9 | 9% |
| 1 to 4.9 | 36 | 38% |
| ≥ 5, < 6 | 51 | 53% |
| **Total RCF Groups** | **96** | **100%** |

*Weeks reviewed include: July 10-16, 2023, August 7-13, 2023, September 4-10, 2023, October 9-15, 2023, November 13-19, 2023, and December 18-24, 2023.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

**Table 16: General Population Average Out-of-Cell Time Per Day Reported for RCF, Six One-Week Periods***

January – June 2024

| Hours** | Jan-March 2024 | | April-June 2024 | | Monthly Average | |
| --- | --- | --- | --- | --- | --- | --- |
| | Groups | % | Groups | % | Groups | % |
| 0 to .9 | 57 | 17% | 8 | 2% | 11 | 9% |
| 1 to 2.9 | 78 | 23% | 86 | 24% | 27 | 23% |
| 3 to 5.9 | 152 | 46% | 186 | 51% | 56 | 48% |
| 6 to 7.9 | 17 | 5% | 16 | 4% | 6 | 5% |
| ≥ 8 | 30 | 9% | 70 | 19% | 17 | 15% |
| **Total RCF Groups** | **334** | **100%** | **366** | **100%** | **117** | **100%** |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

Data suggests RCF also demonstrated some progress in this reporting period. Groups that received less than one hour out-of-cell time per day remained at an average of 9 percent from one reporting period to the next for weeks reviewed. However, RCF was able to offer an average of 20 percent of groups more than 6 hours out-of-cell time daily, on average, for weeks reviewed. RCF's improvements are partially explained by reduced staffing requirements on some units, such as worker units or those with lower security classifications, where both tiers may recreate together under the supervision of a single officer.

As anticipated, PDP continues to struggle with the accurate tracking of out-of-cell time. PDP has procured a Radio Frequency Identification (RFID) system, which will improve accuracy of out-of-cell tracking and other facility movement. The implementation of an RFID tracking system will likely require a year to finalize, and will need refinement before reliable, detailed reports can be generated. PICC and RCF should be commended for efforts to improve out-of-cell time. CFCF is, by far, the most complex facility operationally and its ongoing challenges in

27

improving out-of-cell opportunities, though disappointing, are not surprising. Until PDP has more staff or fewer Class Members, none of PDP's facilities will achieve substantial compliance with this substantive provision.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating:  Non-Compliance**

This is the first reporting period during which PDP data suggests that some Class Members are receiving eight or more hours out-of-cell per day for weeks reviewed. PDP recognizes that it is far from substantial compliance with out-of-cell requirements and that conditions for Class Members remain unacceptable. PDP should, however, be acknowledged for these and other reported improvements, which demonstrate the capabilities of facility leadership and staff, as well as PDP's commitment to improving conditions.

**Substantive Provision 3—Out-of-Cell/Segregation**

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

**Compliance Rating:  Non-Compliance**

Tracking of out-of-cell time in segregation units remains problematic. For example, in this reporting period, Class Members housed in segregation at PICC were temporarily moved to DC for repairs from March 2024 to May 2024. During this time, PDP failed to track out-of-cell time for those Class Members, as reflected in the analysis below.

28

The following table reflects the average total populations of Class Members on all segregation units and the average percentage of Class Members who were offered one hour of out-of-cell time for six one-week periods from January through June 2024:

**Table 17: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
January – June 2024*

| Date | January** | February | March | April*** | May*** | June*** |
|---|---|---|---|---|---|---|
| CFCF (%) | 81%** | 18% | 15% | 36% | 35% | 28% |
| PICC (%) | 51% | 17% | 36% | N/A | N/A | N/A |
| RCF (%) | 12% | 35% | 39% | 24% | 33% | 38% |
| **Average Total Stable Population**** | 156 | 207 | 190 | 149 | 143 | 142 |
| **Average Class Members Out-of-Cell** | 74 | 41 | 49 | 46 | 50 | 46 |
| **Average Percent Out-of-Cell** | 47% | 20% | 26% | 31% | 35% | 32% |

*Weeks reviewed include: January 8-14, 2024, February 12-18, 2024, March 4-10, 2024, April 13-19, 2024, May 13-19, 2024, and June 3-9, 2024. For one-week, RCF evaluated April 29-May 5, 2024, instead of May 13-19, 2024.
**A1P2 not reported this month so totals are incomplete and do not reflect all segregation housing units.
***PICC segregation not included in totals for these months because PDP failed to log daily out-of-cell opportunities for those Class Members.
****"Stable Population" refers to the average total class members who resided in all segregation units for the entire week.

PDP continues to remain non-compliant with this sub-provision.  In this reporting period, the average monthly percentage of Class Members who were offered one hour of out-of-cell time ranged from 20 percent to 47 percent.  Thirty-five percent or fewer Class Members, on average, received one hour out-of-cell time on any given day in five of the six months in this reporting period.  As previously reported, PDP generally offers recreation time for Class Members in segregation only when three officers are present.[39]  When fewer than three officers are present, out-of-cell time is limited or not offered.  Based on documented entries in the out-of-cell trackers, issues with providing daily out-of-cell opportunities may also be impacted by maintenance on housing units and lack of staffing stemming from off-site medical transports.

Comparing out-of-cell data in general population to out-of-cell data in segregation, it appears PDP is beginning to make some decisions about allocation of staffing resources in efforts to improve out-of-cell time in some units.  For example, CFCF's daily out-of-cell opportunities in segregation housing units appeared to improve in this reporting period.  This is reportedly because personnel were redirected from general population units to provide short durations of out-of-cell time in segregation units, as recommended.[40]  Also as recommended, CFCF began providing limited out-of-cell time on segregation units with only two officers present.[41]  This was not the case at PICC and RCF, which may explain why daily out-of-cell opportunities in those facilities' segregation units decreased while out-of-cell opportunities for general population Class Members increased.

[39] Monitor's Second Report, *supra* note 12, at 20.
[40] *Ibid*.
[41] *Id*. at 20.

In an attempt to compare previous reporting periods, the following table reflects the average total populations of Class Members on all segregation units and the average total Class Members who were offered one hour of out-of-cell time for sampled one-week periods in June 2023, November and December 2023, January and February 2024, and May and June 2024:

**Table 18: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
June 2023 – June 2024*

| Date | June 2023 | Nov-Dec 2023 | Jan-Feb 2024*** | May-June 2024**** |
|---|---|---|---|---|
| **Average Total Stable Population** | 192 | 230 | 182 | 143 |
| **Average Class Members Out-of-Cell** | 73 | 75 | 58 | 48 |
| **Average Percent Out-of-Cell** | 38% | 33% | 32% | 34% |
| **Average Percent Not Out-of-Cell** | 62% | 67% | 68% | 66% |

*Weeks reviewed include: June 5-11, 2023, November 13-19, 2023, December 18-24, 2023, January 8-14, 2024, February 12-18, 2024, May 13-19, 2024, and June 3-9, 2024.
**"Stable Population" refers to average total Class Members who resided in all segregation units for the entire week.
***A1P2 not reported this month so totals are incomplete and do not reflect all segregation housing units.
****PICC segregation not included in totals for this review period because PDP failed to log daily out-of-cell opportunities for those Class Members.

The average percentage of Class Members in segregation units who reportedly received no daily out-of-cell time for weeks reviewed increased from 67 percent in November through December 2023 to 68 percent in January through February 2024.  As with previously reporting periods, it was not uncommon for Class Members in segregation units to remain confined in their cells multiple days in a row in this reporting period.[42]

Due to PICC's missing data, April through June 2024 data is not useful for comparison purposes.  Over the previous two reporting periods, there has been little systemwide change; however, some changes at the facility level include:

- CFCF appears to have increased out-of-cell opportunities for units A1P3 and A1P4 in this reporting period.  In Unit A1P3, the average percentage of the population offered out-of-cell time reportedly increased from 27 percent in November through December 2023 to 35 percent in January through June 2024.  Similarly, on Unit A1P4, the average percentage of the population offered out-of-cell time reportedly increased from 28 percent in November through December 2023 to 34 percent in January through June 2024.
- PICC appears to have reduced out-of-cell opportunities in this reporting period.  The average percentage of the population offered out-of-cell time decreased from an average of 39 percent in November and December 2023 to an average of 35 percent in January through March 2024.

---

[42] *Ibid*.

- RCF also appears to have reduced out-of-cell opportunities in this reporting period. The average percentage of the population reportedly offered out-of-cell time decreased from an average of 42 percent in November through December 2023 to an average of 30 percent in January through June 2024.

*Sub-provision 3.2--Defendants further agree that they will continue their normal practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

**Compliance Rating:  Partial Compliance**

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[43]  Also previously reported and discussed below under Substantive Provision 6—Behavioral Health in Segregation, PDP continues to house too many Class Members with mental illness in segregation because it lacks sufficient staff and space for appropriate alternatives.

The Monitoring Team previously reported that PDP redirected staff to hold more frequent hearings for retention on administrative segregation.[44]  As a result, Class Members not receiving retention hearings within the 30-day policy requirement steadily decreased in each reporting period.[45]  These and other efforts also appeared to reduce lengths of stay in administrative segregation and total placements in administrative segregation over three consecutive reporting periods.[46]  PDP sustained improvements to timeframes for retention hearings in this reporting period, however, total placements in both administrative and punitive segregation have increased.

In this reporting period, PDP was able to improve its tracking of durations Class Members spend in both punitive and administrative segregation.  In the first four reporting periods, PDP's administrative segregation totals only reflected days spent for each new administrative segregation term and excluded some Class Members' temporary changes to punitive segregation status.  Consistent with the Monitoring Team's recommendation, in April 2024, PDP also began tracking the total time each Class Member spends in any restricted housing environment, including any status changes between administrative and punitive segregation.[47]  This measure is far more meaningful in assessing potential harm to Class Members who spend extended periods in isolation and in identifying overreliance on either form of restricted housing.

---

[43] Monitor's Fourth Report, *supra* note 12, at 24; Monitor's Second Report, *supra* note 12, at 21.

[44] Monitor's Fourth Report, *supra* note 12, at 25.

[45] *Id.* at 25-26.

[46] Average total administrative segregation placements reduced from 196 during July through December 2022, then to 126 during January through June 2023, the, again, to 107 during July through December 2023.  Monitor's Fourth Report, *supra* note 12, at 25-26; Monitor's Third Report, *supra* note 12, at 24; Monitor's Second Report, *supra* note 12, at 21.

[47] For example, it is common for administrative segregation Class Members to be disciplined.  When this occurs, and if they are found guilty, Class Members return to punitive segregation status for the duration of their sentence.  Following the time spent in punitive segregation, Class Members are frequently then moved to administrative segregation status again.

The following table depicts average total Class Members in administrative segregation and retention reviews exceeding 30- and 60-day timeframes for sample dates in four periods, July through December 2022, January through June 2023, July through December 2023, and January through June 2024:

**Table 19: Reviews for Retention on Administrative Segregation
Exceeding 30 and 60 Days**
July 2022 – June 2024

| | CFCF | | | | PICC | | | | RCF | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | Total Ad-Seg |
| July-Dec 2022 | 95 | 10 | 12 | 26% | 78 | 2 | 2 | 6% | 21 | 193 |
| Jan-June 2023 | 67 | 10 | 3 | 3% | 44 | 2 | 0 | 0% | 14 | 126 |
| July-Dec 2023 | 74 | 2 | 0 | 0% | 16 | 0 | 0 | 0% | 17 | 107 |
| Jan-June 2024 | 95 | 4 | 1 | 1% | 12 | 1 | 0 | 0% | 22 | 133 |

The following table depicts average total Class Members in administrative segregation, retention reviews exceeding 30- and 60-day timeframes, and average lengths of stay in administrative and punitive segregation (restricted housing) for the period January through June 2024:

**Table 20: Reviews for Retention on Administrative Segregation
Exceeding 30 and 60 Days and Average Lengths of Stay in Restricted Housing**
January – June 2024

| | CFCF | | | | | PICC* | | RCF | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | > 30 Days | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing |
| 1-12-24 | 72 | 3 | 0 | 0% | N/A | 19 | N/A | 23 | 7 | N/A | 114 | N/A |
| 2-16-24 | 72 | 9 | 0 | 0% | N/A | 18 | N/A | 19 | 0 | N/A | 109 | N/A |
| 3-15-24 | 86 | 0 | 0 | 0% | N/A | 23 | N/A | 17 | 0 | N/A | 126 | N/A |
| 4-12-24 | 106 | 0 | 0 | 0% | 86 | 1 | 66 | 17 | 0 | 89 | 145 | 85 |
| 5-15-24 | 106 | 9 | 1 | 1% | 57 | 1 | 71 | 40 | 0 | 89 | 147 | 66 |
| 6-14-24 | 125 | 2 | 2 | 2% | 74 | 12 | 59 | 18 | 3 | 80 | 155 | 69 |
| Average | 95 | 4 | 1 | 1% | 72 | 12 | 65 | 22 | 2 | 86 | 133 | 73 |

*PICC reviews were all completed within policy according to documentation reviewed with the exception of one incident in March 2024 with a four-day delay.

Overall, the average number of Class Members in administrative segregation increased by 24 percent in this reporting period, from 107 during July through December 2023 to 133 during

32

January through June 2024.[48]  The average total of 133 Class Members in administrative segregation this reporting period also represents a 6 percent increase over the past calendar year, which averaged 126 from January through June 2023.[49]

Accounting for population differences between reporting periods, there is an increase in the overall proportion of the total PDP population housed in administrative segregation.  Class Members in administrative segregation represented an estimated 2.2 percent of the ADP from July through December 2023[50] versus 2.9 percent from January through June 2024, an approximate 32 percent increase in this reporting period.[51]

RCF and CFCF did not meet 30-day retention hearing requirements for some cases.  CFCF also failed to complete hearings within 60 days in three incidents.  CFCF's missed retention hearing deadlines increased from an average of two cases in the period July through December 2023 to an average of four cases in January through June 2024.  However, an average of four hearings in this reporting period represents a 60 percent reduction in missed deadlines over the last calendar year.  As previously reported, CFCF averaged 10 hearings beyond the 30-day time requirement from January through June 2023.[52]

PDP continues to demonstrate a commitment to timely hearings.  Outcomes are difficult to monitor, however, because documentation is not centralized (it is maintained both electronically and in paper format in housing units) and does not always support continued placement in administrative segregation.  PDP's new, more sophisticated Jail Management System (ATIMS) will provide for real-time monitoring of segregation placements, notify PDP of pending hearing requirements and exceeded timeframes, and facilitate more thorough and efficient documentation regarding rationales for retention or release from administrative segregation.  ATIMS will also assist with internal and external monitoring.  PDP's data team will reportedly initiate review of PDP's current segregation data tracking in the next reporting period with the eventual goal of assuming responsibility for internal compliance monitoring.

As previously reported, PDP has permanently discontinued the automatic placement of state sentenced Class Members into administrative segregation based solely on their state commitments.[53]  PDP also significantly reduced the number of Class Members confined in

---

[48] Monitor's Fourth Report, *supra* note 12, at 26.

[49] Monitor's Third Report, *supra* note 12, at 24.

[50] Percentages were calculated based on the average daily population for the period July-December 2023, as reported in the Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – December 2023, MacArthur Safety and Justice Challenge (Jan. 5, 2024), https://www.phila.gov/media/20240105120028/December-2023-Full-Public-Report.pdf.

[51] Percentages were calculated based on the average daily population for the period January-June 2024, as reported in the Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – June 2024, MacArthur Safety and Justice Challenge (July 16, 2024), https://www.phila.gov/media/20240716150642/June-2024-Full-Public-Report.pdf.

[52] Monitor's Third Report, *supra* note 12, at 24.

[53] PDP continues to periodically segregate a small number of state sentenced Class Members for short periods while they await movement to their designated housing unit.  On June 3, 2022, administrative segregation reports listed 36 state sentenced Class Members in administrative segregation.  Subsequent reviews on January 5, 2024, and June 28, 2024 confirmed there were zero Class Members in administrative segregation exclusively due to pending state prison transfers.

segregation solely due to high bail.  PDP continues to house some high-profile Class Members in segregation, as well as those facing life without possibility of parole or the death penalty.  As staffing increases, PDP will consider options for high security non-segregation housing for these Class Members.

On June 28, 2024, 25 Class Members remained in administrative segregation beyond 90 days, 12 of whom exceeded 90 days in administrative segregation following a punitive segregation term.  Three of the 12 Class Members had reportedly received subsequent punitive segregation terms for compounding infractions, though the infractions may have occurred following their initial 90-day terms.[54]  Two of the three Class Members were involved in serious incidents or presented significant security risks in the general population that may have warranted extended segregation terms.  Finally, one Class Member on the Behavioral Health caseload remained in segregation for approximately 7 months reportedly originating from an altercation with injuries.  However, the rationale for this Class Member's ongoing retention in segregation was documented as the Class Member having a "bad attitude" and refusing to receive treatment for anger management.  The request for approval of this Class Member's extension beyond 90 days included no documentation regarding an interdisciplinary plan to support the patient's reintegration to general population or consideration of this patient for referral to another level of care.

In this reporting period, the subject matter experts reviewed five additional placements of Class Members on the Behavioral Health caseload who had been in segregation beyond 90 days.  PDP records suggest all five patients received periodic social work and psychiatric appointments but limited group treatment, also discussed below under Substantive Provision 6—Behavioral Health in Segregation, *Requirement 4*.  It does not appear that these patients were being followed by an interdisciplinary committee that considers treatment goals or plans for the removal of these patients to a more appropriate environment.

---

[54] Whether the discipline occurred before or after 90-days could not be determined based on PDP's documentation.

The following tables depict total punitive segregation placements and average lengths of stay in punitive segregation for four review periods, July through December 2022, January through June 2023, July through December 2023, and January through June 2024:

**Table 21: Total Placements and Average Lengths of Stay in Punitive Segregation**
July 2022 – June 2024

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Average Punitive Segregation | Average Days in Punitive Segregation | Total Average Punitive Segregation | Average Days in Punitive Segregation | Total Average Punitive Segregation | Average Days in Punitive Segregation | Total Average Punitive Segregation | Average Days in Punitive Segregation |
| July-Dec 2022 | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |
| Jan-June 2023 | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |
| July-Dec 2023 | 70 | 26 | 42 | 22 | 37 | 15 | 148 | 21 |
| Jan-June 2024 | 90 | 30 | 37 | 25 | 36 | 26 | 162 | 27 |

**Table 22: Total Placements and Average Lengths of Stay in Punitive Segregation**
January – June 2024

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| 1-12-24 | 88 | 22 | 48 | 24 | 31 | 28 | 167 | 25 |
| 2-16-24 | 127 | 29 | 52 | 25 | 35 | 30 | 214 | 28 |
| 3-15-24 | 109 | 32 | 38 | 21 | 33 | 26 | 180 | 26 |
| 4-12-24 | 36 | 48 | 42 | 41 | 6 | 33 | 84 | 41 |
| 5-15-24 | 103 | 27 | 9 | 17 | 62 | 25 | 174 | 23 |
| 6-14-24 | 75 | 23 | 30 | 20 | 48 | 14 | 153 | 19 |
| Average | 90 | 30 | 37 | 25 | 36 | 26 | 162 | 27 |
| Difference, July-Dec 2023 and Jan-June 2024 | +29% | +15% | -12% | +14% | -3% | +73% | +9% | +29% |

The year-to-year average days Class Members spent in punitive segregation increased by 42 percent, from 19 days for the period January through June 2023 to 27 days for January through June 2024.  The average number of Class Members in punitive segregation also increased by 17 percent, from 139 for January through June 2023 to 162 for January through June 2024.  The punitive segregation population represented an estimated 3.1 percent of the ADP for January

through June 2023[55] and increased to approximately 3.4 percent of the ADP for January through June 2024.[56]

Previously, PDP's efforts to decrease its segregated population resulted in significant progress over the previous two reporting periods.[57] In this reporting period, PDP regressed and has seen an unfortunate increase in its reliance on administrative and punitive segregation. As anticipated, PDP is clearly struggling to sustain improvements with persisting staff vacancies. PDP has agreed to assess the reasons for the increases and attempt course correction. PDP recognizes this is particularly important given PDP's inability to provide adequate programming, out-of-cell time, and services on these units.

**Status of Recommendations, Sub-Provision 3.2—Out-of-Cell/Segregation, from the Monitor's Fourth Report:**

1. Provide daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met. PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.
   *PDP remains unable to provide daily out-of-cell time to all Class Members. CFCF has intermittently provided reduced out-of-cell opportunities when only two officers are present, but this has not been consistent or operationalized.*
2. Ensure that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.
   *This recommendation has not been implemented.*
3. Use currently available information, such as reports from staff, supervisors, and Class Members to identify and attend to housing units that are struggling to offer out-of-cell time.
   *This recommendation has not been implemented.*
4. Document the reasons for any failures to offer out-of-cell time.
   *PDP security staff continue to improve in documenting reasons for failures to offer out-of-cell time though improvements are not consistent. Thus far, out-of-cell documentation has not been monitored internally, however, the data analysis team is reportedly focusing on improving out-of-cell tracking and documentation.*

The Monitoring Team has made the following recommendations over the course of implementation monitoring to assist PDP in reducing its reliance on punitive segregation:

---

[55] Percentages were calculated based on the average daily population for the period January-June 2023, as reported in the Philadelphia Prison Population Reports. *See* Philadelphia Prison Population Report | July 2015 – June 2023, MacArthur Safety and Justice Challenge (July 19, 2023), https://www.phila.gov/media/20230719111504/June-2023-Public-Piktochart-Report.pdf.

[56] Percentages were calculated based on the average daily population for the period January-June 2024, as reported in the Philadelphia Prison Population Reports. *See* Philadelphia Prison Population Report | July 2015 – June 2024, MacArthur Safety and Justice Challenge (July 16, 2024), https://www.phila.gov/media/20240716150642/June-2024-Full-Public-Report.pdf.

[57] Monitor's Fourth Report, *supra* note 12, at 24-28; Monitor's Third Report, *supra* note 12, at 23-26.

5. Increase educational, therapeutic, and other positive programming in general population units.
    *This recommendation has not been implemented.*

6. Utilize sanctions that do not require isolation, such as creating loss of privilege tiers where Class Members receive out-of-cell time but access to commissary, tablets, and phones is limited or restricted.
    *This recommendation is being piloted as part of the PICC disciplinary pilot discussed below under Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline.*

7. Expand Therapeutic Housing Units, discussed below under Substantive Provision 6—Behavioral Health in Segregation, and develop accompanying disciplinary policies that limit the placement of patients in isolation.
    *This recommendation has not been implemented.  See discussion under Substantive Provision 6—Behavioral Health in Segregation.*

8. Improve systems for behavioral health input in the disciplinary process, discussed below under sub-provision 8.1.
    *This recommendation is being piloted as part of the PICC disciplinary pilot discussed below under Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline.*

9. Establish an interdisciplinary committee to create behavior management plans for Class Members who cycle in and out of segregation.
    *This recommendation has not been implemented.*

10. Develop programming for Class Members in segregation units to address behavior and assist with the transition back to general population.
    *This recommendation has not been implemented.*

11. Direct the new data analysis unit to analyze punitive segregation practices and trends.
    *The data analysis team has not listed segregation practices and trends as a focus for 2024.  However, the data analysis team is focusing on contraband interdiction data, which is an important project to analyze factors that lead to violence, misconduct, and segregation placements.*

12. Revise classification policies and procedures to ensure they are designed to maximize programming and reserve segregation for those with the most serious behavioral issues for the shortest possible durations.
    *This recommendation has not been implemented.*

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon*

*good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating:  Non-compliance**

**Restorative and Transitional Services**

If PDP is expected to return to normal operations, it must ensure that the broad categories of services and programs provided by its Restorative and Transitional Services Division (RTS) are being offered consistent with PDP policy.  In the previous reporting period, PDP reported that it reclassified some RTS positions to better align with current staffing needs.  PDP reports additional position reclassifications occurred in this reporting period.  Position changes and RTS vacancies from January to June 2024 are depicted in the following table:

**Table 23: Restorative and Transitional Services Division Staffing**
January 2024 and June 2024

| Position Category | Allocated Positions Jan 2024 | Filled Positions Jan 2024 | Vacancy Rate Jan 2024 | Allocated Positions June 2024 | Filled Positions June 2024 | Vacancy Rate June 2024 |
|---|---|---|---|---|---|---|
| Instructor | 4 | 1 | 75% | 4 | 2 | 50% |
| Volunteer Services Director | 1 | 1 | 0% | 1 | 0 | 100% |
| Psychologist | 6 | 4 | 33% | 5 | 4 | 20% |
| Prison Psychologist Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Social Work Services Trainee | 0 | 4 | 0% | 5 | 4 | 20% |
| Social Work Services Manager I | 1 | 0 | 100% | 1 | 0 | 100% |
| Social Work Services Manager 2 | 44 | 33 | 25% | 39 | 36 | 8% |
| Social Work Supervisor | 14 | 11 | 21% | 14 | 10 | 29% |
| Human Services Program Administrator | 2 | 2 | 0% | 3 | 3 | 0% |
| Social Services/Housing Program Analyst | 2 | 0 | 100% | 2 | 1 | 50% |
| Prison Close Circuit TV Specialist | 2 | 1 | 50% | 2 | 1 | 50% |
| Inmate Computer-Based Education Instructor | 7 | 4 | 43% | 7 | 6 | 14% |
| Inmate Computer-Based Education Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Assistant Director | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Director | 1 | 0 | 100% | 1 | 0 | 100% |
| Industries Shop Supervisor | 16 | 14 | 13% | 16 | 14 | 13% |
| Education Director | 1 | 1 | 0% | 1 | 1 | 0% |
| **Total** | **104** | **79** | **24%** | **104** | **85** | **18%** |

In this reporting period, RTS filled six positions, decreasing its total vacancy rate from 24 percent in January 2024 to 18 percent in June 2024.  PDP lacks performance metrics and has not completed a staffing analysis for RTS, so it remains unclear whether RTS' current staffing and

positions are sufficient to offer all required services and programs.  It appears the only data currently available is total allocated positions and vacancies as depicted in Table 23 above.

As previously reported, PDP established a behavior modification unit led by RTS and security personnel. [58]  The unit's goal is to offer individual behavior modification plans and programming for a small subset of patients who exhibit extreme maladaptive behaviors.  These patients often spend extended periods in segregation, are frequently hospitalized, and require substantial security and clinical resources.  The behavior modification unit was piloted at PICC and reported initial success in working with several Class Members by using incentives to reduce the frequency of maladaptive behaviors.  The Monitoring Team observed the program during two site visits in January 2024 and were encouraged by its progress.  The unit was closed in March 2024 and reopened in August 2024 in a new location.  These services were not available during the program's closure.

By June 2024, PDP reported that it had identified security personnel whose expertise is well suited to the program and the unique challenges its participants face.  The officers completed additional Crisis Intervention and Mental Health First Aid training and were sent to tour the Pennsylvania Department of Corrections' behavioral modification unit.  PDP designated permanent space to house the program in PHSW, Unit 112, and established regular interdisciplinary meetings to evaluate referrals to the program and patient progress.

During the June and July 2024 site visits, however, the unit was empty and several Class Members who were either previous participants or otherwise appropriate for the program were instead being held in administrative segregation at CFCF.  CFCF personnel reported to the Monitoring Team that they had requested assistance from RTS and Behavioral Health in managing, or possibly moving, some of these patients to more suitable housing.  As of August 29, 2024, none of the Class Members had been moved to the behavior modification unit and all remained in segregation housing, except one patient who was transferred to Norristown State Hospital.

Behaviors displayed by some Class Members who may benefit from the behavior modification program include inserting or swallowing sharp or toxic objects, inappropriate or violent sexual behaviors, smearing or ingesting feces, and unprovoked attacks on other Class Members or staff. Dr. Belavich indicates that the segregation environment is inappropriate for this population because their needs far exceed the capacity of most segregation unit staff and the limited programming offered.  Their behaviors may exacerbate the instability of PDP's segregation environments and the isolation of the environments may exacerbate the patients' symptoms. Because the behaviors and motivations of this small population of Class Members are so complex, they require individualized treatment in a highly controlled, therapeutic setting. Without it, they are unlikely to improve and will likely continue to engage in maladaptive behaviors with the potential for critical incidents or other serious negative outcomes.

It is clear to the Monitoring Team that previously reported failures to communicate and poor interdisciplinary coordination among RTS, security, and healthcare divisions continue to prevent

---

[58] Monitor's Fourth Report, *supra* note 12, at 32.

these and other Class Members from receiving the care they need.  These are precisely the types of issues that the Access to Care Committee was recommended to address.[59]

On August 16, 2024, this Court ordered the City to fund a nine-person Access to Care team to facilitate the provision of physical and behavioral healthcare to PDP's Class Members.[60]  The team must be fully operational by February 12, 2025.

The behavior management unit also requires significant behavioral health staffing.  It is unclear whether additional RTS positions should be allocated or the current staff can absorb the additional workload.  As previously reported, the Monitoring Team recommended that PDP evaluate job descriptions and staffing allocations for all programs and services provided by RTS, including the behavior management unit.[61]  PDP has taken no action to implement this recommendation.

On August 16, 2024, this Court ordered the City to retain an independent consultant to complete an evaluation of the RTS unit's functions and effectiveness.[62]  The evaluation must include comparisons to programs and services offered in other jurisdictions and recommendations for performance metrics.  The City must submit a list of potential consultants to this Court for approval by October 15, 2024, and finalize a contract with the approved vendor within 60 days following the Court's approval.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022 to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating: Partial Compliance**

---

[59] Monitor's First Report, *supra* note 12, at 20.
[60] Order, *supra* note 8, at 4.
[61] Monitor's Fourth Report, *supra* note 12, at 31; Monitor's Third Report, *supra* note 12, at 28.
[62] Order, *supra* note 8, at 5.

Since February 2024, PDP has maintained a weekly average of fewer than 550 backlogged on-site medical appointments, which is an improvement from previous reporting periods.  The table below compares on-site appointment backlogs for two four-week periods in November/December 2023 and June 2024:

**Table 24: On-Site Appointment Backlogs for General Medical and Behavioral Healthcare Weekly Averages, Four-week Comparison**
November/December 2023 and June 2024

| Backlog Report Four-week Period | Weekly Average Backlogged Appointments** | | Change | Percent Change (+/-) |
|---|---|---|---|---|
| | Nov-Dec 2023 | June 2024 | | |
| BH Initial Psychiatric Eval. | 82 | 62 | -20 | -24% |
| BH Medication Evaluation | 73 | 65 | -8 | -11% |
| BH Social Work Sick Call | 25 | 35 | +10 | * |
| BH SW SCTR | 0 | 4 | +4 | * |
| Chronic Care Follow-up | 268 | 75 | -193 | -72% |
| Chronic Care Initial | 121 | 31 | -90 | -74% |
| MAT | 129 | 119 | -10 | -8% |
| MAT Follow-up | 0 | 0 | 0 | * |
| Provider Sick Call | 204 | 62 | -142 | -70% |
| RN Sick Call | 42 | 2 | -40 | * |
| Re-Entry Planning | 46 | 10 | -36 | * |
| **Total Backlog** | **989** | **465** | **-524** | **-53%** |

*Average percent change not calculated for average appointments <50.
**Weeks reviewed include: 11/29/23 to 12/21/23 and 6/5/24 to 6/26/24.

As predicted in the previous reporting period, PDP's recent efforts to improve access to care have resulted in a 53 percent reduction in its on-site appointment backlog since 2023.  In addition to increases in PDP's healthcare staffing, discussed in more detail below, PDP leadership has instituted operational changes that help offset barriers to care caused by the security staffing shortage.  Some changes include:

- Permitting patients to receive medical care during institutional count times;
- Permitting patients housed on different tiers to receive care at the same time;
- Offering some types of care inside housing units rather than requiring security escorts to medical clinics; and
- Additional healthcare "blitzes" during which healthcare and security staff work overtime to complete healthcare appointments.

PDP also implemented a tablet-based sick-call pilot program at CFCF in April 2024.  Patient feedback has been positive and PDP Healthcare reports it has streamlined the sick-call process.

41

RCF's tablet sick-call requests became operational in July 2024 and at PICC in August 2024. PDP estimates DC tablet sick-call requests will be operational in October 2024. PDP agrees that paper sick-call requests must remain available in all PDP facilities, consistent with the Monitoring Team's recommendation.

Finally, PDP has assigned PICC's Health Services Administrator as a "care coordinator" to liaise between providers, patients, and security personnel. PDP credits this improvement with much of the reduction in backlogged appointments at PICC. The Monitoring Team has recommended expansion of the care coordinator initiative to every PDP facility. However, Health Services Administrator is the highest management-level healthcare position in each PDP facility, so the Care Coordinator initiative may be more sustainable if assigned to lower-level healthcare team members. With Court-ordered healthcare staffing increases discussed below, PDP should be able to expand the initiative soon. The Monitoring Team thanks and congratulates PDP's Healthcare Division for its ingenuity and commitment to improving patient care.

**On-Site Specialty Care**

PDP healthcare continues to struggle to provide timely on-site specialty care, particularly for podiatry and optometry services. In this reporting period, on-site specialty care appointments represent 23 percent of the overall appointment backlog.[63] The on-site specialty backlog increased by 76 percent, from 141 appointments in December 2023 to 248 in June 2024. The increase is driven largely by a backlog of 159 on-site optometry appointments, which comprise 64 percent of the overall on-site specialty backlog. Podiatry appointments also remain an issue with a consistent backlog of approximately 50 appointments per month since August 2023. In June 2024, the podiatry backlog reached 65 appointments or 26 percent of the total on-site specialty backlog.

PDP reports success in reducing backlogs for some types of on-site specialty care by having providers travel between facilities and see patients on-site rather than requiring transport to the main clinic at DC/PHSW. The change was finalized in this reporting period and PDP reports it has eliminated backlogs in most areas apart from optometry, podiatry, and x-ray. As a result, PDP has purchased mobile optometry equipment that will allow the specialists to see patients at multiple facilities and reduce the need for security escorts. PDP also plans to expand podiatry services from one day per week to two. Finally, X-ray services are currently provided at each facility except PICC. PDP reports that the backlog in X-ray services is, in part, the result of insufficient security staff to transport patients from PICC to other facilities to receive X-rays during the busy day shift. PDP reports it is attempting to correct this problem by extending hours of service for X-ray patients.

---

[63] PDP offers on-site specialty services in obstetrics, gynecology, optometry, pap testing, podiatry, physical therapy, ultrasound, and x-ray. For on-site specialty appointments, specialty providers come to PDP and treat patients on-site. The on-site specialty backlog is sensitive to minor staffing changes or provider absences.

**Off-Site Specialty Care**

The backlog in off-site specialty care appointments remains a serious concern in this reporting period.  In December 2022, PDP's backlog of off-site appointments awaiting scheduling was 172 total appointments.  In June 2023, the backlog had increased slightly to 187 total appointments awaiting scheduling.  By December 2023, the total backlog (scheduled appointments and those awaiting scheduling) reached 375 total appointments and then reduced slightly in the fourth reporting period to 358 in June 2024.  The graph below depicts appointments completed for off-site specialty appointments from January 2023 through June 2024.  PDP has shown a downward trend in successfully completed off-site specialty appointments over this 18-month period.



The consistent reduction in completed off-site specialty appointments is the greatest contributing factor to the significant backlog.  From January 2023 through June 2023, PDP completed 1,273 off-site specialty appointments.  From July 2023 through December 2023, PDP's completed appointments reduced by 26 percent to 938 completed appointments.  From January through June 2024, they reduced another 9 percent to 851 completed off-site specialty appointments, reflecting a 33 percent decrease in completed appointments for the same period one year earlier.

The following table depicts off-site specialty appointments scheduled and attended from January through June 2024:

**Table 25: Off-Site Specialty Appointment Summary**
January – June 2024

| Month | Jan | Feb | Mar | Apr | May | Jun | Total |
|---|---|---|---|---|---|---|---|
| **# Scheduled** | **464** | **395** | **458** | **525** | **460** | **407** | **2709** |
| Out of Custody | 32 | 20 | 33 | 59 | 29 | 28 | 201 |
| Out of Jurisdiction/Open Ward | 5 | 1 | 5 | 8 | 2 | 4 | 25 |
| Cancel Prior to Transport | 16 | 15 | 16 | 21 | 17 | 21 | 106 |
| COVID-19 Isolation | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| *Total Ineligible* | *54* | *36* | *54* | *88* | *48* | *53* | *333* |
| **# Eligible to Attend Appointment** | **410** | **359** | **404** | **437** | **412** | **354** | **2376** |
| Refused[64] | 45 | 39 | 32 | 34 | 42 | 31 | 223 |
| C/O Shortage | 219 | 116 | 221 | 214 | 205 | 189 | 1164 |
| Cancelled at Office | 4 | 4 | 0 | 1 | 0 | 2 | 11 |
| Scheduling Error | 1 | 5 | 6 | 3 | 5 | 6 | 26 |
| Court | 4 | 6 | 2 | 8 | 6 | 3 | 29 |
| Late to Appointment | 2 | 5 | 1 | 6 | 0 | 3 | 17 |
| Other | 12 | 12 | 10 | 8 | 10 | 3 | 55 |
| *Total NOT Seen* | *287* | *187* | *272* | *274* | *268* | *237* | *1525* |
| **Total Seen** | **123** | **172** | **132** | **163** | **144** | **117** | **851** |
| **% of Eligible Patients Seen** | **30%** | **48%** | **33%** | **37%** | **35%** | **33%** | **36%** |

The greatest contributing factor to the reduction in completed off-site specialty appointments remains lack of security staff to transport patients. Staff shortages reportedly account for 76 percent of appointments missed in this reporting period. PDP has continued to see a decrease in the percentage of eligible patients who attend off-site specialty appointments. Eligible patient attendance decreased from 62 percent in the first half of 2023 to 43 percent in the second half of the year.[65] This downward trend continued in this reporting period, with data indicating only 36 percent of eligible patients attended their scheduled appointments.

Patients regularly report they must wait many months to receive specialty care appointments with providers in the community, and that appointments are most frequently cancelled and rescheduled multiple times before they are seen. PDP has resorted to a process that requires the Healthcare Division's Medical Director to evaluate patient charts and prioritize which patients "must go" for their scheduled appointments. That is, PDP security notifies the Medical Director how many patients may be transported in a given week based on availability of transport staff, and the Medical Director must then determine which patients need care the most. Patients on the must-go list are prioritized for specialty appointments but, even then, may not make them when security post vacancy rates are higher than anticipated. It is inappropriate to require a physician

---

[64] PDP does not currently track reasons for refusals. As previously reported, patients have consistently reported to the Monitoring Team that excessive wait times in holding cells for transportation to appointments is among primary reasons for their refusals. *See* Monitor's Third Report, *supra* note 12, at 31-32.
[65] Monitor's Fourth Report, *supra* note 12, at 35.

to prioritize patient care based on security staff availability rather than medical necessity.  In June 2024, PDP began requiring notifications to executive management when patients on the "must go" list are unable to be transported, which PDP anticipates will improve appointment attendance for those patients.

Throughout the first two years of settlement implementation, PDP has attempted to reduce its off-site specialty backlog in various ways by:  (1) adjusting appointment times for greater uniformity in scheduling; (2) batching patients together to reduce the frequency of medical transports; (3) seeking providers who offer evening appointments; (4) offering outside providers reimbursement for travel to PDP facilities to treat specialty patients on site; (5) guaranteeing payment for all scheduled appointments, whether patients attend or not; and (6) reimbursing off-site specialty care providers at higher rates to provide care on site rather than in their community offices.  Reportedly, none of these efforts were successful.

In this reporting period, PDP finalized the establishment of a nine-bed secure inpatient unit at Frankford Hospital, which began accepting patients on July 22, 2024.  As previously reported, the secure inpatient unit is expected to decrease the number of security officers who are redirected for medical guarding and instead allow them to remain in their PDP facility posts.[66]

**Intake Screenings**

PDP remains unable to meet policy guidelines for completing patient intake screenings within four hours of arrival at PDP.  The following table depicts PDP's reported compliance with four-hour timeframes for each month in the first half of 2024:

**Table 26: Percentage of Intake Screenings Within Four Hours**
January – June 2024

| Month | Percentage (%) |
|---|---|
| January | 37% |
| February | 33% |
| March | 35% |
| April | 40% |
| May | 33% |
| June | 51% |
| Average | 38% |

PDP continues to report that its intake area is staffed with sufficient healthcare personnel to meet the four-hour policy requirement.  PDP acknowledges, however, that security staffing, especially during the overnight hours, is insufficient to meet the four-hour policy requirement and causes intake backlogs.  PDP reports that it will begin to evaluate intake timeframes more closely to identify the extent of policy non-compliance, average intake durations, and areas to target for improvement.

---

[66] *Id.* at 15.

45

**Mortality Information**

Three Class Member's died while in PDP custody in the first six months of 2024.  One death was ruled a homicide, one was due to natural causes, and one cause of death is pending.

**Behavioral Healthcare**

PDP remains out of compliance with required timeframes for behavioral health referrals.[67]  In this reporting period, the behavioral health appointment backlogs reduced by 24 percent for initial psychiatric evaluations and 11 percent for medication evaluations.  Behavioral health appointments comprise 36 percent of the entire on-site, non-specialist appointment backlog.[68]

The following tables depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations for January through June 2024:

**Table 27: Percent Compliance with Behavioral Health Referral Timeframes**
January – June 2024

| Month | Total Completed Referrals | Total Referrals Completed within Timeframes (%) | Emergency Referrals Completed within 4 hours (%) | Emergency Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 48 hours (%) | Routine Referrals Completed within 5 days (%) |
|---|---|---|---|---|---|---|---|
| January | 609 | 58% | 75% | 100% | 19% | 29% | 41% |
| February | 762 | 51% | 72% | 100% | 16% | 31% | 29% |
| March | 708 | 57% | 71% | 100% | 26% | 36% | 50% |
| April | 718 | 61% | 78% | 100% | 22% | 39% | 59% |
| May | 772 | 55% | 73% | 100% | 23% | 36% | 51% |
| June | 761 | 53% | 79% | 100% | 16% | 30% | 33% |
| Average | 4330 | 56% | 75% | 100% | 20% | 34% | 44% |

*Expectation: emergent within 4 hours, urgent within 24 hours, routine within 5 days.

---

[67] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals:  emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.
[68] Refer to Table 24, page 41.

**Table 28: Social Worker Sick Calls**
January – June 2024

| Month | Number Completed | Completed within 24 hours (%) |
|-------|------------------|-------------------------------|
| January | 483 | 72% |
| February | 369 | 72% |
| March | 372 | 69% |
| April | 334 | 60% |
| May | 337 | 64% |
| June | 436 | 48% |
| **Total** | **2331** | **64%** |

**Table 29: Compliance with 14-Day Patient Evaluations**
January – June 2024

| Month | Number Completed | Completed within 14 Days (%) |
|-------|------------------|------------------------------|
| January | 704 | 46% |
| February | 659 | 79% |
| March | 740 | 68% |
| April | 756 | 87% |
| May | 802 | 89% |
| June | 714 | 52% |
| **Total** | **4375** | **70%** |

In this reporting period, behavioral health staff referrals were completed within required timeframes 56 percent of the time.  Compliance with four-hour emergency referral timeframes ranged from 71 percent to 79 percent in the first half of 2024, similar to the 62 to 78 percent compliance range in the second half of 2023.[69]

Compliance rates with urgent and routine referrals remain low in this reporting period. Responses to urgent referrals were completed within 24 hours no more than 26 percent of the time for each month, January through June 2024.  Routine referrals were completed within required timeframes less than 60 percent of the time each month.  Creative operational solutions have assisted in reducing some types of backlogged appointments, however, behavioral health appointment timeframes are unlikely to be met without additional behavioral health providers. Social work sick call requests are patient initiated and require face-to-face triaging of patients within 24 hours of receipt.  Data for this reporting period shows PDP met this goal an average of 64 percent of the time, similar to previous reporting periods.

PDP's compliance with 14-day behavioral health evaluations also decreased in this reporting period.  All Class Members entering PDP are referred for a 14-day evaluation by behavioral health staff.  In the third and fourth reporting periods, PDP maintained a monthly average

---

[69] Monitor's Fourth Report, *supra* note 12, at 39.

compliance rate greater than 90 percent.[70]  This rate reduced to an average of 70 percent compliance in this reporting period with the lowest compliance rate, an average of 46 percent, occurring in January.  As with other Behavioral Health markers, compliance with required timeframes is unlikely without the addition of Behavioral Health providers.

Despite ongoing challenges in providing timely and consistent behavioral healthcare, PDP has continued to make progress in the treatment of opioid use disorder (OUD), another critical component of effective correctional care.  In the past, patients who deviated from their treatment plans or abused orally-administered OUD medications were removed from PDP's Medication Assisted Treatment (MAT) program.  PDP reports it has now received a grant of $600,000 to purchase long-acting medication, administered via injection.[71]  The grant will permit PDP to offer patients another chance in the MAT program and reduce the risk of overdose or death while in custody and following release.  PDP is also beginning to administer OUD medications at intake to assist with withdrawal symptoms and has begun to house OUD medication recipients together at RCF.  PDP reports these improvements have reduced incidence of medication abuse by 30 percent and allows providers to offer cognitive-behavioral therapy treatment groups to these patients.

**Healthcare Staffing**

Healthcare staffing efforts continued in this reporting period with additional full-time positions filled and a reported functional vacancy rate of less than 5 percent each month from January through June 2024.  Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate.  A "functional vacancy" rate includes shifts that are filled by overtime and temporary agency hires and accounts for permanent staff who are out on leave and not reporting for duty.

In December 2023, PDP reported a healthcare staff vacancy rate of 20 percent and a functional vacancy rate of 5 percent.  In June 2024, having filled approximately 10 positions, the staff vacancy rate reportedly reduced to 17 percent.  The functional vacancy rate reportedly reduced to 4 percent, which Dr. Belavich opines is excellent.

---

[70] *Id.* at 38; Monitor's Third Report, *supra* note 12, at 34.
[71] Eligible patients will receive extended-release buprenorphine.  When administered via injection, risk of abuse or noncompliance associated with oral administration are significantly reduced.

The following tables depict healthcare new hires and separations for each classification in this reporting period, January through June 2024, and total healthcare vacancies for December 2023 and June 2024:

**Table 30: Healthcare Personnel New Hires and Separations by Job Classification**
January – June 2024

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Administration | 4 | 2 | +2 |
| Behavioral Health Aide | .4 | .4 | 0 |
| Behavioral Health Clinician | 2 | 1 | +1 |
| Behavioral Health Prescriber | 5 | 1 | +4 |
| Behavioral Health Professional | 1.4 | 0 | +1.4 |
| Certified Nursing Assistant | .4 | 1.8 | -1.4 |
| Dialysis RN and Technician | 0 | 0 | 0 |
| Infectious Disease Physician | 0 | 0 | 0 |
| Licensed Practical Nurse | 14.4 | 10.8 | +3.6 |
| Medical Assistant | 2 | 2.8 | -.8 |
| Medical Records | 1.8 | 4 | -2.2 |
| OB/GYM Physician | 0 | .8 | -.8 |
| Physical Health Clinician | 1 | 1 | 0 |
| Physical Therapist and Assistant | 0 | 0 | 0 |
| Telehealth Coordinator | 0 | 0 | 0 |
| Radiology Technician | 0 | 0 | 0 |
| Registered Nurse | 11.2 | 8.6 | 2.6 |
| **Total** | **43.6** | **34.2** | **+9.4** |

**Table 31: Healthcare Vacancy Report**[72]
December 2023 and June 2024

| Position Category | Allocated Positions Dec 2023 | Unfilled Positions Dec 2023 | Vacancy Rate Dec 2023 | Allocated Positions June 2024 | Unfilled Positions June 2024 | Vacancy Rate June 2024 | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Administration | 49.0 | -1.0 | -2% | 59.5 | -3.0 | -5% | 8% |
| Behavioral Health Aide | 8.4 | 1.4 | 17% | 12.2 | 1.4 | 11% | 32% |
| Behavioral Health Clinicians: Social Worker/Psychologist | 24.0 | 14.6 | 61% | 18.4 | 13.6 | 74% | 24% |
| Behavioral Health Prescribers: Psychiatrist, NP | 15.4 | 6.5 | 42% | 15.2 | 2.5 | 16% | 19% |
| Behavioral Health Professionals: BH Coun./Activity Th. | 15.0 | 0.0 | 0% | 15.0 | -1.4 | -9% | 16% |
| Certified Nursing Assistant | 2.8 | 1.4 | 50% | 2.8 | 2.8 | 100% | 94% |
| Dialysis RN and Dialysis Technician | 1.6 | 0.8 | 50% | 1.5 | 0.8 | 53% | 0% |
| Infectious Disease Physician | 2.0 | 1.0 | 50% | 2.0 | 1.0 | 50% | 59% |
| License Practical Nurse: All LPNs | 68.2 | 11.2 | 16% | 74.2 | 7.6 | 10% | 3% |
| Medical Assistant | 17.0 | 4.2 | 25% | 15.0 | 5.0 | 33% | -17% |
| Medical Records Clerk | 14.8 | 0.0 | 0% | 13.8 | 2.2 | 16% | 10% |
| OB/GYN Physician | 0.8 | 0.0 | 0% | 0.8 | 0.8 | 100% | 56% |
| Physical Health Clinicians: Physician, NP, PA | 18.0 | 1.6 | 9% | 19.8 | 1.6 | 8% | -11% |
| Physical Therapist/Therapist Assistant | 3.0 | 0.0 | 0% | 3.0 | 0.0 | 0% | 11% |
| Telehealth Coordinators | 3.0 | 2.0 | 67% | 3.0 | 2.0 | 67% | 67% |
| Radiology Technician | 2.4 | 0.4 | 17% | 2.4 | 0.4 | 17% | 17% |
| Registered Nurse: All RNs | 68.8 | 18.7 | 27% | 63.1 | 16.1 | 26% | -17% |
| **Total** | **314.2** | **62.8** | **20%** | **321.7** | **53.4** | **17%** | **4%** |

As previously reported, PDP offered an average 13 percent pay increase for most healthcare positions.[73]  Increases took effect in mid-2023 and healthcare staffing largely improved as a result.  Unfortunately, increases did not improve hiring across behavioral health classifications

---

[72] In this reporting period, PDP identified inaccuracies in its healthcare staffing reports, which resulted in erroneous underreporting of unfilled positions and the vacancy rate for December 2023 in the Monitor's Fourth Report.  *See* Monitor's Fourth Report, *supra* note 12, at 41.  PDP reports it has corrected the errors and reported corrections are reflected here.  Additionally, PDP had previously assigned staff to work in some functions which were not specifically allocated.  PDP reports it has now allocated those positions for a total of 7.5 additional positions, increasing the total positions allocated from 314.2 positions in December 2023 to 321.7 in June 2024.

[73] Monitor's Fourth Report, *supra* note 12, at 38-39.

(i.e., prescribers and clinicians).  PDP reports that it has evaluated pay raises for behavioral health positions and determined that PDP's compensation package is competitive with similar positions in the community.  PDP reports it has attempted to correct high vacancies in these job classifications by converting them to positions that are easier to recruit but which would not limit any services available to patients, such as converting social worker positions to clinical psychologist positions.

The vacancy rate for behavioral health clinicians increased from 61 percent in December 2023 to 74 percent in June 2024.  The functional vacancy rate, however, reduced from 45 percent to 24 percent in the same periods, reportedly with the use of additional overtime and registry staff.  Reported percentages are also influenced by the conversion of positions described above.  The vacancy rate for Behavioral Health Prescribers was greatly reduced from 42 percent in December 2023 to 16 percent in June 2024 with the hiring of additional behavioral health nurse practitioners.

On August 16, 2024, this Court ordered the City to increase PDP's Healthcare Division budget to include additional healthcare personnel to serve as healthcare liaisons and to provide additional rounding to monitor patients more closely due to current conditions to ensure compliance with Substantive Provisions 4—Resume Normal Operations, 5—Healthcare, and 6—Behavioral Health in Segregation.[74]

**Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's Fourth Report:**

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.

    *PDP has instituted 13 percent raises, on average, for almost all healthcare classifications, which has improved recruitment and retention in several classifications.  PDP reports it has evaluated salary ranges for behavioral health classifications with higher vacancy rates and has determined that current salaries and benefits are competitive.  PDP reports difficulty recruiting social workers in the Philadelphia area and has decided to convert several vacant positions to licensed psychologists and psychiatric nurse practitioners to reduce overall vacancy rates and increase clinical staff.  These conversions are reflected in Table 31 above.*

2. Continue to explore options to provide both on and off-site appointment services via telehealth.

    *On August 16, 2024, this Court ordered the City to take all reasonable and necessary steps to engage telehealth service providers to improve patient access to healthcare and reduce the number of correctional officers who are redirected for transport duties.[75]*

---

[74] Order, *supra* note 8, at 3-4.
[75] *Id.* at 4.

3.  Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring scheduled appointments occur.

    *PDP reports barriers to off-site care for those on the "must-go" lists described above are addressed during weekly executive meetings of security and healthcare leadership.  Security staffing transportation issues remain the greatest barrier to off-site specialty care.*

4.  PDP should evaluate reimbursement rates for both on-site and off-site specialty services and make increases sufficient to attract necessary providers.

    *PDP reports that the Chief Medical Officer approached seven specialty providers to discuss increased reimbursement rates and incentives for providing on-site specialty care or telehealth.  This offer was reportedly declined with the exception of urology and ENT service providers who agreed to provide some services via telehealth.*

5.  PDP should increase incentives for providers to offer specialty care on-site rather than transporting patients to off-site facilities.  Some incentives may include:  (1) offering outside providers reimbursement for travel time to PDP facilities; (2) guaranteed reimbursement for all scheduled appointments, whether patients attend or not; and (3) reimbursement of off-site specialty care providers at higher rates to provide care on site.

    *As discussed above, PDP reports efforts thus far have been unsuccessful.*

6.  The City should explore contracting with outside law enforcement or private security agencies to establish a team dedicated to off-site transport details.

    *See discussion of this Court's Order to engage a secure transportation and medical guarding contractor above under recommendation 3.*

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating:  Partial Compliance**

To achieve substantial compliance with this substantive provision, PDP must, at a minimum:  (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient TU housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the Behavioral Health caseload.

52

*Requirements 1 and 3:  Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

Data from PDP's biannual audit of segregation rounds for physical and behavioral healthcare from May 2024 reflects a decline in the frequency of physical health rounding.  In October 2023, data showed 94 percent compliance with required daily physical health rounds systemwide, and at least 90 percent compliance at each PDP facility.  Data from a randomly selected two-week period in May 2024 reflects a sharp reduction to 65 percent compliance with required daily medical/physical healthcare rounds systemwide.

None of the facilities achieved 90 percent compliance in this reporting period for daily physical health rounds, and compliance at PICC and DC reduced to 32 percent in this reporting period.  PDP explains the decline in care as resulting from a communication failure regarding the patients' movement.  As discussed in more detail above under Substantive Provision 3—Out-of-Cell/Segregation, and below under Substantive Provision 17—Sanitation, the men's segregation unit at PICC was closed for renovations in this reporting period.  Behavioral Health patients were among those moved to DC while renovations were completed.  PDP Healthcare Division reports it was unaware of the moves and, as a result, failed to complete rounding on those patients from March 27, 2024 through May 11, 2024.  The Monitoring Team is unable to verify precisely why this serious lapse in patient care occurred, however, this appears to be another example of poor interdisciplinary communication and further illustrates the need for additional care coordinators and an effective Access to Care team.

The May 2024 audit suggested improved compliance with weekly behavioral health rounds for Class Member patients on segregation status.  Data reviewed by the Monitoring Team revealed a 96 percent compliance rate for weekly behavioral health rounds systemwide.

As previously reported, a primary goal of frequent rounding is to identify patients who show signs of decline or poor coping in segregation housing, and to make timely referrals for additional services or recommend removal from segregation.[76]  Since compliance monitoring began in 2022, the Monitoring Team has observed patients in segregation whose symptoms strongly suggest they required a higher level of care.  These observations are consistent with those reported by independent oversight and other advocates, including the Pennsylvania Prison Society, *Remick* class counsel, Defender Association of Philadelphia (Defender Association), and counsel from the private bar.

The Monitoring Team has communicated to PDP that compliance with Substantive Provisions 5—Healthcare, and Substantive Provision 6—Behavioral Health in Segregation require the provision of *quality* care in addition to meeting standards for the *frequency* of clinical contacts.  As previously reported, clinical staff report they may request further evaluation from clinical supervisors if they believe a patient requires enhanced care or advocacy.[77]  However, PDP does

---

[76] Monitor's Fourth Report, *supra* note 12, at 43.

[77] *Ibid.*

not track when supervisors are requested or when clinicians request removal of patients from segregation, and the Monitoring Team's strong impression is that such requests are rare. The Monitoring Team has consistently recommended that PDP begin to track this information both for quality improvement and compliance purposes, but PDP reports these data remain unavailable.

In this reporting period, the Monitoring Team reviewed rounding notes in PDP's electronic medical record. Clinical notes for weekly behavioral health rounding should be individualized, reflect a clinician's interaction with each patient, and note any concerns observed by the clinician or communicated by the patient. Notes should also include any observations about, for example, cell conditions and any requests for follow-up care. PDP's clinical rounding notes are not individualized or unique to each patient and are, instead, completed in batches that simply denote whether rounding occurred. Notes reviewed suggest that Behavioral Health's current rounding documentation is of little use in identifying patients' needs.

*Requirement 2: Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Members being considered for placement on segregation status. This requires a face-to-face evaluation by a physical healthcare provider and, for those in Behavioral Health programs, a behavioral health clinician. Patients designated SMI are required to have a behavioral health clearance performed within four hours of placement in segregation. Patients who are on the Behavioral Health caseload but not identified as SMI are to receive a behavioral health clearance within 24-hours of placement.

As previously reported, Dr. Belavich has been assessing samples of behavioral health clearance forms for quality and consistency and has identified issues in each reporting period.[78] Based on a review of 50 physical and behavioral healthcare clearance forms (PDP 86-733) from January through March 2024, Dr. Belavich notes improvement in the identification of Class Members who are SMI or on the Behavioral Health caseload. In previous reporting periods, multiple patients on the Behavioral Health caseload, some of whom were also SMI, were not designated as such and, therefore, did not receive required clearance evaluations consistent with policy. In this reporting period, PDP improved its procedure to reliably identify these Class Members. Cases reviewed in this reporting period reflect those with SMI or assigned to the Behavioral Health caseload are now being accurately identified and their behavioral health clearances are being completed. Physical health sections of the clearances are still being completed consistently, as previously reported.[79]

PDP also developed a pilot project to improve the quality of mental health clinical input in disciplinary hearings and dispositions, the accurate identification of the SMI populations, and to ensure that staff assistant support for disciplinary hearings is offered and documented. The pilot,

---

[78] *Id.* at 44; Monitor's Third Report, *supra* note 12, at 38-39; Monitor's Second Report, *supra* note 12, at 34-35; Monitor's First Report, *supra* note 12, at 21.
[79] Monitor's Fourth Report, *supra* note 12, at 44.

also discussed below under Substantive Provision 8—Discipline, was implemented at PICC in May 2024.

Dr. Belavich reviewed all nine Rules Violation Mental Health Review forms (PDP 363-C) submitted in this reporting period for Behavioral Health or SMI patients at PICC.  Although forms reviewed were generally complete, the quality of behavioral health documentation varied.  In some instances, for example, clinicians noted "unknown" or "not applicable" to questions that required responses.  It remains early in the pilot and PDP reports Behavioral Health managers are working with staff to improve quality and thoroughness.  In the next reporting period, PDP plans to expand the pilot to RCF, which has a larger SMI and Behavioral Health patient population.  PDP reports that Behavioral Health managers will be providing additional training and monitoring the quality of documentation on clearance forms.

Despite reported progress, the Monitoring Team remains concerned about high behavioral health thresholds for recommending mitigation in disciplinary determinations and for diverting patients from segregation who may be at risk in isolation.  As with previous reporting periods, the Monitoring Team identified several Class Members during the June 2024 site visits who were clearly decompensating in segregation.  In most instances, patient electronic medical records reflect that these patients were being followed and had recently been seen by clinicians.  If so, these patients should have been identified for removal from segregation to another level of care.  Previously, the only available alternative to segregation was inpatient hospitalization, and many patients did not meet inpatient criteria.  PDP has included in its pilot program described above the option to divert patients from segregation to TUs and to a new PHSW step-down unit, which gives clinicians additional options.  PDP will need to begin tracking instances of diversion and mitigation both as a quality improvement measure and to prove compliance with this requirement.

Generally, it appears that some Behavioral Health clinicians are either failing to recognize the mental health needs of some highly symptomatic patients in their care or are failing to advocate for their needs appropriately.  In this reporting period, disciplinary hearing officers reported to the Monitoring Team that they could not recall in recent years a single instance in which a clinician recommended mitigation for patients facing discipline.  If true, it is further evidence that PDP must reevaluate its mitigation and diversion thresholds and train clinicians accordingly.

Clinical staff experience the same harmful consequences as security and other personnel working in PDP's poor conditions.  Behavioral health providers have limited placement alternatives and too few clinical tools to adequately support their patients.  At times, efforts to advocate for patients are thwarted by long-standing issues with poor interdisciplinary communication.  These barriers are exacerbated by the security staffing crisis, which may breed exhaustion and a degree of complacency, even among the most dedicated staff.

It has also become increasingly apparent that some of PDP's issues with patient advocacy are rooted in a cultural dynamic within its Behavioral Health division.  Some of the Monitoring Team's efforts over the last two years to address various clinical care and referral and placement thresholds have been met with resistance.  As a result, some of PDP's initiatives to improve care for Behavioral Health patients have been delayed and opportunities to help individual patients

have been missed.  There has been little observable progress in clinical recommendations for mitigation of disciplinary sanctions or removal of mentally ill patients from segregation.  The clinical culture in the Behavioral Health division, and PDP culture as a whole, continues to tolerate inappropriately high thresholds for providing some types of care or prohibiting some types of punishment, and patients are exposed to harm as a result.

*Requirement 4:  Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP continues to struggle to deliver the "Positive Change/Positive Outcomes" (PC/PO) behavioral health group treatment program for patients in segregation due largely to security vacancies.  The program is designed to deliver group treatment for two hours, five days per week, for a total of 10 possible treatment hours each week for every program participant.  PDP tracks the number of treatment hours possible based on the number of staff hired to provide this treatment ("treatment hours possible"), the number of hours offered based on personnel absences, vacations, and redirections ("treatment hours offered"), and number of treatment hours provided based on both healthcare and security staff availability ("treatment hours provided").

The following table reflects total PC/PO group treatment hours possible, offered, and provided on segregated units from January through June 2024:

**Table 32: PC/PO Structured Group Treatment Hours in Segregation**
January – June 2024

| Month | Treatment Hours Possible | Treatment Hours Offered | Treatment Hours Provided | Percent (%) Provided | Percent of Required Hours Provided |
|---|---|---|---|---|---|
| January | N/A | 194 | 57 | 29% | N/A |
| February | 310 | 176 | 67 | 38% | 4% |
| March | 534 | 450 | 59 | 13% | 3% |
| April | 568 | 434 | 49 | 11% | 3% |
| May | 654 | 504 | 113 | 22% | 6% |
| June | 558 | 426 | 107 | 25% | 7% |
| **Average** | **525*** | **364** | **75** | **23%** | **8%*** |

*Averages do not reflect treatment hours possible and percent of required hours provided from January.

PDP also developed a metric in this reporting period that denotes compliance percentages with weekly treatment requirements, or "percent of required hours provided."  In May 2024, for example, 113 hours of group treatment was provided.  Accounting for group size, this only reflects six percent of the goal of 10 treatment hours per week for all eligible segregation patients.

PDP reports all segregation Class Members are eligible to attend PC/PO and participants may opt in and out of groups.  Security classification issues currently limit which Class Members may

attend groups together, but if additional groups are offered, more Class Members of all security classifications should receive additional access to groups.  PDP will remain unlikely to make significant progress in this area without additional security personnel.

*Requirement 5:  Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

PDP has met this requirement.  Previously reported discrepancies between security and Healthcare tracking that were leaving some patients on segregation status without sufficient healthcare rounding were resolved in January 2024.  The Monitoring Team confirmed the data's accuracy each week for four weeks and monthly thereafter throughout this reporting period.  Until PDP implements ATIMS, PDP's segregation and other data must be tracked and reconciled manually.  PDP reports data has remained consistent since the solution was implemented, and it will continue monthly audits to ensure segregation patients are properly tracked.

*Requirement 6:  Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

Dr. Belavich maintains that PDP should reduce its dependence on segregation for all Class Members, especially those on the Behavioral Health caseload, and discontinue its use altogether for SMI patients unless no alternatives exist.[80]  PDP's TU housing provides an alternative to segregation housing in a more therapeutic setting for the mentally ill.  Pre-COVID-19, PDP reserved 128 TU beds for women and 200 for men.  During the COVID-19 lockdown, PDP reduced its available TU beds and, by August 2022, 134 beds remained, including 22 for women and 112 for men.

The women's TU is now housed in PICC C-unit.  C Unit has a 128-bed capacity, 34 of which are reserved for TU patients.  Women with various security classifications are also housed in the unit, which significantly limits out-of-cell time and therapeutic programming for TU patients.  There has been no observable change in the women's TU in this reporting period.  In December 2023, 19 patients were enrolled in the 34-patient program.  In June 2024, that number reduced to 16 patients.  During June site visits, patients reported some positive benefits but limited therapeutic programming and recreational opportunities on the unit.  PDP reports one group per day is provided on the unit and the security staff report making efforts to increase out-of-cell opportunities for the patients.  PDP has acknowledged that the current space is inappropriate for this program and committed to opening a 100-bed TU for women by March 2024.  As of this filing, the expansion has not occurred.

In October 2023, PDP moved the Men's TU from a 128-bed unit to a smaller 64-bed unit.  PDP reports the unit is consistently full and often has a waitlist of less than one week.  PDP reports it has established an interdisciplinary team that meets weekly to evaluate referrals to and from the unit.  PDP Healthcare also reports they are developing a uniform referral template.  Although treatment offered on the unit remains limited, TU participants consistently report that they are benefiting from participation.  Security personnel on the unit are clearly engaged and committed.

---

[80] *Id.* at 46; Monitor's Third Report, *supra* note 12, at 40.

During June site visits, for example, the officer on duty knew each patient by name and each patient's unique mental health needs.  TU participants have reported to the Monitoring Team they feel as though officers on the unit care about them and treat them fairly.  They report that TU officers are making consistent efforts to provide additional recreation time whenever possible.  TU officers and clinicians work collaboratively, and interdisciplinary communication is effective.  For example, officers prepare a daily list of patients who refuse medications or showers so that they may be monitored by clinicians for signs of decompensation.

PDP executives recognize that TU programming must expand.  PDP's Behavioral Health caseload continues to maintain more than 1,600 patients and more than 300 patients with SMI.  Sixty-four total TU beds is inadequate for a population this size, and the Monitoring Team continues to recommend expansion as soon as possible.  PDP confirms its goal is to improve care for the mentally ill by diverting as many patients as possible from segregation to TUs and to offer at least 10 hours of PC/PO group treatment for all patients in segregation.  As with the previous reporting period, there is no definitive plan in the near term to expand TUs or to increase PC/PO group hours absent additional security staff or a substantial reduction in PDP's population.

*Requirement 7:  Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

Behavioral Health patients have been consistently overrepresented in segregation since December 2022 when the Monitoring Team first began collecting this data.  Over twelve months, from June 2023 to June 2024, the number of Behavioral Health patients in segregation has consistently increased and they remain overrepresented in segregation status.  However, the Behavioral Health patient population that is also designated SMI has consistently reduced and they have remained slightly underrepresented on segregation status for 12 months from June 2023 to June 2024.

The following table depicts SMI and Behavioral Health patients in segregation housing on specific dates in June 2023, January 2024, and June 2024:

**Table 33: SMI and Behavioral Health Class Members in Segregation**
June 2023 – June 2024

| | June 9, 2023 | | January 12, 2024 | | June 30, 2024 | |
|---|---|---|---|---|---|---|
| | Count | Percent of PDP Population | Count | Percent of PDP Population | Count | Percent of PDP Population |
| **PDP Census** | 4565 | 100% | 4455 | 100% | 4574 | 100% |
| **Number of SMI** | 439 | 10% | 342 | 8% | 329 | 7% |
| **Number on BH Caseload** | 1653 | 36% | 1633 | 37% | 1672 | 37% |
| **Number in Segregation** | 268 | 6% | 280 | 6% | 290 | 6% |
| | | Percent of Segregation Population | | Percent of Segregation Population | | Percent of Segregation Population |
| **Number of SMI in Segregation** | 21 | 8% | 15 | 5% | 14 | 5% |
| **Number of BH in Segregation** | 102 | 38% | 113 | 40% | 133 | 46% |

Segregation data from select dates in June 2023, January 2024, and June 2024 shows that patients on the Behavioral Health caseload totaled between 36 and 37 percent of PDP's overall population.  Behavioral Health patients represented 38 percent of the segregation population in June 2023, 40 percent in January of 2024, and 46 percent in June 2024.[81]  SMI patients, however, have continued to reduce from 10 percent of PDP's total population in June 2023 to 7 percent in June 2024.  SMI patients are not overrepresented in segregation and PDP has successfully reduced their proportion of the total segregation population in each reporting period, from eight percent in June 2023 to five percent in June 2024.

In this reporting period, Dr. Belavich initiated a qualitative review of medical records for approximately 30 patients in segregation to determine whether applications and removals of SMI designations were appropriate.  Behavioral Health providers report they are making efforts to be more discerning when designating patients SMI.  For example, some providers previously had a practice of designating patients SMI based solely on the patients' self-reporting without attempting to confirm symptoms or community history.  This is an inappropriate practice and may result in unintended negative consequences for these patients.  For charts reviewed, Dr. Belavich determined that SMI designations were appropriate.

Dr. Belavich also determined based on charts reviewed, that removals of patients from SMI designations were appropriate.  PDP's psychiatric providers are the only clinicians who may

---

[81] Monitor's Fourth Report, *supra* note 12, at 47; Monitor's Third Report, *supra* note 12, at 41; Monitor's Second Report, *supra* note 12, at 37.

apply or remove a SMI designation, which Dr. Belavich indicates is sound practice.  However, rationales for the removal of patients from SMI designations were not consistently documented in charts reviewed.  Consequently, assessing clinical decisions to remove these patients' SMI designations required time-consuming review of extensive notes for each patient.  Insufficient documentation limits internal quality control, so PDP has agreed to train providers in thorough documentation practices, which Dr. Belavich will assess via additional chart review in a future reporting period.

**Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:**

1.  PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.
    *PDP preliminarily reports the piloting of this procedure at PICC has been positive. There are relatively few SMI Class Members at PICC, so the pilot will be expanded to RCF in the next reporting period where the new procedure can be tested more thoroughly.*
2.  PDP should make additional progress in identifying security personnel to staff Positive Change, Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.
    *PDP reports it is unable to implement this recommendation without additional security staff or fewer Class Members.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating:  Partial Compliance**

PDP remains unable to offer Class Members consistent access to law libraries.  Insufficient security staff to provide out-of-cell time and escorts to law libraries have presented barriers to law library access since compliance monitoring began, and access has not improved in this reporting period.

In April 2023, the Monitoring Team worked with PDP to implement a law library sign-up and tracking system.[82]  Law library tracking has been inconsistent and has prevented reliable compliance monitoring of this substantive provision.  In efforts to improve Class Members' access to legal research, PDP plans to install kiosks inside PDP housing units.  PDP made progress in this reporting period and initiated the procurement of kiosks with plans to implement a pilot program in the next reporting period.

---

[82] Monitor's Third Report, *supra* note 12, at 43.

PDP recognizes that kiosks do not permit printing or copying of documents, and that it must develop a plan to provide these services upon request, in a timely manner.  PDP has also committed to continuing to provide law library access whenever possible so that Class Members may use research, printing, and copying services themselves.  Finally, PDP reports personnel will be trained with the understanding that kiosks supplement, but do not replace, law libraries and law library access, and that Class Members may not be instructed otherwise.  The implementation of the RFID system discussed above under Substantive Provision 2—Out-of-Cell Time, will assist with tracking law library access.  PDP is unlikely to achieve compliance with this substantive provision without additional security personnel or fewer Class Members.

PDP continues to track maintenance of law library printers and computers via monthly audits.  A review of monthly audits for the period of January through June 2024 reflects equipment was operational on the days reviewed.

On August 16, 2024, this Court ordered PDP to install legal research terminals in every housing unit in every PDP facility by August 18, 2025.[83]

**Substantive Provision 8—Discipline**

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding.  See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating:  Partial Compliance**

---

[83] Order, *supra* note 8, at 5.

The following tables depict PDP's disciplinary hearing data in four six-month periods, July through December 2022, January through June 2023, July through December 2023, and January through June 2024, and for each month, January through June 2024.  The tables include totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

**Table 34: PDP Disciplinary Hearings**
July 2022 – June 2024

| Six-month Total | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| July-Dec 2022 | 268 | 19 | 7% | 30 | 11% | 24 | 9% | 6 | 2% |
| Jan-June 2023 | 303 | 23 | 8% | 34 | 11% | 30 | 10% | 0 | 0% |
| July-Dec 2023 | 322 | 23 | 7% | 30 | 9% | 24 | 7% | 0 | 0% |
| Jan-June 2024 | 359 | 32 | 9% | 32 | 9% | 22 | 6% | 0 | 0% |

**Table 35: PDP Disciplinary Hearings**
January – June 2024

| Month | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| January | 336 | 25 | 7% | 36 | 11% | 23 | 7% | 0 | 0% |
| February | 382 | 36 | 9% | 40 | 10% | 21 | 5% | 0 | 0% |
| March | 371 | 31 | 8% | 24 | 6% | 29 | 8% | 0 | 0% |
| April | 381 | 35 | 9% | 41 | 11% | 18 | 5% | 0 | 0% |
| May | 357 | 40 | 11% | 38 | 11% | 21 | 6% | 0 | 0% |
| June | 324 | 24 | 7% | 15 | 5% | 22 | 7% | 0 | 0% |
| **Average/Average %** | **359** | **32** | **9%** | **32** | **9%** | **22** | **6%** | **0** | **0%** |

In this reporting period, PDP remains compliant with the requirement to allow Class Members to be present at their disciplinary hearings.

However, from approximately February through May 2024, CFCF engaged in an inappropriate practice of group punishment by denying all Class Members in administrative segregation at CFCF access to commissary.  In March 2024, the Monitoring Team learned that security personnel on segregation units at CFCF had reportedly been assaulted on multiple occasions with urine or feces, possibly in violation of § 2701 of the Pennsylvania Criminal Code, or with other

liquids.  At times, assaults were reportedly committed with containers or items purchased from commissary.  In response, PDP withheld commissary privileges from all administrative segregation Class Members in all four segregation units at CFCF for several months.  After significant delay, PDP returned commissary access to eligible Class Members in impacted housing units.

The decision to deny commissary to all administrative segregation Class Members at CFCF rather than limiting perpetrators' access only, was reportedly based on concerns for the safety of personnel.  Assault with bodily or unknown fluids is traumatic by any measure.  Some victims experience post-traumatic stress or other mental health symptoms, and some require disability leave.  Staff on housing units where these assaults occur can become inclined to maintain greater distance from incarcerated persons, thereby reducing vigilance during security checks and further limiting access to required services.

SME McDonald agrees that suspending or reducing access to commissary or other items may be appropriate for limited periods of time while investigations are pending and any population moves are made.  This should have occurred at CFCF and required hours or days, not months, to complete.  She also notes that most group misconduct is rooted in systemic operational failures that must be identified and addressed.  PDP acknowledges, in this instance, Class Members in CFCF segregation housing were likely lashing out against PDP's long-standing failures to provide out-of-cell time and other well-documented poor conditions.  PDP's fear for the safety of its staff was appropriate but, based on PDP policy and generally accepted disciplinary protocols in detention facilities, its response was not.  This systemic failure further highlights the profound deprivation some Class Members experience, the safety risks personnel face, and the questionable decisions operating an overcrowded jail with half the necessary staff may breed.

The percentage of disciplinary reports involving SMI-designated persons continued to reduce in this reporting period.  From July 2022 through June 2023, an average of approximately 10 percent of disciplinary hearings involved Class Members with SMI.  From July 2023 to June 2024, disciplinary hearings involving Class Members with SMI reduced to an average of approximately 7 percent.

The percentage of not guilty and dismissed hearings remains at an average of approximately 18 percent in this reporting period.  The presence of not guilty findings and dismissals is positive and suggests that disciplinary hearing officers are effectively identifying errors or poor disciplinary decisions made by other security staff and supervisors at the times the alleged violations occurred.

In the second reporting period, the Monitoring Team recommended that PDP revise its disciplinary policies, hearing documentation, and training materials to comport with due process and Agreement requirements.[84]  PDP has the infrastructure to implement a revised disciplinary protocol consistent with established due process rights and has initiated revisions.  Change has been slow, however, and will require additional time and effort to implement effectively.

---

[84] Monitor's Second Report, *supra* note 12, at 39-40.

As reported above under Substantive Provision 6—Behavioral Health in Segregation, PDP initiated a pilot disciplinary process at PICC in May 2024. Disciplinary hearing officers must consider mental health evaluations and recommendations in making disciplinary determinations and imposing sanctions for those with SMI or who are otherwise identified as having difficulty understanding the disciplinary process. Clinicians must assess each of these patients and document any behavioral health contraindication to placement in segregation. They must also assess and document whether a patient is able to participate in the hearing process and present a defense. Finally, clinicians must denote whether a Class Member's mental illness should be considered a mitigating factor in any discipline imposed. As discussed above, clinicians will receive additional training in providing sound clinical input.

Hearing officers also require additional training to ensure they have considered, and documented any consideration of, clinical input. With the exception of the PICC pilot, hearing officers are not consistently requiring the completion of mental health assessment forms prior to hearings, nor are they consistently documenting whether they have considered clinical factors in their deliberations. Class Members' rights cannot be adequately protected until clinical factors are properly documented and considered during disciplinary hearings. The subject matter experts will continue to offer PDP additional technical support in the next reporting period to ensure proper implementation of the PICC pilot and this requirement.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3--[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

> **Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

*Sub-provision 8.4--[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[85]*

**Compliance Rating:  Partial Compliance**

PDP reports that it continues to maintain an inventory of tablets consistent with this sub-provision.  The following table reflects current tablet totals at each PDP facility based on documentation provided:

**Table 36: Tablet Availability at Each PDP Facility**
January 2024 and June 2024

| Facility/Housing Unit | Total Tablets Jan 2024 | Total Tablets June 2024 | Difference |
|---|---|---|---|
| ASD Total | 0 | 0 | 0 |
| MOD 3 Total | 12 | 10 | -2 |
| CFCF Total | 188 | 192 | +4 |
| DC Total | 52 | 92 | +40 |
| PICC Total | 61 | 53 | -8 |
| RCF Total | 79 | 78 | -1 |
| **Total** | **392** | **425** | **+33** |

---

[85] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) . . ."*.   In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.

PDP's inventory for January 2024 reflects 392 tablets were issued to housing units and an additional 113 tablets for educational purposes. The inventory as of June 21, 2024 reflects 425 tablets issued to housing units and 114 tablets maintained for educational purposes. This reflects an additional 33 housing unit tablets and 1 education tablet in this reporting period.

PDP is issuing tablets, but it is clear from internal audits, staff interviews, Class Member grievances, review of available video, and on-site observations that housing units are not consistently issuing the required number of tablets when dayrooms are open. As previously reported, some reasons for this likely include failures to replace broken tablets or to keep operational tablets charged, or hoarding of tablets by some Class Members.[86]  In this reporting period, PDP logged the receipt of 29 tablet-related grievances.

PDP reports that it continues to reiterate expectations regarding tablets and monitors compliance internally. PDP also recognizes that the most appropriate solution is to make tablets available to all eligible Class Members. This is addressed in more detail below under sub-provision 9.2. PDP is unlikely to achieve substantial compliance with this substantive provision without more staff and/or issuing tablets to all eligible Class Members.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating:  Partial Compliance**

PDP reports additional progress in the City's lengthy process for procuring tablets for all Class Members. In this reporting period, the City reportedly received responses to a request for proposals issued in the fourth reporting period and is on target to select a vendor by October 2024. Once a vendor is selected, the City must initiate contract negotiations, meet any applicable labor requirements, and ensure all infrastructure upgrades are in place. Assuming progress is not hindered by additional unanticipated delays, the City reports that tablets will be issued by October 2025. In the meantime, the Monitoring Team is working with PDP on upgrading associated policies and developing staff training. As with each of PDP's technology upgrades, implementation must be done thoughtfully to ensure consistent and equitable access to tablets for all Class Members, including those in restricted housing.

---

[86] Monitor's Fourth Report, *supra* note 12, at 54.

The following table depicts total monthly and average grievances for the two largest categories of complaints and "others" submitted via tablet for the period September through December 2023:

**Table 37: Monthly Tablet Grievances**
September – December 2023

| Month | September | October | November | December | Average |
|-------|-----------|---------|----------|----------|---------|
| Commissary | 426 | 420 | 632 | 449 | 482 |
| Food Vendor | 63 | 100 | 124 | 185 | 118 |
| Other[87] | 234 | 192 | 302 | 75 | 201 |
| **Total** | **723** | **712** | **1058** | **709** | **801** |

Tablet grievance categories require refinement and PDP's tracking of paper and tablet grievances require improvements.  PDP's tracking of paper grievances includes additional categories of complaints.  The following table depicts total monthly and average grievances submitted via paper grievance for the period January through May 2024:

**Table 38: Monthly Paper Grievances**
January – May 2024

| Month | January | February | March | April | May | Average |
|-------|---------|----------|-------|-------|-----|---------|
| Commissary Items | 184 | 122 | 113 | 53 | 65 | 107 |
| Law Library Access | 0 | 5 | 6 | 0 | 12 | 5 |
| Out-of-Cell | 1 | 8 | 1 | 4 | 3 | 3 |
| Sanitation/Clothing | 0 | 1 | 2 | 1 | 0 | 1 |
| Discipline | 0 | 0 | 0 | 1 | 0 | 0 |
| Religious Access | 2 | 0 | 1 | 0 | 0 | 1 |
| Medical Access | 23 | 34 | 14 | 4 | 11 | 17 |
| Medication | 4 | 15 | 8 | 3 | 14 | 9 |
| MAT/Suboxone | 16 | 11 | 6 | 5 | 8 | 9 |
| Staff Complaint | 6 | 6 | 4 | 7 | 8 | 6 |
| Mail | 0 | 0 | 3 | 1 | 1 | 1 |
| Grievance Process | 0 | 0 | 1 | 1 | 0 | 0 |
| Housing/Classification | 0 | 3 | 1 | 4 | 0 | 2 |
| Misc. | 1 | 3 | 2 | 1 | 6 | 3 |
| **Total** | **237** | **208** | **162** | **85** | **128** | **164** |

---

[87] Currently, tablet grievances categorized as "other" include both complaints and requests for services.  Because service requests are not grievances, reported totals for grievances in this category as reflected in the table are inflated.  Further categorial breakdown of PDP's tablet grievances is prohibitively time consuming.

PDP reports that improvements to PDP's grievance tracking and data have been included among several projects for PDP's new data management team. Because the team is only beginning to familiarize itself with PDP's data systems, including those for use of force, out-of-cell time, staffing, medical transportation, and contraband interdiction, the team will not likely turn its attention to grievance systems until 2025.

As previously reported, when submitting electronic grievances, PDP will need to ensure Class Members are able to obtain copies of filed grievances, appeals, and any responses.[88]  PDP should also permit Class Members to have access to paper grievance forms at all times, so that Class Members may choose the methods by which grievances are submitted.

In the interim, and prior to PDP issuing tablets to every Class Member, PDP should: (1) dedicate civilian resources to improving the tablet grievance process by adding an option for Class Members to "request" services in addition to filing a complaint/grievance; and (2) improve tracking to separate service requests from grievances; (3) improve tracking to identify non-grievable issues and duplicate grievances; and (4) document when grievances are processed.

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

**Compliance Rating:  Partial Compliance**

Interviews with Class Members, call logs, and the Monitoring Team's observations during site visits support PDP's assertion that Class Members are being offered free fifteen-minute phone calls.  Because out-of-cell time is so restricted, and access to phones is limited, Class Members are unable to benefit from this requirement as PDP intended.  PDP will be unable to achieve substantial compliance with this substantive provision without additional personnel—or fewer Class Members—to improve access to phones, or without providing every eligible Class Member a tablet programmed to offer free fifteen-minute call opportunities daily.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating:  Non-compliance**

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not have a plan for the return to normal operations and, therefore, remains in non-compliance with this sub-provision.

---

[88] Monitor's Fourth Report, *supra* note 12, at 55.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

**Compliance Rating:  Partial Compliance**

The Monitoring Team continues to recommend against the expansion of a call button system at PICC and instead continues to recommend significant improvements to security check protocols. PDP reports that it does not anticipate additional improvements to security check protocols and monitoring until the RFID system is implemented.  RFID will require correctional officers to document security checks by scanning electronic tags for each Class Member, which will allow managers to monitor timeliness of the checks.  PDP reports the current goal is to complete infrastructure modifications and test the RFID system at CFCF by December 2024.  The Monitoring Team continues to recommend that PDP consider PICC for the second phase of RFID rollout if appropriate.

While RFID will permit PDP to monitor the frequency of safety checks, assessing the quality of the checks will continue to require CCTV sampling and review.[89]  The City reports that it is continuing with its plans to replace existing cameras with an integrated camera system.  The Monitoring Team is not hopeful that upgrades will be finalized until at least 2026.  The City has also agreed to pilot a body-worn camera initiative at CFCF in 2025.  The City reports that it has an existing body-worn camera contract that can be expanded to include resources necessary for the pilot.  If so, the City's may be able to meet its predicted pilot timeframe of 2025.

As previously reported, physical plant limitations prevent PICC from installing additional phones and tablet docking stations.[90]  The Monitoring Team reiterates its recommendation that PDP prioritize PICC in issuing tablets to every Class Member assuming it does not interfere with other aspects of the implementation timeline.[91]

In April 2024, the City provided to the Monitoring Team the confidential security analysis prepared by the Pennsylvania Department of Corrections (DOC Report) following the escapes from PICC nearly one year earlier.[92]  Many of the contributing factors to the escapes have been reported publicly and further demonstrate the consequences of the City's failure to resolve PDP's staffing crisis.  The DOC Report did not conflict with any Agreement provisions, this Court's orders, or Monitoring Team recommendations.  PDP is in the process of implementing recommended security upgrades pursuant to the DOC Report's findings.  PDP reports that some

---

[89] It was previously reported that this qualitative assessment of security checks is time consuming and hampered by the lack of an integrated camera system and the staffing crisis.  Monitor's Fourth Report, *supra* note 12, at 56.  Further exploration of the viability of conducting a video assessment will be explored following the implementation of the RFID system at PICC.

[90] Monitor's Second Report, *supra* note 12, at 48.

[91] Monitor's Fourth Report, *supra* note 12, at 56.

[92] PDP reportedly received the report in December 2023.

of the upgrades must be prioritized over some of its other reform efforts, though projects are being managed in tandem and are not expected to cause additional delay.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022.*

> **Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.2--PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

> **Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

> **Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

> **Compliance Rating:  Partial Compliance**

PDP provided copies of 14 call-button work orders completed at CFCF and RCF from January through June 2024.  This represents a significant reduction from the 37 work orders submitted for the period July through December 2023.  The 63 percent reduction is likely associated with new tamper-proof safety plates installed over call buttons at CFCF.  As previously reported, the installation of tamper-proof safety plates excluded the four-person "multipurpose room" cells which do not accommodate safety plates.[93]  Of the 14 call-button work orders submitted in this reporting period, half involved damaged call buttons in multipurpose rooms.  PDP reports it is exploring other potential options for upgrading the call buttons in those areas.

Four of the 14 work orders were documented as completed within one working day.  The number of work orders submitted in this reporting period reduced, which should have resulted in more timely repairs.  However, repairs completed within 24 hours reduced from 29 percent in the previous reporting period to 8 percent in this reporting period.  In this reporting period, call button repairs required an average of 10 calendar days, 5 days longer than average repairs in the

---

[93] Monitor's Fourth Report, *supra* note 12, at 58.

previous reporting period.  PDP anticipates that call button repair timeframes will improve in the next reporting period.

PDP documented one grievance regarding broken call buttons and one grievance regarding the failure to respond to a call button.  Previously reported concerns about access to paper grievances, collection of paper grievances, and access to tablets persist in this reporting period, so grievance data may be unreliable and/or underreported.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

> **Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 13—Visiting**

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

> **Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

> **Compliance Rating:  Partial Compliance**

PDP reports it has not made meaningful changes to its visiting program due to critical vacancies and competing priorities.  As previously reported, PDP has agreed to implement a visiting improvement plan based on feedback from surveys and focus groups.[94]  The plan has not been finalized and PDP reports it cannot yet set deadlines by which substantive improvements may be completed.  Initial feedback reported in the Monitor's Third Report and PDP's responses thus far include:

- PDP's website should include all visiting policies and procedures.
  *This information is now available on PDP's website.*
- When the visiting website is down for "scheduled maintenance," visitors are unable to schedule visits, and the durations of scheduled maintenance are not clearly communicated to users.

---

[94] Monitor's Third Report, *supra* note 12, at 55.

*PDP reports it has communicated this issue to the vendor and the issue will be addressed with the procurement of new tablets.*

- Visitors report that the visiting website's technical support phone line has excessive wait times.
  *PDP reports it has communicated this issue to the vendor and the issue will be addressed with the procurement of new tablets.*

- Visitors report that they are not notified when scheduled visits are cancelled. This is frequently true when a Class Member is in punitive segregation at the time of scheduling or is placed in punitive segregation after a visit is scheduled.
  *PDP reports that ATIMS is being programmed to notify visitors quickly when scheduled visits are cancelled due to movement of Class Members.*

- Class Members and staff request that Class Members receive the ability to approve or deny visits. Currently, Class Members are unable to manage visits and do not know who is visiting until the day of a scheduled visit. Class Members report that they may want to refuse some visits or prioritize some visitors over others. Staff report that it would be more efficient for them, and helpful in avoiding potential conflict in the visiting area, if Class Members were able to accept or deny scheduled visits.
  *PDP reports that new tablets will permit Class Members to view, accept, and reject visitation requests. [95]*

- Class Members request more support from PDP in visiting with their children. For example, they have requested that PDP personnel liaise with caregivers and facilitate visits.
  *PDP reports it has not taken action on this request.*

- Visitors and Class Members request that PDP allow visitors to resume taking photographs during visits.
  *PDP reports it has not taken action on this request.*

- Class Members request additional access to tablet visits generally, and specifically on weekends. They also report that existing tablets are often unavailable and request greater consistency with current tablet visiting. Finally, visitors and Class Members request expanded visiting hours to include evenings for visitors who work and children who attend school during the day.
  *PDP reports that new tablets will allow for expanded tablet visiting hours.*

The Monitoring Team made additional recommendations in previous reporting periods that PDP has agreed to include in its visiting improvement plan.[96] These include:

- Analyzing filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above)
  *The current visiting scheduling system lacks a mechanism to track frequently requested timeslots and does not have a waitlist capability. PDP maintains that it*

---

[95] Class Members reported that it is not uncommon for a visitor to sign up for the allotted visits and then not show up for the visit.
[96] Monitor's Second Report, *supra* note 12, at 51-52; Monitor's First Report, *supra* note 12, at 29-30.

> *does not have sufficient staff at this time to expand visiting hours, but it should consider adjusting existing visiting hours to more desirable timeslots to support working families and children.*

- Ensuring that family visiting spaces in all facilities are regularly sanitized.
  > *There were no grievances filed concerning the overall condition of the visiting rooms and rooms are generally clean during announced and unannounced site visits. Several areas require maintenance to repair broken tiles, chipped paint, and aging plumbing.*

- Ensuring family visiting areas are stocked with age and culturally appropriate activities for youth.
  > *PDP has some age-appropriate activities for children in visiting areas, which should be maintained and expanded while PDP is working on a visiting improvement plan.*

Given PDP's staffing crisis, PDP's decision not to prioritize visiting over other substantive provisions, such as out-of-cell time and access to medical and behavioral health care, may be appropriate. Regarding complaints about PDP's scheduling vendor, however, PDP should be persistent and require definitive responses to requests and timely solutions to issues identified. The vendor should be required to correct deficiencies immediately and provide documentation of any improvements. PDP and the City should ensure that subsequent vendor contracts contain express provisions to address deficiencies identified via surveys, focus groups, and by Class Members and PDP staff.

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

> **Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 14—Attorney Visiting**

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

> **Compliance Rating: Partial Compliance**

As previously reported, PDP does not log individual official visits.[97] As a result, the Monitoring Team has generally relied on reports from PDP, Class Members, Defender Association, members of the private bar, and *Remick* class counsel in assessing areas for improvement and progress.

High-traffic morning hours remained PDP's greatest hurdle regarding in-person official visits at CFCF. As previously reported, PDP worked directly with the Defender Association to strategize solutions to official visiting delays.[98] PDP promulgated numerous pilot programs and short-term

---

[97] Monitor's Fourth Report, *supra* note 12, at 59.
[98] *Ibid*.

policies in efforts to compensate for staffing deficiencies and space limitations.  At CFCF, PDP began utilizing additional visiting rooms, modified institutional count times, and amended tablet visiting schedules, among other initiatives.[99]

Counsel continues to report issues as they arise, but it seems delays have significantly reduced over the last calendar year.  As with other operational challenges reported here, PDP used creative problem-solving and trial-and-error to improve operations.  As previously reported, substantial compliance will require policy changes, staff training, and perhaps additional space allocation, all of which PDP reports will occur once more urgent priorities have been met.[100]  In the future, PDP reports it will evaluate whether it is operationally feasible to expand visiting areas/rooms at CFCF to: 1) increase the number of visiting booths for attorneys and social workers; and 2) resume virtual visits during high-traffic morning hours.

In the next reporting period, the Monitoring Team will continue to track improvements, and findings will eventually be incorporated into formal policy recommendations.  Due to PDP's limited data tracking, compliance with this provision will ultimately be measured based on compliance with PDP's revised official visiting policies.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

### Compliance Rating: Partial Compliance

PDP reports ongoing challenges in meeting the 15-minute requirement for remote legal visits, due primarily to staffing shortages.  This is consistent with delays tracked by the Monitoring Team, as well as reports from the Defender Association and private bar, which reflect inconsistent attendance rates in this reporting period.  As previously reported, PDP tracks delays for completed calls but does not track calls that are scheduled but not completed, which will pose methodological challenges once PDP is ready for a compliance audit.[101]  For now, the Monitoring Team will continue to use its own tablet visiting data to assess progress.

From January 1, 2024, through June 30, 2024, 61 of 91 or 67 percent of the Deputy Monitor's scheduled tablet visits were attended by Class Members.  This reflects a 15 percent decrease from the previous reporting period.  30 of the 91 visits were no-shows and another 12 were delayed beyond the 15-minute compliance window, suggesting a 54 percent compliance rate for sub-provision 14.2 in this reporting period.  Overall, this is a four percent decrease from the last reporting period, highlighting the frustrating lack of consistency with tablet meetings.

PDP has made progress implementing additional time slots for tablet meetings, as recommended. In April 2024, PDP began offering both 25-minute and 55-minute slots, which creates additional

---

[99] An exhaustive list of changes was outlined in the Monitor's Fourth Report.  *See Id.* at 59-60.
[100] *Ibid*.
[101] Monitor's Fourth Report, *supra* note 12, at 60.

flexibility for counsel when scheduling remote visits.  Counsel no longer have to wait an hour between visits when scheduling back-to-back tablet meetings with Class Members.  Delays and problems persist, but this improvement marks progress.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

**Compliance Rating: Non-compliance**

As predicted in the Monitor's Fourth Report, PDP has not made meaningful progress toward compliance with this sub-provision.  PDP's current policy does not require notification to attorneys when visits are delayed or canceled, and PDP has not issued an interim directive regarding this requirement.  Personnel have been instructed to notify attorneys of delays, cancelations, or refusals; however, they may not be held accountable for failures to comply until policies and post orders have been revised and personnel have been trained.  PDP will be unable to comply with this provision until staffing levels improve or the population reduces and policy revisions are complete.

**Substantive Provision 15—COVID-19 Testing**

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame.  These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

75

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:  Partial Compliance**

PDP facilities continued to make efforts to improve sanitation, and facility leadership remained responsive when issues were brought to their attention in this reporting period.  The maintenance contractor is also continuing to make progress.  However, staffing vacancies render the system too strained to maintain progress over entire reporting periods, and the quality of facility sanitation continues to vary among housing units.

Examples of some improvements in this reporting period include plans reported by the CFCF Warden to assign a crew of security personnel to supervise the deep cleaning of housing unit showers.  This is a positive step to address one of the facility's persistent issues.  The Warden notes, however, the security crew will be staffed with overtime personnel, so maintaining a consistent cleaning schedule will be challenging.  Dorms at DC were noticeably cleaner during the June 2024 site visits and lighting and plumbing upgrades were also noted.  Despite these improvements, most sanitation issues identified in previous reporting periods are still present to varying degrees, and some have worsened.  For example, with the exception of one unit at PHSW, PDP's clinical units do not meet accepted standards for clinical care environments and MOD 3 is not an appropriate environment for PDP's youth Class Members.[102]

PDP continues to complete weekly internal sanitation inspections.  Inspectors' findings are shared with facility leadership and the Monitoring Team and generally mirror the issues reported here and complaints the Monitoring Team receives from Class Members.  Examples include:

- At CFCF, inspectors consistently noted graffiti, poorly cleaned and maintained showers, rodents, and frequent Class Member complaints.[103]  The population intermittently complains about inconsistent distribution of clean clothing and bed linens.[104]  CFCF Unit A1P4 reported three inoperable showers for two consecutive inspections completed two weeks apart.[105]  Unit D1P4 is noted as maintaining higher cleanliness standards, consistent with Class Member reports that they receive more regular access to cleaning supplies, soap, and toilet paper.
- At DC, the auditor notes noncompliance with vector control, deteriorating and nonoperational showers, missing windows covered with plastic, chipping paint, graffiti,

---

[102] Beds in the unit have open slats and should be replaced with suicide resistant beds.
[103] PDP Audit CFCF – January 9, 12, 30, 31, 2024; March 8, 2024; April 5, 10, 22, 2024; June 6, 2024.
[104] PDP Audit CFCF – January 9, 12, 31, 2024; April 10, 22, 2024; June 6, 2024.
[105] PDP Audit CFCF – March 8, 2024 and April 5, 2024.

and inoperable phones, drinking fountains, and televisions.[106]  The population generally reported access to cleaning supplies, soap, and toilet paper.  Inconsistent clothing and bed linen exchange were documented as an ongoing issue.

- At MOD 3, youth reported access to laundry, cleaning supplies, and linen.  The unit was determined to be in satisfactory condition.[107]

- At PHSW, the auditor notes month after month that cells remain inoperable due to exposed wires, leaking ceilings, and broken locks, glass, and plumbing.  Showers in unit 207 are noted to be inoperable and contain broken tiles.[108]  The population consistently reported insufficient access to clean clothing, bedding, cleaning supplies, soap, and toilet paper.

- At PICC, the showers are routinely noted on every sanitation audit to have a buildup of soap scum.  Approximately 20 to 30 percent of the population continues to report that they are not receiving two sets of outer clothing and/or clean clothing or bed linens on a weekly basis.  No evidence of vector control issues were noted.[109]  As noted above, PICC closed F Unit during this reporting period for painting and renovation, including the application of chalkboard paint on cell walls to reduce graffiti.  J Unit was also closed in this reporting period for renovations.  There were unaddressed maintenance issues noted during multiple inspections, such as a recreation yard window in H Unit that was covered with a wooden board and exposed electrical wires in a closet in H2.[110]  The population generally reported access to cleaning supplies, soap, and toilet paper.

- At RCF, Class Members generally reported access to clean clothing and bed linens, cleaning supplies, and toilet paper.  Issues observed during sanitation inspections requiring correction were related to graffiti, visual obstructions due to hanging clothing/sheets, soap buildup in showers, and broken vents.[111]

The Monitoring Team met with an inspector in this reporting period to better understand PDP's review methods and how corrective action is monitored when issues recur over more than one inspection period.  The PDP auditing team was receptive to suggestions and plans to implement improvements in the next reporting period.

At PICC, access to feminine hygiene products has continued to improve and Class Members are now generally reporting during site visits that they consistently receive two rolls of toilet paper, eight sanitary pads, four tampons, and one bar of soap three times per week.  As previously reported, Class Members also have direct access to tampons free of charge via dispensers installed in all female housing units.[112]

---

[106] PDP Audit DC – January 17, 2024; February 14, 2024; March 13, 20, 2024: April 22, 2024; May 6, 2024; June 6, 11, 2024.
[107] PDP Audit RCF MOD 3 – January 31, 2024; February 28, 2024; March 28, 2024; April 25, 2024.  MOD 3 is an old unit and the housing environment and program offerings do not meet current youth confinement standards.
[108] PDP Audit PHSW – February 5, 2024; March 1, 27, 2024; April 24, 2024; May 24, 2024; June 19, 2024.
[109] Class Members at PICC reported to the Monitoring Team that ants and garden snakes were becoming an issue.
[110] Examples PDP Audit RCF – February 10, 2024; March 13, 2024; May 22, 2024; June 19, 2024.
[111] PDP Audit RCF Main – January 9, 18, 26, 2024; February 6, 14, 29, 2024; March 5, 13, 22, 2024; April 11, 24, 29, 2024; May 5, 13, 17, 2024; June 2, 10, 20, 2024.
[112] Monitor's Fourth Report, *supra* note 12, at 63.

PICC renovations and improvements at CFCF continued in this reporting period following the expansion of PDP's maintenance contract with US Facilities, Inc.  At PICC, entire housing units are being renovated and common areas and hallways are receiving lighting upgrades and fresh paint.  CFCF closed some housing units for renovations and corridors have been repainted.

MOD 3, where youth are currently housed, requires updated lighting, fresh paint and shower, flooring, and window repair in every housing unit.  At DC, the Monitoring Team observed Class Members accessing the yard for the first time since compliance monitoring began in 2022, reportedly delayed by lengthy, outstanding maintenance projects.  Poor vector control and inconsistent maintenance at DC continue to require immediate intervention that City maintenance cannot provide with current staff.  Neither MOD 3 nor DC/PHSW are covered under the expanded maintenance contract and neither facility meets acceptable standards for youth or adult confinement or clinical care.  City maintenance vacancies continue to cause unacceptable maintenance delays, which directly impact Class Members in both facilities.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

### Compliance Rating:  Partial Compliance

Previously reported issues with inadequate clothing exchange persisted in this reporting period.  The Monitoring Team has alerted PDP executives to this unacceptable condition following every site visit since 2022.  Class Members have continued to report that they did not receive two sets of clean outerwear at intake, that they cannot rely on the weekly laundry exchange in facilities that do not permit in-unit laundering, and that they lack clean clothing, bed linens, and underclothing.  As with previous site visits, the Monitoring Team observed dingy, dirty, or stained bed linens and many cells clearly continue to lack second sets of clean clothing.

PDP has proven it is capable of implementing effective solutions to long-standing failures to distribute supplies to Class Members.  For more than a year, women at PICC complained about inadequate access to feminine hygiene products.  PICC leadership implemented an initial solution with some positive results, but complaints continued.  When leadership revisited the issue, they pivoted to a more durable strategy and have continued to monitor its effectiveness.  As stated above, the feminine hygiene issue now appears to have been resolved.

PDP should apply the same creativity to correct its long-standing failures to provide clean clothing, bed linens, undergarments, and cleaning supplies.  Over two years, SME McDonald has recommended multiple potential approaches to correct these operational deficiencies, including modifying distribution schedules, internal auditing, increasing the number of Class Member workers, procuring more clothing and bed linens, ensuring laundry equipment is operational, and holding managers accountable for required access to these items.  Unlike most other aspects of the Agreement, PDP's staffing crisis does not preclude compliance with this substantive provision.  Ultimately, SME McDonald recommended in this reporting period that executives find any way possible to "flood" housing units with clothing, linens, and cleaning supplies.  In

August 2024, the new Commissioner committed to more intent focus in this area.  Effective solutions should be forthcoming.

**Status of Recommendations, Substantive Provision 17—Sanitation, from the Monitor's Third Report:**

1. PDP should modify schedules to increase the frequency of deep cleaning rounds.

   *There has been no notable improvement in deep cleaning due primarily to lack of staffing to oversee the process and workers to facilitate cleaning.  PDP did, however, purchase pressure washers in this reporting period to assist with shower and cell sanitation.*

2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.

   *PDP reports it has procured secure, rodent-proof containers in this reporting period. The containers are institutional grade, soft-sided boxes for the storage of commissary and edible items in cells and dormitories.  PDP reports containers should be issued in the next reporting period.  This improvement marks progress.*

3. PDP should expedite procurement of sufficient undergarments to meet the needs of all Class Members.

   *During site visits in June 2024, it was evident that undergarments were not being routinely issued.  Following the site visits, PDP reported that Class Members in women's units are now issued three pairs of underwear and two brassieres, and males are issued two sets of boxers and t-shirts.  In the next reporting period, the Monitoring Team will confirm this policy is being implemented as reported.*

4. PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and issuance of hygiene supplies.

   *PDP continues to complete regular internal sanitation audits.  Audits are completed by sergeants who are not assigned to facilities being audited and findings are shared with institutional staff and the Monitoring Team.*

5. PDP should revise its post orders to reflect operational nuances at each facility.  Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities.

   *PDP reports it is in the process of revising post orders but has not had sufficient bandwidth to finalize updates in this reporting period.  The Monitoring Team has recommended that PDP continue to prioritize reform based on available resources with emphasis on improving conditions for Class Members.*

6. PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and linen exchange, and the issuance of cleaning and hygiene supplies.  Plans should include effective monitoring via audits or other modes of verification.

   *PDP has implemented improvements, as noted above, however, supervisor vacancies impede progress in developing recommended plans.  As also noted, PDP must*

79

*identify some way of ensuring Class Members have clean clothing, linens, and cleaning supplies.  Any solutions the Commissioner and his executive team identify should be implemented immediately.*

**Additional recommendations for immediate action:**

7. The City should authorize the emergency procurement of outside contractors to deep clean housing units on a regular schedule, similar to its approach in medical and mental health housing units, which have shown improvement as a result.  The contract should include entire housing units, showers, and all biohazardous cells prior to re-occupancy.

   *PDP reports it cannot implement this recommendation because any outside cleaning crew would require security escorts, which staffing vacancies would not support.  If so, PDP must identify an effective alternative to ensure housing units are sanitized.*

8. The City should authorize PDP to immediately implement an effective vector control program at DC/PHSW and MOD 3.

   *PDP reports that it entered into a new contract for vector control services at DC/PHSW and MOD 3.  The Monitoring Team will evaluate any progress in the next reporting period.*

9. PDP should prioritize capital projects that pose health and safety risks in populated housing units.

   *PDP has not prepared a comprehensive, prioritized capital projects plan.  As previously reported, PDP's aging facilities require significant renovation and repair. Projects will be complex and costly to operationalize.[113]  Significant capital projects have been underway since monitoring began, such as air conditioning installation at DC and lock replacements in all facilities, among others.  However, the City has not dedicated sufficient resources to develop a systemwide plan for renovations and repairs with completion timeframes for each project.*

   *RCF and CFCF visually appear to be in sound repair.  It is unclear, however, whether aspects of the infrastructure require replacement and whether some areas, such as showers and flooring at CFCF, are in acceptable condition.  Each of PICC, MOD 3 and DC/PHSW have critical repair and major capital projects needs.  An acceptable project plan should include repairs and renovations of deficiencies that are observable throughout facilities and housing units as well as hidden or larger infrastructure needs, such as roofs, HVAC, plumbing, and electrical.  The plan should include a full-scale assessment to assist PDP with prioritizing projects based on projected population needs, and fire, life, and safety protocols.*

   *On August 16, 2024, this Court ordered the City to analyze physical plant and long-term capital needs at every PDP facility housing Class Members, and to identify deficits that impact conditions of confinement.[114]  The analysis must be submitted by May 13, 2025.*

---

[113] *Id.* at 16-18.
[114] Order, *supra* note 8, at 6.

10. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

*PDP reports that the City has further expanded PDP's maintenance contract to include all maintenance services at PICC, in addition to emergency repairs. US Facilities, Inc. is now responsible for all maintenance at CFCF, RCF and PICC, including vector control.*

*City maintenance employees are responsible for facilities maintenance and vector control at DC/PHSW and MOD 3. PDP continues to report a maintenance employee vacancy rate exceeding 40 percent.[115] Even with reduced responsibilities, City maintenance is currently unable to meet physical plant needs at DC/PHSW and MOD 3.*

*On August 16, 2024, this Court ordered the City to authorize further expansion of PDP's maintenance contract to include all necessary maintenance at all PDP facilities, and to initiate outreach to labor unions as appropriate.[116]*

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

**Compliance Rating:  Partial Compliance**

PDP continues to maintain a small Use of Force Review Team (UFRT) comprised of two lieutenants and a captain. The UFRT reviews all video of reported uses of force as soon as possible following each incident to identify or exclude any use-of-force policy violations or employee misconduct. The UFRT also continues to complete more comprehensive reviews of a small number of use-of-force packages. The team continues to refine its expertise in identifying factors that contribute to force incidents, the quality force responses and post-incident care, and systemic approaches to reducing reliance on force.

---

[115] Refer to Table 1, page 13.
[116] Order, *supra* note 8, at 5-6.

Meaningful systemic change will require supervisors and managers to take a far more concerted approach to use-of-force reviews. That remains unlikely due to critical security staff vacancies, which continue to result in months-long delays in facility-level use-of-force reviews.[117]

In this reporting period, SME McDonald completed a comprehensive review of five use-of-force packages from each of RCF, CFCF, and PICC to assess any improvement in the quality of reviews at the facility and UFRT levels. Facilities were notified in advance which packets would be reviewed and were encouraged to give them particular focus at the facility-level review. The system showed improvement in addressing contributing factors to force incidents and analyzing use-of-force responses. The UFRT and facility personnel identified a broad range of concerns that included unnecessary/excessive force, policy violations, and training issues. Reviews in this reporting period also included confirmation that some non-compliance issues were addressed. This marks progress.

Incidents reviewed were selected specifically because they each include multiple, complex issues and serve as effective case-studies. Examples below do not reflect typical use-of-force incidents and are not representative of incidents systemwide. Some findings include:

- Five use of force incidents were identified by PDP as involving unnecessary or excessive force, resulting in employee discipline or pending misconduct investigations;
- Pre-force issues were identified in three incidents that were non-emergent and should have involved support from mental health. Packets contained documentation confirming that personnel were retrained in the controlled situation policy; and
- Seven use-of-force incidents were identified as requiring a range of areas for improvement in tactical responses, de-contamination, report writing, isolation, containment, and equipment requirements.

SME McDonald provided feedback on cases and discussed with reviewers any areas for improvement or consideration that were not documented. None of the cases involved excessive use of force that was not identified by PDP. This marks important progress. PDP has remained receptive to feedback during the review processes and is demonstrating more rigorous internal monitoring.

Force incidents reviewed in this reporting period also demonstrate that staff remain ill prepared to manage larger disturbances. Cases included repeated failures to isolate and contain situations, and uninvolved Class Members can be seen on CCTV remaining in close proximity to fights or other disturbances. SME McDonald notes that correcting issues with disturbance control requires intensive training and internal monitoring and mentorship. They are perishable skills that require initial and annual training to maintain, which staff vacancies prevent PDP from providing. However, PDP reports it will conduct disturbance-control drills in the next reporting period. The drills will temporarily impact program offerings but are critical for safety and security. Incidents also demonstrate that staff continue to use unnecessary force and continue to use force after situations are controlled. These issues remain unacceptable but were documented more consistently in this reporting period.

---

[117] Monitor's Fourth Report, *supra* note 12, at 66.

Other areas of progress in this reporting period include:

- On June 27, 2024, following the identification of incidents that should have been recorded and involve mental health clinical support, PDP executives issued a reminder to all staff concerning requirements for pre-planned or controlled force situations.
- PDP worked with the National Institute of Corrections to provide Crisis Intervention training to 26 employees in April 2024.  This is reportedly the first in a series of courses designed to build de-escalation skills and skills in effective engagement with those navigating mental illness.
- PDP lacks sufficient supplies of handcuffs to issue systemwide, so temporary restraints have been purchased for training and distribution in the next reporting period.[118]
- PDP anticipates its new jail management tracking system, referred to in corrections only as ATIMS, will be online in the next reporting period.  It will reportedly have the ability to enhance use-of-force reporting, reviews, and tracking as well as serve as an early warning system for potentially problematic personnel.  ATIMS implementation has been a multi-year effort and will likely require refinement, but PDP is certain to benefit from anticipated improvements.
- PDP reports the new data analysis team is preparing to assist the UFRT in analyzing and reporting on force trends in the next reporting period.

On August 16, 2024, this Court ordered the City to implement the following security measures designed to increase facility safety and reduce reliance on security officers for some tasks:[119]

1. PDP must confer with the Philadelphia Police Department to implement a system to remotely report criminal offenses that occur at PDP facilities, to include a video capability that would allow police personnel to interview complainants and witnesses remotely.  PDP must report the outcome of these discussions by October 15, 2024.
2. The City must fund PDP's K9 detection program.  Funding for the program must be at a level sufficient to conduct routine and consistent sweeps for contraband at each institution and to ensure adequate facilities to house K9s and all necessary equipment.
3. The City must complete the purchase of technology that allows for prompt and efficient scanning, without violating any attorney-client privilege, of incoming legal mail for contraband.  The technology must be purchased by October 15, 2024.

The Monitoring Team is confident that PDP's momentum will continue and anticipates additional progress in some areas.  Progress will be slow and incremental, however, due to critical staffing shortages and an increasing Class Member population.  PDP must still revise its policies on use of force, use-of-force review, and force training.  None of these tasks will likely be completed until staff vacancies or the Class Member population are reduced.  Other critical projects such as group incident training, utilization of body worn cameras and an integrated

---

[118] PDP has not been issuing handcuffs to all staff, which has caused delays in restraining combative Class Members and poses risk to those involved.  Temporary restraints are consistent with the Monitoring Team's recommendation to ensure all staff have restraints.
[119] Order, *supra* note 8, at 6.

camera system, and use of personal alarm devices will also surely take considerable time, funding, and effort to operationalize.