# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated, | : | No.: 2:20-cv-01959-GAM |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and MICHAEL RESNICK, in his official capacity as Commissioner of Prisons, | : | |
| | : | |
| Defendants. | : | |

## MONITOR'S SIXTH REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Sixth Report evaluating Defendants' compliance with the terms of the Agreement through December 31, 2024. The Monitor prepared this report as the sixth of regular reports to be filed of record through the second settlement term ending April 30, 2026. Subsequent reports will be filed according to the following schedule:

| | |
|---|---|
| Monitor's Seventh Report | September 30, 2025 |
| Monitor's Final Report | March 30, 2026 |

I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: March 31, 2025

Respectfully submitted,


By: /s/ Cathleen Beltz
Monitor

The Agreement between Plaintiffs Thomas Remick, et al., on behalf of themselves and all others similarly situated (Plaintiffs), and the City of Philadelphia (City) and Michael Resnick, in his official capacity as Commissioner of Prisons (Commissioner), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-GAM (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.  The two-year Agreement was scheduled to terminate on April 12, 2024.  In the initial settlement term, Defendants met the requirements for substantial compliance with Substantive Provision 15—COVID-19 Testing and Substantive Provision 16—Quarantine.  Defendants also substantially complied with sub-provisions 12.3 and 12.5 (Substantive Provision 12—Locks) and 13.1 and 13.3 (Substantive Provision 13—Visiting).  On January 4, 2024, the parties stipulated to a two-year extension with a new Agreement termination date of April 30, 2026.[1]  Defendants' progress in implementing the Agreement is discussed below.

Pursuant to Substantive Provision 4—Resume Normal Operations, PDP and the Monitor were required to submit a plan for PDP to return to "normal operations" once COVID-19 restrictions were lifted.  The plan was due for submission to this Court by November 1, 2022.  PDP has been unable to finalize a plan primarily due to high vacancies among correctional officer positions coupled with an increasing Class Member population, which limited PDP's ability to predict when it might return to normal operations, significantly improve conditions, and achieve substantial compliance with the Agreement.  Also pursuant to Substantive Provision 4, the Monitor convened several meetings of the parties to strategize solutions to areas of persistent non-compliance.[2]  Meetings involved transparent, good faith collaboration between PDP's previous commissioner, Blanche Carney, her executive team, and counsel for the parties and produced solutions to some of PDP's operational issues.  Ultimately, the City was unwilling to expend necessary resources to address the staffing crisis.

On April 8, 2024, Plaintiffs filed a motion for civil contempt seeking the imposition of sanctions to address Defendants' persistent failure to comply with the Agreement and improve conditions of confinement for Class Members.[3]  On July 12, 2024, this Court held Defendants in civil contempt[4] and on August 16, 2024 ordered the City and PDP to take immediate action on multiple requirements designed to address the following areas of non- or partial compliance:  (1)

---

[1] On January 4, 2024, upon the agreement of the Parties, the *Remick* Court issued an order extending the Agreement through April 30, 2026.  Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 197 (E.D. Pa. Jan. 4, 2024).

[2] Meetings of the parties initially occurred over eight months on June 23, 2023, October 16, 2023, November 8, 2023, December 15, 2023, and February 5, 2024.  Following this Court's contempt finding in July 2024, meetings of the parties resumed during Commissioner Resnick's tenure, the first of which occurred on December 16, 2024.

[3] Plaintiffs' Motion for Civil Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 205 (E.D. Pa. Apr. 8, 2024).  Defendants filed their response to Plaintiffs' motion for civil contempt on May 6, 2024.  *See* Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 208 (E.D. Pa. May 6, 2024).  Plaintiffs replied to Defendants' opposition motion on May 24, 204.  *See also* Plaintiffs' Reply Memorandum on Motion for Civil Contempt of Court, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 209 (E.D. Pa. May 24, 2024).  Additional motion practice was followed by oral argument, which was heard by this Court on June 27, 2024.  During oral argument, Defendants requested an evidentiary hearing.  On July 9, 2024, Defendants submitted an affidavit to this Court documenting their compliance efforts to date which included ten exhibits.  Defendants presented their evidence to this Court during an evidentiary hearing on July 11, 2024.

[4] Sanctions Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 220 (E.D. Pa. July 12, 2024).

Recruitment, Staffing, and Hiring; (2) Healthcare Access for Class Members; (3) Programming and Services for Class Members; (4) Facility Maintenance; (5) Facility Security; and (6) Population Management.[5]  Several of the remedial measures ordered require additional analysis and subsequent direction from this Court to ensure proper implementation.  Discreet requirements of the Court's August 16, 2024 order (Sanctions Order) as well as Defendants' progress in meeting them is discussed throughout this report.

The Agreement provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement.  The Monitor will address Defendants' implementation progress and issue "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision.  Where necessary, the Monitor will make specific recommendations to improve Defendants' compliance with the Agreement.  A "Substantial Compliance" finding means Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision.  A "Partial Compliance" finding means that PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance.  A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete the discrete tasks outlined in a substantive provision.  Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance will be assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence.  Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members.  In issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 30, 2026, termination date.  In this reporting period, the Monitoring Team utilized data tracked through December 31, 2024, and additional information received through March 28, 2025.

The Agreement requires the Monitor to conduct site inspections "at least once every three months." In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP.[6]  During site visits, the Monitor conducts confidential interviews with personnel and Class Members.  The Monitor also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

---

[5] *See* Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 221 (E.D. Pa. Aug. 16, 2024).  The remedial sanctions described in the Sanctions Order primarily seek to remedy non-compliance with Substantive Provision 1—Staffing, Substantive Provision 2—Out-of-Cell Time, Substantive Provision 3—Out-of-Cell/Segregation, Substantive Provision 4—Resume Normal Operations, Substantive Provision 5—Healthcare, Substantive Provision 6—Behavioral Health in Segregation, Substantive Provision 7—Law Library Access, Substantive Provision 10—Phone Calls, Substantive Provision 13—Visiting, Substantive Provision 14—Attorney Visiting, Substantive Provision 17—Sanitation, and Substantive Provision 18—Use-of-Force.
[6] The Monitoring Team completed an unannounced site visit July 10 and July 11, 2024.

The Remick Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[7]  In this reporting period, Deputy Monitor Grosso (Deputy Monitor) has continued to conduct site visits at least once per month to speak with Class Members on PDP housing units.  Following site visits, the Deputy Monitor schedules weekly confidential virtual meetings with Class Members if more privacy is required.  Since weekly two-hour tablet meetings commenced December 6, 2022, the Deputy Monitor has interviewed 374 Class Members across PDP facilities.  The Monitoring Team also utilizes information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

The Monitoring Team periodically receives complaints from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel.  With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary.  With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews.  Conditions observed and information received via these interviews and protocols are consistent with *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

The Monitoring Team also receives information via published reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, criminal defense attorneys, and others independent of PDP.  This information augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms.  The Monitoring Team thanks these oversight partners for their continued contributions and commitment.

In this reporting period, members of the Monitoring Team completed six site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside (RCF).[8]  During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."  The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.

---

[7] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 4 (E.D. Pa. May 25, 2022).

[8] Site visits were conducted July 10-11, 2024, August 27, 2024, October 2, 2024, October 29, 2024, November 4-7, 2024, and December 13, 2024.

In this reporting period, the Monitoring Team continued to meet with PDP Commissioner, Michael Resnick (Commissioner or Commissioner Resnick), and his staff and received access to facilities, personnel, and Class Members.  In the first 10 months of Commissioner Resnick's tenure, he has directed important recruitment efforts and several employee wellness initiatives that are clearly improving the morale of many PDP employees.  Data from this reporting period also suggests corresponding positive trends in vacancy reduction and employee retention.

In October and November 2024, PDP updated its electronic medical records system and transitioned from its antiquated jail management database to a new, more effective database.  As expected, these changes impacted operations, data availability, and compliance percentages as identified periodically throughout this report.  PDP has reported significant additional improvements in some areas since the end of this reporting period in December 2024 and requested that more recent data illustrative of reported improvements be included in this report.  The Monitor declines to include data generated outside of semiannual reporting periods.  However, if reported improvements hold true, PDP should demonstrate marked progress toward compliance with some substantive provisions in the next reporting period.  Areas of reported improvements are noted in relevant sections below.

The Commissioner appointed a new Deputy Commissioner for Restorative and Transitional Services and a new Deputy Commissioner for Operations and Emergency Services, both of whom are well qualified for their positions and reported for duty December 9, 2024.  Their addition to PDP's executive team redistributes critical management workload, much of which had been the sole responsibility of First Deputy Commissioner, Xavier Beaufort (FDC Beaufort), for many months prior to the Commissioner's appointment and while positions remained vacant.  FDC Beaufort should be commended for his commitment to PDP, and for his professional dexterity in filling various leadership roles at once.

The Commissioner is charged with leading PDP through a profound transformation from a jail system rife with neglect to one that meets the needs of every person confined in its facilities.  Despite incremental progress in hiring and retention, meaningful improvement to the daily experiences of Class Members and the work environment for staff necessitates significant reductions in PDP's incarcerated population.  The Sanctions Order requires Defendants to compile and share with their criminal justice partners data about Class Members whose charges, bail, and other criteria may make them appropriate for transfer or release from PDP custody.[9]

In August 2024, the First Judicial District of Pennsylvania, the Defender Association of Philadelphia (Defender), and the District Attorney's Office (DA) initiated a broadscale effort to reduce the jail population while prioritizing public safety.  Based on data provided by Defendants, as well as other public safety and procedural criteria, criminal matters are being evaluated case-by-case and, as appropriate, Class Members are being considered for transfer or release.

Among the most successful initiatives, the Honorable Karen Simmons, Supervising Judge, Criminal Division, Philadelphia Municipal Court, has instituted weekly emergency bail hearings

---

[9] Order, *supra* note 5, at 7.

for Class Members who meet specific criteria and based on recommendations from the Defender and DA.  She is also hearing weekly misdemeanor trials for in-custody defendants with the goal of resolving the cases at the first listing and only granting continuances in exceptional circumstances.  In November 2024, the Honorable Rose Marie DeFino-Nastasi, Supervising Judge, Criminal Division, Philadelphia Common Pleas Court, also promulgated new regulations for *Gagnon* I and *Gagnon* II hearings, specifically designed to accelerate review of common pleas detainers.  Commissioner Resnick negotiated with the Philadelphia Sheriff and the Pennsylvania Department of Corrections (DOC) to double the frequency with which Class Members who have received state prison sentences are transferred from PDP to DOC custody.

These population reduction initiatives have contributed to a reduction in PDP's Class Member population from more than 4,800 in September 2024, to fewer than 3,900 in mid-February 2025. As a result, PDP reports it has discontinued its use of multipurpose rooms to house Class Members, reduced housing unit size, and are focused on reducing post vacancies in the jails. PDP also reports reduced incidence of unsupervised housing units systemwide and a recent reduction in on-site medical backlogs.  Agreement compliance requires sustained efforts to further reduce the population.  The Monitoring Team commends and thanks PDP and its Philadelphia justice partners for their success thus far in this critical undertaking.

# Table of Provisions

*Compliance Findings* ........................................................................................... 8

*Substantive Provision 1—Staffing* .................................................................. 14

    *Sub-provision 1.1* .......................................................................................... 14

    *Sub-provision 1.2* .......................................................................................... 19

    *Sub-provision 1.3* .......................................................................................... 20

    *Sub-provision 1.4* .......................................................................................... 21

*Substantive Provision 2—Out-of-Cell Time* .............................................. 28

    *Sub-provision 2.1* .......................................................................................... 28

    *Sub-provision 2.2* .......................................................................................... 34

*Substantive Provision 3—Out-of-Cell/Segregation* ................................ 34

    *Sub-provision 3.1* .......................................................................................... 34

    *Sub-provision 3.2* .......................................................................................... 38

*Substantive Provision 4—Resume Normal Operations* .......................... 45

*Substantive Provision 5—Healthcare* ........................................................... 48

*Substantive Provision 6—Behavioral Health in Segregation* .............. 63

*Substantive Provision 7—Law Library Access* ......................................... 71

*Substantive Provision 8—Discipline* ............................................................. 71

    *Sub-provision 8.1* .......................................................................................... 71

    *Sub-provision 8.2* .......................................................................................... 74

    *Sub-provision 8.3* .......................................................................................... 74

    *Sub-provision 8.4* .......................................................................................... 74

*Substantive Provision 9—Tablets* .................................................................. 75

    *Sub-provision 9.1* .......................................................................................... 75

    *Sub-provision 9.2* .......................................................................................... 76

*Substantive Provision 10—Phone Calls* ...................................................... 78

    *Sub-provision 10.1* ........................................................................................ 78

    *Sub-provision 10.2* ........................................................................................ 78

*Substantive Provision 11—PICC Emergency Call Systems* ................... 79

*Substantive Provision 12—Locks* ................................................................... 79

    *Sub-provision 12.1* ........................................................................................ 79

    *Sub-provision 12.2* ........................................................................................ 79

*Sub-provision 12.3* ................................................................................................ 80

*Sub-provision 12.4* ................................................................................................ 80

*Sub-provision 12.5* ................................................................................................ 80

***Substantive Provision 13—Visiting*** ........................................................................ **81**

*Sub-provision 13.1* ................................................................................................ 81

*Sub-provision 13.2* ................................................................................................ 81

*Sub-provision 13.3* ................................................................................................ 83

***Substantive Provision 14—Attorney Visiting*** ........................................................ **83**

*Sub-provision 14.1* ................................................................................................ 83

*Sub-provision 14.2* ................................................................................................ 83

*Sub-provision 14.3* ................................................................................................ 84

***Substantive Provision 15—COVID-19 Testing*** ...................................................... **84**

***Substantive Provision 16—Quarantine*** .................................................................. **84**

***Substantive Provision 17—Sanitation*** .................................................................... **85**

*Sub-provision 17.1* ................................................................................................ 85

*Sub-provision 17.2* ................................................................................................ 87

***Substantive Provision 18—Use-of-Force*** ................................................................ **91**

## Compliance Findings

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision.  The Monitoring Team created sub-provisions for some of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision.  This provides additional clarity for Defendants as they work to implement required changes and greater specificity for this Court and the Parties in distinguishing between action items that are being successfully implemented and those that require additional attention.  To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 sub-provisions were created.  In this reporting period, PDP has achieved substantial compliance with 11 sub-provisions, partial compliance with 21 sub-provisions, and remained in non-compliance with 5 sub-provisions.  Sub-provision 3.1 changed from non-compliance to partial compliance in this reporting period.  All other substantive provisions and sub-provisions remain the same.

The table below reflects all provisions and current compliance ratings for each:

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| **1** | | **Staffing** | **PC** |
| | 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | PC |
| | 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *retention* of correctional officers. . . | PC |
| | 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | NC |
| | 1.4 | These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers. | PC |
| **2** | | **Out-of-Cell Time** | **PC** |
| | 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| | 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. *See also* para. 4, *infra*. | NC |
| 3 | | **Out-of-Cell/Segregation** | **PC** |
| | 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | PC |
| | 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| 4 | | **Resume Normal Operations** | **NC** |
| | | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| 5 | | **Healthcare** | **PC** |
| | | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| 6 | | **Behavioral Health in Segregation** | **PC** |
| | | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |
| 7 | | **Law Library Access** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| | PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| **8** | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | SC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| **9** | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| **10** | **Phone Calls** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | NC |
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | SC |
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | SC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | SC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

Progress and updates regarding Defendants' compliance with the Sanctions Order are discussed intermittently throughout the report below.  The table below reflects all Sanctions Order requirements and the current compliance status of each:

| Paragraph | Sanctions Order Requirements (short form) | Compliance Status |
|---|---|---|
| 1 | **Recruitment, Staffing, and Hiring** | **PC** |
| 1(a) | Identify and Hire Outside Recruitment Firm | SC |
| 1(b) | Maintain Continuous-Fill Hiring Lists | SC |
| 1(c) | Evaluate Potential Civilianization of Employees | SC |
| 1(d) | Identify and Contract with Medical Guarding Company | SC |
| 1(e) | Authorize Double-Time Increases to Staff Vacant Shifts | PC |
| 1(f) | Appoint Wellness Coordinator and Fund Employee Wellness Program | PC |
| 1(g) | Comparative Wage and non-Wage Benefits Analysis | PC |
| 1(h) | Expand Rehiring Eligibility within Civil Service Regulation | SC |
| 1(i) | Expand Residency Requirement | SC |
| 2 | **Healthcare** | **PC** |
| 2(a) | Increase YesCare Budget | PC |
| 2(b) | Fund and Operate Access to Care Team | PC |
| 2(c) | Expand Telehealth Services | PC |
| 3 | **Programming and Services for Class Members** | **PC** |
| 3(a) | Identify and Engage Restorative and Transitional Services Consultant | PC |
| 3(b) | Install Law Library Terminals | N/A |
| 4 | **Facility Maintenance** | **NC** |
| 4(a) | Expand Maintenance Contract | NC |
| 4(b) | Analysis of Physical Plant State and Assess Long-term Capital Needs | N/A |
| 5 | **Facility Security** | **PC** |
| 5(a) | Implement Virtual Offense Reporting System | SC |
| 5(b) | Fund K9 Protection Program | PC |
| 5(c) | Purchase Scanning Technology | PC |
| 6 | **Population Management** | **SC** |
| 6(a) | Explore Relocation of Class Members to Other Facilities | SC |
| 6(b) | Produce Monthly Prison Population Reports | SC |
| 7 | **Remedy** | **SC** |
| 7(a) | Pay Court Registry Sum and Fiscal Budget Decrease Prohibition | SC |
| 8 | **Compliance with this Order and the Settlement Agreement** | **SC** |
| 8(a) | Notice to Applicable Union for Civilianizing Employees | SC |
| 8(b) | Hire Compliance Coordinator and Submit Written Status Report | SC |

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

**Compliance Rating:  Partial Compliance**

PDP's correctional officer vacancies decreased by 90 positions, or 5 percent, from June to December 2024.  PDP's total staff vacancies also decreased by 111 positions, or 5 percent, between June 2024 and December 2024.  The following table reflects changes in security, maintenance, human resources, and total staff vacancies since the previous reporting period:

**Table 1: Philadelphia Department of Prisons Vacancy Report**
June 2024 and December 2024

| | Position Classification | Budgeted | June 2024 Filled | June 2024 Vacant | December 2024 Filled | December 2024 Vacant | Vacancies (+/- change) | Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| Sworn Staff | Officers | 1712 | 906 | 806 | 999 | 716 | -90 | 42% (-5%) |
| | Sergeants | 118 | 70 | 48 | 72 | 46 | -2 | 39% (-2%) |
| | Lieutenants | 64 | 55 | 9 | 49 | 15 | 6 | 23% (+9%) |
| | Captains | 29 | 26 | 3 | 24 | 2 | -1 | 7% (-3%) |
| | **Custody Total** | **1923** | **1057** | **866** | **1144** | **779** | **-87** | **41% (-4%)** |
| Maintenance Staff | Trades Worker I | 7 | 7 | 0 | 6 | 1 | 1 | 14% (+14%) |
| | Trades Worker II | 18 | 8 | 10 | 8 | 10 | 0 | 56% (0%) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 33% (0%) |
| | Building Engineer | 1 | 0 | 1 | 0 | 1 | 0 | 100% (0%) |
| | Maintenance Group Leader | 1 | 0 | 1 | 0 | 1 | 0 | 100% (0%) |
| | **Total Maintenance** | **30** | **17** | **13** | **16** | **14** | **+1** | **47% (+4%)** |
| Human Resources (HR) Staff | HR Professional | 2 | 0 | 2 | 0 | 2 | 0 | 100% (0%) |
| | HR Program Admin | 2 | 3 | 0 | 3 | 0 | 0 | 0% (0%) |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% (0%) |
| | **HR Total** | **5** | **4** | **2** | **4** | **2** | **0** | **40% (0%)** |
| **PDP TOTAL** | **All Positions\*** | **2186** | **1266** | **920** | **1377** | **809** | **-111** | **37% (-5%)** |

\*"All Positions" totals include classifications not listed in the table and therefore exceed the sum of budgeted, filled, and vacant positions for each of the Sworn Staff, Maintenance Staff, and HR Staff categories.

In previous reporting periods, PDP staffing issues have been exacerbated by an increasing PDP population as reflected in the following table:

**Table 2: PDP Average Daily Population***
2022 – 2024

| Date | Jan-June 2022 | July-Dec 2022 | Jan-June 2023 | July-Dec 2023 | Jan-June 2024 | July-Dec 2024 |
|---|---|---|---|---|---|---|
| Average Daily Population[10] | 4421 | 4432 | 4429 | 4732 | 4660 | 4545 |

*Data reflects the average daily population total over each reporting period using statistics compiled from publicly available First Judicial District of Pennsylvania Philadelphia Prison Population Reports via the MacArthur Safety and Justice Challenge.

In this reporting period, PDP's average daily population (ADP) decreased from 4,660 in the first half of 2024 to 4,545 in the second half of the year.  The successful population reduction initiatives led by the First Judicial District and other justice partners have further reduced PDP's population as noted above.  By December 31, 2024, the population had reduced to 4,039 from a year-high of 4,839 on September 4, 2024, and to fewer than 3,800 Class Members by the end of February 2025.

---

[10] Average Daily Population is the industry standard for tracking prison populations, which is calculated and used by PDP.  These numbers are included within the publicly available Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – September 2024, MacArthur Safety and Justice Challenge (Oct. 9, 2024).  Due to data migration issues associated with the implementation of ATIMS, the MacArthur reports are currently delayed and, as of March 2025, have not been issued for the months of October, November, and December in 2024.  Accordingly, the Monitoring Team obtained the remaining data in this reporting period directly from PDP.  The MacArthur reports are reportedly expected to resume in the next reporting period.

Paragraph 6(b) of the Sanctions Order requires Defendants to produce monthly data reports. The compiled reports include lists of individual Class Members grouped by specific categories. Paragraph 6(b) requires the following categories:

(i)     Class Members held on bail up to $100,000;

(ii)    Class Members with significant medical needs such as cancer treatment and dialysis requiring frequent off-site medical appointments;

(iii)   Class Members over the age of 60;

(iv)    Class Members who are in PDP's minimum or community security categories, have only misdemeanor and F3 charges, and who have no more than a minor history of misconduct within the PDP; and

(v)     Class Members who are housed in protective custody.

For each Class Member, the person identifier (PPN), admission date, length of stay, total bail amounts, facility, lead charges, lead grades, and docket numbers are provided.

Defendants were required to begin providing monthly data reports by October 15, 2024, and have complied with the requirements of this paragraph. Defendants provided the initial dataset in October 2024. Then, on October 28, 2024, PDP replaced its jail information software, Lock and Track, with ATIMS, the new jail management system. As anticipated, the migration of data from Lock and Track to ATIMS created technical issues in various aspects of PDP operations. As a result, Defendants report that monthly data reports from November 2024 through February 2024 did not contain data about Class Members held on bail up to $100,000. All remaining categories were provided as required.

Defendants reported that the technical issues were resolved by February 12, 2025, and, effective March 3, 2025, agreed to provide required data weekly rather than monthly to further assist population reduction initiatives.

Defendants continued to focus on recruitment in this reporting period.  As with previously highlighted population management initiatives, efforts have also included hiring a recruitment firm pursuant to the Sanctions Order.[11]  Available data on recruitment yields is depicted in the following table:

**Table 3: Philadelphia Department of Prisons Recruitment Yields
for New Hires after January 1, 2021**

| Certification List | Total Applicants | Total Hired | Rate (%) | List Status |
|---|---|---|---|---|
| 2020-0210 | 228 | 36 | 16% | Closed |
| 2021-0906 | 758 | 50 | 7% | Closed |
| 2022-0221 | 298 | 16 | 5% | Closed |
| 2022-0516 | 245 | 25 | 10% | Closed |
| 2022-0905 | 493 | 34 | 7% | Closed |
| 2022-1212 | 422 | 34 | 8% | Closed |
| 2023-0306 | 563 | 32 | 6% | Closed |
| 2023-0501 | 436 | 24 | 6% | Closed |
| 2023-0626 | 626 | 34 | 5% | Closed |
| 2023-0724 | 492 | 28 | 6% | Closed |
| 2023-0821 | 464 | 17 | 4% | Closed |
| 2023-0918 | 402 | 16 | 4% | Closed |
| 2023-1023 | 869 | 50 | 6% | Closed |
| **Total Closed** | **6296** | **396** | **6.3%** | **Closed** |
| 2024-0205 | 981 | 102 | 10% | In Process |
| 2024-0513 | 1351 | 63 | 5% | In Process |
| 2024-0805 | 824 | 0 | N/A | In Process |
| 2024-0902 | 797 | 0 | N/A | In Process |
| **Total Open** | **3953** | **165** | **N/A** | **In Process** |

PDP's overall hiring yield for all closed lists ultimately resulted in approximately 6.3 percent of applicants being hired. This is a slight decrease from last reporting period, which had a rate of 6.9 percent.

---

[11] The City has contracted with and hired the Whalls Group, as discussed further in Status of Recommendations, Substantive Provision 1—Staffing.

However, like last reporting period, PDP continues to yield significantly more applicants compared to 2020 through 2022, as reflected in the table below:

**Table 4: Philadelphia Department of Prisons Employment Applications By Year**
2020 – 2024

| Year | 2020 | 2021 | 2022 | 2023 | 2024 |
|------|------|------|------|------|------|
| Applicants | 228 | 758 | 1455 | 3852 | 2716 |
| Applicants Hired | 36 | 50 | 109 | 151 | 234 |

Retention data suggests PDP experienced reduced turnover for cadets who graduated from academies in 2023. The table below depicts academy schedules, attendance, and graduation data for 2022, 2023, and 2024, and employee retention rates for the 2022, 2023, and 2024 academies:

**Table 5: Philadelphia Department of Prisons Academy Report and Retention Rates**
2022 – 2024

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed Dec 2024 | Retention Rate June 2024 | Retention Rate Dec 2024 |
|------|------|------|------|------|------|------|
| 21-04 | November, 2021 - January, 2022 | 30 | 26 | 8 | 27% | 27% |
| 21-05 | December, 2021 - March, 2022 | 20 | 16 | 6 | 30% | 30% |
| 22-01 | March - June, 2022 | 31 | 25 | 7 | 32% | 23% |
| 22-02 | May - July, 2022 | 21 | 20 | 6 | 43% | 29% |
| 22-03 | August - October, 2022 | 18 | 16 | 8 | 50% | 44% |
| 22-04 | October, 2022 - January, 2023 | 26 | 20 | 11 | 42% | 42% |
| 23-01 | January - March, 2023 | 21 | 22 | 10 | 48% | 48% |
| 23-02 | February - April, 2023 | 17 | 15 | 12 | 76% | 71% |
| 23-03 | April - July, 2023 | 20 | 15 | 9 | 50% | 45% |
| 23-04 | June - September, 2023 | 17 | 16 | 12 | 71% | 71% |
| 23-05 | August - October, 2023 | 32 | 30 | 19 | 59% | 59% |
| 23-06 | October - December, 2023 | 28 | 25 | 21 | 79% | 75% |
| 24-01 | January - March, 2024 | 34 | 30 | 28 | 82% | 82% |
| 24-02 | March - May, 2024 | 20 | 20 | 19 | 95% | 95% |
| 24-03 | May - July, 2024 | 38 | 38 | 32 | N/A | 84% |
| 24-04 | May - July, 2024 | 45 | 38 | 34 | N/A | 76% |
| 24-05 | July - September, 2024 | 54 | 52 | 47 | N/A | 87% |
| 24-06 | September - November, 2024 | 62 | 56 | 52 | N/A | 84% |

In December 2023, only 40 percent of cadets who graduated from academics in 2022 had remained employed.[12]  However, 66 percent of cadets who graduated from academies in 2023 remained employed as of December 2024, which marks improved retention. Additionally, the

---

[12] Monitor's Fourth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 204 at 13 (E.D. Pa. Mar. 29, 2024).

retention rate for cadets who graduated from academies in 2024 was 91 percent as of December 2024.

On average, PDP recruited 128 cadets in each of 2022 and 2023. In 2024, PDP recruited 253 cadets, more than double the average recruits than in the preceding two years. This is important progress. PDP's sustained focus on hiring and retention of correctional officers resulted in the addition of 90 correctional officers in this reporting period, as reflected above in Table 1.

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . .*

### Compliance Rating: Partial Compliance

As previously reported, the City instituted various pay raises, signing and retention bonuses, alternative work schedules, and other strategies designed to enhance retention of correctional officers.[13] The following table depicts monthly averages of PDP employees who voluntarily separated pre-retirement from January 2019 through December 2024:

### Table 6: Average Voluntary Monthly Separations by PDP Employees
2019 – 2024

| | Pre-Arbitration Award | | | | Post-Arbitration Award | | | |
| | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | 2023 | Jan-June 2024 | July-Dec 2024 |
|---|---|---|---|---|---|---|---|---|
| Monthly Average | 10 | 11 | 24 | 23 | 11 | 13 | 12 | 8 |

Voluntary separations of PDP employees have reduced below pre-pandemic levels for the first six-month review period since monitoring began. The average number of staff separating per

---

[13] The August 12, 2022, Arbitration Award authorizes a range of compensation increases. *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, Aug. 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, Dec. 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, Jan. 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Jan. 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Mar. 31, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, June 12, 2024), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

month in this reporting period reduced to an average of 8 employees, notably below the pre-pandemic 2019 average of 10 employees per month.

*Sub-provision 1.3--Ensure that there are sufficient numbers of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating:  Non-compliance**

The following tables depict monthly average percentages of vacant posts at each facility and posts filled with overtime staff for two periods, January through June 2024 and July through December 2024:

**Table 7: Percentage of Posts Left Vacant Due to Staffing Shortages**
January – June 2024

| Date | January | February | March | April | May | June | Average |
|------|---------|----------|-------|-------|-----|------|---------|
| Average | 40% | 40% | 40% | 42% | 37% | 36% | 39% |

**Table 8: Percentage of Posts Left Vacant Due to Staffing Shortages**
July – December 2024

| Date | July | August | September | October | November | December | Average |
|------|------|--------|-----------|---------|----------|----------|---------|
| RCF* | 39% | 40% | 39% | 33% | 35% | 32% | 37% |
| PICC | 27% | 29% | 32% | 29% | 32% | 29% | 30% |
| CFCF | 43% | 37% | 34% | 36% | 38% | 34% | 37% |
| **Average** | **36%** | **35%** | **35%** | **33%** | **35%** | **32%** | **34%** |

*Prior to October 2024, RCF and DC data were reported together as a single facility.  Thereafter, DC was designated a separate institution and its data is not reflected in this table.  DC's data will be included in future reports.

**Table 9: Percentage of Posts Filled with Overtime Staff**
January – June 2024

| Date | January | February | March | April | May | June | Average |
|------|---------|----------|-------|-------|-----|------|---------|
| Average | 25% | 25% | 26% | 27% | 25% | 27% | 26% |

**Table 10: Percentage of Posts Filled with Overtime Staff**
July – December 2024

| Date | July | August | September | October | November | December | Average |
|---|---|---|---|---|---|---|---|
| RCF* | 27% | 29% | 27% | 26% | 24% | 25% | 26% |
| PICC | 26% | 27% | 29% | 28% | 29% | 30% | 28% |
| CFCF | 24% | 26% | 24% | 27% | 27% | 27% | 26% |
| **Average** | **26%** | **27%** | **27%** | **27%** | **27%** | **27%** | **27%** |

*Prior to October 2024, RCF and DC data were reported together as a single facility. Thereafter, DC was designated a separate institution and its data is not reflected in this table. DC's data will be included in future reports.

Average percentages of post vacancies reduced during this reporting period and the use of mandatory or voluntary overtime to fill posts increased slightly in this reporting period. Average post vacancies reduced from 39 percent in the period January through June 2024 to 34 percent in the period July through December 2024. The average percentage of posts filled with overtime staff increased slightly from 26 percent in the period January through June 2024 to 27 percent in the period July through December 2024. Combining the unfilled/vacant posts (34 percent) and the posts filled with overtime staff (27 percent), only 39 percent of posts were filled with regularly assigned staff. When assigning staff to posts, PDP prioritizes filling housing unit posts over posts that serve a supporting role.

*Sub-provision 1.4--These measures will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating:  Partial Compliance**

A substantial compliance rating with sub-provision 1.4 first requires PDP to achieve compliance with sub-provisions 1.1, 1.2, and 1.3.

**Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report (November 2022):**

1. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
   *As previously reported, the City partially addressed this recommendation by comparing PDP correctional officer salaries to other Pennsylvania county systems in the surrounding area. The City, however, did not compare non-wage benefits with other jurisdictions and the City did not compare PDP salaries with Philadelphia's other sworn law enforcement agencies.*

21

Paragraph 1(g) of the Sanctions Order states:[14]

> The City shall compare wages and non-wage benefits available to PDP employees and other City of Philadelphia employees and submit a description of any differences identified to the Monitor. The comparison shall include uniformed public safety personnel and all other PDP job classifications for which vacancy rates exceed ten percent.

The comparison was due for submission by October 15, 2024.

Defendants have partially complied with the requirements of this paragraph. On November 14, 2024, Defendants forwarded a Correctional Series (5H) Salary Survey Results and Analysis, as well as a summary of retirement benefits for other city public safety employees. The submission did not include a comparison of all wages and non-wage benefits or a description of any differences as required. Additionally, the submission only included public safety personnel, not all other PDP job classifications for which vacancies exceed 10 percent as also required. On February 7, 2025, Defendants submitted additional information, which will be assessed in the next reporting period.

2. Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.

Paragraph 1(a) of the Sanctions Order required Defendants to generate a list of outside recruitment firms with a proven track record of hiring for law enforcement agencies and submit the list for the Court's consideration. Defendants were further required to retain the selected firm within 90 days of the Court's approval.

Defendants have complied with the requirements of this paragraph. As previously reported, the list was submitted for the Court's consideration on September 16, 2024.[15] The Court approved Defendants' request to retain the Whalls Group on October 21, 2024, which Defendants retained consistent with this paragraph.

Defendants report the Whalls Group began work on December 2, 2024, with PDP's Office of Professional Compliance (OPC), which is responsible for processing background investigations and application materials. Defendants report as of February 2025, Whalls representatives have met with the City of Philadelphia, Office of Human Resources to set implementation goals and strategies. Whalls Group has also reportedly contacted 1,091 candidates via phone, text, and e-mail, facilitated 21 virtual orientations, and recommended 21 candidates for hiring.

---

[14] Order, *supra* note 5, at 3.
[15] Monitor's Fifth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 224 at 19 (E.D. Pa. Sept. 30, 2024).

3. Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies.

*PDP has completed the staffing analysis. PDP reports it has been focused on filling vacancies, contracting for medical transportation and hospital guarding, and civilianization of positions, and that it will turn to other recommendations in the analysis as staffing permits. The Monitoring Team identified several areas not addressed in the analysis and will work with PDP on those areas, also as staffing permits.*

4. Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

> Paragraph 1(c) of the Sanctions Order requires Defendants to evaluate which departments within PDP may be served in full or in part by civilian employees. The evaluation was due for submission by September 16, 2024.
>
> Defendants have complied with the requirements of this paragraph. On September 16, 2024, the Commissioner reported that he had completed a review of PDP custody positions and determined that 60 case records and 13 information technology positions could be civilianized. While there may be additional opportunities to civilianize positions in the intake area and jail front entrances, SME McDonald opines that the selected positions are an appropriate initial strategy. An arbitration hearing on the civilianization of positions occurred on November 12, 2024. The arbitration award was issued on March 4, 2025, authorizing Defendants to utilize civilians for case records and information technology positions.[16]
>
> Paragraph 1(d) of the Sanctions Order requires Defendants to identify companies capable of providing medical guarding of PDP's open ward patient population, as well as transporting patients to off-site medical appointments. Paragraph 1(d) further requires Defendants to commence contract negotiations with the selected medical guarding company. Defendants were required to identify companies by September 16, 2024, and initiate contract negotiations with the selected service provider by January 21, 2025.
>
> Defendants have complied with the requirements of this paragraph. As previously reported, on September 16, 2024, PDP submitted a draft service agreement from United Security Inc. (USI) to provide the required medical guarding and transportation services.[17] PDP submitted an updated agreement on October 4, 2024 to include "open ward" coverage, which had been previously omitted. On October 21, 2024, this Court approved USI to provide medical guarding and transportation services on a contract basis. The City reported that on December 18, 2024, it contracted with USI to provide the services. The City also reports it has provided orientation training to 30 contracted employees. The March 4, 2025, arbitration award also provides for contracted medical guarding and transportation.[18]

5. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.

   *As previously reported, the City indicated that it streamlined its hiring process in 2021 and that it is processing the current volume of applications within a reasonable*

---

[16] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Mar. 4, 2025), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

[17] Monitor's Fifth Report, *supra* note 15, at 19.

[18] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia, *supra* note 16, at 3.

*timeframe.[19]  The City now reports the Whalls Group is assisting with hiring processes and is expected to report any improvements in future reporting periods.*

6.  Establish continuous-fill civil service hiring lists during the staffing crisis.

> Paragraph 1(b) of the Sanctions Order requires the City to maintain continuous-fill hiring lists to accept applications for employment with PDP.
>
> Defendants have complied with the requirements of this paragraph.  In September 2024, the City reported it had completed modifications to the hiring portal to permit the receipt of applications at all times.

7.  Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.
    *As previously reported, the June 12, 2024, Arbitration Award ordered that the City residency requirement for PDP employees be eliminated until PDP reaches 80 percent of its staffing complement.[20]  The temporary residency waiver only applied to applicants who reside within the Commonwealth of Pennsylvania.*

> Paragraph 1(i) of the Sanctions Order requires the City to expand the residency waiver to applicants residing outside the Commonwealth of Pennsylvania.
>
> Defendants have complied with the requirements of this paragraph.  In September 2024, Defendants reported the residency waiver was extended to qualified applicants outside the Commonwealth of Pennsylvania.  Defendants or the Whalls Group should begin reporting on applications and hires generated from other states in the next reporting period.

---

[19] Monitor's Fourth Report, *supra* note 12, at 17.
[20] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4 (decision date, June 12, 2024), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

8.  PDP should implement strategies for employee retention and a robust employee wellness program.

> Paragraph 1(f) of the Sanctions Order states:[21]
>
>> To assist with employee retention, the City shall, within 150 days of the date of this Order, fund an adequate employee wellness program. Within 90 days of the date of this Order, the PDP shall appoint a Wellness Coordinator to oversee the PDP's employee wellness program.
>
> Defendants were required to hire a Wellness Coordinator by November 14, 2024, and fund an adequate employee wellness program by January 13, 2025.
>
> Defendants have partially complied with the requirements of this paragraph. PDP reported it hired a Wellness Coordinator in November 2024, and opened a new Wellness Center in January 2025. On January 24, 2025, Defendants presented an initial wellness strategy and budget to the Monitoring Team, which SME McDonald opines is in alignment with national practices for correctional staff wellness. PDP reports that $150,000 has been earmarked for this initiative thus far. The Wellness Coordinator is evaluating the program's anticipated budget for the next fiscal year.

9.  The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.
    *As previously reported, this recommendation has been implemented.*[22]

10. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations. The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.
    *As previously reported, this recommendation has been implemented.*[23]

---

[21] Order, *supra* note 5, at 2.
[22] Monitor's Fourth Report, *supra* note 12, at 18.
[23] *Ibid.*

**Additional recommendations for immediate action:**

11. Immediately authorize additional double-time pay each day of the week as necessary to staff all vacant shifts.

> Paragraph 1(e) of the Sanctions Order states, "[t]he City shall immediately authorize PDP to offer additional double-time pay for any day of the week as necessary to staff all vacant shifts."[24]
>
> Defendants have partially complied with the requirements of this paragraph. In October 2024, Defendants reported all required double-time pay had been authorized. PDP reports it is evaluating which, if any, additional days of the week double-time pay should be offered to staff as many vacant shifts as possible. PDP reports it offered double-time pay for the weeks of December 23, 2024, through January 5, 2025, and determined shift vacancies were reduced as a result. Shift vacancy data for similar dates during the previous holiday season, December 28, 2023, through January 7, 2024, showed substantial higher vacancies, suggesting double-time pay contributed to reduced vacancies during the 2024/25 holiday period.
>
> PDP reports it also offered double-time opportunities during Super Bowl weekend 2025 with limited success. Post vacancy rates that weekend reportedly exceeded 60 percent. Holidays and special events are atypical work weeks, so PDP should test the use of double-time pay during regular work weeks as well. Pending further evaluation, PDP reports it is currently authorizing double-time pay when leadership predicts it will assist with reducing vacancies.
>
> PDP's Data Team reviewed a sample of shifts for July through December 2024. Initial findings suggest there are specific periods of time and days of the week that staff historically tend to decline voluntary overtime. In the next reporting period, the Data Team will assess whether double-time pay is useful on high post vacancy days, such as Fridays and Saturdays, or creates unintended consequences such as attendance issues on regular [time-and-a-half] overtime days and/or an increase in sick leave. These reviews will be shared with the Monitoring Team and evaluated in the coming months.

12. The City should establish a well-resourced team to assist with recruitment, application processing, onboarding, and supporting new staff. The team should conduct meaningful exit interviews of staff leaving PDP to determine what is needed to improve retention.

    *As previously reported, the City has partially implemented this recommendation.[25] PDP hired a Recruitment Coordinator who started on July 1, 2024. Whalls Group is expected to aid efforts with recruitment, processing, onboarding, and supporting new staff. The City should measure and report outcomes of initiatives led by both the Recruitment Coordinator and the Whalls Group.*

---

[24] Order, *supra* note 5, at 2.
[25] Monitor's Fifth Report, *supra* note 15, at 22.

**Additional requirements pursuant to the Sanctions Order:**

13. Paragraph 1(h) of the Sanctions Order requires Defendants to expand the rehiring eligibility period for former employees from one year to five years post-resignation. Defendants were required to increase the rehiring window by September 16, 2024.

    Defendants have complied with requirements of this paragraph. In December 2024, Defendants reported that the eligibility period for rehiring was extended from one to five years. As a result, Defendants have identified more than 1,000 former employees who may be eligible for rehire and has assigned the Recruitment Coordinator to contact those employees. Defendants report that PDP's Human Resources team sent letters to approximately 480 former employees in January 2025. In March 2025, PDP reported 12 former employees had been reinstated and that it plans to reinstate more than 20 additional personnel in the next reporting period.

14. Paragraph 6(a) of the Sanctions Order requires the Commissioner to explore realistic, suitable relocation options for Class Members to others secure facilities and, by December 16, 2024, report on any options identified.

    Defendants have complied with requirements of this paragraph. The Commissioner researched two local facilities, Gaudenzia and Liberty Management, both of which were excluded as options due to issues with transporting Class Members to and from court and providing visitation access for attorneys and families. Given the challenges with identifying appropriate relocation facilities, and given the success of other population reduction initiatives, the Commissioner has determined that time and resources are more effectively directed to other reform efforts at this time.

15. Paragraph 8(b) of the Sanctions Order requires Defendants to hire or contract with a permanent full-time internal Compliance Coordinator by December 16, 2024. Paragraph 8(b)(i) further requires Defendants to submit a staffing plan by January 15, 2025.

    Defendants have complied with the requirements of this paragraph. Defendants reported on December 18, 2024, that Alta Management had been hired as the full-time internal Compliance Coordinator. On January 17, 2025, the City forwarded the Alta Management staffing plan to the Monitoring Team, which revealed they had reportedly hired one Senior Manager, one Project Manager, and two Compliance Coordinators.

16. Paragraph 8(b)(ii) requires Defendants to submit a written status report detailing their progress toward implementation of the Sanctions Order by February 12, 2025.

    Defendants have complied with the requirements of this paragraph. Defendants submitted the written status report on February 14, 2025.

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

**Compliance Rating:  Partial Compliance**

PDP remains in partial compliance with this substantive provision. As previously reported, staffing challenges result in most PDP non-segregation housing units being supervised by a single officer.[26] This requires Class Members to recreate in smaller groups, thereby limiting each group's out-of-cell opportunities. For various operational and safety reasons, some housing units are able to offer more out-of-cell time than others. Based on PDP's tracking documentation, multiple units tend to offer more than five hours out-of-cell time daily, and some are offering eight or more.

Systemwide, PDP facilities are not consistently offering five hours daily as required by this sub-provision. Out-of-cell tables for July through December 2024 reflect additional timeframes for tracking out-of-cell compliance and now include the following ranges: zero hours, .1 to .9 hours, 1 to 2.9 hours, 3 to 5.9 hours, 6 to 7.9 hours, and 8 or more hours out of cell. Previously reported issues with tracking and data accuracy persist and reported times can only be verified via CCTV review.[27] Currently, the Monitoring Team is aggregating data produced by PDP to determine the average out-of-cell time offered to Class Members. Tables 11 through 17 below represent the Monitoring Team's efforts to quantify out-of-cell time for Class Members in general population based on documentation provided. The Monitoring Team remains hopeful that PDP's new data analysis team or another PDP bureau will assume responsibility for this task in the near future.

The following tables depict average out-of-cell time that select CFCF general population recreation groups received daily for one week of each month, January through June 2024 and July through December 2024:

**Table 11: General Population Average Out-of-Cell Time Hours
Per Day CFCF, Six One-Week Periods***
January – June 2024

| Hours*** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%)**** |
| 0 to .9** | 64 | 29% |
| 1 to 2.9 | 22 | 10% |
| 3 to 5.9 | 137 | 61% |
| 6 to 7.9 | 0 | 0% |
| ≥ 8 | 0 | 0% |
| Total CFCF Groups | 223 | 100% |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024.
**For Q1 2024, only 1 of the 201 groups for the range of 0 to .9 was more than 0.
***When recreation time for a group is not logged, zero out-of-cell time is assumed.
****Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

---

[26] *Id.* at 23.
[27] Monitor's Fourth Report, *supra* note 12, at 19.

**Table 12: General Population Average Out-of-Cell Time Hours
Per Day CFCF, Six One-Week Periods***
July – December 2024

| Hours** | Monthly Average | |
|---|---|---|
| | Groups | Percent (%)*** |
| 0 | 55 | 25% |
| 0 to .9 | 0 | 0% |
| 1 to 2.9 | 17 | 8% |
| 3 to 5.9 | 148 | 67% |
| 6 to 7.9 | 1 | 0% |
| ≥ 8 | 0 | 0% |
| **Total CFCF Groups** | **222** | **100%** |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, and December 2-8, 2024.

**When recreation time for a group is not logged, zero out-of-cell time is assumed.

***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

In this reporting period, a higher average number of groups received between 3 to 5.9 hours, increasing from 61 percent in January through June 2024 to 67 percent in July through December 2024. PDP trackers for weeks reviewed reflect that 6 or more hours out-of-cell time were offered on one occasion.

PDP reports that population reductions have permitted CFCF to reduce the number of Class Members in every general population housing unit from 128 to no more than 64. As a result, out-of-cell time can be offered to entire housing units at once rather than in two groups separated by housing unit tiers, assuming there are sufficient support staff to respond to emergencies. With additional population reductions and increased staffing, CFCF's out-of-cell data should continue to improve in the next reporting period.

The following tables depict average out-of-cell time that select PICC general population recreation groups received daily for one week of each month, January through June 2024 and July through December 2024:

**Table 13: General Population Average Out-of-Cell Time
Hours Per Day PICC, Six One-Week Periods***

January – June 2024

| Hours** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%)*** |
| 0 to .9 | 9 | 8% |
| 1 to 2.9 | 26 | 22% |
| 3 to 5.9 | 63 | 52% |
| 6 to 7.9 | 12 | 10% |
| ≥ 8 | 10 | 9% |
| Total PICC Groups | 120 | 100% |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024.
**When recreation time for a group is not logged, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

**Table 14: General Population Average Out-of-Cell Time
Hours Per Day PICC, Six One-Week Periods***

July – December 2024

| Hours** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%)*** |
| 0 | 15 | 12% |
| 0 to .9 | 5 | 4% |
| 1 to 2.9 | 25 | 19% |
| 3 to 5.9 | 70 | 56% |
| 6 to 7.9 | 8 | 6% |
| ≥ 8 | 4 | 3% |
| Total PICC Groups | 126 | 100% |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, and December 2-8, 2024.
**When recreation time for a group is not logged, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

In this reporting period, PICC trackers show Class Members in general population units who received at least one hour out-of-cell time daily reduced from 92 percent in the previous reporting period to 84 percent in this reporting period for weeks reviewed. PDP reports the reduction was driven primarily by ongoing staffing challenges, which required the reassignment of some PICC security staff to other facilities to balance limited resources. PDP also reports it initiated unit lockdowns to increase cell searches and provide necessary training in safety operations and emergency response. Other lockdowns, likely due to disturbances or other unit emergencies, are also noted in PDP's trackers and impacted out-of-cell time, but specific reasons for and durations of the lockdowns are not documented.

PICC, and all PDP facilities, should continue efforts to ensure that every Class Member receives some out-of-cell time every day, even if it requires fewer out-of-cell hours for those receiving, for example, more than five hours daily.  This is a strategy PICC and other facilities have used successfully in the past and which should be used until out-of-cell requirements are met.

Beginning in this reporting period, out-of-cell time data for female housing units at PICC, D and E, units has been separated from the out-of-cell data for the male housing units.  As previously reported, the mixed security classifications on some female units limit out-of-cell time for some Class Members.[28]  Current out-of-cell trackers do not distinguish between the various security classifications, so all Class Members in women's units will continue to be tracked together until a new tracking system is implemented.

The following tables depict average out-of-cell time Class Members in female housing units at PICC received daily for one week of each month, July through December 2024:

**Table 15: Female Housing Units Average Out-of-Cell Time Hours Per Day PICC, Six One-Week Periods***
July – December 2024

| | Monthly Average | |
|---|---|---|
| **Hours**** | **Groups** | **Percent (%)**** |
| 0 | 2 | 7% |
| 0 to .9 | 1 | 4% |
| 1 to 2.9 | 3 | 11% |
| 3 to 5.9 | 9 | 32% |
| 6 to 7.9 | 4 | 14% |
| ≥ 8 | 9 | 32% |
| **Total PICC Groups** | **28** | **100%** |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, and December 2-8, 2024.
**When recreation time for a group is not logged, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

For weeks reviewed, approximately 46 percent of groups in female housing units at PICC were offered at least six hours of out-of-cell time, on average, daily.  By comparison, only 9 percent of groups in male housing units at PICC received, on average, 6 or more hours per day for weeks reviewed.  Seven percent of groups in female housing units received no out-of-cell time, on average, compared to 12 percent in male units.  The differences in out-of-cell time between male and female housing units may be explained in part by the fact that incarcerated women are generally lower security risk and engage in less violence, which result in fewer lockdowns and unit-wide searches.  These differences between male and female incarcerated populations should also be considered in other security operations, such as security classifications and segregation placements.

---

[28] Monitor's Fifth Report, *supra* note 15, at 26.

The following tables depict average out-of-cell time that RCF general population recreation groups received daily for one week of each month, January through June 2024 and July through December 2024:

**Table 16: General Population Average Out-of-Cell Time
Hours Per Day RCF, Six One-Week Periods**[*]
January – June 2024

| Hours** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%)*** |
| 0 to .9 | 11 | 9% |
| 1 to 2.9 | 27 | 23% |
| 3 to 5.9 | 56 | 48% |
| 6 to 7.9 | 6 | 5% |
| ≥ 8 | 17 | 15% |
| **Total RCF Groups** | **117** | **100%** |

*Weeks reviewed include: January 8-14, 2024; February 12-18, 2024; March 4-10, 2024, April 1-7, 2024, April 29-May 5, 2024, and June 3-9, 2024.
**When recreation time for a group is not logged, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

**Table 17: General Population Average Out-of-Cell Time
Hours Per Day RCF, Six One-Week Periods**[*]
July – December 2024

| Hours** | Monthly Average | |
| --- | --- | --- |
| | Groups | Percent (%)*** |
| 0 | 4 | 4% |
| 0 to .9 | 1 | 1% |
| 1 to 2.9 | 25 | 25% |
| 3 to 5.9 | 67 | 68% |
| 6 to 7.9 | 1 | 1% |
| ≥ 8 | 1 | 1% |
| **Total RCF Groups** | **98** | **100%** |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, and December 2-8, 2024.
**When recreation time for a group is not logged, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

On October 14, 2024, PDP officially designated DC as a separate institution from RCF. Prior to that date, RCF's out-of-cell data included A and C blocks at DC, both of which have consistently offered at least 8 hours out-of-cell time daily. A and C blocks at DC have continued to provide at least 8 hours out-of-cell daily in this reporting period. Accordingly, the removal of these units from Table 17 may give the misimpression that RCF reduced average out-of-cell time for Class Members, specifically for the higher-end ranges of 6 to 7.9 hours and 8 or more hours out-of-cell.

RCF groups receiving an average of 3 to 5.9 hours out-of-cell increased from 48 percent in the previous reporting period to 68 percent in this reporting period. Groups that received less than one hour of out-of-cell time, on average, reduced from 9 percent in the previous reporting period to 5 percent in this reporting period.

Issues with consistency and accuracy in out-of-cell tracking persist, though PDP's efforts continue. PDP has initiated the installation of a Radio Frequency Identification (RFID) system,[29] which will improve the accuracy of out-of-cell tracking and other Class Member movement systemwide. PDP reports it plans to pilot the RFID system at CFCF in the next reporting period, though implementation will be slow. PDP continues to anticipate full implementation of the RFID system in late 2025 or early 2026. PDP can also expect technology and other issues to require troubleshooting and repair for some time post-implementation. In the interim, the Monitoring Team has recommended that PDP continue efforts to maintain accurate out-of-cell logs using the current tracking system. PDP's data team may be able to improve on the current tracking system, and PDP reports it intends to assign an internal monitor in the next reporting period to improve real-time out-of-cell compliance tracking.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

### Compliance Rating:  Non-Compliance

In this reporting period, PDP trackers suggest that some Class Members are occasionally receiving eight or more hours of out-of-cell per day, on average, during weeks reviewed. PDP is not approaching substantial compliance with this substantive provision, however, improvements in this reporting period demonstrate the strengths of facility leadership and staff and PDP's efforts to comply with Agreement requirements.

### Substantive Provision 3—Out-of-Cell/Segregation

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

### Compliance Rating:  Partial Compliance

Out-of-cell tracking for Class Members in segregation improved slightly in this reporting period.

---

[29] This type of RFID system utilizes a handheld scanner of computer tags and wristbands to track movement of incarcerated persons. Data from the scans is downloaded to the jail management system (ATIMS) and reports may be generated for various activities, including out-of-cell time.

In the previous reporting period, renovations in restricted housing units and activations and closures of various segregation units, particularly at PICC, reportedly limited or prevented tracking of out-of-cell time in some segregation units. Comparisons between the previous reporting period and this reporting period are not wholly reliable, however, it appears that PDP has improved daily out-of-cell opportunities for Class Members in segregation. Discussed in more detail below, data for weeks reviewed in this reporting period suggest that RCF successfully offered at least 81 percent of Class Members in segregation daily out-of-cell time each month between August and December 2024. PDP has therefore achieved partial compliance with this sub-provision.

While out-of-cell time for segregation units in RCF has significantly improved, from July through December 2024, on average, only 37 percent of segregation Class Members at PICC and CFCF were offered out-of-cell time on any given day for weeks reviewed. Because the population of segregation Class Members at PICC and CFCF are significantly greater than that at RCF, many Class Members remain locked in their cells for more than 24 hours at a time, frequently every other day, at least once per week, with no access to exercise, showers, or phone.

The following tables reflect the average total populations of Class Members on all segregation units and the average percentage of Class Members who were offered out-of-cell time for six one-week periods from January 2024 through June 2024 and July through December 2024:

**Table 18: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
January – June 2024*

|  | Average |
|---|---|
| CFCF (%) | 36% |
| PICC** (%) | 35% |
| RCF (%) | 30% |
| **Average Sample Population*** | 165 |
| **Average Class Members Out-of-Cell** | **51** |
| **Average Percent Out-of-Cell** | **31%** |

*Weeks reviewed include: January 8-14, 2024, February 12-18, 2024, March 4-10, 2024, April 13-19, 2024, May 13-19, 2024, and June 3-9, 2024. For one-week, RCF evaluated April 29-May 5, 2024, instead of May 13-19, 2024.
**PICC only evaluated for January, February, and March because PDP failed to log daily out-of-cell opportunities for those Class Members.
***"Sample Population" refers to average total Class Members who resided in segregation units for all seven days during weeks reviewed. Class Members who entered segregation or were removed from segregation on any of the seven days during weeks reviewed were excluded from the analysis. Restricted housing totals are reflected in sub-provision 3.2 below.

**Table 19: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
July – December 2024*

| Date | July | August | September | October | November | December | Average |
|---|---|---|---|---|---|---|---|
| CFCF (%) | 17% | 35% | 41% | 49% | 39% | 41% | 37% |
| PICC (%) | 36% | 58% | 27% | 26% | 38% | 36% | 37% |
| RCF (%) | 24% | 100% | 94% | 95% | 81% | 97% | 82% |
| **Total Sample Population**** | 307 | 305 | 304 | 287 | 276 | 249 | 288 |
| **Average Class Members Out-of-Cell** | **67** | **153** | **141** | **68** | **153** | **142** | **121** |
| **Average Percent Out-of-Cell** | **22%** | **50%** | **46%** | **24%** | **55%** | **57%** | **42%** |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 2-8, 2024, October 7-13, 2024, November 4-10, 2024, and December 2-8, 2024.
**"Sample Population" refers to average total Class Members who resided in segregation units for all seven days during weeks reviewed.  Class Members who entered segregation or were removed from segregation on any of the seven days during weeks reviewed were excluded from the analysis.  Restricted housing totals are reflected in sub-provision 3.2 below.

In this reporting period, RCF consistently offered most Class Members in segregation units out-of-cell time.  This was reportedly accomplished via the redirection of staff and supervisors to the restricted housing unit to ensure that three staff were present so out-of-cell time could be offered.  RCF also allows the majority of Class Members in the restricted housing unit to be in the dayroom together in waist restraints while in the communal setting.  Restraints are removed for showers.  The systematic use of waist restraints during recreation in segregation units is not an appropriate practice.  PDP should instead attempt to identify Class Members who may recreate together safely without restraints and create additional recreation spaces for Class Members who have difficulty recreating with others.  However, waist restraints are currently being used to provide out-of-cell opportunities that might not be offered otherwise.  As a result, from July through December 2024, an average of 82 percent of segregation Class Members at RCF were offered out-of-cell time on any given day.  This represents a 52 percent increase from the previous reporting period.  In August, September, October, and December 2024, RCF appears to have offered at least 90 percent of the segregation population daily out-of-cell time.  This represents a marked turnaround for this facility and reflects strong leadership and teamwork in reducing the isolation experienced by PDP's restricted housing populations.

From July through December 2024, on average, only 37 percent of segregation Class Members at PICC and CFCF were offered out-of-cell time on any given day for weeks reviewed.  According to PDP trackers reviewed, the primary reason documented for failures to offer out-of-cell time was staffing shortages.

The following table reflects the average number of Class Members in all segregation units and the average number of Class Members who were offered out-of-cell time for sampled one-week periods in June 2023, November and December 2023, January and February 2024, July through September 2024, and October through December 2024:

**Table 20: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
June 2023 – December 2024*

| Date | June 2023 (Total) | Nov-Dec 2023 (Average) | Jan-Feb 2024 (Average) | July-Sept 2024 (Average) | Oct-Dec 2024 (Average) |
|---|---|---|---|---|---|
| **Total Sample Population**** | 192 | 230 | 182 | 305 | 271 |
| **Class Members Out-of-Cell** | 73 | 75 | 58 | 120 | 121 |
| **Percent Out-of-Cell** | 38% | 33% | 32% | 39% | 45% |
| **Percent Not Out-of-Cell** | 62% | 67% | 68% | 61% | 55% |

*Weeks reviewed include: June 5-11, 2023, November 13-19, 2023, December 18-24, 2023, January 8-14, 2024, February 12-18, 2024, July 15-21, 2024, August 12-18, 2024, September 2-8, 2024, October 7-13, 2024, November 4-10, 2024, and December 2-8, 2024.
**"Sample Population" refers to average total Class Members who resided in segregation units for all seven days during weeks reviewed. Class Members who entered segregation or were removed from segregation on any of the seven days during weeks reviewed were excluded from the analysis. Restricted housing totals are reflected in sub-provision 3.2 below.

The last two quarters reviewed, July through September 2024 and October through December 2024, demonstrate a lower percentage of Class Members on average who were not offered out-of-cell time on any given day for weeks reviewed. October through December 2024 documented the lowest percentage of restricted housing Class Members who were not offered out-of-cell time daily since monitoring began. Most weeks reviewed in that quarter reflected that out-of-cell time was offered every other day, which remains problematic but is an improvement from previous reporting periods when Class Members consistently experienced days without being offered out-of-cell time.[30] Dr. Belavich opines that exposure to extended periods of isolation as those experienced by some Class Members may cause or exacerbate mental illness and maladaptive, violent, and self-harming behaviors.

Several systemic improvements addressed throughout this report should result in additional increases in out-of-cell time in the next reporting period. They include: (1) increases in hiring and retention of new staff; (2) further reducing the Class Member population; (3) an arbitration award issued in March 2025, which permits PDP to civilianize some positions and allow for contractors to supplement PDP transportation and medical guarding until vacancies reduce;[31] (4) increases in double-time pay opportunities, which have shown promise in incentivizing staff to work overtime; (5) and Whalls Group is in place to assist with recruitment.

---

[30] *See* Monitor's Fifth Report, *supra* note 15, at 3, 30; Monitor's Fourth Report, *supra* note 12, at 24; Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 20 (E.D. Pa. Mar. 3, 2023).
[31] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia, *supra* note 16, at 3.

Addressed under sub-provision 3.2 below, PDP's reliance on segregation has not reduced in this reporting period. Overreliance on segregation exacerbates overall staffing challenges by increasing staffing needs in the high-security housing areas. Safely reducing segregation placements would decrease the number of Class Members who require individualized or small group out-of-cell time and bring PDP closer to national segregation practices and Agreement compliance. The Monitoring Team continues to recommend that PDP reduce its reliance on segregation via additional policy revisions and continued expansion of housing and program alternatives to the placement of Class Members in isolated segregation environments.

*Sub-provision 3.2--Defendants further agree that they will continue their normal practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

### Compliance Rating:  Partial Compliance

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[32]  Also previously reported and discussed below under Substantive Provision 6—Behavioral Health in Segregation, PDP continues to house some Class Members with mental illness or severe behavior management issues in segregation because it lacks sufficient staff and housing for appropriate alternatives.[33]  PDP has committed to and is working toward more effective alternatives for these patients, also discussed below. PDP must secure sufficient staff, housing, and programs to ensure that segregation placements of behavioral health patients and Class Members with behavior management issues are clinically indicated and limited in number and duration. Once alternatives are in place and being utilized consistently, PDP will achieve substantial compliance with this sub-provision.

As recommended, PDP continues to track Class Members' total time in administrative and punitive segregation.[34]  This detailed tracking informs analysis of any staffing challenges that may impact meaningful reviews and whether less restricted settings are appropriate or considered. In this reporting period, the average number of Class Members in administrative segregation reduced by 9, while the average number of Class Members in punitive segregation increased by 12.

---

[32] Monitor's Fourth Report, *supra* note 12, at 24; Monitor's Second Report, *supra* note 30, at 21.
[33] Monitor's Fifth Report, *supra* note 15, at 31.
[34] *Ibid.*

The following table depicts average total Class Members in restricted housing (including administrative segregation and punitive segregation) for sample dates in five periods, July through December 2022, January through June 2023, July through December 2023, January through June 2024, and July through December 2024:

**Table 21: Average Total Placements in Restricted Housing**
July 2022 – December 2024

| Reporting Period | Average Total Restricted Housing |
|---|---|
| July-Dec 2022 | 347 |
| Jan-June 2023 | 265 |
| July-Dec 2023 | 255 |
| Jan-June 2024 | 295 |
| July-Dec 2024 | 298 |

The total number of reviews for retention on segregation that exceeded 30-days, as required, increased from 6 to 13 across facilities in this reporting period, as reflected in Table 24 below. However, PDP has increased the frequency of its reviews for retention of Class Members on segregation to every 7 days for the first 60 days of placement. This is a positive step for PDP to more closely review its reliance on segregation. Unfortunately, documentation for the 7-day reviews failed to memorialize reasons for retention or the Classification Committee's efforts to work with Class Members to prepare them for release to a less restricted setting. The Classification Committee often required completion of anger management workbooks, but no other programming, requirements, or support was documented. The seven-day reviews are time and workload intensive, which may partially explain incomplete documentation, but PDP has committed to completing the more frequent reviews while also improving documentation. Also, 7-day reviews do not replace the 30-day reviews, so PDP should continue to focus on ensuring Class Members in segregation also receive 30-day reviews as lengths-of-stay require.

The following table depicts average total Class Members in administrative segregation and retention reviews exceeding 30- and 60-day timeframes for sample dates in five periods, July through December 2022, January through June 2023, July through December 2023, January through June 2024, and July through December 2024:

**Table 22: Reviews for Retention on Administrative Segregation Exceeding 30 and 60 Days**
July 2022 – December 2024

| | CFCF | | | | PICC | | | | RCF | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | Total Ad-Seg |
| July-Dec 2022 | 95 | 10 | 12 | 26% | 78 | 2 | 2 | 6% | 21 | 193 |
| Jan-June 2023 | 67 | 10 | 3 | 3% | 44 | 2 | 0 | 0% | 14 | 126 |
| July-Dec 2023 | 74 | 2 | 0 | 0% | 16 | 0 | 0 | 0% | 17 | 107 |
| Jan-June 2024 | 95 | 4 | 1 | 1% | 12 | 1 | 0 | 0% | 22 | 133 |
| July-Dec 2024 | 85 | 4 | 1 | 1% | 20 | 3 | 0 | 0% | 18 | 124 |

The following tables depict average total Class Members in administrative segregation, retention reviews exceeding 30- and 60-day timeframes, and average lengths of stay in restricted housing (administrative and punitive segregation) for the periods January through June 2024, and July through December 2024:

**Table 23: Reviews for Retention on Administrative Segregation Exceeding 30 and 60 Days and Average Lengths of Stay in Restricted Housing**
January – June 2024

| | CFCF | | | | | PICC* | | RCF | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | > 30 Days | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing |
| Average | 95 | 4 | 1 | 1% | 72 | 12 | 65 | 22 | 2 | 86 | 133 | 73 |

*PICC reviews were all completed within policy according to documentation reviewed with the exception of one incident in March 2024 with a four-day delay.

40

**Table 24: Reviews for Retention on Administrative Segregation
Exceeding 30 and 60 Days and Average Lengths of Stay in Restricted Housing**
July – December 2024

| | CFCF | | | | | PICC | | | | RCF | | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Average Days in Restricted Housing | Total Ad-Seg | > 30 days | Average Days in Restricted Housing | | Total Ad-Seg | > 30 Days | > 60 days | % > 60 Days | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing |
| 7-19-24 | 87 | 5 | 1 | 1% | 81 | 20 | 1 | 62 | | 16 | 6 | 0 | 0 | 43 | 123 | 72 |
| 8-16-24 | 86 | 7 | 0 | 0% | 71 | 24 | 1 | 46 | | 15 | 5 | 0 | 0 | 49 | 125 | 64 |
| 9-13-24 | 83 | 3 | 0 | 0% | 62 | 21 | 1 | 54 | | 15 | 4 | 3 | 20% | 77 | 129 | 63 |
| 10-18-24 | 80 | 2 | 0 | 0% | 70 | 19 | 0 | 55 | | 21 | 1 | 0 | 0% | 68 | 121 | 67 |
| 11-15-24 | 81 | 5 | 1 | 1% | 90 | 16 | 15 | 76 | | 17 | 7 | 1 | 6% | 95 | 114 | 89 |
| 12-20-24 | 92 | 4 | 1 | 1% | 79 | 18 | 1 | 61 | | 23 | 0 | 0 | 0% | 57 | 133 | 73 |
| **Average** | 85 | 4 | 1 | 1% | 76 | 20 | 3 | 59 | | 18 | 4 | 1 | 4% | 65 | 124 | 71 |
| **Difference, Jan-June 2024 and July-Dec 2024** | -11% | 0% | 0% | 0% | +6% | +67% | +200% | -9% | | -18% | +100% | N/A | N/A | -24% | -7% | -3% |

The average number of Class Members in administrative segregation decreased by seven percent in this reporting period, from 133 in January through June 2024 to 124 in July through December 2024. However, the average monthly total of 124 Class Members in segregation in this reporting period represents an 16 percent increase from July through December 2023, which averaged 107 total Class Members, as reflected in Table 22.

The average number of days Class Members were retained in segregation reduced from 73 days in January through June 2024 to 71 days in July through December 2024. Despite these reductions, combined punitive segregation and administrative segregation populations increased slightly in this reporting period, as referenced above in Table 21.

In addition to group data analysis, the Monitoring Team continues to review samples of individual placements and reviews for retention in segregation. On December 27, 2024, 10 Class Members remained in administrative segregation beyond 90 days, 6 of whom exceeded 90 days in administrative segregation following a punitive segregation term. Four of the 10 Class Members received subsequent punitive segregation terms for compounding infractions. Two of the 10 Class Members were documented to have participated in serious incidents or presented security risks in the general population that may have warranted extended segregation terms. In two of 10 cases, documentation of the reasons for retention of Class Members in segregation were inadequate. One of these two Class Member patients was twice referred to the Therapeutic Housing Unit but was not transferred. The final two of 10 cases reviewed could not be assessed due to poor documentation. Lastly, five of the 10 cases reviewed lacked Deputy Commissioner approval for retention in administrative segregation beyond 90 days as PDP's policy requires.

Also on December 27, 2024, an additional 11 Class Members had been retained for more than 100 days in either punitive or administrative segregation. Eight of the 11 Class Members were

documented to have engaged in subsequent behavior while in segregation that was determined to have posed security risks, which may have warranted retention in segregation. Two of the remaining three cases lacked documentation that warranted retention, and a final case could not be adequately evaluated due to poor documentation. Only two of the 11 cases documented the required Deputy Commissioner approval to retain the Class Members in segregation. PDP reports some failures to obtain Deputy Commissioner approval may have resulted from lack of clarity in the staff directive. Deputy Commissioner approval is required when total segregation time, in both punitive and/or administrative segregation, exceed 90 days. PDP is reevaluating the directive.

PDP acknowledges that the quality of documentation of Classification Committee actions continues to require improvement. The Monitoring Team will continue to assist PDP and monitor its efforts to improve documentation of segregation placements and retention and in the implementation and documentation of behavioral planning for longer-term placements.

The following tables depict total punitive segregation placements and average lengths of stay in punitive segregation for five review periods, July through December 2022, January through June 2023, July through December 2023, January through June 2024, and July through December 2024:

**Table 25: Total Placements and Average Lengths of Stay in Punitive Segregation**
July 2022 – December 2024

|  | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
|  | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| July-Dec 2022 | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |
| Jan-June 2023 | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |
| July-Dec 2023 | 70 | 26 | 42 | 22 | 37 | 15 | 148 | 21 |
| Jan-June 2024 | 90 | 30 | 37 | 25 | 36 | 26 | 162 | 27 |
| July-Dec 2024 | 101 | 26 | 43 | 32 | 30 | 32 | 174 | 29 |

**Table 26: Total Placements and Average Lengths of Stay in Punitive Segregation**
July – December 2024

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| 7-19-24 | 101 | 22 | 39 | 27 | 28 | 37 | 168 | 25 |
| 8-16-24 | 107 | 21 | 47 | 25 | 28 | 33 | 182 | 24 |
| 9-13-24 | 98 | 23 | 46 | 28 | 28 | 33 | 172 | 26 |
| 10-18-24 | 104 | 23 | 42 | 29 | 36 | 18 | 182 | 24 |
| 11-15-24 | 108 | 44 | 41 | 55 | 37 | 45 | 186 | 47 |
| 12-20-24 | 85 | 25 | 43 | 30 | 23 | 27 | 151 | 26 |
| Average | 101 | 26 | 43 | 32 | 30 | 32 | 174 | 29 |
| Difference, Jan-June 2024 and July-Dec 2024 | +12% | -13% | +16% | +28% | -17% | +23% | +7% | +7% |

From 2023 to 2024, the average number of Class Members in punitive segregation increased from 144 to 168 Class Members, representing a 17 percent increase and the highest average since monitoring began.  In this reporting period, there was a monthly average of 174 Class Members in punitive segregation, representing a 7 percent increase from the previous reporting period.  Although PDP initiated a pilot project at PICC to reduce reliance on punitive segregation for lower-level rules violations, PICC's punitive segregation monthly average rose from 37 Class Members in January through June 2024 to 43 Class Members, or 16 percent, in July through December 2024.

Lack of educational and therapeutic programming and out-of-cell time in general population and segregation housing units remain underlying factors to violence and other rules violations that drive overreliance on segregation.  PDP has committed to exploring more effective disciplinary sanctions that do not require the use of punitive segregation, such as creating "loss-of-privilege" units and "step-down" units.  PDP reports it will set a projected completion timeframe for the piloting of additional alternatives to segregation once staffing improves.

**Status of Recommendations, Sub-Provision 3.2—Out-of-Cell/Segregation, from the Monitor's Fourth Report:**

1. Provide daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met.  PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.

   *As discussed above, some creative solutions are being implemented, however, PDP remains unable to provide daily out-of-cell time to all Class Members in segregation units.  CFCF has intermittently provided reduced out-of-cell opportunities when only two officers are present, but this has not been consistent, operationalized, or expanded to other facilities.*

43

2. Ensure that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.

*This recommendation has not been implemented.*

3. Use currently available information, such as reports from staff, supervisors, and Class Members to identify and attend to housing units that are struggling to offer out-of-cell time.

*This recommendation has not been implemented, but the internal monitor PDP intends to assign should be able to assist with this recommendation.*

4. Document the reasons for any failures to offer out-of-cell time.

*PDP security staff continue to improve in documenting reasons for failures to offer out-of-cell time though improvements are not consistent. Once PDP assigns an internal monitor to conduct more timely reviews of documentation, staff training should be more targeted and feedback more consistent.*

The Monitoring Team has also made the following recommendations in meetings with PDP personnel during site visits and virtual meetings over the course of implementation monitoring to assist PDP in reducing reliance on punitive segregation:

5. Increase educational, therapeutic, and other positive programming in general population units.

*This recommendation has not been implemented.*

6. Utilize sanctions that do not require isolation, such as creating loss of privilege tiers where Class Members receive out-of-cell time but access to commissary, tablets, and phones is limited or restricted.

*This recommendation is being piloted as part of the PICC disciplinary pilot discussed below under Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline. PDP is also exploring the use of stepdown and other non-segregation units to reduce reliance on segregation. PDP reports the strategies under development will not be implemented until sufficient staff are identified to support the efforts.*

7. Expand Therapeutic Housing Units, discussed below under Substantive Provision 6—Behavioral Health in Segregation, and develop accompanying disciplinary policies that limit the placement of patients in isolation.

*Therapeutic housing units are being expanded. See discussion below under Substantive Provision 6—Behavioral Health in Segregation.*

8. Improve systems for behavioral health input in the disciplinary process, discussed below under sub-provision 8.1.

*This recommendation is being piloted as part of the PICC disciplinary pilot discussed below under Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline.*

9. Establish an interdisciplinary committee to create behavior management plans for Class Members who cycle in and out of segregation.

*This recommendation has not been implemented. PDP has committed that YesCare clinicians will begin attending Classification Committee meetings.*

10. Develop programming for Class Members in segregation units to address behavior and assist with the transition back to general population.

*This recommendation has not been implemented.*

11. Direct the new data analysis unit to analyze punitive segregation practices and trends.
    *The data analysis team has not listed segregation practices and trends as a focus for 2025.*

12. Revise classification policies and procedures to ensure they are designed to maximize programming and reserve segregation for those with the most serious behavioral issues for the shortest possible durations.
    *Efforts are ongoing, however, this recommendation has not been implemented.*

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating:  Non-compliance**

PDP reports it remains unprepared to present a comprehensive plan for the return to normal operations. PDP's compliance status and plans for out-of-cell time are addressed above under Substantive Provision 2—Out-of-Cell Time and Substantive Provision 3—Out-of-Cell Segregation. PDP's compliance status and plans for visiting are addressed below under Substantive Provision 13—Visiting and Substantive Provision 14—Attorney Visiting. Regarding educational and other rehabilitative programming, the Monitoring Team has not had reliable metrics to assess any current programs and services offered or coordinated by PDP's Restorative and Transitional Services Bureau (RTS).[35]

Discussed in more detail below, PDP is working with a consultant to evaluate this bureau's functions, performance, and effectiveness. If PDP is expected to return to or enhance normal operations, it must ensure that the services and programs provided by RTS are being offered consistent with PDP policy. The Monitoring Team has met with the new Deputy Commissioner and is encouraged by her treatment-centered philosophy and sharp focus on improving services for Class Members.

---

[35] Monitor's Fifth Report, *supra* note 15, at 38.

Previously, PDP reported it reclassified some RTS positions to better align with current staffing needs.  In this reporting period, PDP made progress in reducing vacancies and over-hired in some classifications to offset persistent vacancies.  Position allocations and RTS vacancies from June to December 2024 are depicted in the following table:

**Table 27: Restorative and Transitional Services Division Staffing**
June 2024 and December 2024

| Position Category | Allocated Positions June 2024 | Filled Positions June 2024 | Vacancy Rate June 2024 | Allocated Positions Dec 2024 | Filled Positions Dec 2024 | Vacancy Rate Dec 2024 |
|---|---|---|---|---|---|---|
| Instructor | 4 | 2 | 50% | 4 | 2 | 50% |
| Volunteer Services Director | 1 | 0 | 100% | 1 | 1 | 0% |
| Psychologist | 5 | 4 | 20% | 5 | 8 | 0% |
| Prison Psychologist Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Social Work Services Trainee | 5 | 4 | 20% | 5 | 11 | 0% |
| Social Work Services Manager I | 1 | 0 | 100% | 1 | 0 | 100% |
| Social Work Services Manager 2 | 39 | 36 | 8% | 39 | 37 | 5% |
| Social Work Supervisor | 14 | 10 | 29% | 14 | 14 | 0% |
| Human Services Program Administrator | 3 | 3 | 0% | 3 | 3 | 0% |
| Social Services/Housing Program Analyst | 2 | 1 | 50% | 2 | 1 | 50% |
| Prison Close Circuit TV Specialist | 2 | 1 | 50% | 2 | 1 | 50% |
| Inmate Computer-Based Education Instructor | 7 | 6 | 14% | 7 | 5 | 29% |
| Inmate Computer-Based Education Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Assistant Director | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Director | 1 | 0 | 100% | 1 | 0 | 100% |
| Industries Shop Supervisor | 16 | 14 | 13% | 16 | 14 | 12% |
| Education Director | 1 | 1 | 0% | 1 | 1 | 0% |
| **Total** | **104** | **85** | **18%** | **104** | **101** | **3%** |

In this reporting period, RTS filled 16 positions, decreasing its total vacancy rate from 18 percent in June 2024 to 3 percent in December 2024.  The classifications of Social Work Services Trainee, Social Work Supervisor, and Psychologist were areas of improved hiring that accounted for 14 additional hires overall.  It remains unclear whether RTS staffing is sufficient for the work required.

As previously reported, PDP established a behavior modification unit led by RTS and security personnel. [36]  The Functional Behavior Support Unit's (FBSU) goal is to offer individual behavior modification plans and programming for a small subset of patients who exhibit extreme maladaptive behaviors.  These patients often spend extended periods in segregation, are

---

[36] Monitor's Fourth Report, *supra* note 12, at 32.

frequently hospitalized or require trips to the Emergency Department and require substantial security and clinical resources.

The FBSU was piloted at PICC and reported initial success in working with several Class Members by using incentives to reduce the frequency of maladaptive behaviors. During site visits in November 2024, the FBSU was located in PHSW, Unit 106, and housed three participants. Two of the participants were available for interview during the site visit and both reported that the FBSU and the individualized programming they received were helpful. Personnel confirmed FBSU patients have improved behavior and require fewer trips to area emergency departments and fewer resources for their care than when housed in segregation.

In the previous reporting period, PDP had identified security personnel whose expertise is well suited to the program and the unique challenges its participants face. The officers completed additional Crisis Intervention and Mental Health First Aid training and were sent to tour the Pennsylvania Department of Corrections' behavioral modification unit. PDP designated permanent space to house the program in PHSW, Unit 112, and established regular interdisciplinary meetings to evaluate referrals to the program and patient progress. PDP reports that FBSU security staff continue to be selected based on specific skill sets and desire to work with this population, and that they receive FBSU-specific training.

PDP reports that weekly interdisciplinary meetings are held to consider FBSU new-patient and release referrals, track patient progress, and address any issues that arise. PDP reports improved communication among, security, RTS, and Healthcare divisions, and cites the weekly interdisciplinary meetings as driving the improvements. Unfortunately, many security and healthcare staff the Monitoring Team spoke with during site visits over two reporting periods were not aware that the FBSU exists. PDP should ensure that all staff are aware of the program, its mission, and the referral process and criteria.

As PDP finalizes its FBSU program model and accompanying policies, it should pay particular attention to FBSU eligibility criteria. Patients are currently being evaluated on case-by-case bases, which is appropriate and PDP reports will continue. However, there appears to be some resistance on the part of PDP security leadership to place patients with highly assaultive behavior in the program. The subject matter experts opine that patients who meet other behavior management program criteria and are also physically assaultive are precisely the kind of patients behavior management programs are designed to treat. Without behavior management programs, these patients are often held in segregation indefinitely and may pose risk to personnel and other patients, and often engage in severe and dangerous acts of self-harm.

PDP currently has at least one Class Member who continually cycles in and out of PHSW and punitive and administrative segregation. Because the patient is so resource intensive and assaultive, the patient is moved between PICC, CFCF, and RCF segregation units in efforts to distribute the burden of his housing and care among facilities. This patient and others with similar behavior management issues may benefit from the FBSU. If staffing, physical plant, or other issues prevent the treatment of highly assaultive patients in the FBSU, as it is currently operating, its program and policies should contemplate this patient population as appropriate for FBSU care, and PDP should make any necessary changes to accommodate these Class Members.

The Monitoring Team has also previously questioned whether the FBSU is adequately staffed, given the complex needs of some program participants.  Although RTS staffing has improved in this reporting period, it remains unclear whether RTS is adequately staffed to manage this unit with its current resources.

Paragraph 3(a) of the Sanctions Order states: [37]

> Within 60 days of the date of this Order, the City shall identify and provide to the Monitor competent outside consultant(s) to conduct an objective evaluation of the Restorative and Transitional Services (RTS) Unit's functions and effectiveness.  Within 60 days of approval by the Court, the City shall engage the identified consultant(s).  The evaluation shall include at a minimum, a comparative analysis of programs proven effective in other comparable detention/correctional facilities, and a recommendation for performance metrics against which to assess the performance of PDP employees working in RTS.

The identification of an outside consultant was due by October 15, 2024.

Defendants have partially complied the requirements of this paragraph.  PDP reported on November 14, 2024, that it had interviewed five potential consultants to complete this project.  On November 21, 2024, the City submitted a proposed scope of work and a request to retain an identified vendor.  On January 23, 2025, this Court authorized Defendants to retain Independent Variable to complete the evaluation of RTS' functions and effectiveness.  Defendants retained Independent Variable on February 18, 2025, in advance of the March 24, 2025, Sanctions Order deadline.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating: Partial Compliance**

---

[37] Order, *supra* note 5, at 5.

In the first half of 2024, PDP was able to consistently maintain a weekly average backlog of fewer than 550 backlogged on-site healthcare appointments.[38]  The backlog increased in this reporting period and remained significantly above 550 appointments from July through December 2024.  In November 2024, PDP upgraded its Electronic Medical Record (EMR), which caused issues with charting and provider efficiency and explains some of the November increases.  The new ATIMS implementation did not initially interface properly with the EMR and also reportedly contributed to some of the backlog.  PDP Healthcare has continued its hiring efforts and "blitzes" to address backlogs.[39]  The table below compares on-site appointment backlogs for two four-week periods in June 2024 and December 2024:

**Table 28: On-Site Appointment Backlogs for General Medical and Behavioral Healthcare Weekly Averages, Four-week Comparison**
June 2024 and December 2024

| Backlog Report Four-week Period | Weekly Average Backlogged Appointments** | | Change | Percent Change (+/-) |
|---|---|---|---|---|
| | June 2024 | Dec 2024 | | |
| BH Initial Psychiatric Eval. | 62 | 84 | +22 | +35% |
| BH Medication Evaluation | 65 | 123 | +58 | +89% |
| BH Social Work Sick Call | 35 | 2 | -33 | * |
| BH SW SCTR | 4 | 0 | -4 | * |
| Chronic Care Follow-up | 75 | 107 | +32 | +43% |
| Chronic Care Initial | 31 | 124 | +93 | * |
| MAT | 119 | 133 | +14 | +12% |
| MAT Follow-up | 0 | 0 | 0 | * |
| Provider Sick Call | 62 | 66 | +4 | +6% |
| RN Sick Call | 2 | 53 | +51 | * |
| Re-Entry Planning | 10 | 59 | +49 | * |
| **Total Backlog** | **465** | **751** | **+286** | **+62%** |

*Average percent change not calculated for average appointments <50.
**Weeks reviewed include: 06/05/24 to 06/26/24 and 12/04/24 to 12/27/24.

CFCF continues to account for the greatest number of backlogged appointments.  This is driven by the fact that CFCF houses the most Class Members at PDP's intake unit where patients tend to require higher levels of care than other types of housing units.  The weekly backlog remained high in December 2024, however, PDP reports by March 2025, the backlog had reduced dramatically.  This information will be verified in the next reporting period.  PDP anticipates that with staffing increases and population reduction, the backlog will continue to decrease.

---

[38] Monitor's Fifth Report, *supra* note 15, at 41.
[39] As previously reported, "blitzes" are when healthcare and security staff work overtime to complete healthcare appointments.  *Ibid.*

The following table reflects on-site appointment backlogs for each facility for one day in each of four weeks in December 2024:

**Table 29: On-Site Appointment Backlogs by Facility**
December 2024

| Facility | 12-4-24 | | 12-11-24 | | 12-18-24 | | 12-27-24 | |
|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % |
| CFCF | 535 | 60% | 491 | 68% | 360 | 65% | 346 | 58% |
| DC | 42 | 5% | 44 | 6% | 22 | 4% | 13 | 2% |
| PICC | 217 | 25% | 112 | 15% | 74 | 13% | 108 | 18% |
| RCF | 88 | 10% | 76 | 10% | 95 | 17% | 130 | 22% |
| Total | 885 | 100% | 726 | 100% | 551 | 100% | 598 | 100% |

As previously reported, PDP implemented a tablet-based sick-call pilot program at CFCF in April 2024.[40]  Patient feedback remains positive, and by December 2024, RCF, PICC, and CFCF's tablet sick-call systems were fully operational.  PDP reported delays in implementing the tablet-sick-call system at DC because City maintenance lacked staff to complete the project sooner.  On February 26, 2025, PDP reported the tablet sick-call request system is now implemented at DC.

PDP agrees that paper sick-call requests must remain available in all PDP facilities, and the Monitoring Team observed paper request forms available on housing units during the November 2024 and February 2025 site visits.  Unfortunately, some receptacles on some CFCF units were filled with days-old RTS and sick-call requests and Class Member grievances.  Facility leadership indicated it would take corrective action.  The issue was not observed at other facilities during the site visits.

In the previous reporting period, PDP reported improvements in patient attendance at on-site appointments with the assignment of PICC's Health Services Administrator as a "Care Coordinator" to liaise between providers, patients, and security personnel.  The Monitoring Team recommended expansion of the Care Coordinator initiative to every PDP facility.  Because Health Services Administrator is the highest management-level healthcare position in each PDP facility, the Monitoring Team recommended Care Coordinator positions be assigned to lower-level healthcare team members.  With Court-ordered healthcare staffing increases discussed below, PDP allocated funding for eight Care Coordinators and reportedly hired five in this reporting period.

**On-Site Specialty Care**

In this reporting period, PDP Healthcare continued to struggle to provide timely on-site specialty care, particularly for optometry services.  On-site specialty care appointments represent 20 percent of the overall appointment backlog consisting of on-site specialty appointments, on-site

---

[40] *Id.* at 41.

medical and behavioral health appointments provided by YesCare, and off-site specialty appointments.[41]  The on-site specialty backlog increased by 17 percent this reporting period, from 248 in June 2024 to 289 in December 2024.  The backlog is driven mostly by 217 on-site optometry appointments, which comprise 75 percent of the overall on-site specialty backlog.  Podiatry appointment backlogs reached a high of 109 appointments in August 2024 but were reduced to 23 appointments, or 8 percent of the total on-site specialty backlog, by the end of December 2024.  In March 2025, PDP reported significant reductions in both podiatry and optometry backlogs.  This information will be verified in the next reporting period.

PDP reports that the new Deputy Commissioner of Operations and Emergency Services is coordinating with healthcare to improve medical escorts and, as a result, the optometry backlog had been reduced to 52 appointments as of January 17, 2025.  PDP anticipates progress will continue in the next reporting period.  PDP also continues to address backlogs for some types of on-site specialty care by having providers travel between facilities and see patients on-site rather than requiring transport to the main clinic at DC/PHSW.[42]  This strategy was successful in reducing or eliminating many backlogged appointments in the previous reporting period and remained successful in this reporting period.  PDP purchased mobile optometry equipment that reportedly allowed specialists to see patients at multiple facilities, reduced the need for security escorts, and further reduced the backlog.  As previously reported, PDP extended podiatry services from one day per week to two in this reporting period, which successfully reduced the podiatry backlog to fewer than 25 appointments by the end of the year.[43]  Finally, PDP extended hours of X-ray services and reduced the X-ray appointment backlog to 25 or fewer appointments on a monthly basis since September 2024.

### Off-Site Specialty Care

The backlog for off-site specialty care appointments remains a serious concern in this reporting period.  In December 2022, PDP's backlog of off-site appointments was 172 total appointments either scheduled or awaiting scheduling.  In June 2023, the backlog had increased slightly to 187 total appointments.  In December 2023, the total backlog was 375 appointments and reduced slightly to 358 in June 2024.

In this reporting period, weekly backlog reports show a high of 432 appointments, but by December 2024, it had reduced to 295.  PDP attributes the decrease to improved tracking and scheduling of appointments, and to the reduction in PDP's population.  PDP reports that the EMR upgrade and ATIMS allows for easy identification of duplicate appointments or the possibility of same-day appointments, which reduce transports.

---

[41] PDP offers on-site specialty services in obstetrics, gynecology, optometry, pap testing, podiatry, physical therapy, ultrasound, and x-ray.  For on-site specialty appointments, specialty providers come to PDP and treat patients on-site.  The on-site specialty backlog is sensitive to minor staffing changes or provider absences.

[42] Monitor's Fifth Report, *supra* note 15, at 42.

[43] *Ibid.*

PDP has shown a downward trend in successfully completed off-site specialty appointments over this 24-month period.  The following graph depicts completed monthly off-site specialty appointments from January 2023 through December 2024:



**Completed Off-Site Appointments**
January 2023 – December 2024

PDP has continued to see a reduction in completed off-site specialty appointments in this reporting period.  From January 2023 through June 2023, PDP completed 1,273 off-site specialty appointments.  From July 2023 through December 2023, PDP completed 938 off-site specialty appointments.  From January through June 2024, they reduced, again, by 9 percent to 851 off-site specialty appointments.  From July through December 2024, the number of completed off-site specialty appointments decreased by 7 percent, from 851 in the previous reporting period to 791 in this reporting period, reflecting a 16 percent decrease in completed appointments for the same period one year earlier.  Despite reported improvements in scheduling and tracking of appointments and fewer patients to treat, a significant backlog remains.

Although fewer total appointments were completed this reporting period, a higher percentage of total appointments were completed in this reporting period due to the improvements. The following table depicts off-site specialty appointments scheduled and attended from July through December 2024:

**Table 30: Off-Site Specialty Appointment Summary**
July – December 2024

| Month | Jul | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|
| # Scheduled | 397 | 386 | 374 | 399 | 325 | 314 | 2195 |
| Out of Custody | 29 | 16 | 39 | 22 | 23 | 16 | 145 |
| Out of Jurisdiction/Open Ward | 8 | 5 | 3 | 12 | 3 | 4 | 35 |
| Cancel Prior to Transport | 20 | 13 | 13 | 22 | 13 | 4 | 85 |
| COVID-19 Isolation | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Ineligible* | *57* | *34* | *55* | *56* | *39* | *24* | *265* |
| # Eligible to Attend Appointment | 340 | 352 | 319 | 343 | 286 | 290 | 1930 |
| Refused[44] | 30 | 31 | 25 | 40 | 34 | 23 | 183 |
| C/O Shortage | 168 | 172 | 124 | 141 | 118 | 104 | 827 |
| Cancelled at Office | 1 | 1 | 4 | 4 | 3 | 3 | 16 |
| Scheduling Error | 6 | 4 | 1 | 2 | 1 | 1 | 15 |
| Court | 6 | 5 | 12 | 1 | 3 | 4 | 31 |
| Late to Appointment | 6 | 9 | 9 | 8 | 5 | 5 | 42 |
| Other | 9 | 8 | 1 | 1 | 3 | 3 | 25 |
| *Total NOT Seen* | *226* | *230* | *176* | *197* | *167* | *143* | *1139* |
| **Total Seen** | **114** | **122** | **143** | **146** | **119** | **147** | **791** |
| **% of Eligible Patients Seen** | **34%** | **35%** | **45%** | **43%** | **42%** | **51%** | **41%** |

The greatest contributing factor to the reduction in completed off-site specialty appointments remains lack of security staff to transport patients. Staff shortages reportedly account for 73 percent of appointments missed in this reporting period. Eligible patient attendance increased from 36 percent in the first half of 2024 to 41 percent in the second half of the year.[45]

Patients continue to report frustration with waiting many months to receive specialty care appointments with providers in the community, the frequency with which appointments are cancelled and rescheduled, and the number of times appointments are rescheduled before they are seen. PDP reports it does not have the resources to notify patients when their appointments have been canceled or rescheduled. When the Monitoring Team requests follow-up information about appointments for individual patients, they are consistently shown as rescheduled or awaiting rescheduling. However, uncertainty about whether specialty visits will occur creates anxiety for patients who fear they have been forgotten or permanently canceled, and the

---

[44] PDP does not currently track reasons for refusals. As previously reported, patients have consistently reported to the Monitoring Team that excessive wait times in holding cells for transportation to appointments is among primary reasons for their refusals. *See* Monitor's Third Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 193 at 31-32 (E.D. Pa. Oct. 12, 2023).

[45] Monitor's Fourth Report, *supra* note 12, at 35.

Monitoring Team recommends that PDP implement a mechanism for notifying patients in advance when appointments have been rescheduled.

Because PDP consistently lacks transportation staff for off-site appointments, PDP continues to maintain the "must-go" list for scheduled appointments.[46]  That is, PDP security notifies the Medical Director how many patients may be transported in a given week based on availability of transport staff, and the Medical Director must then determine which patients need care the most. Patients on the must-go list are prioritized for specialty appointments.  As previously reported, even prioritized patients may not make their appointments when security post vacancy rates are higher than anticipated.[47]  In June 2024, PDP began requiring notifications to executive management when patients on the must-go list are unable to be transported, which PDP reports has improved attendance for must-go appointments.  PDP has agreed to monthly audits of sample must-go lists in the next reporting period.  It is inappropriate to require a physician to prioritize patient care based on security staff availability rather than medical necessity, and PDP will not achieve substantial compliance with this substantive provision while a must-go list is required.

Throughout the first two years of settlement implementation, PDP has attempted to reduce its off-site specialty backlog in various ways by:  (1) adjusting appointment times for greater uniformity in scheduling; (2) batching patients together to reduce the frequency of medical transports; (3) seeking providers who offer evening appointments; (4) offering outside providers reimbursement for travel to PDP facilities to treat specialty patients on site; (5) guaranteeing payment for all scheduled appointments, whether patients attend or not; and (6) reimbursing off-site specialty care providers at higher rates to provide care on site rather than in their community offices.  Reportedly, none of these efforts were successful.  The medical guarding and transportation contractor PDP has retained pursuant to the Sanctions Order, discussed above under Substantive Provision 1—Staffing, is anticipated to help reduce the off-site backlog.

In July 2024, PDP finalized the establishment of a nine-bed secure inpatient unit at Jefferson Frankford Hospital, as previously reported.[48]  PDP initially intended the unit to treat surgery patients and provide post-operative care.  Combining the care at a single hospital for this subset of patients was expected to limit the number of security personnel who were redirected from jail posts to medical guarding assignments at various area hospitals.  PDP reports it subsequently learned that Jefferson Frankford hospital no longer offers the anticipated surgical services.  As of December 2024, none of PDP's patients had been admitted or received services on the unit.  PDP worked to identify other patient populations for treatment on the unit and, in February 2025, reported that three patients were admitted and receiving services.  PDP reports it continues to work with hospital administration to identify additional patients for the unit.  It is unclear whether the anticipated security staffing relief will occur as planned given that surgery patients will still require treatment at other area hospitals.

---

[46] See Monitor's Fifth Report, *supra* note 15, at 44-45.
[47] *Id.* at 45.
[48] *Ibid.*

**Intake Screenings**

PDP remains unable to meet policy guidelines for patient intake screenings within four hours of arrival at PDP.

The following table depicts PDP's reported compliance with four-hour timeframes for each month in the second half of 2024:

**Table 31: Percentage of Intake Screenings Within Four Hours**
July – December 2024

| Month | Percentage (%) |
|---|---|
| July | 28 |
| August | 32 |
| September | 44 |
| October* | N/A |
| November | 37 |
| December | 45 |
| Total | 37% |

*Data for October 2024 is not available due to an upgrade to the Electronic Medical Record.

PDP continues to report that its intake area is staffed with sufficient healthcare personnel, but security staffing deficits remain insufficient to meet the four-hour policy requirement and cause intake backlogs. PDP anticipates that once care coordinators are present in the intake area, patients will be guided more quickly through the intake process and compliance will improve.

**Mortality Information**

Six Class Member's died while in PDP custody in 2024. One death was ruled a homicide, one was due to natural causes, and four were pending as of this filing.

The Monitoring Team attended all death reviews that occurred in 2024. Present during the reviews were PDP executive leadership, facility managers, and line personnel involved in emergency responses. PDP continued to evaluate the security and healthcare responses, although CCTV recordings were not shown during death reviews in this reporting period. The Monitoring Team has recommended that PDP show available CCTV footage in all reviews to support critical self-evaluation, including security and medical responses. The Monitoring Team has also continued to recommend that PDP implement a formal system for tracking any systemic issues identified during the reviews and corrective action taken.

PDP's death review processes and critical incident reviews are not subject to monitoring pursuant to the Agreement. Although systemic issues that emerge during the reviews often relate to various substantive provisions in the Agreement, neither the quality of PDP's reviews nor PDP's acceptance or rejection of the Monitoring Team's recommendations impact its compliance. PDP has, however, accepted input from the Monitoring Team on these issues and committed to implementing the recommendations as resources permit.

**Behavioral Healthcare**

Despite significant progress in hiring behavioral health staff this reporting period, PDP remains out of compliance with required timeframes for behavioral health referrals.[49]  PDP reports the transition to ATIMS impacted compliance in this reporting period.

The following tables depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations for July through December 2024:

**Table 32: Percent Compliance with Behavioral Health Referral Timeframes**
July – December 2024

| Month | Total Referrals Received | Total Referrals Completed within Timeframes (%) | Emergency Referrals Completed within 4 hours (%) | Emergency Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 48 hours (%) | Routine Referrals Completed within 5 days (%) |
|---|---|---|---|---|---|---|---|
| July | 826 | 48% | 75% | 100% | 14% | 23% | 36% |
| August | 759 | 53% | 80% | 100% | 19% | 37% | 31% |
| September | 750 | 49% | 77% | 100% | 15% | 28% | 34% |
| October | 639 | 41% | 55% | 86% | 18% | 37% | 37% |
| November | 827 | 42% | 58% | 83% | 14% | 29% | 38% |
| December | 1010 | 45% | 61% | 81% | 18% | 41% | 37% |
| **Average** | **4811** | **46%** | **67%** | **91%** | **16%** | **32%** | **35%** |

*Expectation: Emergent within 4 hours, Urgent within 24 hours, Routine within 5 days.

**Table 33: Social Worker Sick Calls**
July – December 2024

| Month | Number Completed | Completed within 24 hours (%) |
|---|---|---|
| July | 529 | 54% |
| August | 458 | 70% |
| September | 470 | 71% |
| October | N/A | N/A |
| November | N/A | N/A |
| December | N/A | N/A |
| **Total** | **1457** | **65%** |

---

[49] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals:  emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.

**Table 34: Compliance with 14-Day Patient Evaluations**
July – December 2024

| Month | Number Completed | Completed within 14 Days (%) |
|---|---|---|
| July | 858 | 60% |
| August | 858 | 70% |
| September | 899 | 63% |
| October | N/A | N/A |
| November | N/A | N/A |
| December | N/A | N/A |
| **Total** | **2615** | **64%** |

In this reporting period, 46 percent of behavioral health staff referrals were completed within required timeframes.  This marks a reduction from 56 percent compliance with policy timeframes in the previous reporting period.  Compliance with four-hour emergency referral timeframes reduced from 75 percent in the previous reporting period to 67 percent in this reporting period.

Compliance rates with urgent and routine referrals remain low in this reporting period.  Urgent referrals were completed within 24 hours no more than 16 percent of the time, on average, throughout this reporting period.  This compliance rate is reduced from 20 percent, on average, in the previous reporting period.  Routine referrals were completed within required timeframes less than 35 percent of the time, on average, each month, compared to 44 percent compliance in the previous reporting period.

PDPs behavioral health referrals have increased over the past 12 months.  From January through June 2024, PDP received a low of 609 referrals in January 2024 and a high of 772 referrals in May 2024.  In this reporting period, behavioral health referrals reached 827 referrals in November 2024 and 1,010 referrals in December 2024, reflecting 36 percent and 62 percent increases respectively since January 2024.

PDP reports that EMR upgrades prevented PDP from generating data about Social Worker Sick Calls and 14-day behavioral health evaluations for October, November, and December 2024.  As of this filing, PDP was working to resolve the issue.  Based on available data for July, August, and September 2024, it appears that compliance with social worker sick-call requests ranged from 54 percent to 71 percent, similar to the 48 percent to 72 percent range in the previous reporting period.  PDP expects improved compliance with the addition of personnel and anticipates correcting data issues for the next reporting period.

Compliance with 14-day behavioral health evaluations in the first three months of this reporting period ranged from 60 to 70 percent.  In the previous reporting period, compliance ranged from 46 to 89 percent.  2024 compliance ranges were significantly lower than those reported in 2023 when average monthly compliance exceeded 90 percent.  PDP reports it is evaluating the reasons for this reduction and will provide an update in the next reporting period.

**Healthcare Staffing**

Healthcare staffing efforts continued in this reporting period with additional full-time positions filled and a reported functional vacancy rate of less than 5 percent each month from January 2024 through December 2024.  Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate.  A "functional vacancy" rate includes shifts that are filled by overtime and temporary agency hires and accounts for permanent staff who are out on leave and not reporting for duty.  The functional vacancy rate is determined based on budgeted hours and total hours of delivered service.

In June 2024, PDP reported a healthcare staff vacancy rate of 17 percent and a functional vacancy rate of 4 percent.  In December 2024, with the addition of 16 new hires, the healthcare staff vacancy rate reportedly reduced to 9 percent and the functional vacancy rate to -3 percent.  The following tables depict healthcare new hires and separations for each classification in this reporting period, July through December 2024, and total healthcare vacancies for June 2024 and December 2024:

**Table 35: Healthcare Personnel New Hires and Separations by Job Classification**
July – December 2024

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Administration | 0 | 1 | -1 |
| Behavioral Health Aide | 1.2 | 0.4 | +0.8 |
| Behavioral Health Clinician | 7 | 2 | +5 |
| Behavioral Health Prescriber | 4.3 | 0 | +4.3 |
| Behavioral Health Professional | 0 | 0 | 0 |
| Certified Nursing Assistant | 1 | 0 | +1 |
| Dialysis RN and Technician | 0 | 0 | 0 |
| Infectious Disease Physician | 1 | 0 | +1 |
| Licensed Practical Nurse | 10.2 | 10.4 | -0.2 |
| Medical Assistant | 0 | 2 | -2 |
| Medical Records | 3 | 1 | +2 |
| OB/GYM Physician | 0.8 | 0 | +0.8 |
| Physical Health Clinician | 2.6 | 0 | +2.6 |
| Physical Therapist and Assistant | 1 | 1 | 0 |
| Telehealth Coordinator | 0 | 0 | 0 |
| Radiology Technician | 0 | 0 | 0 |
| Registered Nurse | 5 | 2.8 | +2.2 |
| **Total** | **37.1** | **20.6** | **+16.5** |

**Table 36: Healthcare Vacancy Report**
June 2024 and December 2024

| Position Category | Allocated Positions June 2024 | Unfilled Positions June 2024 | Vacancy Rate June 2024 | Allocated Positions Dec 2024 | Unfilled Positions Dec 2024 | Vacancy Rate Dec 2024 | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Administration | 59.5 | -3 | -5% | 59.5 | -2 | -3% | 18% |
| Behavioral Health Aide | 12.2 | 1.4 | 11% | 12.2 | 0.6 | 5% | 19% |
| Behavioral Health Clinicians: Social Worker/Psychologist[50] | 18.4 | 13.6 | 74% | 19.4 | 2 | 10% | -4% |
| Behavioral Health Prescribers: Psychiatrist, NP | 15.2 | 2.5 | 16% | 15.2 | -1.8 | -12% | -11% |
| Behavioral Health Professionals: BH Coun./Activity Th. | 15 | -1.4 | -9% | 15 | -1.4 | -23% | 13% |
| Certified Nursing Assistant | 2.8 | 2.8 | 100% | 2.8 | 1.8 | 64% | 67% |
| Dialysis RN and Dialysis Technician | 1.5 | 0.8 | 53% | 1.5 | 0.8 | 53% | 19% |
| Infectious Disease Physician | 2 | 1 | 50% | 2 | 0 | 0% | 16% |
| License Practical Nurse: All LPNs | 74.2 | 7.6 | 10% | 74.2 | 7.8 | 11% | -20% |
| Medical Assistant | 15 | 5 | 33% | 15 | 7 | 47% | -24% |
| Medical Records Clerk | 13.8 | 2.2 | 16% | 13.8 | 0.2 | 1% | 0% |
| OB/GYN Physician | 0.8 | 0.8 | 100% | 0.8 | 0 | 0% | 42% |
| Physical Health Clinicians: Physician, NP, PA | 19.8 | 1.6 | 8% | 19.8 | -1.0 | -5% | -1% |
| Physical Therapist/Therapist Assistant | 3 | 0 | 0% | 3 | 0 | 0% | 15% |
| Telehealth Coordinators | 3 | 2 | 67% | 3 | 2 | 67% | -71% |
| Radiology Technician | 2.4 | 0.4 | 17% | 2.4 | 0.4 | 17% | 30% |
| Registered Nurse: All RNs | 63.1 | 16.1 | 26% | 63.1 | 13.9 | 22% | -9% |
| **Total** | **321.7** | **53.4** | **17%** | **322.7** | **30.3** | **9%** | **-3%** |

As with the previous reporting period, an average of 13 percent pay increases for most healthcare positions continues to attract candidates and hiring remained strong in this reporting period.[51] From July through December 2024, PDP was able to convert some Behavioral Health positions that were proving challenging to fill to similar clinical classifications that would not limit the services provided the patients. As a result, PDP was able to increase Behavioral Health staffing

---

[50] PDP reports an error in its June 2024 data. Behavioral Health Clinicians should have been reported as 19.4 allocated positions and 7 FTE vacancies. The error was discovered in November 2024 and corrected this reporting period.
[51] Monitor's Fifth Report, *supra* note 15, at 50; Monitor's Fourth Report, *supra* note 12, at 38-39.

by 10.1 FTEs in this reporting period.  PDP anticipates the significant increase in permanent staff should assist in both addressing backlogs and provider continuity for patients.

With additional hires in Behavioral Health classifications, the vacancy rate for Behavioral Health clinicians has decreased from a reported 74 percent in June 2024 to 10 percent in December 2024 with a functional vacancy rate of -4 percent including overtime and registry clinicians. Reflecting a dramatic improvement from previous reporting periods, the vacancy rate for Behavioral Health prescribers was eliminated.  As previously reported, the prescriber vacancy rate was reduced from 42 percent in December 2023 to 16 percent in June 2024 with the hiring of additional Behavioral Health nurse practitioners.[52]  The vacancy rate was eliminated in this reporting period by over-hiring in this classification for a vacancy rate of -12 percent and a functional vacancy rate of -11 percent with overtime and registry staff included.

---

Paragraph 2(a) of the Sanctions Order states:[53]

> The City shall increase the budget for YesCare to provide additional healthcare staffing to serve as liaisons between security personnel and healthcare providers, to expand healthcare services to meet the current and future needs of the patient population, and to provide routine rounding in all housing units due to limited out-of-cell time.
>
> > (i)    Rounding shall occur at least three times per week in all units until the PDP comes into substantial compliance with required out-of-cell time.
> >
> > (ii)   The budget increase shall be sufficient to allow YesCare to provide additional staff members as necessary to ensure substantial compliance with substantive provisions 4 ("Return to Normal Operations"), 5 ("Healthcare") and 6 ("Behavioral Health in Segregation") of the Settlement Agreement.

---

Defendants have partially complied with the requirements of this paragraph.  In October 2024, the City reported that it had negotiated a contract amendment for expanded services with YesCare on September 30, 2024 to allocate 38 additional positions.  In November 2024, Defendants reported that the contract was in effect.  In December, Defendants' reported YesCare had filled 25 of the 38 new positions consistent with this requirement, as reflected in Table 37 below.  PDP also reports it is currently developing a plan to meet additional rounding requirements, which will be finalized in the next reporting period.  To comply with this paragraph, Defendants must ensure that rounding occurs on all housing units at least three times per week until PDP achieves compliance with out-of-cell requirements.  Defendants must also demonstrate that hiring efforts meet current and future needs of the population and that they are sufficient to support substantial compliance with Substantive Provisions 4 through 6 of the Agreement.

---

[52] Monitor's Fifth Report, *supra* note 15, at 51.
[53] Order, *supra* note 5, at 3-4.

The following table depicts the hiring efforts for these positions, which are considered separate from previously allocated, permanent full-time staffing positions reflected in Table 36 (Healthcare Vacancy Report):

**Table 37: YesCare Staffing Increases Pursuant to Sanctions Order**
December 2024

| Job Classification | Allocated | Filled |
|---|---|---|
| Blitz NP | 2 | 0 |
| LPN- Medication Assisted Treatment | 1.4 | 1.4 |
| LPN- Medication Pass | 8.4 | 7 |
| Telehealth Coordinator | 4 | 3 |
| Care Coordinator | 8 | 7 |
| Intake Coordinator | 4.2 | 2.1 |
| Physical Therapy Technician | 1.5 | 1.5 |
| Intake BH Clinician | 2.8 | 1 |
| BH Rounding Staff | 5.8 | 2 |
| **Total** | **38.1** | **25** |

**Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's Fifth Report:**

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.

    *PDP has implemented this recommendation.  PDP has instituted 13 percent raises, on average, for almost all healthcare classifications, which has improved recruitment and retention in several classifications.  PDP reports it has evaluated salary ranges for behavioral health classifications with higher vacancy rates and has determined that current salaries and benefits are competitive.  PDP reports difficulty recruiting social workers in the Philadelphia area and has decided to convert several vacant positions to licensed psychologists and psychiatric nurse practitioners to reduce overall vacancy rates and increase clinical staff.  These conversions are reflected in Table 36 above.  Without an independent salary survey, PDP's strategy was successful in attracting new candidates and significantly reducing Healthcare vacancies.*

2.  Continue to explore options to provide both on and off-site appointment services via telehealth.

> Paragraph 2(c) of the Sanctions Order states:[54]
>
> > Where medical care can properly be rendered using telehealth services, the City shall take all reasonable and necessary steps to employ such services to reduce the number of staff assigned to transport duties, even if the marginal cost of telehealth services is higher than that of in-person visits.
>
> Defendants have partially complied with the requirements of this paragraph. In February 2025, PDP reported that the vendor it had previously identified is unable to meet current needs and, therefore, PDP continues to search for vendors and providers.

3.  Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring scheduled appointments occur.

    *PDP reports the must-go list is now escalated to PDP executive management as necessary. PDP will begin to audit must-go lists monthly in the next reporting period. Once the must-go list is no longer necessary, the workgroup should continue to identify any barriers to off-site specialty care.*

4.  PDP should evaluate reimbursement rates for both on-site and off-site specialty services and make increases sufficient to attract necessary providers.

    *PDP initially reported the Chief Medical Officer approached seven specialty providers to discuss increased reimbursement rates and incentives for providing on-site specialty care or telehealth. All offers were reportedly declined with the exception of urology and ENT service providers who agreed to provide some services via telehealth. In this reporting period, PDP appointed a new Chief Medical Officer who is attempting to identify current providers for a large number of appointments and to propose similar offers.*

5.  PDP should increase incentives for providers to offer specialty care on site rather than transporting patients to off-site facilities. Some incentives may include: (1) offering outside providers reimbursement for travel time to PDP facilities; (2) guaranteed reimbursement for all scheduled appointments, whether patients attend or not; and (3) reimbursement of off-site specialty care providers at higher rates to provide care on site.

    *As discussed above, PDP's new Chief Medical Officer is attempting to implement this recommendation.*

6.  The City should explore contracting with outside law enforcement or private security agencies to establish a team dedicated to off-site transport details.

    *See discussion of the Sanctions Order to engage a secure transportation and medical guarding contractor above under recommendation 3.*

---

[54] Order, *supra* note 5, at 4.

**Additional requirement pursuant to the Sanctions Order:**

Paragraph 2(b) of the Sanctions Order states:[55]

> The City shall fund an Access to Care team, to be housed within the Commissioner's Office, and to include, at minimum, one Deputy Commissioner, one Access to Care Manager at a correctional peace officer management rank, one secretary, one analyst, and at least five Health Care facilitators assigned to PDP facilities. The Access to Care team shall be fully operational within 180 days of the date of this Order.

The Access-to-Care Team was required to be operational by February 12, 2025.

Defendants have partially complied with the requirements of this paragraph. On October 15, 2024, PDP proposed and was approved for an alternate implementation plan for this requirement. Due to security staff vacancies, rather than assigning a nine-person Access-to-Care Team staffed primarily with security personnel, PDP requested to hire 12 healthcare personnel to work alongside housing unit correctional officers for two shifts each weekday in all PDP facilities to ensure patients receive in-person and telehealth care. The team would be overseen by a correctional officer at the rank of major who would report directly to a Deputy Commissioner.

In February 2025, the City reported that a deputy warden had been hired to oversee this team and will report directly to the Deputy Commissioner of Operations and Emergency Services. PDP reports the team was deployed in February 17, 2025.

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating:  Partial Compliance**

To achieve substantial compliance with this substantive provision, PDP must, at a minimum:  (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit (TU) housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the Behavioral Health caseload.

---

[55] *Ibid.*

*Requirements 1 and 3: Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

Data from PDP's biannual audit of segregation rounds for physical and behavioral healthcare from December 2024 shows a sharp reduction in compliance with requirements for physical health rounding. A primary goal of frequent rounding is to identify patients who show signs of decline or poor coping in segregation housing, and to make timely referrals for additional services or recommend removal from segregation.[56] In October 2023, data showed 94 percent compliance with required daily physical health rounds systemwide, and at least 90 percent compliance at each PDP facility. Data from a randomly selected two-week period in May 2024 reflected a sharp reduction to 65 percent compliance with required daily physical healthcare rounds systemwide. PDP Healthcare explained the lapses in care as resulting from population moves from PICC to DC that Healthcare was not informed of.[57] It also served as an example of the poor interdisciplinary communication highlighted in previous reports.[58] PDP reports this communication issue was resolved in this reporting period, and that Healthcare is now being made aware of any changes to restricted housing units and is updated as changes occur.

Data from the December 2024 audit shows additional declines in compliance with physical health rounding in this reporting period. Healthcare achieved merely 26 percent compliance with daily physical health rounds and similarly poor compliance at each of the three facilities reported, CFCF (21 percent compliance), PICC (39 percent compliance), and RCF (47 percent compliance). Healthcare explains this decline as resulting from technical issues with the EMR upgrade that healthcare personnel reportedly believed prevented them from identifying which patients required rounding. PDP Healthcare reports the patient information was indeed available despite the technical issues and that clinicians have now been trained to access it.

As with the lapses in physical health rounds in the previous reporting period, PDP Healthcare leadership reports it first became aware of the additional decline when audit results were generated at the end of the reporting period. As a result, Healthcare reports it has taken corrective action in its quality management system and that health services administrators are now required to complete weekly audits. Frequent auditing is an important mechanism to identify operational lapses before they reach alarming levels, however, such important lapses in care should have been reported to and noticed by Healthcare supervisors sooner. Some aspects of patient care are not quantifiable, and unpredictable systemwide barriers to care are sure to arise again as PDP continues to reform. These lapses over two reporting periods clearly necessitate improved communication between security and healthcare divisions but also within the Healthcare division itself.

Regarding behavioral health rounding, the May 2024 audit showed that Healthcare achieved 96 percent compliance with behavioral health weekly rounding in segregation housing. The December 2024 audit shows 100 percent compliance with behavioral health rounding. Since

---

[56] Monitor's Fourth Report, *supra* note 12, at 43.
[57] Monitor's Fifth Report, *supra* note 15, at 53.
[58] *Id.* at 39, 53-55.

compliance monitoring began in 2022, the Monitoring Team has observed patients in segregation whose symptoms strongly suggest they required a higher level of care.  PDP maintains that clinical staff may request further evaluation from clinical supervisors if they believe a patient requires enhanced care or advocacy, but these instances have not been tracked and staff have indicated such requests were rare.[59]  The Behavioral Health Director reports that modifications to the EMR are being made that will allow clinical staff to document referrals for further evaluation.  Data can then be generated about the circumstances and frequency of these referrals.

As previously reported, Behavioral Health rounding notes are not individualized or unique to each patient and are, instead, completed in batches that simply denote whether rounding occurred.[60]  As such, Dr. Belavich opined that current rounding documentation was of little use in identifying patients' needs.[61]  In addition to the EMR modification described above, the Behavioral Health Director is also adding an EMR feature that provides for individualized notes about each patient receiving rounds.  The new feature will relay information to treating providers about any concerns observed during rounding.  The information will be extracted for tracking, quality improvement, and training purposes.  PDP anticipates the EMR improvements will be operational in the next reporting period.  Compliance with Substantive Provisions 5—Healthcare, and Substantive Provision 6—Behavioral Health in Segregation, require the provision of *quality* care in addition to meeting standards for the *frequency* of clinical contacts.  These EMR improvements will assist Healthcare managers in assessing and improving the quality of care patients receive.

*Requirement 2:  Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Members being considered for placement on segregation status.  This requires a face-to-face evaluation by a physical healthcare provider and, for those in Behavioral Health programs, a behavioral health clinician.  Patients designated SMI are required to have a behavioral health clearance performed within four hours of placement in segregation.  Patients who are on the Behavioral Health caseload but not identified as SMI are to receive a behavioral health clearance within 24-hours of placement.

Dr. Belavich has been assessing samples of the Medical/Behavioral Health Review for Segregation Placement (PDP 86-733) for both quality and consistency in each reporting period.  In this reporting period, Dr. Belavich observed the following based on a sample review of 25 segregation placements:  (1) for cases reviewed, patients with SMI or on the Behavioral Health caseload received timely clearance evaluations; (2) for cases reviewed, patients with SMI or on the Behavioral Health caseload received evaluations within the shorter 4-hour timeframe typically reserved for SMI patients only; (3) in two instances, patients were not cleared for segregation and were diverted to the PHSW for treatment.  These are improvements from audit findings in previous reporting periods.  Physical health sections of the clearances are still being completed consistently, as previously reported.[62]  Healthcare reports that health services

---

[59] Monitor's Fourth Report, *supra* note 12, at 43.
[60] Monitor's Fifth Report, *supra* note 15, at 54.
[61] *Ibid.*
[62] *Ibid.*

administrators will be performing regular internal audits to sustain improvements and make any necessary adjustments.

PDP developed and implemented a pilot project in May 2024 to improve the quality of mental health clinical input in disciplinary hearings and dispositions, the accurate identification of the SMI populations, and to ensure that staff assistant support for disciplinary hearings is offered and documented.  The pilot, also discussed below under Substantive Provision 8—Discipline, was implemented at PICC and is planned to be implemented at RCF in early 2025.

As part of the pilot, PDP developed a Rules Violation Mental Health Review form (PDP 363-C) to document clinical input during hearings and consideration of patients for mitigation or diversion.  Dr. Belavich reviewed 30 PDP 363-C forms submitted in this reporting period for Behavioral Health or SMI patients at PICC.  Forms reviewed from early in the pilot were generally complete, however, the quality of behavioral health documentation varied.  In some instances, for example, clinicians noted "unknown" or "not applicable" to questions that required responses.  In this reporting period, the Behavioral Health Director provided additional training and direction to clinical staff, and forms reviewed in this reporting period generally contain stronger documentation and responses to all required questions.  For the first time during the pilot, one form reflected mitigation in the form of diversion from seg to PHSW, also an improvement.

Healthcare is also enhancing the EMR to capture when patients are diverted from segregation and retained in a TU setting, and when rules violations that would typically result in segregation placements are instead resolved with assistance of TU staff.  Healthcare reports that Behavioral Health managers will continue to train staff in appropriate diversion and mitigation and monitor the quality of documentation on PDP 363-C forms.

*Requirement 4:  Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP reports it remains unable to deliver the "Positive Change/Positive Outcomes" (PC/PO) behavioral health group treatment program for patients in segregation due largely to security vacancies.  The program is designed to deliver group treatment for two hours, five days per week, for a total of 10 possible treatment hours each week for every program participant.  PDP tracks the number of treatment hours possible based on behavioral health staff availability ("treatment hours possible"), the number of treatment hours provided based on both healthcare and security staff availability ("treatment hours provided"), treatment hours necessary for PDP to comply with the requirement that each patient is offered 10 hours per week ("treatment hours required").  Consistent with the previous reporting period, the number of treatment hours currently provided is, on average, 8 percent of hours required for compliance.

The following table reflects total PC/PO group treatment hours possible with current Healthcare staffing versus hours offered to segregated patients from July through December 2024:

**Table 38: PC/PO Structured Group Treatment Hours in Segregation**
July – December 2024

| Month | Treatment Hours Possible | Treatment Hours Provided | Percent Provided | Treatment Hours Required | Percent of Required Hours Provided |
|-------|------|------|------|------|------|
| July | 597 | 104 | 17% | 1733 | 6% |
| August | 504 | 140 | 28% | 1750 | 8% |
| September | 502 | 116 | 23% | 1657 | 7% |
| October | 598 | 159 | 27% | 1767 | 9% |
| November | 452 | 143 | 32% | 1589 | 9% |
| December | 436 | 161 | 37% | 1610 | 10% |
| Average | 515 | 137 | 27% | 1684 | 8% |

Healthcare reports it is working on making aspects of PC/PO programming available to patients on tablets. Tablet programming participation would be voluntary, does not replace in-person structured treatment, and does not count toward treatment hours for compliance purposes. Healthcare expects tablet programming to be available to patients by mid-2025.

*Requirement 5: Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

PDP has met this requirement and monitoring is discontinued.

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

Dr. Belavich maintains that PDP should reduce its dependence on segregation for all Class Members, especially those on the Behavioral Health caseload, and discontinue its use altogether for SMI patients unless no alternatives exist.[63] PDP's TU housing provides an alternative to segregation housing in a more therapeutic setting for the mentally ill. Pre-COVID-19, PDP reserved 128 TU beds for women and 200 for men. During the COVID-19 lockdown, PDP reduced its available TU beds and, by August 2022, 134 beds remained, including 22 for women and 112 for men. PDP reports that although these beds were allocated to the TUs they were never at capacity.

Currently, the women's TU is housed in PICC C-unit with a 128-bed capacity. Thirty-four beds are reserved for TU patients. Patients with various security classifications are also housed in the

---

[63] Monitor's Fifth Report, *supra* note 15, at 57; Monitor's Fourth Report, *supra* note 12, at 46; Monitor's Third Report, *supra* note 44, at 40.

unit, which has limited out-of-cell time and therapeutic programming for TU patients. During the November 2024 site visits, security staff reported that they had enhanced out-of-cell opportunities by allowing TU patients and Class Members with other security classifications to recreate together. They had also made efforts to soften the unit and introduce additional informal opportunities for socialization and recreation on the unit. A rescue dog has been introduced to and lives on the unit, and PDP leadership has created opportunities for some TU participants to hold jobs either on the unit or in other areas of the facility. Additionally, several non-TU participants reported that under the supervision of security staff, they are able to assist TU participants with activities. In December 2024, 23 patients were enrolled in the 34-patient program. This reflects an increase from June 2024, when the number enrolled on the unit was 16 patients. Although informal programming is improving, patients continue to receive limited therapeutic programming on the unit.

In October 2023, PDP moved the Men's TU from a 128-bed unit to a smaller 64-bed unit. PDP reports in December 2024 the unit had 42 participants. Although treatment offered on the unit remains limited, Healthcare reports that a Regional Psychologist has been hired to oversee TU programming. During site visits in November 2024, TU participants continued to report that they were benefiting from participation.

During site visits in this reporting period, security personnel on the unit remained engaged and committed. As with previous site visits, the officer on duty knew each patient by name and each patient's unique mental health needs. Also during the November 2024 site visit, the Monitoring Team observed the unit officer successfully de-escalate a patient who was agitated about a cancelled court date. This allowed the patient to successfully continue programming in the TU without a rule violation. TU participants consistently reported to the Monitoring Team they feel as though officers on the unit care about them and treat them fairly. Collaboration between security and clinical staff continues with consistent communication about medication compliance, personal hygiene, and other factors that contribute to patient wellness.

PDP executives recognize that TU programming must expand. PDP's Behavioral Health caseload continues to maintain more than 1,500 patients and more than 300 patients with SMI. Sixty-four total TU beds is inadequate for a population this size, and the Monitoring Team continues to recommend expansion as soon as possible. PDP reports it plans to add another male TU at RCF when segregation housing units are consolidated at CFCF and confirms its goal to divert as many patients as possible from segregation to TUs and to offer at least 10 hours of PC/PO group treatment for all patients in segregation. Dates for TU expansion have not been set, but PDP estimates within 6 months. PDP is hopeful that the medical transport and guarding contract will improve security staffing on TUs, which may allow for additional treatment groups.

The Monitor's Fifth Report addressed concerns that some of the Monitoring Team's efforts over the last two years to address various clinical care and referral and placement thresholds had been met with resistance. As a result, some of PDP's initiatives to improve care for Behavioral Health patients had been delayed and opportunities to help individual patients had been missed.[64] It appeared that some of PDP's issues with patient advocacy were rooted in a cultural dynamic

---

[64] Monitor's Fifth Report, *supra* note 15, at 55-56.

within its Behavioral Health division.[65]  In this reporting period, the Behavioral Health division took appropriate corrective action to address these issues.

PDP's Behavioral Health Director initiated chart reviews and patient evaluations for all patients with SMI designations who were not already housed in TU settings.  Healthcare reports, thus far, of 154 SMI Class Members, 44, or 29 percent, were deemed appropriate for TU placement, 13 in the women's TU and 31 in the men's TU.  PDP reports that the majority of identified patients have been admitted to available TU beds and the remaining have been placed on waitlists.

PDP Healthcare is also in the process of adding a TU-assessment question to Behavioral Health Clinician and Psychiatric Prescriber forms to ensure that clinical staff always consider patients for TU placement.  The revised form also requires documentation of any reasons a patient is not recommended for a TU.  Healthcare reports it is scheduling in-service trainings with clinical staff to ensure patients are consistently being considered for TU placement and that referrals are being made.  Finally, PDP reports that the previously established interdisciplinary team continues to meet weekly to evaluate referrals to and from TUs.  These are all positive steps in developing a stronger treatment-focused culture within Behavioral Health.

As previously reported, some patients with severe behavioral issues may not be appropriate for a TU environment.[66]  This is most impactful to SMI patients who remain in segregation due to a lack of appropriate alternative housing.  PDP may need to consider the creation of a modified TU for those who are disruptive in its traditional TU.  Some of these patients may require a behavior modification program such as PDP's FBSU, as discussed above under Substantive Provision 4— Return to Normal Operations.  Without appropriate alternatives for consistent care, these patients have tended to cycle between hospitalization and extended segregation placements, which often exacerbate maladaptive or assaultive behaviors.  PDP's alternatives to segregation are improving its efforts to provide necessary treatment to all PDP patients, including those with the most complex needs, and efforts should continue.

*Requirement 7:  Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

Behavioral Health patients have been consistently overrepresented in segregation since December 2022 when the Monitoring Team first began collecting this data.  Over twelve months, from January 2024 to January 2025, the number of Behavioral Health patients in segregation was consistently higher than the overall percentage of Behavioral Health patients in the jail.  However, the Behavioral Health patient population that is also designated SMI has remained consistently low and underrepresented on segregation status for 12 months, from January 2024 through January 2025.

---

[65] *Id.* at 55.
[66] Monitor's Third Report, *supra* note 44, at 40.

The following table depicts SMI and Behavioral Health patients in segregation housing on specific dates in January 2024, June 2024, and January 2025:

**Table 39: SMI and Behavioral Health Class Members in Segregation**
January 12, 2024, June 30, 2024, and January 10, 2025

| | January 12, 2024 | | June 30, 2024 | | January 10, 2025 | |
|---|---|---|---|---|---|---|
| | Count | Percent of PDP Population | Count | Percent of PDP Population | Count | Percent of PDP Population |
| PDP Census | 4455 | 100% | 4574 | 100% | 4190 | 100% |
| Number of SMI | 342 | 8% | 329 | 7% | 271 | 7% |
| Number on BH Caseload | 1633 | 37% | 1672 | 37% | 1531 | 37% |
| Number in Segregation | 280 | 6% | 290 | 6% | 276 | 7% |
| | Count | Percent of Segregation Population | Count | Percent of Segregation Population | Count | Percent of Segregation Population |
| Number of SMI in Segregation | 15 | 5% | 14 | 5% | 13 | 5% |
| Number of BH in Segregation | 113 | 40% | 133 | 46% | 131 | 47% |

Segregation data from select dates in January 2024, June 2024, and January 2025 shows that patients on the Behavioral Health caseload totaled 37 percent of PDP's overall population. Behavioral Health patients represented between 40 percent of the segregation population in January 2024 to 47 percent in January 2025. SMI patients, however, have continued to reduce from 10 percent of PDP's total population in June 2023 to 7 percent in January 2025. SMI patients are not overrepresented in segregation and PDP has successfully reduced their proportion of the total segregation population in each reporting period, from eight percent in June 2023 to five percent in January 2025. PDP holds regular inter-disciplinary team meetings to evaluate the population in segregation.

**Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:**

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.
   *PDP preliminarily reports the piloting of this procedure at PICC has been positive. There are relatively few SMI Class Members at PICC, so the pilot will be expanded to RCF in the next reporting period where the new procedure can be tested more thoroughly. PDP reports it remains unable to identify a date for expansion of the pilot program to RCF.*

70

2. PDP should make additional progress in identifying security personnel to staff Positive Change, Positive Outcomes treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.

>   *PDP reports that the medical guarding and transportation contractor should provide some relief for facility staff to remain in housing units, which would increase treatment groups. PDP also anticipates reserving the women's TU for TU patients only, as discussed above.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022.*

### Compliance Rating:  Partial Compliance

PDP remains unable to offer Class Members consistent access to law libraries.

---

Paragraph 3(b) of the Sanctions Order states: "[t]he City shall install law library terminals in each unit in each facility for class members to use during their recreation time. The law library terminals shall be fully installed within 1 year of the date of this Order."[67]

Installation of terminals must be completed by August 18, 2025.  PDP reports it is currently searching for a vendor for law library terminals.  PDP reports it is also evaluating whether the new tablets, which PDP intends to issue to each eligible Class Member, will permit the loading of legal research materials, also discussed below under Substantive Provision 9—Tablets.  PDP does not intend tablet "libraries" to replace in-person access to law libraries in each facility and recognizes that technology malfunctions, tablets break, and not all Class Members may be eligible or able to use them.  Compliance with this Substantive Provision requires in-person access to law libraries and printers, which PDP reports it will offer in addition to tablets, terminals, or whichever interim supplemental legal research solution it implements.

---

PDP continues to track maintenance of law library printers and computers via monthly audits. Audits from July through December 2024 reflect all law library equipment was operational on the days inspected.

**Substantive Provision 8—Discipline**

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding.  See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

---

[67] Order, *supra* note 5, at 5.

**Compliance Rating:  Partial Compliance**

The following tables depict PDP's disciplinary hearing data over five six-month periods, July through December 2022, January through June 2023, July through December 2023, January through June 2024, and July through December 2024, and each month, July through December 2024.  The tables include totals for disciplinary sanctions issued, "not guilty" findings, dismissals, and discipline imposed despite Class Members' absence without waiver:

**Table 40: PDP Disciplinary Hearings**
July 2022 – December 2024

| Reporting Period | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| July-Dec 2022 | 268 | 19 | 7% | 30 | 11% | 24 | 9% | 6 | 2% |
| Jan-June 2023 | 303 | 23 | 8% | 34 | 11% | 30 | 10% | 0 | 0% |
| July-Dec 2023 | 322 | 23 | 7% | 30 | 9% | 24 | 7% | 0 | 0% |
| Jan-June 2024 | 359 | 32 | 9% | 32 | 9% | 22 | 6% | 0 | 0% |
| July-Dec 2024 | 293 | 25 | 9% | 29 | 10% | 18 | 6% | 0 | 0% |

**Table 41: PDP Disciplinary Hearings**
July – December 2024

| Month | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| July | 368 | 35 | 10% | 63 | 17% | 28 | 8% | 0 | 0% |
| August | 344 | 28 | 8% | 20 | 6% | 27 | 8% | 0 | 0% |
| September | 256 | 18 | 7% | 17 | 7% | 14 | 5% | 0 | 0% |
| October | 297 | 13 | 4% | 28 | 9% | 19 | 6% | 0 | 0% |
| November | 198 | 25 | 13% | 24 | 12% | 7 | 4% | 0 | 0% |
| December | 294 | 30 | 10% | 24 | 8% | 11 | 4% | 0 | 0% |
| Average/Average % | 293 | 25 | 9% | 29 | 10% | 18 | 6% | 0 | 0% |

Documentation for July through December 2024 suggests Class Members have continued to be permitted to attend disciplinary hearings in person.  There was a change in disciplinary hearing officers in this reporting period, however, the percentage of not guilty and dismissed hearings remained, on average, approximately 19 percent.  The willingness of hearing officers to dismiss

violations for procedural or other violations or to find Class Members not guilty when evidence is lacking is critical to ensuring due process in disciplinary hearings.

As with the previous reporting period, the percentage of disciplinary actions involving Class Members with SMI continued to average approximately six percent of the total actions.  In November and December 2024, that average reduced to four percent.  If this two-month reduction in placing those with SMI in segregation is the beginning of a trend, it marks progress toward PDP's goal of further reducing its reliance on segregation for this population.

As previously reported, the disciplinary pilot program at PICC began in May 2024 and continued through this reporting period with additional training and ongoing feedback.[68]  The pilot expands the categories of infractions that may result in lower-level sanctions and requires input from behavioral health staff in disciplinary actions that involve Class Members with SMI.  The new disciplinary process requires hearing officers to consider behavioral health evaluations and recommendations in making disciplinary determinations and imposing sanctions on Class Members with SMI, or on those who are otherwise identified as having difficulty understanding the disciplinary process.  Clinicians must assess each of these Class Members and document any behavioral health contraindication to placement in segregation.  They must also assess and document whether a patient is able to participate in the hearing process and present a defense. Finally, clinicians must denote whether a Class Member's mental illness should be considered a mitigating factor in any disciplinary sanction(s).

The disciplinary pilot also requires the assignment of a trained staff assistant and documentation of effective communication during disciplinary hearings for every Class Member who experiences SMI, an intellectual disability, or other communication barriers.  PDP continues to train staff in meeting these requirements but compliance is low.  The disciplinary pilot will be expanded to RCF in early 2025 and PDP reports personnel are being trained in preparation.  PDP will generate data from pilot disciplinary hearings, including lower-level hearings, typically for minor infractions.

It is too soon to measure outcomes of the pilot, however, it has not appeared to reduce PICC's use of punitive segregation based on data reviewed in this reporting period, and as discussed above under Substantive Provision 3— Out-of-Cell/Segregation.  Both the average lengths of stay and average number of PICC Class Members in punitive segregation increased in this reporting period.[69]  Average lengths of stay may not be expected to decrease if the pilot successfully limited the number of lower-level infractions (and shorter terms) that were subject to punitive segregation.  Also, PICC's segregation data in the previous reporting period was incomplete due to physical plant renovations and the suspension of one of its segregation units. Nonetheless, both measures increased in this reporting period despite cases being reviewed pursuant to the pilot protocol.  As indicated in Substantive Provision 6—Behavioral Health in Segregation, there are also relatively few SMI Class Members at PICC, so the expansion of the pilot to RCF may yield different results.

---

[68] Monitor's Fifth Report, *supra* note 15, at 63.
[69] Refer to Tables 24 and 26.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3--[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

*Sub-provision 8.4--[PDP shall] cancel sanctions [imposed in hearings held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation.  Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline.  Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[70]*

**Compliance Rating:  Partial Compliance**

In January 2025, PDP finalized its selection of its current tablet vendor to also manage the expansion to systemwide tablet distribution.  PDP also reports it determined in this reporting period that its existing technology infrastructure is sufficient for tablet expansion, which may shorten PDP's projected completion timeframe of October 2025.

PDP continues to maintain an inventory of tablets, but the total has reduced since the previous reporting period.  The following table reflects current tablet totals at each PDP facility based on documentation provided:

**Table 42: Tablet Availability at Each PDP Facility**
June 2024 and January 2025

| Facility/Housing Unit | Total Tablets June 2024 | Total Tablets Jan 2025 | Difference |
|---|---|---|---|
| ASD Total | 0 | 0 | 0 |
| MOD 3 Total | 10 | 20 | +10 |
| CFCF Total | 192 | 152 | -40 |
| DC Total | 92 | 53 | -39 |
| PICC Total | 53 | 44 | -9 |
| RCF Total | 78 | 76 | -2 |
| **Total** | **425** | **345** | **-80** |

---

[70] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) . . ."*.  In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.

PDP's inventory for June 2024 totaled 425 tablets issued to housing units and 114 maintained for educational purposes.  Inventory in January 2025 totaled 345 tablets issued to housing units and an additional 112 tablets for educational purposes.  The inventory for this reporting period reflects a reduction of 80 housing unit tablets and 2 educational tablets.  Evidenced by the reduction in tablets in this reporting period, PDP remains challenged in ensuring that the required number of tablets are operational, charged, and available for use in housing units.

PDP explains the reduction in available tablets as the failure of the tablet vendor to replace broken tablets.  SME McDonald notes that it is common for vendors to slow or discontinue the replacement of broken devices if the current contract may be at risk of being canceled and a different vendor may be selected.  It is possible that the issues with failures to replace broken tablets will be resolved now that the same vendor has been selected for tablet expansion and each Class Member is responsible for their own tablet.  In any case, the Monitoring Team recommends that immediate replacement of broken devices be included in the new contract, in effect for the entire contract term, whether or not the City appears poised to replace the vendor.

If the tablet expansion project is implemented with updated policies, staff training, and an effective system for distribution and replacement of broken tablets, PDP will achieve substantial compliance with this substantive provision.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating:  Partial Compliance**

If PDP's tablet expansion initiative is successful, issues with individual access to tablets will reduce.  However, PDP policy and training revisions should address protocols for broken or stolen tablets and other issues such as their use as currency within institutions.  This is also true for all tablet-related services such as grievances, phone calls, visiting, legal research, and therapeutic programming.

The following table depicts total monthly and average grievances for the two largest categories of complaints and "others" submitted via tablet for the period July through December 2024:

**Table 43: Monthly Tablet Grievances**
July – December 2024

| Month | July | August | September | October | November | December | Average |
|-------|------|--------|-----------|---------|----------|----------|---------|
| Commissary | 362 | 275 | 265 | 244 | 330 | 259 | 289 |
| Food Vendor | 64 | 79 | 48 | 85 | 91 | 117 | 81 |
| Other | 299 | 211 | 203 | 132 | 163 | 204 | 202 |
| **Total** | **725** | **565** | **516** | **461** | **584** | **580** | **572** |

PDP's grievance system continues to require improvements, especially in the areas of access, responsivity, and the tracking of paper and electronic grievances.[71]  The Monitoring Team continues to recommend improvements, including the creation of a system for distinguishing between requests for service and formal grievances and a centralized unit to assist with improvements.  Each PDP facility has its own grievance coordinator, but coordinators are not of rank to direct staff improvements.  PDP does not currently have a centralized grievance coordinator to oversee the grievance system, spearhead improvements, ensure consistency across institutions and among grievance coordinators, and direct personnel in improved practices.

PDP recognizes that current issues with the grievance system will likely be compounded once all Class Members have tablets.  It has therefore tasked Alta Management, PDP's new compliance coordinator, with researching best practices in grievance systems and assisting with an improvement plan.  PDP reports it is also negotiating with the tablet vendor to separate requests from grievances among other changes to improve responsiveness and tracking.  Finally, ATIMS has functionality to assist with tracking and monitoring of grievances, which PDP reports it intends to incorporate once other aspects of ATIMS are implemented.

The following tables depict total monthly and average grievances submitted via paper grievance for two periods, January through June 2024 and July through December 2024:

### Table 44: Monthly Paper Grievances
#### January – June 2024

| Month | January | February | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| Commissary Items | 184 | 122 | 113 | 53 | 65 | 78 | 103 |
| Discipline | 0 | 5 | 6 | 0 | 12 | 1 | 0 |
| Grievance Process | 1 | 8 | 1 | 4 | 3 | 0 | 0 |
| Housing/Classification | 0 | 1 | 2 | 1 | 0 | 1 | 2 |
| Law Library Access | 0 | 0 | 0 | 1 | 0 | 10 | 6 |
| Mail | 2 | 0 | 1 | 0 | 0 | 2 | 1 |
| MAT/Suboxone | 23 | 34 | 14 | 4 | 11 | 9 | 9 |
| Medical Access | 4 | 15 | 8 | 3 | 14 | 21 | 18 |
| Medication | 16 | 11 | 6 | 5 | 8 | 10 | 9 |
| Misc. | 6 | 6 | 4 | 7 | 8 | 0 | 2 |
| Out-of-Cell | 0 | 0 | 3 | 1 | 1 | 17 | 6 |
| Religious Access | 0 | 0 | 1 | 1 | 0 | 4 | 1 |
| Sanitation/Clothing | 0 | 3 | 1 | 4 | 0 | 7 | 2 |
| Staff Complaint | 1 | 3 | 2 | 1 | 6 | 3 | 6 |
| **Total** | **237** | **208** | **162** | **85** | **128** | **128** | **158** |

---

[71] Monitor's Fifth Report, *supra* note 15, at 67.

**Table 45: Monthly Paper Grievances**
July – December 2024

| Month | July | August | September | October | November | December | Average |
|---|---|---|---|---|---|---|---|
| Commissary Items | 66 | 33 | 52 | 64 | 70 | 83 | 61 |
| Discipline | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Food Services | 2 | 2 | 2 | 0 | 0 | 4 | 2 |
| Grievance Process | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Housing/Classification | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Law Library Access | 9 | 3 | 0 | 0 | 0 | 0 | 2 |
| Mail | 7 | 3 | 0 | 0 | 5 | 0 | 3 |
| MAT/Suboxone | 6 | 5 | 3 | 3 | 9 | 8 | 6 |
| Medical Access | 32 | 19 | 8 | 15 | 19 | 14 | 18 |
| Medication | 10 | 9 | 3 | 2 | 4 | 1 | 5 |
| Misc. | 0 | 0 | 0 | 1 | 5 | 4 | 2 |
| Out-of-Cell | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Religious Access | 0 | 1 | 1 | 2 | 0 | 0 | 1 |
| Sanitation/Clothing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Social Services | 2 | 3 | 0 | 2 | 4 | 5 | 3 |
| Staff Complaint | 30 | 21 | 3 | 2 | 3 | 2 | 10 |
| Street Eats | 6 | 14 | 7 | 16 | 31 | 47 | 20 |
| Visiting | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| **Total** | **170** | **115** | **80** | **107** | **150** | **168** | **132** |

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Partial Compliance**

PDP continues to authorize 15 minutes of free phone calls daily, however, limited out-of-cell time impedes consistent phone access. PDP reports it has already negotiated with the tablet vendor to ensure 15 minutes of free calls for each Class Member. PDP reports it has also negotiated reduced rates for charged calls, as well as 60 minutes of free video visiting each week.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating: Non-compliance**

As reported above under Substantive Provision 4—Return to Normal Operations, PDP does not yet have a plan for the return to normal operations and, therefore, remains in non-compliance with this sub-provision.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

### Compliance Rating:  Partial Compliance

The Monitoring Team has recommended against the expansion of PDP's current call-button system at PICC and instead recommends significant improvements to PDP's security check protocols.[72]  In the third reporting period, PDP attempted to use CCTV to assess the quality and timeliness of security checks at PICC, but outdated technology, excessive download times, and limited staffing reportedly prevented a thorough review.[73]  In July 2022, the Monitoring Team recommended that PDP install a unified CCTV system that would give supervisors, managers, and executives direct terminal access to real-time and historical CCTV footage.[74]  In December 2023, the City reported it was exploring procurement options and developing a project plan consistent with this recommendation.  PDP has estimated the cost of an integrated camera system at $10 million, which is included in PDP's budget request for the next fiscal year.

An RFID system should allow PDP to monitor the timeliness of security checks, and tablet expansion will create additional avenues for Class Members to request assistance or contact support networks in the community.  PDP is also progressing in its implementation of both initiatives.  PDP reports it continues to move forward with its Body Worn Camera (BWC) pilot and plans to initiate the pilot in segregation housing units and intake areas beginning in late 2025 or early 2026.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022.*

### Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)

*Sub-provision 12.2--PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

---

[72] *Id.* at 69; Monitor's Second Report, *supra* note 30, at 48.
[73] Monitor's Third Report, *supra* note 44, at 52.
[74] Monitor's Fourth Report, *supra* note 12, at 56.

**Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

**Compliance Rating:  Partial Compliance**

PDP's current grievance system does not provide for the reliable tracking of all complaints pursuant to this substantive provision.  In this reporting period, PDP provided a summary log of 24 call-button work orders completed at CFCF and RCF from July through December 2024, an increase from the 15 work orders logged in the previous reporting period.  In the previous reporting period, PDP had installed tamper-proof safety plates on call buttons at CFCF.  In this reporting period, PDP learned the new plates were manipulated, which partially explains the increase.  PDP reports that US facilities has recently added call-button checks to a preventative maintenance checklist.  Of the 24 call-button work orders submitted in this reporting period, six involved damaged call buttons in multipurpose rooms.  In this reporting period, PDP has been able to deactivate all multipurpose rooms, as recommended, following successful population reduction initiatives.

Three of the 24 work orders were documented as completed within one working day, which is a slight improvement since the previous reporting period.  In this reporting period, call button repairs were completed within an average of 19 calendar days, exceeding the 9-day average repair timeframe in the previous reporting period.  PDP reports it will focus on the timeliness of call-button repairs in the next reporting period.  PDP documented one grievance regarding the failure to respond to a call button and zero grievances regarding broken call buttons.  Previously reported concerns about access to paper grievances and tablets, grievance tracking, collection of paper grievances, and responsiveness to paper and tablet grievances persisted in this reporting period.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 13—Visiting**

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

> **Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

> **Compliance Rating:  Partial Compliance**

In this reporting period, PDP reports it has focused on several pending improvements to its in-person visiting scheduling system, many of which included input from Class Members, visitors and visiting personnel.  The following includes updates to several recommended improvements:

- PDP's website should include all visiting policies and procedures.
  *This information remains available on PDP's website.*
- When the visiting website is down for "scheduled maintenance," visitors are unable to schedule visits, and the durations of scheduled maintenance are not clearly communicated to users.
  *PDP's scheduling vendor will reportedly provide performance data on scheduled and emergency maintenance, including timeframes, which PDP reports it will share in the next reporting period.*
- Visitors report that the visiting website's technical support phone line has excessive wait times.
  *PDP reports that the vendor will provide performance metrics on response timeframes for requests for technical support.*
- Visitors report that they are not notified when scheduled visits are cancelled.  This is frequently true when a Class Member is in punitive segregation at the time of scheduling or is placed in punitive segregation after a visit is scheduled.
  *PDP reports that ATIMS has been programmed, and the new tablet system is being designed to notify visitors via email when Class Members are unable to attend a visit.*
- Class Members and staff request that Class Members receive the ability to approve or deny visits.  Currently, Class Members are unable to manage visits and do not know who is visiting until the day of a scheduled visit.  Class Members report that they may want to refuse some visits or prioritize some visitors over others.  Staff report that it would be more efficient for them, and helpful in avoiding potential conflict in the visiting area, if Class Members were able to accept or deny scheduled visits.

*PDP reports the new visiting system will require Class Members to provide PDP with lists of approved visitors who will then be granted access to the scheduling system.*

- Class Members request more support from PDP in visiting with their children. For example, they have requested that PDP personnel liaise with caregivers and facilitate visits.

  *RTS is responsible for special event visiting and visits involving children. As discussed above under Substantive Provision 4—Return to Normal Operations, RTS performance and workload are undergoing a comprehensive evaluation. PDP reports it cannot commit to expansion of RTS duties until the evaluation is complete.*

- Visitors and Class Members request that PDP allow visitors to resume taking photographs during visits.

  *PDP reports it remains unprepared to implement this request.*

- Class Members request additional access to tablet visits generally, and specifically on weekends. They also report that existing tablets are often unavailable and request greater consistency with current tablet visiting. Finally, visitors and Class Members request expanded visiting hours to include evenings for visitors who work and children who attend school during the day.

  *PDP reports that new tablets will allow for expanded tablet visiting hours and has, as reported above, negotiated with the vendor for 60 minutes of free video visiting each week.*

The Monitoring Team made additional recommendations in previous reporting periods that PDP has agreed to include in its visiting improvement plan.[75] These include:

- Analyzing filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above).

  *PDP reports it is not yet prepared to expand visiting hours. It has, however, requested that its vendor explore the possibility of creating a waitlist to identify high-request times, which will inform future scheduling adjustments.*

- Ensuring that family visiting spaces in all facilities are regularly sanitized.

  *In general, visiting areas continue to appear clean during announced and unannounced site visits. Some visiting areas continue to require updates to paint, tiles, etc. Visiting areas should be assessed in the pending facilities maintenance evaluation.*

- Ensuring family visiting areas are stocked with age- and culturally-appropriate activities for youth.

  *PDP reports it has not placed additional focus on this recommendation in this reporting period.*

---

[75] Monitor's Second Report, *supra* note 30, at 51-52; Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 29-30 (E.D. Pa. Nov. 4, 2022).

PDP reports it is confident several changes that were recommended by visitors and Class Members will be implemented in the next reporting period. Once vendor negotiations are finalized, PDP will provide a complete list of improvements, but at least, Class Members should expect to have more control over visits and improved access to video visiting.

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

**Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 14—Attorney Visiting**

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

**Compliance Rating: Partial Compliance**

The Monitoring Team continues to rely on reports from PDP, Class Members, the Defender, members of the private bar, and *Remick* class counsel to assess progress and identify areas for improvement with attorney visiting.

In this reporting period, issues regarding attorney visits have remained relatively stable. The Monitoring Team still periodically receives attorney visiting complaints, most of which involve high-traffic morning hours at CFCF. It appears PDP has largely corrected its most problematic attorney visiting issues. PDP reports that policy revisions and related staff training will occur once staffing levels stabilize. The Monitoring Team will then measure compliance with PDP's revised policies.[76]

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

**Compliance Rating: Partial Compliance**

PDP reports ongoing challenges in meeting the 15-minute requirement for remote legal visits. This is consistent with delays tracked by the Monitoring Team. From July 2024 through December 2024, 66 of 93 or 71 percent of the Deputy Monitor's scheduled tablet visits were attended by Class Members. This reflects a 4 percent increase from the previous reporting period. Twenty-seven visits were no-shows and another 14 were delayed beyond the 15-minute compliance window. Delays in this reporting period ranged from three minutes to three-hours, most of which were attributed to reported count delays, understaffing, and technical issues.

---

[76] As previously reported, PDP does not log individual official visits. Monitor's Fourth Report, *supra* note 12, at 59.

As previously reported, in April 2024, PDP began offering both 25-minute and 55-minute slots, creating additional flexibility for counsel when scheduling remote visits.[77]  Additional time slots remained available in this reporting period.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

**Compliance Rating:  Non-compliance**

PDP's current policy does not require notification to attorneys when visits are delayed or canceled, and PDP has not issued an interim directive regarding this requirement.  As previously reported, personnel have been instructed to notify attorneys of delays, cancelations, or refusals; however, policies and post orders must be revised, and personnel must be trained.[78]  Official visitors continue to report they are not notified of cancelations or delays and that they must contact PDP for information.  As noted above, PDP reports it will revise its policies in a future reporting period.

**Substantive Provision 15—COVID-19 Testing**

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court.  Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19.  They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court.  They will be transported to court if both tests are negative.  Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame.  These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but*

---

[77] Monitor's Fifth Report, *supra* note 15, at 74.
[78] *Id.* at 75.

*who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:  Partial Compliance**

PDP reports it expanded the US Facilities Inc. (US Facilities) contract to include a one-time deep cleaning at CFCF, RCF, and PICC in the next reporting period.  PDP also continues to perform monthly housing unit inspections, and out-of-cell trackers routinely note general inspection cleaning on Saturday mornings throughout the system.  Despite enhanced internal monitoring and reported efforts to improve, failures to ensure the provision of adequate cleaning supplies persisted in this reporting period, and severe maintenance issues continue to exacerbate unsanitary conditions.  PDP's internal inspection reports detail many of the same issues each reporting period, most of which are consistent with those reported to and observed by the Monitoring Team during site visits.

It is unclear based on internal sanitation inspections whether cleaning supplies are maintained and accessible on housing units.  Sanitation inspections frequently note the presence of "adequate" cleaning supplies on PDP housing units while also noting that unit inventories are not being completed.[79]  Class Members have complained that housing unit cleaning supplies are out of stock while personnel often report supplies are available.  PDP has consistently asserted adequate cleaning supplies are available.  If, however, PDP does not monitor unit inventories of cleaning supplies, it can neither measure whether supplies are available nor whether any available supplies are adequate for general inspection cleanings.

At CFCF in this reporting period, PDP inspectors again noted issues with graffiti, though unit renovations and painting are partially addressing them.  Inspections noted unsanitary showers in nearly all housing units.  Inspectors noted a slight improvement in Class Members' reporting of weekly clothing exchange.  Only three units (A1, B1 and B2) received complaints from more than 20 percent of Class Members interviewed that they had not received two sets of clean outer wear.  The provision of clean bed linens remains a problem with six of the eight housing units receiving complaints from more than 20 percent of the population that clean linens are not provided weekly.  Class Members in Housing Units A1, B1, and B2 reported difficulty getting their personal clothing laundered, and Class Members in restricted housing overwhelmingly

---

[79] Examples: RCF Units A, C, E, F, G, H September through November 2024 audits; PICC Units A, B, C, F, G, H September through November 2024 audits; CFCF A Building 1st and 2nd Floor, B Building 2nd Floor, D Building 2nd Floor September through November 2024 audits.

complained of a lack of cleaning supplies for weekly cleaning.  Vector control issues were noted in the C2, Pod 4[80] and D2, Pod 4.[81]

At MOD 3, internal audits continued to show consistent access to cleaning supplies and that youth launder their own clothing.  However, the building requires paint, tile repair, replacement of rusted screening, shower renovation, furniture replacement, and other updates.  The physical plant is aged, dingy, dark, and has not been adequately maintained.  The physical plant and environmental conditions are not appropriate for confined youth and the Monitoring Team continues to recommend that PDP retain an expert in the confinement of youth to assess conditions and recommend improvements.  PDP's acceptance or rejection of this recommendation does not impact compliance with this substantive provision, but progress will be evaluated as part of Substantive Provision 4—Return to Normal Operations.

PDP reports that internal inspections were not completed at DC in this reporting period but will resume in the next reporting period.  Findings in Monitor's Fifth Report include:

> . . .[PDP's internal] auditor notes noncompliance with vector control, deteriorating and nonoperational showers, missing windows covered with plastic, chipping paint, graffiti, and inoperable phones, drinking fountains, and televisions.  The population generally reported access to cleaning supplies, soap, and toilet paper.  Inconsistent clothing and bed linen exchange were documented as an ongoing issue.[82]

During November 2024 and February 2025 site visits, conditions observed by the Monitoring Team mirrored internal inspections from the previous reporting period.  Profound unresolved maintenance issues were clearly observable in housing areas and Class Members continued to complain about basic maintenance issues, such as broken, inoperable shower fixtures, clogged drains, rust, and vermin infestations.  As with the previous reporting period, Class Members at DC generally reported consistent access to cleaning supplies, clean clothing, and bed linens.  Facility managers were present during site visits and Class Members approached them with a degree of familiarity that suggests they maintain a presence inside facilities.  They attempted to address complaints and described efforts that are underway to correct some issues.  Unfortunately, some of DC's dilapidated physical plant conditions continue to overshadow good intentions of its leadership and staff.

At PHSW, PDP has applied fresh paint and placed new furnishings, artwork, and plants in some units.  As with the rest of DC, PHSW requires updates to flooring, showers, bathrooms, and beds, particularly where access for those with mobility impairments is limited or furnishing and fixtures in cells contain anchor points for potential suicide attempts.  During the February 2025 site visit, PDP reported a new high of 14 hospital cells that were inoperable and could not house patients.  As of this filing, PDP reports that 11 of 14 cells have been repaired.  The Monitoring Team will verify this information in the next reporting period.

---

[80] PDP Audit CFCF - September 17, 2024, October 18, 2024, and November 16, 2024.
[81] PDP Audit CFCF - July 23, 2024 and October 24, 2024.
[82] Monitor's Fifth Report, *supra* note 15, at 76-77.

At PICC, internal inspections in this reporting period continued to note soap scum buildup in showers, and approximately 20 to 30 percent of the population continued to complain about lack of access to clean outer wear and linens.  PICC's management team is aware of the issues and cites staffing challenges as the primary cause.  J Unit remained deactivated in this reporting period and repairs to the unit remain unaddressed.  Internal inspections continue to note maintenance issues including the broken recreation yard window and exposed electrical wires in a closet and shower in H Unit.

At RCF, internal inspections in this reporting period continue to identify shower soap scum, graffiti, and hanging linens that block visibility into cells.  Inspections note that at least 80 percent of Class Members generally report access to clean clothing, bed linens, and cleaning supplies.  It also appears that maintenance issues are being addressed based on inspections.  The September 25, 2024, inspection identified two broken clothing dryers in Housing Unit H.  The subsequent inspection the following month documented the dryers had been repaired.  Inspectors also identified two inoperable showers on the upper tier of the same housing unit, which were documented as under repair in a subsequent inspection.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

**Compliance Rating:  Partial Compliance**

Consistent with every reporting period since the Monitor's First Report, many Class Members continue to report that they do not receive two sets of outerwear at intake, that they cannot rely on the weekly laundry exchange in facilities, and that they lack clean clothing, bed linens, and underclothing.  Broken appliances, identified by PDP's new compliance unit, and other long-compounding maintenance problems remain unaddressed as of this filing.  Issues with laundry services are noted in nearly every internal inspection, are the subject of innumerable Class Member grievances over at least three years, and are confirmed for the Monitoring Team by unit personnel during every site visit.

Maintenance and renovations are resulting in incremental improvements to some of PDP's housing units, an enhanced vector control program at DC may have positive results, and new lighting, paint, plumbing fixtures, and furniture improve environments for Class Members.  PDP is also awaiting a comprehensive assessment of all capital project and maintenance needs, which will inform an implementation plan for repairs and renovations.  In the meantime, PDP has not dedicated sufficient focus to correcting easier, less expensive deficiencies that harm Class Members and pose safety risks to Class Members and personnel.  Class Members must have clean, mold-free showers, adequate cleaning supplies, and regularly laundered bed linens and clothing.  They must also be able to sleep, eat, and recreate in safe environments that are free of broken windows, exposed wires, and pests.

PDP's assertion since 2022 that staff vacancies have exacerbated sanitation and maintenance problems and presented barriers to fixing them is correct.  However, defensiveness, rigidity, or

denial that problems are as bad as Class Members and staff report, pose an absolute barrier to reform that a full complement of staff could not overcome. The Commissioner inherited a system in a long-standing, destructive crisis, and he is clearly committed to improving conditions. In his short tenure, he has made creative, commendable efforts that the Monitoring Team believes will soon be observable to Class Members. As with his other reform initiatives, deficiencies addressed in this substantive provision will require time and attention to correct. The Commissioner and his new enhanced executive team must therefore take immediate steps to correct PDP's stubborn failures to meet these most basic requirements consistent with PDP policy and this Court's orders.

**Status of Recommendations, Substantive Provision 17—Sanitation, from the Monitor's Third Report:**

1. PDP should modify schedules to increase the frequency of deep cleaning rounds.
   *PDP has not implemented this recommendation. As discussed above, the City contracted with US Facilities to deep clean some facilities. During site visits in this reporting period, floors in several areas had been cleaned and polished but deep cleaning of housing units had not begun.*

2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.
   *PDP maintains that it completed an extensive search and did not identify rodent-proof containers it deemed safe for a jail environment. In this reporting period, it instead issued all Class Members bags it deems rodent-resistant.*

3. PDP should expedite procurement of sufficient undergarments to meet the needs of all Class Members.
   *PDP has improved in its provision of undergarments to Class Members in female housing units but does not consistently issue clean undergarments to all Class Members. If PDP is committed to ensuring that all Class Members have undergarments, it should establish clear policies for inventory, staff training, follow-through, and monitoring.*

4. PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and issuance of hygiene supplies.
   *PDP continues to complete regular internal sanitation audits. Audits are conducted by sergeants who are not assigned to subject facilities and findings are shared with institutional staff and the Monitoring Team.*

5. PDP should revise its post orders to reflect operational nuances at each facility. Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities.
   *PDP reports it has tasked its new compliance team, Alta Management, with assistance in updating post orders.*

6. PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and

linen exchange, and the issuance of cleaning and hygiene supplies.  Plans should include effective monitoring via audits or other modes of verification.

> *PDP continues to complete monthly internal audits.  The November 2024 internal audits continued to identify areas that were unsanitary and encountered many Class Members who reported a lack of access to sanitation supplies, clean clothing/linen, and the presence of rodents and insects.  Housing unit officers and facility supervisors acknowledged lacking adequate cleaning supplies, days of missed linen exchange, and that some Class Members did not have two sets of outer wear.*

**Additional recommendations for immediate action:**

7. The City should authorize the emergency procurement of outside contractors to deep clean housing units on a regular schedule, similar to its approach in medical and mental health housing units, which has shown improvement as a result.  The contract should include entire housing units, showers, and all biohazardous cells prior to re-occupancy.

> *PDP is partially implementing this recommendation.  PDP reports it intends to have US Facilities complete a one-time deep cleaning of CFCF, RCF, and PICC but intends to have Class Member work crews maintain facilities thereafter.  Deep cleanings of DC and MOD 3, two of the facilities in most dire need, would depend on City maintenance to complete and have not been scheduled.*

8. The City should authorize PDP to immediately implement an effective vector control program at DC/PHSW and MOD 3.

> *PDP has not expanded the US Facilities contract to include vector control at DC/PHSW and MOD 3, but reports it hired a new vector control contractor, as noted above.  The effectiveness of the new vector control program will be assessed in the next reporting period, and the Monitoring Team will continue to evaluate whether the City's vector control contract is providing the same level of service as US Facilities' highly effective vector control program at PDP's other facilities.*

9. PDP should prioritize capital projects that pose health and safety risks in populated housing units.

> *Over five reporting periods, Defendants have not prepared a comprehensive, prioritized capital projects plan, as recommended.  PDP's aging facilities require significant and costly renovation and repair.  Some capital projects have been underway since monitoring began, such as air conditioning installation at some DC housing units and lock replacements in PDP facilities.  However, the City failed to dedicate sufficient resources to develop a systemwide plan for renovations and repairs with completion timeframes for each project.*

> Paragraph 4(b) of the Sanctions Order states:[83]
>
> > The City shall complete an analysis of the state of the physical plant and long-term capital needs at each PDP facility housing Class Members, identifying deficits that impact the conditions of confinement. This analysis should also provide the Commissioner of Prisons with detailed recommendations for a target number of staff employees needed to maintain each facility. The City shall complete the analysis and report its findings to the Monitor within 270 days of the date of this Order.
>
> The analysis is due for submission by May 13, 2025. In February 2025, PDP reported that it is in the process of retaining a vendor to complete an analysis of the state of the physical plant and long-term capital needs for each PDP facility housing Class Members.

*The strategy to engage in an external review of physical plant requirements, including the required number of maintenance personnel to serve PDP, should assist in prioritizing efforts/projects. Nevertheless, issuing clean clothing and linen, as well as keeping facilities clean, operational, and free of pests should be a daily priority.*

10. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

*In April 2023, PDP expanded its maintenance contract to include all maintenance services at PICC, including emergency repairs. US Facilities has since been responsible for all maintenance and vector control at CFCF, RCF, and PICC. City maintenance employees retained responsibility for maintenance and vector control at DC/PHSW and MOD 3. Even with population decreases and reduced responsibilities, City maintenance has been unable to meet physical plant needs at DC/PHSW and MOD 3.*

---

[83] Order, *supra* note 5, at 6.

Paragraph 4(a) of the Sanctions Order states:[84]

> The City shall authorize PDP to expand services contractually provided by U.S. Facilities, Inc., and fund such expanded scope of services until necessary maintenance is performed at all PDP facilities. To the extent any maintenance needs are not included in the scope of work of the RFP that resulted in the contract, the City shall initiate bargaining on the subject or issue a request for proposals in accordance with the applicable collective bargaining agreements.

Defendants have not complied with the requirements of this paragraph. In January 2025, Defendants reported the US Facilities contract had been expanded to include services at DC/PHSW. During the February site visit, however, PDP reported US Facilities would not be assuming maintenance responsibilities at DC/PHSW and that, instead, City maintenance personnel would retain responsibility for DC/PHSW, MOD 3, and PDP's ancillary buildings. Therefore, the US Facilities contract was only expanded to include a one-time deep cleaning of three facilities since the Sanctions Order was issued. In January, DC prepared an extensive list of necessary repairs, but PDP reportedly had not identified start dates, project plans, or completion timeframes for the repairs, nor had work orders been noted for many of the listed repairs. Based on the dilapidated state of the facilities, the City's team, reportedly totaling 16 in February 2025, is likely insufficient to perform necessary maintenance as required. During both the November and February site visits, populated housing areas at DC/PHSW remained in gross disrepair and facilities maintained by the City's team continued to report delays.

In March 2025, PDP reported that the new Deputy Commissioner of Operations and Emergency Services would assume responsibility for oversight of the work performed by City maintenance at DC/PHSW and MOD 3. PDP also reported that a project plan is being developed and will be closely monitored.

## Substantive Provision 18—Use-of-Force

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

---

[84] *Id.* at 5.

**Compliance Rating:  Partial Compliance**

In this reporting period, the Use of Force Review Team (UFRT) continued to review all available CCTV footage of use of force incidents shortly after they occurred to flag serious policy violations.  This is the primary function of the UFRT, which is proving effective in identifying, and appears to be reducing, incidents of unnecessary or excessive force.  With the goal of improving PDP's internal force reviews, SME McDonald also selected an additional 14 completed use-of-force packages from April through September 2024 for the UFRT's review.  As with previous reporting periods, she then evaluated the quality of the use-of-force investigations and reporting and provided feedback to PDP in a technical support role.

SME McDonald met with PDP lieutenants and captains to discuss the quality of the facility-level reviews and areas for improvement.  She notes that additional skills development for PDP supervisors and managers is necessary to ensure they understand general use-of-force principles and methods and are able to conduct meaningful use-of-force reviews.  The Monitoring Team has recommended that PDP continue to train supervisors and managers in force oversight concepts, and to train staff in de-escalation, use-of-force tactics, and report preparation.

Of the 14 force packages selected for review in this reporting period, 5 were from each of CFCF and PICC, and 4 were from RCF.  Two of the CFCF cases could not be reviewed because CCTV was not provided and/or documentation was insufficient to evaluate them.  Facilities were notified in advance which packets would be reviewed and were encouraged to give these incidents particular focus at the facility level of review.  SME McDonald notes that by January 31, 2025, two of the packets had not been reviewed by the facility or the UFRT.

The 12 incidents reviewed in this reporting period involved group disturbances and pre-planned uses of force, which PDP and SME McDonald have discussed at length over four reporting periods.  Institutional level reviews improved, noting training issues and areas for improvement in 11 cases, and the UFRT reviews noted areas for improvement in all twelve cases.  SME McDonald indicates that most incidents involving groups are dynamic, complex, and have at least some training issues to address.  For one incident at CFCF, no issues were identified at the facility-level review despite the UFRT and SME McDonald noting areas for concern.  CFCF is the most operationally complex facility and struggles the most with timely and thorough evaluations.

SME McDonald notes one use-of-force incident in the twelve cases reviewed that appeared unnecessary or excessive.  In that incident, one officer used an inappropriate neck restraint on someone who was physically resistive, and a second officer struck the same Class Member from behind while numerous staff had control of his upper body.  The neck restraint was an unsafe practice that should have been discussed with the officer involved and the use of the head strike should have triggered an internal investigation.  The Warden and the UFRT each identified poor force tactics and ordered staff training in restraint techniques, but neither identified the inappropriate neck restraint and unnecessary strike.

PDP has demonstrated some improvement in this reporting period in its analysis of pre-planned force incidents, likely due to additional training supervisors received in the previous reporting

period.  Of the six pre-planned incidents (all cell extractions), the Wardens and UFRT noted all six incidents involved deviations from policy, including failures to record, failures to seek clinical support for de-escalation pre-force, failures to seek medical input prior to deployment of Oleo Capsicum Resin (OC spray), and/or failures to have medical personnel on standby during extractions.  These improvements in PDP's force analysis are all positive.  It remains troubling, however, that supervisors continue to violate PDP policy when overseeing pre-planned use-of-force incidents.

Four of the incidents reviewed in this reporting period involved group disturbances.  They were selected specifically to assess any progress PDP has made in the isolation and containment of group disturbances.  In all four incidents, the majority of staff continued to respond and attempt to quell disturbances, but the need for additional training in response to these types of incidents is clear.  As incidents escalate, staff frequently lack a command presence, do not have adequate equipment, and do not employ coordinated tactical responses.  Often, responses contributed to on-going violence that could have been neutralized sooner if staff had proper training and equipment.  These issues are now being more routinely identified during the warden or UFRT reviews but will likely persist until PDP is able to update its use-of-force policy and staff can receive training.

PDP does not yet have sufficient internal capacity to reform the system and implement best practices related to de-escalation, force utilization, evidence collection, and force review.  Adequate video technology, emergency equipment, reporting and review mechanisms, and training protocols remain critical to reform.  Improvements to PDP's practices and the reduction in violence and use of force requires sufficient staff to monitor housing units, the consistent provision of educational and therapeutic programming, adequate out-of-cell time and opportunities for large muscle exercise, effective interdiction of contraband, and personnel who are properly trained in emergency and incident response.  Efforts are being made and incremental success is occurring, but the staffing vacancies continue to hinder more meaningful progress.  PDP has been reviewing other system's force protocols and is in the process of identifying an expert for assistance with policy revisions, both of which will support reform.  Ultimately, PDP will need to assign a project lead, and perhaps a team, to develop and implement a comprehensive use-of-force reform strategy.

**Additional requirements pursuant to the Sanctions Order:**

1. Paragraph 5(a) of the Sanctions Order requires PDP to confer with the Philadelphia Police Department [PPD] to implement a system to remotely report criminal offenses that occur at PDP facilities, including video capability that would allow police personnel to interview complainants and witnesses remotely.  PDP was required to report the outcome of these discussions by October 15, 2024.

   Defendants have complied with the requirements of this paragraph.  In October 2024, Defendants reported that PDP and the PPD had conferred and verified the feasibility of a video reporting system.  In December 2024, Defendants reported that PDP and PPD had procured the necessary equipment, and in February 2025, that PDP, the DA, and the PPD collaborated on a workflow plan.  A pilot for remote filing will begin in the next reporting period, allowing PDP staff to file criminal complaints on-site from PDP.

2. Paragraph 5(b) of the Sanctions Order states: "[t]he City shall fund PDP's K9 detection program.  Funding for the program shall be at a level sufficient to conduct routine and consistent sweeps for contraband at each institution and to ensure adequate facilities to house K9s and all necessary equipment."[85]

   Defendants have partially complied with the requirements of this paragraph.  In December, PDP finalized its K-9 search tracking system, which will assist in identifying where sweeps are occurring.  PDP reported in October that it added eight kennels in addition to the six already in use.  In February 2025, PDP reported it had spent $40,000 for the expansion of the kennels.  As a result, PDP reports that it has increased the number of K-9s working in the facility to thirteen.

3. Paragraph 5(c) of the Sanctions Order states: "[t]he City shall complete the purchase of technology that allows for prompt and efficient scanning, without violating any attorney-client privilege, of incoming legal mail for contraband."[86]  The technology must be purchased by October 15, 2024.

   Defendants have partially complied with the requirements of this paragraph.  In November 2024, PDP reported it had begun utilizing mail scanning equipment for incoming legal mail.  In February 2025, Defendants reported that PDP is working to update its policies to provide notification to both the putative sender and intended recipient when legal mail is found to contain contraband, as required.  To achieve compliance with this requirement, PDP must revise its policies to require notification to Class Members when mail is intercepted.

---

[85] Order, *supra* note 5, at 6.

[86] *Ibid.*