# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated, | : | No.: 2:20-cv-01959-GAM |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; and MICHAEL RESNICK, in his official capacity as Commissioner of Prisons, | : | |
| | : | |
| **Defendants.** | : | |

## MONITOR'S SEVENTH REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Seventh Report evaluating Defendants' compliance with the terms of the Agreement through June 30, 2025. The Monitor prepared this report as the seventh of regular reports to be filed of record through the second settlement term ending April 30, 2026. A subsequent final report will be filed March 30, 2026. I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: September 30, 2025                    Respectfully submitted,


                                             By: /s/ Cathleen Beltz
                                             Monitor

The Agreement between Plaintiffs Thomas Remick, et al., on behalf of themselves and all others similarly situated (Plaintiffs), and the City of Philadelphia (City) and Michael Resnick, in his official capacity as Commissioner of Prisons (Commissioner), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-GAM (Action), requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions.  The two-year Agreement was scheduled to terminate on April 12, 2024.  In the initial settlement term, Defendants met the requirements for substantial compliance with Substantive Provision 15—COVID-19 Testing and Substantive Provision 16—Quarantine.  Defendants also substantially complied with sub-provisions 12.3 and 12.5 (Substantive Provision 12—Locks) and 13.1 and 13.3 (Substantive Provision 13—Visiting).  On January 4, 2024, the parties stipulated to a two-year extension with a new Agreement termination date of April 30, 2026.[1]  Defendants' progress in implementing the Agreement is discussed below.

Pursuant to Substantive Provision 4—Resume Normal Operations, PDP and the Monitor were required to submit a plan for PDP to return to "normal operations" once COVID-19 restrictions were lifted.  The plan was due for submission to this Court by November 1, 2022.  PDP has been unable to finalize a plan primarily due to high vacancies among correctional officer positions coupled with an increasing Class Member population, which limited PDP's ability to predict when it might return to normal operations, significantly improve conditions, and achieve substantial compliance with the Agreement.  Also pursuant to Substantive Provision 4, the Monitor convened regular meetings of the parties to strategize solutions to areas of persistent non-compliance.[2]  Meetings involved transparent, good faith collaboration and produced solutions to some of PDP's operational issues.  By February 2024, it became clear the City was unwilling to expend necessary resources to address the staffing crisis.

On April 8, 2024, Plaintiffs filed a motion for civil contempt seeking the imposition of sanctions to address Defendants' persistent failure to comply with the Agreement and improve conditions of confinement for Class Members.[3]  On July 12, 2024, this Court held Defendants in civil contempt[4] and, on August 16, 2024, ordered the City and PDP to take immediate action on multiple requirements designed to address the following areas of non- or partial compliance: (1) Recruitment, Staffing, and Hiring; (2) Healthcare Access for Class Members; (3) Programming and Services for Class Members; (4) Facility Maintenance; (5) Facility Security;

---

[1] On January 4, 2024, upon the agreement of the Parties, the *Remick* Court issued an order extending the Agreement through April 30, 2026.  Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 197 (E.D. Pa. Jan. 4, 2024).
[2] Meetings of the parties were held June 23, 2023, October 16, 2023, November 6, 2023, December 15, 2023, February 5, 2024, December 16, 2024, and April 21, 2025.
[3] Plaintiffs' Motion for Civil Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 205 (E.D. Pa. Apr. 8, 2024).  Defendants filed their response to Plaintiffs' motion for civil contempt on May 6, 2024.  *See* Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 208 (E.D. Pa. May 6, 2024).  Plaintiffs replied to Defendants' opposition motion on May 24, 204.  *See also* Plaintiffs' Reply Memorandum on Motion for Civil Contempt of Court, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 209 (E.D. Pa. May 24, 2024).  Additional motion practice was followed by oral argument, which was heard by this Court on June 27, 2024.  During oral argument, Defendants requested an evidentiary hearing.  On July 9, 2024, Defendants submitted an affidavit to this Court documenting their compliance efforts to date which included ten exhibits.  Defendants presented their evidence to this Court during an evidentiary hearing on July 11, 2024.
[4] Sanctions Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 220 (E.D. Pa. July 12, 2024).

and (6) Population Management.[5]  Several of the remedial measures ordered require additional analysis and subsequent direction from this Court to ensure proper implementation.  Discreet requirements of the Court's August 16, 2024 order (Sanctions Order) as well as Defendants' progress in meeting them is discussed throughout this report.

The Agreement provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement.  The Monitor addresses Defendants' implementation progress and issues "Substantial Compliance," "Partial Compliance," or "Non-compliance" findings for each substantive provision.  Where necessary, the Monitor makes specific recommendations to improve Defendants' compliance with the Agreement.  A "Substantial Compliance" finding means Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision.  A "Partial Compliance" finding means PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance.  A "Non-compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete the discrete tasks outlined in a substantive provision.  Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."[6]

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance is assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence.  Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members.  In issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's April 30, 2026, termination date.  In this reporting period, the Monitoring Team utilized data tracked through June 30, 2025, and additional information received from the parties through September 30, 2025.

The Agreement requires the Monitor to conduct site inspections "at least once every three months."  In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP.[7]  During site visits, the Monitoring Team conducts confidential interviews with personnel and Class Members.  The Monitoring Team also has access to all records, files, electronic files, videos, and other materials, including personnel

---

[5] *See* Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 222 (E.D. Pa. Aug. 16, 2024).  The remedial sanctions described in the Sanctions Order primarily seek to remedy non-compliance with Substantive Provision 1—Staffing, Substantive Provision 2—Out-of-Cell Time, Substantive Provision 3—Out-of-Cell/Segregation, Substantive Provision 4—Resume Normal Operations, Substantive Provision 5—Healthcare, Substantive Provision 6—Behavioral Health in Segregation, Substantive Provision 7—Law Library Access, Substantive Provision 10—Phone Calls, Substantive Provision 13—Visiting, Substantive Provision 14—Attorney Visiting, Substantive Provision 17—Sanitation, and Substantive Provision 18—Use-of-Force.

[6] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 5 (E.D. Pa. May 25, 2022).

[7] In this reporting period, the Monitoring Team completed two unannounced site visits on February 10 and 11, 2025 and June 16 and 17, 2025.

records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

The *Remick* Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[8] In this reporting period, Deputy Monitor Grosso (Deputy Monitor) has continued to conduct site visits at least once per month to speak with Class Members on PDP housing units. Following site visits, the Deputy Monitor schedules weekly confidential virtual meetings with Class Members if more privacy is required. Since weekly two-hour tablet meetings commenced December 6, 2022, the Deputy Monitor has interviewed 440 Class Members across PDP facilities. The Monitoring Team also utilizes information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

The Monitoring Team periodically receives complaints from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel. With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary. With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews. Conditions observed and information received via these interviews and protocols are consistent with *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

The Monitoring Team also receives information via published reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, criminal defense attorneys, and others independent of PDP. This information augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms. The Monitoring Team thanks these oversight partners for their continued contributions and commitment.

In this reporting period, members of the Monitoring Team completed six site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU and MOD 3), and Riverside (RCF).[9] During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement." The Monitor has determined that documentation provided by

---

[8] Monitoring Agreement and Protocol, *supra* note 6, at 4.
[9] Site visits were conducted January 24, 2025, February 10-11, 2025, April 4, 2025, April 21-23, 2025, May 30, 2025, and June 16-17, 2025.

Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel.

In this reporting period, the Monitoring Team continued to meet with PDP Commissioner, Michael Resnick (Commissioner or Commissioner Resnick), and his staff and received access to facilities, personnel, and Class Members. Commissioner Resnick's significant recruitment efforts and employee wellness initiatives are improving morale among PDP employees. Data from this reporting period continues to suggest corresponding positive trends in vacancy reduction and employee retention.

As anticipated, data from this reporting period shows dramatic progress in some of the most challenging areas of the Agreement. PDP has now achieved substantial compliance with sub-provisions 1.1 and 1.2, which require Defendants to implement measures designed to increase the hiring and retention of correctional officers. Pay raises, signing and retention bonuses, residency waivers, 12-hour shifts, and other changes have resulted in nearly 4,200 new applications for employment in this reporting period, or 79 percent more applications than PDP received in the first six months of 2024. PDP is holding more frequent academies and is scheduled to graduate 60 percent more cadets in 2025 than graduated in 2024. Cadet attrition is stabilizing, and average monthly pre-retirement resignations have reduced to half of those reported in 2019, pre-COVID-19.

PDP is also nearing substantial compliance with Substantive Provision 5—Healthcare. By the end of June 2025, PDP had reduced its average total appointment backlog, including off-site specialty appointments, on-site general medical and behavioral health appointments, and on-site specialty care appointments by 83 percent, from 1,587 total backlogged appointments in July 2022 to 271 total backlogged appointments in June 2025. PDP cites increased medical and security staffing, reductions in the patient population, and improved coordination between healthcare and security divisions as the primary reasons for the reductions.

PDP has continued to exceed data production requirements in the population reduction initiative, which has contributed to reducing PDP's average daily population (ADP) from 4,545 in the second half of 2024 to 3,625 in the first half of 2025. Population reduction initiatives led by the First Judicial District, PDP, the Defender Association of Philadelphia (Defender), District Attorney's Office (DA), and other justice partners have continued to reduce PDP's population through this reporting period by an average of 920 Class Members. On May 15, 2025, the population reduced to 3,480 Class Members, reportedly the lowest PDP's population has been in more than three decades.[10]

Considerable work remains for PDP to comply with the Agreement and improve conditions for Class Members, but progress measured in this reporting period required stamina and creative leadership. The PDP team should be commended for these hard-won reforms.

---

[10] John Mitchell, *Lowest Population Level in More than 33 Years*, City of Philadelphia (May 20, 2025), https://www.phila.gov/2025-05-20-incarcerated-population-drops-to-all-time-low-thanks-to-partners-in-the-justice-system/.

The Monitor continues to recommend that PDP prioritize implementation of provisions that are most likely to meet Class Members' needs and improve their daily experiences.  PDP has not yet complied with requirements for out-of-cell time, maintenance, sanitation, and use-of-force practices, among other critical requirements, and prolonged deficiencies in these areas are harmful to Class Members.  PDP has made incremental improvements despite short staffing, but progress toward compliance with some provisions, including some requirements imposed more recently by the Sanctions Order, has been too slow and lacked sufficient focus.  With reducing staff vacancies, historically low ADPs, and an expanded executive team now in place, PDP is expected to intensify focus on these provisions and make substantial progress in the next reporting period.

# Table of Provisions

*Compliance Findings* ............................................................................................ **8**

*Substantive Provision 1—Staffing* ...................................................................... **14**

    *Sub-provision 1.1* .......................................................................................... 14

    *Sub-provision 1.2* .......................................................................................... 20

    *Sub-provision 1.3* .......................................................................................... 21

    *Sub-provision 1.4* .......................................................................................... 23

*Substantive Provision 2—Out-of-Cell Time* ...................................................... **33**

    *Sub-provision 2.1* .......................................................................................... 33

    *Sub-provision 2.2* .......................................................................................... 40

*Substantive Provision 3—Out-of-Cell/Segregation* ......................................... **40**

    *Sub-provision 3.1* .......................................................................................... 40

    *Sub-provision 3.2* .......................................................................................... 43

*Substantive Provision 4—Resume Normal Operations* .................................... **50**

*Substantive Provision 5—Healthcare* ................................................................ **54**

*Substantive Provision 6—Behavioral Health in Segregation* .......................... **70**

*Substantive Provision 7—Law Library Access* ................................................. **79**

*Substantive Provision 8—Discipline* .................................................................. **80**

    *Sub-provision 8.1* .......................................................................................... 80

    *Sub-provision 8.2* .......................................................................................... 82

    *Sub-provision 8.3* .......................................................................................... 83

    *Sub-provision 8.4* .......................................................................................... 83

*Substantive Provision 9—Tablets* ...................................................................... **83**

    *Sub-provision 9.1* .......................................................................................... 83

    *Sub-provision 9.2* .......................................................................................... 84

*Substantive Provision 10—Phone Calls* ............................................................ **87**

    *Sub-provision 10.1* ........................................................................................ 87

    *Sub-provision 10.2* ........................................................................................ 88

*Substantive Provision 11—PICC Emergency Call Systems* ............................. **88**

*Substantive Provision 12—Locks* ....................................................................... **88**

    *Sub-provision 12.1* ........................................................................................ 88

    *Sub-provision 12.2* ........................................................................................ 89

    *Sub-provision 12.3* ........................................................................................ 89

*Sub-provision 12.4*......................................................................................................89

*Sub-provision 12.5*......................................................................................................89

**Substantive Provision 13—Visiting**.........................................................**89**

*Sub-provision 13.1*......................................................................................................89

*Sub-provision 13.2*......................................................................................................90

*Sub-provision 13.3*......................................................................................................92

**Substantive Provision 14—Attorney Visiting**...............................**92**

*Sub-provision 14.1*......................................................................................................92

*Sub-provision 14.2*......................................................................................................92

*Sub-provision 14.3*......................................................................................................93

**Substantive Provision 15—COVID-19 Testing** ................. **93**

**Substantive Provision 16—Quarantine**.......................................**93**

**Substantive Provision 17—Sanitation** ......................................**94**

*Sub-provision 17.1*......................................................................................................94

*Sub-provision 17.2*......................................................................................................95

**Substantive Provision 18—Use-of-Force**.....................................**101**

**Compliance Findings**

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with each provision. The Monitoring Team created sub-provisions for some of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision. This provides additional clarity for Defendants as they work to implement required changes and greater specificity for this Court and the Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 sub-provisions were created. In this reporting period, PDP has achieved substantial compliance with 13 sub-provisions, partial compliance with 22 sub-provisions, and remained in non-compliance with 2 sub-provisions. Sub-provisions 1.1 and 1.2 changed from partial compliance to substantial compliance in this reporting period. Sub-provisions 1.3, 2.2, and 10.2 changed from non-compliance to partial compliance in this reporting period. Sub-provisions 10.1 and 10.2 will be reintegrated into a single provision, Substantive Provision 10—Phone Calls in future reports. All other substantive provisions and sub-provisions remain the same.

The table below reflects all provisions and current compliance ratings for each:

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| **1** | | **Staffing** | **PC** |
| | 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | SC |
| | 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *retention* of correctional officers. . . | SC |
| | 1.3 | Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | PC |
| | 1.4 | These measures [1.1-1.3] will continue until achieved and thereafter to maintain the proper number of correctional officers. | PC |
| **2** | | **Out-of-Cell Time** | **PC** |
| | 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |

| Provision | | Requirements | Compliance Status |
|---|---|---|---|
| | 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022.  The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis.  *See also* para. 4, *infra*. | PC |
| **3** | | **Out-of-Cell/Segregation** | **PC** |
| | 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | PC |
| | 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| **4** | | **Resume Normal Operations** | **NC** |
| | | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services).  During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor.  The parties and the Monitor shall then engage in discussions to resolve the issues in dispute.  If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | |
| **5** | | **Healthcare** | **PC** |
| | | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons.  The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog.  The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible.  The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs.  Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort.  Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures.  Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | |
| **6** | | **Behavioral Health in Segregation** | **PC** |
| | | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | |
| **7** | | **Law Library Access** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| | PDP will continue to provide law library access for all incarcerated individuals.  The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | |
| **8** | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . . | SC |
| 8.3 | [PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . . | SC |
| 8.4 | [PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation.  Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline.  Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| **9** | **Tablets** | **PC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs.  The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF.  This expansion process will be completed by May 1, 2022. | PC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | PC |
| **10** | **Phone Calls** | **PC** |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | PC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | PC |
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to phones and/or tablets and determine whether any policies and practices are necessary to address this matter considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **PC** |
| 12.1 | PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022. | SC |
| 12.2 | PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022. | SC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | PC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **PC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | PC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated. | SC |
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | PC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | NC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021,* for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated.…Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | |

Progress and updates regarding Defendants' compliance with the Sanctions Order are discussed intermittently throughout the report below.  The table below reflects all Sanctions Order requirements and the current compliance status of each:

| Paragraph | Sanctions Order Requirements (short form) | Compliance Status |
|---|---|---|
| 1 | **Recruitment, Staffing, and Hiring** | **PC** |
| 1(a) | Identify and Hire Outside Recruitment Firm | SC |
| 1(b) | Maintain Continuous-Fill Hiring Lists | SC |
| 1(c) | Evaluate Potential Civilianization of Employees | SC |
| 1(d) | Identify and Contract with Medical Guarding Company | SC |
| 1(e) | Authorize Double-Time Increases to Staff Vacant Shifts | SC |
| 1(f) | Appoint Wellness Coordinator and Fund Employee Wellness Program | SC |
| 1(g) | Comparative Wage and non-Wage Benefits Analysis | PC |
| 1(h) | Expand Rehiring Eligibility within Civil Service Regulation | SC |
| 1(i) | Expand Residency Requirement | SC |
| 2 | **Healthcare** | **PC** |
| 2(a) | Increase YesCare Budget | PC |
| 2(b) | Fund and Operate Access to Care Team | SC |
| 2(c) | Expand Telehealth Services | PC |
| 3 | **Programming and Services for Class Members** | **PC** |
| 3(a) | Identify and Engage Restorative and Transitional Services Consultant | PC |
| 3(b) | Install Law Library Terminals | PC |
| 4 | **Facility Maintenance** | **PC** |
| 4(a) | Expand Maintenance Contract | NC |
| 4(b) | Analysis of Physical Plant State and Assess Long-term Capital Needs | PC |
| 5 | **Facility Security** | **PC** |
| 5(a) | Implement Virtual Offense Reporting System | SC |
| 5(b) | Fund K-9 Protection Program | PC |
| 5(c) | Purchase Scanning Technology | PC |
| 6 | **Population Management** | **SC** |
| 6(a) | Explore Relocation of Class Members to Other Facilities | SC |
| 6(b) | Produce Monthly Prison Population Reports | SC |
| 7 | **Remedy** | **SC** |
| 7(a) | Pay Court Registry Sum and Fiscal Budget Decrease Prohibition | SC |
| 8 | **Compliance with this Order and the Settlement Agreement** | **PC** |
| 8(a) | Notice to Applicable Union for Civilianizing Employees | SC |
| 8(b) | Hire Compliance Coordinator and Submit Written Status Report | PC |

**Substantive Provision 1—Staffing**

*Sub-provision 1.1--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

**Compliance Rating:  Substantial Compliance**

Pursuant to multiple arbitration awards over seven reporting periods, the City has implemented pay raises, signing and retention bonuses, and other measures that have enhanced the hiring of correctional officers as required by this sub-provision.[11]  Pursuant to the Sanctions Order, the City hired a recruitment firm, maintains a continuous-fill hiring list, extended the rehiring eligibility timeframe, and further expanded the residency waiver to include out-of-state applicants.  Since July 2024, these combined initiatives have resulted in the total hiring of 292 additional correctional officers over the past year.  Defendants' efforts have resulted in nearly 4,200 application submissions in the first six months of 2025, which is 79 percent more applications than were received in the first six months of 2024.  From December 2024 to June 2025, PDP reduced correctional officer vacancies by 157 positions, representing a nine percent decrease.  Total staff vacancies reduced from 806 in June 2024 to 559 in June 2025, marking a net increase of 247 officers over the past year.  Overall staff vacancies also reduced by 8 percent or 178 positions between December 2024 and June 2025.

PDP has therefore achieved substantial compliance with this sub-provision.  Monitoring of this sub-provision will continue until PDP has achieved substantial compliance with Substantive Provision 1—Staffing, including all sub-provisions, 1 through 4.  Should the current application and hiring rates reduce such that PDP is unable to hire sufficient personnel to meet Agreement requirements, or meeting Agreement requirements pursuant to sub-provision 1.4 below would be unreasonably delayed, the finding will revert to partial compliance and the Monitoring Team will make additional recommendations to support substantial compliance.

---

[11] The August 12, 2022, Arbitration Award authorizes a range of compensation increases.  *See* In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, Aug. 12, 2022) Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2 (decision date, Dec. 8, 2022) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 4-5 (decision date, Jan. 20, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Jan. 27, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Mar. 31, 2023) Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia; In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia (decision date, June 12, 2024), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

The following table reflects changes in security, maintenance, human resources, and total staff vacancies since the previous reporting period:

**Table 1: Philadelphia Department of Prisons Vacancy Report**
December 2024 and June 2025

| | Position Classification | Budgeted | December 2024 | | June 2025 | | Vacancies (+/- change) | Vacancy Rate (+/- change) |
|---|---|---|---|---|---|---|---|---|
| | | | Filled | Vacant | Filled | Vacant | | |
| Sworn Staff | Officers | 1712 | 999 | 716 | 1153 | 559 | -157 | 33% (-9%) |
| | Sergeants | 118 | 72 | 46 | 78 | 40 | -6 | 34% (-5%) |
| | Lieutenants | 64 | 49 | 15 | 47 | 17 | +2 | 27% (+4%) |
| | Captains | 29 | 24 | 2 | 32 | -3 | -5 | 0% (-7%) |
| | **Custody Total** | **1923** | **1144** | **779** | **1310** | **613** | **-166** | **32% (-9%)** |
| Maintenance Staff | Trades Worker I | 7 | 6 | 1 | 7 | 0 | -1 | 0% (-14%) |
| | Trades Worker II | 18 | 8 | 10 | 9 | 9 | -1 | 50% (-6%) |
| | HVAC Mechanic | 3 | 2 | 1 | 2 | 1 | 0 | 0% (-33%) |
| | Building Engineer | 1 | 0 | 1 | 1 | 0 | -1 | 0% (-100%) |
| | Maintenance Group Leader | 1 | 0 | 1 | 1 | 0 | -1 | 0% (-100%) |
| | **Total Maintenance** | **30** | **16** | **14** | **20** | **10** | **-4** | **33% (-14%)** |
| Human Resources (HR) Staff | HR Professional | 2 | 0 | 2 | 2 | 0 | -2 | 0% (-100%) |
| | HR Program Admin | 2 | 3 | 0 | 3 | -1 | -1 | 0% (0%) |
| | HR Manager 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0% (0%) |
| | **HR Total** | **5** | **4** | **2** | **6** | **-1** | **-3** | **0% (-40%)** |
| **PDP TOTAL** | **All Positions*** | **2186** | **1377** | **809** | **1555** | **631** | **-178** | **29% (-8%)** |

\*"All Positions" totals include classifications not listed in the table and therefore exceed the sum of budgeted, filled, and vacant positions for each of the Sworn Staff, Maintenance Staff, and HR Staff categories.

PDP increased staffing in Maintenance and Human Resources in this reporting period. The maintenance vacancy rate reduced from 47 percent in December 2024 to 33 percent in June 2025. Any reduction in Maintenance vacancies is a positive step for PDP. Unfortunately, PDP continues to report significant challenges in hiring Maintenance personnel. The impact of remaining vacancies on PDP operations and living and working conditions remains unacceptable. PDP has committed to contracting for temporary maintenance support, as discussed in more detail below under Substantive Provision 17—Sanitation, but the City has failed to take appropriate action to address maintenance vacancies, discussed under the Sanctions Order, Paragraph 4 below. All Human Resources positions were filled in this reporting period and there are no remaining budgeted vacancies.

In this reporting, PDP's ADP continued to decline, as reflected in the following table:

**Table 2: PDP Average Daily Population***
July 2022 – June 2025

| Date | July-Dec 2022 | Jan-June 2023 | July-Dec 2023 | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 |
|---|---|---|---|---|---|---|
| Average Daily Population[12] | 4432 | 4429 | 4732 | 4660 | 4545 | 3625 |

*Data reflects the average daily population total over each reporting period using statistics compiled from publicly available First Judicial District of Pennsylvania Philadelphia Prison Population Reports via the MacArthur Safety and Justice Challenge.

In this reporting period, PDP's ADP decreased from 4,545 in the last half of 2024 to 3,625 in the first half of 2025.  The successful population reduction initiatives effectuated by the First Judicial District and other justice partners have resulted in significant reductions.  In this reporting period alone, the population reduced by an average of 920 Class Members to a low of 3,480 Class Members, representing a 20 percent reduction.  Since May 2025, PDP's population has remained below 4,100 Class Members.  Population reductions have permitted PDP to discontinue the use of non-traditional beds, (such as four-person cells converted from multipurpose/closet space), helped reduce crowding in the housing units, and improved out-of-cell time in many general population housing units.

---

[12] Average Daily Population is the industry standard for tracking prison populations, which is calculated and used by PDP.  These numbers are included within the publicly available Philadelphia Prison Population Reports.  *See* Philadelphia Prison Population Report | July 2015 – June 2025, MacArthur Safety and Justice Challenge (Aug. 5, 2025), https://www.phila.gov/media/20250805092101/June-2025-Full-Public-Report.pdf.

Paragraph 6(b) of the Sanctions Order requires Defendants to produce monthly data reports.  The compiled reports include lists of individual Class Members grouped by specific categories.  Paragraph 6(b) requires the following categories:

(i)     Class Members held on bail up to $100,000;
(ii)    Class Members with significant medical needs such as cancer treatment and dialysis requiring frequent off-site medical appointments;
(iii)   Class Members over the age of 60;
(iv)    Class Members who are in PDP's minimum or community security categories, have only misdemeanor and F3 charges, and who have no more than a minor history of misconduct within the PDP; and
(v)     Class Members who are housed in protective custody.

For each Class Member, the person identifier (PPN), admission date, length of stay, total bail amounts, facility, lead charges, lead grades, and docket numbers are provided.

Defendants have exceeded the requirements of this paragraph.  In March 2025, Defendants agreed to provide required data weekly rather than monthly and have consistently provided weekly data to support population reduction initiatives throughout this reporting period.  Weekly emergency bail hearings and new procedures for Gagnon I and Gagnon II hearings have continued in this reporting period.[13]

The results of these population reduction efforts have been extraordinary.  At the end of July, the jail population consisted of 3,436 Class Members, or 1,375 fewer Class Members compared to one year earlier.[14]  The City reports PDP's jail population has reduced to historically low levels not seen in over three decades.[15]

---

[13] As previously reported, in October 2024 the Honorable Karen Simmons, Supervising Judge, Criminal Division, Philadelphia Municipal Court, instituted weekly emergency bail hearings for Class Members who meet specific criteria and based on recommendations from the Defender and DA.  In November 2024, the Honorable Rose Marie DeFino-Nastasi, Supervising Judge, Criminal Division, Philadelphia Common Pleas Court, also promulgated new regulations for *Gagnon* I and *Gagnon* II hearings, specifically designed to accelerate review of common pleas detainers.

[14] *See* Philadelphia Prison Population Report | July 2015 – July 2025, MacArthur Safety and Justice Challenge (Aug. 12, 2025), https://www.phila.gov/media/20250812152635/July-2025-Full-Public-Report.pdf.

[15] Mitchell, *supra* note 10.

Defendants' staff recruitment efforts are proving effective. In the previous reporting report, PDP had a hiring rate of 6.4 percent of applicants from closed application lists, which increased slightly to 6.9 percent this reporting period. Recruitment yield data is summarized in the tables below:

**Table 3: Philadelphia Department of Prisons Recruitment Yields for New Hires after January 1, 2021**

| Certification List | Total Applicants | Total Hired | Rate (%) | List Status |
|---|---|---|---|---|
| 2020-0210 | 228 | 36 | 16% | Closed |
| 2021-0906 | 758 | 50 | 7% | Closed |
| 2022-0221 | 298 | 16 | 5% | Closed |
| 2022-0516 | 245 | 25 | 10% | Closed |
| 2022-0905 | 493 | 34 | 7% | Closed |
| 2022-1212 | 422 | 34 | 8% | Closed |
| 2023-0306 | 563 | 32 | 6% | Closed |
| 2023-0501 | 436 | 24 | 6% | Closed |
| 2023-0626 | 626 | 34 | 5% | Closed |
| 2023-0724 | 492 | 28 | 6% | Closed |
| 2023-0821 | 464 | 17 | 4% | Closed |
| 2023-0918 | 402 | 16 | 4% | Closed |
| 2023-1023 | 869 | 50 | 6% | Closed |
| 2024-0205 | 981 | 99 | 10% | Closed |
| 2024-0513 | 1350 | 87 | 6% | Closed |
| 2024-0805 | 828 | 71 | 9% | Closed |
| **Total Closed** | **9455** | **653** | **6.9%** | **Closed** |
| 2024-0902 | 797 | 47 | 6% | In Process |
| 2024-0930 | 1507 | 53 | 4% | In Process |
| 2024-1216 | 908 | N/A | N/A | In Process |
| 2025-0120 | 567 | N/A | N/A | In Process |
| 2025-0217 | 742 | N/A | N/A | In Process |
| 2025-0317 | 705 | N/A | N/A | In Process |
| 2025-0414 | 758 | N/A | N/A | In Process |
| 2025-0512 | 1402 | N/A | N/A | In Process |
| **Total Open[16]** | **7386** | **100** | **N/A** | **In Process** |

[16] Certification list 2025-0623 in process and still accepting applications after June 30, 2025. Will be included next reporting period.

**Table 4: Philadelphia Department of Prisons Employment Applications by Year**
2020 – 2025

| Year | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 (Jan-Jun) |
|------|------|------|------|------|------|----------------|
| Applicants | 228 | 758 | 1455 | 3852 | 6371 | 4174 |
| Applicants Hired* | 36 | 50 | 109 | 151 | 253 | 193 |

*Applicants may be hired in the year following receipt of their application.*

In addition to improved recruitment, retention data shows PDP's cadet attrition is stabilizing for graduates from 2023 onward.  The table below depicts academy schedules, attendance, and graduation data for 2022, 2023, 2024, and the first half of 2025, as well as employee retention rates for 2022, 2023, 2024 and the first half of 2025 academies:

**Table 5: Philadelphia Department of Prisons Academy Report and Retention Rates by Year**
2022 – 2025

| Year | Total Cadets | Total Graduated | Still Employed June 2025 | Retention Rate Dec 2024 | Retention Rate June 2025 |
|------|--------------|-----------------|--------------------------|-------------------------|--------------------------|
| 2022 | 120 | 103 | 33 | 29% | 28% |
| 2023 | 161 | 143 | 89 | 58% | 55% |
| 2024 | 253 | 234 | 191 | 84% | 75% |
| Jan-Jun 2025 | 193 | 120 | 179 | N/A | N/A |

Table 5 shows that from 2022 through June 2025, PDP has seen steady growth in academy enrollment and graduation numbers and improvement in retention rates for recent academies.

Based on the "Total Graduated" column in Table 5, 62 percent of 2023 academy graduates remained employed in June 2025.  By comparison, over a similar two-year period, only 41 percent of 2022 academy graduates remained employed in June 2024.

Similarly, in June 2024, 68 percent of 2023 academy graduates remained employed.  By June 2025, 82 percent of 2024 academy graduates were still employed, further demonstrating improvement (*see* Table 6 below).

PDP's hiring has also increased.  An average of 141 cadets were recruited in 2022 and 2023, 253 in 2024, and 193 in the first half of 2025, with at least 140 more projected for 2025.  As depicted in Table 5 above, 193 total cadets in the first half of 2025 exceed each of 2022 and 2023 yearly totals.

The table below reflects employee retention rates and graduation data for individual academies in 2024 and the first half of 2025:

**Table 6: Philadelphia Department of Prisons Academy Report and Retention Rates by Academy Class**
January 2024 – June 2025

| Class Number | Class Dates | Total Cadets | Total Graduated | Still Employed June 2025 | Retention Rate Dec 2024 | Retention Rate June 2025 |
|---|---|---|---|---|---|---|
| 24-01 | January - March, 2024 | 34 | 30 | 26 | 82% | 76% |
| 24-02 | March - May, 2024 | 20 | 20 | 19 | 95% | 95% |
| 24-03 | May - July, 2024 | 38 | 38 | 26 | 84% | 68% |
| 24-04 | May - July, 2024 | 45 | 38 | 31 | 76% | 69% |
| 24-05 | July - September, 2024 | 54 | 52 | 45 | 87% | 83% |
| 24-06 | September - November, 2024 | 62 | 56 | 44 | 84% | 71% |
| 25-01 | Jan - April, 2025 | 59 | 53 | 53 | N/A | 90% |
| 25-02 | April - July, 2025 | 74 | 67 | 67 | N/A | 91% |
| 25-03 | June - Sept, 2025 | 60 | N/A | 59 | N/A | 98% |

*Sub-provision 1.2--No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers. . .*

**Compliance Rating:  Substantial Compliance**

Salary increases, revised work schedules, employee wellness initiatives, and committed leadership have reduced average attrition rates since 2021 and 2022, and rates have stabilized over the last year.  The table below shows monthly averages of PDP employees who voluntarily separated before retirement from January 2019 to June 2025:

**Table 7: Average Voluntary Monthly Separations by PDP Employees**
2019 – June 2025

| | Pre-Arbitration Award | | | | Post-Arbitration Award | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | 2023 | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 |
| **Monthly Average** | 10 | 11 | 24 | 23 | 11 | 13 | 12 | 8 | 5 |

From January to June 2025, voluntary separations among PDP employees reduced to their lowest since 2019, averaging 5 voluntary staff departures per month, which is half the 2019 pre-pandemic figure.  PDP has therefore achieved substantial compliance with this sub-provision.  As with sub-provision 1.1 above, monitoring of this sub-provision will continue until PDP has achieved substantial compliance with the Substantive Provision, including sub-provisions 1-4.

*Sub-provision 1.3--Ensure that there are sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating:  Partial Compliance**

The following tables depict total average percentages of post vacancies and those filled with overtime staff in all PDP facilities for two periods, January to June and July to December 2024 and in each populated facility from January to June 2025:

**Table 8: Average Percentage of PDP Posts Left Vacant Due to Staffing Shortages**
2024

| Six-month Total | Average |
|---|---|
| Jan-June 2024 | 39% |
| July-Dec 2024 | 34% |

**Table 9: Average Percentage of PDP Posts Left Vacant Due to Staffing Shortages**
January – June 2025

| Date | January | February | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 41% | 40% | 33% | 31% | 28% | 30% | 34% |
| DC | 40% | 38% | 32% | 31% | 28% | 29% | 33% |
| PICC | 35% | 36% | 36% | 32% | 27% | 28% | 32% |
| RCF | 44% | 45% | 42% | 45% | 43% | 42% | 44% |
| **Average** | **40%** | **40%** | **36%** | **35%** | **32%** | **32%** | **36%** |

**Table 10: Average Percentage of PDP Posts Filled with Overtime Staff**
2024

| Six-month Total | Average |
|---|---|
| Jan-June 2024 | 26% |
| July-Dec 2024 | 27% |

**Table 11: Average Percentage of PDP Posts Filled with Overtime Staff**
January – June 2025

| Date | January | February | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 23% | 20% | 21% | 20% | 20% | 23% | 21% |
| DC | 24% | 23% | 22% | 20% | 20% | 21% | 21% |
| PICC | 25% | 25% | 26% | 25% | 24% | 27% | 25% |
| RCF | 22% | 20% | 19% | 21% | 19% | 22% | 20% |
| **Average** | **23%** | **22%** | **22%** | **22%** | **21%** | **23%** | **22%** |

Telestaff data from this reporting period shows average post vacancies increased from 34 percent in the period July through December 2024 to 36 percent in the period January through June 2025. On its face, the data gives a misimpression that PDP's staffing increases have not resulted in corresponding reductions in post vacancies. SME McDonald notes this is due to errors in Telestaff coding that underreport filled posts. PDP has committed to correcting the errors with additional training in Telestaff coding. Accurate coding will be critical for PDP's forthcoming staffing analysis, discussed below under Status of Recommendations, Substantive Provision 1—Staffing. Once the staffing analysis is completed and staff are properly trained, post vacancy data should be more accurate, and vacancies are expected to decrease if staffing levels and the ADP remain stable. Another measure of staff working in the jails is depicted in total staff hours worked, which have increased by an average of nearly 10,000 hours since January 2024.

The following table depicts average total hours worked in the jails from January through June 2024, July through December 2024, and January through July 2025:

**Table 12: Average Total Hours Worked**
January 2024 – June 2025

| Date* | Average Total Hours Worked in Week | Difference Between Reporting Periods | Difference | Difference from Previous Year | Difference |
|---|---|---|---|---|---|
| Jan-June 2024 | 29568 | N/A | N/A | N/A | N/A |
| July-Dec 2024 | 32935 | 3367 | 11% | N/A | N/A |
| Jan-June 2025 | 39235 | 6300 | 19% | 9667 | 33% |

*Dates slightly adjusted to reflect complete half-year timeframes.

The average percentage of posts filled with overtime staff decreased from 26 percent in the period July through December 2024 to 22 percent in the period January through June 2025. The Monitoring Team continues to recommend that PDP utilize additional overtime to meet Agreement requirements, as discussed in more detail below under Status of Recommendations, Substantive Provision 1—Staffing.

PDP reports it intends to make significant changes to its post plan and Telestaff roster in the next reporting period, which will limit comparisons between post vacancies in previous reporting

periods and those beginning after July 1, 2025. PDP anticipates finalizing revisions to its post plan in the first part of 2026, which will establish a new baseline from which to measure post vacancies and compliance with this sub-provision. In the interim, the Monitor's reports will continue to measure average hours worked, as with Table 12 above, but not post vacancies, as with Tables 8, 9, 10, and 11 above.

*Sub-provision 1.4--These measures will continue until achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating: Partial Compliance**

PDP has achieved substantial compliance with sub-provisions 1.1 and 1.2. Once PDP achieves substantial compliance with sub-provision 1.3, the Monitoring Team will assess the durability of PDP's staffing initiatives and make a compliance determination for this sub-provision.

**Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report (November 2022):**

1. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.

   *After recommending this analysis over three reporting periods, in November 2023, the Monitor sent a letter to Defendants requesting that the City implement this recommendation. In December 2023, the City submitted documentation titled, "Office of Human Resources Salary Data Points Chart," which showed correctional officer minimum salaries in 18 jurisdictions, including some neighboring counties. Information regarding hiring bonuses was only submitted for one jurisdiction. Based on documentation provided, the City asserted correctional officer salaries are competitive with other local jurisdictions. This submission did not include information about non-wage benefits and failed to evaluate PDP salaries against those of other sworn law enforcement agencies within Philadelphia.*

   ---

   Paragraph 1(g) of the Sanctions Order states:[17]

   > [w]ithin 60 days of the date of this Order, the City shall compare wages and non-wage benefits available to PDP employees and other City of Philadelphia employees and submit a description of any differences identified to the Monitor. The comparison shall include uniformed public safety personnel and all other PDP job classifications for which vacancy rates exceed ten percent.

   The comparison was due for submission by October 15, 2024.

   Defendants have partially complied with the requirements of this paragraph. On October 15, 2024, Defendants provided a memorandum that summarizes starting salary and pay-

   ---

[17] Order, *supra* note 5, at 3.

range comparisons between PDP classifications through the rank of Deputy Commissioner and 16 other "comparable" but unspecified jurisdictions.[18]  The memo concludes that PDP's starting salaries are "relatively comparable" to other jurisdictions, but that PDP's pay ranges are "significantly smaller" than other jurisdictions and recommends increasing the maximum pay for PDP personnel.[19]  The memo also notes that PDP's hiring and retention bonuses and longevity pay are higher than at least some jurisdictions.[20]

The memo compares starting salaries or salary ranges for entry-level sworn positions, Sergeants, Lieutenants, and Captains at PDP, the Philadelphia Sheriff's Office (Sheriff), and the Philadelphia Police Department (Police).  PDP starting salaries generally appear to be significantly lower than comparable positions at other Philadelphia law enforcement agencies.  Entry level sworn positions at PDP appear to be somewhat comparable to Sheriff and Police positions, but ranges for Sheriff and Police positions were not included in the analysis, so it remained unclear whether salary ranges for entry level sworn positions among uniformed agencies in the City are comparable.

Finally, the memo includes a table titled, "PDP Job Classes with 10%+ Vacancy Rates," which provided salary ranges for only one of four PDP maintenance positions with vacancy rates above 10 percent in June 2024 and failed to compare salary ranges with other City positions or similar positions in other jurisdictions.  The memo also failed to compare non-wage benefits for any of the positions identified in the memo.  This submission provided useful information but did not meet the requirements of this paragraph and did not provide sufficient basis for additional recommendations.

On November 14, 2024, Defendants provided a 50-page document titled, "Reference Guide & Summary Description of Plans A, B, D, J, L, X, Y, 10 and 16."  This document was initially provided in December 2023 and appears to have been resubmitted to meet the requirement for "non-wage benefits" comparisons between PDP and other uniformed positions in Philadelphia.  The second submission of this document contained highlighted language and included only the following explanation:

> For further background information, Police officers are members of Pension Plans D or B, depending on whether their date of hire is before or after July 1, 1988, with new employees placed in Plan 10 unless they opt out.  Deputy Sheriffs could be in plans J, Y, 10 or 16, depending on date of hire.  The relevant dates are listed on pages 9-10 of the Plan Summary.  The various retirement ages are listed out on page 12.  The eligibility requirements are listed on page 19.  Pages 21-23 lay out how the benefits are to be calculated.  When reviewing members of Plans 10 and 16, please refer to page 11, which outlines the Defined Contribution plan.

---

[18] *Correctional Series (5) Salary Survey Results and Analysis*, City of Philadelphia, Office of Human Resources (Oct. 10, 2024).
[19] *Id.* at 4.
[20] *Id.* at 1, 5.

On February 7, 2025, Defendants submitted additional comparisons of wage and non-wage benefits and asserted that correctional roles are not like-to-like comparable to other uniformed agencies because requirements differ across positions. This analysis concluded that PDP salary ranges are five percent lower than Sheriffs' salary ranges and 15 to 20 percent lower than Police and Philadelphia Fire Department (Fire) Paramedic ranges. PDP maintenance positions are reportedly 8 to 13 percent lower than City "Skilled Trades and Industries Maintenance" classifications. For non-wage compensation, new sworn PDP employees appear to receive the same non-wage compensation as new sworn Sheriffs' employees but lower compensation than similar positions in Police and Fire.

Together, Defendants' submissions contain some of the information required in this paragraph. It is possible these submissions contain all required information, but as presented, it is convoluted, and extracting and analyzing key indicators from Defendants' submissions would be prohibitively time consuming. The City's methods are not replicable based on these submissions, and the Monitoring Team lacks the expertise to analyze the information independently. The Monitor therefore recommends the following:

1) Regarding uniformed public safety positions, the Monitor recommends against additional analysis by Defendants at this time. As reported above, PDP has now achieved substantial compliance with sub-provisions 1.1 and 1.2 regarding hiring and retention of correctional officers. In the first six months of 2025, PDP received 4,147 applications, which is 70 percent more than the 2,441 total applications received in 2020, 2021, and 2022 combined. By August 2025, PDP reportedly received another 950 applications from a more recent hiring list. Current correctional officer hiring data suggests that compensation packages are sufficient to attract candidates.

It remains unclear whether current compensation packages are sufficient to attract enough total candidates for PDP to comply with all staffing sub-provisions. It is also unknown whether additional compensation for these classifications would bring Defendants into compliance more quickly. However, the City and PDP report they are at capacity for processing applications and holding academies for the current applicant pool. Additional comparisons of these positions are no longer timely and may result in more distraction than assistance. Should recommendations for additional action be required in the future, the Monitor will retain an expert to complete an independent assessment.

2) Regarding PDP maintenance classifications contemplated in this paragraph, the Monitor recommends that Defendants take immediate additional action to correct maintenance vacancies. Maintenance vacancy rates have fluctuated between 43 percent and 64 percent over the first six reporting periods. The vacancy rate at the end of June was better but remained unacceptable at 33 percent, and PDP and the City have consistently reported difficulty recruiting for these positions. During the June 2025 site visit, the Monitoring Team met with a newly appointed Maintenance Director assigned to DC. At the time, only four of nine maintenance positions at DC/PHSW were filled. The Maintenance Director was clearly motivated and in the process of developing a

maintenance plan for the facility.  PDP acknowledges, however, that aging facilities require constant repairs, and with too few personnel and ever-shifting priorities, completing planned repairs will be challenging.

Despite some improvements and the best efforts of current maintenance personnel, living and working conditions in units impacted by the maintenance vacancies remained unacceptable over each reporting period.  As PDP has worked to increase recreation opportunities, some Class Members have spent extended periods of time locked in cells or units that were poorly lit, lacked appropriate heating, cooling, or ventilation, or had inoperable toilet and sink units, or exceedingly hot, cold, or non-functioning showers.  Multiple cells in PHSW remained unusable over at least three reporting periods, impeding patient care and frustrating patients, providers, and security personnel.

As previously reported, PDP's current maintenance contractor is completing repairs and larger improvements, but other necessary repairs, particularly at DC/PHSW and MOD 3, have lingered for weeks, months, or years.  Aesthetic and some types of routine or preventative maintenance have been largely ignored in some facilities, so some Class Members live in cells with rusty or discolored walls, vents, and toilets, and holes through which rodents or insects have entered cells when infestations were not properly controlled.

As ordered by this Court and discussed in more detail below under Substantive Provision 17—Sanitation, some improvements are underway.  Deep cleaning at DC has been scheduled and PDP plans to expand contracted maintenance services to bridge gaps created by extended vacancies.  PDP is also awaiting a maintenance assessment and staffing analysis, which should spur more change.  However, Defendants have clearly not taken sufficient action to fill permanent full-time maintenance positions over seven reporting periods.

The Monitoring Team recommends that the City increase current recruitment efforts, enhance compensation packages for maintenance classifications, reallocate positions, incorporate useful recommendations from the forthcoming analysis, or make any other changes as necessary to attract qualified candidates.  PDP's maintenance staffing vacancies are a fraction of the crisis the City has faced with its uniformed vacancies and should be correctable with a fraction of the determination the City has shown in filling sworn positions.

2.  Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation, and other validated recruitment and retention strategies.

> Paragraph 1(a) of the Sanctions Order required Defendants to generate a list of outside recruitment firms with a proven track record of hiring for law enforcement agencies and submit the list for the Court's consideration. Defendants were further required to retain the selected firm within 90 days of the Court's approval, or January 21, 2025.
>
> Defendants have complied with the requirements of this paragraph. As previously reported, the list was submitted for the Court's consideration on September 16, 2024.[21] The Court subsequently approved Defendants' request to retain the Whalls Group on October 21, 2024, which Defendants retained consistent with this paragraph. PDP reports that Whalls Group has continued to work closely with PDP's Office of Professional Compliance, helping candidates gather required information for background checks. PDP reports that support from the Whalls Group has been vital to processing applications and maintaining a pool of ready candidates. As a result, PDP anticipates holding more academies in 2025 than in previous years. As noted above, it is unlikely that Defendants' current Human Resources teams could process additional applications or sustain current momentum without additional support.

3.  Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies. *As previously reported, PDP completed a partial staffing analysis in January 2024.[22] The Monitoring Team recommended additional analysis for which PDP has retained Overwatch Innovations (Overwatch) to complete. Overwatch will also assist PDP with post plan development, scheduling, coding, and reporting. The Monitoring Team will continue to track progress and provide updates in the next reporting period.*

---

[21] Monitor's Fifth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 24 at 19 (E.D. Pa. Sept. 30, 2024).
[22] *Operational Analysis: Philadelphia Department of Prisons*, Phronema Justice Strategies (Jan. 2024).

4.  Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

> Paragraph 1(c) of the Sanctions Order requires Defendants to evaluate which departments within PDP may be served in full or in part by civilian employees. The evaluation was due for submission by September 16, 2024.
>
> > Defendants have complied with the requirements of this paragraph. As previously reported, an arbitration hearing on the civilianization of positions occurred on November 12, 2024. The arbitration award was issued on March 4, 2025, authorizing Defendants to fill vacant case records and information technology posts with civilians.[23] PDP began civilianizing these positions in this reporting period. As of July 16, 2025, PDP reported it had hired six civilian employees for case records positions with 37 positions still vacant; similarly, PDP reported that four IT vacancies had been filled with civilians while 17 positions remained open.
>
> Paragraph 1(d) of the Sanctions Order requires Defendants to identify companies capable of providing medical guarding of PDP's open ward patient population, as well as transporting patients to off-site medical appointments. Paragraph 1(d) further requires Defendants to commence contract negotiations with the selected medical guarding company. Defendants were required to identify companies by September 16, 2024, and initiate contract negotiations with the selected vendor by January 21, 2025.
>
> > Defendants have complied with the requirements of this paragraph. As previously reported, United Security Inc. (USI) was identified as a qualified vendor for medical guarding and transportation services. On October 21, 2024, this Court authorized the City to contract with USI for this purpose. The contract was finalized on December 18, 2024. On March 4, 2025, an arbitration award authorized the use of contract vendors for medical guarding and transportation. Defendants report that USI hired 34 staff, all of whom were trained by PDP personnel. PDP reports that the USI staff have been predominantly working to support PDP's Medical Transport Unit. Although PDP reports the contract has been instrumental in supporting operations and reducing off-site medical backlogs, also discussed below under Substantive Provision 5—Healthcare, USI was unable to hire sufficient staff to meet all of PDP's anticipated medical guarding and transportation needs. Data for the week of June 23, 2025 through June 29, 2025, shows that USI supplied an average of nine staff members per day for transportation and hospital guarding, thereby covering only approximately 14 percent of the total daily posts needed. PDP's remaining transportation and guarding needs that week likely required the redirection of some housing unit posts or overtime shifts by housing unit staff. PDP reports it will revisit the need for additional support upon completion of the Overwatch staffing analysis, which should identify PDP's average medical guarding and transportation utilization.

---

[23] In the Matter of Arbitration Between AFSCME District Council 33, Local 159, and Local 1673 *and* City of Philadelphia at 2-3 (decision date, Mar. 4, 2025), Supplemental Interest Arbitration Award, City and AFSCME DC 33, Local 159, Local 1637 | Department of Labor | City of Philadelphia.

5. Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.

   *As previously reported, the City indicated that it streamlined its hiring process in 2021 and that it is processing the current volume of applications within a reasonable timeframe.[24]  In this reporting period, Whalls Group and the City identified additional delays caused by incomplete application submissions and are now working with candidates individually to prepare for the background process.  The Whalls Group indicates that other aspects of the on-boarding process are proceeding within expected timeframes.*

6. Establish continuous-fill civil service hiring lists during the staffing crisis.

   > Paragraph 1(b) of the Sanctions Order requires the City to maintain continuous-fill hiring lists to accept applications for employment with PDP.
   >
   > Defendants have complied with the requirements of this paragraph.  In September 2024, the City reported it had modified the hiring portal to permit the receipt of applications at all times.  The City reports that the continuous-fill list remains in place in this reporting period and, on July 15, 2025, the Office of Human Resource's hiring lists included 5,148 eligible applications.

7. Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.

   *Pursuant to the June 12, 2024 Arbitration Award, the City residency requirement for PDP employees was waived until PDP achieves 80 percent of its staffing levels.  The temporary residency waiver permits applications from counties outside Philadelphia but continued to restrict eligibility to residents of the Commonwealth of Pennsylvania.*

   > Paragraph 1(i) of the Sanctions Order requires the City to expand the residency waiver to applicants residing outside the Commonwealth of Pennsylvania.
   >
   > Defendants have complied with the requirements of this paragraph.  In September 2024, the City reported that it extended the residency waiver to qualified applicants outside the Commonwealth of Pennsylvania.  Defendants have since reported that, as of July 18, 2025, the City has received 1,105 out-of-state applications, representing 14 percent of the total applicant pool.

---

[24] Monitor's Fourth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 204 at 17 (E.D. Pa. Mar. 29, 2024).

8. PDP should implement strategies for employee retention and a robust employee wellness program.

> Paragraph 1(f) of the Sanctions Order requires that PDP appoint a Wellness Coordinator to oversee the PDP employee wellness program and that the City fund an adequate employee wellness program.[25]  Defendants were required to hire a Wellness Coordinator by November 14, 2024, and fund an adequate employee wellness program by January 13, 2025.
>
> Defendants have complied with the requirements of this paragraph.  As previously reported, PDP appointed a Wellness Coordinator in November 2024 and subsequently inaugurated its Wellness Center and gymnasium in January 2025.  PDP also submitted a comprehensive Wellness Strategic Plan to the Monitoring Team in January 2025, which included $150,000 earmarked for the wellness initiative.  In March and April 2025, PDP conducted an employee wellness survey and has initiated contracting for popular options identified by PDP staff.
>
> In August 2025, PDP reported it will be implementing a new-employee mentorship program in the next reporting period.  Program components will include facility-specific mentors who will meet with and support all new personnel in various aspects of PDP operations, the assignment of individual mentors as necessary, frequent communication between program staff and facility management regarding employee progress, and quality improvement surveys upon completion of the program.
>
> Staff interviews conducted during site visits further indicate reduced frustration and generally improved morale.  Employees are more frequently reporting confidence in PDP executive leadership and demonstrated awareness of the Wellness Center, and several employees reported participating in programs or utilizing available services.

9. The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.
   *This recommendation has been implemented.*[26]

10. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations.  The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.
   *This recommendation has been implemented.*[27]

---

[25] Order, *supra* note 5, at 2.
[26] Monitor's Fifth Report, *supra* note 21, at 21.
[27] Monitor's Fourth Report, *supra* note 24, at 18.

**Additional recommendations for immediate action:**

11. Immediately authorize additional double-time pay each day of the week as necessary to staff all vacant shifts.

> Paragraph 1(e) of the Sanctions Order requires the City to immediately authorize PDP to offer additional double-time pay for any day of the week as necessary to staff all vacant shifts.[28]
>
> Defendants have complied with the requirements of this paragraph. Pursuant to the Sanctions Order, the City reports that PDP now has authorization to provide double-time pay on any day of the week with post vacancies. Despite this authorization, with some exceptions, PDP has generally continued its practice of offering double-time pay only on Thursdays and Sundays.
>
> In declining to offer additional double-time pay, PDP appropriately cites uncertainty about the operational impact, including the possibility that mandatory overtime could lead to higher sick leave and other leave usage rates, potentially increasing vacancies. On June 15, 2025, PDP implemented a modified pilot offering double-time pay on two additional days, from Thursday through Sunday, through the end of August 2025. PDP reports as the pilot was implemented, PDP partnered with USI to supplement staffing for transportation and guarding and aimed to reduce reassignments from jail posts for transportation coverage Monday through Friday. PDP reports the four-day-per-week pilot did not reduce post vacancies.
>
> Until PDP is closer to achieving substantial compliance with all staffing sub-provisions, out-of-cell time, and other requirements designed to improve conditions, the Monitoring Team continues to recommend that PDP consider a tightly controlled pilot offering double-time pay every day of the week or other modifications to its current double-time pay schedule. Expansion of a double-time pay pilot program would allow PDP to determine definitively whether additional double-time pay would reduce post vacancies consistent with the spirit of Paragraph 1(e).

12. The City should establish a well-resourced team to assist with recruitment, application processing, onboarding, and supporting new staff. The team should conduct meaningful exit interviews of staff leaving PDP to determine what is needed to improve retention.
    *Efforts by the PDP and Whalls Group are successfully targeting some of the previous challenges to hiring and retention, as described above in this substantive provision.*

---

[28] Order, *supra* note 5, at 2.

**Additional requirements pursuant to the Sanctions Order:**

Paragraph 1(h) of the Sanctions Order requires Defendants to expand the timeframe for eligibility to rehire former employees from one year to five years following resignation. Defendants were required to increase the rehiring window by September 16, 2024.

> Defendants have complied with the requirements of this paragraph. As previously reported, in December 2024, Defendants announced the extension of the rehire eligibility period from one year to five years. Of the 1,000 potential candidates for rehire, the City issued letters to 480 former employees who were eligible for rehire. As a result of these efforts, 43 former sworn staff members had been reinstated as of July 18, 2025.

Paragraph 6(a) of the Sanctions Order requires the Commissioner to explore realistic, suitable relocation options for Class Members to another secure facility and, by December 16, 2024, report on the options identified.

> Defendants have complied with requirements of this paragraph. As previously reported, PDP researched and visited two local facilities, neither of which PDP determined were suitable for Class Members. Given the challenges with identifying appropriate relocation facilities, as well as the continued success of other population reduction initiatives, the Commissioner has determined that time and resources are more effectively directed to other reform efforts. The Monitoring Team agrees.

Paragraph 8(b) of the Sanctions Order states, "[t]he City shall, as required to comply with the mandates of this Order and the Settlement Agreement, hire or contract with a permanent full-time internal Compliance Coordinator" and "submit a staffing plan to the Court via the Monitor for approval."[29] The City was to hire a Compliance Coordinator by December 16, 2024, and submit a staffing plan by January 15, 2025.

> Defendants have partially complied with the requirements of this paragraph. As previously reported, Defendants initially contracted with Alta Management (Alta) and were deemed compliant with this paragraph. Alta's team has completed several projects in support of PDP's compliance with the Agreement and PDP reports Alta's services have been beneficial. In this reporting period, it became clear that Alta cannot function as the compliance team contemplated in this paragraph. PDP has since taken additional steps to comply with this paragraph and reports that Alta will advise PDP on the appropriate size, structure, and scope of a PDP Compliance Unit. In this reporting period, PDP assigned the Access-to-Care Deputy Warden additional duties to assist with off-site medical transportation, as well as laundry and bedding distribution. PDP also hired a full-time Compliance Project Manager who reported for duty on July 7, 2025. The Monitoring Team has consistently recommended that PDP's compliance team consist largely of and/or be led by existing PDP personnel who are familiar with PDP operations. PDP agrees with the recommendation but has been cautious about reassigning facility personnel for this purpose given staffing shortages. PDP now reports it is beginning to formulate a plan for a compliance unit that is supported by PDP operations experts. As PDP prepares a staffing plan, it should ensure that its compliance unit has sufficient expertise in PDP operations, sufficient authority to direct

---

[29] *Id.* at 9.

implementation, and sufficient resources to see PDP through compliance with the Agreement.

Paragraph 8(b)(ii) requires Defendants to submit a written status report detailing their progress toward implementation of the Sanctions Order by February 12, 2025. Subsequent status reports must be submitted on the first day of each quarter until otherwise directed by the Court.
Defendants have complied with the requirements of this paragraph. Defendants submitted the written status report on February 14, 2025. Quarterly status reports were likewise submitted on April 15, 2025 and July 15, 2025.

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1--Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

### Compliance Rating:  Partial Compliance

PDP remains in partial compliance with this sub-provision and continues to report that its greatest barrier to compliance remains insufficient staff. Other challenges include housing units with high numbers of Class Members, as with RCF, or those that house Class Members with varying security classifications who cannot recreate together, as with CFCF, PICC, and RCF. In general population units with fewer than 64 Class Members, or if two officers are present on a single housing unit, PDP is now more consistently able to offer an average of 8 hours per day in those units, which marks notable progress. PDP anticipates additional progress in the next reporting period.

In this reporting period, the Monitoring Team continued to attempt to track out-of-cell time in general population for the following out-of-cell timeframes:  zero hours, .1 to .9 hours, 1 to 2.9 hours, 3 to 5.9 hours, 6 to 7.9 hours, and 8 or more hours. Previously reported issues with tracking and data accuracy persist and reported out-of-cell times can only be verified via CCTV review.[30]  Tables 13 through 20 below represent the Monitoring Team's efforts to quantify out-of-cell time for Class Members in general population based on documentation provided. The Monitoring Team continues to encourage PDP (perhaps the Data Team or another bureau) to assume responsibility for tracking and reporting out-of-cell time. Consistent internal monitoring is necessary to support timely adjustments and progress toward substantial compliance.

---

[30] Monitor's Fourth Report, *supra* note 24, at 19.

The following tables depict average out-of-cell time that select CFCF general population recreation groups were documented as receiving daily for one week of each month for two periods, July through December 2024 and January through June 2025.

**Table 13: General Population Average Out-of-Cell Time Hours Per Day CFCF, Six One-Week Periods**[*]
July 2024 – June 2025

| Hours** | Monthly Average July-Dec 2024 | | Monthly Average Jan-June 2025 | | Difference |
|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | |
| 0 | 55 | 25% | 32 | 17% | -8% |
| 0 to .9 | 0 | 0% | 0 | 0% | 0% |
| 1 to 2.9 | 17 | 8% | 5 | 3% | -5% |
| 3 to 5.9 | 148 | 67% | 62 | 33% | -34% |
| 6 to 7.9 | 1 | 0% | 60 | 32% | +32% |
| ≥ 8 | 0 | 0% | 28 | 15% | +15% |
| **Total CFCF Groups** | **222** | **100%** | **187** | **100%** | |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, December 2-8, 2024, January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

**Table 14: General Population Average Out-of-Cell Time Hours Per Day CFCF, Six One-Week Periods***
January – June 2025

| Hours** | Jan-March 2025 | | April-June 2025 | | Monthly Average | |
|---|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | Groups | Percent (%)*** |
| 0 | 46 | 22% | 18 | 11% | 32 | 17% |
| 0 to .9 | 0 | 0% | 0 | 0% | 0 | 0% |
| 1 to 2.9 | 6 | 3% | 4 | 2% | 5 | 3% |
| 3 to 5.9 | 75 | 36% | 49 | 30% | 62 | 33% |
| 6 to 7.9 | 77 | 36% | 43 | 26% | 60 | 32% |
| ≥ 8 | 7 | 3% | 49 | 30% | 28 | 15% |
| **Total CFCF Groups** | **211** | **100%** | **163** | **100%** | **187** | **100%** |

*Weeks reviewed include: January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

Population reductions, combined with additional staffing, have improved out-of-cell opportunities for Class Members at CFCF. CFCF trackers show that the percentage of groups

receiving no out-of-cell time decreased from 25 percent in July through December 2024 to 17 percent in January through June 2025.

From July to December 2024, no groups averaged six or more hours of out-of-cell time per day. From January to June 2025, however, 47 percent of Class Member groups averaged at least six hours out-of-cell daily, demonstrating significant progress compared to the previous reporting period.

The following tables depict average out-of-cell time that select PICC general population recreation groups received daily for one week of each month for two periods, July through December 2024 and January through June 2025:

**Table 15: General Population Average Out-of-Cell Time Hours Per Day**
**PICC, Six One-Week Periods[*]**
July 2024 – June 2025

| Hours** | Monthly Average July-Dec 2024 | | Monthly Average Jan-June 2025 | | Difference |
|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | |
| 0 | 15 | 12% | 11 | 9% | -3% |
| 0 to .9 | 5 | 4% | 0 | 0% | -4% |
| 1 to 2.9 | 25 | 19% | 14 | 12% | -7% |
| 3 to 5.9 | 70 | 56% | 70 | 57% | +1% |
| 6 to 7.9 | 8 | 6% | 14 | 11% | +5% |
| ≥ 8 | 4 | 3% | 13 | 11% | +8% |
| **Total PICC Groups** | **126** | **100%** | **122** | **100%** | |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, December 2-8, 2024, January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

**Table 16: General Population Average Out-of-Cell Time Hours Per Day PICC, Six One-Week Periods***
January – June 2025

| Hours** | Jan-March 2025 | | April-June 2025 | | Monthly Average | |
|---|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | Groups | Percent (%)*** |
| 0 | 3 | 3% | 18 | 15% | 11 | 9% |
| 0 to .9 | 0 | 0% | 0 | 0% | 0 | 0% |
| 1 to 2.9 | 20 | 17% | 8 | 7% | 14 | 12% |
| 3 to 5.9 | 83 | 70% | 56 | 46% | 70 | 57% |
| 6 to 7.9 | 6 | 5% | 22 | 18% | 14 | 11% |
| ≥ 8 | 7 | 6% | 19 | 15% | 13 | 11% |
| Total PICC Groups | 119 | 100% | 123 | 100% | 122 | 100% |

*Weeks reviewed include: January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.

**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.

***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

In this reporting period, PICC demonstrated slight improvement in out-of-cell opportunities for Class Members in men's general population units. For example, groups receiving three hours or less out-of-cell, on average, decreased from 35 percent in July through December 2024 to 21 percent in January through June 2025. Class Member groups receiving six hours or more out-of-cell time, on average, increased from 9 percent in July through December 2024 to 22 percent in January through June 2025.

PICC, and all PDP facilities, should continue efforts to ensure that every Class Member receives some out-of-cell time every day, even if it requires fewer hours out-of-cell for Class Members who receive more than five hours daily. This is a strategy PICC and other facilities have used successfully over three reporting periods, and it should be used until out-of-cell requirements are met.

As previously reported, mixed security classifications on some women's housing units limit out-of-cell time for some Class Members.[31] Current out-of-cell trackers do not distinguish between security classifications, so all Class Members in women's units will continue to be tracked together until a new system is implemented.

---

[31] Monitor's Fifth Report, *supra* note 21, at 26.

The following tables depict average out-of-cell time Class Members in women's housing units at PICC received daily for one week of each month for two periods, July through December 2024 and January through June 2025:

**Table 17: Women's Housing Units Average Hours Out-of-Cell Per Day
PICC, Six One-Week Periods***
July 2024 – June 2025

| Hours** | Monthly Average July-Dec 2024 | | Monthly Average Jan-June 2025 | | Difference |
|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | |
| 0 | 2 | 7% | 2 | 7% | 0% |
| 0 to .9 | 1 | 4% | 0 | 0% | -4% |
| 1 to 2.9 | 3 | 11% | 1 | 3% | -8% |
| 3 to 5.9 | 9 | 32% | 6 | 21% | -11% |
| 6 to 7.9 | 4 | 14% | 10 | 35% | +21% |
| ≥ 8 | 9 | 32% | 10 | 35% | +3% |
| **Total PICC Groups** | **28** | **100%** | **28** | **100%** | |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, December 2-8, 2024, January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

**Table 18: Women's Housing Units Average Hours Out-of-Cell Per Day
PICC, Six One-Week Periods***
January – June 2025

| Hours** | Jan-March 2025 | | April-June 2025 | | Monthly Average | |
|---|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | Groups | Percent (%)*** |
| 0 | 0 | 0% | 4 | 14% | 2 | 7% |
| 0 to .9 | 0 | 0% | 0 | 0% | 0 | 0% |
| 1 to 2.9 | 1 | 4% | 1 | 2% | 1 | 3% |
| 3 to 5.9 | 8 | 27% | 4 | 14% | 6 | 21% |
| 6 to 7.9 | 7 | 26% | 12 | 43% | 10 | 35% |
| ≥ 8 | 12 | 43% | 7 | 26% | 10 | 35% |
| **Total PICC Groups** | **28** | **100%** | **28** | **100%** | **28** | **100%** |

*Weeks reviewed include: January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

Class Members in women's general population units continued to receive increased out-of-cell opportunities in this reporting period. The number of groups receiving at least six hours out-of-cell time, on average, increased from 46 percent in July through December 2024 to 70 percent from January through June 2025. This reflects significant improvement. Women's units with mixed security classifications, such as C Unit, which houses Class Members in protective custody as well as those on the behavioral health caseload, struggle the most to offer a daily average of six or more hours out-of-cell time.

The following tables depict average out-of-cell time that RCF general population recreation groups received daily for one week of each month or two periods, July through December 2024 and January through June 2025:

**Table 19: General Population Average Out-of-Cell Time Hours Per Day**
**RCF, Six One-Week Periods**[*]
July 2024 – June 2025

| Hours** | Monthly Average July-Dec 2024 | | Monthly Average Jan-June 2025 | | Difference |
|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | |
| 0 | 4 | 4% | 9 | 10% | +6% |
| 0 to .9 | 1 | 1% | 0 | 0% | -1% |
| 1 to 2.9 | 25 | 25% | 27 | 29% | +4% |
| 3 to 5.9 | 67 | 68% | 50 | 54% | -14% |
| 6 to 7.9 | 1 | 1% | 4 | 4% | +3% |
| ≥ 8 | 1 | 1% | 3 | 3% | +2% |
| **Total RCF Groups** | **98** | **100%** | **93** | **100%** | |

*Weeks reviewed include: July 15-21, 2024, August 12-18, 2024, September 9-15, 2024, October 7-13, 2024, November 4-10, 2024, December 2-8, 2024, January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

**Table 20: General Population Average Out-of-Cell Time Hours Per Day RCF,
Six One-Week Periods***
January – June 2025

| Hours** | Jan-March 2025 | | April-June 2025 | | Monthly Average | |
|---|---|---|---|---|---|---|
| | Groups | Percent (%)*** | Groups | Percent (%)*** | Groups | Percent (%)*** |
| 0 | 4 | 5% | 14 | 15% | 9 | 10% |
| 0 to .9 | 0 | 0% | 0 | 0% | 0 | 0% |
| 1 to 2.9 | 24 | 25% | 30 | 33% | 27 | 29% |
| 3 to 5.9 | 60 | 63% | 40 | 44% | 50 | 54% |
| 6 to 7.9 | 4 | 4% | 3 | 3% | 4 | 4% |
| ≥ 8 | 3 | 3% | 3 | 4% | 3 | 3% |
| Total RCF Groups | 95 | 100% | 90 | 100% | 93 | 100% |

*Weeks reviewed include: January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**When PDP fails to log recreation time for a group, zero out-of-cell time is assumed.
***Reported percentages reflect averages of sample populations for weeks reviewed and individual out-of-cell time may vary.

Out-of-cell opportunities for general population Class Members at RCF have not meaningfully improved in this reporting period.  Class Member groups receiving six or more hours out-of-cell time, on average, increased slightly from two percent in July through December 2024 to seven percent in January through June 2025.  However, groups receiving three hours or less out-of-cell time, on average, increased from 30 percent in July through December 2024 to 39 percent in January through June 2025.  Higher staff vacancies at RCF than the other facilities likely contribute to this lack of progress.  PDP reports that new academy classes will be assigned to PICC and RCF to enhance staffing in those facilities.

Out-of-cell trackers for DC and MOD 3 continue to show that youth Class Members (who are not in protective custody) and other Class Members who reside in cellblocks are receiving, on average, at least 8 hours of out-of-cell time daily.  In March 2025, DC activated outdoor recreation yards for dormitory and cellblock housing units.  DC reports it has also been utilizing the gymnasium most days.  Providing access to outdoor spaces and opportunities for large muscle exercise are important improvements in addition to increasing out-of-cell time.

In this reporting period, PDP continued to use paper tracking logs, which were updated by the Data Team to improve accuracy.  A staff member has been assigned to monitor the logs each day and report any issues to the Deputy Commissioner of Operations.  PDP reports it is piloting the Radio Frequency Identification (RFID) system at PICC and RCF to track security checks and movement.  The use of paper logs will continue until staff receive training in RFID tracking of out-of-cell time.  The pilot will expand to CFCF by late 2025 or early 2026.  Once the RFID system is implemented, PDP will convert to electronic tracking of daily out-of-cell opportunities across all housing units.

*Sub-provision 2.2--The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

### Compliance Rating: Partial Compliance

In this reporting period, PDP provided eight hours of out-of-cell time on occasion, with overall increases noted in June 2025. DC general population units (A and C Blocks) and MOD 3 youth (who are not on separation status) maintained an average of 8 hours daily throughout the reporting period.

The following table depicts groups receiving average out-of-cell time of at least eight hours for two periods, July through December 2024 and January through 2025:

### Table 21: Percentage of Class Members Receiving Eight or More Hours Out-of-Cell Time Hours Per Day By Facility, Six One-Week Periods*
July 2024 – June 2025

| Facility | July-Dec 2024 | Jan-June 2025 | % Difference |
|----------|---------------|---------------|--------------|
| CFCF | 0% | 15% | +15% |
| PICC | 3% | 11% | +8% |
| RCF | 1% | 3% | +2% |

*Weeks reviewed include: January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.

As a result, PDP has achieved partial compliance with this sub-provision, with additional progress anticipated once staffing is enhanced at PICC and RCF.

### Substantive Provision 3—Out-of-Cell/Segregation

*Sub-provision 3.1--Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

### Compliance Rating: Partial Compliance

In this reporting period, the Data Team improved PDP's out-of-cell tracking system in segregation units. Although issues with data accuracy persist, staff appear to be tracking out-of-

cell time more consistently.  PDP has again reduced its segregation population in this reporting period, discussed below under sub-provision 3.2, which increases out-of-cell opportunities.  As a result, PDP has increased the number of Class Members in segregation receiving, on average, at least one hour of daily out-of-cell time.  As with the previous reporting period, improvements have been achieved primarily by continuing to require Class Members to recreate in waist and ankle restraints, which impedes large muscle exercise and is an inappropriate practice.  PDP reports it is exploring alternatives, including the installation of individual recreation areas for Class Members who are unable to recreate together.

PDP is planning to consolidate all men's segregation housing into CFCF.  Renovations are underway in CFCF building A2.  Once the consolidation is complete, PICC and RCF will no longer house Class Members in men's segregation units.  The women's segregation unit will remain at PICC according to PDP's current plan.  As part of this initiative, PDP is also developing additional programs, incentives, a "loss-of-privilege" program, and a "stepdown" process for segregated Class Members.  PDP reports it will present a detailed plan in the next reporting period.

From June 2023 through January 2024, PDP's out-of-cell data was largely unreliable.  Tracking was inconsistent and reported data was often based on limited, non-representative samples.[32] Since January 2024, tracking appears somewhat more reliable, and changes made in this reporting period have further improved accuracy.  This report uses data collected from January 2024 onward, which establishes a more reliable baseline from which to measure future progress.

---

[32] Only one week was sampled in the third reporting period.  Monitor's Third Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 193 at 21 (E.D. Pa. Oct. 12, 2023).  Similarly, the fourth reporting period yielded only two sample weeks.  Monitor's Fourth Report, *supra* note 24, at 24.

The following tables reflect the average total populations of Class Members on all segregation units and the average percentage of Class Members who were offered out-of-cell time for six one-week periods, from January 2024 through June 2025, and January through June 2025:

**Table 22: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
January 2024 – June 2025

| Date | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 |
|------|-----|-----|-----|
| CFCF (%) | 36% | 37% | 72% |
| PICC (%) | 35%* | 37% | 40% |
| RCF (%) | 30% | 82% | 63% |
| **Average Sample Population**** | 165 | 288 | 182 |
| **Average Class Members Out-of-Cell** | 51 | 121 | 103 |
| **Average Percent Out-of-Cell** | 31% | 42% | 57% |

*PICC only evaluated for January, February, and March because PDP failed to log daily out-of-cell opportunities for those Class Members.
**"Sample Population" refers to average total Class Members who resided in segregation units for all seven days during weeks reviewed and does not reflect Class Members who entered segregation or were removed from segregation on any of the seven days during weeks reviewed.  Restrictive housing totals are reflected in sub-provision 3.2 below.

**Table 23: Daily Out-of-Cell Opportunities for Class Members on All Segregation Units**
January – June 2025*

| Date | Jan | Feb | March | April | May | June | Average |
|------|-----|-----|-------|-------|-----|------|---------|
| CFCF (%) | 41% | 42% | 95% | 71% | 84% | 99% | 72% |
| PICC (%) | 25% | 40% | 54% | 43% | 38% | 37% | 40% |
| RCF (%) | 56% | 84% | 31% | 54% | 53% | 100% | 63% |
| **Total Sample Population**** | 257 | 203 | 187 | 151 | 179 | 114 | 182 |
| **Average Class Members Out-of-Cell** | 105 | 103 | 130 | 88 | 101 | 91 | 103 |
| **Average Percent Out-of-Cell** | 41% | 51% | 70% | 58% | 56% | 80% | 57% |
| **Average Percent Not Out-of-Cell** | 59% | 49% | 30% | 42% | 44% | 20% | 43% |

*Weeks reviewed include: January 6-12, 2025, February 10-16, 2025, March 24-30, 2025, April 7-13, 2025, May 5-11, 2025, and June 2-8, 2025.
**"Sample Population" refers to average total Class Members who resided in segregation units for all seven days during weeks reviewed.  Class Members who entered segregation or were removed from segregation on any of the seven days during weeks reviewed were excluded from the analysis.  Restricted housing totals are reflected in sub-provision 3.2 below.

Out-of-cell time for Class Members in segregation continued to improve in this reporting period. CFCF made the most progress, increasing the percentage of Class Members who received daily out-of-cell time from 37 percent in the previous reporting period to 72 percent in this reporting period.  RCF saw a decline, from 82 percent of Class Members receiving daily out-of-cell time in

the previous reporting period to 63 percent in this reporting period. Issues persist at PICC, where less than 40 percent of Class Members in segregation have received daily out-of-cell time since monitoring began.

Incremental improvements in out-of-cell time in segregation units are the result of dramatic population reductions, reduced reliance on segregation, and increases in housing unit staffing. If PDP stays the course, out-of-cell time in segregation should continue to improve in the next reporting period.

*Sub-provision 3.2--Defendants further agree that they will continue their normal practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

### Compliance Rating: Partial Compliance

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[33] Also previously reported, and discussed below under Substantive Provision 6—Behavioral Health in Segregation, PDP continues to house some Class Members with mental illness or severe behavior management issues in segregation because it lacks sufficient staff and housing for appropriate alternatives.[34] PDP has committed to more effective alternatives for these patients, also discussed below. PDP must secure sufficient staff, housing, and programs to ensure that segregation placements of Behavioral Health patients and Class Members with behavior management issues are clinically indicated and limited in number and duration. Once alternatives are in place and being utilized consistently, PDP will achieve substantial compliance with this sub-provision.

The following table depicts average total class members in restricted housing (including administrative segregation and punitive segregation) for sample dates in six periods: July through December 2022, January through June 2023, July through December 2023, January through June 2024, July through December 2024, and January through June 2025:

### Table 24: Average Total Placements in Restricted Housing
July 2022 – June 2025

| Reporting Period | Average Total Restricted Housing |
| --- | --- |
| July-Dec 2022 | 347 |
| Jan-June 2023 | 265 |
| July-Dec 2023 | 255 |
| Jan-June 2024 | 295 |
| July-Dec 2024 | 298 |
| Jan-June 2025 | 213 |

---

[33] Monitor's Fourth Report, *supra* note 24, at 24; Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 21 (E.D. Pa. Mar. 3, 2023).
[34] Monitor's Fifth Report, *supra* note 21, at 31.

As recommended, PDP continues to track Class Members' total time in administrative and punitive segregation. This reporting period represents the lowest average number of Class Members in segregation overall since monitoring began. The average number of Class Members in administrative segregation decreased by 46, while the average number of Class Members in punitive segregation decreased by 39, reflecting an average total decrease of 85 Class Members.

PDP generally conducts timely reviews for retention of Class Members in administrative segregation. When PDP does not meet the 30-day or 60-day review timelines, it is typically related to a Class Member being placed in administrative segregation after completing a disciplinary sentence in punitive segregation. In this reporting period, PDP did not complete reviews for retention within 30 days for seven Class Members, and two of the seven were also not completed within 60 days. Nine percent of reviews for retention were not completed within required timeframes, which PDP should correct.

During the April 2025 site visit, SME McDonald reviewed classification files for all 10 Class Members who had been in segregation for more than 90 days. Consistent with previous reporting periods, the documentation supporting retention was insufficient in most cases. Only a few of the ten files reviewed documented Class Members as having participated in any form of programming, aside from completing an in-cell self-guided anger management workbook.

As previously reported, PDP policy requires deputy commissioner approval for retention of Class Members in segregation beyond 90 days.[35] Approval was not timely in at least half of cases reviewed. Only two of ten files reviewed for Class Members retained in segregation beyond 90 days at the end of June 2025 contained meaningful documentation on committee action reports. Most reports failed to articulate reasoning for retaining Class Members in segregation or any programmatic expectations of Class Members prior to release from segregation. In this reporting period, SME McDonald offered additional technical assistance to classification personnel responsible for documenting committee actions and is hopeful the quality of PDP classification documentation will improve in the next reporting period.

PDP continues efforts to reduce reliance on segregation. In this reporting period, the average total segregation population decreased from 347 in July through December 2022 to 213 in January through June 2025 (as reflected in Table 24 above). This decrease is the result of population reductions, as well as PDP's commitment to reduce its segregation population. The Monitoring Team continues to recommend that PDP enhance programming and supervision within the general population to further reduce the need for discipline.

---

[35] Because PDP created a First Deputy Commissioner position in the previous reporting period, PDP's current practice appears to require First Deputy Commissioner approval rather than deputy commissioner approval.

The following table depicts average total Class Members in administrative segregation and retention reviews exceeding 30- and 60-day timeframes for sample dates in six periods, July through December 2022, January through June 2023, July through December 2023, January through June 2024, July through December 2024, and January through June 2025:

**Table 25: Reviews for Retention on Administrative Segregation Exceeding 30 and 60 Days**
July 2022 – June 2025

| | CFCF | | | | PICC | | | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | > 30 Days | > 60 Days | % > 60 Days | Total Ad-Seg | > 60 Days | Total Ad-Seg | Total > 60 Days |
| July-Dec 2022 | 95 | 10 | 12 | 26% | 78 | 2 | 2 | 6% | 21 | 0 | 193 | 14 |
| Jan-June 2023 | 67 | 10 | 3 | 3% | 44 | 2 | 0 | 0% | 14 | 0 | 126 | 3 |
| July-Dec 2023 | 74 | 2 | 0 | 0% | 16 | 0 | 0 | 0% | 17 | 0 | 107 | 0 |
| Jan-June 2024 | 95 | 4 | 1 | 1% | 12 | 1 | 0 | 0% | 22 | 1 | 133 | 2 |
| July-Dec 2024 | 85 | 5 | 0 | 0% | 20 | 22 | 3 | 0% | 15 | 1 | 124 | 4 |
| Jan-June 2025 | 45 | 4 | 1 | 1% | 16 | 1 | 1 | 1% | 20 | 0 | 78 | 2 |

The Monitoring Team continues to recommend that PDP conduct retention reviews every 30 days while in punitive segregation and upon movement from disciplinary segregation to administrative segregation. This would assist the Classification Committee in determining whether retention in segregation remains necessary and provide an opportunity to assess Class Members for programmatic or other needs while transitioning from punitive to administrative segregation.

The following tables depict average total Class Members in administrative segregation and average lengths of stay in administrative and punitive segregation for three periods, January through June 2024, July through December 2024, and January through June 2025:

**Table 26: Average Total Class Members in Administrative Segregation and Average Lengths of Stay in Restricted Housing**
January 2024 – June 2025

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing |
| Jan-June 2024 | 95 | 72 | 12 | 65 | 22 | 86 | 133 | 73 |
| July-Dec 2024 | 85 | 76 | 20 | 59 | 18 | 65 | 124 | 71 |
| Jan-June 2025 | 45 | 83 | 16 | 53 | 18 | 69 | 78 | 73 |

**Table 27: Average Total Class Members in Administrative Segregation and Average Lengths of Stay in Restricted Housing**
January – June 2025

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing | Total Ad-Seg | Average Days in Restricted Housing |
| 1-17-25 | 70 | 101 | 16 | 70 | 11 | 85 | 97 | 95 |
| 2-14-25 | 48 | 88 | 21 | 54 | 16 | 72 | 85 | 77 |
| 3-14-25 | 63 | 67 | 17 | 60 | 21 | 50 | 101 | 62 |
| 4-18-25 | 37 | 76 | 15 | 44 | 20 | 81 | 72 | 70 |
| 5-16-25 | 32 | 76 | 12 | 43 | 11 | 68 | 55 | 66 |
| 6-13-25 | 19 | 87 | 12 | 48 | 26 | 58 | 57 | 65 |
| Average | 45 | 83 | 16 | 53 | 18 | 69 | 78 | 73 |
| Difference, July-Dec 2024 and Jan-June 2025 | -47% | +9% | -18% | -11% | 0% | +6% | -37% | +3% |

The average number of Class Members in segregation reduced significantly during this reporting period from 124 in July through December 2024 to 78 in January through June 2025, representing a 37 percent reduction.  The average number of days Class Members spent in restricted housing, however, increased slightly from 71 days in July through December 2024 to 73 days in January through June 2025, representing a 3 percent increase.

The following tables depict total punitive segregation placements and average lengths of stay in punitive segregation for six review periods, July through December 2022, January through June 2023, July through December 2023, January through June 2024, July through December 2024, and January through June 2025:

**Table 28: Total Placements and Average Lengths of Stay in Punitive Segregation**
July 2022 – June 2025

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| July-Dec 2022 | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |
| Jan-June 2023 | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |
| July-Dec 2023 | 70 | 26 | 42 | 22 | 37 | 15 | 148 | 21 |
| Jan-June 2024 | 90 | 30 | 37 | 25 | 36 | 26 | 162 | 27 |
| July-Dec 2024 | 101 | 26 | 43 | 32 | 30 | 32 | 174 | 29 |
| Jan-June 2025 | 59 | 23 | 43 | 19 | 34 | 18 | 135 | 20 |

**Table 29: Total Placements and Average Lengths of Stay in Punitive Segregation**
January – June 2025

| | CFCF | | PICC | | RCF | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation | Total Punitive Segregation | Average Days in Punitive Segregation |
| 1-17-25 | 83 | 23 | 28 | 24 | 36 | 15 | 147 | 23 |
| 2-14-25 | 69 | 23 | 44 | 17 | 34 | 17 | 147 | 21 |
| 3-14-25 | 51 | 24 | 35 | 14 | 36 | 19 | 122 | 19 |
| 4-18-25 | 56 | 23 | 37 | 19 | 34 | 14 | 127 | 19 |
| 5-16-25 | 43 | 24 | 57 | 13 | 37 | 17 | 137 | 17 |
| 6-13-25 | 50 | 19 | 58 | 25 | 24 | 26 | 132 | 22 |
| Average | 59 | 23 | 43 | 19 | 34 | 18 | 135 | 20 |
| Difference, July-Dec 2024 and Jan-June 2025 | -42% | -13% | 0% | -42% | +14% | -43% | -22% | -30% |

In the previous reporting period, the average number of Class Members in punitive segregation was 174, representing the highest total reported since monitoring began. Population reductions, policy modifications, the disciplinary pilot, and increased frequency of retention reviews have reduced the average number of Class Member in punitive segregation from 174 in July through December 2024 to 135 in January through June 2025. The average number of days Class Members spent in punitive segregation also decreased by 30 percent, from 29 days in July

through December 2024 to 20 days in January through June 2025.  PDP reports it continues to educate hearing officers and staff on alternatives to punitive and administrative segregation, particularly for Class Members on the behavioral health caseload.  PDP's expansion of the disciplinary pilot project, discussed in more detail below under Substantive Provision 8—Discipline, may have also contributed to reducing the punitive segregation population.

PDP's anticipated loss-of-privileges and step-down programs will further reduce PDP's reliance on segregation, generally, and create additional pathways with programming and incentives to reduce lengths of stay in segregation.  PDP has designated housing units A1 and A2 for the men's step-down units and is identifying staff to work in those units with specialized training and incentive pay.  PDP reports that it will submit a draft program model for review in the next reporting period and include a similar plan for a step-down unit for Class Members housed in women's units.

**Status of Recommendations, Sub-Provision 3.2—Out-of-Cell/Segregation, from the Monitor's Fourth Report:**

1. Provide daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met.  PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.
   *This recommendation has not been implemented.  As discussed above, creative solutions are being implemented, however, PDP remains unable to offer daily out-of-cell time to all Class Members in segregation units.  CFCF has intermittently provided reduced out-of-cell opportunities when only two officers are present, but this has not been consistent, operationalized, or expanded to other facilities.*
2. Ensure that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.
   *This recommendation has not been implemented.*
3. Use currently available information, such as reports from staff, supervisors, and Class Members to identify and attend to housing units that are struggling to offer out-of-cell time.
   *In this reporting period, PDP assigned a staff member to review out-of-cell logs and notify executives of any issues.  PDP updated the tracking log and began piloting RFID technology to better track out-of-cell time.  Integrating RFID with the jail management system will take time, and PDP reports it continues to seek methods to improve tracking and increase out-of-cell activities in the meantime.*
4. Document the reasons for any failures to offer out-of-cell time.
   *Out-of-cell tracking has improved and staff are more frequently recording reasons for refusals or failures to offer out-of-cell time.  Ongoing internal monitoring and implementation of the RFID system should support additional improvements.*

The Monitoring Team has also made the following recommendations in meetings with PDP personnel during site visits and virtual meetings over the course of implementation monitoring to assist PDP in reducing reliance on punitive segregation:

5. Increase educational, therapeutic, and other positive programming in general population units.

*PDP reports it plans to implement significant program changes and expansion of existing programs pending completion of the forthcoming Restorative and Transitional Services (RTS) evaluation. PDP estimates that approximately 25 percent of the population is currently participating in some type of educational or therapeutic programming. The Monitoring Team has not verified this information. Additional progress within RTS is discussed in more detail below under Substantive Provision 4—Resume Normal Operations.*

6. Utilize sanctions that do not require isolation, such as creating loss-of-privilege tiers where Class Members receive out-of-cell time, but access to commissary, tablets, and phones is limited or restricted.

*This recommendation has been incorporated to the disciplinary pilot mentioned in Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline. The loss-of-privileges and stepdown programs will reduce reliance on segregation and support reintegration of Class Members to general population where possible.*

7. Expand Therapeutic Housing Units (TU), discussed below under Substantive Provision 6—Behavioral Health in Segregation, and develop accompanying disciplinary policies that limit the placement of patients in isolation.

*Therapeutic housing units are being expanded incrementally. See discussion below under Substantive Provision 6—Behavioral Health in Segregation.*

8. Improve systems for behavioral health input in the disciplinary process, discussed below under sub-provision 8.1.

*This recommendation is being piloted as part of the PICC disciplinary pilot, discussed below under Substantive Provision 6—Behavioral Health in Segregation and Substantive Provision 8—Discipline.*

9. Establish an interdisciplinary committee to create behavior management plans for Class Members who cycle in and out of segregation.

*This recommendation has not been implemented. In the previous reporting period, PDP committed that YesCare clinicians would begin to attend Classification Committee meetings to limit current cycling of some Class Members between segregation, hospitalization, and mental health housing. A delay occurred in this reporting period because YesCare clinicians reportedly opposed participation on the committee on ethical grounds. PDP now reports it intends to include RTS clinicians in committee meetings and liaise with the treating YesCare clinicians on housing and program decisions. PDP now anticipates this recommendation will be implemented in the next reporting period.*

10. Develop programming for Class Members in segregation units to address behavior and assist with the transition back to general population.

*PDP reports it will be reviewing potential programs for this population in the next reporting period.*

11. Direct the new data analysis unit to analyze punitive segregation practices and trends.

*The Data Team has not listed segregation practices and trends as an area of focus for 2025.*

12. Revise classification policies and procedures to ensure they are designed to maximize programming and reserve segregation for those with the most serious behavioral issues for the shortest possible durations.

> *Classification policies remain unchanged. Overreliance on segregation occurs largely because of limited alternatives, insufficient programming, and a cultural dependence on the practice. PDP has shown progress in this area and committed to additional progress in the future.*

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

### Compliance Rating: Non-compliance

PDP reports it is in the process of drafting a plan for the return to normal operations, which it intends to submit to the Monitoring Team for review in the next reporting period. PDP's compliance status and plans for out-of-cell time are addressed above under Substantive Provision 2—Out-of-Cell Time and Substantive Provision 3—Out-of-Cell Segregation. PDP's compliance status and plans for visiting are addressed below under Substantive Provision 13—Visiting and Substantive Provision 14—Attorney Visiting. Regarding educational and other rehabilitative programming, the Monitoring Team has not had reliable metrics to assess any current programs and services offered or coordinated by RTS but remains encouraged by the efforts of Deputy Commissioner Jaco and her team to enhance programming throughout PDP.

**Restorative and Transitional Services**

Paragraph 3(a) of the Sanctions Order states: [36]

> Within 60 days of the date of this Order, the City shall identify and provide to the Monitor competent outside consultant(s) to conduct an objective evaluation of the Restorative and Transitional Services (RTS) Unit's functions and effectiveness. Within 60 days of approval by the Court, the City shall engage the identified consultant(s). The evaluation shall include at a minimum, a comparative analysis of programs proven effective in other comparable detention/correctional facilities, and a recommendation for performance metrics against which to assess the performance of PDP employees working in RTS.

The identification of an outside consultant was due by October 15, 2024.

Defendants have partially complied with the requirements of this paragraph. In January 2025, PDP reported that it had interviewed five potential consultants to complete the required evaluation. Also in January 2025, the City submitted a proposed scope of work and a request to retain Independent Variable Consulting (Independent Variable). On January 23, 2025, this Court authorized Defendants to retain Independent Variable, which they finalized on February 18, 2025, in advance of the March 24, 2025, Sanctions Order deadline. Independent Variable reportedly began the evaluation in March 2025 and provides PDP with regular updates. PDP reports that Independent Variable has held focus groups with Class Members and completed more than 25 interviews with RTS staff and PDP stakeholders. Independent Variable representatives also reviewed and provided feedback to PDP leadership on RTS policies, practices, and data necessary to manage the RTS program. The evaluation is scheduled for completion by October 2025.

PDP reports that Independent Variable's initial evaluation will include all adult programs and services. PDP reports it is exploring the possibility of a subsequent evaluation to include programs and services available to youth. Because youth confined in PDP facilities depend on RTS services, an evaluation of RTS functions and effectiveness vis-à-vis this population is required under this paragraph.

Previously, PDP reclassified some RTS positions maintained a low vacancy rate in this reporting period.[37] PDP reports that Independent Variable is evaluating RTS staffing and services and will make recommendations for appropriate staffing classifications and allocations to improve services.

---

[36] Order, *supra* note 5, at 5.
[37] Monitor's Sixth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 228 at 46 (E.D. Pa. Mar. 31, 2025).

Position allocations and RTS vacancies from December 2024 and June 2025 are depicted in the following table:

**Table 30: Restorative and Transitional Services Division Staffing**
December 2024 and June 2025

| Position Category | Allocated Positions Dec 2024 | Filled Positions Dec 2024 | Vacancy Rate Dec 2024 | Allocated Positions June 2025 | Filled Positions June 2025 | Vacancy Rate June 2025 |
|---|---|---|---|---|---|---|
| Instructor | 4 | 2 | 50% | 4 | 4 | 0% |
| Volunteer Services Director | 1 | 1 | 0% | 1 | 1 | 0% |
| Psychologist | 5 | 8 | 0% | 5 | 7 | 0% |
| Prison Psychologist Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Social Work Services Trainee | 5 | 11 | 0% | 5 | 10 | 0% |
| Social Work Services Manager I | 1 | 0 | 100% | 1 | 0 | 100% |
| Social Work Services Manager 2 | 39 | 37 | 5% | 39 | 35 | 10% |
| Social Work Supervisor | 14 | 14 | 0% | 14 | 12 | 14% |
| Human Services Program Administrator | 3 | 3 | 0% | 3 | 3 | 0% |
| Social Services/Housing Program Analyst | 2 | 1 | 50% | 2 | 1 | 50% |
| Prison Close Circuit TV Specialist | 2 | 1 | 50% | 2 | 2 | 0% |
| Inmate Computer-Based Education Instructor | 7 | 5 | 29% | 7 | 6 | 14% |
| Inmate Computer-Based Education Supervisor | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Assistant Director | 1 | 1 | 0% | 1 | 1 | 0% |
| Correctional Industries Director | 1 | 0 | 100% | 1 | 0 | 100% |
| Industries Shop Supervisor | 16 | 14 | 12% | 16 | 14 | 12% |
| Education Director | 1 | 1 | 0% | 1 | 1 | 0% |
| **Total** | **104** | **101** | **3%** | **104** | **99** | **5%** |

RTS hired five new staff and lost seven staff in this reporting period. The Independent Variable analysis is expected include recommendations for appropriate staffing classifications and allocations to improve RTS services. If job classifications or staffing allocations change as a result, the staffing matrix reported here will change as well, possibly in the next reporting period.

PDP reports that programs and services offered by RTS are currently dependent on external partners, including many volunteers and community-based organizations and are limited by the capacity of each partner to provide services. PDP reports that several contracts are in place, and PDP is awaiting the Independent Variable analysis to assist with determining which partnerships to maintain and which additional contracts are necessary. Current contracts include Heating, Ventilation, and Air Conditioning Technician, Commercial Driver's License, Home Health Aide and Environmental Maintenance classes. Class sizes and lengths of programs vary, but PDP reports the average class size is 20 for sessions ranging from 1 to 12 weeks. PDP estimates up to

25 percent of Class Members participate in programming at some time during their incarceration. PDP reports that RTS and volunteer providers also offer programming in cognitive behavioral therapy, substance use treatment, life skills, workforce development and training, and prerelease classes.  As noted above, the Monitoring Team has been unable to verify this information.

On September 8, 2025, PDP opened a long-anticipated Reentry Center in partnership with the City of Philadelphia Office of Reentry Partnerships, which will offer services to Class Members as they are released from custody.  Initial services will include the return of individual Class Member funds deposited into their PDP accounts, transportation, and housing and community referrals.  PDP reports Reentry Resource Centers at CFCF and RCF are also beginning to offer additional programs for resume writing, interview skills, and mock job interviews.  This is an important initiative spearheaded by the Deputy Commissioner for RTS and her team, and Class Members will benefit from these services.  The City should continue to support reentry initiatives and provide for additional services as quickly as RTS is prepared to offer them.

As recommended and previously reported, PDP established a behavior modification unit led by RTS and security personnel.[38]  The Functional Behavior Support Unit's (FBSU) goal is to offer individual behavior modification plans and programming for a small subset of patients who exhibit extreme maladaptive behaviors.  These patients often spend extended periods in segregation, are frequently hospitalized, require trips to hospital emergency departments, and require substantial security and clinical resources.

The FBSU was initially piloted at PICC in 2023 and reported success with several patients using incentives to reduce the frequency of maladaptive behaviors.  The FBSU was closed in March 2024 and reopened at PHSW-Unit 112 in August 2024.  During site visits in April 2025, the FBSU had three participants.  One participant was available for interview during site visits and reported benefitting from FBSU treatment.  PDP reports that six patients received treatment in the FBSU from assigned RTS psychologists between January and June 2025.

In previous reporting periods, PDP had identified security personnel whose expertise is well suited to the program and the unique challenges its participants face.[39]  PDP reports that FBSU security staff continue to be selected based on specific skill sets and the desire to work with this population, and that they receive FBSU-specific training.

PDP reports that weekly interdisciplinary meetings are held to consider FBSU new-patient and release referrals, track patient progress, and address any issues that arise.  PDP reports that these meetings provide an opportunity to discuss patient and program needs, and the meetings benefit from regular participation of security, RTS, and Healthcare divisions.  During site visits over two reporting periods, many security and healthcare staff were unaware that the FBSU existed or what purpose it served.  PDP was encouraged to ensure that all staff were aware of the program, its mission, and the referral process and criteria.

During the April 2025 site visits, several staff identified Class Members they felt would be appropriate for the FBSU but believed the FBSU was not accepting referrals.  When brought to

---

[38] Monitor's Fourth Report, *supra* note 24, at 32.
[39] Monitor's Sixth Report, *supra* note 37, at 47; Monitor's Fifth Report, *supra* note 21, at 39.

the attention of the Deputy Commissioner of Operations, he directed the dissemination of accurate information, which was reportedly conveyed to staff in this reporting period verbally and via e-mail. FBSU staff were reportedly also encouraged to educate their colleagues about the FBSU and its process for receiving and evaluating referrals.

Ultimately, little has changed with the FBSU over three reporting periods. Currently, FBSU referrals are being evaluated case-by-case, which is appropriate. However, the FBSU does not admit patients with highly assaultive behavior. This is reportedly because cell doors in PHSW lack "food ports," smaller doors through which food and other items may be more safely passed to occupants. Highly assaultive patients are therefore ineligible for the program.

As discussed in previous reports, patients who meet other behavior management program criteria and are also physically assaultive are precisely the types of patients behavior management programs are designed to treat.[40] Without behavior management programs, these patients often languish in segregation indefinitely where they may pose risk to other Class Members or staff and often engage in dangerous acts of self-harm, as is the case with some PDP patients. The FBSU's rigid eligibility criteria are likely why only six patients have been treated there in this reporting period. The Monitoring Team continues to recommend that PDP expand its current eligibility criteria and make any necessary physical plant modifications, or relocate the FBSU, to accommodate PDP's highly assaultive patients who otherwise meet FBSU criteria.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating:  Partial Compliance**

The Monitor's Second Report defined PDP's backlog reduction goal, "To achieve substantial compliance with the substantive provision, PDP must reduce its backlog to no more than 238, or 15 percent of 1,587."[41] In July 2022, PDP began tracking backlogged appointments in all facilities and made changes to its tracking methods to improve accuracy. The July 2022 backlog

---

[40] Monitor's Sixth Report, *supra* note 37, at 47.
[41] Monitor's Second Report, *supra* note 33, at 25.

data for all facilities, including all appointment types, was 1,587.[42]  This total included 1,242 on-site general medical and behavioral health appointments (July 22, 2022), 104 on-site specialty appointments (July 22, 2022), and 241 off-site specialty appointments (July 18, 2022).[43]

As anticipated in the previous report, PDP has successfully achieved and maintained a dramatic reduction in average weekly on-site healthcare appointment backlogs in this reporting period. The Monitor's Sixth Report notes an increase in average backlogs from 550 appointments to 751 appointments from the first half of 2024 to the second half of 2024.[44]  Current PDP data reflects an average backlog of only 61 appointments in June 2025, or a 93 percent reduction since December 2024.  PDP data also reflects that PDP has maintained a weekly on-site backlog of fewer than 100 appointments since March 19, 2025.

In November 2024, PDP upgraded its Electronic Medical Record (EMR), which caused issues with charting and provider efficiency and temporarily increased the backlog.  PDP reports, and reduced backlogs illustrate, these issues have been resolved.  PDP has also maintained a low vacancy rate for healthcare staff throughout this reporting period and has expanded treatment times, as needed, to accommodate additional appointments.  Low healthcare vacancies, the Access-to-Care initiative, and population reductions have largely contributed to the reduction in on-site healthcare appointment backlogs.

---

[42] *Ibid*.
[43] *Ibid*.
[44] Monitor's Sixth Report, *supra* note 37, at 49.

The table below compares on-site appointment backlogs for two four-week periods in December 2024 and June 2025:

**Table 31: On-Site Appointment Backlogs for General Medical and Behavioral Healthcare Weekly Averages, Four-week Comparison**
December 2024 and June 2025

| Backlog Report Four-week Period | Weekly Average Backlogged Appointments** | | Change | Percent Change (+/-) |
|---|---|---|---|---|
| | Dec 2024 | June 2025 | | |
| BH Initial Psychiatric Eval. | 84 | 4 | -80 | -95% |
| BH Medication Evaluation | 123 | 1 | -122 | -99% |
| BH Social Work Sick Call | 2 | 0 | -2 | * |
| BH SW SCTR | 0 | 0 | 0 | * |
| Chronic Care Follow-up | 107 | 5 | -102 | -95% |
| Chronic Care Initial | 124 | 6 | -118 | -95% |
| MAT | 133 | 24 | -109 | -82% |
| MAT Follow-up | 0 | 0 | 0 | * |
| Provider Sick Call | 66 | 3 | -63 | -95% |
| RN Sick Call | 53 | 14 | -39 | -74% |
| Re-Entry Planning | 59 | 4 | -55 | -93% |
| **Total Backlog** | **751** | **61** | **-690** | **-92%** |

*Average percent change not calculated for average appointments <50.
**Weeks reviewed include: 12/04/24 to 12/27/24 and 06/04/25 to 06/25/25.

Unlike the previous reporting period when CFCF accounted for the greatest number of backlogged appointments, the current backlog is small and equally distributed between CFCF and DC. As previously reported, PDP implemented a tablet-based sick-call pilot program at CFCF in April 2024.[45] By December 2024, RCF, PICC, and CFCF's tablet sick-call systems were fully operational. On February 26, 2025, PDP reported the tablet sick-call request system implemented at DC and all facilities are now fully operational. Patient feedback about the tablet request system remains positive.

As recommended, PDP reports that it will continue to make hard-copy sick-call forms available in every populated housing unit though most requests are now being submitted via tablet. The Monitoring Team observed paper sick-call requests available to patients on housing units during April and June 2025 site visits. In the previous reporting period, some grievance and sick-call receptacles in some CFCF units were filled with days-old RTS and sick-call requests and Class Member grievances. Facility leadership committed to corrective action, and the same issues

---

[45] Monitor's Fifth Report, *supra* note 21, at 41.

were not observed during the April 2025 site visit.  The Monitoring Team will continue to spot-check receptacles during site visits.

As previously reported, the assignment of PICC's Health Services Administrator as a "Care Coordinator" to liaise between providers, patients, and security personnel improved on-site appointment attendance.  The Monitoring Team recommended expansion of the Care Coordinator initiative to every PDP facility.  Healthcare staffing increases pursuant to the Sanctions Order included eight care coordinators.  As of this filing, six have been hired and at least one coordinator has been assigned to each facility.

**On-Site Specialty Care**

As with on-site general medical backlogs above, PDP Healthcare made significant progress in reducing on-site specialty backlogs in this reporting period.  On-site specialty care appointments represent eight percent of PDP's total appointment backlog.  The on-site specialty backlog decreased by 92 percent in this reporting period, from 289 in December 2024 to 23 in June 2025.  PDP has maintained an on-site specialty backlog of fewer than 100 appointments since April 2, 2025 and fewer than 40 appointments since May 14, 2025.

The backlog in the previous reporting period was driven mostly by 217 on-site optometry appointments, which totaled 75 percent of the on-site specialty backlog.  PDP expanded optometry service hours and locations to include CFCF and DC so patients do not require transfer between facilities.  These changes and patient population reductions have eliminated the optometry backlog since May 2025.

Podiatry appointment backlogs also contributed to the on-site specialty backlog and reached a high of 109 appointments in August 2024.  This backlog reduced to 23 appointments by the end of December 2024 and was further reduced to only four appointments in June 2025.

PDP Healthcare reports that reductions in the on-site specialty backlogs are due largely to improved coordination between healthcare and security divisions, facilitated by the Deputy Commissioner of Operations.  Improved coordination reportedly increased attendance and reduced patient transfers.  Providers are also now traveling between facilities to treat patients on site rather than requiring transfers to the main clinic at DC/PHSW.[46]  PDP also purchased mobile optometry equipment that allows specialists to see patients at multiple facilities, which also reduces the need for security escorts.  PDP extended podiatry services from one to two days per week in this reporting period, which successfully reduced the podiatry backlog to fewer than five appointments by the end of June 2025.[47]  Finally, PDP expanded the hours X-ray services are offered and successfully reduced the X-ray appointment backlog to two appointments in June 2025.

---

[46] *Id.* at 22.
[47] *Ibid.*

**Off-Site Specialty Care**

The backlog for off-site specialty care appointments represent 69 percent of all backlogged appointments in this reporting period.  In December 2022, PDP's off-site backlog was 172 total appointments that were either scheduled or awaiting scheduling.  In June 2023, the backlog had increased slightly to 187 total appointments.  In December 2023, the total backlog grew to 375 appointments and only reduced slightly to 358 in June 2024.  In the previous reporting period, weekly backlog reports showed a high of 432 appointments, but by December 2024, the total had reduced to 295.  In this reporting period, the number of backlogged appointments for June 2025 returned to the December 2022 backlog of 187 appointments.  In May and June 2025, this backlog remained under 250 appointments each week.  PDP attributes this progress to population reductions, improved tracking and scheduling of appointments, and additional transportation security staff.  PDP also reports that the EMR upgrade and ATIMS allow for easy identification of duplicate appointments, or the possibility of same-day appointments, which also reduce transports.

PDP's total backlog at the end of June 2025 was 271 appointments, which is only 15 percent of the backlog for the same period in 2022, and is approaching the 238 appointments required for substantial compliance with this substantive provision.  PDP has also completed more than 200 off-site specialty appointments each month through most of this reporting period.

The following graph depicts completed monthly off-site specialty appointments from January 2023 through June 2025:



**Completed Off-Site Appointments**
January 2023 – June 2025

In 2023, PDP's completed off-site appointments decreased by 26 percent, from 1,273 in the period January through June to 938 in the period July through December.   From January through June 2024, they again reduced by nine percent to 851 completed appointments.  In the period

July through December 2024, they decreased by another seven percent to 791 completed appointments. From January through June 2025, the number of completed appointments increased by 49 percent to 1,179. From March through June 2025, PDP completed more than 200 off-site specialty appointments each month. In the same period, 69 percent of eligible appointments were completed, and PDP should be able to further reduce the off-site specialty backlog in the next reporting period.

The following table depicts off-site specialty appointments scheduled and attended from January through June 2025:

### Table 32: Off-Site Specialty Appointment Summary
January – June 2025

| Month | Jan | Feb | Mar | Apr | May | June | Total |
|---|---|---|---|---|---|---|---|
| # Scheduled | 380 | 340 | 406 | 421 | 389 | 366 | 2,302 |
| Out of Custody | 29 | 0 | 61 | 71 | 38 | 40 | 239 |
| Out of Jurisdiction/Open Ward | 3 | 2 | 2 | 1 | 5 | 1 | 14 |
| Cancel Prior to Transport | 16 | 13 | 17 | 10 | 9 | 13 | 78 |
| COVID-19 Isolation | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Ineligible* | *48* | *15* | *80* | *82* | *52* | *54* | *331* |
| # Eligible to Attend Appointment | 332 | 325 | 326 | 339 | 337 | 312 | 1,971 |
| Refused[48] | 32 | 37 | 33 | 46 | 49 | 64 | 261 |
| C/O Shortage | 132 | 137 | 63 | 33 | 16 | 15 | 396 |
| Cancelled at Office | 1 | 2 | 0 | 5 | 1 | 3 | 12 |
| Scheduling Error | 0 | 0 | 4 | 3 | 2 | 0 | 9 |
| Court | 2 | 7 | 7 | 6 | 10 | 9 | 41 |
| Late to Appointment | 10 | 0 | 9 | 10 | 3 | 4 | 36 |
| Other | 6 | 18 | 4 | 1 | 4 | 4 | 37 |
| *Total NOT Seen* | *183* | *201* | *120* | *104* | *85* | *99* | *792* |
| **Total Seen** | 149 | 124 | 206 | 235 | 252 | 213 | 1,179 |
| **% of Eligible Patients Seen** | 45 | 38 | 63 | 69 | 75 | 68 | 60 |

PDP reports that the availability of transportation personnel is the greatest contributing factor to reductions in the off-site backlog. Staff shortages reportedly accounted for 132 appointments missed in January 2025 but only 16 missed appointments in May 2025 and 15 missed appointments in June 2025. Eligible patient attendance increased from 45 percent in January 2025 and 38 percent in February 2025 to a high of 75 percent in May 2025.

Because transportation staff are limited, PDP continues to maintain the "must-go" list for scheduled appointments.[49] That is, PDP security notifies the Medical Director how many patients may be transported in a given week based on availability of transport staff, and the

---

[48] PDP does not currently track reasons for refusals. As previously reported, patients have consistently reported to the Monitoring Team that excessive wait times in holding cells for transportation to appointments is among primary reasons for their refusals. *See* Monitor's Third Report, *supra* note 32, at 31-32. PDP reports they now stagger when Class Members are brought to the transfer area for appointments and that wait times have reduced.

[49] *See* Monitor's Fifth Report, *supra* note 21, at 44-45.

Medical Director must then determine which patients need care the most.  Patients on the must-go list are prioritized for specialty appointments.  Those housed in the PHSW also receive priority transportation to off-site appointments.  As previously reported, even prioritized patients may not make their appointments when security post vacancy rates are higher than anticipated.[50]  In June 2024, PDP began requiring notifications to executive management when patients on the must-go list are unable to be transported, which PDP reports has improved attendance for must-go appointments.  PDP agreed to monthly audits of must-go lists and results are reflected in the table below.

The following table reflects total patients on the must-go list, total patients transported to off-site appointments, and total not sent each month March through June 2025:

**Table 33: Patients on Must-Go List**
March – June 2025

| Month | March | April | May | June |
|---|---|---|---|---|
| On List | 72 | 102 | 83 | 37 |
| Sent (n) | 57 | 85 | 77 | 37 |
| Sent (%) | 79% | 83% | 93% | 100% |
| Not Sent | 15 | 17 | 6 | 0 |

PDP has made progress in reducing the must-go list and getting patients to their specialty appointments and anticipates the must-go list will be eliminated in the next reporting period.  In this reporting period, the Monitoring Team reviewed medical records of all 38 patients who were on the must-go list between March and June 2025.  Patients on the must-go list who did not attend their appointments were generally scheduled for a new appointment within one month.

In several instances, patients were re-scheduled multiple times, including one patient whose orthopedic surgery post-operative appointment was rescheduled at least three times.  Charts reviewed by the Monitoring Team in this reporting period did not reflect that patients' conditions were exacerbated as a result of the delays.  However, these delays in care remain problematic and should be eliminated.  The Monitoring Team continues to recommend that PDP identify sufficient security transportation staff as necessary to eliminate the must-go list.

In July 2024, PDP finalized the establishment of a nine-bed secure inpatient unit at Jefferson Frankford Hospital, as previously reported.[51]  PDP initially intended the unit to treat medical inpatient and inpatient surgery patients and provide post-operative care.  Combining the care at a single hospital for this subset of patients was expected to limit the number of security personnel who were redirected from jail posts to medical guarding assignments at various area hospitals.  PDP reported it subsequently learned that Jefferson Frankford Hospital no longer offers the anticipated surgical services and struggled to identify patients who could be served on the unit.  PDP now reports that the unit is admitting patients who require care for substance use withdrawal.  These patients were previously treated at various area hospitals and required deployment of housing unit security personnel for guarding.

---

[50] *Id.* at 45.
[51] *Ibid.*

**Intake Screenings**

PDP remains unable to meet policy guidelines for patient intake screenings within four hours of arrival at PDP.

The following table depicts PDP's reported compliance with four-hour timeframes for each month in the first half of 2025:

**Table 34: Percentage of Intake Screenings Within Four Hours**
January – June 2025

| Month | Percentage (%) |
|-------|----------------|
| January | 54 |
| February | 49 |
| March | 50 |
| April | 73 |
| May | 63 |
| June | 56 |
| Total | 57 |

PDP continues to report that its intake area is staffed with sufficient healthcare and security personnel to meet the four-hour policy requirement, and that healthcare and security leadership have not identified the reasons this deficiency. PDP reports that care coordinators have now been trained on the four-hour requirement and will work to improve compliance in the next reporting period.

**Mortality Information**

One Class Member died while in PDP custody between January and June 2025. The cause of death is pending as of this filing. The Monitoring Team attended PDP's review following this death. The review was chaired by the First Deputy Commissioner and included the Commissioner and PDP's executive leadership team, Healthcare and Security division managers, and line personnel involved in the emergency response. PDP evaluated the security and healthcare responses, although available CCTV recordings were not reviewed. The Monitoring Team continues to recommend that PDP show available CCTV footage in all reviews to support critical self-evaluation. The Monitoring Team has also continued to recommend that PDP implement a formal system for tracking any systemic issues identified during the reviews and corrective action taken. In this reporting period, PDP has committed to tracking identified deficiencies and any corrective action taken.

PDP's death review processes and critical incident reviews are not subject to monitoring pursuant to the Agreement. Although systemic issues that emerge during the reviews often relate to various substantive provisions in the Agreement, neither the quality of PDP's reviews nor PDP's acceptance or rejection of the Monitoring Team's recommendations impact its compliance. PDP continues to consider input and recommendations from the Monitoring Team.

PDP Healthcare reports, in addition to death reviews that are attended by PDP's security and executive staff, Healthcare also reviews each death through a Mortality and Morbidity Review Committee chaired by healthcare and attended by healthcare staff and security personnel. This committee reportedly reviews each death and implements corrective action as needed. Dr. Belavich reviewed documentation from several Mortality and Morbidity Review Committee meetings, which he confirms reflect Healthcare-identified areas for corrective action. Progress on the implementation of corrective action is monitored through the Healthcare Quality Management Committee, chaired by the Executive Healthcare Administrator.

**Behavioral Healthcare**

PDP has made progress in meeting policy timeframes for social worker sick calls and 14-day patient evaluations but remains out of compliance with behavioral health referral timeframes in this reporting period.[52]

The following tables depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations for January through June 2025:

**Table 35: Percent Compliance with Behavioral Health Referral Timeframes**
January – June 2025

| Month | Total Completed Referrals | Total Referrals Completed within Timeframes (%) | Emergency Referrals Completed within 4 hours (%) | Emergency Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 24 hours (%) | Urgent Referrals Completed within 48 hours (%) | Routine Referrals Completed within 5 days (%) |
|---|---|---|---|---|---|---|---|
| January | 927 | 57% | 71% | 97% | 36% | 62% | 59% |
| February | 760 | 58% | 80% | 98% | 27% | 48% | 52% |
| March | 767 | 52% | 78% | 98% | 27% | 51% | 38% |
| April | 709 | 55% | 78% | 98% | 24% | 48% | 48% |
| May | 681 | 59% | 78% | 98% | 32% | 51% | 52% |
| June | 684 | 60% | 80% | 98% | 29% | 53% | 57% |
| **Average** | **4528** | **57%** | **77%** | **98%** | **29%** | **52%** | **51%** |

*Expectation: emergent within 4 hours, urgent within 24 hours, routine within 5 days.

---

[52] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals: emergency referrals, within four hours; urgent referrals, within 24-hours; and routine referrals, within five days.

**Table 36: Social Worker Sick Calls**
January – June 2025

| Month | Number Completed | Completed within 24 hours (%) |
|-------|------------------|-------------------------------|
| January | 381 | 100% |
| February | 299 | 100% |
| March | 236 | 100% |
| April | 246 | 99% |
| May | 268 | 100% |
| June | 194 | 99% |
| **Total** | **1624** | **100%** |

**Table 37: Compliance with 14-Day Patient Evaluations**
January – June 2025

| Month | Number Completed | Completed within 14 Days (%) |
|-------|------------------|------------------------------|
| January | 452 | 87% |
| February | 438 | 98% |
| March | 563 | 88% |
| April | 561 | 87% |
| May | 535 | 92% |
| June | 631 | 91% |
| **Total** | **3180** | **89%** |

In this reporting period, 57 percent of behavioral health referrals were completed within required timeframes. This marks an improvement from 46 percent compliance in the previous reporting period and a similar compliance percentage to the 56 percent reported in the period January through June 2024. Compliance with four-hour emergency referral timeframes also improved from 67 percent in the previous reporting period to 77 percent in this reporting period.

Compliance rates with urgent and routine referrals remain low in this reporting period. Urgent referrals were completed within 24 hours less than 30 percent of the time, on average, throughout this reporting period. This is an improvement from the 20 percent compliance rate in the period January through June 2024 and 16 percent compliance reported in the period July through December 2024. Routine referrals improved from 35 percent compliance in the period July through December 2024 to 51 percent in this reporting period.

Healthcare reports it is working with new staff to reduce behavioral health backlogs and continue to address timeliness of referrals. The Behavioral Health Director reports that training has been provided to improve monitoring of referral timelines by hours (i.e., emergent and urgent) and not days as has occurred previously. PDP also reports that beginning July 1, 2025, a social worker is consistently stationed in the intake area so that urgent and emergent referrals may be seen immediately upon completion of medical intakes.

The number of behavioral health referrals reached a high of 927 referrals in January 2025 and a low of 681 referrals in May 2025.  In the previous reporting period, behavioral health referrals reached 827 in November 2024 and 1,010 referrals in December 2024.  From January through June 2024, PDP received a low of 609 referrals in January 2024 and a high of 772 referrals in May 2024.

In the previous reporting period, PDP reported that EMR upgrades prevented PDP from generating data about Social Worker Sick Calls and 14-day behavioral health evaluations for October, November, and December 2024.  PDP was able to resolve the issue and provide complete data for this reporting period.  Compliance with social worker sick-call requests has been consistently high throughout the reporting period with 99-100 percent of sick calls meeting required timeframes.  PDP attributes this improvement to additional behavioral health staff and fewer patients.

PDP was also unable to generate complete data on compliance with 14-day behavioral health evaluations in the previous reporting period.  The data PDP provided for July, August, and September 2024 ranged from 60 to 70 percent compliance with the 14-day evaluation timeframe, which was lower than in previous reporting periods.  In this reporting period, complete data was available and shows consistent compliance above 85 percent with 14-day evaluations, also attributed to increased staffing and fewer patients.

**Healthcare Staffing**

In this reporting period, PDP filled additional full-time positions and maintained a functional vacancy rate of less than five percent each month from January 2024 through June 2025. Correctional healthcare staff vacancy rates are analyzed based on the number of vacant and filled positions for a "staff vacancy" rate.  A "functional vacancy" rate includes shifts that are filled by overtime and temporary agency hires and accounts for permanent staff who are out on leave and not reporting for duty.  The functional vacancy rate is determined based on budgeted hours and total hours of delivered service.  PDP's consistently low vacancy rates over the last 18 months have contributed to the significant backlog reductions reported above.

In December 2024, PDP reported a healthcare staff vacancy rate of nine percent and a functional vacancy rate of negative three percent. This was an improvement over the previous reporting period in June 2024 when PDP reported a vacancy rate of 17 percent and a functional vacancy rate of 4 percent. During this reporting period, with the net addition of 17 new hires, PDP reports a healthcare vacancy rate of five percent and a functional vacancy rate of zero percent.

The following tables depict healthcare new hires and separations for each classification in this reporting period, January through June 2025, and total healthcare vacancies for December 2024 and June 2025:

**Table 38: Healthcare Personnel New Hires and Separations by Job Classification**
January – June 2025

| Job Classification | New Hires | Separations | Net (+/-) |
|---|---|---|---|
| Administration | 3.0 | 3.4 | -0.4 |
| Behavioral Health Aide | 0.8 | 1.4 | -0.6 |
| Behavioral Health Clinician | 2.0 | 0 | +2 |
| Behavioral Health Prescriber | 1.4 | 2.5 | -1.1 |
| Behavioral Health Professional | 3.4 | 1 | +2.4 |
| Certified Nursing Assistant | 0 | 1 | -1 |
| Clerical | 2 | 1 | +1 |
| Licensed Practical Nurse | 17.6 | 10.5 | +7.1 |
| Medical Assistant | 0 | 4 | -4 |
| Medical Records | 6.2 | 0.4 | +5.8 |
| Physical Health Clinician | 0 | 1 | -1 |
| Physical Therapy Assistant | 1 | 0 | +1 |
| Re-Entry Director | 1 | 1 | 0 |
| Telehealth Coordinator | 2 | 1 | +1 |
| Registered Nurse | 8.8 | 4 | +4.8 |
| **Total** | **49.2** | **32.2** | **+17** |

**Table 39: Healthcare Vacancy Report**
December 2024 and June 2025

| Position Category | Allocated Positions Dec 2024 | Unfilled Positions Dec 2024 | Vacancy Rate Dec 2024 | Allocated Positions June 2025 | Unfilled Positions June 2025 | Vacancy Rate June 2025 | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Administration | 59.5 | -2 | -3% | 59.5 | 3 | 5% | 21% |
| Behavioral Health Aide | 12.2 | 0.6 | 5% | 12.2 | 1.2 | 10% | 15% |
| Behavioral Health Clinicians: Social Worker/Psychologist | 19.4 | 2 | 10% | 19.4 | -1.4 | -7% | -1% |
| Behavioral Health Prescribers: Psychiatrist, NP | 15.2 | -1.8 | -12% | 15.2 | -.07 | -5% | -13% |
| Behavioral Health Professionals: BH Coun./Activity Th. | 15 | -1.4 | -23% | 15 | -2.4 | -16% | 4% |
| Certified Nursing Assistant | 2.8 | 1.8 | 64% | 2.8 | 2.8 | 100% | 90% |
| Dialysis RN and Dialysis Technician | 1.5 | 0.8 | 53% | 1.5 | 0.8 | 53% | -6% |
| Infectious Disease Physician | 2 | 0 | 0% | 2 | 0 | 0% | 21% |
| License Practical Nurse: All LPNs | 74.2 | 7.8 | 11% | 74.2 | 0.7 | 1% | -19% |
| Medical Assistant | 15 | 7 | 47% | 15 | 11 | 73% | 10% |
| Medical Records Clerk | 13.8 | 0.2 | 1% | 13.8 | -5.6 | -41% | -20% |
| OB/GYN Physician | 0.8 | 0 | 0% | 0.8 | 0 | 0% | 40% |
| Physical Health Clinicians: Physician, NP, PA | 19.8 | -1 | -5% | 19.8 | 0 | 0% | 13% |
| Physical Therapist/Therapist Assistant | 3 | 0 | 0% | 3 | -1 | -33% | 6% |
| Telehealth Coordinators | 3 | 2 | 67% | 3 | -1 | -33% | -86% |
| Radiology Technician | 2.4 | 0.4 | 17% | 2.4 | 0.4 | 17% | 29% |
| Registered Nurse: All RNs | 63.1 | 13.9 | 22% | 63.1 | 9.1 | 14% | -1% |
| **Total** | **322.7** | **30.3** | **9%** | **322.7** | **16.9** | **5%** | **0%** |

As with previous reporting periods, an average of 13 percent pay increases for most healthcare positions continues to attract candidates and hiring remained strong in this reporting period.[53]  As previously reported, from July through December 2024, PDP was able to convert some Behavioral Health positions that were proving challenging to fill to similar clinical classifications that PDP reported would not limit services to patients.[54]  As a result, PDP was able to increase Behavioral Health hiring and largely eliminate Behavioral Health vacancies, which helped reduce backlogs.

---

[53] Monitor's Fifth Report, *supra* note 21, at 50; Monitor's Fourth Report, *supra* note 24, at 38-39.
[54] Monitor's Sixth Report, *supra* note 37, at 59.

With additional hires in Behavioral Health classifications, the vacancy rate for Behavioral Health clinicians decreased from a reported 74 percent in June 2024 to negative seven percent in June 2025 with a functional vacancy rate of negative one percent including overtime and registry clinicians.  As previously reported, the prescriber vacancy rate was eliminated during the July through December 2024 reporting period.  The vacancy rate in this reporting period is negative five percent with a functional vacancy rate of -13 percent including overtime and registry clinicians.  Given the Healthcare Division's consistently low vacancy and functional vacancy rates, the Monitoring Team will discontinue monitoring healthcare staffing with the exception of additional staffing requirements pursuant to the Sanctions Order addressed below.

---

Paragraph 2(a) of the Sanctions Order states:[55]

> The City shall increase the budget for YesCare to provide additional healthcare staffing to serve as liaisons between security personnel and healthcare providers, to expand healthcare services to meet the current and future needs of the patient population, and to provide routine rounding in all housing units due to limited out-of-cell time.

> > (i)     Rounding shall occur at least three times per week in all units until the PDP comes into substantial compliance with required out-of-cell time.

> > (ii)    The budget increase shall be sufficient to allow YesCare to provide additional staff members as necessary to ensure substantial compliance with substantive provisions 4 ("Return to Normal Operations"), 5 ("Healthcare") and 6 ("Behavioral Health in Segregation") of the Settlement Agreement.

Defendants have partially complied with the requirements of this paragraph.  In October 2024, the City reported that it had negotiated a contract amendment for expanded services with YesCare on September 30, 2024 to allocate 38 additional positions.  In November 2024, Defendants reported that the contract was in effect.  In December 2024, Defendants reported YesCare had filled 25 of the 38 new positions and in June 2025, 26.4 positions were filled consistent with this requirement, as reflected in Table 40 below.

Regarding additional medical rounding specified in Paragraph 2(a)(i), the Monitoring Team has recommended a modified implementation plan for additional rounding in general population housing units.  If Class Members in any general population housing unit do not receive at least one hour out-of-cell time on any given day, housing unit personnel will notify healthcare administration, and healthcare personnel will then round on any impacted patients in that unit. Notifications received before 2 p.m. will result in rounding the same day.  Notifications received after 2 p.m. will result in rounding the following day if Class Members have remained in their cells.  The policy is being finalized to include additional detail and should be implemented in the next reporting period.

---

[55] Order, *supra* note 5, at 3-4.

The following table depicts the hiring efforts for these positions, which are considered separate from previously allocated, permanent full-time staffing positions reflected in Table 39 (Healthcare Vacancy Report):

**Table 40: YesCare Staffing Increases Pursuant to Sanctions Order**
June 2025

| Job Classification | Allocated | Filled |
|---|---|---|
| Blitz NP | 2.0 | 1 |
| LPN- Medication Assisted Treatment | 1.4 | 1 |
| LPN- Medication Pass | 8.4 | 8.4 |
| Telehealth Coordinator | 4.0 | 3 |
| Care Coordinator | 8.0 | 5 |
| Intake Coordinator | 4.2 | 2.1 |
| Physical Therapy Technician | 1.5 | 1.5 |
| Intake BH Clinician | 2.8 | 2.4 |
| BH Rounding Staff | 5.8 | 2 |
| **Total** | **38.1** | **26.4** |

**Status of Recommendations, Substantive Provision 5—Healthcare, from the Monitor's Fifth Report:**

1. Defendants should engage an independent salary survey to assist PDP in identifying salaries and benefits that are sufficiently competitive to attract and retain full-time healthcare staff.
   *PDP has implemented this recommendation. PDP has instituted 13 percent raises, on average, for almost all healthcare classifications, which has improved recruitment and retention. PDP reports it has evaluated salary ranges for behavioral health classifications with higher vacancy rates and has determined that current salaries and benefits are competitive. PDP reports difficulty recruiting social workers in the Philadelphia area and has converted several vacant positions to licensed psychologists and psychiatric nurse practitioners to reduce overall vacancy rates and increase clinical staff. These conversions are reflected in Table 39 above. Without an independent salary survey, PDP's strategy was successful in attracting new candidates and significantly reducing and stabilizing Healthcare vacancies over two reporting periods.*

2. Continue to explore options to provide both on and off-site appointment services via telehealth.

> Paragraph 2(c) of the Sanctions Order states:[56]
>
>> Where medical care can properly be rendered using telehealth services, the City shall take all reasonable and necessary steps to employ such services to reduce the number of staff assigned to transport duties, even if the marginal cost of telehealth services is higher than that of in-person visits.
>
> Defendants have partially complied with the requirements of this paragraph. In February 2025, PDP reported that the vendor it had previously identified is unable to meet PDP's projected needs and that PDP continued to search for vendors and providers. PDP reports limited success securing telehealth services. Telehealth is being used for psychiatric medication renewals and PDP reports that each facility is now equipped to use telehealth for off-campus specialty follow-up visits. These appointments are currently being made along with requests for telehealth encounters. However, other specialists have generally declined telehealth requests. If PDP eliminates its off-site backlog, as anticipated, additional telehealth services may not be necessary.

3. Create an internal interdisciplinary workgroup to evaluate reasons for missed off-site appointments and develop procedures to increase efficiency in arranging and ensuring scheduled appointments occur.

   *PDP reports the must-go list is now escalated to PDP executive management as necessary and anticipates it will be eliminated in the next reporting period. Thereafter, the workgroup should continue to identify any barriers to off-site specialty care.*

4. PDP should evaluate reimbursement rates for both on-site and off-site specialty services and make increases sufficient to attract necessary providers.

   *PDP reports efforts to attract providers to see patients on-site have been unsuccessful and that PDP has instead focused on reducing backlogs with increased appointments, which they expect will eliminate the backlog in the next reporting period. PDP continues to offer dialysis, infectious disease, OB/GYN, optometry, physical therapy, podiatry and radiology services on site. In an effort to address the backlog, optometry and podiatry service hours have been extended.*

5. PDP should increase incentives for providers to offer specialty care on-site rather than transporting patients to off-site facilities. Some incentives may include: (1) offering outside providers reimbursement for travel time to PDP facilities; (2) guaranteed reimbursement for all scheduled appointments, whether patients attend or not; and (3) reimbursement of off-site specialty care providers at higher rates to provide care on site.

   *As discussed above, PDP's Chief Medical Officer did not identify any providers willing to treat patients on-site and is instead counting on increased off-site trips to reduce the backlog.*

6. The City should explore contracting with outside law enforcement or private security agencies to establish a team dedicated to off-site transport details.

   *This recommendation has been implemented.*

---

[56] Order, *supra* note 5, at 4.

**Additional requirement pursuant to the Sanctions Order:**

Paragraph 2(b) of the Sanctions Order requires the City to fund an Access-to-Care Team, to be housed within the Commissioner's Office, and to include, at minimum, one Deputy Commissioner, one Access-to-Care Manager at a correctional peace officer management rank, one secretary, one analyst, and at least five Health Care facilitators assigned to PDP facilities.[57]

The Access-to-Care Team was required to be operational by February 12, 2025.

Defendants have complied with the requirements of this paragraph. On October 15, 2024, the Monitor approved an alternative implementation plan for this requirement. Due to security staff vacancies, rather than assigning a nine-person Access-to-Care Team staffed primarily with security personnel, PDP requested to hire 12 healthcare personnel to work alongside housing unit correctional officers for two shifts each weekday in all PDP facilities to ensure patients receive in-person and telehealth care. The team would be overseen by a correctional officer at the rank of major who would report directly to a Deputy Commissioner.

In February 2025, the City reported that a major was appointed to oversee the team and reports directly to the Deputy Commissioner of Operations and Emergency Services. PDP reports the team was deployed in February 17, 2025. By the June site visit, patient access to on-site care had improved significantly, evidenced by the backlog reductions. Healthcare personnel and leadership offer high praise to the Access-to-Care Major and his supervising Deputy Commissioner who have improved coordination between unit security and healthcare personnel for on-site and off-site appointments.

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

### Compliance Rating: Partial Compliance

To achieve substantial compliance with this substantive provision, PDP must, at a minimum: (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit (TU) housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the Behavioral Health caseload.

---

[57] *Ibid.*

*Requirements 1 and 3: Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status and resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

In the previous reporting period, PDP reported a reduction in compliance with physical health rounding as reflected in a December 2024 audit, which marked two consecutive reporting periods of reduced compliance.[58]  October 2023 data showed 94 percent compliance with required daily physical health rounds systemwide, and at least 90 percent compliance at each PDP facility.[59]  Data from May 2024 reflected a sharp reduction to 65 percent compliance with required daily physical healthcare rounds.  As previously reported, PDP Healthcare explained the lapses in care as resulting from poor interdisciplinary communication about population moves.[60]  In December 2024, Healthcare had achieved only 26 percent compliance with daily physical health rounds and similarly poor compliance at each of the three facilities reported, CFCF (21 percent compliance), PICC (39 percent compliance), and RCF (47 percent compliance).[61]  This reduction was reportedly caused by the EMR upgrade and lack of training.

As a result of the decreased compliance, Healthcare took appropriate corrective action through its quality management system and directed health services administrators to monitor weekly facility audits and immediately address any barriers to compliance.[62]  Frequent auditing is an important mechanism for early identification of operational lapses, and Healthcare's strategy appears to have worked.  Two comprehensive segregation rounding audits were completed in this reporting period by Healthcare administration.  Data from March 2025 showed 93 percent compliance with physical health rounding systemwide.  Site-specific compliance was 99 percent at CFCF, 96 percent at PICC, and 78 percent at RCF.  Lower compliance at RCF was reportedly caused by failures to document rounds on three of 14 days sampled.  June 2025 data showed 93 percent compliance with physical health rounds systemwide.  Site-specific compliance was 96 percent at CFCF, 99 percent at PICC, and 78 percent at RCF.  Again, lower compliance at RCF was reportedly due to failures to document rounds.  Healthcare reports that managers have received additional training on physical health rounding and documentation and expects improvements in the next reporting period.

Regarding behavioral health rounding, two audits were also completed in this reporting period and overall compliance remains high.  The May 2024 audit showed that Healthcare achieved 96 percent compliance with behavioral health weekly rounding in segregation housing.  The December 2024 audit shows 100 percent compliance with behavioral health rounding.  March 2025 data showed site-specific compliance rates reported at 99 percent at CFCF, 67 percent at PICC, and 284 percent at RCF.  June 2025 data reflects site-specific compliance at 100 percent at CFCF, 97 percent at PICC, and 298 percent at RCF.

---

[58] Monitor's Sixth Report, *supra* note 37, at 64.
[59] *Ibid.*
[60] Monitor's Fifth Report, *supra* note 21, at 53.
[61] Monitor's Sixth Report, *supra* note 37, at 64.
[62] *Ibid.*

For six consecutive reporting periods, the Monitoring Team has observed patients in segregation whose symptoms strongly suggest they required a higher level of care. PDP maintained that clinical staff may request further evaluation from clinical supervisors if they believe a patient requires enhanced care or advocacy, but these requests were not tracked and staff indicated they were rare.[63] The Behavioral Health Director reports that modifications to the EMR have been made that allow clinical staff to document referrals for further evaluation. Dr. Belavich reviewed a sample for April 2025, which reflected eleven instances of rounding staff referring patients in segregation for further evaluation. Referrals were thorough and contained detailed notes of the reasons for each referral, which assists secondary evaluators.

As previously reported, Behavioral Health rounding notes are not individualized or unique to each patient and are instead completed in batches that simply denote whether rounding occurred.[64] As such, Dr. Belavich opined that this current rounding documentation was of little use in identifying patients' needs.[65] In this reporting period, the Behavioral Health Director added an EMR feature that provides for individualized notes about each patient when concerns are noted by rounding clinicians.

The information can be extracted for tracking, quality improvement, and training purposes, which the Behavioral Health Director is reportedly reviewing regularly. Compliance with Substantive Provisions 5—Healthcare, and Substantive Provision 6—Behavioral Health in Segregation, require the provision of *quality* care in addition to meeting the standards for the *frequency* of contacts and reduced backlogs. These EMR improvements will assist Healthcare managers in assessing and improving quality of care.

*Requirement 2: Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

Healthcare clearances are required for all Class Members being considered for placement in segregation. This requires a face-to-face evaluation by a physical healthcare provider and, for those in Behavioral Health programs, a behavioral health clinician. Patients designated SMI are required to have a behavioral health clearance performed within four hours of placement in segregation. Patients on the Behavioral Health caseload without SMI require behavioral health clearances within 24-hours of placement.

In this reporting period, Dr. Belavich continued to assess sample Medical/Behavioral Health Review for Segregation Placement (PDP 86-733) for quality and consistency. Findings from his review of 23 segregation placements in this reporting period were similar to the previous reporting period, as follows: (1) for cases reviewed, patients with SMI or on the Behavioral Health caseload received timely clearance evaluations; (2) for cases reviewed, patients with SMI or on the Behavioral Health caseload received evaluations within the shorter 4-hour timeframe typically reserved for SMI patients only; (3) dispositions by behavioral health staff appeared appropriate based on factors known about the incident at the time. As with audit findings in the

---

[63] Monitor's Fourth Report, *supra* note 24, at 43.
[64] Monitor's Fifth Report, *supra* note 21, at 54.
[65] *Ibid*.

previous reporting period, physical health sections of the sampled clearances were also completed consistently.[66]

As previously reported, PDP developed and implemented a pilot program in May 2024 to improve the quality of mental health clinical input in disciplinary hearings and dispositions, the accurate identification of the SMI populations, and to ensure that staff assistant support for disciplinary hearings is offered and documented.[67]  The pilot, also discussed below under Substantive Provision 8—Discipline, was implemented at PICC in May 2024 and at RCF in February 2025.

As part of the pilot, PDP developed a Rules Violation Mental Health Review form (PDP 363-C) to document clinical input during hearings and consideration of patients for mitigation or diversion.  Dr. Belavich reviewed 30 PDP 363-C forms submitted in this reporting period for Behavioral Health or SMI patients.  Forms reviewed reflected additional improvements since the previous reporting period.  The Director of Behavioral Health reports that each form is reviewed for quality and completeness and the clinicians receive additional training if deficiencies are identified.  Of 10 forms completed in this reporting period for patients with SMI, two recommended mitigation and patients were re-directed to the PHSW instead of segregation and then placed in a TU after discharge from the PHSW.  The remaining eight forms for SMI patients did not recommend mitigation and rationales were articulated.

As previously reported, Healthcare has recently enhanced the EMR to be able to capture when patients are diverted from segregation by being retained in a TU setting, and when rules violations that would typically result in segregation placements are instead resolved with assistance of TU staff.[68]  Healthcare anticipates having data regarding this upgrade in the next reporting period.

*Requirement 4:  Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

PDP reports it remains unable to deliver the "Positive Change/Positive Outcomes" (PC/PO) behavioral health group treatment program for patients in segregation due largely to security staffing deficits.  PC/PO is designed to deliver group treatment for two hours, five days per week, for a total of 10 possible treatment hours each week for every program participant.  PDP tracks the number of treatment hours possible based on behavioral health staff availability ("treatment hours possible"), the number of treatment hours provided based on both healthcare and security staff availability ("treatment hours provided"), treatment hours necessary for PDP to comply with the requirement that each patient is offered 10 hours per week ("treatment hours required").  In the previous reporting period PDP was able to deliver only eight percent of the hours required.  In this reporting period, the number of treatment hours provided was, on average, 15 percent of required treatment hours.

---

[66] Monitor's Sixth Report, *supra* note 37, at 65.
[67] *Id.* at 66.
[68] *Ibid.*

The following table reflects total PC/PO group treatment hours possible with current Healthcare staffing versus hours offered to segregated patients from January through June 2025:

**Table 41: PC/PO Structured Group Treatment Hours in Segregation**
January – June 2025

| Month | Treatment Hours Possible | Treatment Hours Offered | Percent Provided | Treatment Hours Required | Percent of Required Hours Provided |
|---|---|---|---|---|---|
| January | 471 | 190 | 40% | 1583 | 12% |
| February | 429 | 169 | 39% | 1207 | 14% |
| March | 445 | 194 | 44% | 1212 | 16% |
| April | 426 | 194 | 46% | 1212 | 16% |
| May | 486 | 167 | 34% | 982 | 17% |
| June | 474 | 176 | 37% | 1100 | 16% |
| Average | 455 | 182 | 40% | 1216 | 15% |

Healthcare reports that plans to make some aspects of PC/PO programming available to patients on tablets are ongoing. As previously reported, tablet programming participation would be voluntary, does not replace in-person structured treatment, and does not count toward treatment hours for compliance purposes.

*Requirement 5: Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

PDP has met this requirement and monitoring is discontinued.

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient Transition Unit housing.*

Dr. Belavich maintains that PDP should reduce its reliance on segregation for all Class Members, especially those on the Behavioral Health caseload, and discontinue its use altogether for SMI patients unless no alternatives exist.[69] PDP's TU housing provides an alternative to segregation housing in a more therapeutic setting for those with mental illness. As previously reported, Pre-COVID-19, PDP reserved 128 TU beds for women and 200 for men. During the COVID-19 lockdown, PDP reduced its available TU beds. By August 2022, 134 beds remained, including 22 for women and 112 for men. PDP reports that although these beds were allocated to the Transitional Units (TU) they never reached capacity.

The women's TU remains in PICC C-unit with a 128-bed capacity. Thirty-four beds are reserved for TU patients although PDP reports capacity can increase as needed and there is no limit on the number of beds that may be made available. Previously, Class Members with

---

[69] Monitor's Sixth Report, *supra* note 37, at 67; Monitor's Fifth Report, *supra* note 21, at 57; Monitor's Fourth Report, *supra* note 24, at 46; Monitor's Third Report, *supra* note 32, at 40.

various security classifications were also housed in the unit, which had limited out-of-cell time and therapeutic programming for TU patients. During the November 2024 site visits, security staff reported that they had enhanced out-of-cell opportunities by allowing TU patients and Class Members with other security classifications to recreate together. They had also made efforts to soften the unit and introduce additional informal opportunities for socialization and recreation. A rescue dog had been introduced during the previous reporting period and was still living on the unit during the April 2025 site visit. PDP leadership had also created opportunities for some TU participants to hold jobs either on the unit or in other areas of the facility. This was still the practice during April 2025 site visits.

In April 2025, PDP reported that Class Members with various security classifications were moved from the unit, which now houses only TU patients and Class Members with protective custody classifications. In June 2024, the TU had 16 patients. In April 2025, the program had nearly doubled to 31 patients, as recommended.

PDP also reported increased programming opportunities in the TU, as well as increased out-of-cell informal activities. The Behavioral Health Director reported that on both the men's and women's TUs, behavioral health counselors, an activity therapist, social workers, nursing staff, and licensed psychiatric technicians currently provide structured group programming. Group treatment is currently offered Monday through Friday with morning and afternoon groups for a total of up to 10 hours per week and on weekends when staff is available. This marks improvement since the previous reporting period. Healthcare reports its current goal is to ensure that each TU participant attends at least one group per day. If patients decline to participate, a mental health clinician is notified and follows-up with the patient. Increased programming opportunities were confirmed by TU patients during site visits who generally reported the programming is both enjoyable and helpful.

As previously reported, in October 2023, PDP moved the Men's TU from a 128-bed unit to a smaller 64-bed unit.[70] In December 2024, the unit had 42 participants and, in April 2025, increased to 56. Healthcare reports that a Licensed Clinical Social Worker has been hired to oversee the curriculum and programming for the TUs and mental health step-down unit.

In previous reporting periods, TUs had single-assignment security personnel in the TUs. TU officers were uniquely skilled in working with TU patients. They learned patients' names, individual mental health needs, and were observed and reported to have effectively deescalated agitated patients, potentially averting uses of force or rules violations. TU participants knew the officers and some reported feeling as though offices cared about them and treated them fairly. During April 2025 site visits, PDP reported that it had discontinued the consistent security staffing model but that it hopes to resume the model with additional security staffing increases. This change is problematic, and PDP should resume the consistent security staffing model as soon as possible. Dr. Belavich opines that consistent staffing on programs like PDP's TU is critical to effective coordination between clinical and security staff about such issues as patient progress, medication compliance, personal hygiene, and other factors that increase patient wellness.

---

[70] Monitor's Fourth Report, *supra* note 24, at 46.

PDP executives have recognized that men's TU programming must expand and agree that additional TU housing is needed.  Due to population reductions, PDP's Behavioral Health caseload has decreased by nearly 100 patients since the previous reporting period and by approximately 250 patients since June 2024 to a current total of just over 1,400 patients.  PDP's SMI population has decreased by close to 90 patients since June 2024 and by another 30 in this reporting period, totaling 240 patients in June 2025.  Although the population has decreased, 64 total TU beds in men's units remain inadequate for a population this size, and the Monitoring Team continues to recommend expansion as soon as possible.  PDP also continues to report waitlists for men's TU space.

As reported previously, PDP reports that it plans to add another men's TU at RCF when segregation housing units are consolidated at CFCF.[71]  PDP also confirms its goal to divert as many patients as possible from segregation to TUs and to offer at least 10 hours of PC/PO group treatment for all patients in segregation.

The Monitor's Fifth Report addressed concerns that some of the Monitoring Team's recommendations over the last two years to address various clinical care and referral and placement thresholds had been met with resistance.  As a result, some of PDP's initiatives to improve care for Behavioral Health patients had been delayed and opportunities to help individual patients were missed.[72]  It appeared that some of PDP's issues with patient advocacy were rooted in a cultural dynamic within its Behavioral Health division.[73]  In the previous reporting period, the Behavioral Health division took appropriate corrective action to address these issues and efforts appear to be taking root.

During the previous reporting period, PDP's Behavioral Health Director initiated chart reviews and patient evaluations for all patients with SMI designations who were not already housed in TU settings.  As a result, of 154 SMI patients, 44, or 29 percent, were deemed appropriate for TU placement, 13 in the women's TU and 31 in the men's TU.  PDP internal audits during the three-month period, April 2025 through June 2025, show an additional 42 TU referrals, or an average of 14 per month.  Two of 42 referrals were not admitted for a 95 percent acceptance rate.  This is an improvement from a total of 34 referrals over the five-month period, May 2024 through September 2024, or an average of seven per month.  Twelve of the of 34 referrals were not admitted, reflecting a 65 percent acceptance rate.  PDP's efforts to expand TUs are successfully increasing both referrals and acceptance rates, which marks important progress.

PDP reports that increasing TU referrals have been aided through increasing staff awareness about TU referral criteria and changes to healthcare documentation that now require clinicians and psychiatric providers to consider TU placement for every patient they evaluate.  PDP Healthcare added a TU-assessment question to Behavioral Health Clinician and Psychiatric Prescriber forms to ensure that clinical staff always consider TU placement.  The revised form also requires providers to document any reasons a patient is not referred for TU care.  Finally, PDP reports that the previously established interdisciplinary team continues to meet weekly to

---

[71] Monitor's Sixth Report, *supra* note 37, at 68.
[72] Monitor's Fifth Report, *supra* note 21, at 55-56.
[73] *Id.* at 55.

evaluate referrals to and from TUs.  These are all positive steps in developing a stronger treatment-focused culture within Behavioral Health.

As previously reported, some patients with severe behavioral issues may not be appropriate for a TU environment.[74]  This is most impactful to SMI patients who remain in segregation due to a lack of appropriate alternative housing.  The Monitoring Team continues to recommend that PDP create a modified TU for those who are disruptive in its traditional TU.  Some of these patients may require a behavior modification program such as PDP's FBSU, as discussed above under Substantive Provision 4—Return to Normal Operations.  Without appropriate housing alternatives and consistent care, these patients have tended to cycle between hospitalization and extended segregation placements, which often exacerbate symptoms and may cause patients to psychiatrically decompensate.

In efforts to address these concerns, PDP reports that patients with SMI receive priority participation in PC/PO groups and weekly clinical visits as part of individualized treatment plans.  For patients with SMI who are not able to participate in PC/PO, treatment plans are modified to include three individual sessions with a clinician per week.  Additionally, the Behavioral Health Director reports that these patients are also reconsidered for TU or FBSU placement during weekly interdisciplinary team meetings.  PDP's alternatives to segregation housing for patients are improving and efforts should continue.

In June 2024, PDP re-activated its mental health step-down unit in PHSW 107.  This unit existed pre-COVID-19 and treats patients who have been discharged from PHSW but may not be ready to return to their previous housing or to a TU.  The 15-bed unit provides an opportunity for individual and structured programming and for PDP healthcare staff to determine appropriate housing placement.  Many individuals from this unit are referred for placement in the TU.  PDP staff report that this unit has again become a resource in assisting clinical staff in making appropriate housing referrals or recommendations.

PDP's current practice permits mental health patients who are hospitalized while in segregation, or who are diverted from segregation to PHSW, once stabilized, to return to segregation to serve disciplinary sentences they received prior to hospitalization or diversion.  Therefore, some patients may serve disciplinary sentences for rules violations they may have committed in a mental health crisis or as a result of mental illness.  Once back in segregation, these patients' conditions may deteriorate, possibly resulting in patients cycling between segregation and hospitalization.  As alternative housing and programs expand, PDP should revise its current practice to require these patients to serve disciplinary sentences in non-segregation environments.  As previously reported, PDP's current disciplinary practices may have constitutional or Americans with Disabilities (ADA) implications, some of which PDP's disciplinary pilot program and forthcoming policy changes are designed to address.  This practice should be critically reevaluated and changes implemented along with PDP's other policy changes.

*Requirement 7:  Significantly reduce the use of segregation for Class Member patients who require placement on the behavioral health caseload.*

---

[74] Monitor's Third Report, *supra* note 32, at 40.

Behavioral Health patients have been consistently overrepresented in segregation since December 2022 when the Monitoring Team first began collecting this data. Over eighteen months, from January 2024 to June 2025, the number of Behavioral Health patients in segregation was consistently higher than the overall percentage of Behavioral Health patients in the jail. However, the Behavioral Health patient population that is also designated SMI has remained consistently low and underrepresented on segregation status for eighteen months, from January 2024 through June 2025 reaching a low in June 2025 of three percent of the segregation population, or five individuals.

The following table depicts SMI and Behavioral Health patients in segregation housing on specific dates in June 2024, January 2025, and June 2025:

**Table 42: SMI and Behavioral Health Class Members in Segregation**
June 30, 2024, January 10, 2025, and June 26, 2025

| | June 30, 2024 | | January 10, 2025 | | June 26, 2025 | |
|---|---|---|---|---|---|---|
| | Count | Percent of PDP Population | Count | Percent of PDP Population | Count | Percent of PDP Population |
| **PDP Census** | 4574 | 100% | 4190 | 100% | 3560 | 100% |
| **Number of SMI** | 329 | 7% | 271 | 7% | 241 | 7% |
| **Number on BH Caseload** | 1672 | 37% | 1531 | 37% | 1421 | 40% |
| **Number in Segregation** | 290 | 6% | 276 | 7% | 179 | 5% |
| | Count | Percent of Segregation Population | Count | Percent of Segregation Population | Count | Percent of Segregation Population |
| **Number of SMI in Segregation** | 14 | 5% | 13 | 5% | 5 | 3% |
| **Number of BH in Segregation** | 133 | 46% | 131 | 47% | 83 | 46% |

Segregation data from select dates in June 2024, January 2025, and June 2025 shows that patients on the Behavioral Health caseload totaled between 37 to 40 percent of PDP's overall population. Behavioral Health patients represented 46 to 47 percent of the segregation population in June 2024 to June 2025 and, therefore, continue to be overrepresented in segregation.

From June 2024 to June 2025, SMI patients represented five to seven percent of PDP's total population. SMI patients are not overrepresented in segregation at three percent of the segregation population and PDP has successfully reduced their proportion of the total segregation population in each reporting period, from five percent in June 2024 to three percent in June 2025. PDP should continue its efforts to avoid the placement of patients with SMI in segregation whenever possible.

**Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:**

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.

    *The newly introduced mitigation procedure appears to be having a positive effect with increasing recommendations for removal or diversion from segregation. This procedure is now occurring at both PICC and RCF.*

2. PDP should make additional progress in identifying security personnel to staff Positive Change, Positive Outcome treatment groups and fill Transition Units with only Transition Unit patients or others who can safely program in common spaces with them.

    *PDP reports that the medical guarding and transportation contractor provided some relief for facility staff to remain in housing units, which has slightly increased treatment groups. PDP anticipates being able to increase PC/PO treatment in segregation once segregation housing is consolidated into CFCF.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters, and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating:  Partial Compliance**

PDP has not yet demonstrated that Class Members have consistent access to law libraries.

Paragraph 3(b) of the Sanctions Order states: "[t]he City shall install law library terminals in each unit in each facility for class members to use during their recreation time. The law library terminals shall be fully installed within one year of the date of this Order."[75]

Installation of terminals were scheduled to be completed by August 18, 2025.

Defendants have partially complied with this requirement. In the previous reporting period, PDP researched providing access to legal research materials via individually issued tablets rather than terminals installed in housing units.[76] Provided PDP ensures that Class Members have access to printed materials and that those who are ineligible for tablets have regular access to housing unit law libraries, a tablet-based system is generally more accessible.

In July 2025, PDP announced that it will use tablet libraries instead of kiosks and committed to the following: (1) tablet libraries will not replace in-person access to facility law libraries; (2) Class Members will continue to have access to existing in-person law libraries during recreation periods; (3) tablets will be made available to Class Members in administrative segregation to ensure access to legal resources; (4) Class Members who are ineligible for tablets, such as those in punitive segregation, will receive access to housing unit law libraries; and (5) Class Members will have access to printed materials. PDP has not finalized corresponding policies but will consult with the Monitoring Team as they are developed.

The contract with the vendor was signed July 1, 2025, and the distribution of individual tablets is scheduled to begin by the end of 2025.

PDP reports that revisions to its law library policy and Class Member education about the new service will begin in the next reporting period.

PDP continues to maintain oversight of law library printers and computers through monthly audits. Audits conducted from January through July 2025 indicate that all law library equipment was operational on the days inspected. However, at least two grievances were filed during this reporting period regarding broken law library equipment. Both grievances were reported as resolved.

**Substantive Provision 8—Discipline**

*Sub-provision 8.1--All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating:  Partial Compliance**

---

[75] Order, *supra* note 5, at 5.
[76] Monitor's Sixth Report, *supra* note 37, at 71.

The following tables depict PDP's disciplinary hearing data over six-month periods, January through June and July through December in 2022, 2023, 2024, and first half of 2025, and each month, January through June, 2025.  The tables include totals for disciplinary sanctions issued, "not guilty" findings, dismissals, percent of Class Members with SMI subject to discipline, and discipline imposed on Class Members without a hearing:

### Table 43: PDP Disciplinary Hearings
July 2022 – June 2025

| Six-month Total | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | n | % | n | % | n | % | n | % |
| July-Dec 2022 | 268 | 19 | 7% | 30 | 11% | 24 | 9% | 6 | 2% |
| Jan-June 2023 | 303 | 23 | 8% | 34 | 11% | 30 | 10% | 0 | 0% |
| July-Dec 2023 | 322 | 23 | 7% | 30 | 9% | 24 | 7% | 0 | 0% |
| Jan-June 2024 | 359 | 32 | 9% | 32 | 9% | 22 | 6% | 0 | 0% |
| July-Dec 2024 | 293 | 25 | 9% | 29 | 10% | 18 | 6% | 0 | 0% |
| Jan-June 2025 | 250 | 38 | 15% | 17 | 7% | 12 | 5% | 0 | 0% |

### Table 44: PDP Disciplinary Hearings
January – June 2025

| Month | Total Discipline Issued | Total Not Guilty | | Dismissed | | SMI | | Guilty without a hearing - excludes refusals | |
|---|---|---|---|---|---|---|---|---|---|
| | n | N | % | n | % | n | % | n | % |
| January | 289 | 42 | 15% | 11 | 4% | 14 | 5% | 0 | 0% |
| February | 205 | 17 | 8% | 32 | 16% | 8 | 4% | 0 | 0% |
| March | 242 | 28 | 12% | 17 | 7% | 9 | 4% | 0 | 0% |
| April | 246 | 46 | 19% | 19 | 8% | 13 | 5% | 0 | 0% |
| May | 270 | 35 | 13% | 17 | 6% | 10 | 4% | 0 | 0% |
| June | 247 | 57 | 23% | 6 | 2% | 17 | 7% | 0 | 0% |
| Average/Average % | 250 | 38 | 15% | 17 | 7% | 12 | 5% | 0 | 0% |

During this reporting period, PDP complied with the requirements to allow Class Members to attend hearings in person.  No disciplinary hearings were held without Class Members present, except when attendance was refused.  Class Members continue to attend hearings in person, and an average of 22 percent of reported incidents were dismissed or resulted in "not guilty" findings in this reporting period.

As recommended, PDP initiated an "informal" disciplinary hearing pilot project at PICC in May 2024.[77]  The pilot was expanded to RCF in February 2025, with plans to expand to CFCF and DC in the next reporting period.  In contrast to formal disciplinary hearings, which may result in disciplinary segregation, the informal process is limited to outcomes such as corrective

---

[77] Monitor's Fifth Report, *supra* note 21, at 63.

counseling, extra duty, restitution up to but not exceeding $25, one-day loss of dayroom access, and loss of certain other privileges such as commissary, tablets, and non-legal phone calls. Informal hearings are chaired by trained lieutenants as opposed to formal disciplinary hearings, which are chaired by disciplinary hearing officers.

From January to June 2025, PDP reported an average of 47 informal hearings per month, with SMI Class Members involved in approximately four percent of cases. Only three percent of informal hearings resulted in dismissal or a not guilty finding, notably lower, on average, than formal hearings, reportedly because more Class Members admit to violations during informal proceedings. Informal hearings made up 16 percent of total monthly disciplinary hearings in this reporting period.

The Monitoring Team reviewed a sample of completed informal hearings at RCF and PICC for the weeks of April 7-13, 2025 and May 5-11, 2025. For cases reviewed, pilot hearings involved both minor issues, such as Class Members not wearing their wrist bands, and more significant alleged rules violations, including fighting or refusing direct orders resulting in use of force to gain compliance. Prior to the pilot project, Class Members who were found guilty of fighting or refusing direct orders that resulted in force were frequently placed in disciplinary segregation. Under the pilot program, disciplinary reports for minor fights and refusals did not result in segregation placements.

To guard against due process violations, PDP and YesCare have also extended the pilot program to reduce disciplinary segregation for minor offenses, integrating mental health clinicians in hearings for SMI Class Members and providing trained staff assistants for those with communication barriers. Clinical participation is generally being documented consistently. However, documentation of staff assistant participation requires improvement, as does recording effective communication and adaptive support for Class Members with disabilities. With some remaining areas for improvement, PDP and YesCare are making progress toward compliance with this sub-provision.

The disciplinary pilot program has not yet reduced the number of Class Members in punitive segregation at PICC and RCF, where the pilot was implemented. Average time spent in segregation at PICC and RCF have reduced, but the number of Class Members in punitive segregation at those two facilities remains unchanged, as highlighted in Table 29 (Total Placements and Average Lengths of Stay in Punitive Segregation).

The Monitoring Team will make additional recommendations after the informal hearing pilot expands to CFCF and all segregation housing is consolidated. Substantial Compliance with this sub-provision will require updates to policies, training, forms, tracking, and internal auditing.

*Sub-provision 8.2--The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. . .*

**Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3--[PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. . .*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

*Sub-provision 8.4--[PDP shall] cancel sanctions [imposed in hearing held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms.  Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation.  Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline.  Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

*Sub-provision 9.1--PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [first floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[78]*

**Compliance Rating:  Partial Compliance**

As reported above, PDP plans to begin tablet distribution to all eligible Class Members in late 2025.  In July 2025, PDP initiated upgrades to expand housing unit bandwidth for the additional tablets.  PDP reports it is still working with the vendor to include additional services not

---

[78] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units) . . .".*  In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed.  To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.

available on existing tablets, including legal research materials, discussed above under Substantive Provision 7—Law Library Access, and tablet visiting, discussed below under Substantiative Provision 13–Visiting.  Because PDP is prioritizing distribution to Class Members as soon as possible, PDP indicates that some of the enhanced services may be added after tablets are issued.

In the interim, PDP has continued to manage its tablet inventory and has expanded the quantity of available tablets since the previous reporting period.  The following table reflects current tablet totals at each PDP facility based on documentation provided:

**Table 45: Tablet Availability at Each PDP Facility**
June 2024, January 2025, and July 2025

| Facility/Housing Unit | Total Tablets June 2024 | Total Tablets Jan 2025 | Total Tablets July 2025 | Difference, January 2025 to July 2025 |
|---|---|---|---|---|
| MOD 3 Total | 10 | 20 | 20 | 0 |
| CFCF Total | 192 | 152 | 189 | +37 |
| DC Total | 92 | 53 | 84 | +31 |
| PICC Total | 53 | 44 | 50 | +6 |
| RCF Total | 78 | 76 | 81 | +5 |
| **Total** | **425** | **345** | **424** | **+79** |

In January 2025, PDP reported 345 tablets were available in housing units and 114 were reserved for educational use.  By July 2025, this increased to 424 tablets in housing units and 114 for educational use, reflecting an increase of 79 housing unit tablets and no change for educational tablets in this reporting period.  The increase reportedly resulted from a contract extension with the tablet provider, which increased overall supply and allowed PDP to replace previously broken devices.  Despite replacements of broken tablets and the increase in tablet totals, availability in housing units remains unreliable, as observed during site visits and CCTV review, and as reported by Class Members in person and via grievances.

Once individual tablets are distributed, policies are finalized, Class Members are oriented, staff are trained, and PDP implements an efficient, effective, and durable system for distributing and replacing damaged tablets, PDP will achieve substantial compliance with this substantive provision.

*Sub-provision 9.2--The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating:  Partial Compliance**

As described in sub-provision 9.1, PDP is working with the tablet vendor to distribute tablets to all eligible Class Members.  Policies for the expanded services are pending while service upgrades are discussed.  Upgrades in progress include adding law library access and improving the grievance system to clearly separate service requests from grievances.  Tablet upgrades are also anticipated to improve grievance tracking, reporting, and trend analysis, which has been a challenge with the current tablet-based grievance system.  As previously reported, tablet-based grievances will not replace paper-based grievances and hard copies of grievance forms will remain available on all housing units.

The following table depicts total monthly and average grievances for the two largest categories of complaints and "others" submitted via tablet for two periods, July through December 2024 and January through June 2025:

**Table 46: Monthly Tablet Grievances**
July – December 2024

| Month | July | August | September | October | November | December | Average |
|-------|------|--------|-----------|---------|----------|----------|---------|
| Commissary | 362 | 275 | 265 | 244 | 330 | 259 | 289 |
| Food Vendor | 64 | 79 | 48 | 85 | 91 | 117 | 81 |
| Other | 299 | 211 | 203 | 132 | 163 | 204 | 202 |
| **Total** | **725** | **565** | **516** | **461** | **584** | **580** | **572** |

**Table 47: Monthly Tablet Grievances**
January – June 2025

| Month | January | February | March | April | May | June | Average |
|-------|---------|----------|-------|-------|-----|------|---------|
| Commissary | 224 | 149 | 137 | 308 | 216 | 104 | 190 |
| Food Vendor | 82 | 59 | 50 | 77 | 168 | 116 | 92 |
| Other[79] | 349 | 215 | 220 | 332 | 295 | 282 | 282 |
| **Total** | **655** | **423** | **407** | **717** | **679** | **502** | **564** |

Improvements are underway, but PDP's grievance system did not improve in this reporting period.  The Monitoring Team continues to recommend a dedicated, trained, grievance unit, which will reportedly be addressed in the Overwatch staffing analysis.  Without an effective grievance system, Class Members may be at risk and management cannot address ongoing and recurring issues in the jails.  PDP reportedly plans to address its lack of staffing for an effective grievance system as part of Overwatch's forthcoming staffing analysis.  Addressing grievances related to excessive or unnecessary force remains a significant challenge, discussed below under Substantive Provision 18–Use-of-Force.

---

[79] Currently, tablet grievances categorized as "other" include both complaints and requests for services.  Because service requests are not grievances, reported totals for grievances in this category as reflected in the table are inflated.  Further categorial breakdown of PDP's tablet grievances is prohibitively time consuming.

The following tables depict average total grievances and monthly grievances submitted via paper grievance for three periods, January through June 2024, July through December 2024, and January through June 2025:

**Table 48: Average Monthly Paper Grievances**
January 2024 – July 2025

| Reporting Period | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 |
|---|---|---|---|
| Commissary Items | 103 | 61 | 59 |
| Discipline | 4 | 0 | 0 |
| Food Services | N/A* | 2 | 4 |
| Grievance Process | 3 | 0 | 0 |
| Housing/Classification | 1 | 1 | 0 |
| Law Library Access | 2 | 2 | 0 |
| Mail | 1 | 3 | 2 |
| MAT/Suboxone | 16 | 6 | 12 |
| Medical Access | 18 | 18 | 27 |
| Medication | 9 | 5 | 11 |
| Misc.** | 5 | 2 | 6 |
| Out-of-Cell | 3 | 0 | 1 |
| Religious Access | 1 | 1 | 3 |
| Sanitation/Clothing | 3 | 0 | 0 |
| Social Services | N/A | 3 | 6 |
| Staff Complaint | 3 | 10 | 8 |
| Street Eats | N/A | 20 | 26 |
| Tablet | N/A | N/A | 1 |
| Visiting | N/A | 0 | 55 |
| **Total** | **158** | **132** | **220** |

*"N/A" denotes grievances that were previously captured in the "Misc." column.
**For January through June 2025, "Misc." represents only grievances related to trust accounts or worker pay.

**Table 49: Monthly Paper Grievances**
January – June 2025

| Month | Jan | Feb | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| Commissary Items | 56 | 57 | 65 | 69 | 54 | 51 | 59 |
| Discipline | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Food Services | 5 | 4 | 5 | 8 | 1 | 2 | 4 |
| Grievance Process | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Housing/Classification | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Law Library Access | 0 | 1 | 0 | 0 | 1 | 0 | 0 |
| Mail | 2 | 2 | 2 | 3 | 2 | 1 | 2 |
| MAT/Suboxone | 1 | 7 | 9 | 21 | 8 | 27 | 12 |
| Medical Access | 30 | 31 | 25 | 25 | 19 | 31 | 27 |
| Medication | 14 | 9 | 9 | 7 | 13 | 15 | 11 |
| Misc. | 10 | 7 | 1 | 10 | 6 | 4 | 6 |
| Out-of-Cell | 0 | 0 | 0 | 0 | 4 | 0 | 1 |
| Religious Access | 0 | 0 | 8 | 0 | 0 | 7 | 3 |
| Sanitation/Clothing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Social Services | 6 | 2 | 2 | 9 | 5 | 9 | 6 |
| Staff Complaint | 3 | 6 | 9 | 9 | 10 | 8 | 8 |
| Street Eats | 24 | 32 | 25 | 18 | 25 | 29 | 26 |
| Tablet | 3 | 2 | 0 | 0 | 0 | 0 | 1 |
| Visiting | 67 | 45 | 65 | 45 | 67 | 43 | 55 |
| **Total** | **221** | **206** | **226** | **224** | **215** | **227** | **221** |

Paper grievances increased by 67 percent in this reporting period from a monthly average of 132 in July through December 2024 to 220 in January through June 2025.  As previously reported, PDP's current grievance data is not reliable, and the effectiveness of the grievance system cannot be measured until access, tracking, and response procedures are ensured systemwide for both tablet and paper systems.[80]

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1--PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population.  Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

**Compliance Rating:  Partial Compliance**

PDP currently allows 15 minutes of free phone calls daily.  As previously reported, the new tablet contract includes 15 minutes of free calls daily and 60 minutes of free video visiting

---

[80] Monitor's Sixth Report, *supra* note 37, at 77.

weekly for each Class Member.  PDP reports that stationary phones and free calls will remain available for those who, for any reason, do not have a tablet or prefer not to use them.

*Sub-provision 10.2--Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating:  Partial Compliance**

PDP's tablet contract includes 15-minutes of free phone calls daily and PDP has indicated that it has no intention of reverting to 10 minutes of free calls upon its return to normal operations.  PDP is drafting a plan for the return to normal operations, which will memorialize PDP's commitment to offer 15-minutes of free calls daily to all eligible Class Members for the duration of this Agreement and thereafter.  As such, future reports will reintegrate sub-provisions 10.1 and 10.2 into a single provision, Substantive Provision 10—Phone Calls.  PDP will achieve substantial compliance with Substantive Provision 10—Phone Calls once tablets are distributed to every eligible Class Member, 15-minute free calls are in place for every eligible Class Member, and Class Members who are ineligible for tablets but eligible for phone calls are offered daily access to housing unit phones.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

**Compliance Rating:  Partial Compliance**

The Monitoring Team recommended against the expansion PDP's current call-button system at PICC due to concerns about cost, feasibility, and limited effectiveness of the current call-button system.  Alternatively, the Monitoring Team suggested security improvements, increased housing unit staffing, and enhanced security checks that are audited regularly for timeliness and quality.  PDP is implementing several projects to improve safety, including a unified CCTV system with real-time, direct-terminal access, a new security operations center (expected by early 2026), and an RFID system to track security check timeliness.  PDP will reportedly launch its Body Worn Camera (BWC) pilot in segregation housing and intake areas in early 2026.  An individual tablet project is also in development to help Class Members request assistance and connect with support networks.

**Substantive Provision 12—Locks**

*Sub-provision 12.1--PDP initiated the lock replacement program for PICC. . . which will be completed by June 30, 2022.*

**Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.2--PDP initiated the lock replacement program for. . .RCF, which will be completed by June 30, 2022.*

**Compliance Rating:  Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.3--For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4--Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

**Compliance Rating:  Partial Compliance**

PDP reported completing 10 call-button work orders at CFCF and RCF in this reporting period, or 14 fewer than the previous reporting period.  US Facilities Inc. (US Facilities) reportedly added call-button checks to regular maintenance lists, but PDP provided documentation of only one call-button check in this reporting period and no other documentation to verify that US Facilities is completing call-button checks as part of a regular maintenance checklist.  In previous reporting periods, call-button repairs were most frequently documented in multipurpose rooms.  Since multipurpose rooms are no longer being used to house Class Members, fewer work orders are placed and repairs appear to be completed more quicky.

Five of 10 reported work orders were completed within one working day and average repair times decreased from 19 days in the previous reporting period to two days in this reporting period.  Two grievances were documented regarding failures to respond to call buttons, but no grievances about broken call buttons were documented.  Issues with grievance access, tracking, collection, and responsiveness persisted in this reporting period.

*Sub-provision 12.5--PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 13—Visiting**

*Sub-provision 13.1--As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule.  At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

**Compliance Rating:  Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2--Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

PDP reports it has evaluated its current visiting program and pending recommendations from Class Members, visitors, staff, and the Monitoring Team and is working on a formal "Visiting Improvement Plan" (Visiting Plan).  PDP reports the Visiting Plan will likely include several of the recommendations outlined below, although PDP has not made progress in some areas as initially anticipated.  PDP also reports it intends to initiate criminal background checks of all in-person visitors and limit the number of visitors Class Members may have.  PDP reports these changes are necessary because enhanced security efforts have revealed contact visits as a frequent entry point for contraband.  Enhanced security efforts cited include increased cell searches, K-9 patrols, pat searches of personnel, and metal detectors at personnel entrances.  PDP reports visitors' backgrounds will be evaluated case-by-case.  SME McDonald indicates that background checks are standard practice nationally in systems that offer contact visiting.  PDP reports it does not have an implementation timeframe for this change.

The following includes updates to several recommended improvements:

- PDP's website should include all visiting policies and procedures.
  *This information remains available on PDP's website.*
- When the visiting website is down for "scheduled maintenance," visitors are unable to schedule visits, and the durations of scheduled maintenance are not clearly communicated to users.
  *PDP reports it has requested but not received information about scheduled maintenance and system downtime as anticipated in the last report.*
- Visitors report that the visiting website's technical support phone line has excessive wait times.
  *PDP previously reported that the vendor would provide information about wait times for technical assistance.  This has not occurred.*
- Visitors report that they are not notified when scheduled visits are cancelled.  This is frequently true when a Class Member is in punitive segregation at the time of scheduling or is placed in punitive segregation after a visit is scheduled.
  *PDP previously reported that the new tablet system would be programmed to notify visitors via email when Class Members are unable to attend a visit.  PDP now reports this may not be possible.*
- Class Members and staff request that Class Members receive the ability to approve or deny visits.  Currently, Class Members are unable to manage visits and do not know who is visiting until the day of a scheduled visit.  Class Members report that they may want to refuse some visits or prioritize some visitors over others.  Staff report that it would be more efficient for them, and helpful in avoiding potential conflict in the visiting area, if Class Members were able to accept or deny scheduled visits.

>PDP reports the new visiting system will be configured to require Class Members to provide PDP with lists of approved visitors who will then be granted access to the scheduling system following completion of a background check.

- Class Members request more support from PDP in visiting with their children. For example, they have requested that PDP personnel liaise with caregivers and facilitate visits.

  >RTS is responsible for special event visiting and visits involving children. PDP reports it will assess this recommendation as part of the RTS evaluation discussed above under Substantive Provision 4—Return to Normal Operations.

- Visitors and Class Members request that PDP allow visitors to resume taking photographs during visits.

  >PDP reports that photographs are included in the plan.

- Class Members request additional access to tablet visits generally, and specifically on weekends. They also report that existing tablets are often unavailable and request greater consistency with current tablet visiting. Finally, visitors and Class Members request expanded visiting hours to include evenings for visitors who work and children who attend school during the day.

  >As previously reported, the new tablets will allow for expanded tablet visiting hours and provide 60 minutes of free video visiting each week. PDP reports it will evaluate the expansion of visiting hours as part of the forthcoming Overwatch staffing analysis discussed above under Substantive Provision 1—Staffing.

The Monitoring Team made additional recommendations in previous reporting periods that PDP initially agreed to incorporate into the Visiting Plan.[81] They include:

- Analyzing filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above).

  >Reportedly, the tablet vendor indicates there is no way to measure demand for visiting timeslots, but Class Members and visitors suggest evenings are a more convenient visiting time. As noted above, PDP will consider adding evening timeslots as staffing levels increase.

- Ensuring that family visiting spaces in all facilities are regularly sanitized.

  >Visiting areas continue to appear clean during announced and unannounced site visits but maintenance issues persist. PDP reports the visiting areas will be assessed during the pending facilities maintenance evaluation, which is anticipated to begin in the next reporting period.

- Ensuring family visiting areas are stocked with age- and culturally-appropriate activities for youth.

  >PDP reports it is still considering this recommendation.

PDP estimates the Visiting Plan will be finalized some time in 2026.

---

[81] Monitor's Second Report, *supra* note 33, at 51-52; Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 29-30 (E.D. Pa. Nov. 4, 2022).

*Sub-provision 13.3--PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated.*

> **Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 14—Attorney Visiting**

*Sub-provision 14.1--PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

> **Compliance Rating: Partial Compliance**

The Monitoring Team continues to rely on reports from PDP, Class Members, the Defender Association, members of the private bar, and *Remick* class counsel to assess progress and identify areas for improvement with attorney visiting. The Monitoring Team is no longer receiving regular complaints about delayed attorney visits. At CFCF, there are reportedly too few visiting rooms or spaces to meet demand during high-traffic morning hours. Otherwise, PDP's in-person attorney visiting operations generally appear to be running smoothly.

As previously reported, attorney visits are not scheduled and PDP does not log attorneys' arrival times, so there is no way to measure compliance with the 45-minute requirement under this sub-provision.[82] PDP reports that it will explore creating a modified form for the visiting officer on duty to record whether visits occur within 45 minutes of Class Members being called. Of note, Class Members are only called for official visits once an attorney arrives in the official visiting area, not when they enter the facility. PDP has also reported that it is exploring whether ATIMS can assist with tracking individual in-person official visits.

*Sub-provision 14.2--For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

> **Compliance Rating: Partial Compliance**

PDP continues to report challenges in meeting the 15-minute requirement for remote legal visits, though steady progress has been made over the two previous reporting periods. Because PDP does not track the information necessary to measure compliance with this sub-provision, the Monitoring Team continues to track cancellations and delays of regularly scheduled meetings using information tracked by the Deputy Monitor during regular tablet meetings with Class Members. From January 2025 through June 2025, 66 of 86, or 77 percent of the Deputy Monitor's scheduled tablet visits were attended by Class Members. This represents a 6 percent increase from the previous reporting period and a 10 percent increase from the same period in 2024.

---

[82] Monitor's Fourth Report, *supra* note 24, at 59.

Twenty visits were no-shows and another eight were delayed beyond the 15-minute compliance window. Delays in this reporting period ranged from three minutes to one hour, most of which were attributed to reported count delays, understaffing, and technical issues.

As previously reported, in April 2024, PDP began offering counsel both 25-minute and 55-minute tablet meeting timeslots for additional flexibility when scheduling remote visits.[83] The 25-minute time slots remained available in this reporting period.

*Sub-provision 14.3--For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

### Compliance Rating:  Non-compliance

PDP's current policy does not require notifying attorneys when visits are delayed or cancelled, and no interim directive addressing this requirement has been issued. PDP reports, when remote legal visits are scheduled by attorneys, PDP does not receive attorneys' email addresses or phone numbers. PDP intends to check with the remote visiting provider to determine whether attorney email addresses may be logged to facilitate communication about delays or cancellations.

Official visitors continue to report that they are not notified of cancellations or delays and must contact PDP directly to obtain this information.

## Substantive Provision 15—COVID-19 Testing

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID-19. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-19-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID-19 positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

### Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)

## Substantive Provision 16—Quarantine

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under*

---

[83] Monitor's Fifth Report, *supra* note 21, at 74.

*current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

**Compliance Rating:  Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1--Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating:  Partial Compliance**

Jail management reports, internal audits, and out-of-cell tracking show that PDP increased the frequency of GI cleaning in this reporting period.  During April site visits, excluding segregation units, Class Members also more frequently reported regular access to GI cleaning and supplies than has been reported during previous site visits.  In October 2024, PDP expanded its contract with US Facilities to include a one-time deep cleaning at CFCF, RCF, and PICC.  MOD 3 was not included in the deep cleaning plan.

PDP reports that deep cleaning of CFCF's windows, the visitors' lobby, and facility entrances was completed in October 2024 and that floors are scheduled for completion by October 2025.  Deep cleaning at RCF and PICC have also been initiated and are scheduled for completion by October 2025.  DC's cleaning reportedly began in August and is scheduled for completion in mid-October 2025.  Progress in some facilities was noticeable during site visits in this reporting period.  Also in this reporting period, units CFCF A1, A2, and C1; PICC third floor housing units F, G, and H; and RCF G and H received fresh paint or renovation of cells or freshly painted walls.  These are improvements, if only incremental and represent a small percentage of PDP's overall maintenance and sanitation needs.

The Monitoring Team observed some cleaner units and cleaned or renovated showers in some facilities during site visits in this reporting period compared to previous site visits.  Showers were not included in the deep cleaning contracts and some showers observed during site visits continued to contain soap scum, mold, or open shower drains.  PDP continued to document monthly housing unit inspections, noting when areas were unsanitary or lacked sufficient cleaning supplies.  Despite improvements, some units continued to lack sufficient cleaning supplies, and the Monitoring Team also identified discrepancies between supply closet and in-unit inventories.

Internal monthly audits and additional inspections led by the Deputy Commissioner of Operations also documented improvements.  Deep cleaning, shower renovations, new paint, and window replacements improved conditions in some units systemwide.  MOD 3, however, remains dark, poorly maintained, and has seen little sustained improvement over five reporting

periods. Conditions in the facility remain a serious concern for the well-being of youth housed there.

PHSW continues to require improvements and consistent maintenance to safely house patients. In February 2025, PDP reported that 14 cells were inoperable. By the end of March, all but three had been repaired. By June, PDP reported that three cells had again fallen into disrepair and could not be used for patient care. In addition to hospital cells requiring frequent repair, PHSW continues to require updates to flooring, showers, bathrooms, and beds.[84] As previously reported, updates are particularly necessary where access for those with mobility impairments is limited or furnishing and fixtures in cells contain anchor points for potential suicide attempts.[85]

PDP's internal audits suggest that pest control has improved in this reporting period. Previous internal audits noted evidence of pests in multiple housing units. Audits for January and March 2025 only noted pests at CFCF Unit A1P3. Reduced trash in cells and housing units, as observed by the Monitoring Team during site visits and on CCTV, likely contributed to fewer pests. Class Members reported fewer but ongoing pest issues, especially at DC, in this reporting period.

*Sub-provision 17.2--[Defendants agree] to provide regular laundry services under current PDP policies.*

### Compliance Rating: Partial Compliance

PDP internal audits continue to identify deficiencies in weekly linen and clothing exchange as well as access to undergarments and two sets of outer wear at intake. As previously reported, PDP initiated internal monthly audits regarding access to clean clothing, linen, and cleaning supplies in November 2023.[86] PDP's monthly audits include every housing unit systemwide and auditors generally interview approximately 30 Class Members in most units. Internal auditors document their findings in reports that are submitted to jail leadership.

---

[84] Monitor's Sixth Report, *supra* note 37, at 86.
[85] *Ibid.*
[86] Monitor's Fourth Report, *supra* note 24, at 62.

In this reporting period, the Monitoring Team reviewed monthly audits completed for one housing floor from each building at CFCF, every dormitory section or celled unit at DC, and every housing area at both PICC and RCF. The following table denotes with "Y" when at least 80 percent of sampled Class Members interviewed during monthly internal audits reported routinely receiving two sets of outwear (O), access to cleaning supplies (CS), and weekly linen exchange (L) for the period, January through June 2025:

**Table 50: Class Member Reports Regarding Access to Clothing, Linen, and Cleaning Supplies**
PDP Internal Audits, January – June 2025

| | Housing Area | January | | | February | | | March | | | April | | | May | | | June | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | O | CS | L | O | CS | L | O | CS | L | O | CS | L | O | CS | L | O | CS | L |
| CFCF | A1 | | | | | | | | | | | | | | | | | | |
| | B1 | | | | | | | | | | | | | | | | | | |
| | C1 | | Y | | | Y | | | Y | | | | | | Y | | | | |
| | D1 | Y | Y | | | Y | | | Y | | | | | | Y | | N/A | N/A | N/A |
| DC | Blocks | | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| | Dorms | | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| PICC | Med | | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| | Max | | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| | 3rd | | Y | | | Y | | | | | | Y | | | Y | | | Y | |
| RCF | 1st Flr* | | | | Y | Y | | Y | | | | Y | | | Y | | | Y | |
| | 2nd Flr | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| | 3rd Flr | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| | MOD3 | | Y | Y | | Y | Y | Y | Y | Y | Y | Y | Y | | Y | Y | | | Y |

*A and C units have never achieved 80 percent of the sample population reporting weekly linen exchange.

Class Members in 76 percent of housing areas audited over six months reported consistent access to cleaning supplies. Sampled Class Members at DC, PICC, and RCF generally reported more consistent access. However, access to cleaning supplies at CFCF was poor, with Class Members in only 33 percent of housing areas reporting regular access.

Class Members in only 21 percent of housing areas audited in the six months reported regular access to outerwear. None of the housing areas at DC or PICC reported regularly receiving outwear. RCF was closer to compliance, with Class Members in 63 percent of housing areas audited reporting regular access to outerwear.

Like outerwear, Class Member reports of weekly linen exchange were low. Class Members in only 23 percent of housing areas audited reported that linens are exchanged weekly. Again, RCF was the closest to compliance with Class Members in 67 percent of housing areas reporting weekly linen exchange. None of the housing areas at CFCF, DC, or PICC reported receiving consistent weekly linen exchanges.

Excluding A and C housing areas, Class Members in RCF housing units audited reported regular access to clean outerwear, which is laundered in units, but inconsistent access to underclothing and sheets. Youth launder their own clothing in the unit at MOD 3 and generally report access to clean clothing and linens; however, underclothing must be purchased or donated via a chaplain.

CFCF, DC, and PICC have not consistently provided clean outerwear, linen, or underclothing. The Monitoring Team will attempt to replicate internal audit findings on a future site visit once Class Members in at least 80 percent of housing units audited report regular access to outerwear, cleaning supplies, and bed linens.

PDP does not audit underclothing distribution and acknowledges ongoing deficiencies in supplying Class Members with underwear, t-shirts, brassieres, and socks. In the Monitor's Third Report, the Monitoring Team recommended that PDP provide underclothing to every Class Member.[87] In April 2023, PDP drafted a policy consistent with this recommendation. In January 2024, PDP reported that it had procured sufficient supplies of undergarments for all Class Members housed in women's units. In the Monitor's Fourth Report, the Monitoring Team recommended procurement for all Class Members.[88] During site visits in the fifth reporting period, PDP reported that Class Members in women's units were being issued three pairs of underwear and two brassieres, and Class Members in men's units were being issued two sets of boxers and t-shirts.

PDP recognized the indignity of requiring Class Members without funds to rely on donated underclothing and made earnest efforts to correct the problem. At one point, PDP offered Class Members "indigent kits" containing underwear, but reports by staff and Class Members during site visits suggest they are not being distributed consistently. Although the provision of underclothing is not specifically addressed in the Agreement and will not prevent PDP from achieving substantial compliance with this sub-provision, the provision of clean clothing, including underwear, is required by the Pennsylvania Code that governs PDP operations.[89] PDP should demonstrate its commitment to the provision of undergarments and begin to ensure that all Class Members receive them at intake and that they are regularly laundered and distributed on a consistent schedule.

Maintenance, sanitation, laundry, and vector control have improved in some areas, but protocols are not being followed consistently. PDP should evaluate its supply of clothing and bedding needed for the rotating jail population to ensure timely distribution to every Class Member at intake and each week thereafter. Supplies and sanitation practices have fallen short of compliance in every reporting period. Despite some improvements, the pace of reform in this area remains insufficient. PDP's staffing gains should permit the appointment of correctional officer work-crew supervisors to address lingering issues. Failures to comply with this provision reduce the quality of life for Class Members and impact working conditions for line staff who interact with them daily.

As discussed below, Defendants hired CGL Companies (CGL) to assess PDP maintenance needs, necessary capital projects, and maintenance staffing requirements, to help develop a plan for PDP's ongoing maintenance and sanitation challenges. In the next reporting period, the City should use new data and expert recommendations to guide decisions on maintenance priorities, staffing, and project planning. Defendants must then address the aging infrastructure with a clear

---

[87] Monitor's Third Report, *supra* note 32, at 63.
[88] Monitor's Fourth, Report, *supra* note 24, at 64.
[89] 37 Pa. Code Ch. 95.228 (County Correctional Institutions), "written local policy shall provide for each inmate to receive suitable clean clothing including adequate footwear *and* underwear."

strategy, recognizing that plant maintenance, sanitation, and security improvements will require time, project management, and funding.

**Status of Recommendations, Substantive Provision 17—Sanitation, from the Monitor's Third Report:**

1.  PDP should modify schedules to increase the frequency of deep cleaning rounds.

    *PDP has partially implemented this recommendation. As reported above, some facilities were deep-cleaned in this reporting period. At CFCF, floors had been polished, walls were cleaned, and housing areas generally appeared cleaner in several units. However, facilities such as PICC, MOD 3, and DC continue to require deep cleaning and a single deep cleaning round in some facilities is insufficient.*

2.  PDP should provide Class Members with secure, rodent-proof containers for their belongings.

    *As previously reported, PDP issued "rodent resistant" bags.[90]*

3.  PDP should expedite procurement of sufficient undergarments to meet the needs of all Class Members.

    *PDP has not fully addressed this provision. While undergarments are more readily available than when the recommendation was made, they are not issued consistently reportedly due to low inventory and lack of clarity regarding expectations that staff issue undergarments at intake and with each laundry exchange.*

4.  PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and access to hygiene supplies.

    *PDP continues to complete regular internal sanitation audits. Audits are conducted by supervisors who are not assigned to subject facilities and findings are shared with institutional staff, PDP executives, and the Monitoring Team. PDP managers and executives have not corrected, or planned to correct, all deficiencies identified in internal audits and observed by the Monitoring Team.*

5.  PDP should revise its post orders to reflect operational nuances at each facility. Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities who are confined in PDP facilities.

    *PDP initially reported that Alta would assist with updates to post orders. That did not occur in this reporting period, and PDP now reports post orders will be updated as resources permit.*

6.  PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and linen exchange, and distribution of cleaning and hygiene supplies. Plans should include effective monitoring with audits and other methods.

    *PDP continues to complete monthly audits, as recommended. PDP's audits have shown some progress over time but no corrective action plans are documented for areas of non-compliance.*

---

[90] Monitor's Sixth Report, *supra* note 37, at 88.

**Additional recommendations for immediate action:**

7. The City should authorize the emergency procurement of outside contractors to deep clean housing units on a regular schedule, similar to its approach in medical and mental health housing units, which has shown improvement as a result. The contract should include entire housing units, showers, and all biohazardous cells prior to re-occupancy.

   *PDP entered into a contract with US Facilities to complete a one-time deep cleaning of CFCF, RCF, and PICC and reports entering into another contract for deep cleanings of DC. Showers were not included in the deep cleaning contracts though some shower improvements are observable during site visits. PDP continues to report that it plans, but has not yet operationalized, the return of Class Member work crews to assist in maintaining progress made by the one-time deep cleaning. PDP has not sufficiently addressed maintenance and sanitation issues at MOD 3 where PDP's youngest Class Members reside.*

8. The City should authorize PDP to immediately implement an effective vector control program at DC/PHSW and MOD 3.

   *As previously reported, PDP has not expanded the US Facilities contract to include vector control at DC/PHSW and MOD 3 but reports it hired a different pest-control contractor for those facilities. The Monitoring Team received fewer reports of severe pest infestations in this reporting period, but Class Members at DC continue to report issues. During June site visits, some Class Members reported directly to the Commissioner and other executives that mice droppings were still observed in one DC housing unit. The Commissioner directed his team to make necessary adjustments to DC's pest control program to address the complaints. It is not possible to eradicate all pests from every PDP facility, but it remains unclear whether the City's new vector control program at DC is as effective as the programs at PDP's other facilities.*

9. PDP should prioritize capital projects that pose health and safety risks in populated housing units.

   *Over six reporting periods, Defendants failed to prepare a comprehensive, prioritized capital projects plan, as recommended. PDP's aging facilities require significant and costly renovation and repair. Some capital projects have been underway since monitoring began, such as air conditioning installation at some DC housing units and lock replacements in PDP facilities. However, the City failed to dedicate sufficient resources to develop a systemwide plan for renovations and repairs with completion timeframes for each project.*

Paragraph 4(b) of the Sanctions Order states:[91]

> The City shall complete an analysis of the state of the physical plant and long-term capital needs at each PDP facility housing Class Members, identifying deficits that impact the conditions of confinement. This analysis should also provide the Commissioner of Prisons with detailed recommendations for a target number of employees needed to maintain each facility. The City shall complete the analysis and report its findings to the Monitor within 270 days of the date of this Order.

The analysis was due for submission on May 13, 2025.

Defendants have partially complied the requirements of this paragraph. In July 2025, PDP reported that it had retained CGL to assess each facility's maintenance and long-term capital needs, with an initial expected completion date of September 30, 2025. CGL prepared a draft report with maintenance staffing projections at each facility. The Monitoring Team provided feedback on the draft, and the assessment is still in progress as of this filing.

---

[91] Order, *supra* note 5, at 6.

10. Expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

> Paragraph 4(a) of the Sanctions Order states:[92]
>
> > The City shall authorize PDP to expand services contractually provided by U.S. Facilities, Inc., and fund such expanded scope of services until necessary maintenance is performed at all PDP facilities. To the extent any maintenance needs are not included in the scope of work of the RFP that resulted in the contract, the City shall initiate bargaining on the subject or issue a request for proposals in accordance with the applicable collective bargaining agreements.
>
> Defendants have partially complied with the requirements of this paragraph. In January 2025, Defendants reported the US Facilities contract had been expanded by nine employees to include services at DC. During the February site visit, however, PDP reported that US Facilities would not be assuming maintenance responsibilities at DC and that City maintenance personnel would retain responsibility for DC/PHSW, MOD 3, and PDP's [unpopulated] ancillary buildings. PDP prepared an extensive list of necessary repairs at DC/PHSW but did not have a start date, project plan, or completion timeframes for the repairs.
>
> As reported above under Substantive Provision 1—Staffing, Sanctions Order Paragraph 1(g), Current City maintenance staffing is insufficient to complete the extensive repairs and perform ongoing maintenance at DC/PHSW and MOD 3, and populated housing areas remained in disrepair during site visits in this reporting period. In April 2025, PDP reported that the Deputy Commissioner of Operations and the wardens at DC/PHSW and MOD-3 would work more closely with PDP Maintenance to address the facilities' needs. In May 2025, a Maintenance Director at DC/PHSW was appointed to oversee repairs. In June 2025, the Commissioner committed to contracting for additional maintenance support, as needed, and PDP reported contracting with a third-party vendor to deep-clean DC. PDP's efforts to comply with the requirements of this paragraph were excessively delayed and unacceptable conditions continued to impact Class Members for more than a year following this Court's order. The Commissioner has now committed to an appropriate alternative implementation plan for this requirement, which should begin to result in improvements in the next reporting period.

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states:*

---

[92] *Id.* at 5.

*"Force is only used when necessary and only to the degree required to control the inmate(s) or restore order…The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated….Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

### Compliance Rating:  Partial Compliance

Deficiencies persist with PDP's use-of-force practices, investigations, and review protocols. Because deficiencies were so pronounced when monitoring began, the Monitoring Team initially focused on PDP's use-of-force reviews and offered technical assistance to improve the quality of the review process.  In previous reporting periods, PDP was notified in advance which incidents SME McDonald planned to review.  She met regularly with PDP's Use-of-Force Review Team (UFRT) and facility leadership, offered support as cases were reviewed, and identified areas for improvement.  Personnel were receptive and SME McDonald noted incremental progress each reporting period.  In this reporting period, the Monitoring Team shifted from a technical support approach to assessment of a semi-random sample of force incidents, which were requested without advance notice to PDP.

SME McDonald requested 30 percent, or 135 out of 431 total use-of-force files for the period October 2024 through February 2025.  Of the 135 files requested, 59 completed files, or 44 percent, were provided.  Remaining files required additional time to complete.  As previously reported, PDP continues to have a shortage of lieutenants who are responsible for a first-level review of cases at the facility level, which continues to backlog reviews systemwide.  Also in this reporting period, the two UFRT lieutenants were promoted and replaced by two new team members who also require training.

Most of the October 2024 cases remained incomplete six or seven months after incidents occurred.  The Monitoring Team has recommended that PDP track all use-of-force incidents in CORESTAR, PDP's performance management database, or a similar performance management database to monitor for timely completion of use-of-force reviews and other force markers.  This recommendation has not yet been implemented.

SME McDonald analyzed 47 incidents for tactics, documentation, and quality of reviews and determined that PDP's force practices and review processes have not meaningfully improved. Facility reviews improved in some areas but continue to reflect limited compliance with basic force principles.  Reviewers continue to overlook force policy violations, poor investigations and reporting, inconsistent documentation, inadequate incident containment, failures to de-escalate or request assistance, delays in decontamination or medical assistance, and unnecessary or excessive force.

Of 47 incidents, 42 had accompanying CCTV.  Of these, reviewers correctly identified four cases of unnecessary or excessive force.  Two of the four incidents involved excessive force caused by tactical errors and failures to request a supervisor.  These issues were identified during the reviews and appropriately addressed through the employee discipline system.  The remaining two incidents involved unnecessary force.

In the first incident, a Class Member reportedly exits his cell without permission, and the tower officer [mistakenly] opens a second door through which the Class Member is seen on CCTV entering a common area. The housing unit officer pursues the Class Member whose arms are seen raised as the Class Member faces away from the officer. The officer is then seen kicking the Class Member from behind, shoving the Class Member, and deploying OC spray to the Class Member's head area. The officer's report of events does not match CCTV and the Class Member posed no imminent threat. The officer resigned pending investigation and is not eligible for rehire.

The second incident of unnecessary force identified by PDP involved two cellmates allegedly stealing meals during morning meal distribution. An officer identifies the rules violations, and the Class Members return to their cell. Despite no apparent threat, the officer follows the Class Members and deploys OC spray into their cell. The officer then secures their door and proceeds with meal distribution without reporting the force, contacting a supervisor, or arranging for decontamination. This employee was not disciplined following an investigation, which is inappropriate given the serious nature of the abuse.

In addition to the four unnecessary or excessive force incidents identified by PDP, SME McDonald identified another 10 incidents that might have been prevented with de-escalation:

1. A restrained Class Member reportedly refuses an order to move to another cell. The Class Member is not observed on CCTV behaving aggressively and reports do not reflect any threat of violence. Staff are then seen deploying OC spray to the Class Member's face, who ultimately complies. SME McDonald notes that instead of deploying OC spray, officers should have attempted to physically guide the Class Member to the new location while utilizing verbal de-escalation in efforts to gain compliance. If the Class Member escalated to physical resistance, additional force may have been warranted. This issue was not identified in the reviews.
2. During an unclothed body search, a Class Member reportedly refuses and allegedly assaults staff. Body strikes are reportedly used to gain compliance. The incident occurred inside a cell and there is no available CCTV. The Class Member filed a complaint of excessive force, which was not investigated properly, and no witnesses were interviewed. The force was deemed appropriate and no action was taken regarding the failure to investigate.
3. During a unit search, a Class Member reportedly refuses to submit to an unclothed body search. A supervisor is reportedly requested and instructs the Class Member to comply. The Class Member reportedly continues to refuse with no reports of aggression or threats. The sergeant orders deployment of OC spray, after which the Class Member reportedly complies. Rather than ordering OC spray, the sergeant should have placed the Class Member in restraints and attempted to escort the Class Member while attempting to verbally de-escalate. If the Class Member escalated with physical resistance, force may have been warranted. This issue was not identified in the review.
4. In a restricted housing unit, a lone officer opens a cell door without first restraining the Class Member in violation of PDP policy. The Class Member reportedly fails to comply with the officer's order to exit the cell for approximately 10 seconds and then exits the cell and physically resists. The review process identified the need for training but did not note that the

officer could have simply closed the door and sought assistance from a supervisor when the Class Member failed to comply. SME McDonald opines that this incident may have been avoidable.

5. A Class Member on the behavioral health caseload is seen inside a segregation cell with an arm through the food port, refusing to allow staff to secure the door. After a supervisor orders the Class Member to remove the Class Member's arm from the food port, the Class Member again refuses, and OC spray is deployed into the cell. The Class Member complies and the door is secured. Involved personnel then leave the area without ensuring self-decontamination or seeking a medical evaluation. The supervisor did not request assistance from behavioral health staff or record the incident as required. The use of OC spray may have been appropriate in this case, however, the supervisor had time to call a clinician and retrieve a video camera. The failure to encourage or provide for decontamination was wholly inappropriate. The Class Member was finally decontaminated after seven minutes. SME McDonald opines the use of force may have been prevented and efforts to reduce OC exposure were inadequate. These issues were not identified in reviews.

6. The same Class Member from incident 5 above is reportedly yelling inside a cell. The housing officer is seen opening the food port and attempting to de-escalate the situation. The Class Member is reportedly complaining of hunger and the officer is seen giving the Class Member food provided by a second Class Member. The subject Class Member then does not allow the officer to secure the food port. As with the prior incident, a supervisor is called, but not a behavioral health clinician before OC is deployed into the cell. The door is secured, and personnel again walk away leaving the Class Member in the cell for approximately 20 minutes before removing the Class Member for decontamination. These issues were not identified in the reviews.

7. A Class Member in a restricted housing unit refuses to exit the shower. After four minutes, a responding lieutenant orders deployment of OC spray. A clinician was not requested, and the incident was not recorded as required. Inadequate documentation and lack of audio prevent assessment of the incident or de-escalation efforts, making it unclear if force was avoidable. The policy violations were not identified in the reviews.

8. In a general population unit, a Class Member is upset, knocks a phone off the receiver, and walks away. An officer follows and deploys OC spray to the Class Member's back. The incident reports do not match CCTV, and reviews do not address the inconsistencies or the fact that the officer had plenty of time to call for back-up, which would have been safer and might have allowed for de-escalation without force.

9. A Class Member on the behavioral health caseload is seen in the intake area, inside a holding cell, reportedly awaiting transfer to a mental health unit. Reports describe the Class Member as engaging in self-harm by banging the Class Member's head against the cell wall. Staff used OC spray twice during the incident, once while the Class Member was restrained, which SME McDonald opines is tactically questionable. The supervisor failed to request clinical support or record the incident as required. At one point, the Class Member is seen resisting an escort, which ends in an area outside of camera range, and the OC deployments are not visible on CCTV. This case required additional investigation, which was not done, and none of the issues were identified in the reviews.

10. A restrained Class Member is seen sitting on a bench and is reportedly refusing to submit to an unclothed body search. The Class Member is male presenting, and a female presenting sergeant is present. The Class Member is not seen behaving aggressively toward staff or

others, and reports do not reflect any threat of violence by the Class Member. Staff deploy OC spray to the Class Member's face, after which the Class Member complies. The review notes that additional crisis intervention training (CIT) may help with addressing non-compliance in the future. Staff should have attempted de-escalation while attempting to guide the Class Member to another, more private location. If the Class Member escalated with physical resistance, force might have been appropriate. This did not occur, and no policy violations were noted in the reviews.

Some of the more thorough reviews in this reporting period identified the following:

- When staff should not have used force without first requesting a supervisor.
- When force was necessary, but tactics used were inconsistent with PDP policy.
- When staff failed to make command decisions and take action, thereby allowing situations to escalate.

SME McDonald determined that a total of 14 out of 47, or 30 percent of incidents reviewed in this reporting period might have been prevented or mitigated and may have been unnecessary. PDP continues to cite staff vacancies as the primary reason for its lack of progress in this area. Without sufficient training, staff continue to make mistakes and poor decisions, and managers consistently fail to address errors or misconduct.

PDP's grievance system is an inadequate mechanism for Class Members to report force-related misconduct. In this reporting period, 19 serious complaints of excessive force or abuse were logged in PDP's grievance tracking system, none of which were addressed by management. During site visits and Deputy Monitor tablet meetings, Class Members have also reported to the Monitoring Team incidents of excessive force that were never addressed and grievances that went unanswered. During the April 2025 site visits, four excessive force allegations were reported to the Monitoring Team. Subsequent investigations identified two incidents of staff misconduct that were missed by reviewers. The two remaining incidents lacked sufficient CCTV or video storage, so the merits of the allegations could not be determined. It is problematic that reviews continue to miss policy violations and unnecessary and excessive force, and that when Class Members grieve, PDP may fail to investigate and respond.

Staff also lack personal alarm devices or other mechanisms to quickly call for backup, which can extend response times and impede force prevention. PDP is currently updating the radio system to serve as an alarm system and are re-training staff in isolation and containment of incidents.

PDP's force review process is also hindered by dead angles in PDP's CCTV system, limited storage capacity for CCTV recordings, and the lack of body-worn cameras to evaluate de-escalation efforts. PDP reports ongoing efforts to implement a BWC camera pilot program, upgrade its camera system to address dead angles and storage issues, and procure video training technology to improve decision-making and de-escalation practices. The City should expedite procurement and implementation of these technologies. Despite significant technical assistance over five reporting periods, progress has been limited, and potential abuses have gone undetected or unaddressed as a result.

As previously reported, PDP is in the process of engaging a subject matter expert to guide improvements in staff training, equipment, reporting, and reviews, and help align PDP policies and practices with appropriate de-escalation standards.[93]  PDP anticipates that updates to policies and training will improve investigations and reviews and reduce incidents of unnecessary or excessive force.

---

[93] Monitor's Sixth Report, *supra* note 37, at 93.

**Additional requirements pursuant to the Sanctions Order:**

---

Paragraph 5(a) of the Sanctions Order requires PDP to confer with the Philadelphia Police Department to implement a system to remotely report criminal offenses that occur at PDP facilities, including video capability that would allow police personnel to interview complainants and witnesses remotely.  PDP was required to report the outcome of these discussions by October 15, 2024.

      Defendants have complied with the requirements of this paragraph.  In December 2024, Defendants reported that PDP and the Philadelphia Police Department had procured the necessary equipment.  In February 2025, Defendants reported that PDP, the DA, and the Philadelphia Police Department collaborated on a workflow plan.  A pilot was anticipated in this reporting period, but PDP reports the technology is not yet operational.  In the interim, training has been provided regarding the processing of assaults on PDP staff.  PDP anticipates implementation will be completed and PDP staff will begin to file criminal complaints remotely in the next reporting period.

Paragraph 5(b) of the Sanctions Order states: "[t]he City shall fund PDP's K-9 detection program.  Funding for the program shall be at a level sufficient to conduct routine and consistent sweeps for contraband at each institution and to ensure adequate facilities to house K-9s and all necessary equipment."[94]

      Defendants have partially complied with the requirements of this paragraph.  PDP staffed at least 13 dogs and dog handlers consistently throughout this reporting period, as opposed to three each pre-Sanctions Order.  Defendants reportedly spent $40,000 to expand the kennels, and, as of July 15, 2025, PDP has 17 dogs and dog handlers working systemwide.  PDP developed a daily tracking report designed to monitor contraband sweep across facilities, but the Monitoring Team identified inconsistencies in the tracking reports, which PDP anticipates resolving in the next reporting period.

Paragraph 5(c) of the Sanctions Order states: "[t]he City shall complete the purchase of technology that allows for prompt and efficient scanning, without violating any attorney-client privilege, of incoming legal mail for contraband."[95]  The technology was due to be purchased by October 15, 2024.

      Defendants have partially complied with the requirements of this paragraph.  In November 2024, as previously reported, PDP began using mail scanning equipment for incoming legal mail.  However, PDP has yet to update its policy on  handling seized contraband and notification to both the putative senders and intended recipients when legal mail is determined to contain contraband.  The Monitoring Team provided feedback on a draft policy and updated forms, which PDP anticipates finalizing in the next reporting period.

---

[94] Order, *supra* note 5, at 6.
[95] *Ibid*.