# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated,** | : | **No.: 2:20-cv-01959-GAM** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA; and MICHAEL RESNICK, in his official capacity as Commissioner of Prisons,** | : | |
| | : | |
| **Defendants.** | : | |

## MONITOR'S EIGHTH REPORT

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Eighth Report evaluating Defendants' compliance with the terms of the Agreement through December 31, 2025. The Monitor prepared this report as the eighth and final report to be filed of record through the second settlement term ending April 30, 2026. I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: March 30, 2026

Respectfully submitted,

By: /s/ Cathleen Beltz
Monitor

The Agreement between Plaintiffs Thomas Remick, et al., on behalf of themselves and all others similarly situated (Plaintiffs), and the City of Philadelphia (City) and Michael Resnick, in his official capacity as Commissioner of Prisons (Commissioner), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-GAM, requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions. The two-year Agreement was scheduled to terminate on April 12, 2024. In the initial settlement term, Defendants met the requirements for substantial compliance with Substantive Provision 15—COVID-19 Testing and Substantive Provision 16—Quarantine. Defendants also substantially complied with sub-provisions 12.3 and 12.5 (Substantive Provision 12—Locks) and 13.1 and 13.3 (Substantive Provision 13—Visiting). On January 4, 2024, the parties stipulated to a two-year extension with a new Agreement termination date of April 30, 2026.[1] As of this filing, the Parties are negotiating the terms of a second possible extension of the Agreement. Defendants' progress in implementing the Agreement is discussed below.

Pursuant to Substantive Provision 4—Resume Normal Operations, PDP and the Monitor were required to submit a plan for PDP to return to "normal operations" once COVID-19 restrictions were lifted. The plan was due for submission to this Court by November 1, 2022. For seven reporting periods, PDP consistently reported it was unable to finalize a plan primarily due to staff vacancies and a high Class Member population. Also pursuant to Substantive Provision 4, the Monitor convened regular meetings of the parties to strategize solutions to areas of persistent non-compliance.[2] Meetings involved transparent, good faith collaboration and produced solutions to some of PDP's operational issues. By February 2024, it became clear the City was unwilling to expend necessary resources to address the staffing crisis.

On April 8, 2024, Plaintiffs filed a motion for civil contempt seeking the imposition of sanctions to address Defendants' persistent failure to comply with the Agreement and improve conditions of confinement for Class Members.[3] On July 12, 2024, this Court held Defendants in civil contempt[4] and, on August 16, 2024, ordered the City and PDP to take immediate action on multiple requirements designed to address deficiencies in the following areas: (1) Recruitment, Staffing, and Hiring; (2) Healthcare Access for Class Members; (3) Programming and Services for Class Members; (4) Facility Maintenance; (5) Facility Security; and (6) Population

---

[1] On January 4, 2024, upon the agreement of the Parties, the *Remick* Court issued an order extending the Agreement through April 30, 2026. Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 197 (E.D. Pa. Jan. 4, 2024).

[2] Meetings of the parties were held June 23, 2023, October 16, 2023, November 6, 2023, December 15, 2023, February 5, 2024, December 16, 2024, April 21, 2025, and November 5, 2025.

[3] Plaintiffs' Motion for Civil Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 205 (E.D. Pa. Apr. 8, 2024). Defendants filed their response to Plaintiffs' motion for civil contempt on May 6, 2024. *See* Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 208 (E.D. Pa. May 6, 2024). Plaintiffs replied to Defendants' opposition motion on May 24, 2024. *See also* Plaintiffs' Reply Memorandum on Motion for Civil Contempt of Court, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 209 (E.D. Pa. May 24, 2024). Additional motion practice was followed by oral argument, which was heard by this Court on June 27, 2024. During oral argument, Defendants requested an evidentiary hearing. On July 9, 2024, Defendants submitted an affidavit to this Court documenting their compliance efforts to date which included ten exhibits. Defendants presented their evidence to this Court during an evidentiary hearing on July 11, 2024.

[4] Sanctions Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 220 (E.D. Pa. July 12, 2024).

Management.[5] Several of the remedial measures ordered require additional analysis and subsequent direction from this Court to ensure proper implementation. Discrete requirements of the Court's August 16, 2024 order (Sanctions Order), as well as Defendants' progress in meeting them, are discussed throughout this report.

The Agreement provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor addresses Defendants' implementation progress and issues "Substantial Compliance," "Partial Compliance," or "Non-Compliance" findings for each substantive provision. Where necessary, the Monitor makes specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision.

A "Partial Compliance" finding means PDP has successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-Compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete the discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."[6]

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance is assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. In issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's termination and compliance monitoring. In this reporting period, the Monitoring Team utilized data tracked through December 31, 2025, and additional information received from the parties through March 2026.

The Agreement requires the Monitor to conduct site inspections "at least once every three months."[7] In addition to at least one quarterly site visit, the Monitoring Team conducts periodic site visits with little advance notice to PDP, however, all site visits in this reporting period were conducted with advance notice to Defendants. During site visits, the Monitoring Team conducts confidential interviews with personnel and Class Members. The Monitoring Team also has

---

[5] *See* Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 222 (E.D. Pa. Aug. 16, 2024). The remedial sanctions described in the Sanctions Order primarily seek to remedy non-compliance with Substantive Provision 1—Staffing, Substantive Provision 2—Out-of-Cell Time, Substantive Provision 3—Out-of-Cell/Segregation, Substantive Provision 4—Resume Normal Operations, Substantive Provision 5—Healthcare, Substantive Provision 6—Behavioral Health in Segregation, Substantive Provision 7—Law Library Access, Substantive Provision 10—Phone Calls, Substantive Provision 13—Visiting, Substantive Provision 14—Attorney Visiting, Substantive Provision 17—Sanitation, and Substantive Provision 18—Use-of-Force.
[6] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 5 (E.D. Pa. May 25, 2022).
[7] *Id*. at 3.

access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

The *Remick* Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[8] In this reporting period, Deputy Monitor Grosso (Deputy Monitor) continued to conduct site visits at least once per month to speak with Class Members on PDP housing units. Following site visits, the Deputy Monitor scheduled weekly confidential virtual meetings with Class Members if more privacy was required. Since weekly two-hour tablet meetings commenced December 6, 2022, the Deputy Monitor has interviewed 486 Class Members across PDP facilities. The Monitoring Team has utilized information provided during tablet meetings to connect with Class Members' family members who are willing to communicate with the Monitoring Team.

In December 2025, the Deputy Monitor accepted a position outside of Philadelphia. The Deputy Monitor has contributed greatly to *Remick* monitoring through frequent communication with advocates, Class Members, and PDP staff; monthly site visits; monitoring of substantive provisions; and report preparation. The Monitoring Team thanks the Deputy Monitor for his dedication and congratulates him on his professional success. The Deputy Monitor will remain a member of the Monitoring Team on a limited basis.

With the Deputy Monitor's departure, the Monitoring Team will continue to conduct quarterly visits pursuant to the Monitoring Agreement and Protocols but will no longer conduct monthly site visits as described above. The parties and the Monitoring Team will identify whether any adjustments are necessary to ensure that Class Members are able to provide information to the Monitoring Team related to Agreement implementation or compliance, also pursuant to the Monitoring Agreement and Protocols.

The Monitoring Team periodically receives complaints from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel. With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary. With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews. Conditions observed and information received via these interviews and protocols are consistent with *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

The Monitoring Team also receives information via published reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, criminal defense attorneys, and others independent of PDP. This information augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms. The Monitoring Team thanks these oversight partners for their continued contributions and commitment.

---

[8] *Id.* at 4.

In this reporting period, members of the Monitoring Team completed four site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU) and Modular Unit (MOD 3), and Riverside Correctional Facility (RCF).[9] During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."[10] The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will generally be shared with Plaintiffs' co-counsel. In this reporting period, the Monitoring Team continued to meet with PDP Commissioner Michael Resnick (Commissioner) and his staff, and they received access to facilities, personnel, and Class Members.

Based on compliance findings, PDP achieved more progress in this reporting period than it has in any previous reporting period since monitoring commenced. PDP has now achieved substantial compliance with 7 of 18 Substantive Provisions and with 21 of 37 sub-provisions. PDP is poised to achieve substantial compliance with several additional sub-provisions in the next reporting period once policies are finalized and the Monitoring Team verifies that they are successfully implemented. The table below tracks PDP's compliance with all 37 sub-provisions since compliance was first reported at the sub-provision level in the Monitor's Second Report.

| Provision | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 |
|---|---|---|---|---|---|---|---|
| 1.1 | PC | PC | PC | PC | PC | SC | SC |
| 1.2 | PC | PC | PC | PC | PC | SC | SC |
| 1.3 | NC | NC | NC | NC | NC | PC | PC |
| 1.4 | NC | NC | NC | PC | PC | PC | PC |
| 2.1 | PC | PC | PC | PC | PC | PC | PC |
| 2.2 | NC | NC | NC | NC | NC | PC | PC |
| 3.1 | PC | NC | NC | NC | PC | PC | PC |
| 3.2 | PC | PC | PC | PC | PC | PC | PC |
| 4 | NC | NC | NC | NC | NC | NC | PC |
| 5 | PC | PC | PC | PC | PC | PC | SC |
| 6 | PC | PC | PC | PC | PC | PC | PC |
| 7 | PC | PC | PC | PC | PC | PC | PC |
| 8.1 | PC | PC | PC | PC | PC | PC | PC |
| 8.2 | SC | SC | SC | SC | SC | SC | SC |
| 8.3 | PC | SC | SC | SC | SC | SC | SC |
| 8.4 | SC | SC | SC | SC | SC | SC | SC |
| 9.1 | PC | PC | PC | PC | PC | PC | SC |

---

[9] Site visits were conducted July 24, 2025, August 15, 2025, September 19, 2025, and November 3-6, 2025.
[10] Monitoring Agreement and Protocol, *supra* note 6, at 3.

| Provision | Report 2 | Report 3 | Report 4 | Report 5 | Report 6 | Report 7 | Report 8 |
|---|---|---|---|---|---|---|---|
| 9.2 | PC | PC | PC | PC | PC | PC | SC |
| 10.1 | PC | PC | PC | PC | PC | PC | SC |
| 10.2 | NC | NC | NC | NC | NC | PC | SC |
| 11 | PC | PC | PC | PC | PC | PC | PC |
| 12.1 | PC | PC | SC | SC | SC | SC | SC |
| 12.2 | PC | PC | SC | SC | SC | SC | SC |
| 12.3 | SC | SC | SC | SC | SC | SC | SC |
| 12.4 | PC | PC | PC | PC | PC | PC | SC |
| 12.5 | SC | SC | SC | SC | SC | SC | SC |
| 13.1 | SC | SC | SC | SC | SC | SC | SC |
| 13.2 | PC | PC | PC | PC | PC | PC | SC |
| 13.3 | NC | SC | SC | SC | SC | SC | SC |
| 14.1 | PC | PC | PC | PC | PC | PC | SC |
| 14.2 | PC | PC | PC | PC | PC | PC | PC |
| 14.3 | NC | NC | NC | NC | NC | NC | PC |
| 15 | PC | SC | SC | SC | SC | SC | SC |
| 16 | PC | SC | SC | SC | SC | SC | SC |
| 17.1 | PC | PC | PC | PC | PC | PC | PC |
| 17.2 | PC | PC | PC | PC | PC | PC | PC |
| 18 | PC | PC | PC | PC | PC | PC | PC |
| Totals SC | 5 | 9 | 11 | 11 | 11 | 13 | 21 |
| Totals PC | 25 | 21 | 19 | 20 | 21 | 22 | 16 |
| Totals NC | 7 | 7 | 7 | 6 | 5 | 2 | 0 |

In 2025, PDP increased security staffing by more than 60 percent, from 241 new correctional officers in 2024 to 395 in 2025. In the last six months of 2025, PDP reported an average loss of only six employees per month due to voluntary separations, which reflects PDP's lowest annual voluntary separation rate since 2019. PDP is finalizing its recommended staffing analysis and post plans, which will give PDP a final hiring target to achieve substantial compliance with two remaining staffing-related sub-provisions.

PDP has also achieved substantial compliance with Substantive Provision 5—Healthcare. PDP's general medical and specialty care appointment backlog has been reduced from 1,587 backlogged appointments in 2022 to 245 backlogged appointments as of December 31, 2025. Backlog reductions were aided by successful security hiring and retention efforts described above, increased medical staffing, reductions in the patient population, and improved coordination between healthcare and security divisions. Given that many jails across the country continue to experience both unprecedented staffing crises and delayed medical and mental healthcare, Defendants' progress in these areas is commendable.

Pursuant to the Sanctions Order, PDP has finalized an analysis of its Restorative and Transitional Services (RTS) division, which is responsible for delivering the large majority of educational, rehabilitative, and other programs to Class Members. From this analysis, PDP is developing an

5

entirely new program model that increases opportunities for educational and rehabilitative programming, vocational training, and reentry services. Prior to this reporting period, RTS did not have reliable data or performance metrics to evaluate the success of its programs or to determine how many Class Members benefitted from them. In this reporting period, PDP was able to generate baseline data from which to measure future success and is developing a program dashboard to generate future program metrics. Current RTS programs are inadequate and require both enhancement and expansion, which the new program model provides for.

In September 2025, PDP opened a Reentry Center to support Class Members as they transition back into the community. PDP reports that, in the first three months of operation, nearly 600 Class Members accepted at least some reentry services while processing out of PDP. Class Members who spoke with the Monitoring Team during the February 2026 site visit reported that PDP's reentry services were important to them. PDP's pending plan for "resuming normal operations" pursuant to the Agreement hinges largely on the Commissioner's vision for RTS. Rather than mere remediation of constitutional harms and a return to pre-COVID-19 operations, PDP leadership envisions a contemporary correctional model that seeks to educate and treat Class Members through individualized programming and reentry planning.

PDP has continued to exceed data production requirements pursuant to the Sanctions Order as part of a population reduction initiative that reduced PDP's average daily population (ADP) from 4,545 in the second half of 2024 to 3,526 in the second half of 2025. Population reduction initiatives implemented by the First Judicial District and other Philadelphia justice partners have sustained these significant decreases to the prison population. Because PDP's ADP has reduced by more than 1,000 Class Members, PDP is now providing timely and adequate medical and mental healthcare pursuant to the Agreement and is making notable progress with requirements for out-of-cell time and other substantive provisions.

Finally, PDP has now distributed more than 3,000 tablets to eligible Class Members. Before individual tablets were issued, Class Members used housing unit tablets for video calling and other programming for an average combined total of three hours per day. Following individual tablet distribution, combined usage of tablet program modules increased by more than 800 percent. During site visits in February 2026, Class Members offered positive feedback about applications and materials available on tablets.

In previous reporting periods, PDP's efforts to improve compliance with some aspects of the Agreement or Sanctions Order that directly impact the daily experiences of Class Members were insufficient, even given the barriers posed by staff vacancies. In this reporting period, PDP has shown improvement across virtually every substantive provision in the Agreement. This improvement reflects commitment and sustained effort by PDP leadership and staff.

PDP leadership has also cultivated a good reputation and collegial working relationships with members of the defense bar and other Class Member advocates. Early in Agreement monitoring, some advocates preferred to communicate with PDP through the Monitor rather than directly. That is no longer the case, and many describe PDP as both responsive to concerns and receptive to suggestions for improvement.

PDP is maintaining an aggressive pace in implementing multiple concurrent initiatives pursuant to the Agreement. At PDP's current success rate, PDP may expect to achieve compliance with the Agreement sooner than was anticipated during the first three years of implementation. Although work remains to achieve PDP's reform goals and substantial compliance with the Agreement, PDP is now safely described as a system in transformation. Defendants should stay the course and allow PDP's many successes to offset fatigue that may be naturally setting in at this stage in implementation.

As Court-ordered oversight reduces over time, it will also be important for PDP to ensure that each of its initiatives is anchored in internal auditing and real-time monitoring. Reform that is not reinforced through policy, training, and timely corrective action is vulnerable to erosion, and PDP can mitigate this risk by dedicating a permanent internal compliance team as required by the Sanctions Order. PDP must begin to demonstrate that it engages in regular, candid self-assessment based on clear performance standards, and that those standards are maintained with strong accountability systems and swift corrective action.

Ongoing resource limitations combined with the ever-increasing pace of PDP's reform have at times impacted PDP's ability to update policies and deploy meaningful training, leaving staff without clear guidance. In 2024, Defendants invested in a data analysis unit within PDP, which created an opportunity to address these gaps. That unit has now been in place long enough to assume additional responsibility for internal data collection and analysis of security-related provisions.

The Healthcare Division (Healthcare) is demonstrating sound internal tracking and evaluation methods, but PDP has yet to institute comparable practices for security-related substantive provisions. As a result, the Monitoring Team continues to review raw data and generate tables, charts, and trend analyses that PDP ultimately desires to produce internally. Now that PDP has additional resources, it should engage data-driven operations and begin to perform regular monthly, quarterly, and annual audits of Agreement provisions and other important security systems.

Perhaps the most important area for improvement that is not directly monitored pursuant to the Agreement is PDP's Class Member grievance system. An effective grievance system protects Class Members and functions as an early warning system, alerting management to deviations from policy, emerging risks, and systemic issues before they escalate. Neither Class Members nor the Monitoring Team trust PDP's grievance system, which currently leaves many grievances unanswered or poorly addressed and leaves Class Members without institutional or legal recourse. PDP acknowledges that the current system does not align with widely accepted correctional practices and recently dedicated a Grievance Coordinator at the rank of lieutenant and 10 security staff to serve as grievance officers. This marks important progress and is increasingly necessary given the increase in grievances PDP reports receiving since issuing tablets systemwide.

PDP is achieving measurable success, and the next phase requires additional internal data analysis, timely policy development and revision, dedicated units responsible for monitoring compliance, and credible pathways for Class Members to seek redress and exercise their legal rights.

7

# Table of Provisions

*Compliance Findings*................................................................................................... *10*

*Substantive Provision 1—Staffing* ........................................................................ *18*

   *Sub-provision 1.1*...................................................................................................18

   *Sub-provision 1.2*...................................................................................................19

   *Sub-provision 1.3*...................................................................................................20

   *Sub-provision 1.4*...................................................................................................23

*Substantive Provision 2—Out-of-Cell Time* ....................................................... *28*

   *Sub-provision 2.1*...................................................................................................28

   *Sub-provision 2.2*...................................................................................................30

*Substantive Provision 3—Out-of-Cell/Segregation* .......................................... *32*

   *Sub-provision 3.1*...................................................................................................32

   *Sub-provision 3.2*...................................................................................................34

*Substantive Provision 4—Resume Normal Operations*..................................... *45*

*Substantive Provision 5—Healthcare* ................................................................. *50*

*Substantive Provision 6—Behavioral Health in Segregation*........................... *62*

*Substantive Provision 7—Law Library Access* .................................................. *71*

*Substantive Provision 8—Discipline*.................................................................... *72*

   *Sub-provision 8.1*...................................................................................................72

   *Sub-provision 8.2*...................................................................................................76

   *Sub-provision 8.3*...................................................................................................77

   *Sub-provision 8.4*...................................................................................................77

*Substantive Provision 9—Tablets*........................................................................ *77*

   *Sub-provision 9.1*...................................................................................................77

   *Sub-provision 9.2*...................................................................................................78

*Substantive Provision 10—Phone Calls*.............................................................. *78*

   *Sub-provision 10.1*.................................................................................................78

   *Sub-provision 10.2*.................................................................................................78

*Substantive Provision 11—PICC Emergency Call Systems*.............................. *79*

*Substantive Provision 12—Locks*......................................................................... *80*

   *Sub-provision 12.1*.................................................................................................80

   *Sub-provision 12.2*.................................................................................................80

   *Sub-provision 12.3*.................................................................................................80

*Sub-provision 12.4*......................................................................................................*80*

*Sub-provision 12.5*......................................................................................................*81*

***Substantive Provision 13—Visiting***..................................................................... **81**

*Sub-provision 13.1*......................................................................................................*81*

*Sub-provision 13.2*......................................................................................................*81*

*Sub-provision 13.3*......................................................................................................*83*

***Substantive Provision 14—Attorney Visiting***..................................................... **84**

*Sub-provision 14.1*......................................................................................................*84*

*Sub-provision 14.2*......................................................................................................*85*

*Sub-provision 14.3*......................................................................................................*86*

***Substantive Provision 15—COVID-19 Testing*** ................................................... **86**

***Substantive Provision 16—Quarantine***............................................................... **87**

***Substantive Provision 17—Sanitation***.................................................................. **87**

*Sub-provision 17.1*......................................................................................................*87*

*Sub-provision 17.2*......................................................................................................*89*

***Substantive Provision 18—Use-of-Force***............................................................. **95**

**Compliance Findings**

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with the entire provision. The Monitoring Team created sub-provisions for 10 of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision. This provides additional clarity for Defendants as they work to implement required changes and greater specificity for this Court and the Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 action items were created, including 29 sub-provisions and 8 undivided provisions (hereinafter "sub-provisions"). In this reporting period, PDP has achieved substantial compliance with 21 sub-provisions and partial compliance with 16 sub-provisions. For the first time, PDP has achieved at least partial compliance with every sub-provision. In this reporting period, Substantive Provision 5—Healthcare, Substantive Provision 9—Tablets (including sub-provisions 9.1 and 9.2), and Substantive Provision 10—Phone Calls (including sub-provisions 10.1 and 10.2) changed from partial compliance to substantial compliance. In addition, sub-provisions 12.4 and 13.2 changed from partial to substantial compliance, bringing Substantive Provision 12—Locks and Substantive Provision 13—Visiting into substantial compliance. Also in this reporting period, sub-provision 14.1 changed from partial to substantial compliance and sub-provision 14.3 changed from non-compliance to partial compliance. Substantive Provision 4—Resume Normal Operations also changed from non-compliance to partial compliance in this reporting period.

The table below reflects all provisions and current compliance ratings for each substantive provision and each sub-provision:

| Provision | Requirements | Compliance Status |
|:---:|:---|:---:|
| **1** | **Staffing** | **PC** |
| 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | SC |
| 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *retention* of correctional officers. | SC |
| 1.3 | Ensure that there are a sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | PC |
| 1.4 | These measures [1.1-1.3] shall continue until this goal is achieved and thereafter to maintain the proper number of correctional officers. | PC |

10

| Provision | Requirements | Compliance Status |
|---|---|---|
| **2** | **Out-of-Cell Time** | **PC** |
| 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC |
| 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. *See also* para. 4, *infra*. | PC |
| **3** | **Out-of-Cell/Segregation** | **PC** |
| 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | PC |
| 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC |
| **4** | **Resume Normal Operations** | **PC** |
| | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | PC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| **5** | **Healthcare** | **SC** |
|  | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | SC |
| **6** | **Behavioral Health in Segregation** | **PC** |
|  | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation units. | PC |
| **7** | **Law Library Access** | **PC** |
|  | PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | PC |
| **8** | **Discipline** | **PC** |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. | SC |
| 8.3 | [The PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. | SC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| 8.4 | [The PDP shall] cancel sanctions [imposed in hearings held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC |
| **9** | **Tablets** | **SC** |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [1st floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. | SC |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | SC |
| **10** | **Phone Calls** | **SC** |
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | SC |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | SC |

| Provision | Requirements | Compliance Status |
|---|---|---|
| **11** | **PICC Emergency Call Systems** | **PC** |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity. | PC |
| **12** | **Locks** | **SC** |
| 12.1 | PDP initiated the lock replacement program for *PICC*, which will be completed by June 30, 2022. | SC |
| 12.2 | PDP initiated the lock replacement program for *RCF*, which will be completed by June 30, 2022. | SC |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | SC |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC |
| **13** | **Visiting** | **SC** |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | SC |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated outside of PDP. | SC |

14

| Provision | Requirements | Compliance Status |
|---|---|---|
| **14** | **Attorney Visiting** | **PC** |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | SC |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC |
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | PC |
| **15** | **COVID-19 Testing** | **SC** |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | SC |
| **16** | **Quarantine** | **SC** |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | SC |
| **17** | **Sanitation** | **PC** |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC |

15

| Provision | Requirements | Compliance Status |
|---|---|---|
| **18** | **Use-of-Force** | **PC** |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order… The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated… Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | PC |

Progress and updates regarding Defendants' compliance with the Sanctions Order are discussed throughout this report. The table below reflects all Sanctions Order requirements and the current compliance status of each:

| Paragraph | Sanctions Order Requirements (Short Form) | Compliance Status |
|---|---|---|
| **1** | **Recruitment, Staffing, and Hiring** | **SC** |
| 1(a) | Identify and Hire Outside Recruitment Firm | SC |
| 1(b) | Maintain Continuous-Fill Hiring Lists | SC |
| 1(c) | Evaluate Potential Civilianization of Employees | SC |
| 1(d) | Identify and Contract with Medical Guarding Company | SC |
| 1(e) | Authorize Double-Time Increases to Staff Vacant Shifts | SC |
| 1(f) | Appoint Wellness Coordinator and Fund Employee Wellness Program | SC |
| 1(g) | Conduct Comparative Wage and Non-Wage Benefits Analysis | SC |
| 1(h) | Expand Rehiring Eligibility within Civil Service Regulation | SC |
| 1(i) | Expand Residency Requirement | SC |
| **2** | **Healthcare** | **PC** |
| 2(a) | Increase YesCare Budget | PC |
| 2(b) | Fund and Operate Access to Care Team | SC |
| 2(c) | Expand Telehealth Services | SC |

16

| Paragraph | Sanctions Order Requirements (Short Form) | Compliance Status |
|---|---|---|
| **3** | **Programming and Services for Class Members** | **PC** |
| 3(a) | Identify and Engage Restorative and Transitional Services Consultant | SC |
| 3(b) | Install Law Library Terminals | PC |
| **4** | **Facility Maintenance** | **PC** |
| 4(a) | Expand Maintenance Contract | PC |
| 4(b) | Analyze Physical Plant State and Assess Long-term Capital Needs | PC |
| **5** | **Facility Security** | **PC** |
| 5(a) | Implement Virtual Offense Reporting System | SC |
| 5(b) | Fund K-9 Protection Program | SC |
| 5(c) | Purchase Scanning Technology | PC |
| **6** | **Population Management** | **SC** |
| 6(a) | Explore Relocation of Class Members to Other Facilities | SC |
| 6(b) | Produce Monthly Prison Population Reports | SC |
| **7** | **Remedy** | **SC** |
| 7(a) | Pay Court Registry Sum and Fiscal Budget Decrease Prohibition | SC |
| **8** | **Compliance with this Order and the Settlement Agreement** | **PC** |
| 8(a) | Provide Notice to Applicable Union for Civilianizing Employees | SC |
| 8(b) | Hire Compliance Coordinator and Submit Written Status Report | PC |

**Substantive Provision 1—Staffing**

*Sub-provision 1.1—No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

**Compliance Rating: Substantial Compliance**

Defendants remain in substantial compliance with this sub-provision. Monitoring of this sub-provision will continue until PDP has achieved substantial compliance with Substantive Provision 1—Staffing, including all sub-provisions, 1.1 through 1.4. Should the current application and hiring rates reduce such that PDP is unable to hire sufficient personnel to meet Agreement requirements, or meeting Agreement requirements pursuant to sub-provision 1.4 below would be unreasonably delayed, the finding will revert to partial compliance and the Monitoring Team will make additional recommendations to support substantial compliance.

Security staffing and recruitment efforts continued to improve through this reporting period. In July 2025, PDP's vacancy rate for security positions (including officers, sergeants, lieutenants, and captains) was 32 percent, with 1,310 of 1,923 positions filled. As of December 2025, PDP had filled a total of 1,490 positions, reducing the security vacancy rate to 23 percent. PDP reports seven correctional academies were held in 2025, and PDP anticipates a similarly aggressive academy schedule in 2026 and a sufficient number of candidates to fill classes. In total, PDP hired 395 new cadets in 2025, compared to 241 in 2024 and 135 in 2023. PDP also reportedly rehired 48 previously separated correctional staff in 2025. Rehires are required to complete an abbreviated refresher academy, permitting PDP to return experienced personnel to security assignments more quickly. Defendants continue to retain the Whalls Group to assist with recruitment and onboarding of security staff, an effective strategy based on recent hiring outcomes.

Paragraph 6(b) of the Sanctions Order requires Defendants to produce monthly data reports. The compiled reports include lists of individual Class Members grouped by specific categories. Paragraph 6(b) requires the following categories:

    (i)    Class Members held on bail up to $100,000;
    (ii)    Class Members with significant medical needs, such as cancer treatment and dialysis, requiring frequent off-site medical appointments;
    (iii)    Class Members over the age of 60;
    (iv)    Class Members who are in PDP's minimum or community security categories, have only misdemeanor and F3 charges, and have no more than a minor history of misconduct within PDP; and
    (v)    Class Members who are housed in protective custody.

For each Class Member, the person identifier (PPN), admission date, length of stay, total bail amounts, facility, lead charges, lead grades, and docket numbers are provided.

*Defendants continued to exceed the requirements of this paragraph in this reporting period.* In March 2025, Defendants agreed to provide required data weekly rather than monthly and have consistently provided weekly data to support population reduction initiatives throughout this reporting period. Weekly emergency bail hearings and new procedures for Gagnon I and Gagnon II hearings have also continued in this reporting period.[11]

Table 1 below shows the ADP of all PDP facilities in each reporting period from July 2022 to December 2025:

**Table 1: PDP Average Daily Population (ADP)***
July 2022 – December 2025

| Reporting Period | July-Dec 2022 | Jan-June 2023 | July-Dec 2023 | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 | July-Dec 2025 |
|---|---|---|---|---|---|---|---|
| ADP[12] | 4,432 | 4,429 | 4,732 | 4,660 | 4,545 | 3,625 | 3,526 |

*Data reflects the ADP total over each reporting period using statistics compiled from publicly available First Judicial District of Pennsylvania Philadelphia Prison Population Reports via the MacArthur Safety and Justice Challenge.

In this reporting period, PDP's ADP decreased from 3,625 in the first half of 2025 to 3,526 in the second half of 2025. Population reduction initiatives implemented by the First Judicial District and justice partners have sustained significant decreases to the prison population. In this reporting period, the population did not rise above 3,700 Class Members. Overall population reductions in addition to PDP's intensive recruitment efforts have contributed greatly to PDP's progress toward substantial compliance with the Agreement in 2025.

*Sub-provision 1.2—No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers.*

**Compliance Rating: Substantial Compliance**

Defendants remain in substantial compliance with this sub-provision. Monitoring of this sub-provision will continue until PDP has achieved substantial compliance with Substantive Provision 1—Staffing, including all sub-provisions, 1.1 through 1.4. PDP's employee retention rates have continued to improve in this reporting period. Of the 395 new personnel hired in 2025,

---

[11] In October 2024, the Honorable Karen Simmons, Supervising Judge, Criminal Division, Philadelphia Municipal Court, instituted weekly emergency bail hearings for Class Members who meet specific criteria and based on recommendations from the Defender and DA. In November 2024, the Honorable Rose Marie DeFino-Nastasi, Supervising Judge, Criminal Division, Philadelphia Common Pleas Court, also promulgated new regulations for *Gagnon* I and *Gagnon* II hearings, specifically designed to accelerate review of common pleas detainers.

[12] Average Daily Population is the industry standard for tracking prison populations, which is calculated and used by PDP. These numbers are included within the publicly available Philadelphia Prison Population Reports. *See* Philadelphia Prison Population Report | July 2015 – June 2025, MacArthur Safety and Justice Challenge (Jan. 15, 2026), https://www.phila.gov/media/20260115113635/December-2025-Full-Public-Report-2.pdf.

362 remained employed as of December 30, 2025. This represents an exceptional 92 percent first-year retention rate and an improvement from the 74 percent first-year retention rate for the period January–December 2024.[13]

In the period July–December 2025, PDP reported an average loss of only six employees per month due to voluntary separations. Combined with the period January–June 2025, this reflects PDP's lowest annual voluntary separation rate since tracking started in 2019. Table 2 below depicts monthly averages of PDP employees who voluntarily separated pre-retirement from January 2019 through December 2025:

**Table 2: Average Voluntary Monthly Separations by PDP Employees**
January 2019 – December 2025

|  | Pre-Arbitration Award | | | | Post-Arbitration Award | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2019 | 2020 | 2021 | Jan-Aug 2022 | Sep-Dec 2022 | 2023 | 2024 | Jan-June 2025 | July-Dec 2025 |
| Monthly Average | 10 | 11 | 24 | 23 | 11 | 13 | 8 | 5 | 6 |

*Sub-provision 1.3—Ensure that there are a sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating: Partial Compliance**

In this reporting period, PDP continued to assess how best to allocate increasing personnel to sufficient correctional officer posts to improve operations and achieve substantial compliance with this substantive provision. To achieve substantial compliance with this sub-provision, PDP must: (1) finalize and implement its new post plan, and (2) consistently fill at least 90 percent of its jail-based posts.

Tables 3 through 6 below present the overall average percentages of vacant posts and those filled by overtime staff in all PDP facilities for four reporting periods: January–June 2024, July–December 2024, January–June 2025, and July–December 2025, and in each populated facility for the reporting period July–December 2025.

---

[13] Monitor's Sixth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 228 at 16 (E.D. Pa. Mar. 31, 2025).

**Table 3: Average Percentage of All PDP Posts Left Vacant Due to Staffing Shortages**
January 2024 – December 2025

| Reporting Period | Average % Vacant |
|---|---|
| Jan-June 2024 | 39% |
| July-Dec 2024 | 34% |
| Jan-June 2025 | 36% |
| July-Dec 2025 | 28% |

**Table 4: Average Percentage of PDP Posts Left Vacant Due to Staffing Shortages, by Facility and Month**
July – December 2025

| Facility | July | August | Sept | Oct | Nov | Dec | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 28% | 28% | 29% | 29% | 29% | 30% | **29%** |
| DC | 27% | 26% | 26% | 25% | 29% | 21% | **27%** |
| PICC | 28% | 23% | 20% | 18% | 18% | 22% | **21%** |
| RCF | 39% | 36% | 31% | 30% | 29% | 27% | **33%** |
| **Average** | **31%** | **28%** | **27%** | **26%** | **26%** | **25%** | **28%** |

**Table 5: Average Percentage of PDP Posts Filled with Overtime Staff**
January 2024 – December 2025

| Reporting Period | Average % Filled with Overtime Staff |
|---|---|
| Jan-June 2024 | 26% |
| July-Dec 2024 | 27% |
| Jan-June 2025 | 22% |
| July-Dec 2025 | 20% |

**Table 6: Average Percentage of PDP Posts Filled with Overtime Staff, by Facility and Month**
July – December 2025

| Facility | July | August | Sept | Oct | Nov | Dec | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 21% | 24% | 23% | 23% | 20% | 19% | **22%** |
| DC | 20% | 18% | 15% | 15% | 13% | 11% | **16%** |
| PICC | 24% | 24% | 22% | 18% | 18% | 17% | **21%** |
| RCF | 20% | 21% | 20% | 21% | 20% | 21% | **21%** |
| **Average** | **21%** | **22%** | **20%** | **19%** | **18%** | **17%** | **20%** |

In this reporting period, PDP continued to demonstrate improvement in personnel deployment and post coverage. The percentage of vacant posts reduced from 36 percent in the period January–June 2025 to 28 percent in July–December 2025. Vacancy rates continued to vary by facility, with RCF reporting the highest average vacancy rate at 33 percent during July–December 2025 and PICC reporting the lowest vacancy rate at 21 percent for the same period.

PDP's reliance on overtime decreased from 22 percent of posts filled by overtime staff in the period January–June 2025 to 20 percent in July–December 2025. The post reduction trends occurred alongside an increase in total staff hours worked, from an average of 39,235 hours per week in the first half of 2025 to 42,281 hours per week in the second half of the year. This reflects a 28 percent increase from 32,935 average weekly hours worked in the period July–December 2024.

Table 7 below depicts average total hours worked in PDP facilities for four reporting periods: January–June 2024, July–December 2024, January–June 2025, and July–December 2025:

**Table 7: Average Total Hours Worked in PDP Facilities Per Week**
January 2024 – December 2025

| Reporting Period* | Avg. Total Weekly Hours Worked | Increase from Previous Reporting Period | | Increase from Same Period in Previous Year | |
|---|---|---|---|---|---|
| | | # | % | # | % |
| Jan-June 2024 | 29,568 | – | – | – | – |
| July-Dec 2024 | 32,935 | 3,367 | 11% | – | – |
| Jan-June 2025 | 39,235 | 6,300 | 19% | 9,667 | 33% |
| July-Dec 2025 | 42,281 | 3,046 | 8% | 9,346 | 28% |

*Dates adjusted to reflect complete half-year timeframes.

During site visits in November 2025, the Monitoring Team audited the Telestaff roster across all four facilities during every shift to determine whether assigned staff were actually on post during their scheduled shifts. Audit results showed 100 percent compliance, a significant improvement from a similar audit completed in 2023, which indicated that approximately 30 percent of assigned personnel could not be verified as on post. This improvement reflects meaningful progress in staffing and operational accountability.

PDP has also increased filled supervisor positions in this reporting period, specifically at the ranks of sergeant and lieutenant. As previously reported, PDP has required additional supervisors to reduce spans of supervision and increase direct supervision and training of line staff.[14] This is particularly true given PDP's success in hiring so many new staff. PDP now plans to implement its new post plan in the first half of 2026. If PDP changes its staffing allocations and assignments in the next reporting period, as anticipated, comparative post vacancy analysis may be limited.

---

[14] Monitor's Third Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 193 at 14 (E.D. Pa. Oct. 12, 2023).

*Sub-provision 1.4—These measures [1.1-1.3] shall continue until this goal is achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating: Partial Compliance**

PDP has achieved substantial compliance with sub-provisions 1.1 and 1.2. Once PDP achieves substantial compliance with sub-provision 1.3, the Monitoring Team will assess the durability of PDP's staffing initiatives and make a compliance determination for this sub-provision.

***Status of Recommendations, Substantive Provision 1—Staffing, from the Monitor's First Report (November 2022):***

1. Determine whether the current salary and benefits structures pursuant to the arbitration award and other efforts by Defendants are sufficiently competitive with other jurisdictions and agencies to attract applicants, and if not, supplement benefits accordingly.
   *Defendants did not implement this recommendation in its entirety but opted for a path that has now resulted in Defendants achieving substantial compliance with sub-provisions 1.1 and 1.2 related to custody staff vacancies.[15]*

Paragraph 1(g) of the Sanctions Order states: "Within 60 days of the date of this Order, the City shall compare wages and non-wage benefits available to PDP employees and other City of Philadelphia employees and submit a description of any differences identified to the Monitor. The comparison shall include uniformed public safety personnel and all other PDP job classifications for which vacancy rates exceed ten percent."[16] The comparison was due for submission by October 15, 2024.

*Defendants have complied with the requirements of this paragraph.* Given PDP's compliance with hiring and retention of security staff, no additional analysis of security positions is required pursuant to this paragraph.[17]

Regarding persistent maintenance vacancies, PDP successfully reclassified 10 existing, unfilled maintenance positions from Prison Trades Worker I to Prisons Trades Worker II–Maintenance Mechanic. The Maintenance Mechanic position requires a broader skill set for a higher total compensation package than the Prison Trades Worker I position. In March 2026, Defendants reported they have a total of 10 new Maintenance Mechanic positions and had identified more than 40 potential candidates. Four positions were filled as of this filing, and PDP anticipates the remaining six positions will be filled from the existing candidate pool. If so, PDP's maintenance vacancies will be reduced to less than 10 percent and perhaps eliminated. The Monitoring Team will continue to provide updates regarding this requirement and no additional analysis by Defendants is required at this time.

---

[15] Monitor's Seventh Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 231 at 14 and 20 (E.D. Pa. Sept. 30, 2025).
[16] Order, *supra* note 5, at 3.
[17] Monitor's Seventh Report, *supra* note 15, at 14 and 20.

23

2.  Retain a qualified recruitment firm to assist in guiding the City's efforts, which should include salary surveys in support of the previous recommendation and other validated recruitment and retention strategies.

> Paragraph 1(a) of the Sanctions Order required Defendants to generate a list of outside recruitment firms with a proven track record of hiring for law enforcement agencies and submit the list for the Court's consideration. Defendants were further required to retain the selected firm within 90 days of the Court's approval, or January 21, 2025.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[18]

3.  Engage an independent staffing analysis to determine true staffing needs for each facility. The analysis should be completed by someone with specific expertise in jail staffing studies. *Defendants have implemented this recommendation. Overwatch Innovations is in the process of finalizing a comprehensive staffing analysis, as recommended. The analysis is scheduled for completion in the next reporting period and will result in an updated post plan.*

4.  Evaluate which PDP functions currently performed by sworn personnel can be performed by civilians (information technology, records, intake and release, cashier, etc.) and identify or expand civilian employees or contracted services accordingly.

> Paragraph 1(c) of the Sanctions Order requires Defendants to evaluate which departments within PDP may be served in full or in part by civilian employees. The evaluation was due for submission by September 16, 2024.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[19]

> Paragraph 1(d) of the Sanctions Order requires Defendants to identify companies capable of providing medical guarding of PDP's open ward patient population, as well as transporting patients to off-site medical appointments. Paragraph 1(d) further requires Defendants to commence contract negotiations with the selected medical guarding company. Defendants were required to identify companies by September 16, 2024, and initiate contract negotiations with the selected vendor by January 21, 2025.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[20]

---

[18] *Id.* at 27.
[19] *Id.* at 28.
[20] *Ibid.*

5.  Simplify the City's lengthy hiring and onboarding processes that reportedly create delays in recruits reporting to PDP academies.
    *As previously reported, Defendants have implemented this recommendation.*[21]

6.  Establish continuous-fill hiring lists during the staffing crisis.

> Paragraph 1(b) of the Sanctions Order requires the City to maintain continuous-fill hiring lists to accept applications for employment with PDP.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[22]

7.  Assess the impact of Philadelphia's employee residency requirements on PDP's hiring outcomes and consider whether permanent exemptions or modifications are appropriate.
    *As previously reported, Defendants have implemented this recommendation.*[23]

> Paragraph 1(i) of the Sanctions Order requires the City to expand the residency waiver to applicants residing outside the Commonwealth of Pennsylvania.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[24]

8.  PDP should implement strategies for employee retention and a robust employee wellness program.

> Paragraph 1(f) of the Sanctions Order requires that PDP appoint a Wellness Coordinator to oversee the PDP employee wellness program and that the City fund an adequate employee wellness program. Defendants were required to hire a Wellness Coordinator by November 14, 2024 and fund an adequate employee wellness program by January 13, 2025.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[25]

9.  The City should implement a return-to-work strategy that is tailored to the needs of PDP employees who are out on long-term leave or work-related illness.
    *As previously reported, Defendants have implemented this recommendation.*[26]

---

[21] Monitor's Fourth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 204 at 17 (E.D. Pa. Mar. 29, 2024).
[22] Monitor's Seventh Report, *supra* note 145 at 29.
[23] *Ibid.*
[24] *Ibid.*
[25] *Id.* at 30.
[26] Monitor's Fifth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 24 at 21 (E.D. Pa. Sept. 30, 2024).

25

10. Retain an expert to build internal capacity to manage systems, coding, and budgetary processes associated with staffing allocations. The expert should assist PDP in identifying and retaining only the most useful database reports and discontinuing the use of non-essential or inaccurate reports.
    *As previously reported, Defendants have implemented this recommendation.*[27]

***Additional recommendations for immediate action:***

11. Immediately authorize additional double-time pay each day of the week as necessary to staff all vacant shifts.

> Paragraph 1(e) of the Sanctions Order requires the City to immediately authorize PDP to offer additional double-time pay for any day of the week as necessary to staff all vacant shifts.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[28]

12. The City should establish a well-resourced team to assist with recruitment, application processing, onboarding, and supporting new staff. The team should conduct meaningful exit interviews of staff leaving PDP to determine what is needed to improve retention.
    *As previously reported, Defendants have implemented this recommendation.*[29]

***Additional requirements pursuant to the Sanctions Order:***

> Paragraph 1(h) of the Sanctions Order requires Defendants to expand the timeframe for eligibility to rehire former employees from one year to five years following resignation. Defendants were required to increase the rehiring window by September 16, 2024.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[30]

> Paragraph 6(a) of the Sanctions Order requires the Commissioner to explore realistic, suitable options to relocate Class Members to other secure facilities and, by December 16, 2024, to report on the options identified.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[31]

---

[27] Monitor's Fourth Report, *supra* note 21, at 18.
[28] Monitor's Seventh Report, *supra* note 15, at 31.
[29] *Ibid.*
[30] *Id.* at 32.
[31] *Ibid.*

Paragraph 8(b) of the Sanctions Order states: "The City shall, as required to comply with the mandates of this Order and the Settlement Agreement, hire or contract with a permanent full-time internal Compliance Coordinator" and "submit a staffing plan to the Court via the Monitor for approval."[32] The City was to hire a Compliance Coordinator by December 16, 2024 and submit a staffing plan by January 15, 2025.

*Defendants have partially complied with the requirements of this paragraph.* In this reporting period, PDP appointed a compliance Project Manager and anticipates finalizing an organizational chart in the first half of 2026. The Monitoring Team has consistently recommended that PDP create a compliance unit since 2022. PDP has been assisted by Alta Management and various personnel assignments since November 2024, but PDP has not yet created a sufficiently resourced unit to ensure reform is anchored in robust policies, effective training, internal data tracking, regular internal auditing, and meaningful corrective action. An effective compliance unit could track Agreement compliance in real time and guide PDP to substantial compliance more quickly.

The burden of proof for Agreement compliance lies with Defendants, including the preparation and presentation of evidence that supports compliance determinations. Since monitoring commenced, the Monitoring Team has performed tasks, such as project planning and raw data analysis, that should be performed internally and then reviewed or sample replicated by the Monitoring Team as necessary for compliance determinations. Without a compliance unit, the Monitoring Team requires frequent updates from personnel assigned to various tasks and meetings with PDP executives to discuss the status of projects that may be more efficiently and cost-effectively tracked and addressed by a compliance unit.

The Monitoring Team enjoys working closely with PDP personnel at all ranks and remains impressed by PDP's significant progress toward compliance over four years without a dedicated compliance unit. At this stage in Agreement implementation, the compliance team should focus on the remaining substantive provisions that require additional steps to achieve compliance, but they should also focus on the critical task of ensuring PDP sustains compliance with the Agreement as a whole. Systems that successfully implement court-ordered reform may regress without adequate real-time internal monitoring and corrective action once external monitoring is terminated.

Paragraph 8(b)(ii) requires Defendants to submit a written status report detailing their progress toward implementation of the Sanctions Order by February 12, 2025. Subsequent status reports must be submitted on the first day of each quarter until otherwise directed by the Court.

*Defendants have continued to comply with the requirements of this sub-paragraph in this reporting period.*

---

[32] Order, *supra* note 5, at 9.

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1—Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

**Compliance Rating: Partial Compliance**

Defendants will achieve substantial compliance with this sub-provision once PDP: (1) finalizes a reliable out-of-cell tracking system; (2) tracks out-of-cell time using replicable methods; (3) documents any reasons for failures to provide out-of-cell opportunities; and (4) demonstrates that Class Members in each non-restricted housing unit are offered at least five hours of out-of-cell time, each day, at least 90 percent of the time.

PDP continues to use a paper-based out-of-cell tracking system while piloting its Radio Frequency Identification System (RFID). Documentation has continued to improve across most housing units over three reporting periods. Personnel are also more consistently documenting any reasons for failures to offer out-of-cell time, including Class Member refusals. Reliability issues with the paper-based system persist, and documentation can only be verified via Closed Circuit Television (CCTV) review. Electronic tracking with RFID will improve reliability and internal monitoring, but PDP does not anticipate that the RFID system will be fully implemented in 2026. PDP reports that RFID technology is now in place and being piloted in each PDP facility. Technological issues limit interface between ATIMS and the RFID, so meaningful reports and data are not yet available. PDP reports it is transitioning to a cloud-based system, currently scheduled for September 2026, that may correct these issues. In the last two reporting periods, PDP has assigned staff to review daily out-of-cell logs and elevate issues to facility leadership, which is likely contributing to improved documentation and additional out-of-cell opportunities.

Subject Matter Expert Terri McDonald (SME McDonald) continues to calculate PDP's out-of-cell time to assess compliance with the Agreement. As in previous reporting periods, PDP has again committed to generating its own out-of-cell data going forward, which SME McDonald can then sample and validate. As such, the Monitoring Team will no longer track PDP's out-of-cell time. The Monitoring Team remains available for technical support, as always, but PDP will analyze its own data and generate evidence of compliance with Substantive Provision 2—Out-of-Cell Time. The Monitoring Team also continues to urge PDP to use its data team to conduct routine internal evaluations of out-of-cell time in restricted housing and general population units. Internal monitoring will allow PDP to identify documentation or other deficiencies, provide timely feedback, and take corrective action without waiting for or relying on external monitoring.

28

In this reporting period, SME McDonald calculated average daily out-of-cell opportunities in each of three facilities for one-week periods each month between July and December 2025. Table 8 below represents the average out-of-cell time documented facility-wide for CFCF, PICC (men's units), and RCF for weeks reviewed:

**Table 8: Average Out-of-Cell Hours Per Day, Six One-Week Periods***
July – December 2025

| Facility** | July | Aug | Sept | Oct | Nov | Dec | Average*** |
|---|---|---|---|---|---|---|---|
| CFCF | 7.25 | 6.5 | 5.5 | 6.75 | 5.5 | 5.75 | 6.25 |
| PICC | 4.5 | 5 | 6 | 6.25 | 5 | 6.25 | 5.5 |
| RCF | 4.75 | 4.5 | 6.5 | 7.25 | 8.25 | 8.25 | 6.5 |
| Average*** | 5.5 | 5.25 | 6 | 6.75 | 6.25 | 6.75 | 6 |

*Weeks reviewed include: July 7-13, 2025; August 4-10, 2025; September 1-7, 2025; October 6-12, 2025; November 3-9, 2025; and December 1-7, 2025.
**DC, MOD 3, and the women's units at PICC are excluded because they consistently achieve this sub-provision's five-hour benchmark.
***Averages have been rounded to the nearest quarter of an hour.

Facility-wide averages for weeks reviewed generally met or exceeded the five-hour benchmark, and the six-month averages for each facility exceeded five hours per day. SME McDonald also calculated average out-of-cell opportunities for every populated, non-restricted housing area in each facility for the same weeks.

Table 9 below reflects total housing area groups across three facilities that did not reach the five-hour out-of-cell benchmark for the six sampled weeks, July–December 2025:

**Table 9: Non-Restricted Housing Areas Below the Five-Hour Out-of-Cell Benchmark, Six One-Week Periods***
July – December 2025

| Facility | Housing Area Groups Six-Week Total** | Total with <5 Hours Out-of-Cell Time | % with <5 Hours Out-of-Cell Time |
|---|---|---|---|
| CFCF*** | 127 | 12 | 9% |
| PICC | 66 | 22 | 33% |
| RCF | 42 | 18 | 43% |
| All Facilities | 235 | 52 | 22% |

*Weeks reviewed include: July 7-13, 2025; August 4-10, 2025; September 1-7, 2025; October 6-12, 2025; November 3-9, 2025; and December 1-7, 2025.
**This column reflects the combined total of all housing areas reviewed over the six-week sample period.
***CFCF includes all populated pods from the following housing units: B1, B2, C1, C2, D1, and D2.

For the six one-week periods reviewed, 22 percent of housing area groups fell below the five-hour benchmark. At CFCF, nine percent of groups fell below the five-hour benchmark, primarily in September and November and concentrated in pods D2 and, to a lesser extent, D1. Other CFCF pods consistently exceeded the five-hour benchmark. Therefore, compliance challenges at CFCF appear to be limited to specific housing areas rather than facility wide.

At PICC, 33 percent of groups fell below five hours. Underperformance was not limited to a single month and was driven by recurring shortfalls in specific housing units, including A, H, F2, and K. Other PICC housing units generally met or exceeded the five-hour benchmark. At RCF, 43 percent of groups were below the five-hour benchmark. Deficiencies were largely concentrated in July and August. Beginning in September, RCF demonstrated sustained improvement, with all housing areas consistently meeting or exceeding five hours out-of-cell time.

MOD 3 and cell blocks at DC continued to exceed out-of-cell benchmarks in this reporting period. Youth Class Members and those in DC cell blocks consistently received more than eight hours of out-of-cell time each day. The activation of outdoor recreation yards and continued use of gymnasium space further increased out-of-cell opportunities. PDP should continue to seek additional large muscle activities for youth in the gymnasium and outdoor settings.

During site visits in this reporting period, Class Members largely confirmed that they are receiving additional out-of-cell opportunities daily. Continued attention to operations and staffing in housing areas that struggle to offer consistent out-of-cell time should continue to improve compliance with this benchmark.

*Sub-provision 2.2—The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating: Partial Compliance**

Defendants will achieve substantial compliance with this sub-provision when PDP: (1) finalizes a reliable out-of-cell tracking system; (2) tracks out-of-cell time using replicable methods; (3) documents any reasons for failures to provide out-of-cell opportunities; (4) demonstrates that Class members in each non-restricted housing unit are offered at least six hours of out-of-cell time, each day, at least 90 percent of the time; (5) in consultation with counsel for the Parties and the Monitoring Team, identifies an appropriate benchmark for out-of-cell time during normal operations; and (6) meets the normal operations benchmark for out-of-cell opportunities in each non-restricted housing unit, each day, at least 90 percent of the time.

Table 10 below depicts compliance with six- and eight-hour out-of-cell benchmarks for housing area groups reviewed over six one-week periods, July–December 2025:

**Table 10: Compliance with Out-of-Cell Benchmarks in Non-Restricted Housing Areas, Six One-Week Periods***

July – December 2025

| Facility | Housing Area Groups Six-Week Total** | % with <6 Hours Out-of-Cell Time | % with ≥6 to <8 Hours Out-of-Cell Time | % with ≥8 Hours Out-of-Cell Time |
|---|---|---|---|---|
| CFCF*** | 127 | 31% | 64% | 5% |
| PICC | 66 | 62% | 27% | 11% |
| RCF | 42 | 43% | 5% | 52% |
| All Facilities | 235 | 42% | 43% | 15% |

*Weeks reviewed include: July 7-13, 2025; August 4-10, 2025; September 1-7, 2025; October 6-12, 2025; November 3-9, 2025; and December 1-7, 2025.
**This column reflects the combined total of all housing areas reviewed over the six-week sample period.
***CFCF includes all populated pods from the following housing units: B1, B2, C1, C2, D1, and D2.

PDP continued to increase opportunities for six and eight hours of out-of-cell time in this reporting period. For housing area groups reviewed, 58 percent documented meeting or exceeding the six-hour benchmark, including 43 percent that offered an average of six to eight hours out-of-cell time and 15 percent that offered at least eight hours out-of-cell time.

At CFCF, units B1 and B2 averaged at least eight hours throughout the July sample week. Although eight hours of out-of-cell time was not offered daily through all six sample weeks, B1 and B2 are excellent examples of what is achievable when a facility's commitment to out-of-cell time, staffing levels, and daily operations align.

At PICC, units B, C, D, and E consistently met the six-hour benchmark and, throughout the December sample week, also met or exceeded the eight-hour benchmark. Units A, H, F2, and K struggled to meet the six-hour benchmark consistently over the six sample weeks.

At RCF, extended out-of-cell time was increasingly common over the course of the reporting period. During the November and December sample weeks, units A, B, D, E, F, G, and H averaged eight hours or more of out-of-cell time per day. In those months, the majority of RCF units were offering at least eight hours per day. This increasing consistency reflects both stabilizing staffing in housing units and leadership's commitment to maximizing out-of-cell opportunities.

Documentation suggests that the housing units that achieved an average of at least eight hours of out-of-cell time are also the units that appear to be leveraging available staffing and tend to document daily out-of-cell time and the reasons for any failures to offer out-of-cell time. These units also tend to house Class Members with security classifications that permit them to recreate together.

31

Women's general population housing units each averaged between six and eight hours out-of-cell time daily in this reporting period. DC blocks and MOD 3 maintain the highest rates of compliance with the eight-hour benchmark and should serve as an operational goal systemwide. Documentation in this reporting period shows meaningful progress toward compliance with out-of-cell requirements across facilities. Line staff, supervisors, and leadership at every PDP facility deserve recognition for maximizing staffing, actively monitoring daily out-of-cell activity, and adjusting operations to expand out-of-cell opportunities. Substantial compliance with this substantive provision will require PDP to continue to strategically deploy staff to housing units that struggle to reach lower benchmarks. PDP will also need to further refine operations in mixed classification housing areas or where housing configurations pose barriers to extended out-of-cell time.

**Substantive Provision 3—Out-of-Cell/Segregation**

*Sub-provision 3.1—Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

### Compliance Rating: Partial Compliance

Defendants will achieve substantial compliance with this sub-provision when PDP: (1) finalizes a reliable out-of-cell tracking system; (2) tracks out-of-cell time using replicable methods; (3) documents any reasons for failures to provide out-of-cell opportunities, including operational disruptions, security risks, and Class Member refusals; and (4) demonstrates that at least 90 percent of Class Members in all restricted housing units are offered at least one hour of out-of-cell time, free from mechanical restraints, each day.

In this reporting period, available documentation suggests that PDP has continued to increase out-of-cell opportunities in men's restricted housing settings. Tables 11 and 12 below reflect the average total populations of Class Members on all men's segregation units and the average percentage of Class Members who were offered out-of-cell time, in restraints, for reporting periods from January 2024 through December 2025:

**Table 11: Average Percent of Class Members on All Men's Segregation Units
Receiving Daily Out-of-Cell Opportunities, by Facility**
January 2024 – December 2025

| Reporting Period | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 | July-Dec 2025 |
|---|---|---|---|---|
| CFCF | 36% | 37% | 72% | 83% |
| PICC* | 35% | 37% | 40% | – |
| RCF | 30% | 82% | 63% | 89% |
| Avg. Sample Population** | 165 | 288 | 182 | – |
| Avg. Pop. Out-of-Cell | 51 | 121 | 103 | – |
| Average % Out-of-Cell | 31% | 42% | 57% | 85% |

*Data for Jan-June 2024 is limited to Jan-March because PICC failed to log daily out-of-cell opportunities for April-June 2024. Data for July-Dec 2025 is not available because PICC closed its men's restricted housing unit.
**"Sample Population" refers to average total Class Members who resided in segregation units for all seven days during weeks reviewed and does not reflect Class Members who entered segregation or were removed from segregation during the weeks reviewed. For the current reporting period, all Class Members residing in the unit were included in the out-of-cell reviews. Restricted housing totals are reflected in sub-provision 3.2 below.

**Table 12: Percent of Class Members on All Segregation Units
Receiving Daily Out-of-Cell Opportunities, by Facility and Month**
July – December 2025*

| Month | Jul | Aug | Sept | Oct | Nov | Dec | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 76% | 77% | 70% | 89% | 92% | 96% | 83% |
| RCF | 87% | 79% | 85% | 99% | 92% | 94% | 89% |

*For Q3 2025, weeks reviewed include: July 7-13, 2025; August 11-17, 2025; and September 1-7, 2025. For Q4 2025, all days, weeks, and Class Members' access to out-of-cell time was included in the analysis.

In the second half of the reporting period, CFCF and RCF were routinely providing daily out-of-cell opportunities to the large majority of Class Members in men's restricted housing units. At CFCF, average daily out-of-cell time increased from 72 percent during January–June 2025 to 83 percent during July–December 2025, with rates exceeding 90 percent in November and December. RCF similarly improved from 63 percent of Class Members receiving daily out-of-cell time during January–June 2025, to an average of 89 percent in this reporting period and at least 92 percent each month in the second half of the reporting period. PICC did not operate a men's restricted housing unit in this reporting period. PDP reports that it intends to consolidate all men's restricted housing at CFCF as renovations and staffing allow, a transition expected to ultimately result in the discontinuation of the restricted housing unit at RCF.

Class Members in men's restricted housing units continued to recreate in restraints throughout the reporting period, which impedes large muscle exercise and is an inappropriate practice. PDP is in the process of constructing small recreation yards for individual and group recreation at CFCF, where PDP intends to consolidate all men's restricted housing. Once the smaller recreation yards are constructed, PDP has committed to restraint-free recreation in the consolidated unit at CFCF. Also in this reporting period, out of-cell records indicate that

33

personnel denied some Class Members out-of-cell time, noting only "LOP" (loss of privilege) without accompanying rationales for the restrictions. Large muscle exercise via daily recreation is not a "privilege," so any failures to offer recreation must be based on sound, clearly documented safety and security rationales. PDP should ensure that personnel clearly document the reasons for failures to offer out-of-cell time, and that reasons are tied to current safety or security concerns. Reasons must be clearly articulated in each instance.

The women's restricted housing unit at PICC averaged two or three Class Members daily throughout the reporting period. Women's restricted housing is located in E Unit, secured behind a fence. Class Members in women's restricted housing do not typically recreate in restraints, and documentation shows that they were generally permitted out of their cells daily to access showers, television, and telephones as appropriate.

Accuracy and reliability issues persist in out-of-cell tracking documentation in the women's restricted housing unit. Class Members interviewed during site visits reported that they receive some out-of-cell time each day, but not consistently one full hour. Personnel confirmed that the complexity of E Unit, which houses Class Members of varying security classifications, may limit out-of-cell time to 20 or 30 minutes to prioritize showers and at least some out-of-cell time. Documentation did not reflect restrictions on out-of-cell time for LOP status in this reporting period. Also, Class Members were generally permitted to recreate together in the dayroom, which reduces the impact of isolation.

Overall, PDP has made meaningful progress in expanding and documenting out-of-cell access in restricted housing. Because restrictive housing can be harmful to the health and well-being of incarcerated people, PDP must attempt to mitigate any harm by continuing its efforts to ensure, at the minimum, one hour of daily out-of-cell time for Class Members in segregation units. In the next reporting period, SME McDonald will attempt to validate a sample of out-of-cell documentation via CCTV review.

*Sub-provision 3.2—Defendants further agree that they will continue their normal practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

### Compliance Rating: Partial Compliance

Defendants will achieve substantial compliance with this sub-provision once PDP: (1) completes implementation of its alternative housing plan for Class Members who persistently engage in self-harming or other severe maladaptive behaviors; (2) demonstrates that Class Members meeting these criteria are being diverted from segregation to alternative housing, as appropriate; and (3) demonstrates that any initial segregation placements or extended segregation terms are not clinically contraindicated for Class Members meeting these criteria.

As previously reported, PDP's segregation documentation does not identify a lack of housing space or insufficient staffing as rationales for placement or retention of Class Members in administrative segregation.[33] Also previously reported, PDP continues to house some Class

---

[33] Monitor's Fourth Report, *supra* note 21, at 24.

Members with serious mental illness (SMI) and/or severe behavior management issues in segregation because it lacks sufficient staff or appropriate housing alternatives.[34] However, PDP is making progress in implementing its alternative housing plan for these patients.

In January, PDP relocated its Transition Unit (TU) and now has 128 total TU beds. PDP anticipates that 128 beds may eliminate any remaining TU waitlist. PDP has also committed to enhancing its current Functional Behavior Support Unit (FBSU) for a small population of Class Members who cannot be safely housed in TUs or general population.[35] These patients may or may not have SMI or Behavioral Health designations but require intensive behavior management programming. This small patient population has tended to spend extended periods of time in segregation or cycling between segregation, PHSW, TUs, and general population housing. They may require frequent trips to local area emergency departments and expend significant security and clinical resources.

The FBSU was initially piloted at PICC in 2023 and reported success with several patients using incentives to reduce the frequency of assaultive and self-harming behaviors. The FBSU was closed in March 2024 and reopened at PHSW Unit 112 in August 2024. In the previous reporting period, PDP reported that six patients received treatment in the FBSU. In this reporting period, a total of four patients were referred for services and two were admitted. PDP recognizes that FBSU admissions since 2023 are low and likely do not reflect the number of Class Members who may benefit from FBSU treatment. During the November 2025 site visit, the FBSU had two patients. One patient was available for an interview and reported benefiting from FBSU treatment, which he described as including frequent contact with an RTS psychologist and resulting in reduced behaviors that frequently required trips to the local emergency department.

In previous reporting periods, PDP had identified security personnel whose expertise is well suited to the FBSU program and the unique challenges its participants face.[36] PDP reports that FBSU security staff continue to be selected based on specific skill sets and the desire to work with this population, and that they receive FBSU-specific training. PDP reports that weekly interdisciplinary meetings are held to consider FBSU new-patient and release referrals and track patient progress.

During site visits, some security and healthcare staff were unaware that the FBSU exists, which may explain the low referral rates. In this reporting period, the Deputy Commissioner of Security Operations reported that staff were again informed of the program, its mission, and the referral process, verbally and in writing. Unfortunately, during the November 2025 site visit, some segregation personnel identified patients who may benefit from the program but reported that they were told the FBSU was not accepting referrals. PDP should ensure that all staff are aware of the program, its mission, and the referral process and criteria.
Little has changed with the FBSU over four reporting periods. Currently, FBSU referrals are being evaluated case-by-case, which is appropriate. However, the FBSU does not admit patients with highly assaultive behavior. PDP reports this is because cell doors in PHSW lack "food ports," smaller doors through which food and other items may be more safely passed to

---

[34] Monitor's Fifth Report, *supra* note 26, at 31.
[35] Monitor's Fourth Report, *supra* note 21, at 32.
[36] Monitor's Sixth Report, *supra* note 13, at 47.

occupants. As discussed in previous reports, patients who meet other behavior management program criteria and are also physically assaultive are precisely the types of patients that behavior management programs are designed to treat.[37] Without behavior management programs, these patients may spend extended periods in segregation without treatment, requiring significant security resources and engaging in behaviors that may pose additional risk to themselves, other Class Members, and staff. PDP's long-term plan is to retrofit the cells to accommodate assaultive patients, however, retrofitting is a capital project, and PDP does not have a final estimated completion timeframe for the project. In previous reporting periods, PDP has discussed moving the FBSU to a new location, which may be appropriate to reconsider as an alternative to PHSW or as a short-term plan while awaiting retrofitting.

Additional details of PDP's progress in implementing its alternative housing plan are discussed below under Substantive Provision 6—Behavioral Health in Segregation.

*Restricted Housing Practices and Policy Compliance*

When monitoring commenced in 2022, PDP's compliance with out-of-cell requirements in restricted housing was precluded by a combination of historical overreliance on restricted housing, debilitating COVID-19 staffing shortages, jail overcrowding, low restricted housing placement and retention thresholds, poor documentation practices, insufficient tracking and internal monitoring, and frequent noncompliance with PDP's existing restricted housing policies.[38] PDP's restricted housing practices resulted in inappropriate segregation placements or extended lengths of stay in segregation for some Class Members whose retention reviews were missed, delayed, or poorly documented or who were placed or held in segregation due to lack of staff or available alternative housing.

The Monitoring Team recommended consistent policy compliance; changes to policies or practices that contributed to an overreliance on restricted housing or had constitutional implications; improved internal monitoring, hearing, and documentation practices; and a reduction in PDP's restricted housing population.[39] PDP remained receptive to most of the Monitoring Team's recommendations over each reporting period and, despite profound barriers and some fluctuations, improved significantly. PDP's jail population has been reduced; staffing and security operations are stabilizing; and restricted housing policies, practices, and conditions are improving.

In this reporting period, PDP continued to reduce the number of Class Members in restricted housing, including administrative and punitive segregation. This reporting period reflects the lowest average restricted housing population documented since reporting began in 2022. The six-month average total restricted housing population decreased from 213 Class Members in January–June 2025 to 177 Class Members in July–December 2025. This marks a reduction of

---

[37] *Ibid.*

[38] Monitor's First Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 181 at 10-11 (E.D. Pa. Nov. 4, 2022).

[39] Monitor's Second Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 185 at 20 (E.D. Pa. Mar. 3, 2023).

approximately 17 percent since the previous reporting period and an extraordinary 49 percent reduction since the period July–December 2022, when the average total restricted housing population was 347 Class Members.

Table 13 below depicts average total class members in restricted housing (including administrative segregation and punitive segregation) for sample dates for seven reporting periods, from July 2022 to December 2025:

**Table 13: Average Total Population in Restricted Housing\***
July 2022 – December 2025

| Reporting Period | Average Restricted Housing Population |
|---|---|
| July-Dec 2022 | 347 |
| Jan-June 2023 | 265 |
| July-Dec 2023 | 255 |
| Jan-June 2024 | 295 |
| July-Dec 2024 | 298 |
| Jan-June 2025 | 213 |
| July-Dec 2025 | 177 |

*Population numbers are reported weekly and averaged across the reporting period.

Tables 14 and 15 below depict average total Class Members in administrative segregation and average lengths of stay in administrative segregation for four reporting periods and monthly for July–December 2025:

**Table 14: Average Total Population and Average Lengths of Stay (LOS) in Days\***
**in Administrative Segregation**
January 2024 – Dec 2025

| Reporting Period | CFCF Averages | | PICC Averages | | RCF Averages | | Total Averages | |
|---|---|---|---|---|---|---|---|---|
| | Ad Seg Pop | LOS | Ad Seg Pop | LOS | Ad Seg Pop | LOS | Ad Seg Pop | LOS |
| Jan-June 2024 | 95 | 72 | 12 | 65 | 22 | 86 | 129** | 73 |
| July-Dec 2024 | 85 | 76 | 20 | 59 | 18 | 65 | 124 | 71 |
| Jan-June 2025 | 45 | 83 | 16 | 53 | 18 | 69 | 78 | 73 |
| July-Dec 2025 | 42 | 79 | 1 | 43 | 17 | 76 | 61 | 78 |

*Population and LOS numbers are reported weekly and averaged across the reporting period. Facility numbers may not sum to totals due to rounding.
**This total was reported as 133 in previous reports and has been corrected.

In this reporting period, PDP's six-month average administrative segregation population was 61 Class Members, reduced by 22 percent since the previous reporting period and by 53 percent since the period January–June 2024.

37

**Table 15: Average Total Population and Average Lengths of Stay (LOS) in Days***
**in Administrative Segregation, by Month**
July – December 2025

| Month | CFCF Averages | | PICC** Averages | | RCF Averages | | Total Averages | |
|---|---|---|---|---|---|---|---|---|
| | Ad Seg Pop | Avg. LOS | Ad Seg Pop | Avg. LOS | Ad Seg Pop | Avg. LOS | Ad Seg Pop | Avg. LOS |
| July | 43 | 72 | 1 | 41 | 26 | 74 | 75 | 95 |
| August | 36 | 74 | 1 | 47 | 15 | 89 | 52 | 77 |
| September | 47 | 70 | 1 | 40 | 15 | 64 | 63 | 62 |
| October | 50 | 72 | 1 | 45 | 15 | 63 | 65 | 70 |
| November | 49 | 82 | 0 | – | 20 | 80 | 68 | 66 |
| December | 27 | 106 | 0 | – | 13 | 85 | 40 | 65 |
| Average | 42 | 79 | 1 | 43 | 17 | 76 | 61 | 78 |
| Difference*** | -7% | -5% | – | – | -5% | +10% | -22% | +7% |

*Population and LOS numbers are reported weekly and averaged across the month. Facility numbers may not sum to totals due to rounding.
**PICC's men's restricted housing closed in mid-July 2025. Current data includes only women's restricted housing and is not comparable to previous reporting periods.
***Difference calculated between the Jan-June and July-Dec 2025 reporting periods.

In the second half of 2025, CFCF averaged 42 Class Members in administrative segregation, a slight reduction since the previous reporting period. PICC averaged one Class Member in women's administrative segregation. Because the men's administrative segregation unit at PICC was closed early in the reporting period, PICC's administrative segregation data includes the women's segregation unit only and is not compared to previous reporting periods. RCF averaged 17 Class Members in administrative segregation, close to the average of 18 Class Members in the previous reporting period.

The six-month average length of stay in segregation increased by seven percent, from 73 days in January–June 2025 to 78 days in July–December 2025. At RCF, the average length of stay increased by approximately 10 percent, from 69 days in the previous reporting period to 76 days in this reporting period. At CFCF, the average length of stay decreased by five percent, from 83 days to 79 days.

PDP does not have an effective system for the real-time tracking and monitoring of its restricted housing data and practices. The Monitoring Team continues to recommend that PDP monitor its restricted housing population, data, and practices in real time and make appropriate adjustments as issues arise. As PDP continues to progress, internal, real-time monitoring will be necessary to safeguard the rights of Class Members in restricted housing. If PDP begins to track this information internally, the Monitoring Team will be able to measure compliance via sample validation of PDP's data. Otherwise, the Monitoring Team will continue to sample PDP's restricted housing data until PDP achieves substantial compliance with Substantive Provision 3—Out-of-Cell/Segregation.

In initial reporting periods, PDP's Administrative Segregation Monitoring Reports indicated that a high percentage of Class Members in administrative segregation were not being reviewed for retention in administrative segregation within 30-, 60-, or 90-day policy timeframes.[40] Failures to comply with required timeframes likely contributed to PDP's high segregation population, noncompliance with out-of-cell requirements, and extended, perhaps unnecessary, periods of isolation for individual Class Members whose reviews were delayed or missed.

SME McDonald has consistently reviewed samples of retention reviews to monitor PDP's compliance with monthly policy timeframes. With periodic exceptions, PDP's compliance with monthly reviews has remained stable in more recent reporting periods based on samples reviewed.

Table 16 below depicts average total Class Members in administrative segregation and retention reviews exceeding 30- and 60-day timeframes for sample dates in six periods from July 2022 through June 2025:

**Table 16: Average Reviews for Retention on Administrative Segregation
Exceeding 30 and 60 Days***
July 2022 – June 2025

| Reporting Period | CFCF Averages | | | | PICC Averages | | | | RCF Averages | | Total Averages | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ad Seg Pop | Revs >30 Days | Revs >60 Days | % >60 Days | Ad Seg Pop | Revs >30 Days | Revs >60 Days | % >60 Days | Ad Seg Pop | Revs >60 Days | Ad Seg Pop | Revs >60 Days |
| July-Dec 2022 | 95 | 10 | 12 | 26% | 78 | 2 | 2 | 6% | 21 | 0 | **193** | **14** |
| Jan-June 2023 | 67 | 10 | 3 | 3% | 44 | 2 | 0 | 0% | 14 | 0 | **126** | **3** |
| July-Dec 2023 | 74 | 2 | 0 | 0% | 16 | 0 | 0 | 0% | 17 | 0 | **107** | **0** |
| Jan-June 2024 | 95 | 4 | 1 | 1% | 12 | 1 | 0 | 0% | 22 | 1 | **129**** | **2** |
| July-Dec 2024 | 85 | 5 | 0 | 0% | 20 | 22 | 3 | 0% | 18 | 1 | **124** | **4** |
| Jan-June 2025 | 45 | 4 | 1 | 1% | 16 | 1 | 1 | 1% | 18 | 0 | **78** | **2** |

*Population and review numbers are reported weekly and averaged across the reporting period. Facility numbers may not sum to totals due to rounding.
**This total was reported as 133 in previous reports and has been corrected.

---

[40] Monitor's First Report, *supra* note 38, at 13.

In addition to monthly reviews, PDP policy requires an initial review within seven days of placement and subsequent reviews each week thereafter for the first 60 days of placement. Because PDP has sustained compliance with 30-day review timeframes, those metrics were not tracked in the current reporting period. Instead, SME McDonald sampled documentation to assess compliance with seven-day reviews.

Table 17 below depicts average total Class Members in administrative segregation and average late or missed seven-day and monthly retention reviews each month, July–December 2025:

**Table 17: Average Late or Missed Seven-Day and Monthly Retention Reviews***
July – December 2025

| Month | Avg. Ad Seg Population | Avg. Late / Missed Reviews | % Not Timely |
|---|---|---|---|
| July | 75 | 4.0 | 5% |
| August | 52 | 2.8 | 5% |
| September | 63 | 0.5 | <1% |
| October | 65 | 2.4 | 4% |
| November | 68 | 3.0 | 4% |
| December | 40 | 2.3 | 6% |
| **Average** | **60.5** | **2.5** | **4%** |

*Population and review numbers are reported weekly and averaged across the month.

From July–December 2025, an average of approximately four percent of reviews were either late or missed, with a low of less than one percent in September, and a high of approximately six percent in December. Delays in reviews occurred most frequently during the transition from punitive segregation to administrative segregation. Documentation of committee actions during seven-day reviews was poor and did not articulate committee decisions and the steps Class Members were required to take to be considered for removal from restricted housing. Although the incidence of missed or late reviews is relatively low, PDP should ensure that retention reviews are completed at required intervals and documented appropriately.

Based on the sample reviews, incidence of noncompliance with policy timeframes for administrative segregation reviews is generally below ten percent. Therefore, the Monitoring Team will continue to assess the quality of documentation but will not track or report on the timeliness of reviews in the future unless the status of PDP's compliance with sub-provisions 3.1 or 3.2 stalls or regresses. The Monitoring Team continues to recommend that PDP track this information internally to guard against excessive or unnecessary segregation terms.

SME McDonald has also consistently reviewed samples of administrative segregation placements that exceed 90 days. In this reporting period, she reviewed 12 segregation placements exceeding 90 days as of October 1, 2025. As with other retention reviews, documentation of extended placements reflects that monthly reviews were timely, but not thorough. Review entries most often consisted of brief notations indicating "continued retention" or "inmate refusal," with no individualized assessments of risk, progress, or consideration of less restrictive alternatives.

Four of the twelve cases reviewed lacked documentation of the required 90-day extension despite Class Members remaining in administrative segregation beyond 90 days. As with previous reporting periods, some Class Members with extended placements have SMI or Behavioral Health designations.

Documentation of extended placement reviews also lacked information about programming, step-down planning, or rehabilitative opportunities. PDP has acknowledged the need for improved documentation in retention reviews, but little has changed over multiple reporting periods. SME McDonald has met with committee members directly in efforts to support improved documentation. She opines that persistent documentation issues are the result of insufficient personnel resources to meet documentation requirements. PDP should begin to ensure that extended segregation reviews reflect individualized decision-making, clearly documented extension approvals, and meaningful consideration of programming and less restrictive alternatives. The Monitoring Team will continue to review and report on long-term segregation placements until PDP achieves substantial compliance with Substantive Provision 3—Out-of-Cell/Segregation.

Tables 18 and 19 below depict average punitive segregation populations and average lengths of stay in punitive segregation over seven reporting periods between July 2022 and December 2025 and monthly from July–December 2025:

**Table 18: Average Total Population and Average Lengths of Stay (LOS) in Days***
**in Punitive Segregation**
July 2022 – December 2025

| Reporting Period | CFCF Averages | | PICC Averages | | RCF Averages | | Total Averages | |
|---|---|---|---|---|---|---|---|---|
| | Punitive Seg Pop | LOS | Punitive Seg Pop | LOS | Punitive Seg Pop | LOS | Punitive Seg Pop | LOS |
| July-Dec 2022 | 61 | 63 | 49 | 65 | 45 | 37 | 154 | 55 |
| Jan-June 2023 | 64 | 21 | 50 | 23 | 26 | 14 | 139 | 19 |
| July-Dec 2023 | 70 | 26 | 42 | 22 | 37 | 15 | 148 | 21 |
| Jan-June 2024 | 90 | 30 | 37 | 25 | 36 | 26 | 162 | 27 |
| July-Dec 2024 | 101 | 26 | 43 | 32 | 30 | 32 | 174 | 29 |
| Jan-June 2025 | 59 | 23 | 43 | 19 | 34 | 18 | 135 | 20 |
| July-Dec 2025 | 79 | 21 | 7 | 15 | 30 | 20 | 116 | 21 |

*Population and LOS numbers are reported weekly and averaged across the reporting period. Facility numbers may not sum to totals due to rounding.

41

**Table 19: Average Total Population and Average Lengths of Stay (LOS) in Days\***
**in Punitive Segregation, by Month**
July – December 2025

| Month | CFCF Averages | | PICC Averages | | RCF Averages | | Total Averages | |
|---|---|---|---|---|---|---|---|---|
| | Punitive Seg Pop | LOS | Punitive Seg Pop | LOS | Punitive Seg Pop | LOS | Punitive Seg Pop | LOS |
| July | 60 | 18 | 32 | 14 | 22 | 21 | 113 | 18 |
| August | 80 | 20 | 6 | 19 | 29 | 19 | 116 | 20 |
| September | 89 | 20 | 0 | – | 33 | 22 | 122 | 20 |
| October | 82 | 22 | 0 | – | 35 | 21 | 117 | 22 |
| November | 78 | 23 | 0 | – | 28 | 20 | 106 | 22 |
| December | 83 | 24 | 6 | 11 | 31 | 21 | 119 | 22 |
| Average | 79 | 21 | 7 | 15 | 30 | 20 | 116 | 21 |
| Difference\*\* | +33% | -8% | – | – | -12% | +11% | -14% | 5% |

\* Population and LOS numbers are reported weekly and averaged across the month. Facility numbers may not sum to totals due to rounding.
\*\*Difference calculated between the Jan-June and July-Dec 2025 reporting periods.

PDP's punitive segregation population and lengths of stay in punitive segregation have fluctuated over seven reporting periods. In this reporting period, the six-month average punitive segregation population was 116 Class Members, marking a 14 percent reduction from the previous reporting period average of 135 Class Members and a 33 percent reduction from the highest reporting period average of 174 Class Members in the period July–December 2024.

CFCF averaged 79 Class Members in punitive segregation, an increase from 59 Class Members in the previous reporting period. This increase is explained by the closure of PICC's restricted housing unit and the transfer of those Class Members to CFCF. Excluding the few Class Members who remained in restricted housing at PICC in July 2025, PICC averaged one Class Member in the women's punitive segregation unit. RCF averaged 30 Class Members in punitive segregation, a reduction from an average of 34 class members in punitive segregation during the previous reporting period.

Systemwide, the six-month average length of stay in punitive segregation increased from 20 days in the previous reporting period to 21 days in this reporting period. This is a one-day increase since the previous reporting period but an eight-day, or 28 percent, decrease since the period July through December 2024, and a 62 percent decrease since the period July–December 2022 when Class Members spent an average of 55 days in punitive segregation.

In addition to working on its alternative housing plan for Class Members with SMI or Behavioral Health designations and/or severe behavioral issues, PDP also continues to progress in implementing alternatives to restricted housing placements for all Class Members. As previously reported, PDP's plan for a step-down unit at CFCF is a key strategy to reduce reliance on

42

restricted housing following the consolidation of administrative and punitive segregation placements at that facility.[41] In the previous reporting period, PDP identified two housing units for its future step-down program.

In this reporting period, PDP began identifying appropriate personnel to staff the future step-down units and advertising incentive pay to work on those units. PDP reports that the step-down program will be implemented once the small recreation yards are completed and policies and procedures are finalized. PDP submitted a draft step-down policy in this reporting period. SME McDonald provided initial feedback and the Monitoring Team is awaiting a revised draft. In February 2026, PDP reported that all segregation housing had been consolidated at CFCF and that specific pods would be identified to house the program.

The Monitoring Team continues to recommend that PDP create similar step-down programs for Class Members in the women's restricted housing unit. Class Members in the women's unit already recreate together and are not routinely isolated or restrained during recreation. However, these Class Members are not currently offered incentives, structured programming, or a formal step-down pathway comparable to what is being developed for Class Members in men's restricted housing units.

The Monitoring Team also continues to recommend that PDP expand the use of "loss-of-privileges" programs as an alternative to restricted housing. PDP frequently relies on segregation when the primary objective is to restrict privileges. In many cases, the same objective can be achieved through unit-based privilege restrictions. This would reduce the restricted housing population to support out-of-cell compliance, limit the mental health implications of isolation, and permit Class Members to remain outside of their cells for programming and recreate without restraints.

***Status of Recommendations, Sub-Provision 3.2—Out-of-Cell/Segregation, from the Monitor's Fourth Report:***

1. Provide daily out-of-cell time for all Class Members, even if Agreement requirements cannot be met. PDP should reevaluate the current requirement that three officers must be present to provide out-of-cell time.
   *Defendants have not implemented this recommendation, but it may no longer be necessary if PDP is able to meet out-of-cell requirements.*

2. Ensure that current out-of-cell schedules are feasible for personnel to implement, that Class Members receive schedules in advance, and that schedules are consistently adhered to.
   *Defendants have partially implemented this recommendation in that PDP has increased internal oversight of out-of-cell time to monitor the number of hours Class Members are offered, but PDP has not committed to consistent advanced scheduling of out-of-cell opportunities.*

---

[41] Monitor's Seventh Report, *supra* note 15, at 48.

3. Use currently available information, such as reports from staff, supervisors, and Class Members to identify and attend to housing units that are struggling to offer out-of-cell time.
   *Defendants have implemented this recommendation. PDP has assigned a staff member to monitor out-of-cell logs and apprise executives as issues arise. This report contains the final status update for this recommendation.*

4. Document the reasons for any failures to offer out-of-cell time.
   *Defendants have implemented this recommendation. Staff are consistently documenting the reason that out-of-cell time is not offered. This report contains the final status update for this recommendation.*

The Monitoring Team also made the following recommendations in meetings with PDP personnel during site visits and virtual meetings over the course of implementation monitoring to assist PDP in reducing reliance on punitive segregation:

5. Increase educational, therapeutic, and other positive programming in general population units.
   *Defendants have partially implemented this recommendation. In this reporting period, RTS has begun to track some programming offered in general population units and is planning for robust programming in the future. Additional information about RTS's enhanced program planning and progress is discussed below under Substantive Provision 4—Resume Normal Operations. This report will be the final status update for this recommendation.*

6. Utilize sanctions that do not require isolation, such as creating loss-of-privilege tiers where Class Members receive out-of-cell time, but access to commissary, tablets, and phones is limited or restricted.
   *Defendants have partially implemented this recommendation with the step-down units PDP is developing.*

7. Expand TUs, discussed below under Substantive Provision 6—Behavioral Health in Segregation, and develop accompanying disciplinary policies that limit the placement of patients in isolation.
   *Defendants have implemented this recommendation. See discussion under Substantive Provision 6—Behavioral Health in Segregation. This report will be the final status update for this recommendation.*

8. Improve systems for behavioral health input in the disciplinary process, discussed below under sub-provision 8.1 and Substantive Provision 6—Behavioral Health in Segregation.
   *Defendants have partially implemented this recommendation. See discussion of the PICC disciplinary pilot.*

9. Establish an interdisciplinary committee to create behavior management plans for Class Members who cycle in and out of segregation.

   *Defendants have partially implemented this recommendation. Clinical personnel from RTS are now involved in restricted housing committee determinations, which is excellent. However, available documentation does not suggest coordinated efforts during committee meetings to identify the least restrictive environments or transition plans to alternative housing. PDP is, however, implementing its plans for alternatives to segregation for those with SMI and Behavioral Health designations and/or severe behavioral issues. Additionally, nine Class Members were reportedly removed from restricted housing for mental health reasons, which suggests improved collaboration, but PDP has yet to initiate interdisciplinary behavior management plans for those who frequently transition into and out of segregation.*

10. Develop programming for Class Members in segregation units to address behavior and assist with the transition back to general population.

    *Defendants have partially implemented this recommendation. See discussion of "Positive Change/Positive Outcomes" programming below under Substantive Provision 6— Behavioral Health in Segregation.*

11. Direct the new data analysis unit to analyze punitive segregation practices and trends.

    *The Data Team has not listed segregation practices and trends as an area of focus for 2025 but has committed to tracking PDP's out-of-cell time beginning in early 2026.*

12. Revise classification policies and procedures to ensure they are designed to maximize programming and reserve segregation for those with the most serious behavioral issues for the shortest possible durations.

    *PDP is in the process of engaging an expert in classification practices to assist PDP with improvements to its classification policies and procedures. The scope of work is being developed and the Monitoring Team has recommended that it include an assessment of PDP's restricted housing policies and practices.*

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating: Partial Compliance**

45

PDP has achieved partial compliance with this substantive provision. In this reporting period, PDP began drafting a plan for the return to normal operations. PDP initially anticipated finalizing a draft in this reporting period, however, the Commissioner and his team are committed to a plan that exceeds minimum pre-COVID-19 operations. PDP is still finalizing systemwide post plans, enhanced safety and security measures for Class Members and staff, and a robust RTS program and staffing plans. PDP just initiated a process to overhaul its use-of-force policies and practices pursuant to the Agreement and is undertaking large-scale maintenance projects, pursuant to the Sanctions Order, designed to improve conditions. PDP reports that incorporating all of PDP's reform efforts into a single operations plan requires additional time to finalize and now anticipates completing a draft sometime in 2026.

PDP's compliance status and plans for out-of-cell time are addressed above under Substantive Provision 2—Out-of-Cell Time and Substantive Provision 3—Out-of-Cell/Segregation. PDP's compliance status and plans for visiting are addressed below under Substantive Provision 13—Visiting and Substantive Provision 14—Attorney Visiting. Regarding educational and other rehabilitative programming, RTS is making impressive strides under the new leadership team and the Monitoring Team now has some reliable metrics to report regarding current programs and services.

### *Restorative and Transitional Services*

> Paragraph 3(a) of the Sanctions Order states: "Within 60 days of the date of this Order, the City shall identify and provide to the Monitor competent outside consultant(s) to conduct an objective evaluation of the Restorative and Transitional Services (RTS) Unit's functions and effectiveness. Within 60 days of approval by the Court, the City shall engage the identified consultant(s). The evaluation shall include at a minimum, a comparative analysis of programs proven effective in other comparable detention/correctional facilities, and a recommendation for performance metrics against which to assess the performance of PDP employees working in RTS."[42] The identification of an outside consultant was due by October 15, 2024.
>
> *Defendants have complied with the requirements of this paragraph.* PDP retained Independent Variable on February 18, 2025, in advance of the March 24, 2025 Sanctions Order deadline. The evaluation was completed in September 2025 and shared with the Monitoring Team in November 2025. The report is comprehensive and includes identification of current challenges within RTS and recommendations for programming and reentry services. The report covered all adult programs and services and recommended performance metrics to assess quality and performance. PDP reports it has also retained Independent Variable for an implementation phase, which will include analysis of programs and services available to youth.

Previous monitor's reports contained RTS staffing data, including allocated and filled positions.[43] As expected, little has changed in this reporting period. RTS maintains 104 allocated positions and approximately 100 filled positions for a low vacancy rate. Over the past year, PDP has initiated reform of RTS operations. PDP is developing a new program model that increases

---

[42] Order, *supra* note 5, at 5.
[43] Monitor's Seventh Report, *supra* note 15, at 52.

opportunities for educational and rehabilitative programming, vocational training, and reentry services. PDP will use the Independent Variable assessment as part of a blueprint for a new program model and then develop a corresponding budget and new staffing plan. RTS is also implementing a new "Scandinavian Model" housing unit and working to enhance current programs offered by community partners. Given the extensive planning required to reform RTS, neither funding nor final staffing projections are anticipated in 2026.

RTS does not have a dedicated program budget but estimates current expenditures at approximately $1.5 million per year. The greatest numbers of Class Members continue to receive services through volunteer and community providers. PDP estimates that $1.5 million annually provides approximately one quarter of PDP's total program needs. In this reporting period, the RTS executive team was largely focused on securing grant funding and additional volunteer program providers. These efforts proved successful, as discussed below, but PDP executives are clear that current budgeting is inadequate for the size of PDP's population, and that volunteer services are meant to supplement, not replace, permanent contracted services. The City must be prepared to staff and fund a new RTS program, as designed, if the program is expected to succeed. The Commissioner and his RTS team are highly motivated and envision a rich, innovative program that serves as many Class Members as may benefit from it. Given the multitude of debilitating challenges faced by RTS over the years, RTS reform is among the most difficult improvements PDP has undertaken, and the Monitoring Team is inspired by its progress thus far.

As previously reported, RTS did not maintain reliable data about the number of Class Members served from 2022 through part of 2025.[44] RTS has since developed a tracking system for this information and was able to provide data about programs offered in this reporting period. Current RTS contracts are aimed at workforce development and training and include classes for Flagging (traffic control for events, construction sites, etc.); Heating, Ventilation, and Air Conditioning (HVAC) Technician; Commercial Driver's License; and Environmental Maintenance. Some of these contracts existed previously, and Class Members have been benefiting from them. But PDP is now able to provide data for this reporting period, which will serve as a baseline from which to measure future growth.

Table 20 below reflects the number of Class Members who were registered or completed training and obtained certifications during this reporting period:

---

[44] *Id.* at 50.

**Table 20: Training and Certifications Registered or Completed**
July – December 2025

| Training/Certification | Total Completed | Facility – Registered or Completed | | | | |
|---|---|---|---|---|---|---|
| | | CFCF | DC | PICC Men's | PICC Women's | RCF |
| Flagger | 48* | – | – | – | – | – |
| HVAC Technician | 32 | – | 12 | 12 | 15** | 8 |
| Commercial Driver's License | 15* | – | – | – | – | – |
| Environmental Maintenance | 8 | 8 | – | – | – | 12** |

*Breakdown by facility not provided.
**Registered but not completed.

PDP continues to report that class sizes and lengths of programs vary, but the average class size is 20 Class Members with sessions ranging from 1 to 12 weeks. RTS estimates that up to 25 percent of Class Members participate in some form of programming at some point during their incarceration. The table above confirms PDP's assertions that a small number of individuals have completed or are registered for these programs. PDP reports that RTS and volunteer providers also offer cognitive behavioral therapy, substance use treatment, life skills, and pre-release classes. RTS anticipates being able to supply additional program participation data in the future.

RTS also reports existing educational services through Adult Education and Pennypack House School, which serves PDP's incarcerated youth and adults. Adult Education reports that 28 Class Member students are "GED Ready," and 9 students have passed at least one of four GED tests. Thirteen students have passed all four GED tests and earned GED Certification in this reporting period. Pennypack House School focuses on Class Members who are 22 and under and reports having awarded 43 high school diplomas during the most recent academic school year.

PDP reports that throughout 2025, the Volunteer Services Unit supported a network of more than 215 active volunteers from 62 organizations and ministries, offering both secular and faith-based programming across all facilities. RTS volunteers have a critical role in RTS operations, enhancing participants' quality of life, personal growth, and successful reentry by providing mental health and healing support, arts and creative expression, workforce preparation, and other opportunities. Currently, PDP remains unable to quantify the services offered or the number of Class Members who participated in this reporting period. However, PDP's Volunteer Services Unit is conducting an internal review of PDP's volunteer programs to identify additional program needs and will share the results once finalized.

PDP recognizes that RTS's success requires comprehensive, data-driven performance measures. In addition to some initial data reported here, PDP is developing a program dashboard to generate program metrics. Performance indicators are still being developed, but the dashboard should provide for data-informed decisions about all aspects of RTS program needs, offerings, and outcomes.

On September 8, 2025, PDP opened a Reentry Center in partnership with the City of Philadelphia Division of Reentry. This program offers services to Class Members as they are released from custody, including the return of Class Member funds from PDP accounts, transportation, City identification cards, substance use assessments/referrals, clothing vouchers, peer support, access to Career Link, housing, and other community referrals. PDP reports more than 920 returning community members have visited the Reentry Center, 569 (62 percent) of whom have accepted services. PDP reports that in 2026, the Defender Association will begin staffing the Reentry Center with a member of their team to provide case management support with legal follow-up. PDP also reports that the Department of Behavioral Health and Intellectual Disability has hired a Forensic Behavioral Health Navigator who will be stationed at the Reentry Center at various times during work weeks.

The Reentry Center tracks several data points, including requested support, case-related follow-up, medication information, referrals made, and consent for follow-up. Data regarding identified needs and completed referrals is reflected in Tables 21 and 22 below:

**Table 21: Identified Needs, PDP Reentry Center**
September – December 2025

| Identified Need | Number Reporting Need |
|---|---|
| Identification | 312 |
| Employment | 233 |
| Housing | 159 |
| Food | 135 |
| Vocational Programs | 127 |
| Clothing | 115 |
| Mental Health Support | 57 |
| Medical Care | 53 |
| Substance Use Support | 44 |

**Table 22: Completed Referrals, PDP Reentry Center**
September – December 2025

| Identified Need | Referrals Completed |
|---|---|
| Identification | 312 |
| Employment | 157 |
| Housing | 88 |
| Case Management | 76 |
| Clothing | 49 |
| Transportation | 45 |
| Substance Use Treatment | 22 |

PDP reports that after July 1, 2026, PDP will reopen Reentry Resource Centers at CFCF and RCF and expand programs to include resume writing, interview skills, and mock job interviews. PDP has also revived its work release program, scheduled to open in the first half of 2026, to support Class Members with employment, schooling, and vocational opportunities pre-release. PDP's reentry efforts are impressive achievements. In a short timeframe, RTS has demonstrated exceptional skill, galvanizing support for reentry services and the participation of other City departments and numerous community partners. The Reentry Center's early success is a testament to the profound need for these services and to the potential of an increasingly focused and unified RTS team.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

### Compliance Rating: Substantial Compliance

PDP has achieved substantial compliance with this substantive provision. PDP was required to reduce its total backlog (including on-site general medical appointments, on-site specialty-care appointments, and off-site specialty-care appointments) to no more than 15 percent of the 1,587 total backlog identified by PDP in July 2022.[45] PDP was also required to provide adequate and timely medical and mental health treatment to all Class Members. PDP has achieved substantial compliance with this substantive provision.

PDP's total backlog as of December 2025 was 245 (123 on-site general medical appointments, 56 on-site specialty appointments, and 66 off-site specialty appointments).[46] PDP's tracking of backlogged appointments has also improved since 2022. Backlogs for each type of appointment are now tracked weekly rather than monthly, which allows PDP to more closely monitor fluctuations and correct issues within days rather than weeks. The Monitoring Team will continue to track backlogs to ensure sustained compliance but will only report data for each appointment type if PDP falls out of compliance with backlog requirements.

---

[45] Monitor's Second Report, *supra* note 39, at 25.
[46] 245 is 15.4 percent of PDP's 2022 backlog of 1,587.

Regarding the *quality* of medical and mental health care required pursuant to this substantive provision, SME Dr. Tim Belavich (Dr. Belavich) has assessed quality of care through chart reviews and audits over multiple reporting periods and determined that the care is generally of appropriate quality and aligns with accepted correctional practice. His assessments have included the assignment and removal of SMI designations,[47] mortality reviews,[48] patient prioritization on medical must-go lists,[49] segregation placement clearances,[50] medical and mental health rounding notes,[51] and charts of individual patients encountered during site visits or referred by Class Counsel or other patient advocates.[52]

Regarding the *timeliness* of medical and mental health care pursuant to this substantive provision, PDP has achieved substantial compliance with backlog reduction requirements. PDP is also complying with nearly every policy timeframe for the delivery of care as reported here, including intake screenings, behavioral health referrals, social worker sick calls, and 14-day patient evaluations. Although PDP has achieved substantial compliance with this substantive provision, monitoring and reporting of some metrics will continue to ensure sustained compliance.

### On-Site General Medical and Behavioral Healthcare

PDP has maintained a low vacancy rate for healthcare staff throughout the current reporting period and has expanded treatment times, as needed, to accommodate additional appointments. Low healthcare vacancies, improved security staffing and access to care, and population reductions have largely contributed to the reduction in on-site appointment backlogs.

Table 23 below compares on-site appointment backlogs for two four-week periods in June 2025 and December 2025:

---

[47] Monitor's Fifth Report, *supra* note 26, at 59.
[48] Monitor's Fourth Report, *supra* note 21, at 37.
[49] Monitor's Seventh Report, *supra* note 15, at 60.
[50] *Id.* at 72.
[51] *Ibid.*
[52] *Id.* at 60.

**Table 23: On-Site Appointment Backlogs for General Medical and Behavioral Healthcare (BH), Weekly Averages, Four-Week Comparison**
June 2025 and December 2025

| Appointment Type | June 2025* Weekly Avg. | December 2025* Weekly Avg. | Change |
|---|---|---|---|
| BH Initial Psychiatric Evaluation | 4 | 7 | +3 |
| BH Medication Evaluation | 1 | 6 | +5 |
| BH Social Work Sick Call | 0 | 0 | 0 |
| BH Social Work Sick Call Triage | 0 | 2 | +2 |
| Chronic Care Initial | 6 | 19 | +13 |
| Chronic Care Follow-Up | 5 | 66 | +61 |
| Medication Assisted Treatment | 24 | 10 | -14 |
| Medication Assisted Treatment Follow-Up | 0 | 0 | 0 |
| Provider Sick Call | 3 | 10 | +7 |
| Registered Nurse Sick Call | 14 | 2 | -12 |
| Re-Entry Planning | 4 | 1 | -3 |
| **Total Backlog** | **61** | **123** | **+62 (50%)** |

*Weeks reviewed include: June 4 to June 25, 2025 and December 3 to December 24, 2025.

Data from this reporting period reflects a weekly average of 123 backlogged appointments for the month of December 2025, marking a 50 percent increase since the previous reporting period. In this reporting period, weekly backlogs ranged from only 22 appointments in September 2025 to a high of 182 in December 2025. PDP attributes periodic increases in backlogs in this reporting period to staff vacation and leave rather than insufficient medical and security personnel. PDP notes, and the data supports, that PDP makes efforts to quickly address backlogs with overtime or additional registry staff when possible. Unlike previous reporting periods, backlogs that exceed 100 appointments are now usually reduced to less than 100 within one or two weeks.

As previously reported, PDP implemented a tablet-based sick-call pilot program at CFCF in April 2024.[53] By December 2024, RCF, PICC, and CFCF's tablet sick-call systems were fully operational. On February 26, 2025, PDP reported the tablet sick-call request system was implemented at DC and MOD 3. Patient feedback about the tablet request system remains generally positive. During November 2025 site visits, multiple Class Members reported frustration in not receiving responses from Healthcare after placing sick-call requests. Healthcare personnel who were accompanying the Monitoring Team were able to show patients how to check for written responses to some requests that did not require face-to-face triage or in-person visits. This capability is useful to communicate that follow-up appointments have been scheduled or medication renewals have been ordered, for example. PDP committed to additional efforts to ensure patients are aware of and able to access Healthcare responses via tablets, typically within 24 to 48 hours of receipt of a request.

---

[53] Monitor's Fifth Report, *supra* note 26, at 41.

As recommended, PDP reports that it will continue to make hard-copy sick-call forms available in every populated housing unit, though most requests are now being submitted via tablet. The Monitoring Team observed paper sick-call requests available to patients on housing units during site visits in this reporting period. During a follow-up site visit in February 2026, some Class Members in restricted housing at CFCF were reportedly told that paper sick-call requests were no longer available. Paper requests were not available on one housing unit during the February site visit. The Monitoring Team will again confirm the availability of paper sick-call requests during site visits in the next reporting period.

During site visits in some previous reporting periods, the Monitoring Team observed some grievance and sick-call receptacles in housing units that were filled with days-old RTS and sick-call requests and Class Member grievances.[54] Facility leadership committed to corrective action, and the same issues were not observed during site visits in this reporting period. The Monitoring Team will continue to spot-check receptacles during site visits in the next reporting period to confirm the issue has been resolved.

As previously reported, the assignment of PICC's Health Services Administrator as a "Care Coordinator" to liaise between providers, patients, and security personnel improved on-site appointment attendance.[55] The Monitoring Team recommended expansion of the Care Coordinator initiative to every PDP facility. Healthcare staffing increases pursuant to the Sanctions Order allowed PDP to add eight Care Coordinator positions. In the previous reporting period, PDP had hired six of eight coordinators and had assigned one coordinator to each of four facilities.[56] In this reporting period, PDP determined that one coordinator at each larger facility is sufficient to coordinate on-site care and reduced the number of Care Coordinator positions to four.

### On-Site Specialty Care

In this reporting period, on-site specialty-care appointments represented 23 percent of PDP's total appointment backlog. The on-site specialty backlog at the end of December 2025 was 56 appointments, which is an increase from 23 appointments in the previous reporting period. Weekly backlog data shows backlogs remained under 67 appointments each week and averaged 34 backlogged appointments weekly from July–December 2025. The current backlog is largely driven by on-site physical therapy appointments, which account for 71 percent of the on-site specialty backlog in this reporting period.

As previously reported, improved coordination between healthcare and security personnel improved patient attendance and reduced patient transfers among facilities.[57] Providers continue to travel between facilities to treat patients on site rather than requiring transfers to the main clinic at DC/PHSW. PDP's mobile optometry equipment continues to allow specialists to see patients at multiple facilities, which also reduces the need for security escorts. PDP has maintained extended podiatry services on two days per week in this reporting period, which

---

[54] Monitor's Sixth Report, *supra* note 13, at 50.
[55] Monitor's Fifth Report, *supra* note 26, at 42.
[56] Monitor's Seventh Report, *supra* note 15, at 57.
[57] *Ibid.*

successfully reduced the podiatry backlog to fewer than five appointments by the end of December 2025. PDP has also maintained expanded hours for X-ray services and successfully maintained a low X-ray appointment backlog in this reporting period.

***Off-Site Specialty Care***

The off-site specialty-care appointment backlog represents 27 percent of all backlogged appointments in this reporting period. By the end of December, PDP reported a backlog of 66 off-site specialty appointments, the lowest reported since monitoring began, and a 65 percent reduction from 187 appointments in the previous reporting period. The December 2025 backlog also represents an 85 percent reduction from the high of 432 backlogged appointments in the second half of 2024. PDP attributes this progress to population reductions, improved tracking and scheduling of appointments, and additional transportation security staff. PDP also reports that the electronic medical records (EMR) upgrade and jail management system (ATIMS) allow for easy identification of duplicate appointments, or the possibility of same-day appointments, which also reduces off-site transports.

Chart 1 below depicts completed monthly off-site specialty appointments from January 2023 through December 2025:

**Chart 1: Completed Off-Site Appointments**
January 2023 – December 2025



From January–June 2025, the number of completed off-site appointments was 1,179. In this reporting period, PDP made additional progress, recording 1,649 completed appointments for a 40 percent increase since the previous reporting period and a 108 percent increase in completed appointments compared to the period July–December 2024. In this reporting period, 73 percent of eligible appointments were completed, with patient refusals documented as the most frequent reason for missed appointments. Patient refusals have increased, and PDP does not track specific

reasons for the refusals. However, Dr. Belavich opines that PDP's process for managing patient refusals is sound and comparable to jails in other jurisdictions. When patients refuse to attend appointments, healthcare personnel meet with and educate the patients about any potential risks of refusal and then receive signed refusals from the patients. Increases in completed appointments over the last 12 months have modified the trend line for completed appointments from negative to positive, as reflected in the table above.

Table 24 below depicts off-site specialty appointments scheduled and attended from July–December 2025:

**Table 24: Off-Site Specialty Appointment Summary**
July – December 2025

| Month | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|
| # Scheduled | 406 | 431 | 487 | 428 | 405 | 496 | 2,653 |
| Out of Custody | 61 | 56 | 44 | 22 | 32 | 37 | 252 |
| Out of Jurisdiction/Open Ward | 2 | 1 | 5 | 6 | 5 | 11 | 30 |
| Cancel Prior to Transport | 13 | 19 | 17 | 27 | 11 | 17 | 104 |
| COVID-19 Isolation | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total Ineligible* | *76* | *76* | *66* | *55* | *48* | *65* | *386* |
| # Eligible to Attend Appointment | 330 | 355 | 421 | 373 | 357 | 431 | 2,267 |
| Refused[58] | 58 | 56 | 68 | 70 | 54 | 88 | 394 |
| C/O Shortage | 10 | 11 | 15 | 4 | 9 | 5 | 54 |
| Cancelled at Office | 2 | 3 | 1 | 3 | 1 | 5 | 15 |
| Scheduling Error | 1 | 1 | 5 | 1 | 2 | 6 | 16 |
| Court | 12 | 8 | 22 | 8 | 5 | 8 | 63 |
| Late to Appointment | 13 | 6 | 12 | 5 | 0 | 3 | 39 |
| Other | 4 | 6 | 5 | 4 | 4 | 14 | 37 |
| *Total NOT Seen* | *100* | *91* | *128* | *95* | *75* | *129* | *618* |
| Total Seen | 230 | 264 | 293 | 278 | 282 | 302 | 1,649 |
| % of Eligible Patients Seen | 70% | 74% | 70% | 75% | 79% | 70% | 73% |

As with the previous reporting period, PDP continues to report that increased security transportation staffing is the greatest contributing factor to reductions in the off-site backlog. In the previous reporting period, staff shortages reportedly accounted for 132 missed appointments in January 2025 but only 15 missed appointments by June 2025.[59] The positive trend continued in this reporting period, with staff shortages accounting for an average of fewer than 10 missed appointments each month throughout the reporting period. Eligible patient attendance throughout the reporting period averaged 73 percent.

---

[58] As previously reported, patients have consistently reported to the Monitoring Team that excessive wait times in holding cells for transportation to appointments is among the primary reasons for their refusals. *See* Monitor's Third Report, *supra* note 14, at 31-32. PDP reports they now stagger when Class Members are brought to the transfer area for appointments and that wait times have reduced.

[59] Monitor's Seventh Report, *supra* note 15, at 59.

In previous reporting periods, PDP maintained a "must-go" list for scheduled appointments.[60] That is, PDP security notified the Medical Director about how many patients could be transported in a given week based on limited availability of transport staff, and the Medical Director would then determine which patients needed care the most. Those patients were then placed on the must-go list and prioritized for off-site specialty appointments. PDP reports it has now eliminated the must-go list. The Monitoring Team will confirm that the must-go list remains unnecessary through the next reporting period.

As previously reported, PDP established a nine-bed secure inpatient unit at Jefferson Frankford Hospital in 2024.[61] PDP initially intended the unit to treat medical inpatient and inpatient surgery patients and provide post-operative care, but the hospital no longer offers those services. PDP reported that the unit will admit patients who require care for substance use withdrawal, both for Class Member patients as well as pre-arraignment patients in Philadelphia Police Department custody. This agreement should reduce the number of security personnel required to guard these patients as they will now be in a single location.

***Intake Screenings***

Since 2022, PDP has been unable to meet internal policy guidelines for patient intake screenings within four hours of arrival at PDP. PDP maintains accreditation by the National Commission on Correctional Health Care (NCCHC), which recently released updated standards for healthcare and mental health services in correctional facilities.[62] The updated standards reflect that intake screenings should occur within six hours absent exceptional circumstances, such as an unusually large influx of intake patients. PDP has changed its intake guidelines consistent with NCCHC standards and, in November 2025, began monitoring compliance with intake screenings within six hours instead of four. Data for November and December 2025 reflect 89 percent and 84 percent compliance with this updated standard for an average compliance for those months of 87 percent.

Table 25 below depicts PDP's reported compliance with four-hour or six-hour timeframes for each month in the second half of 2025:

---

[60] *Ibid*.

[61] Monitor's Fifth Report, *supra* note 26, at 45.

[62] National Commission on Correctional Health Care. *Standards for health services in jails*. (National Commission on Correctional Health Care 2026); National Commission on Correctional Health Care. *Standards for mental health services in correctional facilities*. (National Commission on Correctional Health Care 2026).

**Table 25: Percentage of Intake Screenings Within NCCHC-Recommended Timeframes**
July – December 2025

| Month | % Within Four Hours | % Within Six Hours |
|---|---|---|
| July | 53% | – |
| August | 55% | – |
| September | 63% | – |
| October | 68% | – |
| November* | – | 89% |
| December | – | 84% |
| **Total** | **60% (Jul-Oct)** | **87% (Nov-Dec)** |

*PDP began monitoring compliance with intake screenings within six hours instead of four in November 2025, consistent with updated NCCHC standards.

PDP has committed to seeing all patients as expeditiously as possible and reports that its intake area is staffed with sufficient healthcare and security personnel to meet the new six-hour policy requirement. Healthcare and security leadership report that they receive daily reports of any Class Members whose intake processing exceeds six hours and the reasons for failures to meet the six-hour requirement. Dr. Belavich anticipates that PDP will remain in compliance with the six-hour timeframe, and the Monitoring Team will report PDP's compliance with the new timeframe in the next reporting period.

*Mortality Information*

Four Class Members died while in PDP custody in 2025. One Class Member's death was ruled accidental due to an overdose, and a second Class Member died by suicide. Two causes of death are still pending as of this filing. The Monitoring Team attended PDP's review following each death. Reviews were chaired by the First Deputy Commissioner and included the Commissioner and PDP's executive leadership team, healthcare and security division managers, and line personnel involved in the emergency response. PDP evaluated the security and healthcare responses, although available CCTV recordings were not reviewed. The Monitoring Team continues to recommend that PDP show available CCTV footage in all reviews to support critical self-evaluation. The Monitoring Team has also continued to recommend that PDP implement a formal system for tracking any security-related systemic issues identified during the reviews and any corrective action taken.

In addition to mortality reviews that are attended by PDP's security and executive staff, Healthcare also reviews each death through a Mortality and Morbidity Review Committee chaired by healthcare leadership and attended by healthcare and security personnel. This committee reportedly reviews each death and implements corrective action as needed, and corrective action is monitored through the Healthcare Quality Management Committee, chaired by the Executive Healthcare Administrator.

PDP's mortality review processes and critical incident reviews are not subject to monitoring pursuant to the Agreement. Although systemic issues that emerge during the reviews may reveal issues with care quality or timeliness pursuant to the Agreement, neither the quality of PDP's

57

reviews nor PDP's acceptance or rejection of the Monitoring Team's recommendations regarding mortality reviews impacted PDP's compliance with the substantive provision. Because PDP has achieved substantial compliance with this substantive provision, this report contains the final update on mortality information.

### *Behavioral Healthcare*

PDP has continued to meet policy timeframes for social worker sick calls and 14-day patient evaluations and has made significant improvements in meeting behavioral health referral timeframes in this reporting period.[63]

Tables 26, 27, and 28 below depict PDP's compliance with policy timeframes for behavioral health referrals, social worker sick calls, and 14-day patient evaluations, respectively, for July–December 2025:

**Table 26: Compliance with Behavioral Health Referral Timeframes, by Type of Referral***
July – December 2025

| Month | Total Referrals Completed | | Emergency Referrals Completed | | Urgent Referrals Completed | | Routine Referrals Completed |
|---|---|---|---|---|---|---|---|
| | Number | % within timeframe | % within 4 hours | % within 24 hours | % within 24 hours | % within 48 hours | % within 5 days |
| July | 816 | 79% | 86% | 99% | 66% | 95% | 82% |
| August | 1,002 | 81% | 85% | 98% | 75% | 95% | 80% |
| September | 930 | 83% | 87% | 99% | 77% | 96% | 87% |
| October | 991 | 86% | 88% | 98% | 79% | 99% | 91% |
| November | 1,010 | 82% | 81% | 99% | 77% | 99% | 89% |
| December | 1,047 | 83% | 81% | 96% | 83% | 98% | 89% |
| **Total** | **5,796** | **82%** | **85%** | **98%** | **77%** | **97%** | **87%** |

*Timeframe expectations: Emergency within 4 hours, Urgent within 24 hours, Routine within 5 days.

---

[63] PDP behavioral healthcare policy prescribes the following timeframes for responding to behavioral health patient referrals: emergency referrals, within 4 hours; urgent referrals, within 24 hours; and routine referrals, within 5 days.

**Table 27: Compliance with 24-Hour Social Worker Sick Call Timeframe**
July – December 2025

| Month | Number Completed | % Completed Within 24 Hours |
|---|---|---|
| July | 220 | 99% |
| August | 243 | 96% |
| September | 221 | 95% |
| October | 204 | 100% |
| November | 214 | 95% |
| December | 186 | 99% |
| **Total** | **1,288** | **97%** |

**Table 28: Compliance with 14-Day Patient Evaluations Timeframe**
July – December 2025

| Month | Number Completed | % Completed Within 14 Days |
|---|---|---|
| July | 571 | 94% |
| August | 600 | 95% |
| September | 733 | 95% |
| October | 601 | 96% |
| November | 652 | 95% |
| December | 619 | 98% |
| **Total** | **3,776** | **95%** |

In this reporting period, behavioral health referrals reached a high of 1,047 referrals in December 2025, with a low of 816 referrals in July 2025. Throughout the previous reporting period, PDP was meeting timeframes across all behavioral health referral types 57 percent of the time. In this reporting period, PDP met policy timeframes across all behavioral health referral types 82 percent of the time. In the previous reporting period, urgent referrals were completed within the 24-hour timeframe less than 30 percent of the time, which was an improvement from the 20 percent compliance rate reported in the period January–June 2024 and 16 percent compliance reported in the period July–December 2024. In this reporting period, urgent referrals were completed within the 24-hour timeframe 77 percent of the time. Compliance with routine referral timeframes increased from 51 percent in the previous reporting period to 87 percent in this reporting period.

In the previous reporting period, Healthcare reported increased efforts to address referrals and backlogs by bringing on new staff and regularly addressing timeliness with personnel.[64] The Behavioral Health Director reported that training had been provided to improve monitoring of referral timelines by hours (i.e., for emergency and urgent referrals) rather than days as measured previously. PDP also reports that effective July 1, 2025, a social worker is consistently stationed in the intake area so that urgent and emergency referrals may be seen immediately upon

---

[64] Monitor's Seventh Report, *supra* note 15, at 63.

59

completion of medical intakes. These efforts have dramatically improved referral timeframes. The Monitoring Team will continue to track and report compliance with referral timeframes in the next reporting period to monitor anticipated improvements in compliance with urgent referral timeframes and to ensure sustained compliance with timeframes overall.

During the July–December 2024 reporting period, PDP reported that EMR upgrades prevented PDP from generating data about social worker sick calls and 14-day patient evaluations for October, November, and December 2024. PDP was able to resolve the issue in the previous reporting period and provide complete data for the previous and current reporting periods. Compliance with social worker sick calls has been consistently high, at 95 to 100 percent in each period. Compliance with 14-day patient evaluations in the previous reporting period exceeded 85 percent. In this reporting period, compliance rates averaged 95 percent. This report contains the final update on PDP's compliance with social worker sick calls and 14-day patient evaluations.

### *Healthcare Staffing*

As noted in the Monitor's Seventh Report, given Healthcare's consistently low vacancy and functional vacancy rates, the Monitoring Team has discontinued monitoring healthcare staffing with the exception of additional staffing requirements pursuant to the Sanctions Order addressed below.[65]

---

Paragraph 2(a) of the Sanctions Order states: "The City shall increase the budget for YesCare to provide additional healthcare staffing to serve as liaisons between security personnel and healthcare providers, to expand healthcare services to meet the current and future needs of the patient population, and to provide routine rounding in all housing units due to limited out-of-cell time.

   (i)     Rounding shall occur at least three times per week in all units until the PDP comes into substantial compliance with required out-of-cell time.

   (ii)    The budget increase shall be sufficient to allow YesCare to provide additional staff members as necessary to ensure substantial compliance with substantive provisions 4 ("Return to Normal Operations"), 5 ("Healthcare") and 6 ("Behavioral Health in Segregation") of the Settlement Agreement."[66]

*Defendants have partially complied with the requirements of sub-paragraph 2(a)(i).* Regarding additional medical rounding, the Monitoring Team has recommended a modified implementation plan for additional rounding in general population housing units. If Class Members in any general population housing unit do not receive at least one hour out-of-cell time on any given day, housing unit personnel will notify healthcare administration, and healthcare personnel will then round on any impacted patients in that unit. Notifications received before 2 p.m. will result in rounding the same day. Notifications received after

---

[65] *Id.* at 67.
[66] Order, *supra* note 5, at 3-4.

2 p.m. will result in rounding the following day if Class Members have remained in their cells. PDP initially anticipated finalizing this policy in this reporting period but now estimates it will be finalized in the next reporting period.

*Defendants have complied with the requirements of sub-paragraph 2(a)(ii).* Regarding the specified budget increase, the City reported in October 2024 that it had negotiated a contract amendment for expanded services with YesCare on September 30, 2024 to allocate 38 additional positions. In November 2024, Defendants reported that the contract was in effect. In December 2024, Defendants reported YesCare had filled 25 of the 38 new positions. In June 2025, 26.4 positions were filled, and in December 2025, 25.3 positions were filled. PDP reports that it does not currently require all 38 positions but that additional positions may be filled in the future as necessary to achieve substantial compliance with Substantive Provision 4—Return to Normal Operations and Substantive Provision 6—Behavioral Health in Segregation.

Table 29 below depicts the hiring efforts for these positions, which are considered separate from previously allocated, permanent full-time staffing positions:

**Table 29: YesCare Staffing Increases Pursuant to Sanctions Order**
December 2025

| Job Classification | Allocated | Filled |
|---|---|---|
| Blitz Nurse Practitioner | 2.0 | 1.0 |
| LPN-Medication Assisted Treatment* | 1.4 | 1.0 |
| LPN-Medication Pass* | 8.4 | 8.4 |
| Telehealth Coordinator | 4.0 | 2.0 |
| Care Coordinator | 8.0 | 4.0 |
| Intake Coordinator | 4.2 | 2.0 |
| Physical Therapy Technician | 1.5 | 1.5 |
| Intake Behavioral Health Clinician | 2.8 | 2.4 |
| Behavioral Health Rounding Staff | 5.8 | 2.0 |
| **Total** | **38.1** | **25.3** |

*LPN stands for Licensed Practical Nurse.

61

*Additional requirements pursuant to the Sanctions Order:*

Paragraph 2(c) of the Sanctions Order states: "Where medical care can properly be rendered using telehealth services, the City shall take all reasonable and necessary steps to employ such services to reduce the number of staff assigned to transport duties, even if the marginal cost of telehealth services is higher than that of in-person visits."[67]

*Defendants have complied with the requirements of this paragraph.* As previously reported, the vendor PDP initially identified was unable to meet PDP's projected needs.[68] PDP searched for other telehealth vendors and providers willing to treat patients via telehealth with limited success. Telehealth is currently being used for psychiatric medication renewals, and PDP reports that each facility is now equipped to use telehealth for off-campus specialty follow-up visits. These appointments are being made along with requests for telehealth, if possible. PDP reports that other specialists have generally declined telehealth requests. It is unclear whether additional efforts to secure telehealth support would be successful, but PDP's efforts thus far have been reasonable. Furthermore, because PDP has achieved substantial compliance with Substantive Provision 5—Healthcare with its current level of telehealth support, additional efforts are likely unnecessary.

Paragraph 2(b) of the Sanctions Order requires the City to fund an Access-to-Care Team, to be housed within the Commissioner's Office, and to include, at a minimum, one Deputy Commissioner, one Access-to-Care Manager at a correctional peace officer management rank, one secretary, one analyst, and at least five Health Care facilitators assigned to PDP facilities. The Access-to-Care Team was required to be operational by February 12, 2025.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[69]

## Substantive Provision 6—Behavioral Health in Segregation

*By September 30, 2022, the PDP and Corizon shall re-establish a mental health program for persons who are in segregation status.*

### Compliance Rating: Partial Compliance

To achieve substantial compliance with this substantive provision, PDP must, at a minimum: (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI; (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation

---

[67] *Id.* at 4.
[68] Monitor's Seventh Report, *supra* note 15, at 69.
[69] *Id.* at 70.

status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to insufficient TU housing; and (7) significantly reduce the use of segregation for Class Member patients who require placement on the Behavioral Health caseload.

*Requirement 1: Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status.*

*Defendants have partially met Requirement 1 regarding physical health rounding.* October 2023 data showed 94 percent compliance with required daily physical health rounds systemwide, and at least 90 percent compliance at each PDP facility.[70] Data from May 2024 reflected a sharp reduction to 65 percent compliance with required daily physical healthcare rounds. At that time, PDP Healthcare explained the lapses in care as resulting from poor interdisciplinary communication about population moves.[71] In December 2024, Healthcare had achieved only 26 percent compliance with daily physical health rounds and similarly poor compliance at each of the three facilities reported, including CFCF (21 percent compliance), PICC (39 percent compliance), and RCF (47 percent compliance).[72] This reduction was reportedly caused by the EMR upgrade and insufficient training.

As a result of sharp reductions in compliance over two reporting periods, Healthcare directed health services administrators to monitor weekly facility audits and correct deficiencies.[73] Healthcare recognizes that frequent rounding audits support the quick identification and correction of any lapses, and the strategy helped improve compliance. Two restricted housing rounding audits completed during the previous reporting period by healthcare administration reflected 93 percent compliance with physical health rounding systemwide, and similarly high site-specific compliance at CFCF and PICC. Lower compliance at RCF was reportedly caused by failures to document rounds. Healthcare reported that managers had received additional training on physical health rounding and documentation and expected site-specific improvements in this reporting period.

However, data from the December 2025 audit reflects decreased compliance since the previous reporting period. Overall compliance with physical health rounds was 77 percent for the 65 patients included in the audit. Site-specific compliance was 74 percent at CFCF, 70 percent at PICC, and 84 percent at RCF. Healthcare explains that lapses were caused by personnel absences and failures to round. Although compliance at RCF improved, lapses in documentation persisted. Healthcare reports that leadership will maintain focus on this issue. In addition to identifying medical issues, daily physical health rounds remain a critical tool to identify any acute behavioral health needs that may emerge between weekly behavioral health rounds in restrictive housing. PDP will meet this requirement when Healthcare achieves 90 percent compliance with daily physical health rounding in every restricted housing unit systemwide.

---

[70] Monitor's Fourth Report, *supra* note 21, at 43.
[71] Monitor's Fifth Report, *supra* note 26, at 53.
[72] Monitor's Sixth Report, *supra* note 13, at 64.
[73] *Ibid.*

*Requirement 2: Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.*

*Defendants have met Requirement 2 regarding behavioral health clearances.* Healthcare clearances are required for all Class Members being considered for placement in restricted housing. This requires a face-to-face evaluation by a physical healthcare provider and a behavioral health clinician for those on the Behavioral Health caseload. Clearances must be completed within 24 hours for all patients on the Behavioral Health caseload and within 4 hours for patients with SMI.

In this reporting period, Dr. Belavich continued to assess sample Medical/Behavioral Health Review for Segregation Placement forms (PDP 86-733) for quality and consistency. Findings from his review of 22 segregation placements in this reporting period were similar to the previous reporting period, as follows: (1) for cases reviewed, patients with SMI or on the Behavioral Health caseload received timely clearance evaluations; (2) for cases reviewed, patients with SMI or on the Behavioral Health caseload received evaluations within the shorter 4-hour timeframe typically reserved for SMI patients only; and (3) dispositions by behavioral health staff appeared appropriate based on factors known about the incident at the time. As with audit findings in the previous reporting period, physical health sections of the sampled clearances were also completed consistently.[74] The Behavioral Health Director also completed an audit of approximately 100 instances of segregation clearances in this reporting period and identified four Class Members for whom segregation was contraindicated and who were instead transferred to the PHSW.

*Requirement 3: Resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.*

*Defendants have met Requirement 3 regarding behavioral health rounding.* Consecutive audits in June and December 2024 and March and December 2025 showed high rates of compliance with weekly behavioral health rounding systemwide. A March 2025 audit showed a lapse in site-specific compliance at PICC, which only met weekly rounding requirements 67 percent of the time. This issue was caused by a failure to document rounds in one PICC housing unit during that audit period. However, a second audit in June 2025 and a third in December 2025 showed site-specific compliance systemwide.

For six consecutive reporting periods, the Monitoring Team observed patients in restricted housing whose symptoms, Dr. Belavich opined, suggested they required a higher level of care. PDP maintained that clinical staff were able to request further evaluation from clinical supervisors if they believed a patient required enhanced care or advocacy, but these requests were not tracked and staff indicated they were rare.[75] Then, in the previous reporting period, the Behavioral Health Director reported that modifications to the EMR had been made that allow clinical staff to document referrals for further evaluation. Dr. Belavich reviewed a sample for April 2025, which reflected 11 instances of rounding staff referring patients in segregation for

---

[74] *Id.* at 65.
[75] Monitor's Fourth Report, *supra* note 21, at 43.

further evaluation. Referrals were thorough and contained detailed notes for each patient. Also in this reporting period, the Behavioral Health Director reports that seven patients were diverted from punitive segregation after placement and did not return to segregation.

PDP has also implemented Dr. Belavich's recommendation for improvements to Behavioral Health rounding documentation. Previously, Behavioral Health rounding notes were not individualized or unique to each patient and were instead completed in batches that simply denoted whether rounding occurred. In the previous reporting period, the Behavioral Health Director added an EMR feature that provides for individualized notes about each patient when concerns are noted by rounding clinicians.[76] The new template for Behavioral Health rounding notes includes the following information:

- Did the patient report any mental health concerns?
- Were any concerning observations made about the patient during rounds (e.g., was the patient responding to internal stimuli)?
- What was observed in the environment (e.g., was the cell clean)?
- Was there an endorsement of suicidal or homicidal ideation?
- Was the patient informed of the sick-call process if no further follow up is needed at this time?

This information can be extracted for tracking, quality improvement, and training purposes. The Behavioral Health Director reports that these EMR improvements have assisted her in assessing and improving quality of care. Consistent weekly behavioral health rounding, individualized charting with the addition of the new EMR template, and frequent quality-of-care reviews by the Behavioral Health Director are now all occurring.

*Requirement 4: Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.*

*Defendants have partially met Requirement 4 regarding group services in segregation.* PDP reports it remains unable to deliver the "Positive Change/Positive Outcomes" (PC/PO) behavioral health group treatment program for patients in segregation due to ongoing security staffing deficits. PC/PO is designed to deliver group treatment for two hours, five days per week, for a total of 10 possible treatment hours each week for every program participant. PDP tracks the number of treatment hours possible based on behavioral health staff availability ("treatment hours possible"), the number of treatment hours provided based on both healthcare and security staff availability ("treatment hours provided"), and the treatment hours necessary for PDP to comply with the requirement that each patient is offered 10 hours per week ("treatment hours required"). In the previous reporting period, PDP was able to deliver only eight percent of the hours required. In this reporting period, the number of treatment hours provided improved to an average of 15 percent of required treatment hours. PDP is confident that PC/PO hours will increase now that restricted housing is consolidated at CFCF. The Behavioral Health Director reports that, with the assistance of security executives, she has created a schedule for providing the required hours in the consolidated restricted housing units.

---

[76] Monitor's Seventh Report, *supra* note 15, at 72.

Table 30 below reflects total PC/PO group treatment hours possible with current healthcare staffing versus hours offered to segregated patients, along with total treatment hours required, from July through December 2025:

**Table 30: PC/PO Structured Group Treatment Hours in Segregation**
July – December 2025

| Month | Treatment Hours Possible | Treatment Hours Provided | % of Possible Hours Provided | Treatment Hours Required | % of Required Hours Provided |
|---|---|---|---|---|---|
| July | 594 | 202 | 34% | 1,188 | 17% |
| August | 422 | 168 | 40% | 884 | 19% |
| September | 440 | 142 | 32% | 1,014 | 14% |
| October | 493 | 189 | 38% | 1,181 | 16% |
| November | 480 | 149 | 31% | 993 | 15% |
| December | 542 | 193 | 36% | 919 | 21% |
| **Total** | **2,971** | **1,043** | **35%** | **6,179** | **17%** |

Healthcare reports that plans to make some aspects of PC/PO programming available to patients on tablets are ongoing now that individual tablets have rolled out to all facilities. As previously reported, tablet programming participation would be voluntary, does not replace in-person structured treatment, and does not count toward treatment hours for compliance purposes.[77]

*Requirement 5: Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.*

*Defendants have met Requirement 5 regarding identifying patients on segregation status.* Monitoring is discontinued.

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient TU housing.*

*Defendants have partially met Requirement 6 regarding sufficient TU housing.* In February, once the segregation population was consolidated at CFCF, PDP opened the anticipated 128-bed TU at RCF. Both moves occurred ahead of schedule. PDP is aware of the challenges with managing such a large TU, but reports PDP has sufficient staffing and space to address any challenges that may arise. As noted above, PDP and Dr. Belavich are confident that PDP now has sufficient TU space for all patients who may benefit from that level of care. Dr. Belavich maintains that PDP should discontinue the placement of SMI patients in segregation unless no alternatives exist. The isolation of the segregation environment is dangerous for patients navigating SMI and may increase the likelihood of self-harm, suicidal or other violent ideation, worsening of symptoms, and other forms of psychiatric decompensation. Dr. Belavich will assess operations of the larger TU in the next reporting period.

---

[77] Monitor's Sixth Report, *supra* note 13, at 67.

The women's TU remains in PICC C-Unit, which has a 128-bed capacity. Thirty-four beds are reserved for TU patients, though PDP reports capacity can increase as needed and there is no limit on the number of beds that may be made available. As previously reported, PDP has made efforts to enhance or "soften" the unit with additional informal opportunities for socialization and recreation.[78] A rescue dog also continued to reside on the unit during the November 2025 site visit. Finally, PDP has created opportunities for some TU participants to hold jobs either on the unit or in other areas of the facility.

In April 2025, PDP reported that Class Members with various security classifications were moved from the PICC C-Unit, which now houses only TU patients and Class Members with protective custody classifications. In June 2024, the TU had 16 patients. In April 2025, the program had nearly doubled to 31 patients. During the monitoring team's tour in November 2025, there were 21 patients on the women's TU.

In November 2025, the PICC behavioral health and psychiatry team, under the direction of the Director of Behavioral Health and recently appointed Psychiatric Director, conducted a review of the women's behavioral health caseload to identify all Class Members who might benefit from the level of care provided by the TU. Social workers, behavioral health counselors, and psychiatry providers were educated about the eligibility criteria for TU placement and were encouraged to consider appropriateness for TU placement at every patient encounter, irrespective of patients' primary psychiatric diagnoses. A list was generated of all patients in PICC's women's units with SMI diagnoses.

A total of 54 patients with SMI were identified. Of those, 21 patients (39 percent) were already in the TU and 33 patients (61 percent) were housed on other units at PICC. At the end of November, the PICC behavioral health and psychiatry teams met and reviewed each patient on the list to determine appropriate levels of care. As a result of this review, seven patients with SMI from general population were admitted to the TU, which increased the size of the program by 24 percent. An additional three patients were identified as appropriate for the TU but declined placement. The treatment team determined these patients were stable enough to remain in general population and that admission against their will would be more harmful than beneficial. An additional four patients with SMI were already enrolled in the OPTIONS (Opportunities for Prevention and Treatment Interventions for Offenders Needing Support) treatment program and appeared to be stable in general population. Five patients were released from custody prior to their scheduled psychiatry re-assessments. Healthcare reports that the same assessment will be completed for Class Members in men's units. These important steps being taken by the Behavioral Health and Psychiatric Directors have allayed any previously reported concerns about potentially problematic cultural dynamics within the Behavioral Health division.[79]

PDP also continues to report increased programming opportunities and out-of-cell informal activities in the TUs. The Behavioral Health Director reported that on both the men's and women's TUs, behavioral health counselors, an activity therapist, social workers, nursing staff, and licensed psychiatric technicians currently provide structured group programming. Group treatment is currently offered Monday through Friday with morning and afternoon groups, for a

---

[78] Monitor's Seventh Report, *supra* note 15, at 75.
[79] Monitor's Fifth Report, *supra* note 26, at 55-56.

total of up to 10 hours per week, and on weekends when staffing permits. Healthcare's current goal is to ensure that each TU participant attends at least one group per day and that clinicians follow up with any patients who refuse. During November 2025 site visits, TU patients continued to report that TU programming is enjoyable and helpful.

As previously reported, PDP moved the men's TU from a 128-bed unit to a smaller 64-bed unit in October 2023.[80] In December 2024, the unit had 42 participants and, by April 2025, had increased to 56. In the previous reporting period, Healthcare indicated that a Licensed Clinical Social Worker (LCSW) had been hired to oversee the curriculum and programming for the TUs. During the November 2025 site visit, the Monitoring Team met with the LCSW and were encouraged by the increased programming in the men's TU and impressed with her plans for additional program development.

In previous reporting periods, TUs had single-assignment security personnel, which is critical for continuity of care and interdisciplinary coordination about such issues as medication compliance, personal hygiene, and other factors that promote patient wellness. TU officers were uniquely skilled in working with TU patients. They learned patients' names, individual mental health needs, and were observed effectively de-escalating agitated patients, potentially averting uses of force or rules violations. TU participants reported that they knew and liked the officers, and some reported feeling as though officers cared about them and treated them fairly. PDP discontinued the single-assignment staffing model for some months in 2025, but the model had resumed by the November site visits. During the November 2025 site visits, TU participants and security staff both reported experiencing benefits of this model.

As previously reported, due to population reductions, PDP's Behavioral Health caseload had decreased by nearly 100 patients from the July–December 2024 reporting period to the January–June 2025 reporting period, to a total of just over 1,400 patients in June 2025.[81] PDP's SMI population had also decreased by nearly 120 patients between June 2024 and June 2025, to a total of 240 patients in June 2025. In this reporting period, PDP's population remained at approximately 3,500 Class Members, but the Behavioral Health caseload reduced to approximately 1,340 patients. Total SMI patients, however, increased by 62 percent to 388 patients in this reporting period. PDP attributes these changes to the new Psychiatric Director, who has been closely monitoring SMI criteria to ensure they are applied appropriately. With the new, larger TU at RCF, PDP now has 128 total TU beds, which may be sufficient to accommodate everyone who requires a TU level of care.

In this reporting period, there were a total of 90 outpatient referrals for the men's TU, which is a 23 percent increase from 73 referrals in the previous reporting period. Of the 90 referrals, 82 patients were accepted reflecting a 91 percent acceptance rate, consistent with previous reporting periods. Of note, there was an increased number of referrals that lacked SMI chart reviews, but Healthcare reports the SMI caseload will be reviewed for TU placement in the first quarter of 2026.

---

[80] Monitor's Fourth Report, *supra* note 21, at 46.
[81] Monitor's Seventh Report, *supra* note 15, at 76.

In June 2024, PDP re-activated its mental health step-down unit in PHSW Unit 107. This unit existed pre-COVID-19 and treats patients who have been discharged from PHSW but may not be ready to return to their previous housing or to a TU. The 15-bed unit provides an opportunity for individual and structured programming and for PDP healthcare staff to determine appropriate housing placement. During the November 2025 site visits, the unit was at capacity and staff reported periodic, short waitlists for beds on the unit. This unit predominantly receives patients from PHSW so those on the waitlist may remain in PHSW until a bed is available. Current programming in the unit includes three therapeutic groups per day on weekdays and at least one group per day on weekends.

*Requirement 7: Significantly reduce the use of segregation for Class Member patients who require placement on the Behavioral Health caseload.*

*Defendants have partially met Requirement 7 regarding Behavioral Health patients in segregation.* Behavioral Health patients had been consistently overrepresented in segregation since December 2022 when the Monitoring Team first began collecting this data. Over 18 months, from January 2024 to June 2025, the percentage of Behavioral Health patients in segregation was consistently higher than the overall percentage of Behavioral Health patients in the jail. As of January 2026, this has changed.

The Behavioral Health patient population that is also designated SMI has remained consistently low and underrepresented on segregation status for 24 months, from January 2024 through January 2026. PDP reports that those identified as SMI in segregation are regularly reviewed for placement on the TU and prioritized for PC/PO treatment. The Behavioral Health Director reports that if an individual identified for TU treatment cannot be moved to the TU for security reasons or has to wait for transfer, they receive specialized services throughout their time in segregation. Services depend on individual needs but typically include a minimum of three psychoeducational encounters per week.

Table 31 below depicts the percentage of SMI and Behavioral Health patients in segregation on specific dates in June 2024, January 2025, June 2025, and January 2026 and compares those rates to the overall population of PDP:

**Table 31: SMI and Behavioral Health (BH) Class Members in Segregation, Compared to Total PDP Population, Four Sampled Days**
June 2024 – January 2026

| Sampled Date | Total Population | | | Segregation Population | | |
|---|---|---|---|---|---|---|
| | PDP Total | % BH | % SMI | PDP Total | % BH | % SMI |
| June 30, 2024 | 4,574 | 37% | 7% | 290 | 46% | 5% |
| Jan. 10, 2025 | 4,190 | 37% | 6% | 276 | 47% | 5% |
| June 26, 2025 | 3,560 | 40% | 7% | 179 | 46% | 3% |
| Jan. 9, 2026 | 3,514 | 40% | 12% | 199 | 25% | 7% |

69

Segregation data from select dates in June 2024, January 2025, and June 2025 shows that patients on the Behavioral Health caseload totaled between 37 and 40 percent of PDP's overall population. Behavioral Health patients represented 46 to 47 percent of the segregation population during that timeframe, reflecting overrepresentation in segregation. In January 2026, however, patients on the Behavioral Health caseload represented 40 percent of PDP's overall population and just 25 percent of the segregation population, reflecting under-representation of Behavioral Health patients in segregation. Neither PDP nor Dr. Belavich are currently able to identify the specific reasons for the reduction in behavioral health patient representation in restricted housing on January 9, 2026. Dr. Belavich will increase the frequency of sampling in the next reporting period to ensure consistency with the January 2026 findings and determine whether the requirement has been met.

From June 2024 to June 2025, SMI patients represented six to seven percent of PDP's total population. In January 2026, SMI patients represented 12 percent of PDP's total population. SMI patients are not overrepresented in segregation, with individuals identified as SMI ranging from three to seven percent of the segregation population from June 2024 through January 2026. PDP should continue providing individualized services for SMI patients in restricted housing and avoid the placement of patients with SMI in segregation whenever possible.

As previously reported, Healthcare has recently enhanced the EMR to better capture when patients are diverted from segregation by being retained in a TU setting, and when rules violations that would typically result in segregation placements are instead resolved with assistance of TU staff.[82] Healthcare now reports that the EMR enhancements have not been effective in tracking this information, so the Behavioral Health Director is developing another tracking system. In the meantime, the Behavioral Health Director provided examples of six patients who received informal discipline on the TU in lieu of being considered for formal discipline. Another two patients whose infractions rose to the level of formal disciplinary write-ups were also permitted to remain on the TU rather than being placed in restricted housing. The Behavioral Health Director and TU security staff report that they address behavioral issues and infractions on the TU informally whenever possible. Informal hearing data addressed below under Substantive Provision 8—Discipline also supports this claim. Consistent clinical care and single-assignment security staff are also cited as contributing to effective discipline mitigation. PDP has committed to more accurate tracking of the discipline mitigation process in TUs in the next reporting period.

Since Monitoring commenced in 2022, PDP has permitted mental health patients who are hospitalized for psychiatric reasons while in segregation, or who are diverted from segregation to PHSW, to return to segregation once they are stabilized to serve disciplinary sentences they received prior to hospitalization or diversion. Once back in segregation, these patients' conditions may deteriorate, possibly resulting in patients cycling between segregation and hospitalization. The Monitoring Team has recommended that alternative housing and programs expand and that PDP revise its current practice to allow these patients to serve disciplinary sentences in non-segregation environments whenever possible. In this reporting period, the Behavioral Health Director cited multiple patients who were removed or diverted from

---

[82] Monitor's Sixth Report, *supra* note 13, at 66.

segregation and transferred directly to the TU or transferred to the PHSW and then to the TU without returning to segregation. This shift in practice reflects additional progress toward reducing PDP's reliance on segregation and exemplifies PDP's commitment to patient wellbeing.

***Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:***

1.  PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.

     *Defendants have implemented this recommendation. The mitigation pilot is seeing initial success in increasing recommendations for diversion from segregation. The Behavioral Health Director continues to review forms periodically but agrees increased oversight may be necessary at this time.*

2.  PDP should make additional progress in identifying security personnel to staff PC/PO treatment groups and fill TUs with only TU patients or others who can safely program in common spaces with them.

     *Defendants have partially implemented this recommendation. PDP reports that the medical guarding and transportation contractor provided some relief from the frequent redirection of security staff for medical transports. PDP anticipates being able to increase PC/PO treatment in segregation now that men's restricted housing is consolidated at CFCF.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters, and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating: Partial Compliance**

Throughout this reporting period, Class Members continued to submit grievances regarding access to the law library. However, in January 2026, PDP reported that more than 3,000 tablets equipped with legal research software were issued to Class Members systemwide. Tablet data for January 15 through February 15, 2026 indicates that Class Members utilized more than 6,000 hours of the legal research application in the one-month period. Data suggests that Class Members are now using approximately 200 hours in the legal research application per day compared to approximately 20 hours per day before individual tablets were issued.

Paragraph 3(b) of the Sanctions Order states: "The City shall install law library terminals in each unit in each facility for Class Members to use during their recreation time. The law library terminals shall be fully installed within one year of the date of this Order."[83] *Defendants have partially complied with the requirements of this paragraph.* In July 2025, PDP announced an alternative implementation plan for this requirement and contracted with its tablet vendor for the installation of a legal research application on each of the tablets scheduled for individual distribution to Class Members. Individually issued tablets provide for greater access to legal research than either kiosks or physical law libraries and, once implemented, will effectively exceed the requirements of this paragraph.

As part of PDP's implementation plan, PDP also committed to the following: (1) tablet libraries will not replace in-person access to facility law libraries; (2) Class Members will continue to have access to existing in-person law libraries during recreation periods; (3) tablets will be made available to Class Members in administrative segregation to ensure access to legal resources; (4) Class Members who are ineligible for tablets, such as those in punitive segregation, will receive access to housing unit law libraries; and (5) Class Members will have access to printed materials.

As noted above, tablets have now been distributed systemwide. PDP reports that personnel have been assigned to a dedicated team responsible for issuing tablets, offering technical assistance, and resolving any access-related issues. Class Members were observed using their personal tablets during site visits in February 2026 and reported enjoying the legal and other materials. PDP has drafted a policy that provides for each of the access points enumerated above. The Monitoring Team has reviewed and provided feedback on the draft policy and awaits the final draft for review. PDP reports that the policy will be finalized after an initial pilot period and any required changes are incorporated. When the policy is finalized and implemented, the Monitoring Team will confirm that the dedicated tablet team is in place and that Class Members are receiving access as listed above. Once access is verified, PDP will have complied with this requirement.

PDP continued to maintain oversight of law library printers and computers through monthly audits in this reporting period. Audit results from July–December 2025 indicate that all law library equipment was operational on the days inspected. One grievance was filed during this reporting period regarding broken library law equipment and was reported as resolved.

**Substantive Provision 8—Discipline**

*Sub-provision 8.1—All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating: Partial Compliance**

---

[83] Order, *supra* note 5, at 5.

PDP has updated its policies and training to ensure Class Members may attend disciplinary hearings, receive disciplinary documentation in advance of hearings, and present evidence in their defense. Class Members may appeal findings or claims of due process violations, and PDP has been piloting a process at PICC (since May 2024) and RCF (since February 2025) to ensure clinical input, as necessary, at hearings involving Class Members with SMI. PDP also reports that hearing officers have received training in PDP's policy and due process rights for incarcerated persons during disciplinary hearings.

To achieve substantial compliance with this sub-provision, PDP must ensure the following: (1) qualified staff assistants and/or language interpreters must be provided for every Class Member, as necessary, to ensure that they understand and may effectively communicate during the proceedings; (2) assistants and/or interpreters will be provided upon request, or without request if the need is documented or obvious; (3) any support provided by assistants and/or interpreters is clearly articulated in hearing documentation; and (4) hearing officers must consider and document clinical input at disciplinary hearings involving SMI patients.

PDP staff and disciplinary hearing officers currently provide some support to Class Members with obvious communication barriers or designated as SMI, but the process is neither formalized nor documented. PDP reports it is formalizing a process to assign staff assistants to Class Members with disabilities or who require translation services during disciplinary hearings and to document support provided. PDP intends to pilot this program at RCF in the next reporting period.

PDP continued to pilot its Rules Violation Mental Health Review form (PDP 363-C) to document clinical input during hearings and the consideration of clinical recommendations for mitigation or diversion. Dr. Belavich has reviewed completed forms in previous reporting periods, noted improvements in clinical documentation from one reporting period to the next, and recommended expansion to disciplinary hearings in every facility.[84]

In this reporting period, the Behavioral Health Director indicated that the pilot and accompanying PDP 363-C forms were not adequately maintained. Dr. Belavich was eventually provided with 14 forms for review, which he determined were completed thoroughly and reflected appropriate recommendations with accompanying rationales for mitigation or diversion in 6 of 14 cases. The quality of the pilot's clinical component is high and the Behavioral Health Director has committed to closer internal monitoring of documentation in the next reporting period.

SME McDonald opines that hearing officers in pilot facilities are often considering clinical input and accepting clinical recommendations. However, documentation provided suggests they are not consistently requiring the completion of mental health assessment forms prior to hearings, and consideration of clinical input is not being systematically documented. The consideration of clinical input protects Class Members' constitutional rights, and proper documentation during disciplinary hearings protects PDP against accusations of violating them. The pilot was not expanded to include CFCF or DC, but it should be now that restricted housing has been consolidated at CFCF.

---

[84] Monitor's Seventh Report, *supra* note 15, at 71.

Tables 32 and 33 below depict PDP's formal disciplinary hearing data over seven reporting periods and each month of the current reporting period, July–December 2025. The tables include totals and percents for "not guilty" findings, dismissals, and Class Members with SMI subject to discipline:

**Table 32: Average Monthly Formal Disciplinary Hearings and Outcomes**
July 2022 – December 2025

| Reporting Period | Avg. Monthly Hearings | Avg. Total and % Not Guilty | | Avg. Total and % Dismissed | | Avg. Total and % with SMI Designation | |
|---|---|---|---|---|---|---|---|
| July-Dec 2022 | 268 | 19 | 7% | 30 | 11% | 24 | 9% |
| Jan-June 2023 | 303 | 23 | 8% | 34 | 11% | 30 | 10% |
| July-Dec 2023 | 322 | 23 | 7% | 30 | 9% | 24 | 7% |
| Jan-June 2024 | 359 | 32 | 9% | 32 | 9% | 22 | 6% |
| July-Dec 2024 | 293 | 25 | 9% | 29 | 10% | 18 | 6% |
| Jan-June 2025 | 250 | 38 | 15% | 17 | 7% | 12 | 5% |
| July-Dec 2025 | 302 | 49 | 16% | 13 | 4% | 27 | 9% |
| **Average** | **300** | **30** | **10%** | **26** | **9%** | **22** | **7%** |

**Table 33: Formal Disciplinary Hearings and Outcomes, by Month**
July – December 2025

| Month | Total Hearings | Total and % Not Guilty | | Total and % Dismissed | | Total and % with SMI Designation | |
|---|---|---|---|---|---|---|---|
| July | 341 | 68 | 20% | 12 | 4% | 22 | 6% |
| August | 224 | 30 | 13% | 17 | 8% | 22 | 10% |
| September | 295 | 53 | 18% | 9 | 3% | 24 | 8% |
| October | 358 | 53 | 15% | 18 | 5% | 23 | 6% |
| November | 288 | 42 | 15% | 15 | 5% | 29 | 10% |
| December | 306 | 48 | 16% | 5 | 2% | 40 | 13% |
| **Average** | **302** | **49** | **16%** | **13** | **4%** | **27** | **9%** |

As with the previous reporting period, hearing documentation in this reporting period continued to indicate that Class Members were present at hearings unless they declined to attend, and refusals were documented. Approximately 16 percent of hearings resulted in not guilty findings, and an additional 4 percent of cases were dismissed. The presence of dismissals and not guilty findings suggests that hearing officers are critically analyzing disciplinary reports, and other markers are largely stable across reporting periods.

In this reporting period, SME McDonald completed a six-month review of formal disciplinary hearing results for SMI and non-SMI Class Members, including not guilty and dismissed outcomes, and whether punitive segregation was imposed.

74

Table 34 below depicts the average monthly formal disciplinary hearings conducted from July through December 2025 for SMI and non-SMI designated populations, evaluating the percentages of guilty findings and the outcomes related to punitive segregation sanctions:

**Table 34: Average Monthly Formal Disciplinary Hearings and Sanctions Imposed, SMI and Non-SMI Class Members**
July – December 2025

| Metric | SMI Class Members | Non-SMI Class Members | Difference SMI vs. Non-SMI |
|---|---|---|---|
| Avg. Monthly Hearings | 27 | 275 | – |
| % Not Guilty or Dismissed | 20% | 21% | -1% |
| Avg. Cases w/ Segregation Imposed | 21 | 216 | – |
| % of Cases w/ Segregation Imposed | 78% | 79% | -1% |
| Avg. Days of Segregation Imposed | 44 | 32 | +38% |
| Median Days of Segregation Imposed | 21 | 30 | -30% |

Over the six-month reporting period, disciplinary hearings resulted in similar rates of not guilty and dismissed outcomes and the imposition of punitive segregation terms for SMI and non-SMI Class Members. The average number of days in punitive segregation imposed was 38 percent higher for SMI (44 days) than non-SMI Class Members (32 days). However, median days imposed was 30 percent lower for SMI (21 days) than non-SMI Class Members (30 days), suggesting that clinical input and mitigation are being considered and applied in typical cases involving Class Members with SMI. Higher average days imposed for SMI Class Members is likely explained by extended segregation terms for Class Members with severe behavior management issues, discussed above under sub-provision 3.2 and Substantive Provision 6—Behavioral Health in Segregation. The Monitoring Team will continue to track and report this data until PDP achieves substantial compliance with sub-provision 3.2.

As previously reported, PDP has implemented an informal disciplinary hearing pilot to provide alternatives to formal disciplinary hearings that may result in punitive segregation.[85] Informal hearings may result in outcomes such as corrective counseling; extra duty; restitution, not exceeding $25; short-term loss of dayroom access; and loss of privileges, including commissary, tablets, and non-legal phone calls. Informal hearings are chaired by trained lieutenants rather than disciplinary hearing officers. During the July–December 2025 reporting period, informal hearings continued at both PICC and RCF. PDP initially anticipated expanding the informal hearing pilot to CFCF and DC in this reporting period but now anticipates expansion in the next reporting period.

Table 35 below depicts PDP's average monthly informal disciplinary hearings by facility, including totals and percents for "not guilty" findings, dismissals, and Class Members with SMI subject to discipline in the current reporting period:

---

[85] *Id.* at 81-82.

**Table 35: Average Monthly Informal Disciplinary Hearings, by Facility**
July – December 2025

| Facility | Avg. Monthly Hearings | Avg. Total and % Not Guilty | | Avg. Total and % Dismissed | | Avg. Total and % with SMI Designation | |
|---|---|---|---|---|---|---|---|
| PICC | 24 | 2 | 6% | 0 | 0% | 1 | 3% |
| RCF | 29 | 0 | 0% | 0 | 0% | 3 | 12% |
| **Average** | **27** | **1** | **3%** | **0** | **0%** | **2** | **8%** |

In the previous reporting period, PDP reported an average of 47 informal disciplinary hearings per month. SMI Class Members were represented in approximately four percent of cases. In this reporting period, the average number of informal hearings decreased to 27 hearings per month.

SME McDonald also reviewed informal hearing logs and determined that outcomes for SMI Class Members consistently reflected measured, time-limited loss-of-privilege sanctions and avoided more serious informal sanctions. In contrast, non-SMI Class Members received the widest range of informal sanctions, including longer periods of loss-of-privileges and the greatest variety of informal sanctions. As with other performance metrics discussed in the monitor's reports, PDP leadership should internally track and monitor informal disciplinary hearing data and documentation to ensure the process is applied consistently across facilities. PDP's informal hearing pilot is proving successful in reducing reliance on punitive segregation and illustrates PDP's commitment to less restrictive alternatives, particularly for SMI Class Members. The Monitoring Team will continue to track and report on PDP's success in reducing reliance on punitive segregation until PDP achieves substantial compliance with Substantive Provision 3—Out-of-Cell/Segregation.

Finally, in the previous reporting period, Class Members reported to the Monitoring Team that PDP hearing officers had begun imposing fines of up to $200 per Class Member for fights that required off-site medical transportation. PDP confirmed that a practice of fining aggressors when fights required off-site treatment had been instituted. Upon further review, PDP determined that, in some instances, aggressors may not have been clearly identifiable and victims may have been fined. PDP has since issued clarified guidelines requiring a preponderance of evidence for a Class Member to be fined and is reviewing fines imposed thus far to determine whether they were appropriate. No fines were imposed in October, November, or December 2025.

*Sub-provision 8.2—The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022].*

**Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

76

Case 2:20-cv-01959-GAM   Document 233   Filed 03/30/26   Page 78 of 100

*Sub-provision 8.3—[The PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing.*

### Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)

*Sub-provision 8.4—[The PDP shall] cancel sanctions [imposed in hearings held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for Plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

### Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)

## Substantive Provision 9—Tablets

*Sub-provision 9.1—PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [1st floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.[86]*

### Compliance Rating: Substantial Compliance

PDP has achieved substantial compliance with this substantive provision. In January 2026, PDP distributed more than 3,000 tablets to individual Class Members systemwide. PDP has dedicated a full-time Tablet Coordinator at the lieutenant level and 11 tablet officers to provide

---

[86] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units)."* In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed. To correct this small oversight in the Agreement's drafting, PDP must instead increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units in order to achieve substantial compliance with this aspect of the substantive provision.

77

tablet-related coverage seven days per week at each facility. PDP has implemented its tablet policy as of January 2026 but is monitoring the tablet rollout through the next reporting period for any necessary policy adjustments.

The purchase and distribution of individual tablets were not required under the Agreement. PDP elected this arguably more complicated solution because it was anticipated to provide the most benefit to Class Members. Initial reactions from Class Members observed during site visits in February 2026 confirm they are receiving benefits of increased contact with loved ones through tablet calling; increased access to legal research, books, and other reading materials; and access to self-guided educational, therapeutic, and spiritual applications. PDP procured and issued tablets quickly and efficiently for a large jail system and should be commended for a successful initiative. Monitoring of this substantive provision is therefore discontinued.

*Sub-provision 9.2—The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

### Compliance Rating: Substantial Compliance

As with sub-provision 9.1 above, PDP has achieved substantial compliance with this sub-provision and monitoring is discontinued.

### Substantive Provision 10—Phone Calls

*Sub-provision 10.1—PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

*Sub-provision 10.2—Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

### Compliance Rating: Substantial Compliance

PDP has achieved Substantial Compliance with Substantive Provision 10—Phone Calls. Individually-issued tablets provide Class Members with 15 minutes of free phone calls daily and 60 minutes of free video visiting each week. For those who are ineligible for a tablet or choose not to use one, PDP has ensured that stationary phones and 15 minutes of free calls are available daily.

Data provided from the telephone vendor indicates that before individual tablets were issued, Class Members made approximately 9,850 calls per day. In the first five days following the distribution of individual tablets, the combined daily call volume, including wall phones and tablets, increased to approximately 21,200 calls per day.

Now that most non-segregation housing units are receiving out-of-cell opportunities daily, as discussed above under Substantive Provision 2—Out-of-Cell Time, dayroom phones are sufficiently accessible to Class Members who need them. Also, the distribution of individual tablets has significantly reduced the need for wall phones. Together, these factors sufficiently ensure equitable and fair access to at least 15 minutes of free phone calls daily. As with Substantive Provision 9—Tablets, PDP has exceeded the requirements of this substantive provision, and monitoring is therefore discontinued.

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

### Compliance Rating: Partial Compliance

The Monitoring Team recommended against the expansion PDP's current call-button system at PICC due to concerns about cost, feasibility, and limited effectiveness of the current call-button system. Instead, the Monitoring Team recommended enhanced security checks that are audited regularly for timeliness and quality. For seven reporting periods, Class Members and staff reported spotty personnel coverage in some PICC housing units during certain shifts, leaving some housing units unattended due to staffing shortages. PDP reported that efforts were made to ensure security checks were completed even when housing units were unattended, but this could not be verified.

In this reporting period, PDP reports consistent staffing coverage in all PICC housing units, and the Monitoring Team's audit of filled posts, discussed above under Substantive Provision 1—Staffing, supports this assertion. Also as noted above, PDP has issued individual tablets to most Class Members to increase opportunities for communication and some types of non-emergency assistance. PDP is in the process of implementing a unified CCTV system with real-time, direct-terminal access, an RFID system to monitor the timeliness of security checks, a new security operations center, and a body-worn camera program, which will eventually permit PDP to monitor the quality of security checks. PICC's leadership team has remained credible in reporting deficiencies throughout Agreement monitoring, and the Monitoring Team is confident in PICCs assessment that units are being consistently staffed. However, PDP has not initiated a process for the internal monitoring of security checks at PICC as recommended. In the next reporting period, the Monitoring Team will complete a limited random audit of the timeliness and quality of security checks at PICC using PDP's current, albeit inadequate, CCTV system.

**Substantive Provision 12—Locks**

*Sub-provision 12.1—PDP initiated the lock replacement program for PICC, which will be completed by June 30, 2022.*

> **Compliance Rating: Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.2—PDP initiated the lock replacement program for RCF, which will be completed by June 30, 2022.*

> **Compliance Rating: Substantial Compliance (March 29, 2024, monitoring discontinued)**

*Sub-provision 12.3—For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4—Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

> **Compliance Rating: Substantial Compliance**

PDP has achieved substantial compliance with this sub-provision and has now achieved substantial compliance with Substantive Provision 12—Locks. In the previous reporting period, all 10 call-button work orders were completed within two working days. In this reporting period, grievances were logged about a lack of responsiveness to call buttons and the intercom system, but no complaints were logged regarding call-button functionality and no work orders for completed call-button repairs were logged. With the success of population reduction initiatives, PDP is no longer housing Class Members in multipurpose rooms, where call buttons were regularly requiring repair. PDP also installed more secure wall plates over call buttons, which has reduced tampering. A work-order system has been in place since monitoring commenced, but the timeliness of call-button repairs has fluctuated.

The discontinuation of housing in multipurpose rooms, the addition of call buttons to a regular preventive maintenance checklist, security upgrades, and internal monitoring by facility managers has reduced the frequency of call-button repairs and provided for the consistent timely repair of any inoperable call buttons. PDP managers should perform monthly internal reviews of call buttons and any work orders to ensure that call buttons continue to function and that timely repairs continue in the future. Monitoring of this substantive provision is discontinued.

*Sub-provision 12.5—PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

**Substantive Provision 13—Visiting**

*Sub-provision 13.1—As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

> **Compliance Rating: Substantial Compliance (March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2—Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

> **Compliance Rating: Substantial Compliance**

PDP has achieved substantial compliance with this sub-provision and has therefore achieved Substantial Compliance with Substantive Provision 13—Visiting. In this reporting period, PDP made determinations about outstanding recommendations for improvement to its visiting program. PDP has not accepted every recommendation, addressed in more detail below. For most of the recommendations that PDP has declined to implement, the Monitoring Team verified PDP's rationales and is satisfied that sufficient effort was made. For some recommendations, including some that PDP previously agreed to incorporate into its forthcoming visiting improvement plan, the Monitoring Team urges PDP to reconsider. PDP was not required to accept every recommendation or to finalize its pending visiting improvement plan pursuant to this substantive provision.

The following recommendations were developed based on feedback from Class Members, visitors, PDP visiting personnel, and the Monitoring Team:

1. PDP's website should include all visiting policies and procedures.
   *Defendants have implemented this recommendation.*

2. When the visiting website is down for "scheduled maintenance," visitors are unable to schedule visits, and the durations of scheduled maintenance should be clearly communicated to users.
   *Defendants have implemented this recommendation. PDP reports it has communicated to the vendor the expectation that, in the event of an outage or scheduled maintenance, PDP should be notified so that pending visitors can receive appropriate notice.*

3. Visitors report that the visiting website's technical support phone line has excessive wait times, which should be improved.

   *The vendor does not currently provide a report on technical support wait times. A review of visitor interactions with the Community Justice Outreach (CJO) unit indicates that no complaints have been received regarding delays on the technical support line. PDP has instructed CJO staff to notify management if any complaints about delays are received, and PDP management will address these issues with the vendor as needed.*

4. Visitors report that they are not notified when scheduled visits are cancelled. This is frequently true when a Class Member is in punitive segregation at the time of scheduling or is placed in punitive segregation after a visit is scheduled. Visitors should be notified if the scheduled visit will be cancelled for these reasons.

   *PDP reports that this recommendation cannot be implemented with respect to the cancellation of visits with individual Class Members. PDP reports that when visitation is impacted by operational issues (i.e., lockdowns or when the scheduling system is temporarily unavailable), visitors are notified with as much advance notice as possible. However, when visits with individual Class Members are impacted for various reasons (i.e., transfer to segregation or medical emergencies), PDP is unable to notify visitors of cancellations in advance. PDP reports that it attempted to integrate the tablet system with ATIMS, to notify visitors when individual Class Members are unable to attend visits, but the two systems cannot be integrated.*

5. Class Members should receive the ability to approve or deny visits. Currently, Class Members are unable to manage visits and do not know who is visiting until the day of a scheduled visit. Class Members report that they may want to refuse some visits or prioritize some visitors over others. Staff report that it would be more efficient for them, and helpful in avoiding potential conflict in the visiting area, if Class Members were able to accept or deny scheduled visits.

   *Defendants have implemented this recommendation. The new visiting system requires that Class Members approve their visitors.*

6. Class Members should receive more support from PDP in visiting with their children. For example, they have requested that PDP personnel liaise with caregivers and facilitate visits.

   *PDP reports that it will make every effort to implement this recommendation as part of its plan for the return to normal operations. PDP is currently unable to commit to a detailed visiting implementation plan pending the RTS program plan, described in Substantive Provision 4—Resume Normal Operations, currently in development. Once the RTS program plan is finalized, PDP will determine whether or how many additional RTS personnel can facilitate additional visits for Class Members and their children. The Monitoring Team recommends that PDP ensure that sufficient personnel are dedicated to this effort in its RTS staffing allocations.*

7. PDP should allow visitors to resume taking photographs during visits, as requested by both visitors and Class Members.

   *PDP is finalizing plans to implement this recommendation on a pilot basis in the next reporting period.*

82

8. Class Members should receive additional access to tablet visits, specifically on weekends. Class Members reported that tablets were often unavailable and requested greater consistency with current tablet visiting.

   *Defendants have implemented this recommendation with the distribution of individual tablets.*

9. PDP should expand visiting hours to include evenings for visitors who work and children who attend school during the day.

   *PDP reports that it does not intend to implement this recommendation at this time due to staffing constraints. The important work RTS is doing on reentry programming suggests PDP understands that maintaining family bonds, especially with school-aged children, is essential to successful reentry. The Monitoring Team recommends that PDP expand visiting hours incrementally to the extent possible as staffing permits. For Class Members with children, PDP should offer at least some evening hours immediately and additional hours as staffing continues to increase.*

10. PDP should analyze filled versus unfilled in-person visiting timeslots and making any necessary scheduling adjustments (consistent with the evening visiting request above).

    *PDP previously committed to implementing this recommendation,[87] but now declines to expand or adjust visiting hours at this time, as noted above. The Monitoring Team recommends that PDP reconsider.*

11. PDP should ensure that family visiting spaces in all facilities are regularly sanitized.

    *PDP has committed to remind visiting staff to monitor the visiting rooms to maintain appropriate sanitation standards.*

12. PDP should ensure that family visiting areas are stocked with age- and culturally-appropriate activities for youth.

    *PDP previously committed to incorporating this recommendation into its visiting improvement plan.[88] PDP reports it is reviewing its supplies of toys and activities in family visiting areas and intends to introduce additional toys and activities for youth. The Monitoring Team recommends that PDP allocate funding for this purpose and ensure that activities are consistently available.*

PDP estimates its visiting plan will be finalized in 2026.

*Sub-provision 13.3—PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated outside of PDP.*

**Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

---

[87] Monitor's Third Report, *supra* note 14, at 55.
[88] *Ibid.*

**Substantive Provision 14—Attorney Visiting**

*Sub-provision 14.1—PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

### Compliance Rating: Substantial Compliance

PDP has achieved substantial compliance with this sub-provision. As previously reported, attorney visits are not scheduled, and PDP does not log attorneys' arrival times. Attorneys may visit multiple clients during a single visit, and Class Members are first called for official visits when attorneys arrive in the official visiting area, not when they enter a facility. As a result, there was no mechanism to measure compliance with the 45-minute requirement under this sub-provision.[89] Alternatively, the Monitoring Team has relied on reports from PDP, Class Members, the Defender Association, members of the private bar, and *Remick* class counsel to assess progress and identify areas for improvement related to attorney visiting.

In 2023, PDP worked directly with the Defender Association to strategize mutually agreeable solutions to official visiting delays and agreed to the following improvements:

- On September 18, 2023, PDP adjusted tablet visiting schedules at CFCF to begin at 12 p.m. rather than during morning high-traffic hours. Tablet visits occur in the same rooms as in-person visits, so this schedule change increased available space for in-person visits during peak hours.
- In October 2023, PDP modified institutional count times at CFCF to reduce the likelihood that clearance delays would interfere with peak official visiting hours.
- In November 2023, PDP agreed to utilize two additional rooms for official visits that had previously been reserved exclusively for visits with Class Members in segregation or protective custody at CFCF.
- The Defender Association also agreed to allow afternoon official visits to take place in a room typically reserved for Defender Association personnel only.
- In March 2024, PDP reported that it began utilizing an additional room for official visits that had previously been reserved exclusively for First Judicial District of Pennsylvania hearings.
- Also in 2024, PDP agreed to permit the use of City-issued internet hotspots in the visiting area.

Most of these improvements are still in effect as of this filing and demonstrate PDP's commitment to ensuring Class Members' access to counsel. Currently, it does not appear that PDP is permitting the use of the hearing room, nor is the Defender Association room being used in the afternoons, as initially agreed upon.

PDP has consulted at length with the Monitoring Team to identify a process for tracking arrival times of Class Members for official visits. Multiple complicating factors render tracking pursuant to this sub-provision infeasible without expending additional security staff resources or

---

[89] Monitor's Fourth Report, *supra* note 21, at 59.

requiring attorneys to schedule visits in advance. The Monitoring Team continues to receive complaints that official visiting space at CFCF is insufficient to meet demand during high-traffic morning hours, so PDP, the Defender Association, and representatives from the private bar may need to revisit the use of the two additional rooms. Otherwise, PDP's in-person attorney visiting operations generally appear to be running smoothly, and the Monitoring Team no longer receives regular complaints regarding visit delays.

Over multiple reporting periods, PDP has maintained that staff vacancies are the primary reason for official visiting delays. As discussed above under Substantive Provision 1—Staffing, PDP is closer to resolving this issue and delays are reducing in frequency. PDP visiting personnel have been briefed and demonstrate an understanding that visits should begin as soon as possible but no later than 45 minutes after attorneys arrive in the official visiting area. Defense counsel have generally expressed to the Monitoring Team that advance scheduling of official visits is not possible or desirable and may impede Class Members' timely access to counsel. Improvements implemented by PDP thus far appear to be working, and PDP has committed to working with counsel should issues with official visits recur in the future. Although PDP has not substantially complied with this sub-provision as written, PDP has remediated deficiencies and substantially complied with the spirit of the sub-provision. Therefore, monitoring of this sub-provision is discontinued.

*Sub-provision 14.2—For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

### Compliance Rating: Partial Compliance

To achieve substantial compliance with this sub-provision, PDP must demonstrate that Class Members are present for remote legal visits within 15 minutes of scheduled start times for 85 percent of scheduled visits.

PDP has made progress toward compliance with this sub-provision in this reporting period. PDP did not previously request attorneys' email addresses or phone numbers when visits were scheduled and, therefore, was unable to notify attorneys of delays or cancellations. PDP also did not previously have a system to measure compliance with this sub-provision.[90]

PDP reports that its tablet vendor, ViaPath, is now obtaining attorneys' email addresses when scheduling remote legal visits. PDP also created a "no-reply" email account to notify attorneys of delays exceeding 15 minutes via a standardized delay notification. All outgoing emails will serve as timestamped records of delay occurrences. PDP has assigned personnel to monitor this email inbox and track delay notifications. PDP reports that it will generate periodic reports regarding outgoing emails sent to counsel. Based on these reports, the Monitoring Team will make a compliance determination.

---

[90] Monitor's Seventh Report, *supra* note 15, at 93.

In this reporting period, the Monitoring Team continued to track cancellations and delays of regularly scheduled meetings with the Deputy Monitor during regular tablet meetings with Class Members. From June 2025 through November 2025, 46 out of 58, or 79 percent, of the Deputy Monitor's scheduled tablet visits were attended by Class Members. This represents a two percent increase from the previous reporting period and a 12 percent increase from the same period in 2024. Eight visits were recorded as no-shows, and an additional four visits were delayed beyond the 15-minute compliance window. Delays during this reporting period ranged from two minutes to 30 minutes and were most frequently attributed to count delays and technical issues.

As previously reported, in April 2024, PDP began offering counsel both 25-minute and 55-minute tablet meeting timeslots for additional flexibility when scheduling remote visits.[91] The 25-minute time slots remained available in this reporting period.

*Sub-provision 14.3—For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

### Compliance Rating: Partial Compliance

To achieve substantial compliance with this sub-provision, PDP must implement an effective mechanism to notify counsel of delays with remote legal visits.

As indicated in sub-provision 14.2, PDP created a no-reply email account for the purpose of communicating with attorneys regarding delays exceeding 15 minutes. The account was reportedly created in November 2025, and PDP revised post orders in this reporting period. Visiting officers were reportedly trained on the new procedures in January 2026. PDP reports that the new process has now been fully implemented and that attorneys are currently being notified when delays exceed 15 minutes. As with sub-provision 14.2 above, the Monitoring Team will evaluate the process in the next reporting period and make a compliance determination for this sub-provision.

**Substantive Provision 15—COVID-19 Testing**

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia*

---

[91] Monitor's Fifth Report, *supra* note 26, at 74.

*Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

**Compliance Rating: Substantial Compliance (October 12, 2023, monitoring discontinued)**

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1—Defendants agree to continue conducting the weekly General Inspection (GI) cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this sub-provision, PDP must at least: (1) ensure that daily inventories of cleaning supplies are completed and documented at least 90 percent of the time; (2) monitor the availability of cleaning supplies (systemwide and on each occupied housing unit); (3) standardize the distribution of cleaning supplies in each occupied housing unit; (4) maintain consistent GI cleaning schedules for each occupied housing unit at least 90 percent of the time; and (5) ensure GI cleaning includes cells and housing areas (i.e., showers, floors, and walls).

PDP continues to complete monthly housing unit audits based on visual observations by PDP staff and structured interviews with Class Members. Auditors assess the cleanliness of cells and common areas; the condition of housing units; and the availability of clothing, bed linens, and cleaning supplies. Auditors also interview Class Members regarding access to sanitation supplies and opportunities to participate in GI cleaning. In addition to the review of internal audits, the Monitoring Team also reviews of out-of-cell logs for notations about GI cleaning, observes housing unit conditions via CCTV, and requests input from Class Members and staff during site visits. CCTV in this reporting period suggests that units are cleaner and dayrooms are generally free of trash.

Documentation in this reporting period indicates that GI cleaning is scheduled on a weekly basis, as required. Out-of-cell logs reflect regularly scheduled opportunities for GI cleaning and Class Members generally confirm this information during site visits. Class Members continue to report that GI cleaning days are occurring, but that access to cleaning supplies remains inconsistent and varies among facilities and housing units.

In this reporting period, the Monitoring Team reviewed every available monthly audit completed for every housing unit at CFCF, DC, PICC, and RCF. Table 36 below denotes with a "Y" when the majority of housing units in a given housing area had at least 80 percent of Class Members reporting during monthly internal audits that they routinely received two sets of outerwear (O), access to cleaning supplies (C), and weekly linen exchange (L) for the period July–December 2025:

**Table 36: Class Members' Reported Access to Outerwear (O), Cleaning Supplies (C), and Bed Linens (L), by Housing Area and Month\***
July – December 2025

| Facility | Housing Area** | July O | July C | July L | Aug O | Aug C | Aug L | Sept O | Sept C | Sept L | Oct O | Oct C | Oct L | Nov O | Nov C | Nov L | Dec O | Dec C | Dec L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CFCF | A Building | | | | | | | | | | | | | | | | | | |
| | B Building | | Y | | | Y | | | Y | | | Y | | | Y | | | | |
| | C Building | Y | Y | | Y | Y | | Y | Y | | Y | Y | | Y | Y | | | Y | |
| | D Building | Y | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| DC | Blocks | | Y | | | Y | | | Y | | | Y | | | | Y | | | |
| | Dorms | | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| | PHSW | | | | | | | | | | | | | | | | | | |
| PICC | Med | Y | Y | Y | Y | Y | | Y | Y | | Y | Y | | | Y | | Y | Y | |
| | Max | | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| | 3rd Floor | Y | Y | | | Y | | | Y | | | Y | | | Y | | | Y | |
| RCF | 1st Floor | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| | 2nd Floor | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | | Y | Y | | Y | Y | |
| | 3rd Floor | Y | Y | Y | Y | | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | Y | |
| | MOD 3 | Y | Y | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | Y | | Y |

\* Note that the threshold in this table is 80 percent adherence, despite the requirement for 90 percent adherence to achieve substantial compliance with sub-provisions 17.1 and 17.2.
\*\*Compliance rates discussed below include individual "housing units" (blocks, units, and dormitories) but are summarized in this table at the "housing area" level.

Class Member interview data from PDP's internal audits indicates that Class Members in an average of 68 percent of housing units audited reported consistent access to cleaning supplies. This represents a decline from 76 percent in the previous reporting period. RCF met the 80 percent threshold for cleaning supplies in approximately 71 percent of housing units audited. CFCF remained inconsistent despite modest improvement in some buildings. During site visits in this reporting period, the Monitoring Team spot-checked housing units for the availability of

cleaning supplies. The availability of supplies continued to vary by housing unit and facility. As with previous reporting periods, the availability of supplies lacks consistency and housing unit inventories were often missing, inaccurate, or not current.

PDP's internal audits also documented persistent sanitation and environmental deficiencies that GI cleaning alone has not resolved. Across facilities, audits repeatedly noted obstructed views into cells caused by sheets or coverings, graffiti, and deferred cell maintenance; and deteriorating shower conditions, including soap scum, rusted fixtures, broken tiles, clogged drains, and standing water. These findings have recurred across multiple months, indicating that routine cleaning opportunities have not been sufficient to address all parts of housing areas, such as showers, and underlying maintenance needs. Maintenance issues are addressed in more detail below under Paragraphs 4(a) and (b) of the Sanctions Order.

Vector control issues were also documented repeatedly in PDP's internal audits in this reporting period. Audits identified evidence of rodents and other pests in multiple housing areas, including DC (B block and dormitory housing) and several CFCF housing units.[92] During site visits in this reporting period, some Class Members reported that vector control was showing improvement. Others raised ongoing concerns. During a visit to DC B block in November 2025, Class Members were vocal about ongoing mice infestations and reported sightings of rodents in their housing units. Class Members pointed out to the Monitoring Team what they reported as mouse droppings. Class Members' reports of vector control issues are consistent with PDP's audit findings, which persisted over several months in this reporting period. DC reports that it has begun to serve meals in the dining room rather than housing areas. This may help curb some of the issues, and it would be unrealistic to expect PDP to permanently eradicate every pest infestation and all droppings or other signs thereof. However, these findings suggest that GI cleaning and trash removal may be insufficient without more effective vector control services. PDP has committed to reevaluating its current extermination programs.

*Sub-provision 17.2—[Defendants agree] to provide regular laundry services under current PDP policies.*

### Compliance Rating: Partial Compliance

To achieve substantial compliance with this substantive provision, PDP must demonstrate that Class Members are offered access to laundry services or are issued clean bed linens and clothing each week at least 90 percent of the time.

PDP has made progress in improving laundry services in this reporting period. PDP has replaced several unit washers and dryers and is in the process of procuring new industrial washing machines. ATIMS is being utilized for documenting and tracking clothing and bed linens and PDP's Compliance Manager receives daily reports. PDP managers have briefed intake staff

---

[92] CFCF Sanitation Audit: July 2, 2025 (A-1); July 11, 2025 (B-1, B-2); July 17, 2025 (C-1, C-2); August 4, 2025 (A-1, A-2); August 9, 2025 (B-1, B-2); August 13, 2025 (C-1, C-2). DC Sanitation Audit: July 7, 2025 (A, B, C Blocks and ABC Dayroom); July 14, 2025 (Dormitory Housing); August 19, 2025 (Dormitory Housing); September 30, 2025 (Dormitory Housing).

regarding the distribution of complete clothing sets and consulted with laundry officers to clarify expectations. PDPs internal audits and interviews with Class Members show modest improvement in clothing distribution but little change in the provision of clean bed linens.

PDP's internal sanitation audits assess compliance with laundry service requirements through visual inspections of laundry practices and storage areas and structured interviews with Class Members regarding access to clean outerwear and weekly linen exchange. The results of these interviews are summarized in Table 36 above, using a "Y" to indicate when the majority of housing units in a given housing area had at least 80 percent of Class Members report they were consistently being provided access to clean outerwear and bed linens.

Class Member reports of regular access to clean outerwear improved since the previous reporting period but remained inconsistent overall. Across all facilities, Class Members in 37 percent of housing units audited reported regular access to outerwear, compared to 21 percent in the previous reporting period. This improvement was driven primarily by improved performance at RCF, but most housing areas audited did not meet the majority 80 percent threshold consistently. Internal audit findings are consistent with feedback the Monitoring Team received during site visits.

Access to weekly linen exchange remained one of the weakest sanitation metrics systemwide in this reporting period. Class Members in only 21 percent of housing units audited reported regular weekly linen exchange, similar to 23 percent in the previous reporting period. With the exception of RCF, most housing areas across facilities failed to meet the majority 80 percent threshold in every month audited.

PDP's executive team maintains that PDP has procured sufficient supplies of bed linens for the population but cites frequent misuse (such as the blocking of cell windows or lower bunks with sheets or blankets) as causing shortages on housing units. Internal audits identify the same misuse, and the Monitoring Team also observed misuse during site visits.

The control of Class Members' appropriate use of bed linens is a security issue, which PDP is addressing as part of its enhanced security protocols as staffing improves. In the interim, the misuse of bed linens by some Class Members does not excuse the withholding of bed linens from others. Whether the solution is increased procurement, distribution rescheduling, monitoring of misuse, or a combination thereof, clean bed linens and clothing support a basic human need that PDP must ensure is met for all Class Members. PDP reports it is considering alternative procedures that do not reduce out-of-cell time and improve laundry services, and linen distribution remains a key focus of PDP's current compliance personnel.

90

PDP is in the process of determining whether to issue underclothing to all or some Class Members, as addressed in the second,[93] third,[94] fourth,[95] fifth,[96] sixth,[97] and seventh[98] monitor's reports. Previously, undergarments for Class Members in women's units could be provided by a PDP chaplain upon request and as available. In April 2023, under Commissioner Blanche Carney (Ret.) (Commissioner Carney), PDP agreed to provide underclothing to some Class Members consistent with this recommendation. In January 2024, PDP reported that it had procured sufficient supplies of undergarments for all Class Members housed in women's units. During site visits in the fifth reporting period, January through June 2024, PDP reported that Class Members in women's units were being issued three pairs of underwear and two brassieres, and Class Members in men's units were being issued two sets of boxers and t-shirts.

During site visits in November 2025, Class Members in men's housing units rarely reported that they received undergarments, and Class Members in women's units again reported undergarments had to be requested from a chaplain. Although the provision of underwear is not a requirement for compliance with this substantive provision, PDP's current executive team recognizes the value of undergarments to jail populations. PDP reports it is currently evaluating any legal obligation to provide undergarments pursuant to state law and whether the provision of undergarments is feasible. Given the Commissioner's admirable reform goals, and consistent with widely accepted national corrections practice, Defendants should commit to the provision of underwear for all Class Members.

PDP is continuing to increase focus on sanitation through routine cleaning, one-time deep cleaning, expanded internal audits, the procurement of industrial-scale laundry equipment, and other targeted adjustments. If managed with urgency and follow-through, PDP is well positioned to achieve measurable improvement and substantial compliance with Substantive Provision 17—Sanitation.

***Status of Recommendations, Substantive Provision 17—Sanitation, from the Monitor's Third Report:***

1. PDP should modify schedules to increase the frequency of deep cleaning rounds.
   *Defendants have partially implemented this recommendation with a one-time deep cleaning of housing areas in every occupied facility.*

2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.
   *Defendants have implemented this recommendation.*

---

[93] Monitor's Second Report, *supra* note 39, at 60.
[94] Monitor's Third Report, *supra* note 14, at 63.
[95] Monitor's Fourth Report, *supra* note 21, at 64.
[96] Monitor's Fifth Report, *supra* note 26, at 79.
[97] Monitor's Sixth Report, *supra* note 13, at 88.
[98] Monitor's Seventh Report, *supra* note 15, at 97-98.

3. PDP should expedite procurement of sufficient undergarments to meet the needs of all Class Members.
    *Defendants are considering this recommendation.*

4. PDP jail managers should conduct thorough assessments in every facility to identify specific deficiencies in the areas of general sanitation and vector control, clothing and linen exchange, and access to hygiene supplies.
    *Defendants have implemented this recommendation, but corrective action is insufficient.*

5. PDP should revise its post orders to reflect operational nuances at each facility. Post orders should account for the needs of unique populations, such as women, youth, and those navigating mental illness or other disabilities who are confined in PDP facilities.
    *Defendants are in the process of implementing this recommendation.*

6. PDP executives and facility leadership should develop plans to increase guidance for unit personnel in meeting expectations for general sanitation and vector control, clothing and linen exchange, and distribution of cleaning and hygiene supplies. Plans should include effective monitoring with audits and other methods.
    *Defendants have implemented this recommendation, with ongoing deficiencies noted above.*

7. The City should authorize the emergency procurement of outside contractors to deep clean housing units on a regular schedule, similar to its approach in medical and mental health housing units, which has shown improvement as a result. The contract should include entire housing units, showers, and all biohazardous cells prior to re-occupancy.
    *PDP contracted for a one-time deep cleaning of CFCF, RCF, PICC, DC, and MOD 3 and has future plans to use Class Member cleaning crews to maintain sanitation standards. Based on the November site visit, some facilities appear to have reverted to unacceptable conditions, especially in areas like restricted housing, PHSW, and MOD 3, where Class Members may be young, have mental health issues, or not be permitted to help with deep cleaning. PDP has yet to implement a long-term strategy to maintain improvements or address persistent problems.*

8. The City should authorize PDP to immediately implement an effective vector control program at DC/PHSW and MOD 3.
    *PDP maintains vector control contracts at all facilities, with U.S. Facilities, Inc. sub-contracting for services at PICC, RCF, and CFCF. DC/PHSW and MOD 3 are treated by other extermination contractors. PDP's sanitation audits of CFCF and DC identified ongoing issues, and Class Member reports to the Monitoring Team during site visits suggest ongoing deficiencies. DC is an older facility adjacent to a creek and open grass areas, which presents unique challenges for effective vector control. However, PICC, despite also being an older facility near open grass areas, has resolved similar issues, suggesting PDP has the capacity to achieve successful vector control.*

92

9. PDP should prioritize capital projects to improve areas that pose health and safety risks in populated housing units.

> *Defendants are implementing this recommendation, discussed under Sanctions Order paragraph 4(b) below.*

---

Paragraph 4(b) of the Sanctions Order states: "The City shall complete an analysis of the state of the physical plant and long-term capital needs at each PDP facility housing Class Members, identifying deficits that impact the conditions of confinement. This analysis should also provide the Commissioner of Prisons with detailed recommendations for a target number of employees needed to maintain each facility. The City shall complete the analysis and report its findings to the Monitor within 270 days of the date of this Order."[99] The analysis was due for submission on May 13, 2025.

*Defendants have partially complied with the requirements of this paragraph.* PDP has requested additional analysis and now anticipates that its vendor, CGL Companies (CGL), will finalize reports regarding long-term capital projects and maintenance staffing needs in the next reporting period. Defendants will have flexibility in how compliance with this paragraph is demonstrated, but the Monitoring Team has recommended that PDP develop a capital projects plan that prioritizes Class Members' health and safety in housing units that PDP intends to populate.

---

10. PDP should expand existing contracts to correct maintenance vacancies that severely impact conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

---

Paragraph 4(a) of the Sanctions Order states: "The City shall authorize PDP to expand services contractually provided by U.S. Facilities, Inc., and fund such expanded scope of services until necessary maintenance is performed at all PDP facilities. To the extent any maintenance needs are not included in the scope of work of the request for proposals (RFP) that resulted in the contract, the City shall initiate bargaining on the subject or issue an RFP in accordance with the applicable collective bargaining agreements."[100]

*Defendants have partially complied with the requirements of this paragraph.* In February 2025, PDP indicated that it did not intend to expand the U.S. Facilities, Inc. contract to include DC/PHSW and MOD 3 and that City maintenance personnel would maintain responsibility for those facilities. At the time, City maintenance staffing was insufficient to complete the extensive repairs and perform ongoing maintenance at DC/PHSW and MOD 3, and populated housing areas remained in various states of disrepair. In May 2025, PDP appointed a Maintenance Director over DC and MOD 3. PDP reports it has since taken additional steps to meet the requirements of this paragraph, including the following:

---

[99] Order, *supra* note 5, at 6.
[100] *Id.* at 5.

- As discussed above, under Sanctions Order paragraph 1(g), PDP anticipates filling most of its City maintenance vacancies in the next reporting period.
- PDP is in the process of identifying eligible Class Member work crews to support City maintenance personnel.
- City maintenance has been empowered to contract with outside agencies to service DC/PHSW and MOD 3. PDP reports that it has retained two contractors, one that is currently providing electrician services and a second that is finalizing employee background checks as of this filing.
- PDP reports the City's Capital Projects Office has three projects at DC/PHSW and MOD 3, including: (1) currently underway, bathroom and door renovations (at DC) and showers (at MOD 3); (2) in the pre-construction phase, charging stations and a new kitchen panel (at DC); and (3) currently out for bid, bathroom and shower renovations (at DC); cell-door replacement (at PHSW); and laundry improvements, building exterior restoration, and lighting and window replacement (at DC).

These are all important steps toward compliance with the requirements of this paragraph, and the Monitoring Team supports PDP's alternative implementation plan but questions whether it will prove effective within a reasonable timeframe given the poor housing conditions for Class Members in some facilities, the extensive work that remains to improve conditions, and historically slow progress. Improvements were not noted during November site visits, and most previously reported deficiencies persisted.[101] Some improvements were noted, however, during February site visits, and some projects were underway.

To comply with the requirements of this paragraph, PDP must demonstrate that maintenance staffing and additional contracts will suffice for the completion of "necessary maintenance at all PDP facilities." Defendants have flexibility in how compliance is demonstrated but have considered the preparation of a dynamic, regularly updated maintenance plan that identifies one-time and preventative maintenance projects and estimated completion timeframes, which the Monitoring Team would also support.

---

[101] Deficiencies at PHSW, observed by PDP's internal auditors and the Monitoring Team, included standing water, inoperable plumbing, and deteriorated showers. PDP staff and internal auditors repeatedly identified inoperable cells due to plumbing, electrical, or locking-mechanism failures, as well as rusted fixtures and non-functioning sinks and showers. Standing water was also documented in multiple housing areas. Work orders were issued and some conditions were addressed, but similar deficiencies were documented again in subsequent audits.

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order… The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated… Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

### Compliance Rating: Partial Compliance

In 2022, pursuant to this substantive provision, PDP provided refresher training on use-of-force policy II.A.8 – *Use of Force and Restraints* (use-of-force policy), which contains language emphasizing the importance of de-escalation. PDP satisfied this requirement with more than 90 percent of available staff documented as trained.[102] PDP's use-of-force policy is trained first at the academy and annually thereafter. The policy lays an adequate foundation for appropriate practices and requires updating and revision but not replacement. PDP reports that it initiated more in-depth de-escalation and Crisis Intervention Team (CIT) training prior to the onset of the COVID-19 pandemic, but that training was paused in 2020.[103]

PDP's use-of-force policy emphasizes de-escalation but ultimately authorizes the use of force if a Class Member fails to comply with verbal commands absent active resistance or assaultive behavior. It also requires clarification regarding: (1) when force is authorized for passive resistance; (2) protocols for pre-planned versus emergency force; (3) the role of behavioral health in de-escalation; (4) duty to intervene; and (5) duty to report excessive or unnecessary force. The policy also requires a clear statement of zero-tolerance for excessive or unnecessary force, failure to report apparent excessive or unnecessary force, and dishonesty in force reporting, among other revisions.[104] An initial assessment of PDP's use-of-force practices in 2022 and 2023 revealed that inadequate force reporting and investigations, low use-of-force standards, poor quality use-of-force reviews, and ineffective training and accountability mechanisms fostered a culture of complacency toward unnecessary or excessive uses of force.[105]

---

[102] Monitor's Second Report, *supra* note 39, at 61.
[103] *Ibid.*
[104] *Id.* at 61-62.
[105] *Id.* at 61.

A complete assessment of PDP's use-of-force practices would require time and attention[106] and PDP's staffing crisis at the time prevented the cultural and operational change the problem demanded. The Monitoring Team therefore focused initially on PDP's use-of-force review process. Early detection and intervention in cases involving unconstitutional uses of force was required immediately, irrespective of staffing or other barriers. The Monitoring Team also issued initial recommendations for immediate action that PDP accepted. In April 2023, Commissioner Carney issued a memorandum to all staff reiterating her expectations for de-escalation wherever possible and personnel duties to summon a supervisor, intercede if a colleague appears to be acting outside of policy during an incident, and accurately report all uses of force.[107] Commissioner Carney also communicated a zero-tolerance policy for abuse and failures to report abuse.[108]

To address deficits in PDP's use-of-force review process, Commissioner Carney issued Executive Order 23-03: Use of Force Review Team (UFRT) in August 2023.[109] At the time, the UFRT team consisted of one captain, two lieutenants, and one analyst position. As initially envisioned, the UFRT would be responsible for reviewing designated incidents immediately or shortly after they occurred, managing the use-of-force review process, tracking trends, and specifying training needs. The UFRT was intended to assist PDP with the early identification of policy violations that required immediate intervention.

Despite an earnest desire to improve, PDP's staffing crisis and cultural resistance to change impeded PDP's progress over each reporting period. SME McDonald continued to work closely with personnel at every management rank, reviewing CCTV, evaluating investigations, and assessing tactics with the goal of supporting early identification and intervention. The UFRT and facility managers were receptive, and improvements have been noted in each reporting period. However, PDP maintained that comprehensive systemic reform with too few resources and low staff morale was unlikely, and progress has been slow.

As PDP's population reduces and recruitment and retention efforts increase PDP's security workforce, among other improvements, PDP is turning an operational corner. In this reporting period, PDP engaged CGL to assist with updating its use-of-force policies and practices. As of this filing, CGL has deployed a team of use-of-force subject matter experts whose scope of work includes updating, refining, and improving use-of-force policies, training curricula, internal use-of-force monitoring, documentation standards, internal auditing, and use-of-force reviews at each stage in the process. CGL will place specific emphasis on staff decision-making and

---

[106] In the Monitor's First Report, the Monitoring Team indicated that consideration of "all relevant material and factors" pursuant to this substantive provision will include assessments of the following: "(1) current use of force policies and procedures; (2) use of force training curriculum and instruction on law, policy, tactics, prevention, de-escalation, reporting, investigation, use of specialized equipment, and guidelines for planned versus emergency use of force; (3) current reporting and investigation practices based on specific and aggregate use of force investigations; (4) systems for commending personnel who utilize effective use of force, prevention, and de-escalation tactics; (5) disciplinary thresholds and dispositions for inappropriate or excessive uses of force; (6) mechanisms for review of use of force incidents at supervisory, management, and executive levels; and (7) processes for identifying, implementing, and monitoring any use of force-related corrective action or other quality improvement measures." *See* Monitor's First Report, *supra* note 38, at 35.

[107] Monitor's Third Report, *supra* note 14, at 65.

[108] *Ibid.*

[109] *Id.* at 65-66.

de-escalation techniques to prevent and reduce use of force. At PDP's initial meeting with CGL in early March 2026, PDP executives communicated a clear understanding of the problem and a high degree of resolve to fix it. SME McDonald attended the initial meeting and she and the Monitor will remain closely engaged with CGL's work and PDP's progress throughout.

Additional progress includes PDP's pending body-worn camera pilot, with staff training scheduled to begin in the next reporting period. PDP is progressing as planned in upgrading to an integrated CCTV system in 2026 and intends to utilize Evidence.com for video storage and improved tracking of incidents. The reporting structure for use-of-force reviews has been reorganized to increase executive-level supervision, and quarterly meetings with facility wardens are now occurring to address specific incidents. The force tracking system has been enhanced to improve incident monitoring and reporting capabilities, and the UFRT, now reduced to two lieutenants, continues to complete front-end reviews of use-of-force incidents. PDP reports that it has begun hand-selecting staff assigned to TUs and restricted housing and providing them with additional training focused on de-escalation techniques.

Individual employee accountability is another area of incremental improvement identified in this reporting period. In previous reporting periods, serious violations of PDP's use-of-force policies—including force that was not objectively reasonable and, in some cases, appeared excessive and potentially unlawful—were not accompanied by corresponding employee discipline, corrective action, or termination.

In this reporting period, PDP identified policy violations earlier in the review process in a discrete set of completed disciplinary cases, and issued discipline, retraining, and, in at least one case, termination of the employee. In 14 cases resulting in employee discipline, at least four cases were referred to the district attorney (DA) for review, and at least two employees were charged as a result. PDP provided official internal affairs investigations for two of the four DA referrals. The remaining cases relied on facility investigations completed by lieutenants who are not properly trained to conduct employee internal affairs investigations.

Investigations reflected incomplete factual development, the absence of witness interviews, insufficient incorporation of video evidence, and vague linkages between conduct and policy violations. PDP recognizes this as an area for improvement and reports that the City's law department will assist PDP supervisors and internal affairs in improving the quality of their investigations. Pending CGL's review and recommendations, PDP should consider assigning investigations of apparent unnecessary or excessive force to its Office of Professional Conduct rather than unit lieutenants. The Monitoring Team will complete additional analysis of PDP's internal affairs and disciplinary decision making in the next reporting period.

As anticipated, use-of-force packages reviewed in this reporting period continue to show some improvement but reflect similar issues to those addressed in previous monitor's reports. Some issues include significantly delayed use-of-force reviews at each stage, inconsistent application of de-escalation principles, poor documentation quality, and internal systems failing to identify and respond to problematic use-of-force incidents. PDP now faces an additional challenge driven by the large influx of new security staff to replace the loss of experienced staff and supervisors

97

during the COVID-19 pandemic. New personnel are typically less culturally entrenched and more receptive to adopting new practices, but they lack expertise with a full range of security and use-of-force scenarios.

Of the 86 use-of-force packages requested for review, from incidents occurring March through July 2025, fewer than half (approximately 45 percent) were completed by November 2025. This marked an improvement from the previous reporting period when only 30 percent of requested packets were completed. For some cases provided in this reporting period, warden-level review was completed months beyond the 45-day benchmark or was not documented at all. These delays in use-of-force reviews continue to undermine PDP's ability to impose timely corrective action, identify trends, and prevent recurrence of unnecessary or excessive force. PDP anticipates a reduction in the use-of-force package backlog in the next reporting period now that executive leadership is directly overseeing the timeliness of use-of-force reviews.

Finally, PDP's grievance system remains an inadequate mechanism for identifying and responding to force-related misconduct. In this reporting period, 10 grievances alleging excessive or unnecessary force were identified during the Monitoring Team's review. None of the 10 grievances received appropriate management responses, and none were looped into the use-of-force review process for evaluation, investigation, or corrective action. Despite the Monitoring Team's repeated recommendations, PDP has not yet begun to flag or investigate Class Members' allegations of excessive force. This creates a high likelihood that some instances of excessive or unnecessary uses of force reported by Class Members continue to go unaddressed.

With more staff, fewer Class Members, a motivated executive team, CGL's pending review, and continued input from the Monitoring Team, PDP has an opportunity to more proactively operationalize de-escalation expectations through policy, training, supervision, and review, rather than relying on post-incident review alone. PDP's efforts will be evaluated in subsequent reporting periods, with anticipation of measurable improvements in staff use of de-escalation techniques and reductions in unnecessary force, improved documentation of de-escalation efforts, and greater consistency and accountability in supervisory and executive review of use-of-force incidents where alternatives to force were available.

***Additional requirements pursuant to the Sanctions Order:***

> Paragraph 5(a) of the Sanctions Order requires PDP to confer with the Philadelphia Police Department to implement a system to remotely report criminal offenses that occur at PDP facilities, including video capability that would allow police personnel to interview complainants and witnesses remotely. PDP was required to report the outcome of these discussions by October 15, 2024.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[110]

---

[110] Monitor's Seventh Report, *supra* note 15, at 107.

Paragraph 5(b) of the Sanctions Order states: "The City shall fund PDP's K-9 detection program. Funding for the program shall be at a level sufficient to conduct routine and consistent sweeps for contraband at each institution and to ensure adequate facilities to house K-9s and all necessary equipment."[111]

*Defendants have complied with the requirements of this paragraph.* As previously reported, PDP has expanded its K-9 detection program with the purchase of additional K-9s and the construction of additional kennel space.[112] In the previous reporting period, the Monitoring Team identified inconsistencies in PDP's logs that track contraband sweeps performed by the K-9 detection unit.[113] In this reporting period, PDP submitted tracking logs that demonstrate routine searches for contraband were completed at all four facilities. No inconsistencies were identified.

Paragraph 5(c) of the Sanctions Order states: "The City shall complete the purchase of technology that allows for prompt and efficient scanning, without violating any attorney-client privilege, of incoming legal mail for contraband."[114] The technology was due to be purchased by October 15, 2024.

*Defendants have partially complied with the requirements of this paragraph.* As previously reported, PDP purchased and began utilizing the mail scanning equipment in November 2024.[115] PDP finalized a draft policy in July 2025 and shared a revised draft with Plaintiffs in February 2026.[116] PDP intends to implement the finalized policy in the next reporting period.

---

[111] Order, *supra* note 5, at 6.

[112] Monitor's Seventh Report, *supra* note 15, at 107.

[113] *Ibid.*

[114] Order, *supra* note 5, at 6.

[115] Monitor's Sixth Report, *supra* note 13, at 94.

[116] Given the number of policies and concurrent reforms PDP is implementing, delays in drafting policies are anticipated. It is poor practice for PDP to operationalize the mail scanning equipment more than a year before a corresponding policy is implemented. Appropriate timing of reforms and related policies, and the timely drafting of new or revised policies, are all tasks that the recommended compliance unit could facilitate.