**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS REMICK, et al., on behalf of Themselves and all others similarly situated,** | : | **No.: 2:20-cv-01959-GAM** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| **CITY OF PHILADELPHIA; and MICHAEL RESNICK, in his official capacity as Commissioner of Prisons,** | : | |
| **Defendants.** | : | |

**MONITOR'S NINTH REPORT**

Pursuant to Section 19 of the Settlement Agreement (Agreement) and Section 7 of the Monitoring Agreement and Protocols, the Monitor appointed by this Court submits the attached Monitor's Ninth Report evaluating Defendants' compliance with the terms of the Agreement through June 30, 2026. The Monitor prepared this report as the ninth report to be filed of record through the third settlement term ending April 30, 2027. The Monitor's Tenth Report is scheduled for filing March 31, 2027. I am available to answer any questions the Court may have regarding this report and Defendants' compliance with the Agreement at such times as are convenient for the Court.

DATED: September 30, 2026

Respectfully submitted,

By: /s/ Cathleen Beltz
Monitor

The Agreement between Plaintiffs Thomas Remick, et al., on behalf of themselves and all others similarly situated (Plaintiffs), and the City of Philadelphia (City) and Michael Resnick, in his official capacity as Commissioner of Prisons (Commissioner), in *Thomas Remick et al., v. City of Philadelphia,* Case No. CV 01959-GAM, requires system-wide reform of the Philadelphia Department of Prisons (PDP) as prescribed in 18 substantive provisions. The two-year Agreement was scheduled to terminate on April 12, 2024. On January 4, 2024, the parties stipulated to a two-year extension with a new Agreement termination date of April 30, 2026.[1]

In this reporting period, the parties stipulated to the termination of the following substantive provisions and sub-provisions: 1.1, 1.2, 1.4, 2.1, 3.2, 5, 7, 8.2, 8.3, 8.4, 9, 10, 11, 12, 13, 14, 15, and 16. Pursuant to this Court's Stipulated Order, monitoring of those substantive provisions and sub-provisions ceased on April 30, 2026.[2] Remaining substantive provisions and sub-provisions will continue to be monitored through the end of the settlement term ending April 30, 2027.

Pursuant to Substantive Provision 4—Resume Normal Operations, PDP and the Monitor were required to submit a plan for PDP to return to "normal operations" once COVID-19 restrictions were lifted. The plan was due for submission to this Court by November 1, 2022. For seven reporting periods, PDP consistently reported it was unable to finalize a plan primarily due to staff vacancies and a high Class Member population. Also pursuant to Substantive Provision 4, the Monitor convened regular meetings of the parties to strategize solutions to areas of persistent non-compliance.[3] Meetings involved transparent, good faith collaboration and produced solutions to some of PDP's operational issues. By February 2024, it became clear the City was unwilling to expend necessary resources to address the staffing crisis.

On April 8, 2024, Plaintiffs filed a motion for civil contempt seeking the imposition of sanctions to address Defendants' persistent failure to comply with the Agreement and improve conditions of confinement for Class Members.[4] On July 12, 2024, this Court held Defendants in civil contempt[5] and, on August 16, 2024, ordered the City and PDP to take immediate action on multiple requirements designed to address deficiencies in the following areas: (1) Recruitment, Staffing, and Hiring; (2) Healthcare Access for Class Members; (3) Programming and Services

---

[1] On January 4, 2024, upon the agreement of the Parties, the *Remick* Court issued an order extending the Agreement through April 30, 2026. Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 197 (E.D. Pa. Jan. 4, 2024).

[2] Stipulated Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 234 (E.D. Pa. Apr. 30, 2026).

[3] Meetings of the parties were held June 23, 2023, October 16, 2023, November 6, 2023, December 15, 2023, February 5, 2024. Subsequent meetings of the parties were held December 16, 2024, April 21, 2025, November 5, 2025, and April 22, 2026.

[4] Plaintiffs' Motion for Civil Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 205 (E.D. Pa. Apr. 8, 2024). Defendants filed their response to Plaintiffs' motion for civil contempt on May 6, 2024. *See* Defendants' Response in Opposition to Plaintiffs' Motion for Contempt and Sanctions, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 208 (E.D. Pa. May 6, 2024). Plaintiffs replied to Defendants' opposition motion on May 24, 2024. *See also* Plaintiffs' Reply Memorandum on Motion for Civil Contempt of Court, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 209 (E.D. Pa. May 24, 2024). Additional motion practice was followed by oral argument, which was heard by this Court on June 27, 2024. During oral argument, Defendants requested an evidentiary hearing. On July 9, 2024, Defendants submitted an affidavit to this Court documenting their compliance efforts to date which included ten exhibits. Defendants presented their evidence to this Court during an evidentiary hearing on July 11, 2024.

[5] Sanctions Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 220 (E.D. Pa. July 12, 2024).

for Class Members; (4) Facility Maintenance; (5) Facility Security; and (6) Population Management.[6] Several of the remedial measures ordered require additional analysis and subsequent direction from this Court to ensure proper implementation. Discrete requirements of the Court's August 16, 2024 order (Sanctions Order), as well as Defendants' progress in meeting them, are discussed throughout this report.

The Agreement provides that the Monitor issue "regular reports to counsel and the Court" that assess Defendants' compliance with each substantive provision of the Agreement. The Monitor addresses Defendants' implementation progress and issues "Substantial Compliance," "Partial Compliance," or "Non-Compliance" findings for each substantive provision. Where necessary, the Monitor makes specific recommendations to improve Defendants' compliance with the Agreement. A "Substantial Compliance" finding means Defendants "have and are reasonably expected to continue to substantially satisfy" the requirements of an Agreement provision.

A "Partial Compliance" finding means Defendants have successfully completed some of the discrete tasks outlined in a substantive provision and continues to demonstrate progress toward substantial compliance. A "Non-Compliance" finding means that Defendants have "not substantially satisfied" Agreement requirements by failing to complete the discrete tasks outlined in a substantive provision. Defendants will not be found in non-compliance based on "isolated or minor instances of failure [to substantially comply]" or "omissions of a technical or trivial nature."[7]

Where substantial compliance requires the revision of existing policies or promulgation of new ones, Defendants' compliance is assessed based on policy language and substance, notification and training of personnel, and policy implementation and adherence. Finally, the Monitor and Parties agree that successful reform is ultimately measured by sustained improvements to living conditions for Class Members. In issuing compliance findings, the Monitor will consider whether reforms implemented pursuant to the Agreement are durable and their benefits are expected to outlive the Agreement's termination and compliance monitoring. In this reporting period, the Monitoring Team utilized data tracked through June 30, 2026, and additional information received from the parties through August 2026.

The Agreement requires the Monitor to conduct site inspections "at least once every three months."[8] In addition to at least one quarterly site visit, the Monitoring Team typically conducts periodic site visits with little advance notice to PDP, however, all site visits in this reporting period were conducted with advance notice to Defendants. During site visits, the Monitoring Team conducts confidential interviews with personnel and Class Members. The Monitoring

---

[6] *See* Order, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 222 (E.D. Pa. Aug. 16, 2024). The remedial sanctions described in the Sanctions Order primarily seek to remedy non-compliance with Substantive Provision 1—Staffing, Substantive Provision 2—Out-of-Cell Time, Substantive Provision 3—Out-of-Cell/ Segregation, Substantive Provision 4—Resume Normal Operations, Substantive Provision 5—Healthcare, Substantive Provision 6—Behavioral Health in Segregation, Substantive Provision 7—Law Library Access, Substantive Provision 10—Phone Calls, Substantive Provision 13—Visiting, Substantive Provision 14—Attorney Visiting, Substantive Provision 17—Sanitation, and Substantive Provision 18—Use-of-Force.

[7] Monitoring Agreement and Protocol, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 169 at 5 (E.D. Pa. May 25, 2022).

[8] *Id*. at 3.

Team also has access to all records, files, electronic files, videos, and other materials, including personnel records and patient protected health information, as necessary to measure Defendants' compliance with the Agreement.

The *Remick* Monitoring Agreement and Protocol requires the Monitor to "establish means of communication to enable Class Members, their families, and advocates to provide information related to implementation of and compliance with the Agreement."[9] In this reporting period, the Monitoring Team welcomed Deputy Monitor, Patrick Fitzgerald (Deputy Monitor). The Deputy Monitor conducts site visits at least once per month to speak with Class Members on PDP housing units. Following site visits, the Deputy Monitor schedules weekly confidential virtual meetings with Class Members if more privacy is required. The Deputy Monitor tracks Class Members he speaks with as well as any issues that arise. The information contributes to the Monitor's compliance determinations.

The Monitoring Team periodically receives complaints from Plaintiffs' co-counsel detailing specific allegations and systemic issues communicated by Plaintiffs to co-counsel. With prior authorization from Class Members, co-counsel provides the Monitoring Team with Class Members' identifying information, and the Monitoring Team follows up with individual Class Members as necessary. With prior authorization from Class Members, select complaints and systemic issues are forwarded to PDP for response or investigation, which the Monitoring Team tracks and reviews. Conditions observed and information received via these interviews and protocols are consistent with *Remick* filings and reports by PDP staff and others who work in or inspect PDP facilities.

The Monitoring Team also receives information via published reports and communications with oversight agencies, reform advocates, Plaintiffs' co-counsel, criminal defense attorneys, and others independent of PDP. This information augments the Monitoring Team's direct observations and helps shape recommendations that the Monitoring Team hopes will produce the most durable reforms. The Monitoring Team thanks these oversight partners for their continued contributions and commitment.

In this reporting period, members of the Monitoring Team completed four site visits to all PDP facilities, including Curran-Fromhold Correctional Facility (CFCF), The Detention Center (DC) and the Prison Health Services Wing (PHSW), Philadelphia Industrial Correctional Center (PICC), the Alternative and Special Detention Central Unit (ASD-CU) and Modular Unit (MOD 3), and Riverside Correctional Facility (RCF).[10] During each site visit, the Monitoring Team spoke with Class Members and personnel in every area visited regarding Agreement requirements and conditions inside PDP facilities.

The Agreement requires the Monitor to "provide to the parties those documents and reports that are secured by her office which, in her judgment, should be shared to effectuate the terms and conditions of the Agreement."[11] The Monitor has determined that documentation provided by Defendants and utilized by the Monitoring Team in making compliance determinations will

[9] *Id.* at 4.
[10] Site visits were conducted January 2-3, 2026; April 21-23, 2026; July 9-10, 2026, and August 31, 2026.
[11] Monitoring Agreement and Protocol, *supra* note 7, at 3.

generally be shared with Plaintiffs' co-counsel. In this reporting period, the Monitoring Team continued to meet with the Commissioner and his staff, and they received access to facilities, personnel, and Class Members.

PDP has achieved substantial compliance with 7 of 18 Substantive Provisions and with 21 of 37 sub-provisions. The table below tracks PDP's compliance with all 37 sub-provisions since compliance was first reported at the sub-provision level in the Monitor's Second Report.
As addressed above, monitoring has been discontinued for the sub-provisions marked with an asterisk.

| Provision | Monitor's Report | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 1.1 | PC | PC | PC | PC | PC | SC | SC | SC* |
| 1.2 | PC | PC | PC | PC | PC | SC | SC | SC* |
| 1.3 | NC | NC | NC | NC | NC | PC | PC | PC |
| 1.4 | NC | NC | NC | PC | PC | PC | PC | PC* |
| 2.1 | PC | PC | PC | PC | PC | PC | PC | PC* |
| 2.2 | NC | NC | NC | NC | NC | PC | PC | PC |
| 3.1 | PC | NC | NC | NC | PC | PC | PC | PC |
| 3.2 | PC | PC | PC | PC | PC | PC | PC | PC* |
| 4 | NC | NC | NC | NC | NC | NC | PC | PC |
| 5 | PC | PC | PC | PC | PC | PC | SC | SC* |
| 6 | PC | PC | PC | PC | PC | PC | PC | PC |
| 7 | PC | PC | PC | PC | PC | PC | PC | PC* |
| 8.1 | PC | PC | PC | PC | PC | PC | PC | PC |
| 8.2 | SC | SC | SC | SC | SC | SC | SC | SC* |
| 8.3 | PC | SC | SC | SC | SC | SC | SC | SC* |
| 8.4 | SC | SC | SC | SC | SC | SC | SC | SC* |
| 9.1 | PC | PC | PC | PC | PC | PC | SC | SC* |
| 9.2 | PC | PC | PC | PC | PC | PC | SC | SC* |
| 10.1 | PC | PC | PC | PC | PC | PC | SC | SC* |
| 10.2 | NC | NC | NC | NC | NC | PC | SC | SC* |
| 11 | PC | PC | PC | PC | PC | PC | PC | PC* |
| 12.1 | PC | PC | SC | SC | SC | SC | SC | SC* |
| 12.2 | PC | PC | SC | SC | SC | SC | SC | SC* |
| 12.3 | SC | SC | SC | SC | SC | SC | SC | SC* |
| 12.4 | PC | PC | PC | PC | PC | PC | SC | SC* |
| 12.5 | SC | SC | SC | SC | SC | SC | SC | SC* |
| 13.1 | SC | SC | SC | SC | SC | SC | SC | SC* |
| 13.2 | PC | PC | PC | PC | PC | PC | SC | SC* |
| 13.3 | NC | SC | SC | SC | SC | SC | SC | SC* |
| 14.1 | PC | PC | PC | PC | PC | PC | SC | SC* |
| 14.2 | PC | PC | PC | PC | PC | PC | PC | PC* |

| Provision | | Monitor's Report | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 14.3 | | NC | NC | NC | NC | NC | NC | PC | PC* |
| 15 | | PC | SC | SC | SC | SC | SC | SC | SC* |
| 16 | | PC | SC | SC | SC | SC | SC | SC | SC* |
| 17.1 | | PC | PC | PC | PC | PC | PC | PC | PC |
| 17.2 | | PC | PC | PC | PC | PC | PC | PC | PC |
| 18 | | PC | PC | PC | PC | PC | PC | PC | PC |
| Totals | SC | 5 | 9 | 11 | 11 | 11 | 13 | 21 | 21 |
| | PC | 25 | 21 | 19 | 20 | 21 | 22 | 16 | 16 |
| | NC | 7 | 7 | 7 | 6 | 5 | 2 | 0 | 0 |

PDP was able to sustain progress documented in the previous reporting period and continued to improve in some areas as detailed below. PDP was able to increase the number of group treatment hours it provides in restricted housing units and continues to improve its behavioral health treatment services under strong leadership. PDP retained CGL to guide PDP's use-of-force reform and, in close coordination with the Monitoring Team, has initiated the reform process. PDP continued to reduce post vacancies at the line personnel level and maintained high employee retention rates, which are reflected in improved operations and employee morale. Finally, for the first time, PDP's Data Analysis Unit successfully compiled PDP's out-of-cell data using sound, verifiable methods, which were validated and are discussed below. Despite sound methods, inaccuracies in PDP's tracking of out-of-cell time at the housing unit level persist.

PDP has continued to exceed data production requirements pursuant to the Sanctions Order as part of a population reduction initiative that reduced PDP's average daily population (ADP) from 4,660 in the first half of 2024 to 3,359 in the first half of 2026, a 28 percent reduction. The ADP is down by 167 or five percent from the previous reporting period. Population reduction initiatives implemented by the First Judicial District and other Philadelphia justice partners have sustained these significant decreases to the prison population. Without these decreases, PDP would not have progressed to the extent detailed below. If population reductions are not sustained, it is likely that progress will stall, operations will backslide, and conditions will worsen. The table below shows the ADP of all PDP facilities in each reporting period from July 2022 to June 2026.

**PDP's Average Daily Population**
July 2022 – June 2026

| Period | July-Dec 2022 | Jan-Jun 2023 | July-Dec 2023 | Jan-Jun 2024 | July-Dec 2024 | Jan-Jun 2025 | July-Dec 2025 | Jan-Jun 2026 |
|---|---|---|---|---|---|---|---|---|
| ADP* | 4,432 | 4,429 | 4,732 | 4,660 | 4,545 | 3,625 | 3,526 | 3,359 |

*ADP is the industry standard for tracking prison populations, and it is calculated and used by PDP. The numbers in this table represent the ADP over each entire reporting period and are calculated from the publicly available Philadelphia Prison Population Reports.[12]

PDP continues to develop a new program model for its Restorative and Transitional Services (RTS) Division that increases opportunities for educational and rehabilitative programming, vocational training, and reentry services. Current programs remained inadequate in this reporting period and continue to require both enhancement and expansion. PDP issued but was denied a funding request for this fiscal year. To achieve RTS's admirable program goals, PDP must establish a program budget for RTS programs, which continue to rely primarily on grant funding and volunteers. An enhanced budget will also be required for PDP's plan to "return to normal operations" pursuant to the Agreement.

Other previously reported deficiencies persist with PDP's grievance system, its segregation practices for Class Members navigating mental illness, failed or delayed identification of excessive uses of force, poor interdisciplinary coordination among PDP bureaus, stalled policy development, and PDP's failure to appoint a compliance team to assist with Agreement compliance and internal oversight of PDP operations pursuant to the Sanctions Order. Without a dedicated Compliance Unit to guide the correction of remaining deficiencies and embed reform into operations, the Monitor fears that many of the positive changes PDP has achieved so far will not be sustained in the long term.

[12] Philadelphia Prison Population Report | July 2024 – June 2026, First Judicial District of Pennsylvania (July 15, 2026), https://www.phila.gov/media/20260715153541/June-2026-Full-Public-Report.pdf.

# Table of Provisions

***Compliance Findings*** ... ***9***

***Substantive Provision 1—Staffing*** ... ***18***

*Sub-provision 1.1* ... *18*

*Sub-provision 1.2* ... *18*

*Sub-provision 1.3* ... *19*

*Sub-provision 1.4* ... *23*

***Substantive Provision 2—Out-of-Cell Time*** ... ***27***

*Sub-provision 2.1* ... *27*

*Sub-provision 2.2* ... *27*

***Substantive Provision 3—Out-of-Cell/Segregation*** ... ***30***

*Sub-provision 3.1* ... *30*

*Sub-provision 3.2* ... *33*

***Substantive Provision 4—Resume Normal Operations*** ... ***33***

***Substantive Provision 5—Healthcare*** ... ***37***

***Substantive Provision 6—Behavioral Health in Segregation*** ... ***39***

***Substantive Provision 7—Law Library Access*** ... ***51***

***Substantive Provision 8—Discipline*** ... ***53***

*Sub-provision 8.1* ... *53*

*Sub-provision 8.2* ... *57*

*Sub-provision 8.3* ... *57*

*Sub-provision 8.4* ... *57*

***Substantive Provision 9—Tablets*** ... ***57***

*Sub-provision 9.1* ... *57*

*Sub-provision 9.2* ... *58*

***Substantive Provision 10—Phone Calls*** ... ***58***

*Sub-provision 10.1* ... *58*

*Sub-provision 10.2* ... *58*

***Substantive Provision 11—PICC Emergency Call Systems*** ... ***58***

***Substantive Provision 12—Locks*** ... ***59***

*Sub-provision 12.1* ... *59*

*Sub-provision 12.2* ........ *59*
*Sub-provision 12.3* ........ *59*
*Sub-provision 12.4* ........ *59*
*Sub-provision 12.5* ........ *59*
***Substantive Provision 13—Visiting* ........ *59***
*Sub-provision 13.1* ........ *59*
*Sub-provision 13.2* ........ *60*
*Sub-provision 13.3* ........ *60*
***Substantive Provision 14—Attorney Visiting* ........ *60***
*Sub-provision 14.1* ........ *60*
*Sub-provision 14.2* ........ *60*
*Sub-provision 14.3* ........ *60*
***Substantive Provision 15—COVID-19 Testing* ........ *61***
***Substantive Provision 16—Quarantine* ........ *61***
***Substantive Provision 17—Sanitation* ........ *61***
*Sub-provision 17.1* ........ *61*
*Sub-provision 17.2* ........ *64*
***Substantive Provision 18—Use-of-Force* ........ *70***

**Compliance Findings**

Some of the Agreement's 18 substantive provisions contain related but discrete action items that must be completed for PDP to achieve substantial compliance with the entire provision. The Monitoring Team created sub-provisions for 10 of the 18 substantive provisions based on these discrete action items and issues separate compliance findings for each enumerated sub-provision. This provides additional clarity for Defendants as they work to implement required changes and greater specificity for this Court and the Parties in distinguishing between action items that are being successfully implemented and those that require additional attention. To achieve substantial compliance with each substantive provision, PDP must first achieve substantial compliance with every sub-provision.

From the Agreement's 18 substantive provisions, 37 action items were created, including 29 sub-provisions and 8 undivided provisions (hereinafter "sub-provisions"). In this reporting period, PDP has achieved substantial compliance (SC) with 21 sub-provisions and partial compliance (PC) with 16 sub-provisions. This is the same level of compliance as the previous reporting period. Upon agreement of the parties, 28 of the 37 sub-provisions were terminated from the Agreement.[13] Of the 28 terminated provisions, PDP had previously achieved substantial compliance with 21 sub-provisions and monitoring had been discontinued for 14 sub-provisions. Seven of the 28 terminated sub-provisions remained in partial compliance when they were terminated. The table below reflects all provisions and current compliance ratings for each substantive provision and each sub-provision, as well as dates that monitoring was discontinued, where appliable.

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **1** | **Staffing** | **PC** | |
| 1.1 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *hiring* of correctional officers. | SC | April 30, 2026 |
| 1.2 | No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the *retention* of correctional officers. | SC | April 30, 2026 |
| 1.3 | Ensure that there are a sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility. | PC | Ongoing |
| 1.4 | These measures [1.1-1.3] shall continue until this goal is achieved and thereafter to maintain the proper number of correctional officers. | PC | April 30, 2026 |

[13] Stipulated Order, *supra* note 2, at 1.

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **2** | **Out-of-Cell Time** | **PC** | |
| 2.1 | Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day. | PC | April 30, 2026 |
| 2.2 | The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases of out-of-cell time should continue to be made beyond the August 1, 2022 standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, *infra*, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. *See also* para. 4, *infra*. | PC | Ongoing |
| **3** | **Out-of-Cell/Segregation** | **PC** | |
| 3.1 | Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day. | PC | Ongoing |
| 3.2 | Defendants further agree that they will continue their practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units. | PC | April 30, 2026 |

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **4** | **Resume Normal Operations** | **PC** | |
| | By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions. | PC | Ongoing |
| **5** | **Healthcare** | **SC** | |
| | The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as “the Backlog Plan”) set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The “Backlog Plan” is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog. | SC | April 30, 2026 |
| **6** | **Behavioral Health in Segregation** | **PC** | |
| | By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation status. | PC | Ongoing |

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **7** | **Law Library Access** | **PC** | |
| | PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters and the Monitor shall make any recommendations on these matters by August 1, 2022. | PC | April 30, 2026 |
| **8** | **Discipline** | **PC** | |
| 8.1 | All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. *See Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974); *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018); *Stevenson v. Carroll*, 495 F.3d 62, 70–71 (3d Cir. 2007). | PC | Ongoing |
| 8.2 | The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022]. | SC | April 30, 2026 |
| 8.3 | [The PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing. | SC | April 30, 2026 |
| 8.4 | [The PDP shall] cancel sanctions [imposed in hearings held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022. | SC | April 30, 2026 |

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **9** | **Tablets** | **SC** | |
| 9.1 | PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [1st floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022. | SC | March 30, 2026 |
| 9.2 | The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices. | SC | March 30, 2026 |
| **10** | **Phone Calls** | **SC** | |
| 10.1 | PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices. | SC | March 30, 2026 |
| 10.2 | Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls. | SC | March 30, 2026 |
| **11** | **PICC Emergency Call Systems** | **PC** | |
| | The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity. | PC | April 30, 2026 |

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **12** | **Locks** | **SC** | |
| 12.1 | PDP initiated the lock replacement program for *PICC*, which will be completed by June 30, 2022. | SC | March 29, 2024 |
| 12.2 | PDP initiated the lock replacement program for *RCF*, which will be completed by June 30, 2022. | SC | March 29, 2024 |
| 12.3 | For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022. | SC | March 3, 2023 |
| 12.4 | Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner. | SC | March 30, 2026 |
| 12.5 | PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system. | SC | March 3, 2023 |
| **13** | **Visiting** | **SC** | |
| 13.1 | As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots. | SC | March 3, 2023 |
| 13.2 | Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues. | SC | April 30, 2026 |
| 13.3 | PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated outside of PDP. | SC | Oct. 12, 2023 |
| **14** | **Attorney Visiting** | **PC** | |
| 14.1 | PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit. | SC | March 30, 2026 |
| 14.2 | For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment. | PC | April 30, 2026 |
| 14.3 | For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay. | PC | April 30, 2026 |

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **15** | **COVID-19 Testing** | **SC** | |
| | The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols. | SC | Oct. 12, 2023 |
| **16** | **Quarantine** | **SC** | |
| | If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, *see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021*, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative. | SC | Oct. 12, 2023 |
| **17** | **Sanitation** | **PC** | |
| 17.1 | Defendants agree to continue conducting the weekly General Inspection ("GI") cleaning days with supplies provided by officers to clean cells and housing areas. | PC | Ongoing |
| 17.2 | [Defendants agree] to provide regular laundry services under current PDP policies. | PC | Ongoing |

| Provision | Requirements | Status | Monitoring Discontinued |
|---|---|---|---|
| **18** | **Use-of-Force** | **PC** | |
| | PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order… The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated… Staff will not use pepper spray as a means of punishment, personal abuse, or harassment." | PC | Ongoing |

Progress and updates regarding Defendants' compliance with the Sanctions Order are discussed throughout this report. The table below reflects all Sanctions Order requirements and the current compliance status of each, as well as the page number where discussion of each can be found.

| Paragraph | Sanctions Order Requirements (Short Form) | Compliance Status | Page Number |
|---|---|---|---|
| **1** | **Recruitment, Staffing, and Hiring** | **SC** | |
| 1(a) | Identify and Hire Outside Recruitment Firm | SC | 25 |
| 1(b) | Maintain Continuous-Fill Hiring Lists | SC | 25 |
| 1(c) | Evaluate Potential Civilianization of Employees | SC | 25 |
| 1(d) | Identify and Contract with Medical Guarding Company | SC | 25 |
| 1(e) | Authorize Double-Time Increases to Staff Vacant Shifts | SC | 25 |
| 1(f) | Appoint Wellness Coordinator and Fund Employee Wellness Program | SC | 26 |
| 1(g) | Conduct Comparative Wage and Non-Wage Benefits Analysis | SC | 26 |
| 1(h) | Expand Rehiring Eligibility within Civil Service Regulation | SC | 27 |
| 1(i) | Expand Residency Requirement | SC | 27 |

| Paragraph | Sanctions Order Requirements (Short Form) | Compliance Status | Page Number |
|---|---|---|---|
| **2** | **Healthcare** | **PC** | |
| 2(a) | Increase YesCare Budget | PC | 38 |
| 2(b) | Fund and Operate Access to Care Team | SC | 39 |
| 2(c) | Expand Telehealth Services | SC | 39 |
| **3** | **Programming and Services for Class Members** | **PC** | |
| 3(a) | Identify and Engage Restorative and Transitional Services Consultant | SC | 35 |
| 3(b) | Install Law Library Terminals | PC | 52 |
| **4** | **Facility Maintenance** | **PC** | |
| 4(a) | Expand Maintenance Contract | PC | 67 |
| 4(b) | Analyze Physical Plant State and Assess Long-term Capital Needs | PC | 66 |
| **5** | **Facility Security** | **PC** | |
| 5(a) | Implement Virtual Offense Reporting System | SC | 73 |
| 5(b) | Fund K-9 Protection Program | SC | 73 |
| 5(c) | Purchase Scanning Technology | PC | 73 |
| **6** | **Population Management** | **SC** | |
| 6(a) | Explore Relocation of Class Members to Other Facilities | SC | 27 |
| 6(b) | Produce Monthly Prison Population Reports | SC | 20 |
| **7** | **Remedy** | **SC** | |
| 7(a) | Pay Court Registry Sum and Fiscal Budget Decrease Prohibition | SC | NA |
| **8** | **Compliance with this Order and the Settlement Agreement** | **PC** | |
| 8(a) | Provide Notice to Applicable Union for Civilianizing Employees | SC | NA |
| 8(b) | Hire Compliance Coordinator and Submit Written Status Report | PC | 27 |

**Substantive Provision 1—Staffing**

*Sub-provision 1.1—No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the hiring of correctional officers.*

**Compliance Rating: Substantial Compliance (achieved September 30, 2025)**

PDP achieved substantial compliance with this sub-provision in the seventh reporting period, but monitoring of PDP's hiring efforts continued to support compliance with sub-provision 1.3 below. However, upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[14]

> Paragraph 6(b) of the Sanctions Order requires Defendants to produce monthly data reports. The compiled reports include lists of individual Class Members grouped by specific categories. Paragraph 6(b) requires the following categories:
>
> (i) Class Members held on bail up to $100,000;
> (ii) Class Members with significant medical needs, such as cancer treatment and dialysis, requiring frequent off-site medical appointments;
> (iii) Class Members over the age of 60;
> (iv) Class Members who are in PDP's minimum or community security categories, have only misdemeanor and F3 charges, and have no more than a minor history of misconduct within PDP; and
> (v) Class Members who are housed in protective custody.
>
> For each Class Member, the person identifier (PPN), admission date, length of stay, total bail amounts, facility, lead charges, lead grades, and docket numbers are provided.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[15]

*Sub-provision 1.2—No later than April 20, 2022, the Defendants shall implement measures, including but not limited to signing and retention bonuses, to enhance the retention of correctional officers.*

**Compliance Rating: Substantial Compliance (achieved September 30, 2025)**

PDP achieved substantial compliance with this sub-provision in the seventh reporting period but monitoring continued to support compliance with sub-provision 1.3 below. However, upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[16]

---

[14] *Ibid*.
[15] Monitor's Sixth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 228 at 16 (E.D. Pa. Mar. 31, 2025).
[16] Stipulated Order, *supra* note 2, at 1.

*Sub-provision 1.3—Ensure that there are a sufficient number of correctional officers to cover all posts, according to PDP post plans on each shift at each facility.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this sub-provision, PDP must: (1) finalize and implement its new post plan, and (2) consistently fill at least 90 percent of its jail-based posts.

In this reporting period, PDP demonstrated slight improvement in personnel deployment and post coverage. Tables 1 through 4 below represent the overall average percentages of vacant posts and those filled by overtime staff in all PDP facilities for five reporting periods between January 2024 and June 2026, and in each populated facility for each month of the reporting period January–June 2026.

**Table 1: Average Percentage of All PDP Posts Left Vacant Due to Staffing Shortages**
January 2024 – June 2026

| Reporting Period | Average Percent Vacant |
|---|---|
| Jan-June 2024 | 39% |
| July-Dec 2024 | 34% |
| Jan-June 2025 | 36% |
| July-Dec 2025 | 28% |
| Jan-June 2026 | 25% |

**Table 2: Average Percentage of PDP Posts Left Vacant Due to Staffing Shortages, by Facility and Month**
January – June 2026

| Facility | Jan | Feb | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 28% | 26% | 25% | 26% | 27% | 27% | **27%** |
| DC | 27% | 24% | 24% | 21% | 21% | 21% | **23%** |
| PICC | 18% | 16% | 16% | 20% | 24% | 24% | **20%** |
| RCF | 30% | 28% | 27% | 30% | 31% | 29% | **29%** |
| **Average** | **26%** | **24%** | **23%** | **24%** | **26%** | **25%** | **25%** |

**Table 3: Average Percentage of PDP Posts Filled with Overtime Staff**
January 2024 – June 2026

| Reporting Period | Average Percent Filled with Overtime Staff |
|---|---|
| Jan-June 2024 | 26% |
| July-Dec 2024 | 27% |
| Jan-June 2025 | 22% |
| July-Dec 2025 | 20% |
| Jan-June 2026 | 15% |

**Table 4: Average Percentage of PDP Posts Filled with Overtime Staff, by Facility and Month**
January – June 2026

| Facility | Jan | Feb | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 19% | 15% | 18% | 17% | 18% | 18% | **18%** |
| DC | 10% | 6% | 7% | 10% | 11% | 10% | **9%** |
| PICC | 17% | 15% | 15% | 16% | 18% | 17% | **16%** |
| RCF | 10% | 18% | 19% | 19% | 19% | 17% | **17%** |
| **Average** | **14%** | **14%** | **15%** | **16%** | **17%** | **16%** | **15%** |

The average percentage of vacant posts decreased from 28 percent during the period July–December 2025 to 25 percent during January–June 2026. Vacancy rates also improved in all four facilities compared to the previous reporting period. DC and RCF each reduced their average vacancies by four percentage points from the previous reporting period. Vacant posts at DC averaged 23 percent in this reporting period, with RCF continuing to report the highest vacancy rate, at 29 percent. CFCF and PICC remained relatively stable, reducing their average vacancy rates from 29 to 27 percent and 21 to 20 percent, respectively.[17]

PDP's reliance on overtime continued to decline during the reporting period. The average percentage of posts filled through overtime decreased from 20 percent during July–December 2025 to 15 percent during January–June 2026, with reductions of four to seven percentage points across all facilities. Until hiring levels are sufficient to consistently staff at least 90 percent of authorized posts, the continued reduction in overtime reflects a management decision to accept higher post vacancy rates, and reduced housing unit supervision, rather than utilize overtime to staff a greater percentage of authorized posts.

Although overtime utilization decreased, staffing hours worked continued to increase in this reporting period. Table 5 below depicts the average total hours worked in PDP facilities for five reporting periods from January 2024 to June 2026.

[17] Monitor's Eighth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 233 at 21 (E.D. Pa. Mar. 30, 2026).

**Table 5: Average Total Hours Worked in PDP Facilities Per Week**
January 2024 – June 2026

| Reporting Period* | Avg. Total Weekly Hours Worked | Increase from Previous Reporting Period | | Increase from Same Period in Previous Year | |
|---|---|---|---|---|---|
| | | # | % | # | % |
| Jan-June 2024 | 29,568 | – | – | – | – |
| July-Dec 2024 | 32,935 | 3,367 | 11% | – | – |
| Jan-June 2025 | 39,235 | 6,300 | 19% | 9,667 | 33% |
| July-Dec 2025 | 42,281 | 3,046 | 8% | 9,346 | 28% |
| Jan-June 2026 | 44,082 | 1,801 | 4% | 4,847 | 12% |

*Dates adjusted to reflect complete half-year timeframes.

Based on academy data, PDP has maintained the aggressive recruitment pace noted in the Monitor's seventh and eighth reports. PDP hired 395 new correctional officers during 2025 through seven academy classes. In this reporting period, PDP conducted three correctional officer academies, which yielded 147 new officers.

PDP's recruitment efforts are also reflected in increases in overall security staffing. In the previous reporting period, PDP had filled 1,490 of 1,923 positions in PDP's post plan at the time the Agreement was entered.[18] This represented a 23 percent vacancy rate at the ranks of Correctional Officer through Captain. In this reporting period, PDP reports an improved 18 percent vacancy rate with 1,567 positions filled.

Despite these improvements, the Monitoring Team identified a significant issue in PDP's supervisor post vacancies. For purposes of this report, supervisory "positions" refer to the number of filled sergeant and lieutenant positions, while "posts" refer to the daily assignments that must be staffed to ensure safe and effective facility operations. Low position vacancy rates represent PDP's hiring success, and low post vacancy rates represent PDP's success in deploying supervisors to each required post each day.

By June 30, 2026, PDP had filled 145 of 182 authorized sergeant and lieutenant positions, resulting in a combined supervisory vacancy rate of approximately 20 percent. Supervisory post vacancy rates were much higher, however. Table 6 below represents average supervisory post vacancy rates for six one-week periods, each month, January–June 2026.

[18] *Id*. at 18.

**Table 6: Average Percentage of PDP Supervisory Posts Left Vacant by Facility, Six One-Week Periods***
January – June 2026

| Facility | Jan | Feb | March | April | May | June | Average |
|---|---|---|---|---|---|---|---|
| CFCF | 52% | 50% | 54% | 50% | 51% | 56% | **52%** |
| DC | 42% | 39% | 45% | 41% | 45% | 43% | **43%** |
| PICC | 32% | 30% | 32% | 27% | 30% | 35% | **31%** |
| RCF | 44% | 44% | 40% | 36% | 44% | 42% | **42%** |
| **Average** | **43%** | **41%** | **42%** | **39%** | **42%** | **44%** | **42%** |

*Sample weeks: Jan 5-11, 2026; Feb 2-8, 2026; March 2-8, 2026; April 6-12, 2026; May 4-10, 2026; and June 1-7, 2026 (the first full week of each month).

Although PDP reduced its combined supervisory position vacancy rate to approximately 20 percent, supervisory post vacancies averaged 42 percent systemwide and ranged from 31 percent at PICC to 52 percent at CFCF, PDP's most operationally complex facility. This disparity can be explained by deployment practices, leave utilization, training assignments, administrative responsibilities, or other factors that are limiting PDP's ability to consistently staff critical supervisory posts.

In August 2026, PDP reported that it had made an additional 15 sergeant promotions. These promotions should further reduce supervisor vacancy rates in the next reporting period. The Monitoring Team will evaluate whether these additional promotions result in a corresponding reduction in supervisor post vacancies and improved day-to-day supervisor coverage.

PDP's inability to consistently staff supervisory posts has implications beyond the staffing provision. Effective supervision is essential to achieving and sustaining compliance with numerous Agreement requirements. Supervisors are responsible for ensuring that sound disciplinary practices are used pursuant to Substantive Provision 8—Discipline, that Class Members receive required out-of-cell opportunities pursuant to Substantive Provision 2—Out-of-Cell Time, that sanitation and environmental health requirements are met pursuant to Substantive Provision 17—Sanitation, and that use-of-force standards are being met pursuant to Substantive Provision 18—Use of Force. Until PDP is able to consistently deploy supervisors to necessary posts and substantially reduce supervisor post vacancies, PDP will likely continue to face difficulty achieving or sustaining compliance with some Agreement requirements.

Through this reporting period, PDP continued to report an average loss of only six employees per month. This marks the fourth consecutive reporting period in which PDP had fewer than 10 voluntary separations per month. Therefore, employee retention is no longer a significant operational concern. Absent a sudden or substantial increase in voluntary separations in the future, this report contains the final update on employee retention.

In July 2026, PDP finalized the revision of its security post plan. The new post plan increased posts for ranks of Correctional Officer through Captain from 1,923, in place when the Agreement was entered, to 1,992 total posts for those positions.

This increase, based on PDP's internal analysis, reflects PDP's commitment to safe facility operations and long-term compliance with the Agreement.

The Monitoring Team will work with PDP in the next reporting period to determine which posts will be measured as mandatory security posts for compliance with this sub-provision. They will also establish a methodology for calculating post vacancy rates to determine when PDP is staffing at least 90 percent of mandatory security posts as required. Completion of the revised post plan marks an important milestone for PDP.

To achieve substantial compliance with this sub-provision, PDP should both stay the course in hiring and retention and address the high supervisory post vacancy rates systemwide. The Monitoring Team does not anticipate that PDP will achieve substantial compliance with this sub-provision in the next reporting period, but renewed attention to supervisor deployments would position PDP for compliance once it achieves its staffing requirements.

*Sub-provision 1.4—These measures [1.1-1.3] shall continue until this goal is achieved and thereafter to maintain the proper number of correctional officers.*

**Compliance Rating: Partial Compliance**

PDP has achieved substantial compliance with sub-provisions 1.1 and 1.2. To achieve substantial compliance with this sub-provision, PDP was first required to achieve compliance with sub-provision 1.3. Upon agreement of the Parties, monitoring of this sub-provision was terminated, effective April 30, 2026.[19]

Paragraph 1(a) of the Sanctions Order required Defendants to generate a list of outside recruitment firms with a proven track record of hiring for law enforcement agencies and submit the list for the Court's consideration. Defendants were further required to retain the selected firm within 90 days of the Court's approval, or January 21, 2025.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[20]

Paragraph 1(b) of the Sanctions Order requires the City to maintain continuous-fill hiring lists to accept applications for employment with PDP.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[21]

Paragraph 1(c) of the Sanctions Order requires Defendants to evaluate which departments within PDP may be served in full or in part by civilian employees. The evaluation was due for submission by September 16, 2024.

[19] Stipulated Order, *supra* note 2, at 1.
[20] Monitor's Sixth Report, *supra* note 15 at 22.
[21] *Id.* at 25.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[22]

Paragraph 1(d) of the Sanctions Order requires Defendants to identify companies capable of providing medical guarding of PDP's open ward patient population, as well as transporting patients to off-site medical appointments. Paragraph 1(d) further requires Defendants to commence contract negotiations with the selected medical guarding company. Defendants were required to identify companies by September 16, 2024, and initiate contract negotiations with the selected vendor by January 21, 2025.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[23]

Paragraph 1(e) of the Sanctions Order requires the City to immediately authorize PDP to offer additional double-time pay for any day of the week as necessary to staff all vacant shifts.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[24]

Paragraph 1(f) of the Sanctions Order requires that PDP appoint a Wellness Coordinator to oversee the PDP employee wellness program and that the City fund an adequate employee wellness program. Defendants were required to hire a Wellness Coordinator by November 14, 2024 and fund an adequate employee wellness program by January 13, 2025.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[25]

Paragraph 1(g) of the Sanctions Order states: "Within 60 days of the date of this Order, the City shall compare wages and non-wage benefits available to PDP employees and other City of Philadelphia employees and submit a description of any differences identified to the Monitor. The comparison shall include uniformed public safety personnel and all other PDP job classifications for which vacancy rates exceed ten percent."[26] The comparison was due for submission by October 15, 2024.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[27] Given PDP's compliance with hiring and retention of security staff, no additional analysis of security positions is required pursuant to this paragraph.

Regarding persistent maintenance vacancies, PDP successfully reclassified 10 existing, unfilled maintenance positions from Prison Trades Worker I to Prisons Trades Worker II–Maintenance Mechanic. The Maintenance Mechanic position requires a broader skill set for a higher total compensation package than the Prison Trades Worker I position. In March 2026, Defendants reported that four of the ten reclassified positions were filled.

---

[22] *Id.* at 24.
[23] *Ibid.*
[24] Monitor's Seventh Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 231 at 31 (E.D. Pa. Sept. 30, 2025).
[25] *Id.* at 30.
[26] Order, *supra* note 6, at 3.
[27] Monitor's Eighth Report, *supra* note 17, at 23.

By June 30, 2026, all HVAC, Maintenance Director, Engineer, and Group Leader I positions were filled. Prison Trades Worker I positions were staffed at six of seven authorized positions, reflecting a 14 percent vacancy rate, while Prison Trades Worker II positions were staffed at 16 of 18 total authorized positions, reflecting an 11 percent vacancy rate. The primary remaining staffing challenges involve supervisory maintenance positions, where only two of four Maintenance Supervisor positions and three of four Group Leader III positions were filled, reflecting 50 and 25 percent vacancy rates for those positions, respectively. Maintenance staffing has improved and PDP has largely addressed skilled trades vacancies. Supervisor vacancies and inefficient maintenance operations persist at DC/PHSW and MOD 3. No additional analysis from PDP pursuant to this paragraph is required at this time.

The Monitoring Team will continue to track maintenance vacancies until PDP complies with paragraph 4 of this Order, which requires the expansion of the U.S. Facilities contract until necessary maintenance is completed at all facilities. Findings from an analysis of the maintenance work order system are currently being finalized by the Monitoring Team, and PDP is expecting final reports from CGL. The Monitoring Team maintains that PDP's current City maintenance team is insufficient to correct existing maintenance deficiencies while also implementing a preventive maintenance schedule.

Paragraph 1(h) of the Sanctions Order requires Defendants to expand the timeframe for eligibility to rehire former employees from one year to five years following resignation. Defendants were required to increase the rehiring window by September 16, 2024.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[28]

Paragraph 1(i) of the Sanctions Order requires the City to expand the residency waiver to applicants residing outside the Commonwealth of Pennsylvania.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[29]

Paragraph 6(a) of the Sanctions Order requires the Commissioner to explore realistic, suitable options to relocate Class Members to other secure facilities and, by December 16, 2024, to report on the options identified.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[30]

---

[28] Monitor's Sixth Report, *supra* note 15 at 28.
[29] *Id.* at 25.
[30] *Id.* at 28.

Paragraph 8(b) of the Sanctions Order states: "The City shall, as required to comply with the mandates of this Order and the Settlement Agreement, hire or contract with a permanent full-time internal Compliance Coordinator" and "submit a staffing plan to the Court via the Monitor for approval."[31] The City was to hire a Compliance Coordinator by December 16, 2024 and submit a staffing plan by January 15, 2025.

*Defendants have partially complied with the requirements of this paragraph.* In this reporting period, PDP identified compliance staffing needs as part of its Overwatch organizational and post planning process. The proposed Overwatch structure includes two lieutenant positions, two sergeant positions, and two correctional officer positions dedicated to compliance functions. However, the Monitoring Team has not been provided with an organizational chart as promised in the previous reporting period, duty statements, reporting relationships, or an implementation plan explaining how these positions will function as an integrated Compliance Unit or support PDP's long-term compliance strategy.

As addressed under Substantive Provision 2—Out-of-Cell Time below, PDP's Data Analysis Unit successfully assumed responsibility for out-of-cell tracking and analysis in this reporting period. This task was previously performed by the Monitoring Team for eight reporting periods, and the Data Analysis Unit has demonstrated that PDP personnel are capable of performing this and other challenging compliance functions internally.

Generally, compliance management remains decentralized. Responsibilities for policy development, project management, internal compliance auditing and monitoring, corrective action, and performance measurement continue to be distributed among personnel as collateral assignments in addition to their full-time operational responsibilities. PDP has identified capable personnel to lead individual initiatives but has not established a Compliance Unit responsible for coordinating, monitoring, and sustaining compliance with the Agreement.

Paragraph 8(b)(ii) requires Defendants to submit a written status report detailing their progress toward implementation of the Sanctions Order by February 12, 2025. Subsequent status reports must be submitted on the first day of each quarter until otherwise directed by the Court.

*Defendants have continued to comply with the requirements of this sub-paragraph in this reporting period.*

[31] Order, *supra* note 6, at 9.

**Substantive Provision 2—Out-of-Cell Time**

*Sub-provision 2.1—Upon the entry of this Agreement, and no later than May 15, 2022, Defendants shall ensure that each incarcerated person at the Philadelphia Department of Prisons (PDP), with the exception of those who are housed in a designated segregation unit, shall be provided the following out-of-cell times for the following periods: (a) no later than May 15, 2022, no less than four hours of out-of-cell time each day; and (b) no later than August 1, 2022, no less than five hours of out-of-cell time each day.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this sub-provision, PDP was required to: (1) finalize a reliable out-of-cell tracking system; (2) track out-of-cell time using replicable methods; (3) document any reasons for failures to provide out-of-cell opportunities; and (4) demonstrate that Class Members in each non-restricted housing unit are offered at least five hours of out-of-cell time, each day, at least 90 percent of the time. However, each of these requirements are also captured under sub-provision 2.2. Upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[32]

*Sub-provision 2.2—The parties agree that out-of-cell times under normal operations of the PDP have ranged from 8-10 hours a day and increases in out-of-cell time should continue to be made beyond the August 1, 2022, standard, with a presumptive expected increase to six hours by October 15, 2022. The parties agree that this next step shall be based on the recommendations of the Court appointed Monitor, infra, para. 19, as to scope and timing. Accordingly, the Monitor shall provide recommendations to the Court, based on the Monitor's analysis of all relevant factors and proposals by the parties, on the next increase in out-of-cell time no later than October 1, 2022, and thereafter on a quarterly basis. See also para. 4, infra.*

**Compliance Rating: Partial Compliance**

Defendants will achieve substantial compliance with this sub-provision once PDP: (1) finalizes a reliable out-of-cell tracking system; (2) tracks out-of-cell time using replicable methods; (3) documents any reasons for failures to provide out-of-cell opportunities; (4) demonstrates that Class Members in each non-restricted housing unit are provided at least six hours of documented out-of-cell opportunities each day at least 90 percent of the time; (5) in consultation with counsel for the Parties and the Monitoring Team, identifies an appropriate benchmark for out-of-cell time during normal operations; and (6) demonstrates that each non-restricted housing unit consistently meets the agreed-upon benchmark for normal operations.

*Requirement 1: Finalize a reliable out-of-cell tracking system.* PDP has partially met this requirement. PDP completed deployment of its Radio Frequency Identification (RFID) system across all facilities. During the April 2026 site visit, staff routinely used the scanners to record Class Member movement in the Guardian RFID tracking system and generally demonstrated familiarity with the technology. Several employees acknowledged that competing priorities

[32] Stipulated Order, *supra* note 2, at 1.

occasionally cause them to omit scans. Because the reliability of RFID data requires consistent application, continued training, supervision, and mentoring remain necessary.

Although the RFID system is operational, PDP continues to rely on paper out-of-cell logs for compliance reporting because the platform has not yet been fully integrated with the jail management system (ATIMS). An integrated ATIMS out-of-cell tracking report was initially expected in September 2026, but, due to vendor delays, PDP now anticipates it will be available in December 2026.

As anticipated, reliance on paper logs continues to present reliability issues. During the April 2026 site visit, Subject Matter Expert (SME) Terri McDonald compared a random sample of paper out-of-cell logs with available closed-circuit television (CCTV) footage and found that approximately 50 percent of logs were inconsistent with the corresponding video. Documented out-of-cell start times generally preceded actual out-of-cell times by approximately 30 minutes because staff recorded start times based on when they were directed to begin out-of-cell operations rather than when cell doors were unlocked.

PDP has since provided additional guidance on accurate documentation of out-of-cell time. In the next reporting period, the Monitoring Team will review a combination of paper logs, electronically generated reports, if available, and CCTV to measure reliability of facility-specific tracking.

*Requirement 2: Track out-of-cell time using replicable methods*. PDP has met this requirement. PDP assumed responsibility for internally tracking out-of-cell time and calculating compliance with general population out-of-cell requirements. As recommended, with assistance from SME McDonald, PDP's Data Analysis Unit addressed technical issues and refined its tracking methods, which permitted the Monitoring Team to validate the results.

The same out-of-cell data analysis tool is used for both general population and restrictive housing out-of-cell time, which permits PDP to audit performance across both populations using a common methodology. This should strengthen routine internal quality review as internal tracking and reporting continues.

*Requirement 3: Document any reasons for failures to provide out-of-cell opportunities*. PDP has partially met this requirement. Personnel generally documented reasons when scheduled out-of-cell opportunities were missed or interrupted, including lockdowns, staffing shortages, security investigations, searches, and other events. Compared to previous reporting periods, these entries addressed some of the recurring documentation deficiencies and improved out-of-cell tracking.

In this reporting period, however, documentation deficiencies persisted at CFCF D-1 and D-2 Units, where personnel intermittently failed to record when out-of-cell time was provided and the reasons for failures to offer out-of-cell opportunities. Documentation deficiencies on these units complicated the compliance analysis and reduced reported performance for those housing units. These deficiencies were not representative of practices elsewhere, and enhanced supervision should address the issue in the next reporting period.

*Requirement 4: Demonstrate that Class Members in each non-restricted housing unit are provided at least six hours of documented out-of-cell opportunities each day at least 90 percent of the time.* PDP has partially met this requirement. Table 7 below represents the percentage of housing units in each facility meeting averages of at least five-, six-, seven-, and eight-hour benchmarks for out-of-cell time, January–June 2026.

**Table 7. Percentage of Housing Units Meeting Out-of-Cell Benchmarks**
January – June 2026

| Facility | Benchmark | | | |
|---|---|---|---|---|
| | ≥5 Hours | ≥6 Hours | ≥7 Hours | ≥8 Hours |
| CFCF | 47% | 37% | 24% | 21% |
| DC | 92% | 91% | 90% | 89% |
| MOD 3 | 95% | 95% | 94% | 91% |
| PICC | 84% | 78% | 64% | 47% |
| RCF | 94% | 92% | 90% | 64% |

DC, MOD 3, and RCF exceeded the requirement that housing units provide at least six hours of daily out-of-cell opportunities at least 90 percent of the time. These facilities also met higher benchmarks, demonstrating continued progress toward normal operations. DC consistently exceeded the five-, six-, and seven-hour benchmarks and nearly met the eight-hour benchmark throughout the reporting period. MOD 3 consistently exceeded all four benchmarks throughout the reporting period. RCF consistently exceeded the five-, six-, and seven-hour benchmarks, but compliance declined at the eight-hour benchmark.

CFCF and PICC did not achieve the 90 percent six-hour benchmark. At CFCF, challenges were concentrated in D-1 and D-2 Units, where both documentation and performance require additional attention. At PICC, compliance varied among units but generally declined with each higher benchmark. The women's Unit A averaged 4.5 hours in the first quarter and 4.1 hours in the second quarter. Unit F2 averaged 7.3 hours in the first quarter and 7.7 hours in the second quarters. Unit H averaged 7.6 and 7.7 hours in each quarter, respectively, and available data from Unit K reflected an average of 8.2 hours. Continued improvement in PICC's Unit A and stronger documentation and out-of-cell performance in CFCF's D-1 and D-2 Units should improve facility results in the next reporting period.

*Requirement 5: In consultation with counsel for the Parties and the Monitoring Team, identify an appropriate benchmark for out-of-cell time during normal operations.* PDP has not met this requirement. Now that PDP is tracking its out-of-cell time internally using a method that can be validated by the Monitoring Team, it may be well positioned in the next reporting period to propose an out-of-cell time goal for normal operations. If PDP is able to improve accuracy in reporting, correct inconsistent practices among housing units, and track performance at consistently higher benchmarks, the Monitoring Team anticipates that discussions about normal operations benchmarks can begin as additional data becomes available.

*Requirement 6: Demonstrate that each non-restricted housing unit consistently meets the agreed-upon benchmark for normal operations.* To meet this requirement, PDP must first establish a normal operations benchmark pursuant to *Requirement 5* above. As noted above, PDP continues to progress toward eight to ten hours out-of-cell time daily. Most general population housing units are scheduled for three daily out-of-cell periods totaling approximately nine hours. The remaining challenge is to implement out-of-cell schedules consistently and accurately document the opportunities provided.

**Substantive Provision 3—Out-of-Cell/Segregation**

*Sub-provision 3.1—Defendants shall ensure that persons on segregation units shall be provided: (a) no later than May 1, 2022, thirty minutes out-of-cell time on a daily basis and (b) no later than July 1, 2022, no less than one hour each day.*

**Compliance Rating: Partial Compliance**

Defendants will achieve substantial compliance with this sub-provision when PDP: (1) finalizes a reliable out-of-cell tracking system; (2) tracks out-of-cell time using replicable methods; (3) documents any reasons for failures to provide out-of-cell opportunities, including operational disruptions, security risks, and Class Member refusals; and (4) demonstrates that at least 90 percent of Class Members in all restricted housing units are offered at least one hour of out-of-cell time, free from mechanical restraints, each day.

*Requirement 1: Finalize a reliable out-of-cell tracking system.* PDP has partially met this requirement. As discussed above, personnel continued to use daily written logs pending the integration of RFID and ATIMS. Once the integration is complete, the Monitoring Team will be able to assess whether the electronic system alone will suffice for measuring compliance.

*Requirement 2: Track out-of-cell time using replicable methods.* PDP has met this requirement. As addressed above under Substantive Provision 2—Out-of-Cell Time, PDP has assumed responsibility for internal out-of-cell tracking, which the Monitoring Team was able to validate. Documentation deficiencies continue to impact reliability, but PDP's Data Analysis Unit is using sound methods to track documented out-of-cell time.

*Requirement 3: Document any reasons for failures to provide out-of-cell opportunities, including operational disruptions, security risks, and Class Member refusals.* PDP has partially met this requirement. In this reporting period, the Monitoring Team compared a sample of out-of-cell logs with CCTV footage for restricted housing units at CFCF. Unlike discrepancies identified in general population out-of-cell logs, restricted housing unit out-of-cell documentation corresponded more closely with operations observed on CCTV. This improves confidence in the accuracy of written logs on restricted housing units pending electronic integration. PDP is tracking when Class Members refuse out-of-cell opportunities but not the reasons for any refusals.

Restricted housing units generally maintained complete daily logs, and staff consistently documented refusals and operational reasons for failures to provide out-of-cell opportunities. The logs, however, do not fully capture the time Class Members spend outside of their cells. During the site visit, the Monitoring Team observed structured programming in most men's restricted housing unit dayrooms. Programming chairs were staged in the units and staff conducted organized activities with some Class Members. Because these activities did not appear to be reflected in the written logs, the data may underreport out-of-cell time provided.

*Requirement 4: Demonstrate that at least 90 percent of Class Members in all restricted housing units are offered at least one hour of out-of-cell time, free from mechanical restraints, each day.* PDP has partially met this requirement. In previous reporting periods, the Monitoring team calculated the average percentage of class members in men's restricted housing units who were offered daily out-of-cell opportunities by facility. In the January–June 2024 reporting period, no facilities were above 40 percent compliance. By July–December 2025, PICC's restricted housing unit had closed, but CFCF and RCF were reporting above 80 percent compliance. PDP's internal data analysis now permits housing-unit-level tracking, which reflects additional increases in the percentage of Class Members who were offered one hour of daily out-of-cell time in this reporting period. As of this filing, approximately 50 percent of Class Members were recreating without restraints. PDP expects that the remaining 50 percent will be recreating without restraints by October 2026. Table 8 below shows out-of-cell opportunities offered in the current reporting period by housing unit.

**Table 8. Percentage of Days Class Members in Restricted Housing Units Were Offered Out-of-Cell Opportunities and Average Refusal Rates, by Housing Unit**
January – June 2026

| Facility | Housing Unit | Q1 Offer Rate | Q2 Offer Rate | 6-Month Avg. Refusal Rate |
|---|---|---|---|---|
| CFCF | A1P1 | 87% | 89% | 32% |
| | A1P2 | 83% | 86% | 30% |
| | A1P3 | 82% | 86% | 33% |
| | A1P4 | 74% | 81% | 35% |
| | A2P1 | 88% | 72% | 26% |
| | A2P2 | 85% | 76% | 9% |
| | A2P4 | 80% | 83% | 22% |
| RCF | RHU | 92% | 96% | 30% |
| Women's RHU | E Unit | 86% | 86% | 10% |

RCF exceeded the 90 percent benchmark throughout the reporting period. At CFCF, A1 Pods 1 through 3 documented offering out-of-cell time from 82 percent to 89 percent of the time. A1 Pod 4 remained lower, at 74 percent and 81 percent in Q1 and Q2, respectively. A2 had more variability. A2 Pod 3 functioned as the Step-Down Unit rather than a traditional restricted-housing unit and is therefore excluded. The remaining A2 pods documented offering

out-of-cell time between 72 percent and 88 percent of the time. The women's restricted housing unit at PICC documented offering out-of-cell opportunities approximately 86 percent of the time.

The data discussed here reflects out-of-cell opportunities *offered* rather than *accepted*. Class Members interviewed during the reporting period consistently reported being offered out-of-cell time most days, which supports the documentation. Average refusal rates varied considerably, from approximately 10 percent in the women's restricted housing unit to up to 35 percent in areas of CFCF A1. Some units experienced higher refusal rates during specific months, but the six-month averages demonstrate notable differences in participation across housing units.

Given the harmful effects of isolation, lack of out-of-cell time is not acceptable whether it results from operational limitations or repeated Class Member refusals. PDP should be commended for substantially increasing daily out-of-cell opportunities but should evaluate refusal patterns and implement individualized strategies to increase participation in recreation and programming.

After consolidating men's restrictive housing at CFCF, PDP continued the construction of individual recreation yards. As refusals decrease and participation increases, existing recreation capacity will be increasingly strained and continue to require Class Members to recreate in restraints. In future reporting periods, once the recreation yards are implemented, the Monitoring Team will evaluate whether restraint-free recreation and appropriate social interaction reduce refusal rates and improve the amount of time Class Members spend outside their cells.

The Monitoring Team observed significant operational progress in the men's restrictive housing program. During the April 2026 site visits, the Step-Down Unit at CFCF was fully operational, orderly, well supervised, and among the cleanest housing units observed. Class Members assigned to the unit were routinely out of their cells for six to eight hours per day for programming and other structured activities. Programming also increased in other restricted housing unit dayrooms with the use of programming chairs to safely facilitate group activities.

These improvements have not yet been fully incorporated into policy or extended to the women's program. The Monitoring Team reviewed PDP's draft consolidated restrictive housing policy and provided comments. The draft reflects operational changes in the men's program, including the Step-Down Unit, but remains unfinished and does not establish a comparable framework for women's restrictive housing.

Data shows that the few Class Members in the women's restricted housing unit were offered one hour of daily out-of-cell time approximately 86 percent of the time and averaged approximately 51 minutes each day. However, they continue to recreate in restraints, no comparable Step-Down Unit has been established, and construction of walk-alone recreation yards has not begun. PDP must develop a comprehensive policy and physical plant strategy in the women's unit to provide for restraint-free recreation.

Overall, PDP improved its internal analysis, maintained more complete documentation that corresponds to CCTV footage at CFCF, expanded structured programming, implemented the men's Step-Down Unit, and advanced construction planning for the men's walk-alone recreation yards. Significant work remains before PDP achieves substantial compliance, however, including

RFID integration, continued validation of source documentation, restraint-free recreation, finalization and implementation of the restrictive housing policy, and the implementation of comparable improvements in the women's restricted housing unit.

*Sub-provision 3.2—Defendants further agree that they will continue their normal practice of not placing incarcerated people in segregation units due to the lack of space or staffing on other units.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this sub-provision, PDP was required to: (1) complete implementation of its alternative housing plan for Class Members who persistently engage in self-harming or other severe maladaptive behaviors; (2) demonstrate that Class Members meeting these criteria are being diverted from segregation to alternative housing, as appropriate; and (3) demonstrate that any initial segregation placements or extended segregation terms are not clinically contraindicated for Class Members meeting these criteria. Upon agreement of the parties, the requirements of this sub-provision are now incorporated into Substantive Provision 6—Behavioral Health in Segregation, and monitoring of this sub-provision was discontinued, effective April 30, 2026.[33]

**Substantive Provision 4—Resume Normal Operations**

*By November 1, 2022, based on discussions between the parties and the Court-appointed Monitor, the parties and the Monitor shall submit to the Court a plan for a return to normal operations of the PDP (regarding out-of-cell time, programming, visits, and other services). During the period that precedes a return to normal operations, if the Monitor determines that the Defendants are not providing the agreed-upon out-of-cell time, Defendants must provide specific reasons for non-compliance to the Plaintiffs and the Monitor. The parties and the Monitor shall then engage in discussions to resolve the issues in dispute. If no agreement is reached, Defendants may move for the amendment or modification of these provisions, but only upon good cause shown, and the Plaintiffs may move for appropriate intervention by the Court, including possible contempt of court sanctions.*

**Compliance Rating: Partial Compliance**

PDP reports that incorporating all of its reform efforts into a single operations plan requires additional time to finalize and does not anticipate finalizing a plan in 2026.

[33] *Id.* at 1-2.

***Restorative and Transitional Services***

> Paragraph 3(a) of the Sanctions Order states: "Within 60 days of the date of this Order, the City shall identify and provide to the Monitor competent outside consultant(s) to conduct an objective evaluation of the [RTS division's] functions and effectiveness. Within 60 days of approval by the Court, the City shall engage the identified consultant(s). The evaluation shall include at a minimum, a comparative analysis of programs proven effective in other comparable detention/correctional facilities, and a recommendation for performance metrics against which to assess the performance of PDP employees working in RTS."[34] The identification of an outside consultant was due by October 15, 2024.
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[35]

Previous Monitor's reports contained RTS staffing data, including allocated and filled positions.[36] Pending a new staffing plan that should be developed as part of RTS reform, little has changed in this reporting period. RTS maintains 104 allocated positions and approximately 100 filled positions for a low vacancy rate.

Regarding enhanced educational and rehabilitative programming for Class Members, PDP reports it continued to work on needs assessment protocols in this reporting period and met with Class Members to identify programming they believe will benefit them upon release. PDP reports that it has relied on the assessment from its contractor Independent Variable (IV) to develop a new program model but that they are still in the initial phases of the process. As such, PDP has not developed a corresponding program budget or staffing plan for RTS and does not anticipate finalizing a program budget or staffing plan in 2026.

Without adequate funding, RTS will continue to be significantly hindered in its ability to provide programming, which is essential for Class Members while in custody and for successful reentry. PDP currently reports expenditures of approximately $1.5 million per year for contracts with individual program vendors. However, the greatest number of Class Members continue to receive services through volunteer and community providers. In this reporting period, the RTS executive team continued to focus largely on securing grant funding and additional volunteer program providers. PDP executives report that PDP requested an additional $1.1 million for programming, equipment, and repairs for the PDP skills center for the 2027 fiscal year, but that the request was denied.

As previously reported, RTS did not maintain reliable data about the number of Class Members served from 2022 through part of 2025.[37] RTS has since begun to track its provision of services and is able to provide data about programs offered for the two most recent reporting periods. Current RTS contracts are aimed at workforce development and training and include classes for Heating, Ventilation, and Air Conditioning (HVAC) Technician; Commercial Driver's License;

---

[34] Order, *supra* note 6, at 5.
[35] Monitor's Eighth Report, *supra* note 17, at 46.
[36] Monitor's Seventh Report, *supra* note 24, at 52.
[37] *Id.* at 50.

and Environmental Maintenance. The contract for Flagging (traffic control for events, construction sites, etc.) was not used this reporting period because the contractor had difficulty filling the instructor position. The number of Class Members served through PDP's contracts remains exceptionally low, as illustrated in Table 9 below, which reflects the number of Class Members who were registered or completed training and obtained certifications during this reporting period. PDP should evaluate current services provided to ensure Class Members are receiving the full value of each contract and that vendors are performing to expectations.

**Table 9: Training and Certifications Completed by Class Members through RTS**
July 2025 – June 2026

| Training/Certification | July-Dec 2025 | Jan-June 2026 |
|---|---|---|
| HVAC Technician | 32 | 25 |
| Commercial Driver's License | 15 | 64 |
| Environmental Maintenance | 8 | 46 |
| Flagger | 48 | 0 |
| **Total** | **103** | **135** |

PDP continues to report that class sizes and lengths of programs vary, but the average class size is 20 Class Members with sessions ranging from 1 to 12 weeks. Through a laborious hand count in the seventh reporting period, RTS estimated that up to 25 percent of Class Members participate in some form of programming at some point during their incarceration. RTS did not repeat the count in this reporting period but estimates similar participation percentages. In addition to contracted services reported above, PDP reports that RTS and volunteer providers also offer cognitive behavioral therapy, substance use treatment, life skills, and pre-release classes. RTS is currently developing a dashboard that will assist with tracking and anticipates being able to generate additional program participation data in the future.

RTS also reports continuing to provide educational services through Adult Education and Pennypack House School, which serves PDP's incarcerated youth and adults. During the previous reporting period, Adult Education data reflected that 13 students had completed their GED tests and earned GED Certification. Pennypack House School, which focuses on Class Members who are 22 and under, reported having awarded 43 high school diplomas during the most recent academic school year.[38] During this reporting period, Adult Education reports nine GED completions, and Pennypack House School reports awarding 39 high school diplomas.

PDP continues to report strong support from the Volunteer Services Unit's network of volunteers. Without an operating budget, RTS volunteers maintain a critical role in RTS operations. RTS and IV reportedly developed a new process for vetting and onboarding new volunteer applicants and developed a new Volunteer Services dashboard that is being utilized to quantify services offered.

[38] Monitor's Eighth Report, *supra* note 17, at 48.

As previously reported, on September 8, 2025, PDP opened a Reentry Center in partnership with the City of Philadelphia Division of Reentry with a goal of offering services to Class Members as they are released from custody.[39] PDP reported that, from its opening through the end of 2025, more than 920 returning community members have visited the Reentry Center, and 569 (62 percent) of them have accepted services. From January through June 2026, PDP reports that an additional 1,430 returning community members have visited the Reentry Center, with 952 (67 percent) accepting services. PDP reports that in 2026, the Defender Association began staffing the Reentry Center with a member of their team to provide case management support with legal follow-up. PDP also reports that the Forensic Behavioral Health Navigator hired by the Department of Behavioral Health and Intellectual Disability is stationed at the Reentry Center at various times during the work week.

The Reentry Center tracks several data points, including requested support, case-related follow-up, medication information, referrals made, and consent for follow-up. Data regarding identified needs and completed referrals is shown in Tables 10 and 11 below, and the numbers reflect an increase and expansion of services during this reporting period.

**Table 10: Identified Needs, PDP Reentry Center**
September 2025 – June 2026

| Identified Need | Sep 2025-Dec 2025 | Jan 2026-June 2026 |
|---|---|---|
| Identification | 312 | 488 |
| Employment | 233 | 347 |
| Housing | 159 | 158 |
| Food | 135 | 23 |
| Vocational Programs | 127 | 170 |
| Clothing | 115 | 64 |
| Mental Health Support | 57 | 95 |
| Medical Care | 53 | 65 |
| Substance Use Support | 44 | 40 |
| **Total** | **1,235** | **1,450** |

[39] *Id.* at 49.

**Table 11: Completed Referrals, PDP Reentry Center**
September 2025 – June 2026

| Identified Need | Sep 2025-Dec 2025 | Jan 2026-June 2026 |
|---|---|---|
| Identification | 312 | 647 |
| Employment | 157 | 256 |
| Housing | 88 | 125 |
| Case Management | 76 | 106 |
| Clothing | 49 | 48 |
| Transportation | 45 | 45 |
| Substance Use Treatment | 22 | 32 |
| Medical* | – | 58 |
| Mental Health* | – | 45 |
| Free Phone* | – | 52 |
| **Total** | **749** | **1,414** |

*These referral options were new as of the current reporting period.

PDP reports that by the end of 2026, PDP will reopen Reentry Resource Centers at CFCF and RCF and expand programs to include resume writing, interview skills, and mock job interviews. PDP has also revived its work release program, which opened during this reporting period, to support Class Members with employment, schooling, and vocational opportunities pre-release.

**Substantive Provision 5—Healthcare**

*The Defendants shall provide adequate and timely medical and mental health treatment to all incarcerated persons. The Defendants agree to institute the programs and measures (referred to as "the Backlog Plan") set forth by Bruce Herdman, PDP Chief of Medical Operations, at his deposition of March 21, 2022, to address the existing backlog. The "Backlog Plan" is a new, three-month effort to see backlogged patients as soon as possible. The City has allocated substantial funding to allow Corizon Health services to engage additional agency staff to augment its full-time staff to further reduce backlogs. Four agencies are contracted to provide staff towards this end. Agencies will provide additional providers, including MD/DOs, NPs, LCSWs, and RNs for this effort. Based on these programs and measures, the Defendants agree to substantially eliminate the existing backlog by August 1, 2022, and thereafter to continue addressing any remaining backlog consistent with these programs and measures. Substantial elimination shall mean reduction to a backlog of no more than ten to fifteen percent of the current backlog.*

**Compliance Rating: Substantial Compliance (achieved March 31, 2026)**

Upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[40]

[40] Stipulated Order, *supra* note 2, at 1.

***Additional requirements pursuant to the Sanctions Order:***

Paragraph 2(a) of the Sanctions Order states: "The City shall increase the budget for YesCare to provide additional healthcare staffing to serve as liaisons between security personnel and healthcare providers, to expand healthcare services to meet the current and future needs of the patient population, and to provide routine rounding in all housing units due to limited out-of-cell time.

(i) Rounding shall occur at least three times per week in all units until the PDP comes into substantial compliance with required out-of-cell time.

(ii) The budget increase shall be sufficient to allow YesCare to provide additional staff members as necessary to ensure substantial compliance with substantive provisions 4 ("Return to Normal Operations"), 5 ("Healthcare"), and 6 ("Behavioral Health in Segregation") of the Settlement Agreement."[41]

*Defendants have partially complied with the requirements of sub-paragraph 2(a)(i).* Regarding additional medical rounding, the Monitoring Team recommended a modified implementation plan for additional rounding in general population housing units. If Class Members in any general population housing unit do not receive at least one hour out-of-cell time on any given day, housing unit personnel will notify healthcare administration, and healthcare personnel will then round on any impacted patients in that unit. Notifications received before 2 p.m. will result in rounding the same day. Notifications received after 2 p.m. will result in rounding the following day if Class Members have remained in their cells. PDP initially anticipated finalizing this policy by the end of 2025. In July 2026, the policy was finalized and implemented. Data should be available in the next reporting period.

*As previously reported, Defendants have complied with the requirements of sub-paragraph 2(a)(ii).*[42]

Paragraph 2(b) of the Sanctions Order requires the City to fund an Access-to-Care Team, to be housed within the Commissioner's Office, and to include, at a minimum, one Deputy Commissioner, one Access-to-Care Manager at a correctional peace officer management rank, one secretary, one analyst, and at least five Health Care facilitators assigned to PDP facilities. The Access-to-Care Team was required to be operational by February 12, 2025.

*As previously reported, Defendants have complied with the requirements of this paragraph.*[43]

[41] Order, *supra* note 6, at 3-4.
[42] Monitor's Eighth Report, *supra* note 17, at 61.
[43] Monitor's Seventh Report, *supra* note 24, at 70.

> Paragraph 2(c) of the Sanctions Order states: "Where medical care can properly be rendered using telehealth services, the City shall take all reasonable and necessary steps to employ such services to reduce the number of staff assigned to transport duties, even if the marginal cost of telehealth services is higher than that of in-person visits."[44]
>
> *As previously reported, Defendants have complied with the requirements of this paragraph.*[45]

**Substantive Provision 6—Behavioral Health in Segregation**

*By September 30, 2022, the PDP and [YesCare] shall re-establish a mental health program for persons who are in segregation status.*

**Compliance Rating: Partial Compliance**

By agreement of the parties, sub-provision 3.2 will now be incorporated into Substantive Provision 6—Behavioral Health in Segregation.[46] Requirements for compliance with that sub-provision are now incorporated into the following revised compliance requirements for Substantive Provision 6.

To achieve substantial compliance with this substantive provision, PDP must, at a minimum: (1) resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status; (2) ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status; (3) resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating serious mental illness (SMI); (4) resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status; (5) establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units; (6) safely discontinue the use of segregation for Class Member patients due to insufficient Transition Unit (TU) housing, and complete implementation of its alternative housing plan for Class Members who persistently engage in self-harming or other severe maladaptive behaviors; (7) demonstrate that Class Members meeting these criteria, and those with Behavioral Health (BH) and SMI designations, are being diverted from segregation to alternative housing, as appropriate; (8) significantly reduce the use of segregation for Class Member patients who require placement on the BH caseload; and (9) discontinue the use of extended segregation for Class Members with SMI designations.

---

[44] Order, *supra* note 6, at 4.
[45] Monitor's Eighth Report, *supra* note 17, at 62.
[46] Stipulated Order, *supra* note 2, at 2.

*Requirement 1: Resume the provision of daily medical/physical health rounds for each Class Member patient placed on punitive or administrative segregation status.* PDP has partially met this requirement. PDP had variable compliance with this requirement over several reporting periods. In recent reporting periods, PDP made efforts to internally audit and monitor compliance, which Healthcare recognizes supports the quick identification and correction of any lapses.

Data from a December 2025 audit reflected 77 percent, or partial compliance, with physical health rounding. Site-specific compliance was 74 percent at CFCF, 70 percent at PICC, and 84 percent at RCF. Healthcare explained previously that lapses were caused by personnel absences and individual failures to round.[47] This reporting period included data from four physical health rounding audits and reflects marked improvement and compliance with the requirements of this provision, as shown in Table 12 below.

**Table 12: Compliance with Daily Physical Health Rounding in Segregation**

January, February, March, and May 2026

| Facility | Jan 2026 | Feb 2026 | March 2026 | May 2026 |
|---|---|---|---|---|
| **CFCF** | 84% | 96% | 93% | 100% |
| **PICC** | 93% | 89% | 86% | 100% |
| **RCF*** | 86% | 91% | – | – |
| **Overall Compliance** | **85%** | **95%** | **92%** | **100%** |

*Men's restrictive housing was consolidated at CFCF after February 2026.

Since February 2026, PDP has maintained over 90 percent overall compliance with the daily physical health rounding requirement, though there were instances of less than 90 percent facility compliance at PICC during that time period. The most recent audit, utilizing data from May 2026, reflects that PDP has met the 90 percent requirement regarding physical health rounding by achieving 100 percent compliance in every restricted housing unit systemwide. PDP attributes increased compliance to the consolidation of men's segregation housing at CFCF. If PDP sustains 90 percent compliance throughout the next reporting period, PDP will have met this requirement.

*Requirement 2: Ensure that behavioral health clearances are completed consistent with PDP policy for each Class Member patient placed on segregation status.* As previously reported, PDP has met this requirement.[48] Monitoring is discontinued.

*Requirement 3: Resume the provision of weekly behavioral health rounds for each Class Member patient on segregation status who is navigating SMI.* PDP has met this requirement. Previous audits in June and December 2024 and March and December 2025 showed high rates of compliance with weekly behavioral health rounding systemwide. A March 2025 audit showed a lapse in site-specific compliance at PICC, which only met weekly rounding requirements

---

[47] Monitor's Eighth Report, *supra* note 17, at 63.

[48] *Id.* at 64.

67 percent of the time. This was corrected, and audits in June 2025 and December 2025 showed site-specific compliance systemwide.[49] During this reporting period, audits from January, February, March, and May 2026 all reflect 99 to 100 percent compliance with required behavioral health rounding.

In each reporting period, the Monitoring Team has observed patients in restricted housing units who required a higher level of care. PDP maintained that clinical staff were able to request further evaluation from clinical supervisors if they believed a patient required enhanced care or advocacy, but these requests were not tracked and staff indicated they were rare.[50] Then, in the seventh reporting period, the Behavioral Health Director reported that modifications to the Electronic Medical Records (EMR) template had been made that allow clinical staff to document referrals for further evaluation. SME Dr. Tim Belavich reviewed a sample for April 2025, which reflected 11 instances of rounding staff referring patients in segregation for further evaluation. Referrals were thorough and contained detailed notes for each patient. In the eighth reporting period, the Behavioral Health Director reported that seven patients were diverted from punitive segregation after placement and did not return to segregation.

In this reporting period, Dr. Belavich reviewed a sample of 10 clinical notes of individuals who were identified through behavioral health rounding as either needing evaluation by Behavioral Health or requesting a referral for behavioral health services. As with previous reviews, notes were thorough and contained information to assist the clinical staff in completing the evaluation.

Consistent weekly behavioral health rounding, individualized charting with the addition of the EMR template, and frequent quality-of-care reviews by the Behavioral Health Director are now all occurring. Because PDP has consistently shown strong compliance with behavioral health rounding, and individualized notes reflect that Class Members are being appropriately identified and referred for behavioral health services through this process, monitoring of this requirement will be discontinued in subsequent reporting periods.

*Requirement 4: Resume the provision of group services for no fewer than 10 hours per week for each Class Member patient on segregation status.* PDP has partially met this requirement. PDP data reflects a significant improvement in PDP's ability to deliver the "Positive Change/Positive Outcomes" (PC/PO) behavioral health group treatment program for patients in segregation in this reporting period. Healthcare attributes improvements to the consolidation of men's segregation at CFCF in March 2026 and reductions in the segregation populations.

PC/PO is designed to deliver group treatment for two hours, five days per week, for a total of 10 possible treatment hours each week for every program participant. PDP tracks the number of treatment hours possible based on Behavioral Health staff availability ("treatment hours possible"), the number of treatment hours provided based on both healthcare and security staff availability ("treatment hours provided"), and the treatment hours necessary for PDP to comply with the requirement that each patient is offered 10 hours per week ("treatment hours required"). Table 13 below reflects total PC/PO group treatment hours possible with current healthcare

---

[49] *Ibid.*

[50] Monitor's Fourth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 204 at 43 (E.D. Pa. Mar. 29, 2024).

staffing versus hours offered to segregated patients, along with total treatment hours required, January – June 2026.

**Table 13: PC/PO Structured Group Treatment Hours in Segregation**
January – June 2026

| Month | Treatment Hours Possible | Treatment Hours Provided | % of Possible Hours Provided | Treatment Hours Required | % of Required Hours Provided |
|---|---|---|---|---|---|
| January | 536 | 161 | 30% | 947 | 17% |
| February | 336 | 106 | 32% | 757 | 14% |
| March | 593 | 277 | 47% | 748 | 37% |
| April | 788 | 556 | 71% | 818 | 68% |
| May | 794 | 437 | 55% | 753 | 58% |
| June | 836 | 371 | 44% | 742 | 50% |
| **Total** | **3,883** | **1,908** | **49%** | **4,765** | **40%** |

In the previous reporting period, PDP was only able to deliver 17 percent of the total treatment hours required.[51] In this reporting period, the number of treatment hours provided significantly increased, to 40 percent of required hours over the entire reporting period and 59 percent of treatment hours required in April, May, and June. The Behavioral Health Director reported that she has worked closely with security executives to create a schedule that increases the provision of required PC/PO hours and that meetings are held regularly to sustain incremental progress.

Healthcare reports that plans to make some aspects of PC/PO programming available to patients on tablets are ongoing. The feasibility of this initiative is reportedly being explored with the new healthcare vendor. As previously reported, PDP continues to maintain that tablet programming participation would be voluntary, does not replace in-person structured treatment, and does not count toward treatment hours for compliance purposes.[52]

*Requirement 5: Establish a reliable mechanism to identify all Class Member patients on segregation status who are not housed in identified segregation units.* As previously reported, PDP has met this requirement.[53] Monitoring is discontinued.

*Requirement 6: Safely discontinue the use of segregation for Class Member patients due to lack of sufficient TU housing, and complete implementation of an alternative housing plan for Class Members who persistently engage in self-harming or other severe maladaptive behaviors*. PDP has partially met this requirement. Dr. Belavich continues to maintain that PDP should discontinue the placement of SMI patients in segregation unless no alternatives exist.
Dr. Belavich further determined that given PDP's current segregation practices, PDP should

---

[51] Monitor's Eighth Report, *supra* note 17, at 66.
[52] Monitor's Sixth Report, *supra* note 15, at 67.
[53] Monitor's Fifth Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-GAM, Dkt. 24 at 57 (E.D. Pa. Sept. 30, 2024).

discontinue extended segregation terms for all SMI patients. The isolation of the segregation environment is dangerous for patients navigating SMI and may increase the likelihood of self-harm, suicidal or other violent ideation, worsening of symptoms, and other forms of psychiatric decompensation. PDP must ensure that it has sufficient TU space for all patients who may benefit from TU services and sufficient alternative housing for Class Members who require a TU level of care but cannot be safely admitted to a TU for behavioral reasons.

***TU Capacity and Programming***

In February 2026, when the segregation population was consolidated at CFCF, PDP opened its 128-bed men's TU at RCF. PDP is aware of the challenges with managing such a large TU but has maintained that PDP has sufficient staffing and space to address any challenges that may arise. PDP reports the unit is capped at 100 patients to ensure programs run smoothly. Executives report they will consider increasing the capacity should the need arise.

In December 2024, the men's TU had 42 patients. By April 2025, the population had increased to 56 patients, and to 60 patients in November 2025. In April 2026, the now-larger TU remained at 60 patients with several patients awaiting transfer to the unit. PDP reported that transfers typically took fewer than five days once the need for the TU level of care was identified. PDP reports that, as of July 2026, the TU had 68 patients with a waitlist of 8 patients. The wait was reportedly caused by a lice outbreak that required management prior to transfer.

The women's TU remains at PICC C-Unit, which has a 128-bed capacity. Of these, 34 beds are currently reserved for TU patients, though PDP reports capacity can increase as needed. In June 2024, the women's TU had 16 patients. In April 2025, the program had nearly doubled to 31 patients. During the Monitoring Team's tours in November 2025 and April 2026, there were 21 patients on the women's TU. PDP reports that as of June 30, 2026, there were 23 patients on the women's TU. Given the consistency of the patient population over time, and successful population reductions, PDP has demonstrated sufficient capacity for patients requiring care in the women's TU.

As previously reported, PDP has made efforts to enhance services in the women's TU with additional informal opportunities for socialization and recreation.[54] A rescue dog also continued to reside on the unit for multiple reporting periods. Group programming is provided daily and each patient is offered at least 10 hours of structured treatment per week. Finally, PDP has created opportunities for some TU participants to hold jobs either on the unit or in other areas of the facility.

The Behavioral Health Director tracks admissions to the TUs and reported 142 admissions to the men's TU from January through June 2026 and 35 admissions to the women's TU during the same period. The Behavioral Health Director also reports that she plans an additional SMI chart review to ensure all those who can benefit from TU services have been identified. She anticipates completing the review in the next reporting period.

---

[54] Monitor's Seventh Report, *supra* note 24, at 75.

PDP also continues to report increased programming opportunities and informal out-of-cell activities in the TUs. The Behavioral Health Director reports that behavioral health counselors, an activity therapist, social workers, nursing staff, and licensed psychiatric technicians currently provide structured group programming on both the men's and women's TUs. Group treatment is offered Monday through Friday with morning and afternoon groups, for a total of 10 hours on weekdays, and additional treatment is offered on weekends as staffing permits. Healthcare's current goal is to ensure that each TU patient attends at least one group per day and that clinicians follow up with any patients who refuse in order to encourage their participation. PDP also reports the recent introductions of a horticulture curriculum and the Seeking Safety curriculum, which focuses on substance use and trauma. In the men's TU, PDP created four separate treatment areas within the larger unit for smaller group programming, and personnel use the day room for larger groups. The smaller treatment areas and an outdoor recreation area allow for multiple programs to be held simultaneously.

In previous reporting periods, TUs had single-assignment security personnel, which is critical for continuity of care and interdisciplinary coordination about such issues as medication compliance, personal hygiene, and other factors that promote patient wellness. TU officers were uniquely skilled in working with TU patients and received additional training from Behavioral Health in working with patients. PDP discontinued the single-assignment staffing model for some months in 2025, but had resumed it by the November 2025 site visits and maintained it through this reporting period. PDP leadership reports that they understand the importance of this staffing model for the success of the TU programs and are committed to single-assignment staffing going forward. Dr. Belavich is confident that PDP now has sufficient TU space for all patients who may benefit from that level of care and are able to program successfully on the unit.

***Alternative Housing Plan***

In June 2024, PDP re-activated its mental health step-down unit in PHSW Unit 107. This unit existed pre-COVID-19 and treats patients who have been discharged from PHSW but may not be ready to return to their previous housing or to a TU. The 15-bed unit provides an opportunity for patients to participate in individual and structured programming and for PDP healthcare staff to determine an appropriate housing placement. During the November 2025 site visits, the unit was at capacity and staff reported periodic, short waitlists for beds on the unit. During the April 2026 site visit, personnel reported that the unit was at capacity but there were no recent waitlists. They reported waitlists were now rare because the larger men's TU has capacity to accept patients when they are ready for transfer. Current programming in the unit includes three therapeutic groups per day on weekdays and at least one group per day on weekends. Groups are led by nurses, social workers, Behavioral Health nurse practitioners, and activity therapists.

PDP is also required to find alternatives to segregation for patients who require a TU level of care but whose behavior prevents them from being safely housed in the TU. These patients may or may not have SMI or BH designations and tend to spend extended periods of time in segregation or cycling between segregation, PHSW, TUs, and general population housing. They may require frequent trips to local area emergency departments and significant security and clinical resources.

In this reporting period, Behavioral Health documented offering specialized services to 14 patients with BH or SMI designations, who required a TU level of care but were housed in either segregation or general population. PDP reports that these specialized services typically include three psychoeducational interactions with Behavioral Health personnel per week. PDP's provision, and now tracking, of these services is commendable, but these patients require a higher level of care than is currently being provided. Also, some Class Members with severe behavior management issues may not meet the criteria for the BH caseload and would not be eligible for enhanced BH services in segregation. These Class Members still require incentive-based, individualized services, however, which they are not currently receiving.

In 2023, PDP piloted the Functional Behavior Support Unit (FBSU) to treat these patients with individualized incentives designed to reduce the frequency and severity of their maladaptive behaviors. Although the unit reported initial success, it was staffed with personnel who were not allocated for this purpose and the FBSU was closed for five months between March and August 2024. Since it reopened in 2024, the FBSU has not operated as envisioned and gaps in care persist.

In 2025, PDP reported that only eight patients received services on the FBSU for the entire year. In this reporting period, eight Class Members were reportedly referred to the FBSU but only three were admitted. Of the other five, two were reportedly rejected due to physical plant and security staff limitations, two reportedly refused participation, and one was rejected by the contracted psychiatric provider.

Since its inception, PDP has recognized that FBSU referrals and admissions have been low and likely do not reflect the number of Class Members who may benefit from treatment on this unit. During previous site visits, some security and healthcare staff were unaware that the FBSU exists, which may explain low referral rates. In the previous reporting period, the Deputy Commissioner of Security Operations reported that staff were again informed of the program, its mission, and the referral process, verbally and in writing.[55] During the November 2025 site visits, segregation personnel identified patients to the Monitoring Team who may benefit from the program but reported that they were told the FBSU was not accepting referrals. During the April 2026 visit, staff were aware of the FBSU and the referral process but also of the extremely small admittance rate.

Another factor that has limited the effectiveness of the FBSU is PDP's policy that placement and retention on the unit is voluntary and that patients may refuse admission or transfer out of the unit upon request. During the April 2026 and July 2026 site visits, the FBSU had only one patient. Security personnel on the unit reported that they had not received FBSU-specific training, and that due to the low FBSU patient census, the unit is also being utilized for other purposes, such as the housing of Class Members who are difficult to place because of their security level or criminal case factors. RTS is responsible for the treatment of FBSU patients and in April and July 2026 reported insufficient personnel resources to meet FBSU treatment needs. The voluntary admission and discharge policy, overly restrictive admittance criteria, reported physical plant limitations, lack of consistent security and clinical personnel, and insufficient clinical resources has rendered the FBSU ineffective.

[55] Monitor's Eighth Report, *supra* note 17, at 35.

In August 2026, PDP reported that it was considering a new option for the housing and treatment of these patients as an alternative to segregation. A significant barrier to the implementation of PDP's alternative housing plan is disagreement within PDP about whether treatment and services should be the responsibility of Healthcare or RTS. Despite efforts by the Monitoring Team to propose solutions and mediate this issue over multiple reporting periods, the longstanding internal point of contention continues to stall progress and impact care. Resolution requires the Commissioner to make a decision and direct personnel to proceed accordingly, both of which should happen immediately. The Monitoring Team will provide additional detail in the next reporting period and will continue to evaluate PDP's development of behavioral health housing capable of safely treating Class Members with severe maladaptive behaviors while minimizing unnecessary isolation.

*Requirement 7: Demonstrate that Class Members with BH or SMI designations are being diverted from segregation to alternative housing, as appropriate.* PDP has partially met this requirement. In this reporting period, the Behavioral Health Director implemented a tracking system to identify those who are diverted from segregation and retained in a TU setting or admitted to the PHSW, and to record when rules violations that would typically result in punitive segregation placements are instead resolved with assistance of TU staff.

Initial data from January 2026 through March 2026 reflects 60 instances (36 at RCF and 24 at PICC) of SMI patients who were evaluated for disciplinary infractions. Of the 60 cases, 45 Rules Violation/Mental Health Review forms were completed and 15 could not be located. It is unclear whether forms were not completed or were completed and lost. However, circumstances and outcomes of all 60 instances were reviewed. In 27 cases (45 percent), patients were placed in segregation. Seven of these originated from the TU. In 25 cases (42 percent), patients remained on the TU or in general population rather than being placed in segregation, and in 8 cases (13 percent), they were diverted to PHSW. When individuals are retained on their units, they may have privileges temporarily revoked. Of the 60 cases evaluated, some type of mitigation occurred 55 percent of the time, though mitigating factors were identified in only 2 of the 45 evaluations with accompanying forms where patients were retained on the TU rather than being placed in segregation.

In the next reporting period, the Behavioral Health Director indicates clinicians will receive additional training in the identification of patients who require mitigation evaluations, the completion of required documentation, and the identification and documentation of any mitigating factors. Dr. Belavich continues to maintain that SMI patients should only be placed in segregation for limited durations and when no alternatives exist. PDP is making progress in diverting patients, but the fact that 45 percent of SMI patients with disciplinary infractions continued to be placed in segregation in this reporting period is indicative of the gaps that remain in alternative placement options, as discussed above.

*Requirement 8: Significantly reduce the use of segregation for Class Member patients who require placement on the BH caseload.* PDP has met this requirement. PDP continued to reduce its total restrictive housing populations in this reporting period to its lowest level since reporting began in 2022. The six-month average across both administrative and punitive segregation decreased from 177 Class Members during July – December 2025 to 150 during

January – June 2026. The reductions are encouraging and reflect improvements in staffing, classification practices, step-down programming, and alternatives to restrictive housing.

During the reporting period, PDP also retained nationally recognized classification expert James Austin to assist with administrative segregation practices, protocols, classification decisions, and documentation. This work began during the current reporting period and will continue through the next six months. It provides an important opportunity to build on PDP's substantial population reduction by improving placement decisions, retention reviews, and documentation.

BH patients had been consistently overrepresented in segregation since December 2022 when the Monitoring Team began collecting this data. Over 18 months, from January 2024 to June 2025, the percentage of BH patients in segregation was consistently higher than the overall percentage of BH patients in the jail. From January through June 2026, however, BH patients were no longer overrepresented in segregation. The BH patient population that is also designated SMI has remained consistently underrepresented on segregation status for 30 months from January 2024 through June 2026.

Table 14 below depicts the percentage of SMI and BH patients in segregation on specific dates in June 2024, January 2025, June 2025, January 2026, and June 2026 and compares those rates to the overall population of PDP.

**Table 14: SMI and BH Class Members in Segregation,**
**Compared to Total PDP Population, Five Sampled Days**
June 2024 – January 2026

| Sampled Date | Total Population | | | Segregation Population | | | | |
|---|---|---|---|---|---|---|---|---|
| | PDP Total | % BH | % SMI | PDP Total | % BH | # BH | % SMI | #SMI |
| June 30, 2024 | 4,574 | 37% | 7% | 290 | 46% | 133 | 5% | 15 |
| Jan. 10, 2025 | 4,190 | 37% | 6% | 276 | 47% | 130 | 5% | 14 |
| June 26, 2025 | 3,560 | 40% | 7% | 179 | 46% | 82 | 3% | 5 |
| Jan. 9, 2026 | 3,514 | 40% | 12% | 199 | 25% | 50 | 7% | 14 |
| June 5, 2026 | 3,109 | 32% | 12% | 143 | 26% | 37 | 9% | 13 |

Segregation data from select dates in June 2024, January 2025, and June 2025 shows that patients on the BH caseload totaled between 37 and 40 percent of PDP's overall population. BH patients represented 46 to 47 percent of the segregation population during that timeframe, reflecting overrepresentation in segregation. In January and June 2026, however, patients on the BH caseload reduced to 25 percent of the segregation population, reflecting under-representation of BH patients in segregation. Based on sample dates from June 2024 through June 2026, PDP successfully reduced the number of BH patients in segregation from 133 patients to 37 patients. PDP's success in meeting this requirement is a result of both the reduced disproportionality of BH patients and PDP's overall reduction in its use of segregation.

Regarding SMI patients, from June 2024 to June 2025, SMI patients represented six to seven percent of PDP's total population. In January and June 2026, more SMI patients were identified, increasing their representation to 12 percent of PDP's total population. SMI patients have never been overrepresented in segregation, ranging from three to nine percent of the segregation population. This represents no more than 15 individuals at any given time, though as discussed elsewhere, PDP should avoid the placement of patients with SMI and BH designations in segregation whenever possible. The Behavioral Health Director attributes both increases in the total SMI population as well as decreases in the total BH population to enhanced training and vigilance in the identification of BH and SMI criteria.

*Requirement 9: Discontinue the use of extended segregation for SMI patients.* PDP has partially met this requirement. Despite reductions in the use of restrictive housing and other important improvements, the isolative conditions in PDP's restricted housing units, as they are currently operating, are dangerous for SMI patients. Healthcare's creation of a specialized treatment plan for these patients is an important step but does not replace the level of formal and informal treatment that occurs on the TUs. PDP's delays in implementing alternative housing options for those who require a TU level of care but cannot be safely housed in a TU are unacceptable. Illustrated in more detail below, these delays combined with persisting deficiencies in restrictive housing determinations, continue to cause some patients to remain in segregation unnecessarily. If PDP implements the required alternative housing plan and continues to maintain sufficient TU housing, PDP will eliminate the need for extended segregation placements for these patients. Tables 15 and 16 below show average populations in each type of restrictive housing across each month of the current reporting period, along with average lengths of stay (LOS) by behavioral health designation.

**Table 15. Average Population and LOS in Administrative Segregation, by Behavioral Health Designation**
January – June 2026

| Month | Average Pop. | Percent by Designation | | | Average LOS | | |
|---|---|---|---|---|---|---|---|
| | | SMI | BH | Non-SMI/BH | SMI | BH | Non-SMI/BH* |
| January | 41 | 4% | 34% | 62% | 53 | 65 | 68 |
| February | 41 | 6% | 22% | 72% | 53 | 70 | 68 |
| March** | 42 | 6% | 27% | 67% | 73 | 63 | 70 |
| April | 42 | 11% | 29% | 60% | 69 | 79 | 64 |
| May | 43 | 8% | 31% | 61% | 72 | 63 | 71 |
| June | 45 | 6% | 27% | 67% | 70 | 66 | 77 |
| **Average** | **42** | **7%** | **28%** | **65%** | **65** | **68** | **69** |

*This column has been adjusted to avoid skewing by three long-term outlier placements of Class Members who are neither SMI nor BH patients, two of whom are no longer in PDP custody as of this filing. (The third Class Member should be evaluated for removal to the least restrictive setting based on legitimate security needs.) Including those Class Members, the Non-SMI/BH average LOS is 104 days and the overall average LOS is 90 days. **The March 20, 2026 Special Management Monitoring Report duplicated the March 13 report and was excluded to avoid double-counting.

**Table 16. Average Population and LOS in Punitive Segregation, by Behavioral Health Designation**
January – June 2026

| Month | Average Pop. | Percent by Designation | | | Average LOS | | |
|---|---|---|---|---|---|---|---|
| | | SMI | BH | Non-SMI/BH | SMI | BH | Non-SMI/BH |
| January | 129 | 8% | 26% | 67% | 16 | 28 | 24 |
| February | 120 | 14% | 32% | 54% | 18 | 20 | 23 |
| March* | 103 | 14% | 35% | 51% | 24 | 25 | 18 |
| April | 86 | 17% | 36% | 47% | 20 | 22 | 22 |
| May | 113 | 16% | 28% | 56% | 21 | 24 | 23 |
| June | 99 | 16% | 28% | 56% | 24 | 26 | 26 |
| **Average** | **108** | **14%** | **31%** | **56%** | **21** | **24** | **23** |

*The March 20, 2026 Special Management Monitoring Report duplicated the March 13 report and was excluded to avoid double-counting.

In administrative segregation, the average length of stay for SMI Class Members was approximately 65 days, for BH Class Members it was approximately 68 days, and for Class Members without either designation (excluding outliers) it was approximately 69 days. In punitive segregation, SMI Class Members averaged approximately 21 days, BH Class Members approximately 24 days, and Class Members without either designation approximately 23 days. Based on this data, SMI and BH patients have similar lengths of stay in segregation as non-SMI/BH Class Members. They are, however, more vulnerable to the dangers of isolation and are at greater risk than non-SMI/BH Class Members of severe mental health decline. PDP must improve efforts to remove these patients from the segregation environment as soon as possible.

During the January – June 2026 reporting period, 11 Class Members were held in the women's administrative segregation unit for an average stay of approximately 10 days. Although lengths of stay are shorter in the women's segregation unit, the majority of Class Members (6 of 11) in segregation were either designated SMI (three patients) or BH (three patients). These patients likely require alternative housing and individualized incentive-based treatment consistent with PDP's plans for its men's alternative housing. Because the population is small, they are unlikely to have their own alternative housing unit, but they must receive services, including treatment, programming, and step-down opportunities, that are equitable to Class Members in the men's units.

In this reporting period, a review of long-term SMI cases in segregation revealed recurring deficiencies in placement and retention decisions. In several cases, an initial placement in segregation appeared appropriate because of serious assaultive or disruptive conduct. In the months that followed, however, administrative reviews failed to explain why retention in segregation remained necessary, identify measurable behavioral objectives or interventions to

provide for removal to a less restrictive setting, establish objective release criteria, or document any mental health symptoms or psychiatric decompensation.

One SMI patient remained in a restricted housing unit for approximately nine months after a serious September 2025 assault. The subsequent disciplinary history consisted primarily of repeated court refusals, two identification-armband violations, and one refusal to submit to an unclothed body search. Administrative reviews continued the placement without explaining why these largely nonviolent events justified extended segregation or documenting efforts to incentivize cooperation or identify a meaningful pathway to a less restrictive setting.

Another patient remained in a restricted housing unit for approximately 90 days after an assault on another incarcerated person and inappropriate sexual contact with a staff member. No additional assaultive behavior was documented, yet retention decisions continued without objective release criteria, measurable goals, or a structured transition plan. The Class Member also refused more than 90 percent of offered out-of-cell opportunities, a common indicator of psychiatric distress, but the record contained no individualized engagement strategy or coordinated intervention to end the prolonged isolation.

A third SMI patient repeatedly cycled between restricted housing units and PHSW for at least three months because of suicidal behavior, flooding, threats, property destruction, and other conduct associated with psychiatric instability. Although the behavior presented legitimate safety concerns, the record did not reflect a coordinated Security and Behavioral Health strategy to address symptoms and reduce risk, an individualized treatment or behavior management plan, or a pathway to appropriate alternative housing. The patient remained in a restricted housing unit at the end of the reporting period.

A fourth SMI patient was placed in segregation after allegedly throwing feces or spoiled milk at other Class Members. The patient had reported being assaulted prior to the incident, but the record did not establish whether that allegation was investigated or whether alternatives were considered. The only subsequent disciplinary event was a court refusal. Repeated reviews nevertheless extended segregation to at least 50 days without explaining why it remained necessary or identifying objectives and interventions that would support removal to a less restrictive environment. The patient remained in a restricted housing unit at the end of the reporting period.

These cases demonstrate that durations of segregation terms for this population remain problematic. They also show that PDP has not consistently documented what, if anything, is being done to increase engagement, reduce risk, modify behavior, and prepare patients for movement. Too often, the administrative review process functions simply as recurring authorization for continued segregation rather than as a critical multidisciplinary assessment that determines whether a restricted housing unit remains the least restrictive option.

The Monitoring Team has consistently raised these issues with PDP executives over the course of Agreement monitoring but has been met largely with resistance and the recitation of general security concerns these patients pose. Indeed, these patients often create serious safety risks, and corrections executives must maintain a strong security orientation to ensure facility safety.

They must also ensure, however, that patients' rights are not violated and that patients are not isolated solely as the result of operational deficiencies and failures to supervise. PDP leadership requires a paradigm shift in the treatment and housing of patients whose symptoms pose safety and security risks but who remain vulnerable to the dangers of isolation.

PDP leadership is excited to introduce a new 32-bed housing unit based on the Scandinavian prison model, which emphasizes human dignity and prioritizes rehabilitation over punishment. The Scandinavian model also strictly prescribes treatment over isolation, even in the most complex mental health cases.[56] The Monitoring Team commends PDP for pursuing this initiative and encourages PDP to ensure that greater caution is taken to avoid segregation for SMI and BH patients whenever possible and to avoid extended segregation terms in every case. These changes would be consistent with the principles of the Scandinavian model and would likely serve even more Class Members than the new model unit PDP is developing.

***Status of Recommendations, Substantive Provision 6—Behavioral Health in Segregation, from the Monitor's Second Report:***

1. PDP should reexamine its behavioral health policies and practices for segregation clearances and rounding, with particular focus on thresholds for diversion or removal from segregation based on patient acuity.

   *Defendants have implemented this recommendation. The mitigation pilot is now active at all facilities and data reflects success in increasing diversion from segregation. The Behavioral Health Director has developed a tracking system and reports utilizing data to identify opportunities for training as well as ensuring that data is comprehensive.*

2. PDP should make additional progress in identifying security personnel to staff PC/PO treatment groups and fill TUs with only TU patients or others who can safely program in common spaces with them.

   *Defendants are implementing this recommendation. In this reporting period, specifically since the consolidation of restrictive housing at CFCF in March 2026, PDP has seen an increase in the number of PC/PO hours provided and the number of TU beds filled.*

**Substantive Provision 7—Law Library Access**

*PDP will continue to provide law library access for all incarcerated individuals. The Monitor and the parties will discuss access and scheduling matters, and the Monitor shall make any recommendations on these matters by August 1, 2022.*

**Compliance Rating: Partial Compliance**

---

[56] Parliamentary Ombud of Norway (Sivilombudet). (2025). Special Report to the Storting on Extensive Cell Confinement and De Facto Isolation in Norwegian Prisons (Document 4:1 (2024/25)). https://www.sivilombudet.no/wp-content/uploads/2025/06/Special-report-to-the-Storting-on-extensive-cell-confinement-and-de-facto-isolation-in-Norwegian-prisons-2025.pdf. See also https://www.scandinavianprisonproject.com.

To achieve substantial compliance with this provision, PDP was required to: (1) ensure that Class Members have access to housing unit law-libraries in addition to tablet materials; (2) ensure that Class Members in administrative and punitive segregation have access to legal research materials; (3) ensure that all Class Members have access to printed legal materials; and (4) finalize a policy governing those practices. Upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[57]

Paragraph 3(b) of the Sanctions Order states: "The City shall install law library terminals in each unit in each facility for Class Members to use during their recreation time. The law library terminals shall be fully installed within one year of the date of this Order."[58]

*Defendants have partially complied with the requirements of this paragraph.* In July 2025, PDP contracted with its tablet vendor for the installation of a legal research application on each tablet, and tablets were then distributed systemwide. Individually issued tablets provide for greater access to legal research than either kiosks or physical law libraries and, once fully implemented, will effectively exceed the requirements of this paragraph.

As part of PDP's implementation plan, PDP also committed to the following: (1) tablet libraries will not replace in-person access to facility law libraries; (2) Class Members will continue to have access to existing in-person law libraries during recreation periods; (3) tablets will be made available to Class Members in administrative segregation to ensure access to legal resources; (4) Class Members who are ineligible for tablets, such as those in punitive segregation, will receive access to housing unit law libraries; and (5) Class Members will have access to printed materials.

As previously reported, tablets have now been distributed systemwide.[59] PDP reports that the tablet support team is still in place in this reporting period. Law library sign-up sheets were available in most housing units, and Class Members generally understood the sign-up process. Class Members reported, however, that available slots were limited and that access at scheduled times was not ensured. At CFCF and PICC, not all segregation units have a dedicated law library tablet, and access is therefore dependent upon personnel to issue tablets upon request. Class Members in administrative and punitive segregation reported barriers to accessing tablets for legal materials, including lack of access to request forms. PDP has drafted a policy that provides for each of the enumerated requirements above. The Monitoring Team has reviewed and provided feedback on the draft policy, but PDP reports the policy was not finalized in this reporting period.

[57] Stipulated Order, *supra* note 2, at 1.
[58] Order, *supra* note 6, at 5.
[59] Monitor's Eighth Report, *supra* note 17, at 71.

**Substantive Provision 8—Discipline**

*Sub-provision 8.1—All future disciplinary proceedings at the PDP shall be held in accord with established due process rights, including the presence of the incarcerated person who is the subject of the proceeding. See Wolff v. McDonnell, 418 U.S. 539, 563–66 (1974); Kanu v. Lindsey, 739 F. App'x 111, 116 (3d Cir. 2018); Stevenson v. Carroll, 495 F.3d 62, 70–71 (3d Cir. 2007).*

**Compliance Rating: Partial Compliance**

As previously reported, PDP has updated its policies and training to ensure Class Members may attend disciplinary hearings, receive disciplinary documentation in advance of hearings, and present evidence in their defense.[60] Class Members may appeal findings or claims of due process violations, and PDP has been piloting a process to ensure clinical input, as necessary, at hearings involving Class Members with SMI. PDP also reports that hearing officers have received training in PDP's policy and due process rights for incarcerated persons during disciplinary hearings.

To achieve substantial compliance with this sub-provision, PDP must ensure the following: (1) qualified staff assistants and/or language interpreters must be provided for every Class Member, as necessary, to ensure that they understand and may effectively communicate during the proceedings; (2) assistants and/or interpreters must be provided upon request, or without request if the need is documented or obvious; (3) any support provided by assistants and/or interpreters must be clearly articulated in hearing documentation; and (4) hearing officers must consider and document clinical input at disciplinary hearings involving SMI patients.

In the previous reporting period, PDP intended to pilot its Staff Assistant process at RCF, strengthen internal monitoring of the Rules Violation Mental Health Review process, and expand the informal disciplinary process beyond PICC and RCF to CFCF and DC. PDP reports it was unable to pilot its Staff Assistant process at RCF due to its large use-of-force backlog but will make efforts to begin the pilot in the next reporting period. The informal disciplinary hearing pilot was reportedly expanded to CFCF and DC at the end of the reporting period. The Monitoring Team will analyze informal disciplinary hearings across all facilities in the next reporting period.

In 2024, PDP developed a series of forms to document compliance with due process requirements during disciplinary hearings pursuant to this sub-provision. These include a Staff Assistant Worksheet (PDP Form 363-A) to be completed by the assigned staff assistant before the disciplinary hearing. Staff assistants will be required to document any accommodations a Class Member needs to ensure effective communication and address any barriers, including language, cognitive, literacy, hearing, or other limitations. They will be required to document assistance provided and efforts to ensure the Class Member understood the allegations and the disciplinary process itself.

[60] *Id.* at 73.

PDP also developed a Hearing Officer Worksheet (PDP Form 363-B) to document when a staff assistant is assigned prior to a hearing, whether the staff assistant was requested and/or present during the hearing, how effective communication was established, that the hearing officer reviewed the Behavioral Health assessment for Class Members with SMI, and how that information was considered in reaching the final disciplinary disposition.

Finally, PDP developed a Rules Violation Mental Health Review (PDP Form 363-C) to be completed by Behavioral Health clinicians prior to disciplinary dispositions being issued in cases involving SMI Class Members. The purpose of the form is to provide the hearing officer with relevant clinical information regarding the Class Member's mental health status, communication needs, and any mitigating factors and recommendations for disciplinary sanctions before dispositions are issued.

To evaluate compliance, the Monitoring Team completed a review of 10 percent of disciplinary cases involving Class Members with SMI during January–June 2026. As anticipated, Staff Assistant and Hearing Officer Worksheets (PDP Forms 363-A and B) have not been implemented and were not present in cases reviewed. The disciplinary packets maintained in ATIMS also failed to include Rules Violation Mental Health Review forms (PDP Form 363-C), but some of the completed forms were separately collected by Behavioral Health and provided to the Monitoring Team for review.

In the previous reporting period, PDP acknowledged that the forms were not completed and maintained as required.[61] Dr. Belavich was eventually provided 14 forms for review for the six-month reporting period. In this reporting period, as detailed above under *Requirement 7* of Substantive Provision 6—Behavioral Health in Segregation, the Behavioral Health Director developed a tracking system to monitor completion and collection of PDP Form 363-C. She determined that for the first half of the reporting period, from January through March, 60 forms should have been completed, but only 45 were located. The Behavioral Health Director reports she will continue to monitor forms and review the process throughout the next reporting period.

The forms provided generally indicated that clinical personnel were completing and providing them to hearing officers in advance of disciplinary dispositions. Hearing officers typically documented receipt on the forms themselves, but hearing officer reports in ATIMS did not contain the forms or note review of clinical input or actions taken in response. Hearing officers report that, despite the lack of documentation, they generally accept clinical recommendations.

PDP's disciplinary processes cannot be evaluated from a single, integrated hearing record. The review in this reporting period remained unnecessarily complicated and required reconstruction of cases using documentation maintained by separate PDP bureaus. Until PDP Forms 363-A, B, and C, or adequate alternative documentation, are completed consistently in every relevant case, and all required information is documented as prescribed by PDP policy and incorporated into disciplinary records, PDP will remain in partial compliance with this sub-provision.

[61] *Ibid.*

Tables 17 and 18 below depict PDP's formal disciplinary hearing data over eight reporting periods and for each month of the current reporting period, January–June 2026. The tables include totals and percentages of not guilty findings, dismissals, and Class Members with SMI who were subject to discipline.

**Table 17: Average Monthly Formal Disciplinary Hearings and Outcomes**
July 2022 – June 2026

| Reporting Period | Avg. Monthly Hearings | Avg. Total and % Not Guilty | | Avg. Total and % Dismissed | | Avg. Total and % with SMI Designation | |
|---|---|---|---|---|---|---|---|
| July-Dec 2022 | 268 | 19 | 7% | 30 | 11% | 24 | 9% |
| Jan-June 2023 | 303 | 23 | 8% | 34 | 11% | 30 | 10% |
| July-Dec 2023 | 322 | 23 | 7% | 30 | 9% | 24 | 7% |
| Jan-June 2024 | 359 | 32 | 9% | 32 | 9% | 22 | 6% |
| July-Dec 2024 | 293 | 25 | 9% | 29 | 10% | 18 | 6% |
| Jan-June 2025 | 250 | 38 | 15% | 17 | 7% | 12 | 5% |
| July-Dec 2025 | 302 | 49 | 16% | 13 | 4% | 27 | 9% |
| Jan-June 2026 | 272 | 45 | 17% | 13 | 5% | 38 | 14% |
| **Average** | **296** | **32** | **11%** | **25** | **8%** | **24** | **8%** |

**Table 18: Formal Disciplinary Hearings and Outcomes**
January – June 2026

| Month | Total Hearings | Total and % Not Guilty | | Total and % Dismissed | | Total and % with SMI Designation | |
|---|---|---|---|---|---|---|---|
| January | 249 | 45 | 18% | 5 | 2% | 39 | 16% |
| February | 259 | 34 | 13% | 7 | 3% | 36 | 14% |
| March | 264 | 40 | 15% | 18 | 7% | 26 | 10% |
| April | 270 | 48 | 18% | 19 | 7% | 43 | 16% |
| May | 277 | 44 | 16% | 16 | 6% | 38 | 14% |
| June | 310 | 58 | 19% | 14 | 5% | 48 | 15% |
| **Average** | **272** | **45** | **17%** | **13** | **5%** | **38** | **14%** |

During the reporting period, PDP conducted an average of 272 formal disciplinary hearings each month. Approximately 17 percent resulted in findings of not guilty and an additional five percent were dismissed. Hearings involving Class Members with SMI represented approximately 14 percent of all formal disciplinary hearings in this reporting period, representing an increase from nine percent in the previous reporting period. The increase may be explained, in part, by the increase in SMI patients due to enhanced screening practices discussed above under Substantive Provision 6—Behavioral Health in Segregation. Percentages of not guilty findings and dismissed disciplinary charges were similar to previous reporting periods.

Table 19 below compares disciplinary outcomes for Class Members with SMI and non-SMI Class Members, including dismissals or findings of not guilty, the imposition of punitive segregation, and the average and median days of punitive segregation imposed.

**Table 19: Comparison of Formal Disciplinary Outcomes for SMI and Non-SMI Class Members**
January – June 2026

| Metric | Non-SMI | SMI | Difference |
|---|---|---|---|
| Average Monthly Hearings | 234 | 38 | — |
| Not Guilty or Dismissed | 20% | 24% | +4pp |
| Average Monthly Cases with Punitive Segregation | 169 | 25 | — |
| Percent with Punitive Segregation | 73% | 66% | -7pp |
| Average Days of Punitive Segregation Imposed | 23 | 22 | -4% |
| Median Days of Punitive Segregation Imposed | 20 | 15 | -25% |

Class Members with SMI experienced modestly more favorable disciplinary outcomes than non-SMI Class Members during the reporting period. Hearings involving Class Members with SMI resulted in findings of not guilty or dismissal slightly more frequently, punitive segregation was imposed somewhat less often, and both the average and median segregation sanctions were slightly shorter.[62] The Monitoring Team's case-level review was generally consistent with the data, though exact comparisons are limited because disciplinary incidents involve unique combinations of rules violations, and the disciplinary database does not capture prior disciplinary history or other aggravating or mitigating circumstances.

The Monitoring Team’s analysis of lengths of stay is limited to disciplinary hearings that resulted in the imposition of punitive segregation and does not include data regarding diversion or mitigation in cases involving Class Members with SMI. PDP has invested considerable effort to develop disciplinary policies, forms, and sound processes to satisfy the requirements of this sub-provision. Remaining work primarily requires additional staff training, and consistent implementation, documentation, and integration of these processes into routine practice. As with several other multidisciplinary reform initiatives over the course of Agreement implementation, successful implementation will require improved coordination among security, Behavioral Health, training, information technology, and Compliance Unit personnel.

[62] The Monitoring Team evaluated both the average and median disciplinary sanctions because the average may be influenced by a relatively small number of unusually long disciplinary sanctions, whereas the median reflects the midpoint of all sanctions imposed and provides a better indication of the disciplinary sanction typically received by a Class Member.

*Sub-provision 8.2—The PDP shall expunge the disciplinary records for all persons who were not present at their disciplinary hearings for the period March 2020 to the current date [April 12, 2022].*

**Compliance Rating: Substantial Compliance (achieved March 3, 2023, monitoring discontinued)**

*Sub-provision 8.3—[The PDP shall] release from segregation all incarcerated persons who were not present at their disciplinary hearings but who are [on April 12, 2022] still serving a disciplinary sentence, or who are in administrative segregation following a disciplinary sentence imposed without a hearing.*

**Compliance Rating: Substantial Compliance (achieved October 12, 2023, monitoring discontinued)**

*Sub-provision 8.4—[The PDP shall] cancel sanctions [imposed in hearings held between March 2020 and April 12, 2022] that require payments for damage to property or other restitution, and/or return payments made by persons who were required to pay for damage to property or other harms. Provided, however, the PDP may seek to conduct due process hearings for individuals covered by this provision who are still in segregation, but only: (a) if there is a small and discrete number of such cases, and (b) upon first providing counsel for Plaintiffs the names of those persons, the disciplinary charges, and information related to the length of placement in segregation. Nothing in this section prohibits persons subject to the disciplinary process set forth above from asserting individual legal challenges to the discipline. Defendants shall provide to counsel for Plaintiffs a list of individuals and disciplinary matters subject to this exception by April 15, 2022.*

**Compliance Rating: Substantial Compliance (achieved March 3, 2023, monitoring discontinued)**

**Substantive Provision 9—Tablets**

*Sub-provision 9.1—PDP has undertaken expansion efforts to increase the number of tablets available within the PDP facilities by adding eighty (80) additional tablets, according to operational capabilities and housing designs. The expansion of tablets is as follows: from four (4) to six (6) tablets on each housing unit at CFCF for a total of fifty-six (56) additional tablets; and, at RCF, expanding from six (6) to eight (8) tablets on the [1st floor] (4 housing units) and expanding from eight (8) to twelve (12) tablets on the [2nd and 3rd floors] of RCF (4 larger units) for a total of twenty-four (24) additional tablets at RCF. This expansion process will be completed by May 1, 2022.*[63]

**Compliance Rating: Substantial Compliance (achieved March 31, 2026, monitoring discontinued)**

---

[63] The Agreement, as written, requires the expansion of tablets at RCF *"from six (6) to eight (8) tablets on the 2nd and 3rd floor (4 housing units) and expanding from eight (8) to twelve (12) tablets on the 1st floor of RCF (4 larger units)."* In fact, RCF's larger units are located on the 2nd and 3rd floors and the smaller units are located on

*Sub-provision 9.2—The parties and the Monitor will discuss any future increases in the number of tablets based on all relevant factors, including operational feasibility and physical capacity. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to available tablets, and if so, the PDP shall implement agreed upon practices.*

**Compliance Rating: Substantial Compliance (achieved March 31, 2026, monitoring discontinued)**

**Substantive Provision 10—Phone Calls**

*Sub-provision 10.1—PDP agrees to maintain 15 minutes of free phone calls on a daily basis for the PDP population. Further, the Monitor and the parties shall discuss whether any policies and practices are necessary to address equitable and fair individual access to phones and, if so, the PDP shall implement agreed upon practices.*

*Sub-provision 10.2—Upon a return to normal operations, the PDP will revert to the provision of 10 minutes of free phone calls.*

**Compliance Rating: Substantial Compliance (achieved March 31, 2026, monitoring discontinued)**

**Substantive Provision 11—PICC Emergency Call Systems**

*The Monitor and the parties shall discuss the issues unique to PICC regarding emergency call systems and access to tablets and/or phones and determine whether any policies and practices are necessary to address these matters considering all relevant factors, including operational feasibility and physical capacity.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this substantive provision, PDP was required to initiate a process for the internal monitoring of security checks at PICC. Upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[64]

---

the 1st floor, suggesting that the numbers of tablets required were inadvertently reversed. To correct this small oversight in the Agreement's drafting, PDP was instead required to increase tablets from eight to twelve on the second and third floor housing units and from six to eight on the first-floor housing units.

[64] Stipulated Order, *supra* note 2, at 1.

**Substantive Provision 12—Locks**

*Sub-provision 12.1—PDP initiated the lock replacement program for PICC, which will be completed by June 30, 2022.*

> **Compliance Rating: Substantial Compliance (achieved March 29, 2024, monitoring discontinued)**

*Sub-provision 12.2—PDP initiated the lock replacement program for RCF, which will be completed by June 30, 2022.*

> **Compliance Rating: Substantial Compliance (achieved March 29, 2024, monitoring discontinued)**

*Sub-provision 12.3—For the repair of call button devices in existing facilities, PDP will conduct a one-time test of all call buttons and make any necessary repairs by August 1, 2022.*

> **Compliance Rating: Substantial Compliance (achieved March 3, 2023, monitoring discontinued)**

*Sub-provision 12.4—Any future complaints related to the operation of call buttons shall be addressed through work orders, which will be addressed and completed by Defendants in a timely manner.*

> **Compliance Rating: Substantial Compliance (achieved March 31, 2026, monitoring discontinued)**

*Sub-provision 12.5—PDP will provide refresher training before June 1, 2022, to correctional staff on PDP practices with respect to responses to the emergency call button system.*

> **Compliance Rating: Substantial Compliance (achieved March 3, 2023, monitoring discontinued)**

**Substantive Provision 13—Visiting**

*Sub-provision 13.1—As of March 7, 2022, PDP reinstituted in-person visitation for all vaccinated incarcerated persons with family members. PDP is in the process of increasing capacity for in-person visits by increasing the number of visits that can be accommodated during the current hourly schedule. At a minimum, current CFCF visiting shall be increased by 8 slots, PICC increased by 4 slots, and RCF increased by 2 slots.*

> **Compliance Rating: Substantial Compliance (achieved March 3, 2023, monitoring discontinued)**

*Sub-provision 13.2—Further, the parties and Monitor shall discuss all matters related to visitation, and the monitor shall issue recommendations on these issues.*

**Compliance Rating: Substantial Compliance (achieved March 31, 2026, monitoring discontinued)**

*Sub-provision 13.3—PDP reaffirms that it will acknowledge and record the vaccination status of those individuals who provide information that they were vaccinated outside of PDP.*

**Compliance Rating: Substantial Compliance (achieved October 12, 2023, monitoring discontinued)**

**Substantive Provision 14—Attorney Visiting**

*Sub-provision 14.1—PDP shall continue to follow a policy of providing attorneys with access to their clients within 45 minutes of their scheduled visit.*

**Compliance Rating: Substantial Compliance (achieved March 31, 2026, monitoring discontinued)**

*Sub-provision 14.2—For remote legal visits (in all formats), the PDP shall continue to ensure that the client is on the call/computer/video within 15 minutes of the scheduled start time of the appointment.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this sub-provision, PDP was required to demonstrate that Class Members were present for remote legal visits within 15 minutes of scheduled start times for 85 percent of scheduled visits. Upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[65]

*Sub-provision 14.3—For these time frames, PDP will not be responsible for delays caused by the incarcerated person or by exigent circumstances, but where a delay is caused by the incarcerated person or by exigent circumstances, PDP will inform the attorney of the delay.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this sub-provision, PDP was required to demonstrate that the mechanism to notify counsel of delays with remote legal visits was effective. Upon agreement of the parties, monitoring of this sub-provision was discontinued, effective April 30, 2026.[66]

---

[65] *Ibid.*
[66] *Ibid.*

**Substantive Provision 15—COVID-19 Testing**

*The PDP shall continue the present policy regarding testing of persons who are scheduled for court. Those who are housed on "green blocks" are either fully vaccinated or are not considered to have been exposed to COVID. They will be rapid-tested the night before court, and they will be brought to court if they receive negative test results. Those housed on a "yellow block" may have been exposed to a COVID-positive individual, and they will be rapid-tested twice, the night before court and the morning of court. They will be transported to court if both tests are negative. Those housed on a "red block" are COVID positive and will be isolated for ten days and not brought to court during that time frame. These protocols will be maintained subject to continued cooperation from criminal justice partners and on the advice of the Philadelphia Department of Public Health. Provided, however, that the Defendants shall not unilaterally change the protocols and they shall timely notify Plaintiffs' counsel of any change or proposed change in these protocols.*

**Compliance Rating: Substantial Compliance (achieved October 12, 2023, monitoring discontinued)**

**Substantive Provision 16—Quarantine**

*If there becomes a need in the future for use of quarantine housing areas at PDP, CDC guidelines shall continue to be followed for those who have been exposed to COVID-19. Under current policy, see Interim Guidance on Management for Correctional and Detention Centers, June 9, 2021, for persons who are vaccinated and are exposed to a person with COVID-19, but test negative, they shall not be quarantined; for those who have been exposed to COVID-19, but who have not been vaccinated, and test negative, they shall be quarantined for a period of ten days and released at that time if they test negative.*

**Compliance Rating: Substantial Compliance (achieved October 12, 2023, monitoring discontinued)**

**Substantive Provision 17—Sanitation**

*Sub-provision 17.1—Defendants agree to continue conducting the weekly General Inspection (GI) cleaning days with supplies provided by officers to clean cells and housing areas.*

**Compliance Rating: Partial Compliance**

To achieve substantial compliance with this sub-provision, PDP must at least: (1) ensure that daily inventories of cleaning supplies are completed and documented at least 90 percent of the time; (2) monitor the availability of cleaning supplies (systemwide and on each occupied housing unit); (3) standardize the distribution of cleaning supplies in each occupied housing unit; (4) maintain consistent GI cleaning schedules for each occupied housing unit at least 90 percent of the time; and (5) ensure GI cleaning includes cells and housing areas (i.e., showers, floors, and walls).

In this reporting period, the Monitoring Team assessed conditions during site visits and evaluated PDP's daily sanitation supply inventories, standardized sanitation supplies master inventory, housing unit records, Class Member grievances, and internal monthly sanitation audits, including structured Class Member interviews. PDP made measurable improvement in its sanitation systems and in conditions at several facilities, which were reflected at the April and July 2026 site visits. The restricted housing units at CFCF were the cleanest the Monitoring Team has observed since monitoring began, and several units at RCF and PICC were cleaner and better maintained than was observed during previous site visits. However, deficiencies persisted in inventory management, supervisory review, corrective action, and sanitation conditions at DC, PHSW, and MOD 3.

*Requirement 1: Ensure that daily inventories of cleaning supplies are completed and documented at least 90 percent of the time.* PDP has partially met this requirement. Cleaning supply inventories submitted for April 15, 2026 were unclear or missing documentation, which prevented a reliable systemwide assessment. PDP responded by providing additional guidance to personnel and making improvements to the inventory process. Inventories provided for June 1, 2026 were significantly improved. Inventories for both shifts were documented in 64 of 68 housing areas reviewed, reflecting a 94 percent completion rate. Measured by shifts, 131 of 136 total required inventories, or 96 percent, were completed. A one-day sample is insufficient to establish substantial compliance for the reporting period but demonstrates improvement and PDP’s receptivity to the Monitoring Team’s recommendations following the April review. In the next reporting period, the Monitoring Team will evaluate a larger sample and determine whether PDP has met the 90 percent compliance benchmark for this requirement.

*Requirement 2: Monitor the availability of cleaning supplies (systemwide and on each occupied housing unit).* PDP has partially met this requirement. The Monitoring Team’s June 2026 review also included comparisons between housing unit inventories and corresponding master supply inventories to determine the availability of cleaning supplies and whether documentation is consistent. Cleaning equipment, such as mops, brooms, and dustpans, was generally documented as available in unit inventories but did not always match the master inventory. CFCF, DC, and RCF forms generally documented the presence of cleaning solution containers but did not document whether they contained adequate amounts of cleaning solution. PICC's records more consistently documented both the presence and levels of cleaning products.

PDP has established an effective mechanism to monitor the availability of cleaning supplies. Housing unit personnel have been directed to complete daily inventories, facility master inventories identify the availability of supplies, and PDP conducts monthly sanitation audits. Concerns remain with the consistency of documentation and management of the process, however. Documents contain little evidence that supervisors routinely compare daily unit inventories with master supply inventories, address recurring shortages, ensure timely resupply, and track corrective action to completion. The continuing shortage of first-line supervisors discussed above under Substantive Provision 1—Staffing is likely the reason for deficient supervision of sanitation requirements. Inventories and sanitation audits must serve as proactive management tools or risk being reduced to documentation exercises.

*Requirement 3: Standardize the distribution of cleaning supplies in each occupied housing unit.* PDP has partially met this requirement. PDP maintains required sanitation lists but individual housing unit inventories regularly fail to include required sanitation supplies, which results in inconsistencies among units. PDP should ensure that each housing unit in each facility has a clear mandatory sanitation supply list and that adequate supplies are distributed to units to meet mandates.

*Requirement 4: Maintain consistent GI cleaning schedules for each occupied housing unit at least 90 percent of the time.* PDP has partially met this requirement. As previously reported, PDP generally maintains GI cleaning schedules that are being followed across housing units.[67] During site visits over two reporting periods, Class Members and unit personnel generally reported that GI cleaning days occur regularly and as scheduled. PDP has not provided documentation of consistent, on schedule GI cleaning, however, in housing areas that do not track out-of-cell time, such as PHSW and dormitories at DC. Deficiencies in supply availability and unit personnel and management oversight also continue to impact the quality of GI cleaning.

*Requirement 5: Ensure GI cleaning includes cells and housing areas (i.e., showers, floors, and walls).* PDP has partially met this requirement. Weekly GI cleaning provides opportunities for Class Members to clean their own cells. Additionally, unit workers are required to clean showers, floors, and walls daily. The quality of the cleaning has improved since PDP staffing vacancies have reduced and Class Member work crews are able to clean more consistently. However, the quality of GI cleaning varies among housing units and facilities likely due to inconsistent availability of cleaning supplies and cleanliness expectations, housing unit personnel supervision of unit work crews, and management supervision of unit personnel and GI cleaning inspections. PDP is encouraged to increase and standardize expectations to ensure showers and unit walls are scrubbed daily and that floors remain free of debris and are mopped routinely throughout the day systemwide. As PDP's workforce increases, PDP should maintain sufficient work crews and improve management supervision of GI cleaning.

The Monitoring Team continues to distinguish between sanitation deficiencies that may be corrected by improved sanitation practices from other physical plant conditions, such as deteriorated showers, damaged fixtures, and other conditions that cannot be corrected through GI cleaning alone. Sanitation in this reporting period continued to improve in several areas and facilities, as noted above, but conditions remain inconsistent systemwide.

PDP's internal sanitation audits continued to document recurring reports of rodents and insects in multiple DC housing areas. PDP maintains vector control contracts at all facilities, and counsel for Defendants is reportedly comparing vector control practices between contractors to determine how to introduce effective vector control measures in every facility.

Over seven reporting periods, SME McDonald has made specific recommendations to improve facility sanitation, some of which required additional personnel to implement but some of which could have been implemented despite staffing shortages.[68] Given PDP's improving staffing

[67] Monitor's Eighth Report, *supra* note 17, at 88.

[68] Monitor's Third Report, *Remick v. City of Philadelphia*, No. 2:20-cv-01959-BMS, Dkt. 193 at 63-64 (E.D. Pa. Oct. 12, 2023); Monitor's Fourth Report, *supra* note 50, at 64-65; Monitor's Fifth Report, *supra* note 53,

levels and population reductions, PDP is now well positioned to implement her recommendations and meet the requirements of this sub-provision. PDP should approach requirements under this sub-provision with the same commitment it showed as discussed under *Requirement 1* above. If that occurs, PDP should achieve substantial compliance with this sub-provision in the next reporting period.

*Sub-provision 17.2—Defendants agree to provide regular laundry services under current PDP policies.*

**Compliance Rating: Partial Compliance**

PDP will achieve substantial compliance with this sub-provision when it demonstrates that Class Members are offered access to laundry services or are issued clean clothing and bed linens each week at least 90 percent of the time.

In this reporting period, the Monitoring Team made observations and spoke with Class Members and personnel during site visits. They also reviewed PDP's monthly sanitation audits, Guardian RFID/ATIMS documentation, grievances, and distribution records. PDP maintained established laundry schedules, continued to document in Guardian RFID/ATIMS when clothing and bed linens were issued, and began daily reporting to PDP's compliance personnel. PDP also reported updating its laundry policy and continued training staff regarding documentation responsibilities.

The Monitoring Team was able to confirm reported progress, but current Guardian RFID/ ATIMS reports do not yet generate reliable data that demonstrate compliance. The Monitoring Team will continue to work with PDP's Data Analysis Unit in the next reporting period to determine whether reports can be refined and validated to measure compliance. In the meantime, monthly sanitation audits supplemented by grievances, interviews, observations, and spot-checks remain the most reliable measure of systemwide performance. Table 20 below represents the monthly average of Class Members reporting to PDP's internal auditors that they have received two sets of clean outerwear and clean bed linens weekly.

**Table 20. Average Percent of Class Members Reporting Weekly Receipt of Laundry Services, by Facility**
January–June 2026

| Facility | Clean Institutional Clothing | Clean Bed Linens |
|---|---|---|
| RCF | 81% | 75% |
| PICC | 75% | 68% |
| CFCF | 72% | 63% |
| DC | 72% | 63% |

at 79-81; Monitor's Sixth Report, *supra* note 15, at 88-90; Monitor's Seventh Report, *supra* note 24, at 98-101; Monitor's Eighth Report, *supra* note 17, at 91-93.

PDP's monthly sanitation audit results reflect Class Members reporting stable but as yet insufficient laundry services. RCF reported the strongest results, and several RCF housing units, including MOD 3, consistently reflected comparatively favorable reports regarding clothing and linens distribution. Results at all facilities, however, remained below the 90 percent benchmark, particularly for weekly bed linen exchange.

Electronic and paper grievances continued to allege deficiencies in clothing and linens distribution, including failures to provide two complete sets of outerwear, lack of appropriate sizing, and delayed laundering in units without exchange protocols. During the April 2026 site visits, staff reported that outerwear availability had generally improved, but that bed linen shortages persisted. For example, one laundry officer reported issuing only one clean sheet each week due to critical shortages, and a June grievance response separately acknowledged shortages of laundry items. PDP reports that additional bed linens have since been ordered.

PDP continued efforts to strengthen laundry capacity and inventory management. PDP initiated additional institutional-clothing procurement through the Pennsylvania Department of Corrections and purchased two industrial-grade commercial washers and dryers reportedly scheduled for installation in the next reporting period. These measures, together with the updated policy, established schedules, electronic documentation, and internal oversight, will improve performance if fully implemented and regularly monitored internally.

***Status of Recommendations, Substantive Provision 17—Sanitation, from the Monitor's Third Report:***

1. PDP should modify schedules to increase the frequency of deep-cleaning rounds.

   *PDP has partially implemented this recommendation. PDP previously completed a one-time deep cleaning of occupied facilities.*[69] *During this reporting period, PDP trained approximately 15 Class Members in specialized industrial cleaning techniques and added Class Member work crews at DC. These efforts are promising but do not yet constitute a recurring, supervised, systemwide deep-cleaning program.*

2. PDP should provide Class Members with secure, rodent-proof containers for their belongings.

   *PDP has implemented this recommendation.*

3. PDP should expedite procurement of sufficient undergarments to meet the needs of all Class Members.

   *PDP has not implemented this recommendation. In this reporting period, counsel for Defendants opined that PDP is not required to provide undergarments under Pennsylvania state law. Therefore, the Commissioner has rescinded PDP's earlier commitment to provide underwear to all Class Members and reverted to PDP's previous practice of only providing*

---

[69] Monitor's Seventh Report, *supra* note 24, at 94.

*undergarments for purchase or as part of basic needs kits, reportedly available upon request to Class Members who cannot purchase them.*

*PDP's decision not to provide underwear to every Class Member at intake is disappointing. It is inconsistent with modern correctional practice, the Commissioner's stated vision for PDP reform, and principles of basic human dignity. The Monitoring Team recommends that the Commissioner reconsider this decision and begin to provide underwear to all Class Members during intake and as part of regular laundry distribution.*

4. PDP jail managers should conduct thorough assessments in every facility to identify deficiencies in general sanitation and vector control, clothing and linen exchange, and access to hygiene supplies.

   *PDP has implemented this recommendation through monthly sanitation audits and facility reviews, but corrective action remains insufficient, as discussed above.*

5. PDP should revise its post orders to account for operational differences among facilities and the needs of Class Members who are in the women's units, youth, or navigating mental illness or other disabilities.

   *PDP has not implemented this recommendation. The delay remains connected to inadequate compliance and policy staffing.*

6. PDP executives and facility leadership should increase guidance for unit personnel regarding sanitation, vector control, laundry, and distribution of cleaning and hygiene supplies, supported by effective monitoring and audits.

   *PDP has implemented this recommendation, but with continuing operational and corrective action deficiencies discussed above.*

7. The City should authorize emergency procurement of outside contractors to deep clean housing units on a regular schedule, including showers and biohazardous cells before re-occupancy.

   *PDP has not implemented this recommendation. As noted above, PDP previously contracted for a one-time deep cleaning of CFCF, RCF, PICC, DC, and MOD 3. PDP has also been attempting to develop Class Member cleaning crews through skills training and reportedly assembled a Class Member work crew at DC. Conditions at some facilities had improved during site visits, but problems persisted in older facilities and specialized housing. PDP has not yet established a long-term strategy for recurring deep cleaning.*

8. The City should authorize PDP to implement an effective vector-control program at DC/PHSW and MOD 3.

   *PDP has partially implemented this recommendation. PDP maintains vector-control contracts at all facilities. PICC has demonstrated sustained improvement, while vector*

*control deficiencies persist at DC and PHSW. During this reporting period, counsel for Defendants reportedly compared the U.S. Facilities and PDP maintenance vector-control contracts. The outcome of the review was not shared in this reporting period and there is no evidence to suggest that DC's recurring deficiencies have been resolved.*

9. PDP should prioritize capital projects that address health and safety risks in populated housing units.

   *Implementation of this recommendation is ongoing, as discussed under paragraph 4(b) of the Sanctions Order below.*

Paragraph 4(b) of the Sanctions Order states: "The City shall complete an analysis of the state of the physical plant and long-term capital needs at each PDP facility housing Class Members, identifying deficits that impact the conditions of confinement. This analysis should also provide the Commissioner of Prisons with detailed recommendations for a target number of employees needed to maintain each facility. The City shall complete the analysis and report its findings to the Monitor within 270 days of the date of this Order."[70] The analysis was due on May 13, 2025.

*Defendants have partially complied with the requirements of this paragraph.* PDP's contractor CGL provided a preliminary analysis of maintenance staffing and a draft physical plan report, but the reports were not finalized in this reporting period. PDP requested that CGL incorporate current City capital projects and sought authority to expand the assessment to include approximately 300,000 additional square feet of PDP buildings, other maintenance responsibilities, and a Maintenance Recovery Plan that would prioritize future work.

The DC roof project was completed, other capital projects continued, and PDP and the City Capital Projects Office conducted regular project meetings. The Monitoring Team has not received a final completion date for the expanded CGL work or a completed long-term capital projects plan.

10. PDP should expand existing contracts to address maintenance vacancies that severely affect conditions of confinement at ASD-CU and MOD 3, DC, and PICC.

    *This recommendation is addressed under paragraph 4(a) of the Sanctions Order below.*

Paragraph 4(a) of the Sanctions Order states: "The City shall authorize PDP to expand services contractually provided by U.S. Facilities, Inc., and fund such expanded scope of services until necessary maintenance is performed at all PDP facilities. To the extent any maintenance needs are not included in the scope of work of the request for proposals (RFP) that resulted in the contract, the City shall initiate bargaining on the subject or issue an RFP in accordance with the applicable collective bargaining agreements."[71]

[70] Order, *supra* note 6, at 6.
[71] *Id.* at 5.

*Defendants have partially complied with the requirements of this paragraph.* In February 2025, PDP indicated that the contract with U.S. Facilities would not be expanded to include DC/PHSW and MOD 3 and instead indicated that City maintenance personnel would retain responsibility for maintenance at those facilities. At the time, City maintenance staffing was insufficient to complete the extensive repairs that had accumulated in PDP's oldest populated housing units at DC/PHSW and MOD 3 since the beginning of the COVID-19 pandemic. Severe disrepair in aged buildings was exacerbated by high City maintenance vacancies, lack of supervision at every level in PDP's chain of command, and significant physical plant neglect of both populated and unpopulated housing units.[72]

PDP did, however, expand the U.S. Facilities contract within facilities it already serviced (RCF, CFCF, and PICC) for approximately $3,000,000 over two fiscal years. This limited expansion was not consistent with the spirit of this paragraph as the Monitor believes was understood by the Parties when the Sanctions Order was entered. However, PICC, CFCF, and RCF have also required extensive maintenance and repairs, and Class Members have likely benefitted from U.S. Facilities' expansion in those facilities.

In May 2025, PDP appointed a Maintenance Director over DC and MOD 3, increased supervision by PDP executives, and initiated several projects, as previously reported, to improve maintenance operations at DC/PHSW and MOD 3.[73] In March 2026, the Monitoring Team approved the following alternative implementation plan for this paragraph:

- PDP agreed to create Class Member work crews to support City maintenance personnel.
- City maintenance was reportedly empowered to contract with outside agencies to service DC/PHSW and MOD 3. PDP reportedly retained two maintenance vendors, one for electrician services and a second for general maintenance services, and was finalizing employee background checks as of the filing of the Monitor's Eighth Report in March 2026.
- PDP further reported that the City's Capital Projects Office had three projects at DC/PHSW and MOD 3 that were underway or out for bid as of the Monitor's Eighth Report, and additional projects were being initiated and closely monitored by PDP executives.

Then, during April 2026 site visits, PDP informed the Monitoring Team that the general maintenance vendor it planned to engage was unable to clear a security background check and would not be retained. PDP further indicated it would not seek a replacement vendor to support the work of City maintenance. PDP then asserted that City maintenance is performing all necessary work at DC/PHSW and MOD 3 and does not require additional support from a maintenance vendor as this paragraph contemplates.

As of the end of this reporting period, PDP had filled the majority of its City maintenance vacancies at DC/PHSW and MOD 3. PDP also reported that it has increased oversight of

[72] Monitor's Seventh Report, *supra* note 24, at 101.
[73] *Ibid.*

maintenance projects with monthly meetings regarding outstanding maintenance issues and capital projects. Facility wardens also reportedly began noting the completion of critical work orders in their weekly reports to PDP executives.

In an effort to support PDP's contention that requirements prescribed in this paragraph were met or are no longer necessary, PDP provided data from its maintenance work order system for all facilities for the period January–June 2026. The work orders provided contained coding issues, failed entries, and other documentation problems that rendered it impossible to measure whether necessary maintenance work orders were being entered or completed or how long repairs were taking. The Monitoring Team is therefore unable to support PDP's assertion that all necessary maintenance is being performed and that additional support pursuant to this paragraph is unnecessary.

In August 2026, the Monitoring Team initiated a comprehensive review and audit of PDP's work order system to assess compliance with the requirements of this paragraph and offer technical assistance to improve maintenance operations. In advance of the Monitoring Team's on-site audit, PDP initiated an internal audit of maintenance needs at every populated housing unit at DC/PHSW and MOD 3. The Commissioner stated that if PDP determined support was needed, PDP would seek a second general maintenance vendor pursuant to the approved alternative implementation plan. PDP's internal audit was a positive step.

On September 14, 2026, while on site for the Monitoring Team's audit, SME Jay Virbel learned that PDP's internal maintenance audit identified nearly 600 repairs and maintenance issues that lacked corresponding work orders. These findings reflect a profound systemic breakdown that suggests security personnel are not reporting maintenance issues and that City maintenance personnel are not monitoring the state of the physical plant. They also confirm that PDP lacks an adequate strategy for identifying and resolving routine and preventive maintenance deficiencies at DC/PHSW and MOD 3. Finally, PDP's findings are consistent with Monitor's reports over eight reporting periods that identify inadequate living conditions marked by significant neglect and disrepair in populated housing units.

On September 15, 2026, SME Virbel reviewed maintenance operations in the facilities serviced by U.S. Facilities and determined preliminarily that maintenance issues were being identified and work orders completed consistent with expectations. These findings are also consistent with the Monitoring Team's observations during previous site visits.

Defendants' failure to comply with this Court's order issued more than two years ago following a finding of contempt surely compounded the maintenance backlog. PDP is capable of maintenance improvements and renovations to acceptable standards, as evidenced by its employee wellness center, opened in 2025, its work release dormitory, completed in 2026, and its Scandinavian model housing unit, in progress. The Monitoring Team has raised, but PDP rejected, concerns about misaligned priorities in diverting maintenance resources to some of these projects while Class Members were forced to live, and PDP staff were forced to work, in unacceptable conditions.

Based on PDP's audit and the Monitoring Team's preliminary findings, the City maintenance team is clearly ill-equipped to manage needed repairs without significant assistance from U.S. Facilities or other vendors. Defendants grossly underestimated the gravity of the problem and overestimated PDP's capacity to fix it. The City has failed to allocate sufficient maintenance positions to DC/PHSW and MOD 3, and those responsible for overseeing PDP's maintenance operations do not appear to have adequate training in correctional maintenance management.

Ultimately, CGL's final staffing analysis and PDP's implementation of any resulting recommendations, as well as improvements to PDP's work order system, should improve maintenance operations and permit meaningful evaluation thereof. However, compliance with this paragraph has been unnecessarily delayed without adequate justification. PDP now faces the additional hurdle of managing a severe maintenance backlog, in addition to an existing workorder backlog, and Defendants have yet to present a realistic plan to address it.

**Substantive Provision 18—Use-of-Force**

*PDP policies and training address correctional staff's use of force, use of pepper spray, de-escalation measures, and an incarcerated person's non-compliance with verbal commands. The parties agree that correctional officers should follow de-escalation measures provided in PDP policies. The Monitor shall review these issues and make recommendations based on a review of all relevant material and factors. In the interim, PDP shall advise and re-train correctional officers on the proper application of the Use of Force and Restraints Policy, 3.A.8, and with respect to de-escalation requirements in accordance with the PDP policy which in part states: "Force is only used when necessary and only to the degree required to control the inmate(s) or restore order… The use of pepper spray is justifiable when the Officer's presence and verbal command options have been exhausted and the inmate remains non-compliant or the inmate's level of resistance has escalated… Staff will not use pepper spray as a means of punishment, personal abuse, or harassment."*

**Compliance Rating: Partial Compliance**

In this reporting period, PDP continued to work with CGL and the Monitoring Team to revise its use-of-force policies. PDP's executive leadership team meets regularly with CGL whose work is closely monitored by SME McDonald, and the Monitor receives regular progress updates and reviews any memoranda and internal reports produced as part of CGL's engagement. Despite resistance to the Monitoring Team's use-of-force recommendations in early reporting periods, PDP's executive leadership team is proving excellent partners in this reform effort, contributing meaningfully and taking ownership while remaining receptive to observations and feedback. CGL's work on PDP's use-of-force reform team has thus far proven highly effective. CGL team members have significant expertise and their approach ensures that momentum is sustained.

CGL has completed its initial use-of-force analyses, and its findings largely mirror the findings and recommendations made by the Monitoring Team over each reporting period. Findings include insufficient de-escalation strategies, investigative delays, inconsistent supervisory review, insufficient training, fragmented accountability processes, and inadequate organizational

learning. CGL recommended dedicated force investigators, standardized investigative practices, clearer referral criteria, improved supervisory training, better integration between facility review and Internal Affairs, enhanced use of body-worn cameras (BWCs), and stronger executive oversight. CGL has also incorporated all policy recommendations previously made by the Monitoring Team into its workplan.

PDP implemented BWCs in this reporting period, for which it should be commended. CGL emphasizes, and the Monitoring Team agrees, that BWCs should be viewed as substantially more than an evidentiary tool. Properly used, BWC footage allows supervisors to evaluate communication, patience, supervisory intervention, command presence, de-escalation, disengagement, and decision-making before force occurs. Those capabilities will significantly strengthen organizational learning if consistently incorporated into supervisory review.

PDP's CCTV, video storage, and incident tracking initiatives remain underway. The CCTV upgrade is a three-year rollout and implementation is not anticipated in the next reporting period. However, access to available video has become easier as upgraded components have come online. Force incidents are now more clearly tracked in ATIMS, and PDP can ultimately transition video storage and related records to Evidence.com.

Also in this reporting period, executive leadership revised expectations for use-of-force de-escalation, reporting, intervention, and accountability. The Monitoring Team also observed improvement in executive-level force reviews at some facilities, particularly RCF and PICC, where wardens increasingly evaluated not only whether force technically complied with policy, but also the circumstances that contributed to force incidents and whether force could have been prevented.

As PDP’s new use-of-force transformation remains largely in the planning phase, PDP’s efforts in this reporting period represent additional progress in rectifying a long-standing culture of complacency toward excessive and unnecessary force. PDP has yet to develop a properly functioning review and accountability system that is consistent systemwide and free from chronic delays and failures to investigate. An effective accountability system must identify organizational risk early enough to prevent the next unnecessary use of force, and lasting cultural change depends on consistent expectations, timely coaching, corrective action, and accountability.

PDP’s accountability systems remain highly constrained by an ongoing inability to complete investigations and administrative reviews within reasonable timeframes. In this reporting period, SME McDonald selected incidents that occurred between December 2025 and March 2026. This date range was selected to ensure that PDP had 90 to 180 days to complete supervisory review, executive-level review, and associated investigations before her review commenced in June 2026. PDP produced documentation for only 25 of 75 total requested incidents, and packets remained incomplete, lacked final executive review, or were missing significant investigative documentation. Although many of the December 2025 incidents were completed through the review process, fewer of the January, February, and March incidents had reached completion. Delays, therefore, remain systemic rather than isolated.

Several warden-level reviews, particularly at RCF and PICC, demonstrated substantially stronger analysis than in previous reporting periods. Rather than merely determining whether force complied with policy, wardens increasingly evaluated command and control, housing-unit management, communication, tactical decision-making, supervisory performance, opportunities for disengagement, missed de-escalation opportunities, and whether force itself could have been prevented. This represents an important evolution in PDP's accountability process.

Modern correctional agencies evaluate not only whether force was legally or technically justified, but also whether better supervision, communication, planning, tactical patience, or earlier intervention might have prevented force altogether. Reviews identifying those broader issues provide substantially greater organizational value than reviews limited only to policy compliance. Unfortunately, in numerous cases, lieutenant, captain, and deputy warden reviews identified few meaningful deficiencies, while subsequent warden-level review recognized significant operational concerns requiring corrective action or additional training. Facility executive review should confirm and refine thoughtful supervisory analysis, not become the first meaningful evaluation of an incident.

The Monitoring Team did not observe comparable improvement at the remaining facilities. While individual reviews varied, warden-level reviews at CFCF and DC generally remained more conclusory, identified fewer operational lessons, and less frequently recognized tactical or supervisory deficiencies than those reviewed at RCF and PICC. It is important to note that DC's review and analysis of incidents was limited without access to video, which is being partially addressed with BWC implementation. Accordingly, although facility executive leadership has demonstrated progress, expectations for critical analysis have not yet been adopted at all facilities or supervisory levels. Though not consistent systemwide, improved oversight seemed to have resulted in fewer incidents in which staff resorted to OC spray on Class Members solely for refusing a direct order, which management has often failed to identify as inappropriate force.

The PDP Use of Force Review Team continues to consist of two lieutenants assigned within the Office of Professional Compliance (OPC) who are responsible for the review of video immediately following use-of-force incidents. PDP's staffing analysis anticipates additional Use of Force Review Team personnel assigned to each facility. Those positions are not yet in place, but the Monitoring Team will evaluate implementation and any resulting change in front-end review capacity in the next reporting period.

In addition to evaluating facility-level accountability systems, SME McDonald requested all OPC employee personnel investigations involving allegations of unnecessary or excessive force that were initiated in this reporting period. For each investigation, the Monitoring Team requested the entire OPC investigative file including the associated use-of-force investigation, hearing board findings, Commissioner decisions, District Attorney referral status, and final disciplinary dispositions. PDP identified eight matters that occurred in this reporting period but only produced files for three of the eight investigations. The remaining matters were pending investigation, awaiting hearing committee or Commissioner action or District Attorney disposition, or the requested investigative materials had not yet been produced. The oldest incidents dated back to July 2025. As a result, the Monitoring Team was unable to complete a

comprehensive assessment of employee discipline or final accountability outcomes for incidents that occurred in this reporting period.

The three investigations reviewed reflect appropriate referrals of potentially unnecessary or excessive force allegations to OPC and, where necessary, the Philadelphia District Attorney's Office, although referral practices remain inconsistent. OPC investigations reviewed were substantially more thorough than routine facility investigations. OPC investigators reviewed fixed and BWC footage, interviewed employees, compared statements against video, applied PDP policies, and explained their findings. Facility reviews generally reflected less factual development and independent analysis.

In one matter that was appropriately referred for investigation by DC on the day it occurred, OPC sustained the finding of unnecessary force after video and interview evidence showed that an employee violated PDP policy, escalated a verbal encounter, and continued using force after gaining compliance. Following the completion of another OPC investigation involving unnecessary force, the disciplinary hearing board recommended only a three-day suspension coupled with remedial training. The Commissioner subsequently rejected that recommendation and directed termination.

A third incident that occurred on August 2, 2025 was not referred to OPC until more than six months later, on February 13, 2026, despite two Class Member grievances alleging staff misconduct that were submitted shortly after the incident. None of the supervisory review, the grievance process, nor OPC's front-end video review identified the need for earlier referral. PDP and CGL are ensuring that timely investigation of force-related grievances is included in PDP’s revised force policy.

The Monitoring Team continues to recommend that every credible allegation of unnecessary or excessive force receive prompt Internal Affairs screening, whether the allegation originates from Class Member grievances, supervisory or executive-level review, BWC footage, medical findings, Class Member or personnel witness statements, or any other credible source. The Monitoring Team also continues to recommend executive-level training to assist managers in completing thorough, unapologetic reviews of each force incident and recommending appropriate corrective action considering the event’s overall context and seriousness of employee conduct.

The review in this reporting period also underscores the related concern that PDP has not established a structured process for evaluating whether employees accused of serious force misconduct should continue working in direct contact with Class Members while administrative review, Internal Affairs investigations, disciplinary proceedings, criminal conduct reviews, or District Attorney referrals remain pending. Although PDP has the authority to impose immediate suspension in appropriate circumstances, employees frequently return to regular duty once an initial 90-day period expires even as serious misconduct allegations are pending Internal Affairs investigations, disciplinary proceedings, or District Attorney referral outcomes. PDP does not have a documented interim risk assessment process through which PDP executives evaluate the seriousness of an allegation or incident, available video evidence, prior disciplinary history,

potential criminal exposure, and reasonable placement alternatives before returning involved personnel to unrestricted contact with Class Members.

The Monitoring Team is not recommending automatic removal from duty whenever allegations arise. Rather, PDP should adopt a documented, individualized risk assessment process that considers temporary reassignment, modified duties, or other reasonable safeguards while serious allegations remain pending. PDP is making strides in reforming its use-of-force policies and procedures, which is a positive step. Success will ultimately require reduced reliance on force whenever time and circumstances permit, reductions in preventable, excessive, and unnecessary uses of force, and improved report writing, investigative quality, timeliness, supervisory review, and employee accountability.

***Additional requirements pursuant to the Sanctions Order:***

Paragraph 5(a) of the Sanctions Order requires PDP to confer with the Philadelphia Police Department to implement a system to remotely report criminal offenses that occur at PDP facilities, including video capability that would allow police personnel to interview complainants and witnesses remotely. PDP was required to report the outcome of these discussions by October 15, 2024.

Paragraph 5(b) of the Sanctions Order states: "The City shall fund PDP's K-9 detection program. Funding for the program shall be at a level sufficient to conduct routine and consistent sweeps for contraband at each institution and to ensure adequate facilities to house K-9s and all necessary equipment."[74]

*As previously reported, Defendants have complied with the requirements of both of these paragraphs.*[75]

Paragraph 5(c) of the Sanctions Order states: "The City shall complete the purchase of technology that allows for prompt and efficient scanning, without violating any attorney-client privilege, of incoming legal mail for contraband."[76] The technology was due to be purchased by October 15, 2024.

*Defendants have partially complied with the requirements of this paragraph.* As previously reported, PDP purchased and began utilizing the mail scanning equipment in November 2024.[77] PDP finalized a draft policy in July 2025 and shared a revised draft with Plaintiffs in February 2026.[78] PDP reportedly intends to implement the finalized policy in the next reporting period.

---

[74] Order, *supra* note 6, at 6.
[75] Monitor's Seventh Report, *supra* note 24, at 107.
[76] Order, *supra* note 6, at 6.
[77] Monitor's Sixth Report, *supra* note 15, at 94.
[78] Given the number of policies and concurrent reforms PDP is implementing, delays in drafting policies are anticipated. It is poor practice for PDP to operationalize the mail scanning equipment more than a year before a corresponding policy is implemented. Appropriate timing of reforms and related policies, and the timely drafting of new or revised policies, are all tasks that the Compliance Unit could facilitate.